**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

RAYMING CHANG                                                           )
532 20th Street, N.W., Apt. #706                                        )
Washington, DC 20006,                                                   )
                                                                        )
AMY CHASTAIN                                                            )
1400 East-West Highway, Apt. #1203                                     )
Silver Spring, MD 20910,                                                )
                                                                        )
YOUNG CHOI                                                              )
510 21st Street, N.W., Apt. #710                                       )
Washington, DC 20006,                                                   )
                                                                        )
MEAGHAN ENRIGHT                                                         )
Guthridge Hall                                                          )
2115 F Street, N.W., Apt. # 112                                        )    CASE NUMBER 1:02CV02010
Washington, DC 20052,                                                   )    JUDGE:  Emmet G. Sullivan
                                                                        )    DECK TYPE:  General Civil
LEANNE LEE                                                              )
600 20th Street, N.W., Apt. #212                                       )
Washington, DC 20052,                                                   )
                                                                        )
ELIZABETH L. YOUNG                                                      )
238 N. Payne Street                                                     )
Alexandria, Virginia 22314,                                             )
                                                                        )
CHRISTOPHER ZARCONI                                                     )
950 25th Street, N.W., Apt. #117S                                      )
Washington, DC 20037,                                                   )
                                                                        )
                              Plaintiffs,                               )
              v.                                                        )
                                                                        )
THE UNITED STATES OF AMERICA                                           )
Office of the Attorney General                                          )
950 Pennsylvania Avenue, N.W.                                           )
Washington, DC 20530-0001,                                              )
                                                                        )
THE DISTRICT OF COLUMBIA                                                )
John A. Wilson Building, 6th floor                                     )
1350 Pennsylvania Avenue, N.W.                                          )
Washington, DC 20004,                                                   )
                                                                        )

THE NATIONAL PARK SERVICE            )
1849 C Street, N.W.                  )
Washington, DC 20240,               )
                                     )
THE METROPOLITAN POLICE              )
DEPARTMENT OF THE DISTRICT           )
OF COLUMBIA                          )
300 Indiana Avenue, N.W.             )
Washington, DC 20001,               )
                                     )
JOHN or JANE DOES 1-10,              )
                                     )
JOHN or JANE DOES 11-20,             )
                                     )
          Defendants.            )
_____)

### FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs RayMing Chang, Amy Chastain, Young Choi, Meaghan Enright, Leanne Lee, Elizabeth L. Young, and Christopher Zarconi (hereinafter "the Plaintiffs") bring this Complaint and allege as follows:

### NATURE OF THE ACTION

1.      This is an action for injunctive and declaratory relief to protect the Plaintiffs and the public from a policy or practice of "trap-and-arrest" in which police surround persons, including persons engaged in no illegal conduct, who receive no order to disperse and who, even if such an order to disperse is given, are deprived of any ability to leave the area.

2.      This action further seeks injunctive and declaratory relief to protect the Plaintiffs and the public from a policy of arresting journalists, bystanders, and observers who are caught within trap-and-arrest zones during demonstrations.

3.     This action further seeks injunctive and declaratory relief to protect the Plaintiffs and the public from the use of excessive force in preventing individuals from leaving trap-and-arrest zones.

4.     This action further seeks injunctive and declaratory relief to protect the Plaintiffs and the public from a practice or policy of keeping arrested individuals in restraints or handcuffs for excessive periods, of up to 24 hours or more, including handcuffing individuals in a fetal position by handcuffing one wrist to the person's opposing ankle (*e.g.*, handcuffing a person's right wrist to that person's left ankle).

5.     This action further seeks injunctive and declaratory relief to protect the Plaintiffs and the public from the use of abusive confinement and threats to secure no contest pleas.

6.     This action further seeks injunctive and declaratory relief to protect the Plaintiffs and the public from the practice of denying arrestees their right to access to counsel and other *Miranda* rights.

7.     This action further seeks damages for injuries sustained by the Plaintiffs which were caused by the Defendants' unlawful actions.

8.     This action further seeks damages for injuries sustained by the Plaintiffs which were caused by the Defendants' conspiracy to deprive the Plaintiffs of their Constitutional rights.

9.     This action further seeks damages for injuries sustained by the Plaintiffs which were caused by certain Defendants' negligence in failing to prevent the other Defendants' conspiracy to deprive the Plaintiffs of their Constitutional rights.

10.     These challenged policies and practices deprived the Plaintiffs of their rights under the First Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, and the Fourteenth Amendment of the United States Constitution, and violated laws

governing the proper conditions for arrest, use of restraints, and processing of individuals in custody.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (1996).

12.     Venue is proper pursuant to both 28 U.S.C. § 1391 (b) & (e) (1996).

13.     This Court has the authority to render injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 (1996).

## THE PARTIES

### *Definitions*

14.     General John G. Pershing Park ("Pershing Park") is located between 14th and 15th Streets, N.W., on Pennsylvania Avenue, N.W., Washington, D.C.  "Freedom Plaza" is located between 13th and 14th Streets, N.W., on Pennsylvania Avenue, N.W., Washington, D.C.  Both are four to five blocks from the main buildings of the World Bank and the International Monetary Fund ("IMF"), and on the other side of the White House-Treasury Department complex.

15.     *The Hatchet* is an independent newspaper servicing the George Washington University and the surrounding community.  *The Hatchet* has been in existence for 99 years, has a circulation of 11,500, is distributed at over 70 locations, and is published twice a week.  *The Hatchet* has received numerous awards for journalism and photojournalism, including awards from the Society of Professional Journalists.

16.     The Metropolitan Police Academy (the "Academy") is a facility of the Metropolitan Police Department ("MPD") of the District of Columbia, located at 4665 Blue Plains Drive, S.W., Washington, D.C.

17.     Judiciary Square is a District of Columbia government facility located at or near 409 F. Street, N.W., Washington, D.C.

18.     The National Lawyers Guild ("NGL") is a national organization founded in 1937 which works for legal reform and social justice.

*Plaintiffs*

19.     The Plaintiffs are current students enrolled at the George Washington University in Washington, D.C.  Five of the Plaintiffs are residents of the District of Columbia, one is a resident of the Commonwealth of Virginia, and one is a resident of Maryland.

20.     RayMing Chang is a first-year law student at the George Washington University and a resident of the District of Columbia.  Mr. Chang was arrested on the morning of September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza.  Mr. Chang was not a protester but was in that area in his capacity as a legal observer for the NLG.  Mr. Chang was wearing a badge which identified him as an NLG member.  Mr. Chang was held for approximately 18 hours by the MPD, most of which was on a bus at Judiciary Square in Washington, D.C.  He was handcuffed during 13 of those hours.  He was released after 3:00 a.m. on September 28, 2002 after paying a $100 fine.

21.     Amy Chastain is a third-year law student at the George Washington University and a resident of Silver Spring, Maryland.  Ms. Chastain was arrested on the morning of September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza.  Ms. Chastain was not a protester but was in that area in her capacity as a legal observer for the NLG.  Ms. Chastain was

wearing a green hat clearly marked with the letters NLG and an identification tag to identify her as an observer for the NLG. Ms. Chastain was held for approximately 18 hours by the MPD, most of which was on a bus at Judiciary Square in Washington, D.C. She was handcuffed during 13 of those hours. She was released after 3:00 a.m. on September 28, 2002 after paying a $100 fine.

22.     Young Choi is an undergraduate student at George Washington University and a resident of the District of Columbia. He is the staff photographer for *The Hatchet*. On September 27, 2002, Mr. Choi was in the vicinity of Pershing Park and Freedom Plaza taking photographs for *The Hatchet*. He was not a protester. Mr. Choi was standing in the group which was encircled by police in riot gear. Mr. Choi tried to explain to the officers that he was a staff photographer with *The Hatchet* and showed his press ID, but he was not allowed to leave. He was arrested, loaded onto a Metro bus, and taken to the Academy. Mr. Choi was held on the fully loaded bus for approximately 15 hours, after which time he was "processed," and then handcuffed ankle to wrist until his release. Mr. Choi was not released until he agreed to "forfeit collateral" and pay a $50 fine for allegedly failing to obey a lawful order. When he asked for an explanation, the officers told him that he could either be released at that time by paying $50 or he could stay in custody until as late as Tuesday to attend court. Mr. Choi paid the fine and was released around 2:00 a.m. on September 28, 2002.

