## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

RAYMING CHANG
532 20th Street, N.W., Apt. # 706
Washington, DC 20006,

AMY CHASTAIN
1400 East-West Highway, Apt. # 1203
Silver Spring, MD 20910,

YOUNG CHOI
510 21st Street, N.W., Apt. # 710
Washington, DC 20006,

MEAGHAN ENRIGHT
Guthridge Hall
2115 F Street, N.W., Apt. # 112
Washington, DC 20052,

LEANNE LEE
600 20th Street, N.W., Apt. # 212
Washington, DC 20052,

ELIZABETH L. YOUNG
238 N. Payne Street
Alexandria, Virginia 22314,

CHRISTOPHER ZARCONI
950 25th Street, N.W., Apt. # 117S
Washington, DC 20037,

FRANKLIN JONES
3710 Hayes Street, N.E., Apt. # 304
Washington, D.C. 20019,

ERICA LUSK
1220 Blair Mill Road, Apt. # 304
Silver Spring, MD 20910,

CONSOLIDATED:
CASE NUMBER 1:02CV02010

JUDGE:  Emmet G. Sullivan
DECK TYPE:  General Civil

KERI RASMUSSEN                                        )
13029 Old Stage Coach Road, Apt. # 2718              )
Laurel, MD 20708                                     )
                                                     )
                    Plaintiffs,                      )
         v.                                          )
                                                     )
THE UNITED STATES OF AMERICA                         )
Office of the Attorney General                       )
950 Pennsylvania Avenue, N.W.                         )
Washington, D.C. 20530-0001,                         )
                                                     )
THE DISTRICT OF COLUMBIA                              )
John A. Wilson Building, 6th floor                   )
1350 Pennsylvania Avenue, N.W.                        )
Washington, D.C. 20004,                              )
                                                     )
ANTHONY A. WILLIAMS,                                 )
in his official capacity as                          )
Mayor of the District of Columbia                    )
1350 Pennsylvania Avenue, N.W.                        )
Washington, D.C. 20001                               )
                                                     )
THE NATIONAL PARK SERVICE                             )
1849 C Street, N.W.                                  )
Washington, D.C. 20240,                              )
                                                     )
RICHARD MURPHY,                                      )
in his official capacity as a                        )
Major, U.S. Park Police                              )
1849 C Street, N.W.                                  )
Washington, D.C. 20240,                              )
                                                     )
CHARLES H. RAMSEY                                    )
in his official capacity as                          )
Chief Executive Officer of the                       )
Metropolitan Police Department                       )
300 Indiana Avenue, N.W.                             )
Washington, DC 20001,                                )
                                                     )
PETER J. NEWSHAM,                                    )
in his official capacity as                          )
Assistant Chief of the                               )
Metropolitan Police Department                       )
300 Indiana Avenue, N.W.                             )
Washington, D.C. 20001                               )

JOHN or JANE DOES 1-10, 11-20 )
)
Defendants. )
_____)

## CONSOLIDATED SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs RayMing Chang, Amy Chastain, Young Choi, Meaghan Enright, Leanne Lee, Elizabeth L. Young, and Christopher Zarconi (hereinafter "the Chang Plaintiffs") and Plaintiffs Franklin Jones, Erica Lusk, and Keri Rasmussen (hereinafter "the Jones Plaintiffs") bring this Complaint.  The Chang Plaintiffs allege as follows[1]:

## NATURE OF THE ACTION

1.      This is an action for injunctive and declaratory relief to protect the Chang Plaintiffs and the public from a policy or practice of "trap-and-arrest" in which police surround persons, including persons engaged in no illegal conduct, who receive no order to disperse and who, even if such an order to disperse is given, are deprived of any ability to leave the area.

2.      This action further seeks injunctive and declaratory relief to protect the Chang Plaintiffs and the public from a policy of arresting journalists, bystanders, and observers who are caught within trap-and-arrest zones during demonstrations.

3.      This action further seeks injunctive and declaratory relief to protect the Chang Plaintiffs and the public from the use of excessive force in preventing individuals from leaving trap-and-arrest zones.

---

[1]   The allegations of the Jones Plaintiffs' begin at paragraph 242 and with the twenty-third claim for relief.

4.       This action further seeks injunctive and declaratory relief to protect the Chang Plaintiffs and the public from a practice or policy of keeping arrested individuals in restraints or handcuffs for excessive periods, of up to 24 hours or more, including handcuffing individuals in a fetal position by handcuffing one wrist to the person's opposing ankle (*e.g.*, handcuffing a person's right wrist to that person's left ankle).

5.       This action further seeks injunctive and declaratory relief to protect the Chang Plaintiffs and the public from the use of abusive confinement and threats to secure no contest pleas.

6.       This action further seeks injunctive and declaratory relief to protect the Chang Plaintiffs and the public from the practice of denying arrestees their right to access to counsel and other *Miranda* rights.

7.       This action further seeks damages for injuries sustained by the Chang Plaintiffs which were caused by the Defendants' unlawful actions.

8.       This action further seeks damages for injuries sustained by the Chang Plaintiffs which were caused by the Defendants' conspiracy to deprive the Chang Plaintiffs of their Constitutional rights.

9.       This action further seeks damages for injuries sustained by the Chang Plaintiffs which were caused by certain Defendants' negligence in failing to prevent the other Defendants' conspiracy to deprive the Chang Plaintiffs of their Constitutional rights.

10.      These challenged policies and practices deprived the Chang Plaintiffs of their rights under the First Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, and the Fourteenth Amendment of the United States Constitution, and violated laws

governing the proper conditions for arrest, use of restraints, and processing of individuals in custody.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (1996).

12.     Venue is proper pursuant to both 28 U.S.C. § 1391 (b) & (e) (1996).

13.     This Court has the authority to render injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 (1996).

## THE PARTIES

### *Definitions*

14.     General John G. Pershing Park ("Pershing Park") is an area of federal park land located between 14th and 15th Streets, N.W., on Pennsylvania Avenue, N.W., Washington, D.C. "Freedom Plaza" is located between 13th and 14th Streets, N.W., on Pennsylvania Avenue, N.W., Washington, D.C.  Both are four to five blocks from the main buildings of the World Bank and the International Monetary Fund ("IMF"), and on the other side of the White House-Treasury Department complex.

15.     *The Hatchet* is an independent newspaper servicing the George Washington University and the surrounding community.  *The Hatchet* has been in existence for 99 years, has a circulation of 11,500, is distributed at over 70 locations, and is published twice a week.  *The Hatchet* has received numerous awards for journalism and photojournalism, including awards from the Society of Professional Journalists.

16.     The Metropolitan Police Academy (the "Academy") is a facility of the Metropolitan Police Department ("MPD") of the District of Columbia, located at 4665 Blue Plains Drive, S.W., Washington, D.C.

17.     Judiciary Square is a District of Columbia government facility located at or near 409 F. Street, N.W., Washington, D.C.

18.     The National Lawyers Guild ("NLG") is a national organization founded in 1937 which works for legal reform and social justice.

### The Chang Plaintiffs

19.     At the time of the events that are the subject of this complaint, the Chang Plaintiffs were students enrolled at the George Washington University in Washington, D.C.  Five of the Chang Plaintiffs are residents of the District of Columbia, one is a resident of the Commonwealth of Virginia, and one is a resident of the State of Maryland.

20.     At the time of the events that are the subject of this complaint, RayMing Chang was a first-year law student at the George Washington University and a resident of the District of Columbia.  Mr. Chang was arrested on the morning of  September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza.  Mr. Chang was not a protester but was in that area in his capacity as a legal observer for the NLG.  Mr. Chang was wearing a badge which identified him as an NLG member.  Mr. Chang was held for approximately 18 hours by the MPD, most of which was on a bus at Judiciary Square in Washington, D.C.  He was handcuffed during 13 of those hours.  He was released after 3:00 a.m. on September 28, 2002 after paying a $100 fine.

21.     At the time of the events that are the subject of this complaint, Amy Chastain was a third-year law student at the George Washington University and a resident of Silver Spring, Maryland.  Ms. Chastain was arrested on the morning of  September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza.  Ms. Chastain was not a protester but was in that area in her capacity as a legal observer for the NLG.  Ms. Chastain was wearing a green hat clearly marked with the letters NLG and an identification tag to identify her as an observer for the NLG.  Ms.

Chastain was held for approximately 18 hours by the MPD, most of which was on a bus at Judiciary Square in Washington, D.C. She was handcuffed during 13 of those hours. She was released after 3:00 a.m. on September 28, 2002 after paying a $100 fine.

22.     At the time of the events that are the subject of this complaint, Young Choi was an undergraduate student at George Washington University and a resident of the District of Columbia. He was the staff photographer for *The Hatchet*. On September 27, 2002, Mr. Choi was in the vicinity of Pershing Park and Freedom Plaza taking photographs for *The Hatchet*. He was not a protester. Mr. Choi was standing in the group which was encircled by police in riot gear. Mr. Choi tried to explain to the officers that he was a staff photographer with *The Hatchet* and showed his press ID, but he was not allowed to leave. He was arrested, loaded onto a Metro bus, and taken to the Academy. Mr. Choi was held on the fully loaded bus for approximately 15 hours, after which time he was "processed," and then handcuffed ankle to wrist until his release. Mr. Choi was not released until he agreed to "forfeit collateral" and pay a $50 fine for allegedly failing to obey a lawful order. When he asked for an explanation, the officers told him that he could either be released at that time by paying $50 or he could stay in custody until as late as Tuesday to attend court. Mr. Choi paid the fine and was released around 2:00 a.m. on September 28, 2002.

23.     At the time of the events that are the subject of this complaint, Meaghan Enright was an undergraduate student at George Washington University and a resident of the District of Columbia. Ms. Enright was in the vicinity of Pershing Park and Freedom Plaza on September 27, 2002 taking photographs of protester and police activities which she hoped to have published in *The Hatchet*. Ms. Enright was not a protester. When police officers in riot gear from several jurisdictions, including MPD, surrounded the plaza at approximately 10:00 a.m., Ms. Enright

was denied an exit and was arrested, along with everyone else within the perimeter.  Ms. Enright was handcuffed with her hands behind her, loaded onto a Metro bus, and driven to the Academy. She was held on the bus until she was taken off to be processed at approximately 8:30 p.m. Then, she was taken to a mat on the floor of the Academy gymnasium and her right wrist was handcuffed to her left ankle.  She was forced to remain in this fetal position for most of the time until she was released at approximately 2:00 p.m. on September 28, 2002.  Ms. Enright's mother sent a lawyer to the Academy to represent her daughter, but Ms. Enright was denied access to her counsel.

24.     At the time of the events that are the subject of this complaint, Leanne Lee was an undergraduate student at George Washington University and a resident of the District of Columbia.  Ms. Lee was arrested on September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza while on a photo assignment as a journalist with *The Hatchet*.  Ms. Lee was not a protester.  After being arrested, Ms. Lee was loaded onto a Metro bus and taken to the Academy. Ms. Lee remained in handcuffs until her release at approximately 1 p.m. on September 28th after spending the night with her wrist shackled to her ankle.  After being told that she would not be released until Monday if she challenged her arrest, she agreed to plead no contest to a charge of failing to obey an order to disperse and pay a $50 fine.

