## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RAYMING CHANG<br>532 20th Street, N.W., Apt. #706<br>Washington, DC 20006,<br><br>AMY CHASTAIN<br>709 Fillmore Street, Apt. 4<br>San Francisco, CA 94117<br><br>YOUNG CHOI<br>1204 Manor Lane<br>Mt. Pleasant, S.C. 29464<br><br>MEAGHAN ENRIGHT<br>1900 South Eads St. #128<br>Arlington, VA 22202<br><br>LEANNE LEE<br>Chez Michel Reuss<br>113 Rue Caulaincourt<br>75018, Paris<br>France<br><br>ELIZABETH L. YOUNG<br>542 Linden Street #3<br>San Francisco, CA 94102<br><br>CHRISTOPHER ZARCONI<br>2100 Connecticut Avenue NW, Apt. B1<br>Washington, DC 20008,<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>THE UNITED STATES OF AMERICA<br>Office of the Attorney General<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530-0001,<br><br>THE DISTRICT OF COLUMBIA<br>John A. Wilson Building, 6th floor<br>1350 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004, | CONSOLIDATED:<br>CASE NUMBER 1:02CV02010<br><br>JUDGE: Emmet G. Sullivan<br>DECK TYPE: General Civil |

268520.6

ANTHONY A. WILLIAMS,                            )
in his official capacity as                     )
Mayor of the District of Columbia               )
1350 Pennsylvania Avenue, N.W.                  )
Washington, D.C. 20001                          )
                                                )
THE NATIONAL PARK SERVICE                       )
1849 C Street, N.W.                             )
Washington, D.C. 20240,                         )
                                                )
RICHARD MURPHY,                                 )
in his official capacity as a                   )
Major, U.S. Park Police, and in his individual  )
and personal capacity                           )
1849 C Street, N.W.                             )
Washington, D.C. 20240,                         )
                                                )
CHARLES H. RAMSEY                               )
in his official capacity as                     )
Chief Executive Officer of the                  )
Metropolitan Police Department, and in his      )
individual and personal capacity                )
300 Indiana Avenue, N.W.                        )
Washington, DC 20001,                           )
                                                )
MICHAEL J. FITZGERALD,                          )
In his official capacity as Assistant Chief of the )
Metropolitan Police Department and in his       )
individual and personal capacity                )
300 Indiana Avenue, N.W.                        )
Washington, D.C. 20001                          )
                                                )
BRIAN K. JORDAN,                                )
In his official capacity as Assistant Chief of the )
Metropolitan Police Department and in his       )
individual and personal capacity                )
300 Indiana Avenue, N.W.                        )
Washington, D.C. 20001                          )
                                                )
PETER J. NEWSHAM,                               )
in his official capacity as                     )
Assistant Chief of the                          )
Metropolitan Police Department, and in his      )
individual and personal capacity                )
300 Indiana Avenue, N.W.                        )

Washington, D.C.  20001                          )
                                                 )
B. DIGIROLAMO,                                   )
an officer of the Metropolitan Police Department )
on September 27, 2002, with badge #0497, in      )
his individual and personal capacity             )
                                                 )
A. HARRISON,                                     )
an officer of the Metropolitan Police Department )
on September 27, 2002, with badge #2046, in      )
his individual and personal capacity             )
                                                 )
M. SMITH,                                        )
An officer of the Metropolitan Police Department )
On September 27, 2002, with badge #3486, in      )
his individual and personal capacity             )
                                                 )
FAIRFAX COUNTY SHERIFF'S                         )
DEPARTMENT,                                       )
4110 Chain Bridge Road                           )
Fairfax, V.A. 22030                              )
                                                 )
JOHN or JANE DOES 1-10                           )
                                                 )
Defendants.                                      )
_____)

## THIRD AMENDED COMPLAINT
### FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs RayMing Chang, Amy Chastain, Young Choi, Meaghan Enright, Leanne Lee,

Elizabeth Young, and Christopher Zarconi (hereinafter "the Plaintiffs") bring this Complaint and

allege as follows:

## NATURE OF THE ACTION

1.      This is an action for injunctive and declaratory relief to protect the Plaintiffs and the

public from a policy, custom and/or practice of "trap-and-arrest" in which police

surround persons, including persons engaged in no illegal conduct, who receive no order

to disperse and who, even if such an order to disperse is given, are deprived of any ability to leave the area.

2.      This action further seeks injunctive and declaratory relief to protect the Plaintiffs and the public from a policy, custom and/or practice of arresting journalists, bystanders, and observers who are caught within trap-and-arrest zones during demonstrations.

3.      This action further seeks injunctive and declaratory relief to protect the Plaintiffs and the public from the policy, custom and/or practice of using excessive force to prevent individuals from leaving trap-and-arrest zones.

4.      This action further seeks injunctive and declaratory relief to protect the Plaintiffs and the public from a policy, custom and/or practice of keeping arrested individuals in restraints or handcuffs for excessive periods, of up to 24 hours or more, including handcuffing individuals in a fetal position by handcuffing one wrist to the person's opposing ankle (*e.g.*, handcuffing a person's right wrist to that person's left ankle).

5.      This action further seeks injunctive and declaratory relief to protect the Plaintiffs and the public from a policy, custom and/or practice of using abusive confinement and/or the threats of abusive confinement to secure no contest pleas.

6.      This action further seeks injunctive and declaratory relief to protect the Plaintiffs and the public from a policy, custom and/or practice of denying arrestees their right of access to counsel and of denying arrestees other *Miranda* rights.

7.      This action further seeks damages for injuries sustained by the Plaintiffs which were caused by the Defendants' unlawful actions.

8.    This action further seeks damages for injuries sustained by the Plaintiffs which were caused by the Defendants' conspiracy to deprive the Plaintiffs of their Constitutional rights.

9.    This action further seeks damages for injuries sustained by the Plaintiffs which were caused by certain Defendants' negligence in failing to prevent the other Defendants' from depriving the Plaintiffs of their Constitutional rights.

10.   This action further seeks damages for injuries sustained by the Plaintiffs which were caused by certain Defendants' negligence in failing to prevent the other Defendants' conspiracy to deprive the Plaintiffs of their Constitutional rights.

## JURISDICTION AND VENUE

11.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (1996).