23.     Meaghan Enright is an undergraduate student at George Washington University and a resident of the District of Columbia. Ms. Enright was in the vicinity of Pershing Park and Freedom Plaza on September 27, 2002 taking photographs of protester and police activities which she hoped to have published in *The Hatchet*. Ms. Enright was not a protester. When police officers in riot gear from several jurisdictions, including MPD, surrounded the plaza at

approximately 10:00 a.m., Ms. Enright was denied an exit and was arrested, along with everyone

else within the perimeter.  Ms. Enright was handcuffed with her hands behind her, loaded onto a

Metro bus, and driven to the Academy.  She was held on the bus until she was taken off to be

processed at approximately 8:30 p.m.  Then, she was taken to a mat on the floor of the Academy

gymnasium and her right wrist was handcuffed to her left ankle.  She was forced to remain in

this fetal position for most of the time until she was released at approximately 2:00 p.m. on

September 28, 2002.  Ms. Enright's mother sent a lawyer to the Academy to represent her

daughter, but Ms. Enright was denied access to her counsel.

24.     Leanne Lee is an undergraduate student at George Washington University and a

resident of the District of Columbia.  Ms. Lee was arrested on September 27, 2002 in the vicinity

of Pershing Park and Freedom Plaza while on a photo assignment as a journalist with *The

Hatchet*.  Ms. Lee was not a protester.  After being arrested, Ms. Lee was loaded onto a Metro

bus and taken to the Academy.  Ms. Lee remained in handcuffs until her release at approximately

1 p.m. on September 28th after spending the night with her wrist shackled to her ankle.  After

being told that she would not be released until Monday if she challenged her arrest, she agreed to

plead no contest to a charge of failing to obey an order to disperse and pay a $50 fine.

25.     Elizabeth Young is a second-year law student at the George Washington

University and is a resident of Alexandria, Virginia.  She was arrested in the morning of

September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza.  Ms. Young was present

as an observer for the NLG.  Ms. Young was wearing a green NLG hat and a badge that

identified her as an NGL member.  She noticed that the police had surrounded the area and were

compressing the trapped crowd into a small area by using lines of riot police.  Ms. Young asked

to leave, explaining that she was not a protester.  She was repeatedly denied an exit and was

handcuffed.  She was held in handcuffs by the police on a bus at Judiciary Square in Washington, D.C. for most of the time she was detained.  Ms. Young was released at approximately 2:30 a.m. on September 28, 2002 after paying a $100 fine.

26.     Christopher Zarconi is an undergraduate student at George Washington University and a resident of the District of Columbia.  He is a paid employee of *The Hatchet* where he worked as the photo-editor.  On September 27, 2002, Mr. Zarconi was in the vicinity of Pershing Park and Freedom Plaza taking photographs for the newspaper.  He was not a protester. After the police surrounded the area, Mr. Zarconi displayed his press pass and asked to be allowed to leave, but the officers denied his request and told him that nobody was allowed to leave the plaza.  Mr. Zarconi, along with everyone else in the perimeter, was then corralled into one corner of the plaza by police in riot gear in a trap-and-arrest maneuver and arrested, loaded onto a Metro bus, and taken to the Academy.  He was held in restraints on the bus for over 10 hours and then handcuffed in a fetal position for over 12 hours.  Mr. Zarconi was released about 1:00 p.m. Saturday, September 28, 2002 after paying a $50 fine.

### *Defendants*

27.     The United States Government is an interested party because various federal agencies, including but not limited to the United States Department of the Interior and the National Park Service, reportedly participated in the planning and carrying out of the arrests and detentions described in this Complaint.  The Attorney General of the United States and the United States Attorney for the District of Columbia represent the Executive Branch of the United States Government in such matters.

28.     The District of Columbia is a municipal corporation and constitutes the city government of Washington, D.C.  It was created by and exists under the laws of the United States.

29.     The National Park Service ("Park Service") is part of the United States Department of the Interior.  The Park Service is responsible for some of the areas in which arrests were made.  Park Service police participated in the trap-and-arrest practices described in this Complaint and supplied both personnel and resources to the enforcement effort during the protests.

30.     The MPD is the agency responsible for policing the District of Columbia.  MPD officers participated in the trap-and-arrest practices described in this Complaint and supplied personnel and resources to the enforcement effort during the protests.  The MPD officers also participated in the detention of the Plaintiffs and other arrestees, including restraining them, depriving them of counsel, and coercing no contest pleas from them in exchange for release.

31.     John or Jane Does 1-10 are, as yet, unidentified agents, officers, or officials of the federal government or the District of Columbia who were responsible for, personally participated in, or observed and took no action to correct or prevent, the illegal and unconstitutional arrests described in this Complaint, including, among others: the trap-and-arrest practices; the policy of extended detention; the practice of using restraints for excessive periods of time, including the use of restraints to restrict arrestees to a fetal position; the policy of denying arrestees their access to counsel; and the practice of using abusive confinement and threats to secure no contest pleas.

32.     John or Jane Does 11-20 are, as yet, unidentified agents, officers, or officials of the District of Columbia government or other state or local governments who were responsible

for, personally participated in, or observed and took no action to correct or prevent, the illegal

and unconstitutional arrests described in this Complaint, including, among others: the trap-and-

arrest practices; the policy of extended detention; the practice of using restraints for excessive

periods of time, including the use of restraints to restrict arrestees to a fetal position; the policy of

denying arrestees their access to counsel; and the practice of using abusive confinement and

threats to secure no contest pleas.

## FACTUAL BACKGROUND

### *The Trap-and-Arrest Practice*

33.     The instant matter comes before the Court after hundreds of arrests were carried

out by MPD, Park Service police, and other state, local, and federal police departments.

34.     The protests occurred on the weekend of September 27, 2002, at various locations

around Washington, D.C.

35.     The number of protesters was estimated to be between 3000 and 5000 people.

36.     The U.S. government and District of Columbia government assembled a huge

police force, including police officers from other states and local governments, to deal with

expected demonstrations.  Ultimately, it was reported that the number of protesters was so small

that 650 of 1700 police officers assembled from numerous police forces were sent home and

D.C. Chief of Police Charles H. Ramsey admitted there was "no justification" for keeping such a

large police force given the small size of the protests.

37.     The protests were directed against the policies of the World Bank, the

International Monetary Fund ("IMF"), and the United States government as they relate to a host

of concerns ranging from the environment to worker rights to third world debt to the rights of

indigenous people.

38.     Reportedly, while there were limited incidents of property damage, the protests were largely peaceful and did not result in significant property damage.

39.     Announcements about the protests were publicized weeks in advance and described a variety of exhibitions ranging from live music to giant puppets shows to bicycle groups.

40.     Given the prior media coverage, a significant number of individuals in addition to the protesters themselves were present to witness the activities.  In addition to bystanders and protesters, there was a large contingent of journalists in the area of the protests, including ones from the nearby George Washington University, as well as individuals serving as observers to record any abusive conduct by the police.

41.     The George Washington University is located next to two of the institutions targeted by some protesters, the World Bank and the IMF.  Some individual schools of the University, including the George Washington Law School, and some student dormitories are located directly across the street from these sites.  The University is also located within a few blocks of the White House and the United States State Department.  Students on campus could see or hear the protests at these various locations and, by simply walking out the doors of their schools or dormitories, were within the general protest area.

42.     Prior to and during the protests, neither police nor public officials closed nearby institutions, including the George Washington University, or prohibited observers or journalists from viewing the protests or the actions of the protesters or police, and had not warned observers or journalists that they could be arrested if found within the area of the protests.

43.     In various locations in which protests occurred, the police surrounded large numbers of individuals and cut off all exits.  Individuals caught within these zones were often

prevented from leaving for up to two hours, after being compressed into a smaller area by formations of police in riot gear advancing toward each other or some natural barrier (such as a wall), with the individuals caught between them and unable to exit.  Eventually, the persons caught in such traps were arrested.  These actions demonstrated an apparent pattern and practice of encircling, trapping, and arresting protesters and everyone else in their vicinity as a method of suppressing the demonstrations by removing large numbers of individuals from the vicinity.

44.     It was reported that this trap-and-arrest technique resulted in almost 700 arrests by mid-afternoon on the first day, September 27, 2002.

45.     After the fact, D.C. Chief of Police Ramsey was reported as explaining that anyone caught in these zones "had no business in the street" and that he viewed such presence as a cause for arrest.  D.C. Chief of Police Ramsey further stated publicly that "mayhem" would result unless he arrested anyone deemed to be "blocking a street."