25.     At the time of the events that are the subject of this complaint, Elizabeth Young was a second-year law student at the George Washington University and a resident of Alexandria, Virginia.  She was arrested in the morning of September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza.  Ms. Young was present as an observer for the NLG.  Ms. Young was wearing a green NLG hat and a badge that identified her as an NLG member.  She noticed that the police had surrounded the area and were compressing the trapped crowd into a

small area by using lines of riot police.  Ms. Young asked to leave, explaining that she was not a

protester.  She was repeatedly denied an exit and was handcuffed.  She was held in handcuffs by

the police on a bus at Judiciary Square in Washington, D.C. for most of the time she was

detained.  Ms. Young was released at approximately 2:30 a.m. on September 28, 2002 after

paying a $100 fine.

26.     At the time of the events that are the subject of this complaint, Christopher

Zarconi was an undergraduate student at George Washington University and a resident of the

District of Columbia.  He was a paid employee of *The Hatchet* where he worked as the photo-

editor.  On September 27, 2002, Mr. Zarconi was in the vicinity of Pershing Park and Freedom

Plaza taking photographs for the newspaper.  He was not a protester.  After the police surrounded

the area, Mr. Zarconi displayed his press pass and asked to be allowed to leave, but the officers

denied his request and told him that nobody was allowed to leave the plaza.  Mr. Zarconi, along

with everyone else in the perimeter, was then corralled into one corner of the plaza by police in

riot gear in a trap-and-arrest maneuver and arrested, loaded onto a Metro bus, and taken to the

Academy.  He was held in restraints on the bus for over 10 hours and then handcuffed in a fetal

position for over 12 hours.  Mr. Zarconi was released about 1:00 p.m. Saturday, September 28,

2002 after paying a $50 fine.

### The Chang Defendants

27.     The United States is an interested party because various federal agencies,

including but not limited to the United States Department of the Interior and the National Park

Service, reportedly participated in the planning and carrying out of the arrests and detentions

described in this Complaint.  The Attorney General of the United States and the United States

Attorney for the District of Columbia represent the Executive Branch of the United States Government in such matters.

28.      The District of Columbia is a municipal corporation and constitutes the city government of Washington, D.C.  It was created by and exists under the laws of the United States.

29.      The National Park Service ("Park Service") is part of the United States Department of the Interior.  The Park Service is responsible for some of the areas in which arrests were made.  Park Service police participated in the trap-and-arrest practices described in this Complaint and supplied both personnel and resources to the enforcement effort during the protests.  According to the Final Report Relative to Complaints of Alleged Misconduct Made at the October 24, 2003, Hearing of the Committee on the Judiciary of the Council of the District of Columbia Concerning the IMF/World Bank Protests (hereinafter "Final Report"), the Fairfax County Police Department ("Fairfax Police") also participated in the trap and arrest by supplying personnel to the enforcement efforts.

30.      Chief Charles Ramsey is the head of the MPD.  The MPD is the agency responsible for policing the District of Columbia.  According to the Final Report, MPD officers participated in the trap-and-arrest practices described in this Complaint and supplied personnel and resources to the enforcement effort during the protests.  The MPD officers also participated in the detention of the Plaintiffs and other arrestees, including restraining them, depriving them of counsel, and coercing no contest pleas from them in exchange for release.

31.      Peter J. Newsham is an Assistant Chief of the MPD.  He is in charge of the Office of Professional Responsibility.  Chief Newsham was on duty at Pershing Park on September 27, 2002 and was responsible for Area IV of the World Bank/IMF demonstration detail, which

encompassed Pershing Park.  According to the Final Report, while on the scene at Pershing Park,

Assistant Chief Newsham gave the order to arrest the individuals in the park for "Failure to obey

a police order."

32.     Richard Murphy is a Major in the U.S. Park Police.  Major Murphy was on the

scene at Pershing Park on September 27, 2002 and witnessed the individuals being detained in

Pershing Park.  According to the Final Report, Major Murphy told Assistant Chief Newsham that

the conduct in Pershing Park did not meet the criteria for mass arrests based on Park Police

protocols, however, then assisted MPD by positioning Park Police officers around the perimeter

of Pershing Park in order to prevent anyone from leaving.  As detailed in the Final Report, the

Fairfax Police also assisted in holding protesters back and keeping them from exiting during the

arrest process.

33.     John or Jane Does 1-10 are, as yet, unidentified agents, officers, or officials of the

federal government or the District of Columbia who were responsible for, personally participated

in, or observed and took no action to correct or prevent, the illegal and unconstitutional arrests

described in this Complaint, including, among others: the trap-and-arrest practices; the policy of

extended detention; the practice of using restraints for excessive periods of time, including the

use of restraints to restrict arrestees to a fetal position; the policy of denying arrestees their

access to counsel; and the practice of using abusive confinement and threats to secure no contest

pleas.

34.     John or Jane Does 11-20 are, as yet, unidentified agents, officers, or officials of

the District of Columbia go vernment or other state or local governments who were responsible

for, personally participated in, or observed and took no action to correct or prevent, the illegal

and unconstitutional arrests described in this Complaint, including, among others: the trap-and-

arrest practices; the policy of extended detention; the practice of using restraints for excessive periods of time, including the use of restraints to restrict arrestees to a fetal position; the policy of denying arrestees their access to counsel; and the practice of using abusive confinement and threats to secure no contest pleas.

## FACTUAL BACKGROUND

### *The Trap-and-Arrest Practice*

35.     The instant matter comes before the Court after hundreds of arrests were carried out by MPD, Park Service police, and other state, local, and federal police departments.

36.     The protests occurred on the weekend of September 27, 2002, at various locations around Washington, D.C.

37.     The number of protesters was initially estimated to be between 3000 and 5000 people.

38.     The U.S. government and District of Columbia government assembled a huge police force, including police officers from other states and local governments, to deal with expected demonstrations.  Ultimately, it was reported that the number of protesters was so small that 650 of 1700 police officers assembled from numerous police forces were sent home and D.C. Chief of Police Charles H. Ramsey admitted there was "no justification" for keeping such a large police force given the small size of the protests.

39.     The protests were directed against the policies of the World Bank, the International Monetary Fund ("IMF"), and the United States government as they relate to a host of concerns including the environment, worker rights, third world debt and the rights of indigenous people.

40.     Reportedly, while there were limited incidents of property damage, the protests were largely peaceful and did not result in significant property damage.

41.     Announcements about the protests were publicized weeks in advance and described a variety of exhibitions ranging from live music to giant puppets shows to bicycle groups.

42.     Given the prior media coverage, a significant number of individuals in addition to the protesters themselves were present to witness the activities.  In addition to bystanders and protesters, there was a large contingent of journalists in the area of the protests, including ones from the nearby George Washington University, as well as individuals serving as observers to record any abusive conduct by the police.

43.     The George Washington University is located next to two of the institutions targeted by some protesters, the World Bank and the IMF.  Some individual schools of the University, including the George Washington University Law School, and some student dormitories are located directly across the street from these sites.  The University is also located within a few blocks of the White House and the United States State Department.  Students on campus could see or hear the protests at these various locations and, by simply walking out the doors of their schools or dormitories, were within the general protest area.

44.     Prior to and during the protests, neither police nor public officials closed nearby institutions, including the George Washington University, or prohibited observers or journalists from viewing the protests or the actions of the protesters or police, and had not warned observers or journalists that they could be arrested if found within the area of the protests.

45.     In various locations in which protests occurred, the police surrounded large numbers of individuals and cut off all exits.  Individuals caught within these zones were often

prevented from leaving for up to two hours, after being compressed into a smaller area by formations of police in riot gear advancing toward each other or some natural barrier (such as a wall), with the individuals caught between them and unable to exit.  Eventually, the persons caught in such traps were arrested.  These actions demonstrated an apparent pattern and practice of encircling, trapping, and arresting protesters and everyone else in their vicinity as a method of suppressing the demonstrations by removing large numbers of individuals from the vicinity.

46.     It was reported that this trap-and-arrest technique resulted in almost 700 arrests by mid-afternoon on the first day, September 27, 2002.

47.     After the fact, D.C. Chief of Police Ramsey was reported as explaining that anyone caught in these zones "had no business in the street" and that he viewed such presence as a cause for arrest.  D.C. Chief of Police Ramsey further stated publicly that "mayhem" would result unless he arrested anyone deemed to be "blocking a street."

48.     Witnesses in the media observed this technique and noted that bystanders, observers, and journalists were often arrested with protesters when they were unable to leave the arrest zones.  The Final Report confirms that this technique was used to make arrests.

49.     D.C. Chief of Police Ramsey reportedly heralded these arrests as instrumental to the police's ability to keep control over the protests.  Of the mass arrests, he observed that "a lot of wind was taken out of their sails Friday."

### *The Arrests of the Chang Plaintiffs*

50.     All of the Chang Plaintiffs are George Washington University students who were present at the protests as journalists, bystanders, or observers.

51.      RayMing Chang was arrested on the morning of  September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza while serving as a legal observer for the NLG. Given the allegations of abusive police conduct at other anti-globalization protests, Mr. Chang and his fellow observers were asked to observe the protests and keep a log of events and any abusive conduct.  Mr. Chang never heard a demand to disperse, he was never given an order to disperse, and he was not engaged in any protest activity.  Mr. Chang was wearing an NLG identification badge.  Mr. Chang attempted to leave the area but was prevented from doing so. Mr. Chang was trapped within a closed perimeter and then arrested.  He was handcuffed, loaded onto a Metro bus, and taken to the Academy and then to Judiciary Square for allegedly disobeying an order.

52.      Amy Chastain was arrested on the morning of September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza while serving as an observer for the NLG.  Ms. Chastain was never given an order to disperse.  She was not engaged in any protest activity.  Ms. Chastain observed other people, including some who appeared to be tourists, being denied exit when they tried to leave the area.  Although Ms. Chastain was wearing a green hat clearly marked with the letters NLG and an identification tag identifying her as an observer for the NLG, she was herded into a corner with all the other people caught inside the trap-and-arrest perimeter and arrested. She was handcuffed, loaded onto a Metro bus, and taken to the Academy and then to Judiciary Square for allegedly disobeying an order.

53.      Young Choi is the staff photographer for *The Hatchet*.  He was not engaged in any protest activity.  On September 27, 2002, Mr. Choi was in the vicinity of Pershing Park and Freedom Plaza taking photographs for *The Hatchet*.  Mr. Choi was never given an order to disperse.  He was standing with the group which was encircled by police in riot gear.  Mr. Choi

tried to explain to the officers that he was a staff photographer with *The Hatchet*, but he was not allowed to leave.  He was handcuffed and loaded onto a Metro bus and taken to the Academy for allegedly disobeying an order to disperse.

54.     Meaghan Enright was arrested on the morning of September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza while taking photographs she hoped to have published in *The Hatchet*.  Ms. Enright was never given an order to disperse.  Police officers in riot gear from several jurisdictions, including MPD, surrounded the plaza at approximately 10:00 a.m.  When Ms. Enright tried to leave, she was denied an exit, and when she asked why she was being detained, the officers would not answer.  After approximately an hour, the police began closing the perimeter until everyone inside the perimeter was herded into one corner of the plaza.  The officers then arrested everyone inside the perimeter, including Ms. Enright.  The officers confiscated Ms. Enright's camera equipment and, after telling her that they would not be responsible for any loss or damage, threw it onto a pile of confiscated possessions.  She was handcuffed, loaded onto a Metro bus, and taken to the Academy for allegedly disobeying an order.