12.   Venue is proper pursuant to both 28 U.S.C. § 1391 (b) & (e) (1996).

13.   This Court has the authority to render injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 (1996).

## THE PARTIES

### *Definitions*

14.   General John G. Pershing Park ("Pershing Park") is an area of federal park land located between 14th and 15th Streets, N.W., on Pennsylvania Avenue, N.W., Washington, D.C. "Freedom Plaza" is located between 13th and 14th Streets, N.W., on Pennsylvania Avenue, N.W., Washington, D.C.  Both are four to five blocks from the main buildings of the World Bank and the International Monetary Fund ("IMF"), and on the other side of the White House-Treasury Department complex.

15. *The Hatchet* is an independent newspaper servicing the George Washington University and the surrounding community. *The Hatchet* has been in existence for 101 years, has a circulation of 11,500, is distributed at over 70 locations, and is published twice a week. *The Hatchet* has received numerous awards for journalism and photojournalism, including awards from the Society of Professional Journalists.

16. The Metropolitan Police Academy (the "Academy") is a facility of the Metropolitan Police Department ("MPD") of the District of Columbia, located at 4665 Blue Plains Drive, S.W., Washington, D.C.

17. Judiciary Square is a District of Columbia government facility located at or near 409 F. Street, N.W., Washington, D.C.

18. The National Lawyers Guild ("NLG") is a national organization founded in 1937 which works for legal reform and social justice.

19. The Fairfax County Sheriff's Department ("Fairfax County") is responsible for public safety in Fairfax County, Virginia.

20. The George Washington University is located next to two of the institutions targeted by some protesters, the World Bank and the IMF. Some individual schools of the University, including the George Washington University Law School, and some student dormitories are located directly across the street from these sites. The University is also located within a few blocks of the White House and the United States State Department. Students on campus could see or hear the protests at these various locations and, by simply walking out the doors of their schools or dormitories, were within the general protest area.

***The Plaintiffs***

21.   At the time of the events that are the subject of this Complaint, RayMing Chang was a first-year law student at the George Washington University.  Mr. Chang was, and continues to be, a resident of the District of Columbia.

22.   At the time of the events that are the subject of this Complaint, Amy Chastain was a third-year law student at the George Washington University.  Ms. Chastain was a resident of Maryland at the time of the arrest.  Ms. Chastain is currently a resident of the State of California.

23.   At the time of the events that are the subject of this Complaint, Young Choi was an undergraduate student at the George Washington University.  Mr. Choi was a resident of the District of Columbia at the time of the arrest.  Mr. Choi is currently a resident of the State of South Carolina.

24.   At the time of the events that are the subject of this Complaint, Meaghan Enright was an undergraduate student at the George Washington University.  Ms. Enright was a resident of the District of Columbia at the time of the arrest.  Ms. Enright is currently a resident of the Commonwealth of Virginia.

25.   At the time of the events that are the subject of this Complaint, Leanne Lee was an undergraduate student at the George Washington University.  Ms. Lee was a resident of the District of Columbia at the time of her arrest.  Ms. Lee is currently a resident of Paris, France.

26.   At the time of the events that are the subject of this Complaint, Elizabeth Young was a second-year law student at the George Washington University.  Ms. Young was a resident of the Commonwealth of Virginia at the time of her arrest.  Ms. Young is currently a resident of the State of California.

27.   At the time of the events that are the subject of this Complaint, Christopher Zarconi was an undergraduate student at the George Washington University.  Mr. Zarconi was, and continues to be, a resident of the District of Columbia.

### The Chang Defendants

28.   The United States is an interested party because various federal agencies, including but not limited to the United States Department of the Interior and the National Park Service, participated in the planning and carrying out of the arrests and detentions described in this Complaint.  The Attorney General of the United States and the United States Attorney for the District of Columbia represent the Executive Branch of the United States Government in such matters.

29.   The District of Columbia is a municipal corporation and constitutes the city government of Washington, D.C.  It was created by and exists under the laws of the United States.

30.   Anthony A. Williams is, and was at the time of the events that are the subject of this Complaint, the mayor of the District of Columbia.

31.   The National Park Service ("Park Service") is part of the United States Department of the Interior.  The Park Service has police authority over Pershing Park and some of the other areas in which arrests were made.

32.   At the time of the events that are the subject of this Complaint, Richard Murphy was a Major in the Park Police.  Defendant Murphy was on the scene at Pershing Park on September 27, 2002, and was in command of those officers present from the Park Police.

33.   Charles Ramsey is, and was at the time of the events that are the subject of this Complaint, the Chief of the MPD.  The MPD is the agency responsible for policing the District of Columbia.

34. Michael J. Fitzgerald is, and was at the time of the events that are the subject of this Complaint, the Executive Assistant Chief of the MPD.

35. Brian K. Jordan is, and was at the time of the events that are the subject of this Complaint, an Assistant Chief of the MPD.

36. Peter J. Newsham is, and was at the time of the events that are the subject of this Complaint, an Assistant Chief of the MPD. At the time of the events that are the subject of this Complaint, Defendant Newsham was in charge of the Office of Professional Responsibility. Defendant Newsham was on duty at Pershing Park on September 27, 2002, and was responsible for Area IV of the World Bank/IMF demonstration detail, which encompassed Pershing Park.

37. B. Digirolamo was an officer of the MPD with badge number 0497 at the time of the events that are the subject of this Complaint. On information and belief, B. Digirolamo is currently an officer of the MPD.

38. A. Harrison was an officer of the MPD with badge number 2046 at the time of the events that are the subject of this Complaint. On information and belief, A. Harrison is currently an officer of the MPD.

39. M. Smith was an officer of the MPD with badge number 3486 at the time of the events that are the subject of this Complaint. On information and belief, M. Smith is currently an officer of the MPD.

40. The Fairfax County Sheriff's Department is, and was at the time of the events that are the subject of this Complaint, a county public safety agency located in Fairfax County, Virginia.

41.   John or Jane Does 1-10 are, as yet, unidentified agents, officers, or officials of the federal government, the District of Columbia, or state or local governments, who were responsible for, personally participated in, or observed and took no action to correct or prevent, the illegal and unconstitutional arrests described in this Complaint, including, among others: the trap-and-arrest practices; the policy of extended detention; the practice of using restraints for excessive periods of time, including the use of restraints to restrict arrestees to a fetal position; the policy of denying arrestees their access to counsel; and the practice of using abusive confinement and threats to secure no contest pleas.