46.     Witnesses in the media observed this technique and noted that bystanders, observers, and journalists were often arrested with protesters when they were unable to leave the arrest zones.

47.     D.C. Chief of Police Ramsey reportedly heralded these arrests as instrumental to the police's ability to keep control over the protests.  Of the mass arrests, he observed that "a lot of wind was taken out of their sails Friday."

### *The Arrests of the Plaintiffs*

48.     All of the plaintiffs are George Washington University students who were present at the protests as journalists, bystanders, or observers.

49.     RayMing Chang was arrested on the morning of  September 27, 2002 in the

vicinity of Pershing Park and Freedom Plaza while serving as a legal observer for the NLG.

Given the allegations of abusive police conduct at other anti-globalization protests, Mr. Chang

and his fellow observers were asked to observe the protests and keep a log of events and any

abusive conduct.  Mr. Chang never heard a demand to disperse, he was never given an order to

disperse, and he was not engaged in any protest activity.  Mr. Chang was wearing an NLG

identification badge.  Mr. Chang attempted to leave the area but was prevented from doing so.

Mr. Chang was trapped within a closed perimeter and then arrested.  He was handcuffed, loaded

onto a Metro bus, and taken to the Academy and then to Judiciary Square for allegedly

disobeying an order.

50.     Amy Chastain was arrested on the morning of September 27, 2002 in the vicinity

of Pershing Park and Freedom Plaza while serving as an observer for the NLG.  Ms. Chastain

was never given an order to disperse.  She was not engaged in any protest activity.  Ms. Chastain

observed other people, including some who appeared to be tourists, being denied exit when they

tried to leave the area.  Although Ms. Chastain was wearing a green hat clearly marked with the

letters NLG and an identification tag identifying her as an observer for the NLG, she was herded

into a corner with all the other people caught inside the trap-and-arrest perimeter and arrested.

She was handcuffed, loaded onto a Metro bus, and taken to the Academy and then to Judiciary

Square for allegedly disobeying an order.

51.     Young Choi is the staff photographer for *The Hatchet*.  He was not engaged in

any protest activity.  On September 27, 2002, Mr. Choi was in the vicinity of Pershing Park and

Freedom Plaza taking photographs for *The Hatchet*.  Mr. Choi was never given an order to

disperse.  He was standing with the group which was encircled by police in riot gear.  Mr. Choi

tried to explain to the officers that he was a staff photographer with *The Hatchet*, but he was not allowed to leave.  He was handcuffed and loaded onto a Metro bus and taken to the Academy for allegedly disobeying an order to disperse.

52.     Meaghan Enright was arrested on the morning of September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza while taking photographs she hoped to have published in *The Hatchet*.  Ms. Enright was never given an order to disperse.  Police officers in riot gear from several jurisdictions, including MPD, surrounded the plaza at approximately 10:00 a.m.  When Ms. Enright tried to leave, she was denied an exit, and when she asked why she was being detained, the officers would not answer.  After approximately an hour, the police began closing the perimeter until everyone inside the perimeter was herded into one corner of the plaza.  The officers then arrested everyone inside the perimeter, including Ms. Enright.  The officers confiscated Ms. Enright's camera equipment and, after telling her that they would not be responsible for any loss or damage, threw it onto a pile of confiscated possessions.  She was handcuffed, loaded onto a Metro bus, and taken to the Academy for allegedly disobeying an order.

53.     Leanne Lee was arrested on September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza while on a photo assignment as a journalist with *The Hatchet*.  She was arrested after being surrounded and confined in an trap-and-arrest zone.  Ms. Lee never heard an order to disperse.  She was not engaged in any protest activity and desired to leave the area but was prevented from doing so.  She was repeatedly denied such an exit by the police when she approached officers to explain that she needed to leave to go to her internship at Agence France Presse ("AFP"), a French news service.  Ms. Lee used her cellular phone to call her employer at AFP several times during her detention to advise him that she was being detained and was unable

to get to the AFP office. Ms. Lee was handcuffed and an officer used a knife to cut the strap on a camera equipment bag that she was holding before she was moved to a bus. She was taken to the Academy for allegedly disobeying an order.

54.     Elizabeth Young was arrested on the morning of September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza while serving as an observer for the NLG. Ms. Young was wearing a hat emblazoned with the letters NLG and a badge which clearly identified her as an observer for the NLG. Ms. Young was never given an order to disperse. She was not engaged in any protest activity. Ms. Young asked to leave and was repeatedly denied an exit. She was handcuffed, loaded onto a Metro bus, and taken to the Academy and then to Judiciary Square for allegedly disobeying an order.

55.     Christopher Zarconi was arrested on the morning of September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza while taking photographs in his capacity as photo-editor of *The Hatchet*. Mr. Zarconi was never given an order to disperse. He was not engaged in any protest activity. After being informed by another journalist that police in riot gear had formed a perimeter and were denying everyone exit from the plaza, Mr. Zarconi made his way to the perimeter to seek exit. Mr. Zarconi displayed his press pass and asked to be allowed to leave, but the officers denied his request and told him that nobody was allowed to leave the area. Mr. Zarconi, along with everyone else in the perimeter, was then corralled into one corner of the plaza by police in riot gear in a trap-and-arrest maneuver. Before being loaded onto a Metro bus, Mr. Zarconi again displayed his press pass and asked to be allowed to leave. He was denied once again. His camera bag was confiscated and thrown onto a pile of other confiscated bags, and he was not given a receipt of any sort for his equipment, some of which was expensive. Mr.

Zarconi was handcuffed, loaded onto a Metro bus, and taken to the Academy for allegedly disobeying an order.

### *The Confinement and Release Conditions*

56.     Four of the Plaintiffs were held at the Academy until the afternoon of Saturday, September 28, 2002, and three of the Plaintiffs were held at Judiciary Square until the early morning hours of Saturday, September 28, 2002.

57.     RayMing Chang was held until the early morning of September 28, 2002; most of this time was spent handcuffed, the discomfort of which prevented him from sleeping.  After sitting on the full bus for approximately 13 hours, Mr. Chang was taken to cellblock B in the Judiciary Center.  Mr. Chang was not given access to individual counsel before being asked by police officers to plead to criminal charges.  Mr. Chang was told that he was charged with "Failure to Obey" and was given three options:  (1) remain in custody until an arraignment on Saturday or Monday, (2) pay $100 and "forfeit," or (3) pay $100 and schedule a hearing at Superior Court later.  Mr. Chang selected the third option because he did not want to remain in custody.  Despite having made his selection clear, the station clerk marked Mr. Chang's collateral receipt as "forfeit."

58.     Amy Chastain was held from the morning of September 27, 2002 to the early morning of September 28, 2002.  She remained handcuffed and on a Metro bus for much of this time.  She was later taken to Judiciary Square for processing and held there until her release.  Ms. Chastain was not given access to individual counsel before being asked by police officers to plead to criminal charges.  During processing, Ms. Chastain was asked about her involvement in the protests and was asked her purposes for being in the arrest zones.  She was told by an officer that she had to choose between remaining in custody until arraignment or paying $100 to "post

and forfeit."  In order to end her confinement, Ms. Chastain opted to pay the $100 fine and was
then released.

59.     Young Choi was held from the morning of September 27, 2002 until the early
morning of September 28, 2002.  He was held in handcuffs on a Metrobus for approximately 6
hours at the Academy.  After he was processed, he was taken to a mat in the Academy and
handcuffed in a fetal position, wrist to opposite ankle, for approximately 8 hours.  Mr. Choi was
not given access to individual counsel before being questioned by police officers and being asked
to plead to criminal charges.  Mr. Choi was not released until he agreed to "forfeit collateral" and
pay a $50 fee for allegedly failing to obey a lawful order.  When he asked for an explanation, the
officers told him that he could either be released at that time by paying $50 or he could stay in
custody until as late as Tuesday to attend court.  Mr. Choi paid the fine and was released around
2:00 a.m. on September 28, 2002.