55.     Leanne Lee was arrested on September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza while on a photo assignment as a journalist with *The Hatchet*.  She was arrested after being surrounded and confined in a trap-and-arrest zone.  Ms. Lee never heard an order to disperse.  She was not engaged in any protest activity and desired to leave the area but was prevented from doing so.  She was repeatedly denied such an exit by the police when she approached officers to explain that she needed to leave to go to her internship at Agence France Presse ("AFP"), a French news service.  Ms. Lee used her cellular phone to call her employer at AFP several times during her detention to advise him that she was being detained and was unable

to get to the AFP office.  Ms. Lee was handcuffed and an officer used a knife to cut the strap on a camera equipment bag that she was holding before she was moved to a bus.  She was taken to the Academy for allegedly disobeying an order.

56.     Elizabeth Young was arrested on the morning of September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza while serving as an observer for the NLG.  Ms. Young was wearing a hat emblazoned with the letters NLG and a badge which clearly identified her as an observer for the NLG.  Ms. Young was never given an order to disperse.  She was not engaged in any protest activity.  Ms. Young asked to leave and was repeatedly denied an exit. She was handcuffed, loaded onto a Metro bus, and taken to the Academy and then to Judiciary Square for allegedly disobeying an order.

57.     Christopher Zarconi was arrested on the morning of September 27, 2002 in the vicinity of Pershing Park and Freedom Plaza while taking photographs in his capacity as photo-editor of *The Hatchet*.  Mr. Zarconi was never given an order to disperse.  He was not engaged in any protest activity.  After being informed by another journalist that police in riot gear had formed a perimeter and were denying everyone exit from the plaza, Mr. Zarconi made his way to the perimeter to seek exit.  Mr. Zarconi displayed his press pass and asked to be allowed to leave, but the officers denied his request and told him that nobody was allowed to leave the area.  Mr. Zarconi, along with everyone else in the perimeter, was then corralled into one corner of the plaza by police in riot gear in a trap-and-arrest maneuver.  Before being loaded onto a Metro bus, Mr. Zarconi again displayed his press pass and asked to be allowed to leave.  He was denied once again.  His camera bag was confiscated and thrown onto a pile of other confiscated bags, and he was not given a receipt of any sort for his equipment, some of which was expensive.  Mr.

Zarconi was handcuffed, loaded onto a Metro bus, and taken to the Academy for allegedly disobeying an order.

### The Confinement and Release Conditions

58.     Four of the Chang Plaintiffs were held at the Academy until the afternoon of Saturday, September 28, 2002, and three of the Chang Plaintiffs were held at Judiciary Square until the early morning hours of Saturday, September 28, 2002.

59.     RayMing Chang was held until the early morning of September 28, 2002; most of this time was spent handcuffed, the discomfort of which prevented him from sleeping.  After sitting on the full bus for approximately 13 hours, Mr. Chang was taken to cellblock B in the Judiciary Center.  Mr. Chang was not given access to individual counsel before being asked by police officers to plead to criminal charges.  Mr. Chang was told that he was charged with "Failure to Obey" and was given three options:  (1) remain in custody until an arraignment on Saturday or Monday, (2) pay $100 and "forfeit," or (3) pay $100 and schedule a hearing at Superior Court later.  Mr. Chang selected the third option because he did not want to remain in custody.  Despite having made his selection clear, the station clerk marked Mr. Chang's collateral receipt as "forfeit."

60.     Amy Chastain was held from the morning of September 27, 2002 to the early morning of September 28, 2002.  She remained handcuffed and on a Metro bus for much of this time.  She was later taken to Judiciary Square for processing and held there until her release.  Ms. Chastain was not given access to individual counsel before being asked by police officers to plead to criminal charges.  During processing, Ms. Chastain was asked about her involvement in the protests and was asked her purposes for being in the arrest zones.  She was told by an officer that she had to choose between remaining in custody until arraignment or paying $100 to "post

and forfeit."  In order to end her confinement, Ms. Chastain opted to pay the $100 fine and was then released.

61.     Young Choi was held from the morning of September 27, 2002 until the early morning of September 28, 2002.  He was held in handcuffs on a Metrobus for approximately 6 hours at the Academy.  After he was processed, he was taken to a mat in the Academy and handcuffed in a fetal position, wrist to opposite ankle, for approximately 8 hours.  Mr. Choi was not given access to individual counsel before being questioned by police officers and being asked to plead to criminal charges.  Mr. Choi was not released until he agreed to "forfeit collateral" and pay a $50 fee for allegedly failing to obey a lawful order.  When he asked for an explanation, the officers told him that he could either be released at that time by paying $50 or he could stay in custody until as late as Tuesday to attend court.  Mr. Choi paid the fine and was released around 2:00 a.m. on September 28, 2002.

62.     Meaghan Enright was held from the morning of September 27, 2002 to the afternoon of September 28, 2002.  After she was arrested, she was handcuffed with her hands behind her, loaded onto a Metro bus, and driven to the Academy.  She was unloaded from the bus and processed at approximately 8:30 p.m.  The rest of her belongings, except her identification and $50 to "pay out," were confiscated, including shoelaces and drawstrings.  Ms. Enright was not given access to individual counsel before being questioned by police officers and being asked to plead to criminal charges.  During processing, Ms. Enright was briefly asked about her involvement in the protests and was asked her purposes for being in the arrest zones. She was taken to a mat on the floor of the Academy gymnasium and her right wrist was handcuffed to her left ankle.  She was forced to remain in this fetal position for most of the time until she was released at approximately 2:00 p.m. on September 28, 2002.  Ms. Enright's mother

sent a lawyer to the Academy to represent her daughter, but Ms. Enright was denied access to her counsel.  The officers told Ms. Enright that she did not have a right to an attorney because she was not being interrogated.  Any questions or messages Ms. Enright had for her attorney were to be relied via an officer.  Ms. Enright was told that she had three options:  (1) pay $50 and be released, (2) plead guilty, or (3) plead not guilty and remain in custody until Monday.  Ms. Enright was not given the opportunity to discuss this choice with her counsel.  She paid the fine in order to secure her release.

63.     Leanne Lee was held from the morning of September 27, 2002 to the afternoon of September 28, 2002.  She was held on a Metro bus at the Academy for several hours before being processed.  Ms. Lee was not given access to individual counsel before being asked by police officers to plead to criminal charges.  She was denied a vegetarian meal; the only food she had during her more than 24 hours of detention consisted of a granola bar she successfully begged from a passing officer and a cookie.  While still handcuffed, Ms. Lee was moved to a mat with seven or eight other people.  Then, an officer handcuffed Ms. Lee's right wrist to her left ankle and left Ms. Lee to sleep in this fetal position.  She remained handcuffed in this fetal position until approximately 1 p.m. the following day, September 28, 2002.  Ms. Lee was told by an officer that if she challenged the arrest, she would be held until Monday.  In order to end this confinement, she finally agreed to plead no contest, paid a $50 fine, and was then released.

64.     Elizabeth Young was held from the morning of September 27, 2002 to the early morning of September 28, 2002.  She remained handcuffed for most of this period.  For almost two hours, the police refused her repeated requests to have the restraints loosened despite her complaints of pain in her wrists.  Ms. Young was held on a Metro bus for much of this time and then was held at Judiciary Square until her release.  Ms. Young was not given access to

individual counsel before being asked by police officers to plead to criminal charges.  Ms. Young was given three options:  (1) remain in custody until an arraignment on Saturday or Monday, (2) pay $100 and "forfeit," or (3) pay $100 and schedule a hearing at Superior Court later.  Ms. Young selected the third option because she did not want to remain in custody.  Despite having communicated this choice to the station clerk,  Ms. Young's collateral receipt was marked "forfeit."

65.     Christopher Zarconi was held from the morning of September 27, 2002 until the afternoon of September 28, 2002.  After he was placed on a Metro bus, he was driven to the Academy.  Mr. Zarconi was forced to sit handcuffed on this fully loaded bus from approximately 11:00 a.m. until approximately 9:30 p.m.  He and the other arrestees had to ask permission to use the restroom, and then they were taken in small groups.  When Mr. Zarconi was allowed off the bus, he was taken into the Academy to be "processed."  The rest of his belongings, including shoelaces and drawstrings, were confiscated and placed in an evidence bag.  Mr. Zarconi was photographed and fingerprinted and allowed to use the automated teller machine to withdraw $50, which he was told he would need if he wanted to leave custody before Tuesday.  Mr. Zarconi was not given access to individual counsel before being questioned by police officers.  At one point during processing, Mr. Zarconi was asked about his "cause;" Mr. Zarconi explained he was not a protester but was a member of the press.  Nonetheless, he was then led to a wrestling mat on the floor of the gymnasium and handcuffed right wrist to left ankle.   Mr. Zarconi was forced to remain in this fetal position for over 12 hours until approximately 1:00 p.m. Saturday, September 28, 2002.  Mr. Zarconi was required to pay $50 before being released from custody.

*Alleged Injuries and Standing*

66.     The Chang Plaintiffs suffered direct and significant injuries due to the violations described in this Complaint.

67.     The arrest practices described in this Complaint caused the Chang Plaintiffs to be subject to improper arrest and confinement, some for 24 hours or more.

68.     The arrest practices described in this Complaint further caused the Chang Plaintiffs to be subject to criminal charges and criminal fines.

69.     The arrest practices described in this Complaint further prevented the Chang Plaintiffs from participating in protected activities, including the exercise of their rights of free press, free association, and assembly.

70.     The confinement practices described in this Complaint caused the Chang Plaintiffs to be restrained for excessive periods without proper cause or authority.

71.     The confinement practices described in this Complaint caused the Chang Plaintiffs physical harm and discomfort by being denied proper food and movement during the time that they were in custody.

72.     The arrest and confinement practices further harmed the Chang Plaintiffs by coercing no contest pleas to criminal charges under the threat of longer confinement under abusive, illegal conditions, resulting in the creation of criminal records against them, and requiring them to pay fines.

73.     The arrest and confinement practices further harmed the Chang Plaintiffs by subjecting them to reputational and professional injury stemming from their arrest for allegedly disobeying police orders to disperse while performing their roles as journalists and observers.

74.     The Chang Plaintiffs suffered direct injury to their reputations and status in the denial of their right to counsel before being asked to plead no contest to criminal charges.

75.     The Chang Plaintiffs suffered direct injury to their reputations and status in the denial of *Miranda* warnings before being questioned and asked to plead in a criminal matter.

76.     The Chang Plaintiffs, and other similarly situated persons, remain at risk of future arrests if arrest and detention procedures similar to those described in this Complaint occur while witnessing future protests and demonstrations, including ones planned for the coming months.

77.     As individuals directly harmed by unconstitutional and unlawful practices of arrest and confinement, the Chang Plaintiffs have standing to seek relief before this Court for an actual controversy under the Declaratory Judgment Act and to seek damages and other appropriate relief, including injunctive relief.

### The Aftermath

78.     Following the arrests of the Chang Plaintiffs and others, based on allegations of official misconduct, the MPD conducted an investigation.

79.     Reports containing the results of the internal investigations were provided to both Chief Ramsey and Mayor Williams in 2003.  Copies of those investigative materials and report (the "Report") have been provided to the parties and posted on the docket by the Court.

80.     The Report found the order to arrest the individuals in Pershing Park was given by Assistant Chief Newsham.

81.     The Report found that it was possible that there were individuals in Pershing Park that were not part of any protest group.  The Report also found that it was possible that numerous individuals inside Pershing Park had arrived there lawfully.

82.     The Report found there was no evidence that Pershing Park had been cleared before any larger groups of protesters entered the park.