## FACTUAL BACKGROUND

### *The Trap-and-Arrest Practice*

42.   The instant matter comes before the Court after hundreds of arrests were carried out by the MPD, the Park Service, Fairfax County, and other state, local, and federal police departments.

43.   Arrests occurred on the weekend of September 27, 2002, at Pershing Park and various locations around Washington, D.C.

44.   Before September 27, 2002, the MPD estimated that it planned on arresting more than 3000 people.

45.   The U.S. government and District of Columbia government assembled a huge police force, including police officers from other states and local governments, including Fairfax County, to deal with expected demonstrations.  Ultimately, it was reported that the number of protesters was so small that 650 of 1700 police officers assembled from numerous police forces were sent home.  Defendant Ramsey admitted there was "no justification" for keeping such a large police force given the small size of the protests.

268520.6

46. The protests were directed against the policies of the World Bank, the International Monetary Fund ("IMF"), and the United States government as they relate to a host of concerns including the environment, worker rights, third-world debt and the rights of indigenous people.

47. Reportedly, while there were limited incidents of property damage, the protests were largely peaceful and did not result in significant property damage.

48. Announcements about the protests were publicized weeks in advance and described a variety of exhibitions ranging from live music to giant puppet shows to bicycle groups.

49. Given the prior media coverage, a significant number of individuals in addition to the protesters themselves were present to witness the activities. In addition to bystanders and protesters, there was a large contingent of journalists in the area of the protests, including ones from the nearby George Washington University, as well as individuals serving as observers to record any abusive conduct by the police.

50. Prior to and during the protests, neither police nor public officials closed nearby institutions, including the George Washington University, or prohibited observers or journalists from viewing the protests or the actions of the protesters or police, and had not warned observers or journalists that they could be arrested if found within the area of the protests.

51. In various locations including Pershing Park, police officers from the MPD, the Park Service, Fairfax County, and other jurisdictions surrounded large numbers of individuals and cut off all exits. Individuals were caught within these zones and were arrested in that they were prevented from leaving, were compressed into a smaller area by formations of police in riot gear advancing toward each other or some natural or previously erected

barrier (such as a security fence) with the individuals caught between them and unable to exit. Eventually, the persons caught in such traps were hand-cuffed and taken onto busses by the police.

52.    Police officers at Pershing Park, including those officers in command, knew or should have known that there was no probable cause to arrest most, or all, of these people, and that many of the individuals held against their will within Pershing Park had not committed any illegal act.

53.    Defendants Ramsey, Fitzgerald, Jordan and Newsham met and decided to arrest and take into custody all the individuals trapped within Pershing Park.

54.    During that meeting, these officers knew, or should have known there was no probable cause for arresting all or most of these individuals and most of the individuals within Pershing Park had not committed an illegal act.

55.    During that meeting, these officers knew, or should have known, that most of the individuals within Pershing Park had not been given an order to disperse, or been given any warning to leave Pershing Park.

56.    During that meeting, these officers knew, or should have known, that many of the individuals within Pershing Park had been, and were being, denied an opportunity to disperse.

57.    Defendants Ramsey, Fitzgerald, Jordan, and/or Newsham communicated the order to the officers surrounding Pershing Park to surround the individuals in Pershing Park restrain them from leaving the Park, and, ultimately, handcuff them and take them into custody.

58. Defendant Murphy was on the scene at Pershing Park on September 27, 2002, and was in command of the officers present from the Park Police and the officers present from Fairfax County.

59. Defendant Murphy knew that there was no probable cause for arresting most of the individuals in Pershing Park, and that most of these individuals had not committed an illegal act.

60. Defendant Murphy knew that the conduct of the individuals in Pershing Park did not meet the criteria applied by the Park Service required to conduct a mass arrest.

61. Defendant Murphy informed Defendant Newsham and possibly others that the conduct in Pershing Park did not meet the criteria applied by the Park Service for mass arrests.

62. Nevertheless, Defendant Murphy commanded the Park Police and Fairfax County Sheriff's officers under his direct and/or indirect command to assist the MPD to carry out the mass arrests by positioning Park Police around a portion of the perimeter of Pershing Park.

63. At the urging of the MPD, the Park Police and Fairfax County Sheriff's Department agreed to assist in the arrest of all individuals present in Pershing Park.

64. Commander Basilio Cachuela, Jr., an officer of the Fairfax County Sheriff's Department, assisted the MPD and/or Park Police to carry out the mass arrests by positioning Fairfax County Sheriff's officers on a portion of the perimeter of Pershing Park and ordering those officers to prevent anyone from leaving the Park and by supplying generally personnel and resources to the enforcement effort.

65. The Defendants arrested individuals within Pershing Park who they knew, or should have known, had not committed an illegal act.  The Defendants knew or should have known

268520.6                                      - 13 -

that these arrests were made without probable cause to suspect that those individuals had committed an illegal act.

66. The trapping and arresting of protesters, and anyone else in their vicinity, has been utilized in the past by Defendants as a method of suppressing demonstrations by removing large numbers of individuals for a period of time from the vicinity of a demonstration and from the city streets.

67. These actions demonstrate an apparent policy, custom and/or practice of encircling, trapping, and arresting protesters and everyone else in their vicinity as a method of suppressing the demonstrations by removing large numbers of individuals from the vicinity.

68. It was reported that this trap-and-arrest technique resulted in almost 700 arrests by mid-afternoon on the first day, September 27, 2002.

69. After the fact, Defendant Ramsey explained that anyone caught in these zones "had no business in the street" and that he viewed such presence as a cause for arrest.

70. Defendant Ramsey further stated publicly that "mayhem" would result unless he arrested anyone deemed to be "blocking a street."

71. Witnesses in the media observed this technique and noted that bystanders, observers, and journalists were often arrested with protesters when they were unable to leave the arrest zones.

72. Defendant Ramsey reportedly heralded these arrests as instrumental to the police's ability to keep control over the protests. Of the mass arrests, he observed that "a lot of wind was taken out of their sails Friday."

73.    An investigation was conducted, and a Final Report Relative to Complaints of Alleged Misconduct Made at the October 24, 2003, Hearing of the Committee on the Judiciary of the Council of the District of Columbia Concerning the IMF/World Bank Protests (hereinafter "Final Report") was made by the MPD.