60.     Meaghan Enright was held from the morning of September 27, 2002 to the
afternoon of September 28, 2002.  After she was arrested, she was handcuffed with her hands
behind her, loaded onto a Metro bus, and driven to the Academy.  She was unloaded from the
bus and processed at approximately 8:30 p.m.  The rest of her belongings, except her
identification and $50 to "pay out," were confiscated, including shoelaces and drawstrings.  Ms.
Enright was not given access to individual counsel before being questioned by police officers
and being asked to plead to criminal charges.  During processing, Ms. Enright was briefly asked
about her involvement in the protests and was asked her purposes for being in the arrest zones.
She was taken to a mat on the floor of the Academy gymnasium and her right wrist was
handcuffed to her left ankle.  She was forced to remain in this fetal position for most of the time
until she was released at approximately 2:00 p.m. on September 28, 2002.  Ms. Enright's mother

sent a lawyer to the Academy to represent her daughter, but Ms. Enright was denied access to her counsel.  The officers told Ms. Enright that she did not have a right to an attorney because she was not being interrogated.  Any questions or messages Ms. Enright had for her attorney were to be relied via an officer.  Ms. Enright was told that she had three options:  (1) pay $50 and be released, (2) plead guilty, or (3) plead not guilty and remain in custody until Monday.  Ms. Enright was not given the opportunity to discuss this choice with her counsel.  She paid the fine in order to secure her release.

61.     Leanne Lee was held from the morning of September 27, 2002 to the afternoon of September 28, 2002.  She was held on a Metro bus at the Academy for several hours before being processed.  Ms. Lee was not given access to individual counsel before being asked by police officers to plead to criminal charges.  She was denied a vegetarian meal; the only food she had during her more than 24 hours of detention consisted of a granola bar she successfully begged from a passing officer and a cookie.  While still handcuffed, Ms. Lee was moved to a mat with seven or eight other people.  Then, an officer handcuffed Ms. Lee's right wrist to her left ankle and left Ms. Lee to sleep in this fetal position.  She remained handcuffed in this fetal position until approximately 1 p.m. the following day, September 28, 2002.  Ms. Lee was told by an officer that if she challenged the arrest, she would be held until Monday.  In order to end this confinement, she finally agreed to plead no contest, paid a $50 fine, and was then released.

62.     Elizabeth Young was held from the morning of September 27, 2002 to the early morning of September 28, 2002.  She remained handcuffed for most of this period.  For almost two hours, the police refused her repeated requests to have the restraints loosened despite her complaints of pain in her wrists.  Ms. Young was held on a Metro bus for much of this time and then was held at Judiciary Square until her release.  Ms. Young was not given access to

individual counsel before being asked by police officers to plead to criminal charges.  Ms. Young was given three options:  (1) remain in custody until an arraignment on Saturday or Monday, (2) pay $100 and "forfeit," or (3) pay $100 and schedule a hearing at Superior Court later.  Ms. Young selected the third option because she did not want to remain in custody. Despite having communicated this choice to the station clerk,  Ms. Young's collateral receipt was marked "forfeit."

63.    Christopher Zarconi was held from the morning of September 27, 2002 until the afternoon of September 28, 2002.  After he was placed on a Metro bus, he was driven to the Academy.  Mr. Zarconi was forced to sit handcuffed on this fully loaded bus from approximately 11:00 a.m. until approximately 9:30 p.m.  He and the other arrestees had to ask permission to use the restroom, and then they were taken in small groups.  When Mr. Zarconi was allowed off the bus, he was taken into the Academy to be "processed."  The rest of his belongings, including shoelaces and drawstrings, were confiscated and placed in an evidence bag.  Mr. Zarconi was photographed and fingerprinted and allowed to use the automated teller machine to withdraw $50, which he was told he would need if he wanted to leave custody before Tuesday.  Mr. Zarconi was not given access to individual counsel before being questioned by police officers. At one point during processing, Mr. Zarconi was asked about his "cause;" Mr. Zarconi explained he was not a protestor but was a member of the press.  Nonetheless, he was then led to a wrestling mat on the floor of the gymnasium and handcuffed right wrist to left ankle.   Mr. Zarconi was forced to remain in this fetal position until approximately 1:00 p.m. Saturday, September 28, 2002, or over 12 hours.  Mr. Zarconi was required to pay $50 before being released from custody.

## ALLEGED INJURIES AND STANDING

64. The Plaintiffs suffered direct and significant injuries due to the violations described in this Complaint.

65. The arrest practices described in this Complaint caused the Plaintiffs to be subject to improper arrest and confinement, some for 24 hours or more.

66. The arrest practices described in this Complaint further caused the Plaintiffs to be subject to criminal charges and criminal fines.

67. The arrest practices described in this Complaint further prevented the Plaintiffs from participating in protected activities, including the exercise of their rights of free press, free association, and assembly.

68. The confinement practices described in this Complaint caused the Plaintiffs to be restrained for excessive periods without proper cause or authority.

69. The confinement practices described in this Complaint caused the Plaintiffs physical harm and discomfort by being denied proper food and movement during the time that they were in custody.

70. The arrest and confinement practices further harmed the Plaintiffs by coercing no contest pleas to criminal charges under the threat of longer confinement under abusive, illegal conditions, resulting in the creation of criminal records against them, and requiring them to pay fines.

71. The arrest and confinement practices further harmed the Plaintiffs by subjecting them to reputational and professional injury stemming from their arrest for allegedly disobeying police orders to disperse while performing their roles as journalists and observers.

72.     The Plaintiffs suffered direct injury to their reputations and status in the denial of their right to counsel before being asked to plead no contest to criminal charges.

73.     The Plaintiffs suffered direct injury to their reputations and status in the denial of *Miranda* warnings before being questioned and asked to plead in a criminal matter.

74.     Plaintiffs, and other similarly situated persons, remain at risk of future arrests if arrest and detention procedures similar to those described in this Complaint occur while witnessing future protests and demonstrations, including ones planned for the coming months.

75.     As individuals directly harmed by unconstitutional and unlawful practices of arrest and confinement, Plaintiffs have standing to seek relief before this Court for an actual controversy under the Declaratory Judgment Act and to seek damages and other appropriate relief, including injunctive relief.

## FIRST CLAIM FOR RELIEF
*(The First Amendment of the United States Constitution; Right of Assembly)*

76.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 75 as if set forth fully herein.

77.     The arrest and confinement practices and policies described in this Complaint violate the right of assembly guaranteed in the First Amendment of the United States Constitution.

78.     The First Amendment protects the rights of free speech, a free press, association and peaceful assembly.  *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980). These rights "share a common core purpose of assuring freedom of communication on matters relating to the functioning of government."  *Id.*  Public streets and sidewalks are "public fora" and restrictions on activities in such fora are "subject to a particularly high degree of scrutiny."

*United States v. Grace*, 461 U.S. 171, 177 (1983); *NAACP Western Region v. City of Richmond*, 743 F.2d 1346 (9th Cir. 1984); *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996).  By merely observing protests in close proximity to their residences and schools, however, George Washington University students, including the Plaintiffs, were subject to trap-and-arrest tactics.

79.     The arrest and confinement practices and policies described in this Complaint violate the right of citizens to walk, to assemble, and to observe events under the First Amendment of the United States Constitution.   The Plaintiffs were not in violation of any law by peacefully appearing on public streets to witness or record events.   The Defendants prevented the Plaintiffs from continuing these protected activities without cause and without warning.

80.     The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Plaintiffs exercising their First Amendment rights, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and assemble with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## SECOND CLAIM FOR RELIEF
*(The Fourteenth Amendment of the United States Constitution; Right of Assembly)*

81.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 80 as if set forth fully herein.

82.     The arrest and confinement practices and policies described in this Complaint violate the right of assembly guaranteed in the First Amendment of the United States Constitution.

83.     The First Amendment applies to certain of the Defendants via the Fourteenth Amendment to protect the rights of free speech, a free press, association and peaceful assembly. *Richmond Newspapers*, 448 U.S. at 576.  These rights "share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Id.*  Public streets and sidewalks are "public fora" and restrictions on activities in such fora are "subject to a particularly high degree of scrutiny." *Grace*, 461 U.S. at 177; *NAACP*, 743 F.2d at 1346; *Collins*, 110 F.3d at 1371.  By merely observing protests in close proximity to their residences and schools, however, George Washington University students, including the Plaintiffs, were subject to trap-and-arrest tactics.

84.     The arrest and confinement practices and policies described in this Complaint violate the right of citizens to walk, to assemble, and to observe events under the First Amendment of the United States Constitution, as applied via the Fourteenth Amendment.  The Plaintiffs were not in violation of any law by peacefully appearing on public streets to witness or record events.  The Defendants prevented the Plaintiffs from continuing these protected activities without cause and without warning.

85.     The trap-and-arrest practice, and subsequent abusive detention, not only created

direct injury to the Plaintiffs exercising their First Amendment rights, as applied via the

Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated

persons for future observation or media coverage of future demonstrations.  If this conduct is not

enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being

caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and assemble

with others witnessing and observing, protests and demonstrations in the Washington, D.C. area,

including protests and demonstrations planned for the coming months, and in any other area in

which similar trap-and-arrest maneuvers are practiced.