83.     The Report found that the information and details on each arrest form – specifically indicating that an arrestee had been given an order to leave Pershing Park was "exposed" as inaccurate – in fact, none of the officers could actually testify that any individual was actually given a warning to leave.

84.     The Report found that each arrestee was subject to "an improper charge for this particular event" and that the "arrest paperwork could not support the claim that each officer personally warned each of the defendants listed in the form."

85.     The Report found that the MPD's policy of at least two documented warnings prior to an arrest being made was not followed in this case as "no warnings were given" to the individuals in Pershing Park.

86.     The Report found that Assistant Chief Newsham, Park Police Major Murphy, and others stated they heard "no warnings to disperse given by police."

87.     Indeed, the Report also found there was no evidence that individuals were given warnings before entering Pershing Park.

88.     Finally, the Report concluded that "police officials on the scene made procedural errors as it relates to the affecting of arrests, choice of criminal charges, and manner of arrest documentation."

## FIRST CLAIM FOR RELIEF
*(The First Amendment of the United States Constitution; Right of Assembly)*

89.     The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 88 as if set forth fully herein.

90.     The arrest and confinement practices and policies described in this Complaint violate the right of assembly guaranteed in the First Amendment of the United States Constitution.

91.     The First Amendment protects the rights of free speech, a free press, association and peaceful assembly. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980). These rights "share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Id.* Public streets and sidewalks are "public fora" and restrictions on activities in such fora are "subject to a particularly high degree of scrutiny." *United States v. Grace*, 461 U.S. 171, 177 (1983); *NAACP Western Region v. City of Richmond*, 743 F.2d 1346 (9th Cir. 1984); *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996). By merely observing protests in close proximity to their residences and schools, however, George Washington University students, including the Chang  Plaintiffs, were subject to trap-and-arrest tactics.

92.     The arrest and confinement practices and policies described in this Complaint violate the right of citizens to walk, to assemble, and to observe events under the First Amendment of the United States Constitution. The Chang Plaintiffs were not in violation of any law by peacefully appearing on public streets to witness or record events. The Defendants prevented the Chang Plaintiffs from continuing these protected activities without cause and without warning.

93.     The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Chang Plaintiffs exercising their First Amendment rights, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations. If this conduct is not enjoined, the Chang Plaintiffs and other

similarly situated persons remain at risk in the future of being caught in similar trap-and-arrest

maneuvers when they seek to witness or observe, and assemble with others witnessing and

observing, protests and demonstrations in the Washington, D.C. area, including protests and

demonstrations planned for the coming months, and in any other area in which similar trap-and-

arrest maneuvers are practiced.

### SECOND CLAIM FOR RELIEF
(*The Fourteenth Amendment of the United States Constitution; Right of Assembly*)

94.     The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1

through 93 as if set forth fully herein.

95.     The arrest and confinement practices and policies described in this Complaint

violate the right of assembly guaranteed in the First Amendment of the United States

Constitution.

96.     The First Amendment applies to certain of the Defendants via the Fourteenth

Amendment to protect the rights of free speech, a free press, association and peaceful assembly.

*Richmond Newspapers*, 448 U.S. at 576.  These rights "share a common core purpose of assuring

freedom of communication on matters relating to the functioning of government." *Id.* Public

streets and sidewalks are "public fora" and restrictions on activities in such fora are "subject to a

particularly high degree of scrutiny." *Grace*, 461 U.S. at 177; *NAACP*, 743 F.2d at 1346;

*Collins*, 110 F.3d at 1371.  By merely observing protests in close proximity to their residences

and schools, however, George Washington University students, including the Chang Plaintiffs,

were subject to trap-and-arrest tactics.

97.     The arrest and confinement practices and policies described in this Complaint

violate the right of citizens to walk, to assemble, and to observe events under the First

Amendment of the United States Constitution, as applied via the Fourteenth Amendment.  The

Chang Plaintiffs were not in violation of any law by peacefully appearing on public streets to

witness or record events.  The Defendants prevented the Chang Plaintiffs from continuing these

protected activities without cause and without warning.

98.     The trap-and-arrest practice, and subsequent abusive detention, not only created

direct injury to the Chang Plaintiffs exercising their First Amendment rights, as applied via the

Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated

persons for future observation or media coverage of future demonstrations.  If this conduct is not

enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of

being caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and

assemble with others witnessing and observing, protests and demonstrations in the Washington,

D.C. area, including protests and demonstrations planned for the coming months, and in any

other area in which similar trap-and-arrest maneuvers are practiced.

## THIRD CLAIM FOR RELIEF
*(The First Amendment of the United States Constitution; Right of Association)*

99.     The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1

through 98 as if set forth fully herein.

100.     The arrest and confinement practices and policies described in this Complaint

violate the right of association guaranteed in the First Amendment of the United States

Constitution.

101.     The First Amendment protects the rights of free speech, a free press, association,

and peaceful assembly.  *Richmond Newspapers*, 448 U.S. at 576.  These rights "share a common

core purpose of assuring freedom of communication on matters relating to the functioning of

government." *Id.*  Public streets and sidewalks are "public fora" and restrictions on activities in

such fora are "subject to a particularly high degree of scrutiny."  *Grace*, 461 U.S. at 177;

*NAACP*, 743 F.2d at 1346; *Collins*, 110 F.3d at 1371.  By merely leaving their residences and

schools and, thus, associating with protestors, George Washington University students, including

the Chang Plaintiffs, were subject to trap-and-arrest tactics.

102.     The arrest and confinement practices and policies described in this Complaint

violate the right of citizens to walk, to associate, and to observe events under the First

Amendment of the United States Constitution.  The Chang Plaintiffs were not in violation of any

law by appearing on public streets to witness or record events.  The Defendants prevented the

Chang Plaintiffs from continuing these protected activities without cause and without warning.

103.     The Chang Plaintiffs were prevented from exercising their right of association

with both the media and others observing the protests, including public interest groups.  For

example, Mr. Chang, Ms. Chastain, and Ms. Young were present at the demonstrations in their

association with the NLG, as part of a large group of observers.  The trap-and-arrest practice, as

described in this Complaint, prevented Mr. Chang, Ms. Chastain, and Ms. Young from

associating with the media, the general public and other observers.

104.     Ms. Lee, Ms. Enright, Mr. Zarconi, and Mr. Choi have also been hindered in their

right to associate with the public, observers and other members of the media, including other

student journalists, and observing and reporting on the demonstration and police reactions to the

demonstration because of the policy of trap-and-arrest described in this Complaint.

105.     The trap-and-arrest practice, and subsequent abusive detention, not only created

direct injury to the Chang Plaintiffs exercising their First Amendment rights, but also creates a

chilling effect for them and other similarly situated persons for future observation or media

coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## FOURTH CLAIM FOR RELIEF
*(The Fourteenth Amendment of the United States Constitution; Right of Association)*

106.    The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 105 as if set forth fully herein.

107.    The arrest and confinement practices and policies described in this Complaint violate the right of association guaranteed in the First Amendment of the United States Constitution.

108.    The First Amendment applies to certain of the Defendants via the Fourteenth Amendment to protect the rights of free speech, a free press, association, and peaceful assembly. *Richmond Newspapers*, 448 U.S. at 576.  These rights "share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Id.*  Public streets and sidewalks are "public fora" and restrictions on activities in such fora are "subject to a particularly high degree of scrutiny."  *Grace*, 461 U.S. at 177; *NAACP*, 743 F.2d at 1346; *Collins*, 110 F.3d at 1371.  By merely leaving their residences and schools and, thus, associating with protestors, George Washington University students, including the Chang Plaintiffs, were subject to trap-and-arrest tactics.

109.    The arrest and confinement practices and policies described in this Complaint violate the right of citizens to walk, to associate, and to observe events under the First Amendment of the United States Constitution, as applied via the Fourteenth Amendment.  The Chang Plaintiffs were not in violation of any law by appearing on public streets to witness or record events.  The Defendants prevented the Chang Plaintiffs from continuing these protected activities without cause and without warning.

110.    The Chang Plaintiffs were prevented from exercising their right of association with both the media and others observing the protests, including public interest groups.  For example, Mr. Chang, Ms. Chastain, and Ms. Young were present at the demonstrations in their association with the NLG, as part of a large group of observers.  The trap-and-arrest practice, as described in this Complaint, prevented Mr. Chang, Ms. Chastain, and Ms. Young from associating with the media, the general public and other observers.

111.    Ms. Lee, Ms. Enright, Mr. Zarconi, and Mr. Choi have also been hindered in their right to associate with the public, observers and other members of the media, including other student journalists, observing and reporting on the demonstration and the police reaction to the demonstration because of the policy of trap-and-arrest described in this Complaint.

112.    The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Chang Plaintiffs exercising their First Amendment rights, as applied via the Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington,

D.C. area, including protests and demonstrations planned for the coming months, and in any

other area in which similar trap-and-arrest maneuvers are practiced.

## FIFTH CLAIM FOR RELIEF
*(The First Amendment of the United States Constitution; Free Press)*

113.     The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1

through 112 as if set forth fully herein.

114.     The arrest and confinement practices and policies described in this Complaint

violate the right of free press guaranteed in the First Amendment of the United States

Constitution.

115.     The First Amendment protects the rights of free speech, a free press, association,

and peaceful assembly.  *Richmond Newspapers*, 448 U.S. at 576.  These rights "share a common

core purpose of assuring freedom of communication on matters relating to the functioning of

government."  *Id.*  Public streets and sidewalks are "public fora" and restrictions on activities in

such fora are "subject to a particularly high degree of scrutiny."  *Grace*, 461 U.S. at 177;

*NAACP*, 743 F.2d at 1346; *Collins*, 110 F.3d at 1371.  By merely leaving their residences and

schools and, thus, associating with protestors, George Washington University students, including

the Chang Plaintiffs, were subject to trap-and-arrest tactics.

116.     The Chang Plaintiffs were engaged in the exercise of free press activities that

included media coverage and human rights monitoring.  Mr. Chang, Ms. Chastain, and Ms.

Young were present to observe, record, and ultimately report potential human rights violations.

Mr. Choi, Ms. Enright, Ms. Lee and Mr. Zarconi were present at the demonstrations in their

association with a student newspaper.

117.    The Defendants prevented the Chang Plaintiffs from continuing these protected activities without cause and without warning.  The Chang Plaintiffs were not in violation of any law by recording events for the media.

118.    The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Chang Plaintiffs exercising their First Amendment rights, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being caught in similar trap-and-arrest maneuvers when they seek to witness, observe, and report on protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

**SIXTH CLAIM FOR RELIEF**
(*The Fourteenth Amendment of the United States Constitution; Free Press*)

119.    The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 118 as if set forth fully herein.

120.    The arrest and confinement practices and policies described in this Complaint violate the right of free press guaranteed in the First Amendment of the United States Constitution.

121.    The First Amendment applies to certain of the Defendants via the Fourteenth Amendment to protect the rights of free speech, a free press, association, and peaceful assembly. *Richmond Newspapers*, 448 U.S. at 576.  These rights "share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Id.* Public streets and sidewalks are "public fora" and restrictions on activities in such fora are "subject to a

particularly high degree of scrutiny." *Grace*, 461 U.S. at 177; *NAACP*, 743 F.2d at 1346; *Collins*, 110 F.3d at 1371.  By merely leaving their residences and schools and, thus, associating with protestors, George Washington University students, including the Chang Plaintiffs, were subject to trap-and-arrest tactics.