74.    The Final Report confirms that there were possibly individuals in the park that were not protesters and who had arrived there lawfully, that it cannot be established that all of the persons in the park were part of any particular group engaged in unlawful behavior, and that no warnings were given to the demonstrators in the park prior to their arrest.

### *The Arrests of the Plaintiffs*

75.    All of the Plaintiffs are George Washington University students who were present at the protests as journalists, bystanders, or observers.

76.    Mr. Chang was arrested on the morning of September 27, 2002, in the vicinity of Pershing Park and Freedom Plaza.  Mr. Chang was not a protester.  Given the allegations of abusive police conduct at other anti-globalization protests, Mr. Chang and his fellow observers were asked by the NLG to observe the protests and keep a log of events and any abusive conduct.  Consequently, Mr. Chang was in the Pershing Park area prior to his arrest in the capacity of a legal observer for the NLG.  Mr. Chang was wearing a badge which identified him as an NLG member.  Mr. Chang never heard a demand to disperse, he was never given an order to disperse, and he was not engaged in any protest activity.  Mr. Chang attempted to leave the area but was prevented from doing so. Mr. Chang was trapped within a closed perimeter and then arrested.

77.    Ms. Chastain was arrested on the morning of September 27, 2002, in the vicinity of Pershing Park and Freedom Plaza.  Ms. Chastain was not a protester but was in that area in her capacity as a legal observer for the NLG.  Ms. Chastain was wearing a green hat

clearly marked with the letters NLG and an identification tag to identify her as an observer for the NLG. Ms. Chastain never heard a demand to disperse, was never given an order to disperse and was not engaged in any protest activity. Ms. Chastain observed other people, including some who appeared to be tourists, being denied exit when they tried to leave the area. Ms. Chastain was herded into a corner of Pershing Park with all the other people caught inside the trap-and-arrest perimeter. Ms. Chastain was arrested, handcuffed, loaded onto a Metro bus, and taken to the Academy and then to Judiciary Square for allegedly disobeying an order.

78.    Mr. Choi was arrested on September 27, 2002, in the vicinity of Pershing Park and Freedom Plaza.   Mr. Choi was not a protester but was in that area in his capacity as a photographer for *The Hatchet*. Mr. Choi never heard a demand to disperse, was never given an order to disperse and was not engaged in any protest activity. Mr. Choi was standing with a group of people encircled by police in riot gear. Mr. Choi attempted to leave that group but he was prevented from doing so by police officers. Although he explained to the officers that he was a staff photographer with *The Hatchet*, and displayed his press ID, he was not allowed to leave. Mr. Choi was arrested, handcuffed, loaded onto a Metro bus, and taken to the Academy for allegedly disobeying an order to disperse.

79.    Ms. Enright was arrested on September 27, 2002, in the vicinity of Pershing Park and Freedom Plaza. Ms. Enright was not a protester but was in that area in her capacity as a photographer for *The Hatchet*. Ms. Enright never heard a demand to disperse, was never given an order to disperse, and was not engaged in any protest activity. When Ms. Enright tried to leave Pershing Park, she was denied an exit, and when she asked

why she was being detained, the officers would not answer.  After approximately an hour, the police began closing the perimeter until everyone inside the perimeter was herded into one corner of the plaza.  The officers then arrested everyone inside the perimeter, including Ms. Enright.  The officers confiscated Ms. Enright's camera equipment and, after telling her that they would not be responsible for any loss or damage, threw it onto a pile of confiscated possessions.

80.     Ms. Lee was arrested on September 27, 2002, in the vicinity of Pershing Park and Freedom Plaza.  Ms. Lee was not a protester but was in that area in her capacity as a photographer and as a journalist for *The Hatchet*.  Ms. Lee never heard a demand to disperse, was never given an order to disperse, and was not engaged in any protest activity.  Ms. Lee attempted several times to leave Pershing Park.  During one of those attempts, she explained that she needed to leave to go to her internship at Agence France Presse ("AFP"), a French news service.  Each time she attempted to leave the park she was denied exit.  Ms. Lee used her cellular phone to call her employer at AFP several times during her detention to advise him that she was being detained and was unable to get to the AFP office.  Ms. Lee was handcuffed and an officer used a knife to cut the strap on a camera equipment bag that she was holding before she was moved to a bus.

81.     Ms. Young was arrested on the morning of September 27, 2002, in the vicinity of Pershing Park and Freedom Plaza.  Ms. Young was not a protester but was in that area in her capacity as a legal observer for the NLG.  Ms. Young was wearing a green hat emblazoned with the letters NLG and a badge which clearly identified her as an observer for the NLG.  Ms. Young never heard a demand to disperse, was never given an order to disperse, and was not engaged in any protest activity.  Ms. Young asked to leave

Pershing Park and was repeatedly denied an exit. Ms. Young was arrested, handcuffed, and loaded onto a Metro bus.

82. Mr. Zarconi was arrested on the morning of September 27, 2002, in the vicinity of Pershing Park and Freedom Plaza. Mr. Zarconi was not a protester but was in that area in his capacity as a photographer and photo-editor of *The Hatchet*. Mr. Zarconi never heard a demand to disperse, was never given an order to disperse and was not engaged in any protest activity. After being informed by another journalist that police in riot gear had formed a perimeter and were denying everyone exit from the plaza, Mr. Zarconi made his way to the perimeter to seek exit. Mr. Zarconi displayed his press pass and asked to be allowed to leave, but the officers denied his request and told him that nobody was allowed to leave the area. Mr. Zarconi, along with everyone else in the perimeter, was then corralled into one corner of the plaza by police in riot gear in a trap-and-arrest maneuver. Before being loaded onto a Metro bus, Mr. Zarconi again displayed his press pass and asked to be allowed to leave. He was denied once again. His camera bag was confiscated and thrown onto a pile of other confiscated bags, and he was not given a receipt of any sort for his equipment, some of which was expensive. Mr. Zarconi was handcuffed, loaded onto a Metro bus, and taken to the Academy for allegedly disobeying an order.

83. According to the records of the MPD, Defendant Digirolamo arrested Ms. Enright, Ms. Lee, and Mr. Zarconi on September 27, 2002, at 15th and Pennsylvania in Washington, DC. Defendant Digirolamo charged Ms. Enright, Ms. Lee and Mr. Zarconi with failure to obey a police order.

84. In truth and in fact, Defendant Digirolamo did not give Ms. Enright, Ms. Lee, or Mr. Zarconi any orders which were not followed, nor did he witness any other authorized government official give them any orders which were not followed.