## THIRD CLAIM FOR RELIEF
*(The First Amendment of the United States Constitution; Right of Association)*

86.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 85

as if set forth fully herein.

87.     The arrest and confinement practices and policies described in this Complaint

violate the right of association guaranteed in the First Amendment of the United States

Constitution.

88.     The First Amendment protects the rights of free speech, a free press, association,

and peaceful assembly.  *Richmond Newspapers*, 448 U.S. at 576.  These rights "share a common

core purpose of assuring freedom of communication on matters relating to the functioning of

government." *Id.*  Public streets and sidewalks are "public fora" and restrictions on activities in

such fora are "subject to a particularly high degree of scrutiny."  *Grace*, 461 U.S. at 177;

*NAACP*, 743 F.2d at 1346; *Collins*, 110 F.3d at 1371.  By merely leaving their residences and

schools and, thus, associating with protestors, George Washington University students, including the Plaintiffs, were subject to trap-and-arrest tactics.

89.     The arrest and confinement practices and policies described in this Complaint violate the right of citizens to walk, to associate, and to observe events under the First Amendment of the United States Constitution.  The Plaintiffs were not in violation of any law by appearing on public streets to witness or record events.  The Defendants prevented the Plaintiffs from continuing these protected activities without cause and without warning.

90.     The Plaintiffs were prevented from exercising their right of association with both the media and others observing the protests, including public interest groups.  For example, Mr. Chang, Ms. Chastain, and Ms. Young were present at the demonstrations in their association with the NLG, as part of a large group of observers.  The trap-and-arrest practice, as described in this Complaint, prevented Mr. Chang, Ms. Chastain, and Ms. Young from associating with the media, the general public and other observers.

91.     Ms. Lee, Ms. Enright, Mr. Zarconi, and Mr. Choi have also been hindered in their right to associate with the public, observers and other members of the media, including other student journalists, and observing and reporting on the demonstration and police reactions to the demonstration because of the policy of trap-and-arrest described in this Complaint.

92.     The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Plaintiffs exercising their First Amendment rights, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and

demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

### FOURTH CLAIM FOR RELIEF
(*The Fourteenth Amendment of the United States Constitution; Right of Association*)

93.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 92 as if set forth fully herein.

94.     The arrest and confinement practices and policies described in this Complaint violate the right of association guaranteed in the First Amendment of the United States Constitution.

95.     The First Amendment applies to certain of the Defendants via the Fourteenth Amendment to protect the rights of free speech, a free press, association, and peaceful assembly. *Richmond Newspapers*, 448 U.S. at 576. These rights "share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Id.* Public streets and sidewalks are "public fora" and restrictions on activities in such fora are "subject to a particularly high degree of scrutiny." *Grace*, 461 U.S. at 177; *NAACP*, 743 F.2d at 1346; *Collins*, 110 F.3d at 1371. By merely leaving their residences and schools and, thus, associating with protestors, George Washington University students, including the Plaintiffs, were subject to trap-and-arrest tactics.

96.     The arrest and confinement practices and policies described in this Complaint violate the right of citizens to walk, to associate, and to observe events under the First Amendment of the United States Constitution, as applied via the Fourteenth Amendment. The Plaintiffs were not in violation of any law by appearing on public streets to witness or record

events.  The Defendants prevented the Plaintiffs from continuing these protected activities without cause and without warning.

97.     The Plaintiffs were prevented from exercising their right of association with both the media and others observing the protests, including public interest groups.  For example, Mr. Chang, Ms. Chastain, and Ms. Young were present at the demonstrations in their association with the NLG, as part of a large group of observers.  The trap-and-arrest practice, as described in this Complaint, prevented Mr. Chang, Ms. Chastain, and Ms. Young from associating with the media, the general public and other observers.

98.     Ms. Lee, Ms. Enright, Mr. Zarconi, and Mr. Choi have also been hindered in their right to associate with the public, observers and other members of the media, including other student journalists, observing and reporting on the demonstration and the police reaction to the demonstration because of the policy of trap-and-arrest described in this Complaint.

99.     The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Plaintiffs exercising their First Amendment rights, as applied via the Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

**FIFTH CLAIM FOR RELIEF**
*(The First Amendment of the United States Constitution; Free Press)*

100.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 100 as if set forth fully herein.

101.    The arrest and confinement practices and policies described in this Complaint violate the right of free press guaranteed in the First Amendment of the United States Constitution.

102.    The First Amendment protects the rights of free speech, a free press, association, and peaceful assembly.  *Richmond Newspapers*, 448 U.S. at 576.  These rights "share a common core purpose of assuring freedom of communication on matters relating to the functioning of government."  *Id.*  Public streets and sidewalks are "public fora" and restrictions on activities in such fora are "subject to a particularly high degree of scrutiny."  *Grace*, 461 U.S. at 177; *NAACP*, 743 F.2d at 1346; *Collins*, 110 F.3d at 1371.  By merely leaving their residences and schools and, thus, associating with protestors, George Washington University students, including the Plaintiffs, were subject to trap-and-arrest tactics.

103.    The Plaintiffs were engaged in the exercise of free press activities that included media coverage and human rights monitoring.  Mr. Chang, Ms. Chastain, and Ms. Young were present to observe, record, and ultimately report potential human rights violations.  Mr. Choi, Ms. Enright, Ms. Lee and Mr. Zarconi were present at the demonstrations in their association with a student newspaper.

104.    The Defendants prevented the Plaintiffs from continuing these protected activities without cause and without warning.  The Plaintiffs were not in violation of any law by recording events for the media.

-- 28 --

105.     The trap-and-arrest practice, and subsequent abusive detention, not only created

direct injury to the Plaintiffs exercising their First Amendment rights, but also creates a chilling

effect for them and other similarly situated persons for future observation or media coverage of

future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated

persons remain at risk in the future of being caught in similar trap-and-arrest maneuvers when

they seek to witness, observe, and report on protests and demonstrations in the Washington, D.C.

area, including protests and demonstrations planned for the coming months, and in any other area

in which similar trap-and-arrest maneuvers are practiced.

## SIXTH CLAIM FOR RELIEF
*(The Fourteenth Amendment of the United States Constitution; Free Press)*

106.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 105

as if set forth fully herein.

107.     The arrest and confinement practices and policies described in this Complaint

violate the right of free press guaranteed in the First Amendment of the United States

Constitution.

108.     The First Amendment applies to certain of the Defendants via the Fourteenth

Amendment to protect the rights of free speech, a free press, association, and peaceful assembly.

*Richmond Newspapers*, 448 U.S. at 576.  These rights "share a common core purpose of assuring

freedom of communication on matters relating to the functioning of government."  *Id.*  Public

streets and sidewalks are "public fora" and restrictions on activities in such fora are "subject to a

particularly high degree of scrutiny."  *Grace*, 461 U.S. at 177; *NAACP*, 743 F.2d at 1346;

*Collins*, 110 F.3d at 1371.  By merely leaving their residences and schools and, thus, associating

with protestors, George Washington University students, including the Plaintiffs, were subject to trap-and-arrest tactics.

109.    The Plaintiffs were engaged in the exercise of free press activities that included media coverage and human rights monitoring.  Mr. Chang, Ms. Chastain, and Ms. Young were present to observe, record, and ultimately report potential human rights violations.  Mr. Choi, Ms. Enright, Ms. Lee and Mr. Zarconi were present at the demonstrations in their association with a student newspaper.

110.    The Defendants prevented the Plaintiffs from continuing these protected activities without cause and without warning.  The Plaintiffs were not in violation of any law by recording events for the media.

111.    The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Plaintiffs exercising their First Amendment rights, as applied via the Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being caught in similar trap-and-arrest maneuvers when they seek to witness, observe, and report on protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## SEVENTH CLAIM FOR RELIEF
(*The Fourth Amendment of the United States Constitution; Illegal Search and Seizure*)

112.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 111 as if set forth fully herein.

113.     The policies and practices alleged in this Complaint violate the Fourth Amendment of the United States Constitution in subjecting the Plaintiffs to unlawful searches and seizures.

114.     The Plaintiffs were encircled and trapped within arrest zones and denied opportunities to exit these zones.  The Plaintiffs were arrested and searched without any probable cause basis for the charge of failing to obey an alleged order to disperse.  Since they never received such an order and, even if such an order was given, they were denied the opportunity to disperse or otherwise leave the area, the search and seizure led to the unlawful confinement of all of the Plaintiffs.