122.    The Chang Plaintiffs were engaged in the exercise of free press activities that included media coverage and human rights monitoring.  Mr. Chang, Ms. Chastain, and Ms. Young were present to observe, record, and ultimately report potential human rights violations.  Mr. Choi, Ms. Enright, Ms. Lee and Mr. Zarconi were present at the demonstrations in their association with a student newspaper.

123.    The Defendants prevented the Chang Plaintiffs from continuing these protected activities without cause and without warning.  The Chang Plaintiffs were not in violation of any law by recording events for the media.

124.    The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Plaintiffs exercising their First Amendment rights, as applied via the Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being caught in similar trap-and-arrest maneuvers when they seek to witness, observe, and report on protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

**SEVENTH CLAIM FOR RELIEF**

(*The Fourth Amendment of the United States Constitution; Illegal Search and Seizure*)

125.    The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 124 as if set forth fully herein.

126.    The policies and practices alleged in this Complaint violate the Fourth Amendment of the United States Constitution in subjecting the Chang Plaintiffs to unlawful searches and seizures.

127.    The Chang Plaintiffs were encircled and trapped within arrest zones and denied opportunities to exit these zones.  The Chang Plaintiffs were arrested and searched without any probable cause basis for the charge of failing to obey an alleged order to disperse.  Since they never received such an order, the search and seizure led to the unlawful confinement of all of the Chang Plaintiffs.

128.    The search and seizure led to property damage to some of the Chang Plaintiffs, including Ms. Lee, Ms. Enright and Mr. Zarconi.

129.    The Chang Plaintiffs have been injured by this violation of their Fourth Amendment rights.

130.    The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Chang Plaintiffs by violating their Fourth Amendment rights, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being subject to unlawful searches and seizures if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington,

D.C. area, including protests and demonstrations planned for the coming months, and in any other

area in which similar trap-and-arrest maneuvers are practiced.

## EIGHTH CLAIM FOR RELIEF
*(The Fourteenth Amendment of the United States Constitution;*
*Illegal Search and Seizure)*

131.    The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1

through 130 as if set forth fully herein.

132.    The policies and practices alleged in this Complaint violate the Fourth

Amendment of the United States Constitution in subjecting the Chang Plaintiffs to unlawful

searches and seizures.

133.    The Fourth Amendment applies to certain Defendants via the Fourteenth

Amendment.

134.    The Chang Plaintiffs were encircled and trapped within arrest zones and denied

opportunities to exit these zones.  The Chang Plaintiffs were arrested and searched without any

probable cause basis for the charge of failing to obey an alleged order to disperse.  Since they

never received such an order, the search and seizure led to the unlawful confinement of all of the

Chang Plaintiffs.

135.    The search and seizure led to property damage to some of the Chang Plaintiffs,

including Ms. Lee, Ms. Enright and Mr. Zarconi.

136.    The Chang Plaintiffs have been injured by this violation of their Fourth Amendment

rights, as applied via the Fourteenth Amendment.

137.    The trap-and-arrest practice, and subsequent abusive detention, not only created

direct injury to the Chang Plaintiffs by violating their Fourth Amendment rights, as applied via the

Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated

persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being subject to unlawful searches and seizures if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## NINTH CLAIM FOR RELIEF
*(The Fourteenth Amendment of the United States Constitution; Due Process)*

138.    The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 137 as if set forth fully herein.

139.    The Due Process Clause applies to certain Defendants via the Fourteenth Amendment.  *Armstrong v. District of Columbia Public Library*, 154 F. Supp. 2d. 67, 80 (D.D.C. 2001).  Under the Due Process Clause, the Chang Plaintiffs are protected against the deprivation of life, liberty, or property without due process of law.  *Bolling v. Sharpe*, 347 U.S. 497 (1954). This includes a protection against false arrests and unlawful confinement.

140.    The Chang Plaintiffs were subject to false arrest and unlawful confinement as a result of the practices and policies described in this Complaint.  The Chang Plaintiffs were not engaged in any illegal activity and were not given a warning or opportunity to disperse.  These Defendants lacked probable cause to arrest the Chang Plaintiffs for any criminal violation.

141.    The trap-and-arrest practice, and subsequent abusive detention, not only created direct injury to the Chang Plaintiffs by violating their right to Due Process, but also creates a chilling effect for them and other similarly situated persons for future observation or media

coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being denied due process if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

### TENTH CLAIM FOR RELIEF
*(The Fifth Amendment of the United States Constitution;*
*Failure to Provide Miranda Warning)*

142.    The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 141 as if set forth fully herein.

143.    The Fifth Amendment applies to any individuals in federal custody.  Under the Fifth Amendment, individuals in custody are entitled to be informed of their *Miranda* rights, including their right to remain silent and their right to counsel.  The Supreme Court recently reaffirmed that *Miranda* is a constitutional rule binding on the arresting officers.  *Dickerson v. United States*, 530 U.S. 428, 433 (2000).

144.    None of the Chang Plaintiffs were given their *Miranda* rights at the time of their arrest.

145.    None of the Chang Plaintiffs were given their *Miranda* rights at the time of questioning by police officers.

146.    None of the Chang Plaintiffs were given their *Miranda* rights when asked to plead in a criminal matter.

147.    The failure of the Defendants to inform the Chang Plaintiffs of their rights left them uncertain of their status or their ability to refuse to speak to officers.  This failure to inform

the Chang Plaintiffs of their rights left them uncertain of their right to seek counsel before pleading no contest to criminal charges.

148.     The resulting pleas entered for the Chang Plaintiffs have caused them reputational and financial injury.  The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law.  All of the Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

149.     The Defendants' failure to advise the Chang Plaintiffs of their *Miranda* rights not only created direct injury to the Chang Plaintiffs by violating their Fifth Amendment rights, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of not being advised of their *Miranda* rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## ELEVENTH CLAIM FOR RELIEF
*(The Fourteenth Amendment of the United States Constitution;*
*Failure to Provide Miranda Warning)*

150.     The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 149 as if set forth fully herein.

151. The Fifth Amendment applies to any individuals placed into custody by state or local officers, including certain Defendants, via the Fourteenth Amendment. Under the Fifth Amendment, individuals in custody are entitled to be informed of their *Miranda* rights, including their right to remain silent and their right to counsel. The Supreme Court recently reaffirmed that *Miranda* is a constitutional rule binding on the arresting officers. *Dickerson*, 530 U.S. at 433.

152. None of the Chang Plaintiffs were given their *Miranda* rights at the time of their arrest.

153. None of the Chang Plaintiffs were given their *Miranda* rights at the time of questioning by police officers.

154. None of the Chang Plaintiffs were given their *Miranda* rights when asked to plead in a criminal matter.

155. The failure of these Defendants to inform the Chang Plaintiffs of their rights left them uncertain of their status or their ability to refuse to speak to officers. This failure to inform the Chang Plaintiffs of their rights left them uncertain of their right to seek counsel before pleading no contest to criminal charges.

156. The resulting pleas entered for the Chang Plaintiffs have caused them reputational and financial injury. The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law. All of the Chang Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

157. These Defendants' failure to advise the Chang Plaintiffs of their *Miranda* rights not only created direct injury to the Chang Plaintiffs by violating their Fifth Amendment rights,

via the Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of not being advised of their *Miranda* rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

### TWELFTH CLAIM FOR RELIEF
(*The Fifth Amendment of the United States Constitution;*
*Right to Counsel*)

158.    The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 157 as if set forth fully herein.

159.    The Fifth Amendment of the United States Constitution affords the right to counsel before questioning individuals who are in federal custody.

160.    The Chang Plaintiffs were placed in custody on the morning of September 27, 2002, but  were never given individual access to counsel before they were questioned by police officers.  The Chang Plaintiffs were questioned about their involvement in the protests and purposes for being in the arrest zones, and they were ultimately asked to plead to criminal charges.

161.    Counsel for the NLG attempted to gain access to the arrested NLG observers, including Mr. Chang, Ms. Chastain, and Ms. Young, but were refused such access to individuals. Instead, counsel was limited to briefly addressing the bus of students at Judiciary Square and collecting ATM cards to withdraw money for the students to use to secure their release.

162.    An attorney for Ms. Enright was retained by her family and personally sought access to Ms. Enright at the Academy but was refused.  Ms. Enright also specifically asked to speak with her attorney but was denied.  The officers told her that she did not have a right to counsel.  Any questions or messages Ms. Enright had for her attorney were to be relied via an officer.

163.    None of the Chang Plaintiffs were offered access to public defenders or volunteer counsel before being questioned and being asked to plead to criminal charges.

164.     The failure of the Defendants to inform the Chang Plaintiffs of their rights left them uncertain of their status or their ability to refuse to speak to officers.  This failure to inform the Chang Plaintiffs of their rights left them uncertain of their right to seek counsel before pleading no contest to criminal charges.

165.    Individuals in custody are entitled to be informed of their *Miranda* rights, including their right to remain silent and their right to counsel, but the Chang Plaintiffs were never informed of these rights.

166.    The refusal of access to counsel resulted in direct injury to the Chang Plaintiffs who answered questions posed by law enforcement officers and proceeded to plead to criminal charges without advice on its meaning, implications, or their rights.  The resulting pleas entered for the Chang Plaintiffs have caused them reputational and financial injury.  The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law.  All of the Chang Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

167.    The Defendants' failure to allow the Chang Plaintiffs access to counsel not only created direct injury to the Chang Plaintiffs by violating their Fifth Amendment rights, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being denied access to counsel if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

### THIRTEENTH CLAIM FOR RELIEF
(*The Fourteenth Amendment of the United States Constitution; Right to Counsel*)

168.    The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 167 as if set forth fully herein.

169.    The Fifth Amendment of the United States Constitution applies to state and local officers, including certain of the Defendants , via the Fourteenth Amendment, and requires that individuals in their custody be afforded the right to counsel before questioning.

170.    The Chang Plaintiffs were placed in custody on the morning of September 27, 2002, but  were never given individual access to counsel before they were questioned by police officers.  The Chang Plaintiffs were questioned about their involvement in the protests and purposes for being in the arrest zones, and they were ultimately asked to plead to criminal charges.

171.    Counsel for the NLG sought access to the arrested NLG observers, including Mr. Chang, Ms. Chastain, and Ms. Young, but were refused such access to individuals.  Instead,

counsel was limited to briefly addressing the bus of students at Judiciary Square and collecting ATM cards to withdraw money for the students to use to secure their release.

172.     An attorney for Ms. Enright was retained by her family and personally sought access to Ms. Enright at the Academy but was refused.  Ms. Enright also specifically asked to speak with her attorney but was denied.  The officers told her that she did not have a right to counsel.  Any questions or messages Ms. Enright had for her attorney were to be relied via an officer.

173.     None of the Chang Plaintiffs were offered access to public defenders or volunteer counsel before being questioned and asked to plead to criminal charges.

174.      The failure of these Defendants to inform the Chang Plaintiffs of their rights left them uncertain of their status or their ability to refuse to speak to officers.  This failure to inform the Chang Plaintiffs of their rights left them uncertain of their right to seek counsel before pleading no contest to criminal charges.

175.     Individuals in custody are entitled to be informed of their *Miranda* rights, including their right to remain silent and their right to counsel, but the Chang Plaintiffs were never informed of these rights.

176.     The refusal of access to counsel resulted in direct injury to the Chang Plaintiffs who proceeded to answer questions posed by law enforcement officers and plead to criminal charges without advice on its meaning, implications, or their rights.  The resulting pleas entered for the Chang Plaintiffs have caused them reputational and financial injury.  The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law.  All

of the Chang Plaintiffs also will have to report the fact of their arrests and pleas in common

employment applications and future school applications.