85. On information and belief, Defendant Digirolamo had no reason to believe that Ms. Enright, Ms. Lee, or Mr. Zarconi had failed to obey any order given from any other police officer, and arrested Ms. Enright, Ms. Lee and Mr. Zarconi without probable cause.

86. According to the records of the MPD, Defendant Harrison arrested Mr. Chang, Ms. Chastain, and Ms. Young on September 27, 2002, at 15th and Pennsylvania in Washington, DC. Defendant Harrison charged Mr. Chang, Ms. Chastain and Ms. Young with failure to obey a police order.

87. In truth and in fact, Defendant Harrison did not give Mr. Chang, Ms. Chastain, and Ms. Young any orders which were not followed, nor did he witness any other authorized government official give them any orders which not followed.

88. On information and belief, Defendant Harrison had no reason to believe that Mr. Chang, Ms. Chastain, and Ms. Young had failed to obey any order given from any other police officer, and arrested Mr. Chang, Ms. Chastain, and Ms. Young without probable cause.

89. According to the records of the MPD, Defendant Smith arrested Mr. Choi on September 27, 2002, at 15th and Pennsylvania Avenue in Washington, DC. Defendant Smith charged Mr. Choi with failure to obey a police order.

90. In truth and in fact, Defendant Smith did not give Mr. Choi any orders which were not followed, nor did he witness any other authorized government official give Mr. Choi any orders which were not followed.

91.      On information and belief, Defendant Smith had no reason to believe that Mr. Choi had

         failed to obey any order given from any other police officer, and arrested Mr. Choi

         without probable cause.

### The Confinement and Release Conditions

92.      Four of the Plaintiffs were held at the Academy until the afternoon of Saturday,

         September 28, 2002, and three of the Plaintiffs were held at Judiciary Square until the

         early morning hours of Saturday, September 28, 2002.

93.      After being arrested, Mr. Chang was loaded onto a Metro bus, and taken to the Academy

         and then to Judiciary Square. Mr. Chang was held for approximately 18 hours by the

         MPD, most of which was on a bus at Judiciary Square in Washington, D.C. He was

         handcuffed during 13 of those hours. The discomfort of being handcuffed prevented

         Mr. Chang from sleeping during this time. After sitting on the full bus for approximately

         13 hours, Mr. Chang was taken to cellblock B in the Judiciary Center. Mr. Chang was

         not given access to individual counsel before being asked by police officers to plead to

         criminal charges. Mr. Chang was told that he was charged with "Failure to Obey" and

         was given three options: (1) remain in custody until an arraignment on Saturday or

         Monday, (2) pay $100 and "forfeit," or (3) pay $100 and schedule a hearing at Superior

         Court later. Mr. Chang selected the third option because he did not want to remain in

         custody. Despite having made his selection clear, the station clerk marked Mr. Chang's

         collateral receipt as "forfeit." Mr. Chang was released after 3:00 a.m. on September 28,

         2002.

94.      After being arrested, Ms. Chastain was handcuffed and placed on a metro bus.

         Ms. Chastain was held for approximately 18 hours by the MPD, most of which was on

         the metro bus at Judiciary Square in Washington, D.C. She was later taken to Judiciary

Square for processing and held there until her release. Ms. Chastain was not given access to individual counsel before being asked by police officers to plead to criminal charges. During processing, Ms. Chastain was asked about her involvement in the protests and was asked her purposes for being in the arrest zones. She was told by an officer that she had to choose between remaining in custody until arraignment or paying $100 to "post and forfeit." In order to end her confinement, Ms. Chastain opted to pay the $100 fine. Ms. Chastain was released after 3:00 a.m. on September 28, 2002, after paying a $100 fine.

95.　After being arrested, Mr. Choi was held for approximately 16 hours by the MPD. Approximately 6 hours of that time he was handcuffed on a bus at Judiciary Square in Washington, D.C. After he was removed from the bus, he was processed, taken to a mat in the Academy and handcuffed in a fetal position, wrist to opposite ankle, for approximately 8 hours. Mr. Choi was not given access to individual counsel before being questioned by police officers and being asked to plead to criminal charges. Mr. Choi was not released until he agreed to "forfeit collateral" and pay a $50 fee for allegedly failing to obey a lawful order. When he asked for an explanation, the officers told him that he could either be released at that time by paying $50 or he could stay in custody until as late as Tuesday to attend court. Mr. Choi paid the fine and was released around 2:00 a.m. on September 28, 2002.

96.　After being arrested, Ms. Enright was held for approximately 27 hours by the MPD, approximately 10 hours of which was spent handcuffed on a metro bus. She was unloaded from the bus at the Academy and processed at approximately 8:30 p.m. The rest of her belongings, except her identification and $50 to "pay out," were confiscated,

including shoelaces and drawstrings. Ms. Enright was not given access to individual counsel before being questioned by police officers and being asked to plead to criminal charges. During processing, Ms. Enright was briefly asked about her involvement in the protests and was asked her purposes for being in the arrest zones. She was taken to a mat on the floor of the Academy gymnasium and her right wrist was handcuffed to her left ankle. She was forced to remain in this fetal position for most of the time until she was released at approximately 2:00 p.m. on September 28, 2002. Ms. Enright's mother sent a lawyer to the Academy to represent her daughter, but Ms. Enright was denied access to her counsel. The officers told Ms. Enright that she did not have a right to an attorney because she was not being interrogated. Any questions or messages Ms. Enright had for her attorney were to be relayed via an officer. Ms. Enright was told that she had three options: (1) pay $50 and be released, (2) plead guilty, or (3) plead not guilty and remain in custody until Monday. Ms. Enright was not given the opportunity to discuss this choice with her counsel. She paid the fine in order to secure her release. Ms. Enright was released at approximately 2:00 p.m. on September 28, 2002.

97.     After being arrested, Ms. Lee was held by the MPD for approximately 27 hours. Several hours of her confinement occurred on a Metro bus at the Academy waiting to be processed. Ms. Lee was not given access to individual counsel before being asked by police officers to plead to criminal charges. She was denied a vegetarian meal; the only food she had during her more than 24 hours of detention consisted of a granola bar she successfully begged from a passing officer and a cookie. While still handcuffed, Ms. Lee was moved to a mat with seven or eight other people. An officer then handcuffed Ms. Lee's right wrist to her left ankle and left Ms. Lee to sleep in this fetal position. She

remained handcuffed in this fetal position until approximately 1 p.m. the following day, September 28, 2002. Ms. Lee was told by an officer that if she challenged the arrest, she would be held until Monday. In order to end this confinement, she finally agreed to plead no contest, paid a $50 fine, and was then released.