115.     The search and seizure led to property damage to some of the Plaintiffs, including Ms. Lee.

116.     Plaintiffs have been injured by this violation of their Fourth Amendment rights.

117.     The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Plaintiffs by violating their Fourth Amendment rights, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being subject to unlawful searches and seizures if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area,

including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## EIGHTH CLAIM FOR RELIEF
*(The Fourteenth Amendment of the United States Constitution;*
*Illegal Search and Seizure)*

118.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 117 as if set forth fully herein.

119.    The policies and practices alleged in this Complaint violate the Fourth Amendment of the United States Constitution in subjecting the Plaintiffs to unlawful searches and seizures.

120.    The Fourth Amendment applies to certain Defendants via the Fourteenth Amendment.

121.    The Plaintiffs were encircled and trapped within arrest zones and denied opportunities to exit these zones.  The Plaintiffs were arrested and searched without any probable cause basis for the charge of failing to obey an alleged order to disperse.  Since they never received such an order and, even if such an order were given, they were denied the opportunity to disperse or otherwise leave the area, the search and seizure led to the unlawful confinement of all of the Plaintiffs.

122.    The search and seizure led to property damage to some of the Plaintiffs, including Ms. Lee.

123.    Plaintiffs have been injured by this violation of their Fourth Amendment rights, as applied via the Fourteenth Amendment.

124.    The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Plaintiffs by violating their Fourth Amendment rights, as applied via the

Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being subject to unlawful searches and seizures if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## NINTH CLAIM FOR RELIEF
*(The Fourteenth Amendment of the United States Constitution; Due Process)*

125.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 124 as if set forth fully herein.

126.     The Due Process Clause applies to certain Defendants via the Fourteenth Amendment.  *Armstrong v. District of Columbia Public Library*, 154 F. Supp. 2d. 67, 80 (D.D.C. 2001).  Under the Due Process Clause, the Plaintiffs are protected against the deprivation of life, liberty, or property without due process of law.  *Bolling v. Sharpe*, 347 U.S. 497 (1954).  This includes a protection against false arrests and unlawful confinement.

127.     The Plaintiffs were subject to false arrest and unlawful confinement as a result of the practices and policies described in this Complaint.  The Plaintiffs were not engaged in any illegal activity and were not given a warning or opportunity to disperse.  These Defendants lacked probable cause to arrest the Plaintiffs for any criminal violation.

128.     The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Plaintiffs by violating their right to Due Process, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of

future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated

persons remain at risk in the future of being denied due process if caught in similar trap-and-

arrest maneuvers when they seek to witness or observe, and associate with others witnessing and

observing, protests and demonstrations in the Washington, D.C. area, including protests and

demonstrations planned for the coming months, and in any other area in which similar trap-and-

arrest maneuvers are practiced.

**TENTH CLAIM FOR RELIEF**
*(The Fifth Amendment of the United States Constitution;*
*Failure to Provide Miranda Warning)*

129.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 128

as if set forth fully herein.

130.    The Fifth Amendment applies to any individuals in federal custody.  Under the

Fifth Amendment, individuals in custody are entitled to be informed of their *Miranda* rights,

including their right to remain silent and their right to counsel.  The Supreme Court recently

reaffirmed that *Miranda* is a constitutional rule binding on the arresting officers.  *Dickerson v.*

*United States*, 530 U.S. 428, 433 (2000).

131.    None of the Plaintiffs were given their *Miranda* rights at the time of their arrest.

132.    None of the Plaintiffs were given their *Miranda* rights at the time of questioning

by police officers.

133.    None of the Plaintiffs were given their *Miranda* rights when asked to plead in a

criminal matter.

134.    The failure of the Defendants to inform the Plaintiffs of their rights left them

uncertain of their status or their ability to refuse to speak to officers.  This failure to inform the

Plaintiffs of their rights left them uncertain of their right to seek counsel before pleading no contest to criminal charges.

135.    The resulting pleas entered for the Plaintiffs have caused them reputational and financial injury.  The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law.  All of the Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

136.    The Defendants' failure to advise the Plaintiffs of their *Miranda* rights not only created direct injury to the Plaintiffs by violating their Fifth Amendment rights, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of not being advised of their *Miranda* rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## ELEVENTH CLAIM FOR RELIEF
*(The Fourteenth Amendment of the United States Constitution;*
*Failure to Provide Miranda Warning)*

137.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 136 as if set forth fully herein.

138.    The Fifth Amendment applies to any individuals placed into custody by state or local officers, including certain Defendants, via the Fourteenth Amendment.  Under the Fifth Amendment, individuals in custody are entitled to be informed of their *Miranda* rights, including

their right to remain silent and their right to counsel.  The Supreme Court recently reaffirmed that *Miranda* is a constitutional rule binding on the arresting officers.  *Dickerson*, 530 U.S. at 433.

139.    None of the Plaintiffs were given their *Miranda* rights at the time of their arrest.

140.    None of the Plaintiffs were given their *Miranda* rights at the time of questioning by police officers.

141.    None of the Plaintiffs were given their *Miranda* rights when asked to plead in a criminal matter.

142.     The failure of these Defendants to inform the Plaintiffs of their rights left them uncertain of their status or their ability to refuse to speak to officers.  This failure to inform the Plaintiffs of their rights left them uncertain of their right to seek counsel before pleading no contest to criminal charges.

143.    The resulting pleas entered for the Plaintiffs have caused them reputational and financial injury.  The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law.  All of the Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

144.    These Defendants' failure to advise the Plaintiffs of their *Miranda* rights not only created direct injury to the Plaintiffs by violating their Fifth Amendment rights, via the Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of not being advised of their *Miranda* rights if caught in similar trap-and-arrest maneuvers when they seek to

witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## TWELFTH CLAIM FOR RELIEF
*(The Fifth Amendment of the United States Constitution;*
*Right to Counsel)*

145.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 144 as if set forth fully herein.

146.    The Fifth Amendment of the United States Constitution affords the right to counsel before questioning individuals who are in federal custody.

147.    The Plaintiffs were placed in custody on the morning of September 27, 2002, but were never given individual access to counsel before they were questioned by police officers. The Plaintiffs were questioned about their involvement in the protests and purposes for being in the arrest zones, and they were ultimately asked to plead to criminal charges.

148.    Counsel for the NLG attempted to gain access to the arrested NLG observers, including Mr. Chang, Ms. Chastain, and Ms. Young, but were refused such access to individuals. Instead, counsel was limited to briefly addressing the bus of students at Judiciary Square and collecting ATM cards to withdraw money for the students to use to secure their release.

149.    An attorney for Ms. Enright was retained by her family and personally sought access to Ms. Enright at the Academy but was refused.  Ms. Enright also specifically asked to speak with her attorney but was denied.  The officers told her that she did not have a right to counsel.  Any questions or messages Ms. Enright had for her attorney were to be relied via an officer.

150.    None of the Plaintiffs were offered access to public defenders or volunteer counsel before being questioned and being asked to plead to criminal charges.

151.    The failure of the Defendants to inform the Plaintiffs of their rights left them uncertain of their status or their ability to refuse to speak to officers.  This failure to inform the Plaintiffs of their rights left them uncertain of their right to seek counsel before pleading no contest to criminal charges.

152.    Individuals in custody are entitled to be informed of their *Miranda* rights, including their right to remain silent and their right to counsel, but the Plaintiffs were never informed of these rights.

153.    The refusal of access to counsel resulted in direct injury to the Plaintiffs who answered questions posed by law enforcement officers and proceeded to plead to criminal charges without advice on its meaning, implications, or their rights.  The resulting pleas entered for the Plaintiffs have caused them reputational and financial injury.  The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law.  All of the Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

154.    The Defendants' failure to allow the Plaintiffs access to counsel not only created direct injury to the Plaintiffs by violating their Fifth Amendment rights, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being denied access to counsel if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others

witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

### THIRTEENTH CLAIM FOR RELIEF
*(The Fourteenth Amendment of the United States Constitution; Right to Counsel)*

155.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 154 as if set forth fully herein.

156.    The Fifth Amendment of the United States Constitution applies to state and local officers, including certain of the Defendants , via the Fourteenth Amendment, and requires that individuals in their custody be afforded the right to counsel before questioning.