177.     These Defendants' failure to allow the Chang Plaintiffs access to counsel not only

created direct injury to the Chang Plaintiffs by violating their Fifth Amendment rights, via the

fourteenth Amendment, but also creates a chilling effect for them and other similarly situated

persons for future observation or media coverage of future demonstrations.  If this conduct is not

enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of

being denied access to counsel if caught in similar trap-and-arrest maneuvers when they seek to

witness or observe, and associate with others witnessing and observing, protests and

demonstrations in the Washington, D.C. area, including protests and demonstrations planned for

the coming months, and in any other area in which similar trap-and-arrest maneuvers are

practiced.

## FOURTEENTH CLAIM FOR RELIEF
*(The Sixth Amendment of the United States Constitution;*
*Right to Counsel)*

178.     The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1

through 177 as if set forth fully herein.

179.     The Sixth Amendment of the United States Constitution affords the right to

counsel for individuals at a critical stage of their criminal cases, such as preliminary hearings or

arraignments.  *White v. Maryland*, 373 U.S. 59 (1963).

180.     The Chang Plaintiffs were denied their Sixth Amendment right to counsel when

they were asked to plead no contest to criminal misdemeanors without access to legal

representation.  The students serving as legal observers were denied their Sixth Amendment

rights when their counsel was denied individual access to them before they were asked to plead

to the charges.  Ms. Enright was denied her Sixth Amendment rights when an attorney, retained by her family and present at the Academy, was denied access to her before she was asked to plead to the criminal charge.

181.    All of the students were denied individual access to public defenders or volunteer counsel before being asked to plead to criminal charges.

182.    The refusal of counsel resulted in direct injury to the Chang Plaintiffs who proceeded to plead to criminal charges without advice on its meaning, implications, or their rights.  The resulting pleas entered for the Chang Plaintiffs have caused them reputational injury. The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law.  All of the Chang Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

183.    The Defendants' failure to allow the Chang Plaintiffs access to counsel not only created direct injury to the Chang Plaintiffs by violating their Sixth Amendment rights, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being denied access to counsel if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## FIFTEENTH CLAIM FOR RELIEF
*(The Fourteenth Amendment of the United States Constitution; Right to Counsel)*

184.    The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 183 as if set forth fully herein.

185.    The Sixth Amendment of the United States Constitution applies to individuals placed into custody by state or local officers, including certain Defendants, via the Fourteenth Amendment.  Under the Sixth Amendment, individuals are afforded the right to counsel at a critical stage of their criminal cases, such as preliminary hearings or arraignments.  *White*, 373 U.S. at 59.

186.    The Chang Plaintiffs were denied their Sixth Amendment right to counsel, as applied via the Fourteenth Amendment, when they were asked to plead no contest to criminal misdemeanors without access to legal representation.  The students serving as legal observers were denied their Sixth Amendment rights, as applied via the Fourteenth Amendment, when their counsel was denied individual access to them before they were asked to plead to the charges.  Ms. Enright was denied her Sixth Amendment rights, as applied via the Fourteenth Amendment, when an attorney, retained by her family and present at the Academy, was denied access to her before she was asked to plead to the criminal charge.

187.    All of the students were denied individual access to public defenders or volunteer counsel before being asked to plead to criminal charges.

188.    The refusal of counsel resulted in direct injury to the Chang Plaintiffs who proceeded to plead to criminal charges without advice on its meaning, implications, or their rights.  The resulting pleas entered for the Chang Plaintiffs have caused them reputational injury.  The fact of an arrest and a guilty plea will require the law students to report these facts to their

respective bar associations and face potential further inquiry as to their fitness to enter the practice of law.  All of the Chang Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

189.     The Defendants' failure to allow the Chang Plaintiffs access to counsel not only created direct injury to the Plaintiffs by violating their Sixth Amendment rights, as applied via the Fourteenth Amendment, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being denied access to counsel if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## SIXTEENTH CLAIM FOR RELIEF
*(42 U.S.C. § 1983)*

190.     The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 189 as if set forth fully herein.

191.     The District of Columbia, Mayor Williams, Chief Ramsey, Assistant Chief Newsham, Major Murphy, and John or Jane Doe 11-20 Defendants engaged in widespread false arrests and Constitutional violations during these demonstrations that violated 42 U.S.C. § 1983.

192.     The Chang Plaintiffs were deprived of their well-established Constitutional rights afforded by the First Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, and Fourteenth Amendment.

193.    The pattern and practice of trap-and-arrest and subsequent confinements were intended, as a policy of the District of Columbia, Mayor Williams, Chief Ramsey, Assistant Chief Newsham, Major Murphy, and John or Jane Doe 11-20 Defendants, to ensure the arrest and confinement of large numbers of individuals, regardless of whether there was any probable cause to believe each of those individuals had committed an illegal or criminal act, as a method of controlling and suppressing demonstrations.  The Chang Plaintiffs were subject to false arrest and deprived of their constitutional rights as a direct result of this policy.

194.    The Chang Plaintiffs were further injured as a part of the unconstitutional practice of leaving prisoners handcuffed over the course of more than 12 hours. The widespread use of restraints reflects a policy on the part of the District of Columbia, Mayor Williams, Chief Ramsey, Assistant Chief Newsham, Major Murphy, and John or Jane Doe 11-20 Defendants in these demonstrations.

195.    The John or Jane Doe 11-20 Defendants acted in their individual capacities to violate 42 U.S.C. §1983.

196.    Mayor Williams, Chief Ramsey, Assistant Chief Newsham, Major Murphy, the District of Columbia, and John or Jane Doe 11-20 Defendants acted intentionally, or with reckless disregard, in undertaking such actions as would violate clearly established constitutional rights of the Chang Plaintiffs. The acts of these Defendants were malicious and in willful, wanton, or reckless disregard of the Chang Plaintiffs' rights.

197.    The Chang Plaintiffs have suffered actual damages as a result of the violation of 42 U.S.C. § 1983 in the practice and policy of a trap-and-arrest policy as well as the practice and policy of abusive confinement described this Complaint.

198.    The District of Columbia, Mayor Williams, Chief Ramsey, Assistant Chief Newsham, Major Murphy, and John or Jane Doe 11-20 Defendants' deprivation of the Chang Plaintiffs' constitutional rights not only created direct injury to the Chang Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, Chang Plaintiffs and other similarly situated persons remain at risk in the future of being denied their constitutional rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

### SEVENTEENTH CLAIM FOR RELIEF
(*Bivens Action*)

199.    The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 198 as if set forth fully herein.

200.    The United States of America, Park Service, Major Murphy, District of Columbia, Chief Ramsey, Assistant Chief Newsham, and John or Jane Does 1-10 Defendants (the "*Bivens*" Defendants) engaged in widespread false arrests and constitutional violations during these demonstrations.

201.    The Chang Plaintiffs were deprived of their constitutional rights by the *Bivens* Defendants, including deprivation of their Constitutional rights afforded by the First Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, and the Fourteenth Amendment.

202.     The pattern and practice of trap-and-arrest and subsequent confinements were intended, as a policy of the *Bivens* Defendants, to ensure the arrest and confinement of large numbers of individuals, regardless of whether there was any probable cause to believe each of those individuals had committed an illegal or criminal act, as a method of controlling and suppressing demonstrations.  The Chang Plaintiffs were subject to false arrest and deprived of their constitutional rights as a direct result of this policy.

203.     The Chang Plaintiffs were further injured as a part of the unconstitutional practice of leaving prisoners handcuffed over the course of more than 12 hours. The widespread use of restraints reflects a policy on the part of the *Bivens* Defendants in these demonstrations.

204.     The John or Jane Doe 1-10 Defendants acted in their individual capacities to violate the Chang Plaintiffs' constitutional rights.

205.     The *Bivens* Defendants acted intentionally, or with reckless disregard, in undertaking such actions as would violate clearly established constitutional rights of the Chang Plaintiffs.  The acts of these Defendants were malicious and in willful, wanton, or reckless disregard of the Chang Plaintiffs' rights.

206.     The Chang Plaintiffs have suffered actual damages caused by the *Bivens* Defendants' constitutional violations in the policy and practice of a trap-and-arrest maneuver and the policy and practice of abusive confinement described in this Complaint.

207.     The *Bivens* Defendants are liable for constitutional violations.  *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

208.     The *Bivens* Defendants' deprivation of the Chang Plaintiffs' constitutional rights not only created direct injury to the Chang Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.

If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being denied their constitutional rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## EIGHTEENTH CLAIM FOR RELIEF
### (*42 U.S.C. § 1985*)

209.   The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 208 as if set forth fully herein.

210.   Defendants, and others not yet identified, conspired to deprive the Chang Plaintiffs, and others in their class, of their civil rights or privileges, including their First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

211.   Upon information and belief, prior to or on September 27, 2002, Defendants, and others not yet identified, agreed to utilize the unconstitutional trap-and-arrests maneuver described in this Complaint; instructed the law enforcement officers who would attend the protests to use the unconstitutional trap-and-arrest maneuver; or instructed the law enforcement officers who would attend the protests on how to perform the unconstitutional trap-and-arrest maneuver.

212.   Prior to September 27, 2002, Defendants agreed upon a cost-sharing plan for the law enforcement presence, which was to include, and did include, the use of the unconstitutional trap-and-arrest maneuver.

213.   Defendants took additional steps in furtherance of this conspiracy, including, but not limited to, failing to give an audible order to disperse or giving such an order and denying

plaintiffs the ability to disperse; unlawfully arresting the Chang Plaintiffs; denying the Chang Plaintiffs' access to counsel; failing to inform the Chang Plaintiffs of their *Miranda* rights; and placing the Chang Plaintiffs in restraints unnecessarily, including restraining them in a fetal position, and leaving them in such restraints for unnecessarily long periods of time.

214.    Defendants targeted the Chang Plaintiffs because of their perception of the Chang Plaintiffs' political beliefs and associations, which Defendants presumed because of their youth and student status.

215.    Upon information and belief, similarly situated journalists and observers who appeared to be older than the average college student were allowed to leave the trap-and-arrest area, while the Chang Plaintiffs were forbidden an exit.

216.    The Chang Plaintiffs were injured by the Defendants' conspiracy to deprive them of their Constitutional rights.

217.    The Defendants' conspiracy to deprive the Chang Plaintiffs of their constitutional rights not only created direct injury to the Chang Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being denied their constitutional rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## NINETEENTH CLAIM FOR RELIEF
*(42 U.S.C. § 1986)*

218.     The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 217 as if set forth fully herein.

219.     Some or all of the Defendants, and others not yet identified, were aware of the conspiracy to violate the Chang Plaintiffs' rights, in violation of 42 U.S.C. § 1985, and neglected to prevent it.

220.     Upon information and belief, several of the Defendants' law enforcement officers knew of the conspiracy and yet participated in the unconstitutional trap-and-arrest maneuver.

221.     These Defendants were negligent in failing to prevent this conspiracy.

222.     The Chang Plaintiffs were injured by the Defendants' negligent failure to prevent this conspiracy.

223.     The Defendants' negligent failure to prevent this conspiracy to deprive the Chang Plaintiffs of their constitutional rights not only created direct injury to the Chang Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being denied their constitutional rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## TWENTIETH CLAIM FOR RELIEF
(*Common Law Conspiracy*)

224.    The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 223 as if set forth fully herein.

225.    Defendants conspired to deprive the Chang Plaintiffs of their civil rights or privileges, including their First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

226.    Upon information and belief, prior to or on September 27, 2002, Defendants agreed the unconstitutional trap-and-arrest maneuver would be utilized; instructed the law enforcement officers who would attend the protests to use the unconstitutional trap-and-arrest maneuver; or instructed the law enforcement officers who would attend the protests on how to perform the unconstitutional trap-and-arrest maneuver.