98. After being arrested, Ms. Young was held for approximately 15 hours by the MPD, most of which was on a bus while handcuffed. For almost two hours, the police refused her repeated requests to have her restraints loosened despite her complaints of pain in her wrists. Ms. Young was eventually taken to Judiciary Square. Ms. Young was not given access to individual counsel before being asked by police officers to plead to criminal charges. Ms. Young was given three options: (1) remain in custody until an arraignment on Saturday or Monday, (2) pay $100 and "forfeit," or (3) pay $100 and schedule a hearing at Superior Court later. Ms. Young selected the third option because she did not want to remain in custody. Despite having communicated this choice to the station clerk, Ms. Young's collateral receipt was marked "forfeit." Ms. Young was released at approximately 2:30 a.m. on September 28, 2002.

99. After being arrested, Mr. Zarconi was held for approximately 26 hours. Approximately 10 hours of this time Mr. Zarconi was held in restraints on a metro bus. He and the other arrestees had to ask permission to use the restroom, and, when permission was granted, they were taken in small groups. When Mr. Zarconi was allowed off the bus, he was taken into the Academy to be "processed." At the Academy, the rest of Mr. Zarconi's belongings, including shoelaces and drawstrings, were confiscated and placed in an evidence bag. Mr. Zarconi was photographed and fingerprinted and allowed to use the automated teller machine to withdraw $50, which he was told he would need if he

wanted to leave custody before Tuesday. Mr. Zarconi was not given access to individual counsel before being questioned by police officers. At one point during processing, Mr. Zarconi was asked about his "cause;" Mr. Zarconi explained he was not a protester but was a member of the press. Nonetheless, he was then led to a wrestling mat on the floor of the gymnasium and handcuffed right wrist to left ankle. Mr. Zarconi was forced to remain in this fetal position for over 12 hours until approximately 1:00 p.m. Saturday, September 28, 2002. Mr. Zarconi was required to pay $50 before being released from custody.

100.   With regard to similar arrests made of other individuals who were lawfully within Pershing Park, Chief Ramsey has stated "The District of Columbia government has carefully examined the events of September 27 and 28, 2002, concerning arrests and detentions that occurred on those days. Our investigation shows that our handling of various aspects of those events was flawed. Our investigation also shows that you should not have been arrested or detained. On my own behalf, and that of the Government of the District of Columbia, we sincerely regret any hardship that our mistakes of September 27 and 28, 2002 may have caused your or persons close to you."

### *Alleged Injuries and Standing*

101.   The Plaintiffs suffered direct and significant injuries due to the violations described in this Complaint.

102.   The arrest practices described in this Complaint caused the Plaintiffs to be subject to improper arrest and confinement, some for 24 hours or more.

103.   The arrest practices described in this Complaint further caused the Plaintiffs to be subject to criminal charges and criminal fines.

104. The arrest practices described in this Complaint further prevented the Plaintiffs from participating in protected activities, including the exercise of their rights of free press, free association, and assembly.

105. The confinement practices described in this Complaint caused the Plaintiffs to be restrained for excessive periods without proper cause or authority.

106. The confinement practices described in this Complaint caused the Plaintiffs physical harm and discomfort by being denied proper food and movement during the time that they were in custody.

107. The arrest and confinement practices further harmed the Plaintiffs by coercing no contest pleas to criminal charges under the threat of longer confinement under abusive, illegal conditions, resulting in the creation of criminal records against them, and requiring them to pay fines.

108. The arrest and confinement practices further harmed the Plaintiffs by subjecting them to reputational and professional injury stemming from their arrest for allegedly disobeying police orders to disperse while performing their roles as journalists and observers.

109. The Plaintiffs suffered direct injury to their reputations and status in the denial of their right to counsel before being asked to plead no contest to criminal charges.

110. The Plaintiffs suffered direct injury to their reputations and status in the denial of *Miranda* warnings before being questioned and asked to plead in a criminal matter.

111. The Plaintiffs, and other similarly situated persons, remain at risk of future arrests if arrest and detention procedures similar to those described in this Complaint occur while witnessing future protests and demonstrations, including ones planned for the coming months.

268520.6

112.    The Defendants unlawful actions have chilled the Plaintiffs, and other similarly situated persons, from engaging in future observation, participation, or media coverage of future demonstrations.

113.    As individuals directly harmed by unconstitutional and unlawful practices of arrest and confinement, the Plaintiffs have standing to seek relief before this Court for an actual controversy under the Declaratory Judgment Act and to seek damages and other appropriate relief, including injunctive relief.

### *The Aftermath*

114.    Following the arrests of the Plaintiffs and others, based on allegations of official misconduct, the MPD conducted an investigation.

115.    Reports containing the results of the internal investigations were provided to both Defendant Ramsey and Mayor Williams in 2003.  Copies of those investigative materials and report (the "Report") have been provided to the parties and posted on the docket by the Court.

116.    The Report found that the order to arrest the individuals in Pershing Park was given by Defendant Newsham.

117.    The Report found that it was possible that there were individuals in Pershing Park that were not part of any protest group.  The Report also found that it was possible that numerous individuals inside Pershing Park had arrived there lawfully.

118.    The Report found there was no evidence that Pershing Park had been cleared before any larger groups of protesters entered the park.

119.    The Report found that the information and details on each arrest form – specifically indicating that an arrestee had been given an order to leave Pershing Park was "exposed"

as inaccurate – in fact, none of the officers could actually testify that any individual was actually given a warning to leave.

120. The Report found that each arrestee was subject to "an improper charge for this particular event" and that the "arrest paperwork could not support the claim that each officer personally warned each of the defendants listed in the form."

121. The Report found that the MPD's policy of at least two documented warnings prior to an arrest being made was not followed in this case as "no warnings were given" to the individuals in Pershing Park.

122. The Report found that Defendant Newsham, Defendant Murphy, and others stated they heard "no warnings to disperse given by police."

123. Indeed, the Report also found there was no evidence that individuals were given warnings before entering Pershing Park.