157.    The Plaintiffs were placed in custody on the morning of September 27, 2002, but were never given individual access to counsel before they were questioned by police officers. The Plaintiffs were questioned about their involvement in the protests and purposes for being in the arrest zones, and they were ultimately asked to plead to criminal charges.

158.    Counsel for the NLG sought access to the arrested NLG observers, including Mr. Chang, Ms. Chastain, and Ms. Young, but were refused such access to individuals.  Instead, counsel was limited to briefly addressing the bus of students at Judiciary Square and collecting ATM cards to withdraw money for the students to use to secure their release.

159.    An attorney for Ms. Enright was retained by her family and personally sought access to Ms. Enright at the Academy but was refused.  Ms. Enright also specifically asked to speak with her attorney but was denied.  The officers told her that she did not have a right to counsel.  Any questions or messages Ms. Enright had for her attorney were to be relied via an officer.

160.     None of the Plaintiffs were offered access to public defenders or volunteer counsel before being questioned and asked to plead to criminal charges.

161.     The failure of these Defendants to inform the Plaintiffs of their rights left them uncertain of their status or their ability to refuse to speak to officers.  This failure to inform the Plaintiffs of their rights left them uncertain of their right to seek counsel before pleading no contest to criminal charges.

162.     Individuals in custody are entitled to be informed of their *Miranda* rights, including their right to remain silent and their right to counsel, but the Plaintiffs were never informed of these rights.

163.     The refusal of access to counsel resulted in direct injury to the Plaintiffs who proceeded to answer questions posed by law enforcement officers and plead to criminal charges without advice on its meaning, implications, or their rights.  The resulting pleas entered for the Plaintiffs have caused them reputational and financial injury.  The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law.  All of the Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

164.     These Defendants' failure to allow the Plaintiffs access to counsel not only created direct injury to the Plaintiffs by violating their Fifth Amendment rights, via the Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being denied access to counsel if caught in similar trap-and-arrest maneuvers when they seek to

witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

### FOURTEENTH CLAIM FOR RELIEF
*(The Sixth Amendment of the United States Constitution;*
*Right to Counsel)*

165.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 164 as if set forth fully herein.

166.    The Sixth Amendment of the United States Constitution affords the right to counsel for individuals at a critical stage of their criminal cases, such as preliminary hearings or arraignments. *White v. Maryland*, 373 U.S. 59 (1963).

167.    The Plaintiffs were denied their Sixth Amendment right to counsel when they were asked to plead no contest to criminal misdemeanors without access to legal representation. The students serving as legal observers were denied their Sixth Amendment rights when their counsel was denied individual access to them before they were asked to plead to the charges. Ms. Enright was denied her Sixth Amendment rights when an attorney, retained by her family and present at the Academy, was denied access to her before she was asked to plead to the criminal charge.

168.    All of the students were denied individual access to public defenders or volunteer counsel before being asked to plead to criminal charges.

169.    The refusal of counsel resulted in direct injury to the Plaintiffs who proceeded to plead to criminal charges without advice on its meaning, implications, or their rights. The resulting pleas entered for the Plaintiffs have caused them reputational injury. The fact of an

arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law. All of the Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

170.    The Defendants' failure to allow the Plaintiffs access to counsel not only created direct injury to the Plaintiffs by violating their Sixth Amendment rights, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations. If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being denied access to counsel if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

### FIFTEENTH CLAIM FOR RELIEF
(*The Fourteenth Amendment of the United States Constitution; Right to Counsel*)

171.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 170 as if set forth fully herein.

172.    The Sixth Amendment of the United States Constitution applies to individuals placed into custody by state or local officers, including certain Defendants, via the Fourteenth Amendment. Under the Sixth Amendment, individuals are afforded the right to counsel at a critical stage of their criminal cases, such as preliminary hearings or arraignments. *White*, 373 U.S. at 59.

173.    The Plaintiffs were denied their Sixth Amendment right to counsel, as applied via the Fourteenth Amendment, when they were asked to plead no contest to criminal misdemeanors without access to legal representation.   The students serving as legal observers were denied their Sixth Amendment rights, as applied via the Fourteenth Amendment, when their counsel was denied individual access to them before they were asked to plead to the charges.  Ms. Enright was denied her Sixth Amendment rights, as applied via the Fourteenth Amendment, when an attorney, retained by her family and present at the Academy, was denied access to her before she was asked to plead to the criminal charge.

174.    All of the students were denied individual access to public defenders or volunteer counsel before being asked to plead to criminal charges.

175.    The refusal of counsel resulted in direct injury to the Plaintiffs who proceeded to plead to criminal charges without advice on its meaning, implications, or their rights.  The resulting pleas entered for the Plaintiffs have caused them reputational injury.   The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law.  All of the Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

176.    The Defendants' failure to allow the Plaintiffs access to counsel not only created direct injury to the Plaintiffs by violating their Sixth Amendment rights, as applied via the Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being denied access to counsel if caught in similar trap-and-arrest maneuvers when they seek to

witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## SIXTEENTH CLAIM FOR RELIEF
*(42 U.S.C. § 1983)*

177.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 176 as if set forth fully herein.

178.    The District of Columbia, MPD, and John or Jane Doe 11-20 Defendants engaged in widespread false arrests and Constitutional violations during these demonstrations that violated 42 U.S.C. § 1983.

179.    The Plaintiffs were deprived of their well established Constitutional rights afforded by the First Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, and Fourteenth Amendment.

180.    The pattern and practice of trap-and-arrest and subsequent confinements were intended, as a policy of the District of Columbia, MPD, and John or Jane Doe 11-20 Defendants, to ensure the arrest and confinement of large numbers of individuals, regardless of whether there was any probable cause to believe each of those individuals had committed an illegal or criminal act, as a method of controlling and suppressing demonstrations.  The Plaintiffs were subject to false arrest and deprived of their constitutional rights as a direct result of this policy.

181.    The Plaintiffs were further injured as a part of the unconstitutional practice of leaving prisoners handcuffed over the course of more than 12 hours. The widespread use of

restraints reflects a policy on the part of the District of Columbia, MPD, and John or Jane Doe 11-20 Defendants in these demonstrations.

182.     The John or Jane Doe 11-20 Defendants acted in their individual capacities to violate 42 U.S.C. §1983.

183.     The MPD, District of Columbia, and John or Jane Doe 11-20 Defendants acted intentionally, or with reckless disregard, in undertaking such actions as would violate clearly established constitutional rights of the Plaintiffs. The acts of these Defendants were malicious and in willful, wanton, or reckless disregard of the Plaintiffs' rights.

184.     Plaintiffs have suffered actual damages as a result of the violation of 42 U.S.C. § 1983 in the practice and policy of a trap-and-arrest policy as well as the practice and policy of abusive confinement described this Complaint.

185.     The District of Columbia, MPD, and John or Jane Doe 11-20 Defendants' deprivation of the Plaintiffs' constitutional rights not only created direct injury to the Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being denied their constitutional rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

**SEVENTEENTH CLAIM FOR RELIEF**
*(Bivens Action)*

186.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 185 as if set forth fully herein.

187.     The United States of America, Park Service, District of Columbia, MPD, and John or Jane Does 1-10 Defendants (the "*Bivens*" Defendants) engaged in widespread false arrests and constitutional violations during these demonstrations.

188.     The Plaintiffs were deprived of their constitutional rights by the *Bivens* Defendants, including deprivation of their Constitutional rights afforded by the First Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, and the Fourteenth Amendment.

189.     The pattern and practice of trap-and-arrest and subsequent confinements were intended, as a policy of the *Bivens* Defendants, to ensure the arrest and confinement of large numbers of individuals, regardless of whether there was any probable cause to believe each of those individuals had committed an illegal or criminal act, as a method of controlling and suppressing demonstrations.  The Plaintiffs were subject to false arrest and deprived of their constitutional rights as a direct result of this policy.

190.     The Plaintiffs were further injured as a part of the unconstitutional practice of leaving prisoners handcuffed over the course of more than 12 hours. The widespread use of restraints reflects a policy on the part of the *Bivens* Defendants in these demonstrations.

191.     The John or Jane Doe 1-10 Defendants acted in their individual capacities to violate the Plaintiffs' constitutional rights.

192.     The *Bivens* Defendants acted intentionally, or with reckless disregard, in undertaking such actions as would violate clearly established constitutional rights of the Plaintiffs.

The acts of these Defendants were malicious and in willful, wanton, or reckless disregard of the Plaintiffs' rights.

193.    The Plaintiffs have suffered actual damages caused by the *Bivens* Defendants' constitutional violations in the policy and practice of a trap-and-arrest maneuver and the policy and practice of abusive confinement described in this Complaint.