227.    Defendants took additional steps in furtherance of this conspiracy, including, but not limited to, failing to give an audible order to disperse or giving such an order and denying the Chang Plaintiffs' the ability to disperse; unlawfully arresting the Chang Plaintiffs; denying the Chang Plaintiffs access to counsel; failing to inform the Chang Plaintiffs of their *Miranda* rights; and placing the Chang Plaintiffs in restraints unnecessarily, including restraining them in a fetal position, and leaving them in such restraints for excessive periods of time.

228.    The Chang Plaintiffs were injured by the Defendants' conspiracy to deprive them of their Constitutional rights.

229.    The Defendants' conspiracy to deprive the Chang Plaintiffs of their constitutional rights not only created direct injury to the Chang Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being denied their constitutional rights if caught in similar

trap-and-arrest maneuvers when they seek to witness or observe, and associate with others

witnessing and observing, protests and demonstrations in the Washington, D.C. area, including

protests and demonstrations planned for the coming months, and in any other area in which similar

trap-and-arrest maneuvers are practiced.

## TWENTY-FIRST CLAIM FOR RELIEF
*(False Arrest)*

230.    The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1

through 229 as if set forth fully herein.

231.    Defendants unlawfully detained the Chang Plaintiffs when they arrested the Chang

Plaintiffs on September 27, 2002.

232.    The false arrests have caused the Chang Plaintiffs reputational injury.  The fact of

an arrest and a guilty plea will require the law students to report these facts to their respective bar

associations and face potential further inquiry as to their fitness to enter the practice of law.  All of

the Chang Plaintiffs also will have to report the fact of their arrests and pleas in common

employment applications and future school applications.

233.    The Defendants' unlawful arrest of the Chang Plaintiffs not only created direct

injury to the Chang Plaintiffs, but also creates a chilling effect for them and other similarly situated

persons for future observation or media coverage of future demonstrations.  If this conduct is not

enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of

being unlawfully arrested if caught in similar trap-and-arrest maneuvers when they seek to witness

or observe, and associate with others witnessing and observing, protests and demonstrations in the

Washington, D.C. area, including protests and demonstrations planned for the coming months, and

in any other area in which similar trap-and-arrest maneuvers are practiced.

## TWENTY-SECOND CLAIM FOR RELIEF
### (*False Imprisonment*)

234.     The Chang Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 233 as if set forth fully herein.

235.     Defendants unlawfully detained the Chang Plaintiffs when they arrested and imprisoned the Chang Plaintiffs on September 27, 2002 and September 28, 2002.

236.     The Chang Plaintiffs were unlawfully deprived of their freedom by Defendants' use of actual force and threats of force.

237.     Defendants acted intentionally in unlawfully imprisoning the Chang Plaintiffs.

238.     Mr. Chang, Ms. Chastain, and Ms. Young were confined in cells at Judiciary Square until their release on September 28, 2002.

239.     Mr. Choi, Ms. Enright, Ms. Lee, and Mr. Zarconi were detained at the Academy, handcuffed wrist to ankle for the majority of the time, until their release on September 28, 2002.

240.     The false imprisonments have caused the Chang Plaintiffs reputational injury.  The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law.  All of the Chang Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

241.     The Defendants' unlawful imprisonment of the Chang Plaintiffs not only created direct injury to the Chang Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Chang Plaintiffs and other similarly situated persons remain at risk in the future of being unlawfully imprisoned if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and

demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## RELIEF REQUESTED

WHEREFORE, the Chang Plaintiffs pray that this Court:

a. Enter an order declaring that the trap-and-arrest and confinement policies and practices described in this Complaint violate the First Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, the Fourteenth Amendment, and 42 U.S.C. § 1983;

b. Order injunctive relief to require clear and audible warnings to disperse at future protests with an opportunity for individuals to exit areas of protest;

c. Order injunctive relief to compel the District of Columbia authorities to expunge the record of the Chang Plaintiffs and reimburse any fines paid to secure release;

d. Order injunctive relief to compel the District of Columbia authorities to expunge the record of any individuals unlawfully arrested and charged as part of the trap-and-arrest practices, including, but not limited to, the Chang Plaintiffs;

e. Order injunctive relief to require the reimbursement of criminal fines by those subject to these unlawful arrests, including but not limited to the Chang Plaintiffs;

f. Award the Chang Plaintiffs actual damages for harms caused by the Defendants' unlawful conduct;

g. Award the Chang Plaintiffs punitive damages where allowed by law;

h. Award the Chang Plaintiffs reasonable attorneys' fees and costs incurred in maintaining this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (1994 & Supp. 1996);

i.      Award the Chang Plaintiffs damages and reasonable attorneys' fees and costs incurred in maintaining this action pursuant to 42 U.S.C. § 1988; and

j.      Award such other relief as it may deem just and proper.

The Jones Plaintiffs allege as follows:

### JURISDICTION AND VENUE

242.    This action arises under the Fourth Amendment to the Constitution of the United States and 42 U.S.C. § 1983. The claims herein give rise to federal question jurisdiction pursuant to 28 U.S.C. § 1331. In addition, this Court has jurisdiction to render injunctive and declaratory relief pursuant to 28 U.S.C. §§2201 and 2202.  The Court has jurisdiction over the common-law claims of the Jones Plaintiffs by virtue of the doctrine of ancillary jurisdiction.

243.    This Court's personal jurisdiction over the District of Columbia and the officials thereof is manifest.

244.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e).

### PARTIES

245.     Plaintiff Franklin Jones is an adult resident of the District of Columbia and a citizen of the United States.

246.    Plaintiff Erica Lusk is an adult resident of the State of Maryland and a citizen of the United States.

247.    Plaintiff Keri Rasmussen is an adult resident of the State of Maryland and a citizen of the United States.

248.    Defendant The District of Columbia is a person subject to direct liability under 42 U.S.C. §1983.

249.    Defendant Anthony A. Williams is the Mayor of the District of Columbia and, as such, is being sued in his official capacity.

250.    Defendant Charles H. Ramsey is the Chief Executive Officer of the Metropolitan Police Department, an agency of the District of Columbia and, as such, is being sued in his official capacity.

251.    Defendant(s) John/Jane Doe are persons, as yet unknown, who provided material support and/or participated in the constitutional violations described herein and, when identified, will be sued in their individual and/or official capacity(ies).

## COMMON FACTUAL BACKGROUND

252.    On and about the dates of September 27, 2002, September 28, 2002, and September 29, 2002 the World Bank and/or the International Monetary Fund ("WB/IMF") scheduled meetings to take place in the District of Columbia.

253.    In advance of such dates certain organizations and associations made public their intention to conduct demonstrations during said meetings in protest of the WB/IMF's policies and practices.

254.    In response to the public pronouncements of certain protest groups Defendant Ramsey, with the knowledge, consent, supervision, and/or participation of Defendant Williams and Defendant(s) John/Jane Doe, formulated a premeditated, deliberate strategy to deprive citizens of the United States of certain constitutional rights.

255.    This strategy consisted of surrounding gatherings of demonstrators of any significant size, along with any innocent bystanders who happened to also be in the same general area, with a cordon of police officers and, without regard to the specific actions of the persons inside the perimeter of officers, to pre-emptively arrest, *en masse,* all persons inside the

perimeter without warning and without affording an opportunity for those persons to voluntarily disperse.

256.   This strategy further consisted of knowingly and deliberately charging arrested persons with baseless criminal offenses solely to provide a pretext to delay the release of those persons.

257.   On and about the dates of September 27, 2002, September 28, 2002, and September 29, 2002 the Defendants utilized this strategy at various times and locations within the District of Columbia with premeditated, deliberate disregard of the blatant violation of the constitutional rights of hundreds of arrested persons.

258.   In September of 2002 the Jones Plaintiffs were all photojournalism students at the Corcoran College of Art and Design in the District of Columbia.

259.   Prior to the anticipated beginning of the demonstrations the instructors in the Jones Plaintiffs' photojournalism courses suggested that the upcoming demonstrations would afford an opportunity to the students to gain field experience covering a major news event.

**TWENTY-THIRD CLAIM FOR RELIEF**
**(Jones Plaintiff:  Franklin Jones)**

260.   The allegations contained in Paragraphs 242 through 259 are incorporated herein by reference.

261.   At all times referenced in this Count the Defendants acted under color of the laws of the District of Columbia.

262.   At or about 10:00 a.m. on the morning of September 27, 2002 Plaintiff Jones arrived at Freedom Plaza in the District of Columbia to take photographs of the demonstration at that location.

263.     As he approached, Plaintiff Jones observed a line of police officers standing in a circle around the Plaza.

264.     Upon reaching this circle the officers stepped aside so that Plaintiff Jones could enter the Plaza.

265.     Upon passing the line of police officers no warning was given to Plaintiff Jones that he would be subject to arrest if he entered the Plaza.

266.     For approximately one-half an hour Plaintiff Jones took photographs in the Plaza.

267.     As Plaintiff Jones then attempted to leave Freedom Plaza, he was informed by police officers that he was not permitted to leave at that location. He informed the officers that he was a photojournalism student, not a demonstrator and showed the officers his student identification and camera equipment. He was not told why he was not permitted to leave. He was advised to request of other officers to be allowed to leave the Plaza.

268.     Plaintiff Jones then attempted to leave the Plaza by requesting of several officers at different locations along the perimeter. He was not permitted to leave nor was he told of the reason why he was being detained within the Plaza.

269.     Shortly thereafter a number of Metro buses arrived at the Plaza and the police cordon began to constrict upon the persons detained therein and to herd them toward the buses.

270.     Plaintiff Jones was placed under arrest, searched, hand-cuffed, and directed to board a bus.

271.     Thereafter, Plaintiff Jones was transported to the Metropolitan Police Department Academy and then to a location apparently in the Third District for further search, booking, finger-printing, and photographing.

272.     At approximately 10:00 p.m. Plaintiff Jones was released after posting a $100.00 fine for the offense of Failure to Obey a Police Officer.

273.     At no time during the events described above was Plaintiff Jones ordered by the police to disperse or to leave the Plaza.

274.     At no time during the events described above was Plaintiff Jones allowed by the police to leave the Plaza despite his repeated requests to be permitted to leave.

275.     At no time during the events described above did Plaintiff Jones fail to obey any order given by any law enforcement officer; in fact, he remained within the confined area at the instruction of law enforcement officers and at no time made any effort to disregard any orders or instruction or to resist arrest in any fashion.

276.     The arrest of Plaintiff Jones was effected by police officers under the direction and control of the Defendants and in specific execution of the strategy devised by the Defendants.

277.     This arrest was made in deliberate and callous disregard of Plaintiff Jones' rights under the First Amendment to the Constitution of the United States to exercise the freedoms of speech, assembly, and of the press; and Plaintiff Jones' right under the Fourth Amendment to the Constitution of the United States to be free from unreasonable search and seizure.

278.     As a result of the violation of his constitutional rights Plaintiff Jones suffered pain and physical discomfort, inconvenience, embarrassment, humiliation, emotional and mental distress, and damage to his reputation.

279.     The above-alleged conduct of the Defendants, in arresting and detaining Plaintiff Jones, constituted an offensive touching of Plaintiff Jones without his consent and thus giving rise to liability by the Defendants for the common-law tort of Battery.