124. Finally, the Report concluded that "police officials on the scene made procedural errors as it relates to the affecting of arrests, choice of criminal charges, and manner of arrest documentation."

125. An investigation was conducted by the Judiciary Committee of the District of Columbia City Council of the events described in this Complaint and of the Final Report.

126. With regard to the arrests, the Judiciary Committee found that the MPD made a "preemptive mass arrest" at Pershing Park, that Defendant Ramsey had set a tone that allowed for and approved of the preemptive arrests, that MPD commanders did not have probable cause to arrest everyone in the park on the basis of the alleged unlawful activity, that the arrests were done without first giving orders or warnings, in violation of MPD policy, and that Defendant Ramsey is responsible for the arrests.

127. With regard to the Final Report, and the investigation leading to the Final Report, the Judiciary Committee found that the MPD violated its own general orders in failing to promptly initiate the investigation that led to the Final Report, that at the direction of Chief Ramsey and in violation of MPD general orders, changes were made to the investigative report after it was completed by the Office of Professional Responsibility, that these changes served to weaken criticism of the Department and the nature of the arrests, that clear conflicts of interest were present during the investigation, and that the investigation and release of the final report were marked by evasions and misstatements by senior officials including Defendant Ramsey, giving rise to the appearance of an attempt to cover up Defendant Ramsey's role in ordering the Pershing Park arrests.

128. With regard to similar arrests made of other individuals who were lawfully within Pershing Park, Chief Ramsey has stated "The District of Columbia government has carefully examined the events of September 27 and 28, 2002, concerning arrests and detentions that occurred on those days. Our investigation shows that our handling of various aspects of those events was flawed. Our investigation also shows that you should not have been arrested or detained. On my own behalf, and that of the Government of the District of Columbia, we sincerely regret any hardship that our mistakes of September 27 and 28, 2002 may have caused your or persons close to you."

## FIRST CLAIM FOR RELIEF

### (First Amendment)

129. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 128 as if set forth fully herein.

130.   The arrest and confinement described in this Complaint, including the policy, custom
and/or practice of performing such arrests, violates the Plaintiffs rights of free assembly,
association, and press guaranteed in the First Amendment of the United States
Constitution.  Defendants are liable for such violation pursuant to 42 U.S.C. § 1983, the
Fourteenth Amendment, and/or *Bivens v. Six Unknown Named Agents of Federal Bureau
of Narcotics,* 403 U.S. 388 (1971).

## SECOND CLAIM FOR RELIEF

### (Fourth Amendment)

131.   The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 130 as
if set forth fully herein.

132.   The search and seizure described in this Complaint, including the policy, custom and/or
practice of performing such searches and seizures, violates the Plaintiffs rights
guaranteed in the Fourth Amendment of the United States Constitution.  Defendants are
liable for such violation pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment,
and/or *Bivens,* 403 U.S. at 388.

## THIRD CLAIM FOR RELIEF

### (Due Process)

133.   The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 132 as
if set forth fully herein.

134.   The trap-and-arrest practice, and subsequent abusive detention, described in this
Complaint, including the policy, custom and/or practice of performing conducting such
arrests and detentions, violates the Plaintiffs rights guaranteed under the Fifth and
Fourteenth Amendments of the United States Constitution.  Defendants are liable for

such violation pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment, and/or *Bivens,*
403 U.S. at 388.

## FOURTH CLAIM FOR RELIEF

### (Failure to Provide Miranda Warning)

135.   The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 134 as
if set forth fully herein.

136.   The failure to advise Plaintiffs of their *Miranda* rights, including the policy, custom
and/or practice of failing to do so, violates the Plaintiffs rights guaranteed in the Fifth and
Fourteenth Amendments of the United States Constitution.  Defendants are liable for
such violation pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment, and/or *Bivens,*
403 U.S. at 388.

## FIFTH CLAIM FOR RELIEF

### (Right to Counsel)

137.   The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 136 as
if set forth fully herein.

138.   The failure to advise Plaintiffs of their right to counsel, including the policy, custom
and/or practice of failing to do so, violates the Plaintiffs rights guaranteed in the Fifth,
Sixth, and Fourteenth Amendments of the United States Constitution.  Defendants are
liable for such violation pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment,
and/or *Bivens,* 403 U.S. at 388.

## SIXTH CLAIM FOR RELIEF

### (Conspiracy 42 U.S.C. § 1985)

139. The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 138 as if set forth fully herein.

140. Defendants conspired to deprive the Plaintiffs, and others in their class, of their civil rights or privileges, including their First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

141. Upon information and belief, prior to or on September 27, 2002, Defendants, and others not yet identified, conspired and agreed to utilize the unconstitutional trap-and-arrest described in this Complaint; instructed the law enforcement officers who would attend the protests to use the unconstitutional trap-and-arrest maneuver; or instructed the law enforcement officers who would attend the protests on how to perform the unconstitutional trap-and-arrest maneuver.

142. Prior to September 27, 2002, Defendants agreed upon a cost-sharing plan for the law enforcement presence, which was to include, and did include, the use of the unconstitutional trap-and-arrest maneuver.

143. Defendants took additional steps in furtherance of this conspiracy, including, but not limited to, failing to give an audible order to disperse or giving such an order and denying the Plaintiffs the ability to disperse; unlawfully arresting the Plaintiffs; denying the Plaintiffs access to counsel; failing to inform the Plaintiffs of their *Miranda* rights; and placing the Plaintiffs in restraints unnecessarily, including restraining them in a fetal position, and leaving them in such restraints for excessive periods of time.

144. Defendants targeted the Plaintiffs because of their perception of the Plaintiffs' political beliefs and associations, which Defendant presumed because of their youth and student status.

145. Similarly situated journalists and observers who appeared to be older than the average college student were allowed to leave the trap-and-arrest area while the Plaintiffs were forbidden an exit.

146. The Plaintiffs were injured by the Defendants' conspiracy to deprive them of their Constitutional rights.

147. The Defendants' conspiracy to deprive the Plaintiffs of their constitutional rights not only created direct injury to the Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations. If this conduct is not enjoined, the Plaintiffs and other similarly situated persons remain at risk in the future of being denied their constitutional rights if caught in similar trap-and-arrest maneuvers when they seek to witness, observe, or associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

**SEVENTH CLAIM FOR RELIEF**

**(Neglect to Prevent Conspiracy, 42 U.S.C. § 1986)**

148. The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 147 as if set forth fully herein.

149.  Some or all of the Defendants, and others not yet identified, were aware of the conspiracy to violate the Plaintiffs' rights, in violation of 42 U.S.C. § 1985, and neglected to prevent it.