194.    The *Bivens* Defendants are liable for constitutional violations.  *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

195.    The *Bivens* Defendants' deprivation of the Plaintiffs' constitutional rights not only created direct injury to the Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being denied their constitutional rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## EIGHTEENTH CLAIM FOR RELIEF
(*42 U.S.C. § 1985*)

196.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 195 as if set forth fully herein.

197.    Defendants, and others not yet identified, conspired to deprive Plaintiffs, and others in their class, of their civil rights or privileges, including their First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

198.    Upon information and belief, prior to or on September 27, 2002, Defendants, and others not yet identified, agreed to utilize the unconstitutional trap-and-arrests maneuver described in this Complaint; instructed the law enforcement officers who would attend the protests to use the unconstitutional trap-and-arrest maneuver; or instructed the law enforcement officers who would attend the protests on how to perform the unconstitutional trap-and-arrest maneuver.

199.    Prior to September 27, 2002, Defendants agreed upon a cost-sharing plan for the law enforcement presence, which was to include, and did include, the use of the unconstitutional trap-and-arrest maneuver.

200.    Defendants took additional steps in furtherance of this conspiracy, including, but not limited to, failing to give an audible order to disperse or giving such an order and denying plaintiffs the ability to disperse; unlawfully arresting Plaintiffs; denying Plaintiffs access to counsel; failing to inform Plaintiffs of their *Miranda* rights; and placing Plaintiffs in restraints unnecessarily, including restraining them in a fetal position, and leaving them in such restraints for unnecessarily long periods of time.

201.    Defendants targeted Plaintiffs because of their perception of Plaintiffs' political beliefs and associations, which Defendants presumed because of their youth and student status.

202.    Upon information and belief, similarly situated journalists and observers who appeared to be older than the average college student were allowed to leave the trap-and-arrest area, while Plaintiffs were forbidden an exit.

203.    Plaintiffs were injured by the Defendants' conspiracy to deprive them of their Constitutional rights.

204.    The Defendants' conspiracy to deprive Plaintiffs of their constitutional rights not only created direct injury to the Plaintiffs, but also creates a chilling effect for them and other

similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being denied their constitutional rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

### NINETEENTH CLAIM FOR RELIEF
*(42 U.S.C. § 1986)*

205.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 204 as if set forth fully herein.

206.    Some or all of the Defendants, and others not yet identified, were aware of the conspiracy to violate Plaintiffs' rights, in violation of 42 U.S.C. § 1985, and neglected to prevent it.

207.    Upon information and belief, several of the Defendants' law enforcement officers knew of the conspiracy and yet participated in the unconstitutional trap-and-arrest maneuver.

208.    These Defendants were negligent in failing to prevent this conspiracy.

209.    Plaintiffs were injured by the Defendants' negligent failure to prevent this conspiracy.

210.    The Defendants' negligent failure to prevent this conspiracy to deprive Plaintiffs of their constitutional rights not only created direct injury to the Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated

persons remain at risk in the future of being denied their constitutional rights if caught in similar

trap-and-arrest maneuvers when they seek to witness or observe, and associate with others

witnessing and observing, protests and demonstrations in the Washington, D.C. area, including

protests and demonstrations planned for the coming months, and in any other area in which similar

trap-and-arrest maneuvers are practiced.

## TWENTIETH CLAIM FOR RELIEF
### (*Common Law Conspiracy*)

211.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 210 as

if set forth fully herein.

212.    Defendants conspired to deprive Plaintiffs of their civil rights or privileges,

including their First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

213.    Upon information and belief, prior to or on September 27, 2002, Defendants agreed

the unconstitutional trap-and-arrest maneuver would be utilized; instructed the law enforcement

officers who would attend the protests to use the unconstitutional trap-and-arrest maneuver; or

instructed the law enforcement officers who would attend the protests on how to perform the

unconstitutional trap-and-arrest maneuver.

214.    Defendants took additional steps in furtherance of this conspiracy, including, but

not limited to, failing to give an audible order to disperse or giving such an order and denying

Plaintiffs the ability to disperse; unlawfully arresting Plaintiffs; denying Plaintiffs access to

counsel; failing to inform Plaintiffs of their *Miranda* rights; and placing Plaintiffs in restraints

unnecessarily, including restraining them in a fetal position, and leaving them in such restraints for

excessive periods of time.

215.    Plaintiffs were injured by the Defendants' conspiracy to deprive them of their Constitutional rights.

216.    The Defendants' conspiracy to deprive Plaintiffs of their constitutional rights not only created direct injury to the Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being denied their constitutional rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## TWENTY-FIRST CLAIM FOR RELIEF
### (False Arrest)

217.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 216 as if set forth fully herein.

218.    Defendants unlawfully detained Plaintiffs when they arrested Plaintiffs on September 27, 2002.

219.    The false arrests have caused Plaintiffs reputational injury.  The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law.  All of the Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

220.    The Defendants' unlawful arrest of the Plaintiffs not only created direct injury to the Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for

future observation or media coverage of future demonstrations.  If this conduct is not enjoined,

Plaintiffs and other similarly situated persons remain at risk in the future of being unlawfully

arrested if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and

associate with others witnessing and observing, protests and demonstrations in the Washington,

D.C. area, including protests and demonstrations planned for the coming months, and in any other

area in which similar trap-and-arrest maneuvers are practiced.

### TWENTY-SECOND CLAIM FOR RELIEF
*(False Imprisonment)*

221.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 220 as

if set forth fully herein.

222.    Defendants unlawfully detained Plaintiffs when they arrested and imprisoned

Plaintiffs on September 27, 2002 and September 28, 2002.

223.    Plaintiffs were unlawfully deprived of their freedom by Defendants' use of actual

force and threats of force.

224.    Defendants acted intentionally in unlawfully imprisoning Plaintiffs.

225.    Mr. Chang, Ms. Chastain, and Ms. Young were confined in cells at Judiciary

Square until their release on September 28, 2002.

226.    Mr. Choi, Ms. Enright, Ms. Lee, and Mr. Zarconi were detained at the Academy,

handcuffed wrist to ankle for the majority of the time, until their release on September 28, 2002.

227.    The false imprisonments have caused Plaintiffs reputational injury.  The fact of an

arrest and a guilty plea will require the law students to report these facts to their respective bar

associations and face potential further inquiry as to their fitness to enter the practice of law.  All of

the Plaintiffs also will have to report the fact of their arrests and pleas in common employment

applications and future school applications.

228.    The Defendants' unlawful imprisonment of the Plaintiffs not only created direct injury to the Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Plaintiffs and other similarly situated persons remain at risk in the future of being unlawfully imprisoned if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## RELIEF REQUESTED

WHEREFORE, the Plaintiffs pray that this Court:

a.    Enter an order declaring that the trap-and-arrest and confinement policies and practices described in this Complaint violate the First Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, the Fourteenth Amendment, and 42 U.S.C. § 1983;

b.    Order injunctive relief to require clear and audible warnings to disperse at future protests with an opportunity for individuals to exit areas of protest;

c.    Order injunctive relief to compel the District of Columbia authorities to expunge the record of the Plaintiffs and reimburse any fines paid to secure release;

d.    Order injunctive relief to compel the District of Columbia authorities to expunge the record of any individuals unlawfully arrested and charged as part of the trap-and-arrest practices, including, but not limited to, the Plaintiffs;

e.    Order injunctive relief to require the reimbursement of criminal fines by those subject to these unlawful arrests, including but not limited to the Plaintiffs;

f.      Award Plaintiffs actual damages for harms caused by the Defendants' unlawful
conduct;

g.      Award Plaintiffs punitive damages where allowed by law;

h.      Award Plaintiffs reasonable attorneys' fees and costs incurred in maintaining this
action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (1994 & Supp. 1996);

i.      Award Plaintiffs damages and reasonable attorneys' fees and costs incurred in
maintaining this action pursuant to 42 U.S.C. § 1988; and

j.      Award such other relief as it may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury of twelve on all issues.

Respectfully submitted,


_____Jonathan Turley_____
Jonathan Turley (D.C. Bar 417674)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001



_____Daniel C. Schwartz_____
Daniel C. Schwartz (D.C. Bar No. 17749)
Vanessa Y. Chandler (D.C. Bar No. 459137)
BRYAN CAVE LLP
700 Thirteenth St., N.W.
Washington, D.C.  20005
(202) 508-6000

Counsel for Plaintiffs


December 6, 2002