280.    The above-alleged conduct of the Defendants, in arresting and detaining Plaintiff Jones, was done without legal authority and without reasonable grounds to believe that Plaintiff Jones had committed any arrestable offense and thus giving rise to liability by the Defendants for the common-law tort of False Imprisonment.

WHEREFORE, Plaintiff Franklin Jones demands judgment against the Defendants, jointly and severally, for compensatory damages in the amount of $500,000.00, punitive damages in the amount of $500,000.00, costs and expenses associated with this action, reasonable attorney's fees as permitted under 42 U.S.C. § 1888, injunctive relief directed to the District of Columbia to fully and completely expunge any and all records of the arrest and detention of Plaintiff Jones, declaratory relief that the arrest and detention of Plaintiff Jones was illegal and order that said arrest and detention be recharacterized for all intents and purposes as an "incident", and for any further relief as this Court deems fair and just.

### TWENTY-FOURTH CLAIM FOR RELIEF
#### (Jones Plaintiff:  Erica Lusk)

281.    The allegations contained in Paragraphs 242 through 280 are incorporated herein by reference.

282.    At all times referenced in this Count the Defendants acted under color of the laws of the District of Columbia.

283.    At approximately 7:00 to 7:30 a.m. on the morning of September 27, 2002 a number of demonstrators gathered at Franklin Park near the intersection of 14th and K Streets in the northwest quadrant of the District of Columbia.

284.    Shortly thereafter Plaintiff Lusk, in the company of Plaintiff Rasmussen, arrived at the intersection to cover the demonstration.

285.    The demonstrators then began to walk along K Street toward Vermont Avenue.

286.    Plaintiff Lusk followed along on the edge of the demonstration, taking photographs of the events.

287.    At Vermont Avenue, near McPherson Square, a cordon of police officers blockaded the route of the demonstration. A second cordon of officers closed in behind the rear of the demonstrators.

288.    At this point in time Plaintiff Lusk was behind the line of officers. Intending solely to obtain photographs of the demonstration, Plaintiff Lusk, along with Plaintiff Rasmussen and several members of the Press, approached the line of officer.

289.    The officers stepped aside to permit Plaintiff Lusk and the others to enter the perimeter. No warning was given that they would be subject to arrest merely for being inside the perimeter.

290.    A short while afterward the police cordon, without any order to disperse, began to close upon the demonstrators and bystanders inside the perimeter.

291.    Plaintiff Lusk then attempted to pass back through the cordon, explaining that she was a photojournalism student and showing her school identification and camera equipment.

292.    Plaintiff Lusk was not permitted to pass through the cordon of police officers.

293.    For approximately an hour the police would enter the perimeter and arrest several persons at a time. Throughout this time period Plaintiff Lusk repeatedly requested to be allowed to leave, continually explaining, as above, that she was not a demonstrator.

294.    Eventually, Plaintiff Lusk was placed under arrest, hand-cuffed, and directed to board a bus.

295.    Plaintiff Lusk was transported to the Metropolitan Police Department Academy for booking, finger-printing, and photographing.

296.    At approximately 2:00 a.m. Plaintiff Lusk was released after posting a $50.00 fine for the offense of Failure to Obey a Police Officer.

297.    At no time during the events described above was Plaintiff Lusk ordered by the police to disperse or to leave the area of the demonstration.

298.    At no time during the events described above was Plaintiff Lusk allowed by the police to leave the area of the demonstration despite her repeated requests.

299.    At no time during the events described above did Plaintiff Lusk fail to obey any order given by any law enforcement officer; in fact, she remained within the confined area at the instruction of law enforcement officers and at no time made any effort to disregard any orders or instruction or to resist arrest in any fashion.

300.    The arrest of Plaintiff Lusk was effected by police officers under the direction and control of the Defendants and in specific execution of the strategy devised by the Defendants.

301.    This arrest was made in deliberate and callous disregard of Plaintiff Lusk's rights under the First Amendment to the Constitution of the United States to exercise the freedoms of speech, assembly, and of the press; and Plaintiff Lusk's right under the Fourth Amendment to the Constitution of the United States to be free from unreasonable search and seizure.

302.    As a result of the violation of her constitutional rights Plaintiff Lusk suffered pain and physical discomfort, inconvenience, embarrassment, humiliation, emotional and mental distress, and damage to her reputation.

303.     The above-alleged conduct of the Defendants, in arresting and detaining Plaintiff Lusk, constituted an offensive touching of Plaintiff Lusk without her consent and thus giving rise to liability by the Defendants for the common-law tort of Battery.

304.     The above-alleged conduct of the Defendants, in arresting and detaining Plaintiff Lusk, was done without legal authority and without reasonable grounds to believe that Plaintiff Lusk had committed any arrestable offense and thus giving rise to liability by the Defendants for the common-law tort of False Imprisonment.

WHEREFORE, Plaintiff Erica Lusk demands judgment against the Defendants, jointly and severally, for compensatory damages in the amount of $500,000.00, punitive damages in the amount of $500,000.00, costs and expenses associated with this action, reasonable attorney's fees as permitted under 42 U.S.C. § 1888, injunctive relief directed to the District of Columbia to fully and completely expunge any and all records of the arrest and detention of Plaintiff Lusk, declaratory relief that the arrest and detention of Plaintiff Lusk was illegal and order that said arrest and detention be recharacterized for all intents and purposes as an "incident", and for any further relief as this Court deems fair and just.

## TWENTY-FIFTH CLAIM FOR RELIEF
### (Jones Plaintiff:  Keri Rasmussen)

305.     The allegations contained in Paragraphs 242 through 304 are incorporated herein by reference.

306.     At all times referenced in this Count the Defendants acted under color of the laws of the District of Columbia.

307.    At approximately 7:00 to 7:30 a.m. on the morning of September 27, 2002 a number of demonstrators gathered at Franklin Park near the intersection of 14th and K Streets in the northwest quadrant of the District of Columbia.

308.    Shortly thereafter Plaintiff Rasmussen in the company of Plaintiff Lusk, arrived at the intersection to cover the demonstration.

309.    The demonstrators then began to walk along K Street toward Vermont Avenue.

310.    Plaintiff Rasmussen followed along on the edge of the demonstration, taking photographs of the events.

311.    At Vermont Avenue, near McPherson Square, a cordon of police officers blockaded the route of the demonstration. A second cordon of officers closed in behind the rear of the demonstrators.

312.    At this point in time Plaintiff Rasmussen was behind the line of officers. Intending solely to obtain photographs of the demonstration, Plaintiff Rasmussen, along with Plaintiff Lusk and several members of the Press, approached the line of officer.

313.    The officers stepped aside to permit Plaintiff Rasmussen and the others to enter the perimeter. No warning was given that they would be subject to arrest merely for being inside the perimeter.

314.    A short while afterward the police cordon, without any order to disperse, began to close upon the demonstrators and bystanders inside the perimeter.

315.    Plaintiff Rasmussen then attempted to pass back through the cordon, explaining that she was a photojournalism student and showing her school identification and camera equipment.

316.    Plaintiff Rasmussen was not permitted to pass through the cordon of police officers.

317.    For approximately an hour the police would enter the perimeter and arrest several persons at a time. Throughout this time period Plaintiff Rasmussen repeatedly requested to be allowed to leave, continually explaining, as above, that she was not a demonstrator.

318.    Eventually, Plaintiff Rasmussen was placed under arrest, hand-cuffed, and directed to board a bus.

319.    Plaintiff Rasmussen was transported to the Metropolitan Police Department Academy for booking, finger-printing, and photographing.

320.    At approximately 10:00 p.m. Plaintiff Rasmussen was released after posting a $50.00 fine for the offense of Failure to Obey a Police Officer.

321.    At no time during the events described above was Plaintiff Rasmussen ordered by the police to disperse or to leave the area of the demonstration.

322.    At no time during the events described above was Plaintiff Rasmussen allowed by the police to leave the area of the demonstration despite her repeated requests.

323.    At no time during the events described above did Plaintiff Rasmussen fail to obey any order given by any law enforcement officer; in fact, she remained within the confined area at the instruction of law enforcement officers and at no time made any effort to disregard any orders or instruction or to resist arrest in any fashion.

324.    The arrest of Plaintiff Rasmussen was effected by police officers under the direction and control of the Defendants and in specific execution of the strategy devised by the Defendants.

325.     This arrest was made in deliberate and callous disregard of Plaintiff Rasmussen's rights under the First Amendment to the Constitution of the United States to exercise the freedoms of speech, assembly, and of the press; and Plaintiff Rasmussen's right under the Fourth Amendment to the Constitution of the United States to be free from unreasonable search and seizure.

326.     As a result of the violation of her constitutional rights Plaintiff Rasmussen suffered pain and physical discomfort, inconvenience, embarrassment, humiliation, emotional and mental distress, and damage to her reputation.

327.     The above-alleged conduct of the Defendants, in arresting and detaining Plaintiff Rasmussen, constituted an offensive touching of Plaintiff Rasmussen without her consent and thus giving rise to liability by the Defendants for the common-law tort of Battery.

328.     The above-alleged conduct of the Defendants, in arresting and detaining Plaintiff Rasmussen, was done without legal authority and without reasonable grounds to believe that Plaintiff Rasmussen had committed any arrestable offense and thus giving rise to liability by the Defendants for the common-law tort of False Imprisonment.

WHEREFORE, Plaintiff Keri Rasmussen demands judgment against the Defendants, jointly and severally, for compensatory damages in the amount of $500,000.00, punitive damages in the amount of $500,000.00, costs and expenses associated with this action, reasonable attorney's fees as permitted under 42 U.S.C. § 1888, injunctive relief directed to the District of Columbia to fully and completely expunge any and all records of the arrest and detention of Plaintiff Rasmussen, declaratory relief that the arrest and detention of Plaintiff Rasmussen was illegal and order that said arrest and detention be recharacterized for all intents and purposes as an "incident", and for any further relief as this Court deems fair and just.

## JURY DEMAND

Both the Chang Plaintiffs and the Jones Plaintiffs hereby demand a trial by a jury of twelve on all issues herein.

Respectfully submitted,

_____Jonathan Turley_____
Jonathan Turley (D.C. Bar 417674)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001

_____Daniel C. Schwartz_____
Daniel C. Schwartz (D.C. Bar No. 17749)
BRYAN CAVE LLP
700 Thirteenth St., N.W.
Washington, D.C. 20005
(202) 508-6000

Counsel for the Chang Plaintiffs

_____Brian C. Malone_____
Brian C. Malone, Esquire (D.C. Bar # 464544)
Thomas R. Mooers, Esquire (D.C. Bar #429538)
2410 N. Washington Boulevard
Arlington, Virginia 22201
(703) 283-9918

Counsel for the Jones Plaintiffs

Dated:  September 25, 2003

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2003, a true and correct copy of the foregoing Consolidated Complaint was filed with the District Court electronically and by first-class United States mail, postage pre-paid, to:

> Thomas Koger, Esq.
> Deputy Counsel, Equity Division
> Office of the Corporation Counsel
> 441 4th Street, N.W.
> Sixth Floor
> Washington, D.C. 20001
>
> Counsel for the District Defendants
>
> Laurie Weinstein, Esq.
> Assistant United States Attorney
> Judiciary Center Building
> 555 4th Street, N.W.
> Washington, D.C. 20001
>
> Counsel for the Federal Defendants

_____
Scott M. Badami