150.  Upon information and belief, several of the Defendants knew of the conspiracy and yet participated in the unconstitutional trap-and-arrest maneuver, or made no attempt to stop the unconstitutional trap-and-arrest maneuver.

151.  These Defendants were negligent in failing to prevent this conspiracy.

152.  The Plaintiffs were injured by the Defendants' negligent failure to prevent this conspiracy.

153.  The Defendants' negligent failure to prevent this conspiracy to deprive the Plaintiffs of their constitutional rights not only created direct injury to the Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations.  If this conduct is not enjoined, the Plaintiffs and other similarly situated persons remain at risk in the future of being denied their Constitutional rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## EIGHTH CLAIM FOR RELIEF

### (Common Law Conspiracy)

154.  The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 153 as if set forth fully herein.

155. Defendants conspired to deprive the Plaintiffs of their civil rights or privileges, including their First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

156. Upon information and belief, prior to or on September 27, 2002, Defendants agreed the unconstitutional trap-and-arrest maneuver would be utilized; instructed the law enforcement officers who would attend the protests to use the unconstitutional trap-and-arrest maneuver; or instructed the law enforcement officers who would attend the protests on how to perform the unconstitutional trap-and-arrest maneuver.

157. Defendants took additional steps in furtherance of this conspiracy, including, but not limited to, failing to give an audible order to disperse or giving such an order and denying the Plaintiffs the ability to disperse; unlawfully arresting the Plaintiffs; denying the Plaintiffs access to counsel; failing to inform the Plaintiffs of their *Miranda* rights; and placing the Plaintiffs in restraints unnecessarily, including restraining them in a fetal position, and leaving them in such restraints for excessive periods of time.

158. The Plaintiffs were injured by the Defendants' conspiracy to deprive them of their Constitutional rights.

159. The Defendants' conspiracy to deprive the Plaintiffs of their constitutional rights not only created direct injury to the Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations. If this conduct is not enjoined, the Plaintiffs and other similarly situated persons remain at risk in the future of being denied their constitutional rights if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington,

D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## NINTH CLAIM FOR RELIEF

### (False Arrest)

160. The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 159 as if set forth fully herein.

161. Defendants unlawfully detained the Plaintiffs when they arrested the Plaintiffs on September 27, 2002.

162. The false arrests have caused the Plaintiffs reputation injury. The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law. All of the Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

163. The Defendants' unlawful arrest of the Plaintiffs not only created direct injury to the Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations. If this conduct is not enjoined, the Plaintiffs and other similarly situated persons remain at risk in the future of being unlawfully arrested if caught in similar trap-and-arrest maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## TENTH CLAIM FOR RELIEF

### (False Imprisonment)

164. The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 163 as if set forth fully herein.

165. Defendants unlawfully detained the Plaintiffs when they arrested and imprisoned the Plaintiffs on September 27, 2002, and September 28, 2002.

166. The Plaintiffs were unlawfully deprived of their freedom by Defendants' use of actual force and threats of force.

167. Defendants acted intentionally in unlawfully imprisoning the Plaintiffs.

168. Mr. Chang, Ms. Chastain, and Ms. Young were confined in cells at Judiciary Square until their release on September 28, 2002.

169. Mr. Choi, Ms. Enright, Ms. Lee, and Mr. Zarconi were detained at the Academy, handcuffed wrist to ankle for the majority of the time, until their release on September 28, 2002.

170. The false imprisonments have caused the Plaintiffs reputation injury. The fact of an arrest and a guilty plea will require the law students to report these facts to their respective bar associations and face potential further inquiry as to their fitness to enter the practice of law. All of the Plaintiffs also will have to report the fact of their arrests and pleas in common employment applications and future school applications.

171. The Defendants' unlawful imprisonment of the Plaintiffs not only created direct injury to the Plaintiffs, but also creates a chilling effect for them and other similarly situated persons for future observation or media coverage of future demonstrations. If this conduct is not enjoined, the Plaintiffs and other similarly situated persons remain at risk in the future of being unlawfully imprisoned if caught in similar trap-and-arrest

maneuvers when they seek to witness or observe, and associate with others witnessing and observing, protests and demonstrations in the Washington, D.C. area, including protests and demonstrations planned for the coming months, and in any other area in which similar trap-and-arrest maneuvers are practiced.

## RELIEF REQUESTED

WHEREFORE, the Plaintiffs pray that this Court:

a.      Enter an order declaring that the trap-and-arrest and confinement policies and practices described in this Complaint violate the First Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, the Fourteenth Amendment, and 42 U.S.C. §§ 1983, 1985, and 1986;

b.      Order injunctive relief to require clear and audible warnings to disperse at future protests with an opportunity for individuals to exit areas of protest;

c.      Order injunctive relief to compel the District of Columbia authorities to expunge the record of the Plaintiffs and reimburse any fines paid to secure release;

d.      Order injunctive relief to compel the District of Columbia authorities to expunge the record of any individuals unlawfully arrested and charged as part of the trap-and-arrest practices, including, but not limited to, the Plaintiffs;

e.      Order injunctive relief to require the reimbursement of criminal fines by those subject to these unlawful arrests, including but not limited to the Plaintiffs;

f.      Award the Plaintiffs actual damages for harms caused by the Defendants' unlawful conduct;

g.      Award the Plaintiffs punitive damages where allowed by law;

h. Award the Plaintiffs reasonable attorneys' fees and costs incurred in maintaining this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (1994 & Supp. 1996);

i. Award the Plaintiffs damages and reasonable attorneys' fees and costs incurred in maintaining this action pursuant to 42 U.S.C. § 1988; and

j. Award such other relief as it may deem just and proper.

**JURY DEMAND**

The Plaintiffs hereby demand a trial by a jury of twelve on all issues herein.

Respectfully submitted,


Jonathan Turley (D.C. Bar 417674)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001

_____

Daniel C. Schwartz (D.C. Bar No. 17749)
BRYAN CAVE LLP
700 Thirteenth St., N.W.
Washington, D.C. 20005
(202) 508-6000

Counsel for the Plaintiffs


Dated: 2/1/05