IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAYMING CHANG et al.,  )<br><br>Plaintiffs,  )<br><br>vs.  )<br><br>UNITED STATES OF AMERICA )<br>et al.,  )<br><br>Defendants.  ) | Civil Action No. 1:02cv2010 (EGS) |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE FEDERAL DEFENDANTS' RENEWED MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Jonathan Turley (D.C. Bar No. 417674)
2000 H Street, N.W.
Washington, D.C. 20052
(202) 994-7001

Daniel C. Schwartz (D.C. Bar No. 017749)
Nikki A. Ott (D.C. Bar No. 495047)
BRYAN CAVE LLP
700 Thirteenth Street, N.W.
Suite 700
Washington, D.C. 20005
(202) 508-6000

Counsel for the *Chang* Plaintiffs

Dated:  December 14, 2005

## Table of Contents

I.      PRELIMINARY STATEMENT ................................................................... 1

II.     STANDARDS OF REVIEW ..................................................................... 5

III.    ARGUMENT ............................................................................................ 6

     A.    Sovereign Immunity Does Not Bar the Constitutional Claims Against the Federal Defendants. ..........................................................................6

          1.    Injunctive Relief is Available Against the National Park Service, the United States Park Police, and Richard Murphy in his Official Capacity. ..........................................................................6

          2.    Section 702 of the Administrative Procedure Act Waives Sovereign Immunity of Federal Agencies and Officers for Claims Seeking Injunctive Relief..........................................................................7

          3.    Plaintiffs' Claims for Relief Fall Within Section 702's Waiver of Sovereign Immunity..........................................................................9

          4.    Sovereign Immunity Does Not Bar Suits Based on Unconstitutional Actions by Government Officials. ..........................................................................10

     B.    The Federal Defendants Violated Plaintiffs' Constitutional and Legal Rights by Arresting Plaintiffs Without Probable Cause..........................................................................11

          1.    Dismissal or Summary Judgment is Inappropriate Where, as Here, Basic Facts, Properly Pleaded, are In Dispute ..........................................................................11

          2.    Plaintiffs Were Arrested When They Were First Surrounded and Confined Within Pershing Park. ..........................................................................13

          3.    Providing Assistance to Another Law Enforcement Agency Does Not Limit the Federal Defendants' Liability. ..........................................................................18

          4.    The MPD's Request for Assistance in Arresting Individuals Within Pershing Park Was Objectively *Un*reasonable. ..........................................................................20

          5.    The Rationale of Protecting the White House Grounds Cannot Justify Otherwise False Arrests ..........................................................................26

     C.    Murphy Is Not Entitled to Qualified Immunity ..........................................................................28

          1.    Murphy Should Have Known that His Actions Would Violate Plaintiffs' Constitutional Rights. ..........................................................................28

2.    The Evidence Indicates that Murphy Intended to Violate the
Plaintiffs' Constitutional Rights ...............................................................32

3.    Murphy Violated Clearly Established Constitutional Rights......................34

D.    Plaintiffs Have Standing to Request Injunctive Relief ..........................................35

E.    The Federal Defendants Seek to Deprive Plaintiffs the Opportunity of
Proving  Properly Alleged Violations of Sections 1985 and 1986. ......................36

F.    Violations of Plaintiffs' Miranda Rights and Right to Counsel............................41

IV.   CONCLUSION...................................................................................................................... 42

**Table of Authorities**

## CASES

*Aulson v. Blanchard*,
   83 F.3d 1 (1st Cir. 1996)..............................................................................39

*Bailey v. United States*,
   389 F.2d 305 (D.C. Cir. 1967).........................................................14, 16, 17

*Baptiste v. J.C. Penney Co.*,
   147 F.3d 1252 (10th Cir. 1998) ......................................................20, 26, 35

*Barham v. Ramsey*,
   338 F. Supp. 2d 48 (D.D.C. 2004)..................................................... *passim*

*Berg v. County of Allegheny*,
   219 F.3d 261 (3d Cir. 2000)...................................................................20, 29

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993)................................................................................38, 39

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................................6

*Chamber of Commerce of the United States v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) .......................................................................8

*Clark v. Library of Congress*,
   750 F.2d 89 (D.C. Cir. 1984) ....................................................................8, 11

*Conley v. Gibson*,
   355 U.S. 41 (1957)..........................................................................................5

*Dellums v. Powell*,
   566 F.2d 167 (D.C. Cir. 1977) ....................................................................34

*Dronenburg v. Zech*,
   741 F.2d 1388 (1984)......................................................................................8

*Farber v. City of Paterson, CIV 03-4535 (DRD)*,
   2004 U.S. Dist. LEXIS 13060 (D.N.J. July 14, 2004)...........................37, 39

*Glasson v. City of Louisville*,
   518 F.2d 899 (6th Cir. 1975) .......................................................................39

*Gray v. Bell*,
   712 F.2d 490 (D.C. Cir. 1983) .......................................................................5

*Harlow v. Fitzgerald,*
   457 U.S. 800 (1982) ..................................................................................28

*Hoai v. Vo,*
   935 F.2d 308 (D.C. Cir. 1991) ..............................................................38, 39

*Hobson v. Wilson,*
   737 F.2d 1 (D.C. Cir. 1984) ......................................................................39

*Keating v. Carey,*
   706 F.2d 377 (2d Cir. 1983)......................................................................39

*Kowal v. MCI Telecommunications Corp.,*
   16 F.3d 1271 (D.C. Cir. 1994) ....................................................................5

*Larson v. Domestic and Foreign Commerce Corp.,*
   337 U.S. 682 (1949)..................................................................................11

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)............................................................................35, 36

*Marshall v. Columbia Lea Regional Hospitalital,*
   345 F.3d 1157 (10th Cir. 2003) ................................................................35

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986)....................................................................................5

*Mendocino Environmental Center v. Mendocino County,*
   192 F.3d 1283 (9th Cir. 1999) ......................................................20, 22, 29

*Quinones v. Szorc,*
   771 F.2d 289 (7th Cir. 1985) ....................................................................37

*Ramirez v. Butte-Silver Bow County.,*
   298 F.3d 1022 (9th Cir. 2002), *aff'd,* 540 U.S. 551 (2004) .........................35

*Reynolds El v. Husk,*
   273 F. Supp. 2d 11 (D.D.C. 2002) ...............................................................7

*Rogers v. England,*
   362 F. Supp. 2d 269 (D.D.C. 2005)..............................................................5

*Schnapper v. Foley,*
   667 F.2d 102 (D.C. Cir. 1981)......................................................................8

*Sea-Land Service Inc. v. The Alaska Railroad,*
   659 F.2d 243 [page cite?] (D.C. Cir. 1981) ...............................................8-9

*Smith v. United States,*
    353 F.2d 838 (D.C. Cir. 1965) ...........................................................................15, 19

*Terry v. Ohio,*
    392 U.S. 1 (1968) ..............................................................................................14, 19

*Turner v. Raynes,*
    611 F.2d 92 (5th Cir. 1980) ....................................................................................19

*United States v. Beck,*
    598 F.2d 497 (9th Cir. 1979) ..................................................................................15

*United States v. Hensley,*
    469 U.S. 221 (1985) ...................................................................... 19, 24-25, 29

*United States v. Maez,*
    872 F.2d 1444 (10th Cir. 1989) ..............................................................................15

*United States v. Mendenhall,*
    446 U.S. 544 (1980) ................................................................................................14

*United States v. Morgan,*
    743 F.2d 1158 (6th Cir. 1984) ................................................................................15

*United States v. Robertson,*
    833 F.2d 777 (9th Cir. 1987) ..................................................................................15

*United States v. Robinson,*
    536 F.2d 1298 (9th Cir. 1976) ................................................................................19

*United States v. Ward,*
    488 F.2d 162 (9th Cir. 1973) ..................................................................................15

*United States v. White,*
    648 F.2d 29 (D.C. Cir. 1981) ........................................................... *passim*

*Wahhab v. City of New York,*
    386 F. Supp. 2d 277 (S.D.N.Y. 2005) ...........................................................19, 24, 29

*Washington Mobilization Committee v. Cullinane,*
    566 F.2d 107 (D.C. Cir. 1977) ...........................................................................34, 35

*Whiteley v. Warden, Wyoming State Penitentiary,*
    401 U.S. 560 (1971) ...................................................................................19, 24, 29

*Wilson v. City of Boston,*
    421 F.3d 45 (1st Cir. 2005) ......................................................................................35

## STATUTES

5 U.S.C. §551(10) .........................................................................................................10

5 U.S.C. § 551 (13) ......................................................................................................10

5 U.S.C. § 701 ........................................................................................................6, 10

5 U.S.C. § 702 ..............................................................................................................8

28 U.S.C. § 2671 *et seq.*..............................................................................................6

42 U.S.C. § 1983..........................................................................................................7

42 U.S.C. § 1985................................................................................................ *passim*

42 U.S.C. § 1986................................................................................................ *passim*

## RULES

Fed. R. Civ. P. 12(b)(6).................................................................................................5

Fed. R. Civ. P. 56(c) ....................................................................................................5

Fed. R. Civ. P. 56(e) ....................................................................................................6

Local Rule of Civil Procedure 7.1(b).............................................................................1

## OTHER AUTHORITIES

S. Rep. No. 996, 94th Cong., 2d Sess. at 2 (1976)................................................................8

Pursuant to Local Rule of Civil Procedure 7.1(b), Plaintiffs RayMing Chang, *et al*. ("Plaintiffs") submit this Memorandum of Points and Authorities in Opposition to the Federal Defendants'[1] Renewed Motion to Dismiss, or in the Alternative, for Summary Judgment ("Fed. Br.").

## I.    PRELIMINARY STATEMENT

In the course of this litigation, one fact has become incontrovertible: hundreds of people were unlawfully arrested in Pershing Park on September 27, 2002.  After many admissions that these arrests were improper, the question has become how to hold those at fault accountable for their actions and how to prevent future abuses from occurring.  The Federal Defendants, instead, seek to convert their participation in these unlawful arrests into a basis to actually increase their ability to commit the same acts in the future.  Their claim of innocence through passive participation is little more than a request for a judicially-created immunity for law enforcement agencies engaging in unlawful police conduct.

Plaintiffs are former George Washington University students (Third Amended Complaint ("Complaint")  ¶¶ 21-27) who were in Pershing Park on the morning of September 27, 2002, for either of two reasons: taking pictures as photo-journalists for *The Hatchet*, the respected newspaper published by the student body of George Washington University, or as legal observers for the purpose of monitoring the protection of the legal rights of other people in the Park, including demonstrators. (*See* Complaint  ¶¶ 76-82.)  In both cases, Plaintiffs carried

---

[1]    The Federal Defendants consist of the United States of America, the National Park Service ("NPS") and former Major Richard Murphy ("Murphy").  At the time of the events discussed herein, Murphy served as a Captain in the United States Park Police ("USPP"), a subordinate entity within the NPS.  Subsequent to these events, Murphy was promoted to the rank of Major.  He has since retired from the USPP.

identification indicating their purposes for being in the Park. *(Id.)*  Whether or not others who were trapped in the Park had engaged in civil disturbances or law violations elsewhere in the District that morning (or at any other time or place) has no bearing on Plaintiffs' claims.  There is no allegation that any of them took any action that would justify their arrests.

Plaintiffs were "arrested" when their freedom of movement was eliminated and they were no longer allowed to leave the Park by the police line that encircled it.  That occurred when Murphy directed USPP to join a line of police officers from the Metropolitan Police Department ("MPD") and the Fairfax County Sheriff's Department ("FCSD") that surrounded Pershing Park and prevented Plaintiffs and all other persons (including many other innocent bystanders) trapped there from exiting the Park.  The FCSD officers were present at the Park due to an agreement with the USPP. *(See* Plaintiffs' Response to FCSD's Motion to Dismiss, also filed on this date.)[2]  MPD officers were on the east, west, northeastern and southeastern boundaries of the Park; USPP officers were on the southern and southwestern boundaries of the Park (interspersed with groups of MPD officers); and FCSD officers were on the northwestern boundary of the Park. (Ex. A, Murphy Tr. 200:04-22, 201:01-08.)[3]

About an hour after Plaintiffs (and others) were trapped in the Park, the northern and eastern boundaries of the police line were collapsed, forcing people in the Park toward its

---

[2]   In fact, on the basis of that Agreement, the Fairfax County Sheriff's Department has cross-claimed against the United States and the USPP, claiming that the USPP "agreed, pursuant to contracting to indemnify and save harmless FCSD agents all claims by third parties for property damages and personal injury which may arise, and of activities of the other parties to this agreement, outside their respective jurisdictions." Cross-claim filed October 7, 2005 (Doc. No. 189).

[3]   References to "Tr." are to deposition transcripts, relevant portions of which are attached hereto as Exhibits A-L.

2

southwest corner.  There, buses were brought and MPD officers flexi-cuffed individuals in the Park and loaded them onto the buses.  The walls of the collapsing police line, forcing people within the Park to the southwest corner, consisted of MPD officers and, for as long as they were needed, the FCSD.  (*See* Ex. B, Cachuela Tr. 54:13-22.)  The southern, southwestern and western walls of the police line formed the barriers against which the individuals in the Park were corralled; those walls consisted of MPD and USPP officers.

The Federal Defendants raise two primary defenses in their motion.  First, they seek dismissal or summary judgment on the ground that the USPP officers and their commander, then-Captain Murphy, were only interested in protecting the White House grounds, not in arresting the people in the Park.  Therefore, despite the fact that the USPP and Murphy clearly knew that people were not being permitted to leave the Park by the coordinated actions of the USPP, the MPD and the FCSD, the Federal Defendants did not "arrest" Plaintiffs or others in the Park because that was not their intent.  As we will show below, the USPP's current representation of its actual intent at the time is highly implausible.  At a minimum, the USPP's and Murphy's actual intent at the time is a hotly disputed fact, which should alone be sufficient grounds for denying the Motion.

According to the Federal Defendants, a law enforcement agency can secure dismissal before the end of discovery based solely on its ability to conjure up some plausible "intent" after-the-fact to override their clearly contrary contemporaneous statements.  Such a *post hoc* rationalization negates not just the countervailing evidence but the very real injury to the citizens in the Park, including Plaintiffs, who lost their freedom of movement once the police line closed and persons trapped inside were not permitted to leave.  The law is clear: persons are "arrested"

3

at the time they lose their freedom of movement, regardless of the Federal Defendants' subjective motivational claims made after–the-fact to legitimize their improper conduct.

Second, the Federal Defendants claim they were not responsible for the arrests because they formed only a "partial static line" (Fed. SOF ¶ 13) against which the people in the Park were forced (and through which no one was permitted to exit).[4/]  In other words, the Federal Defendants claim they have no liability for the false and illegal arrests that occurred because it was only the MPD who engaged in the physical acts of flexi-cuffing and loading onto buses the individuals in the Park.  The Federal Defendants make this argument despite the fact that, but for the MPD and USPP police line preventing people from leaving the Park on the south and west sides, such flexi-cuffing and loading onto buses presumably could not have occurred.

The Federal Defendants' argument is specious.  They claim that all the responsibility for the trap-and-arrest should be exclusively on the MPD (and FCSD) officers who squeezed the people in the Park toward the southwestern corner, and the MPD officers who physically applied flexi-cuffs, while exonerating the USPP officers who, with MPD officers, formed the wall against which the people in the Park were squeezed.  That argument must be rejected.  In a flagrant smashing of constitutional rights such as occurred here, there is no basis for placing all the blame on the hammer and none on the anvil, as the Federal Defendants seek to do.  Each of the MPD, USPP and FCSD bear responsibility and liability for the false arrests that occurred, regardless of the specific role each played.

---

[4/]     The one person who did seek to exit through the USPP's police line was the one person the Federal Defendants concede they "arrested."  (Ex. A, Murphy Tr. 279:08-19.)

4

On October 15, 2002, Plaintiffs filed their original complaint naming the United States of America and the NPS as defendants.  By the Court's leave, Plaintiffs later filed their Third Amended Complaint which, among other things, added Murphy as a defendant in his official and individual capacity.  On November 7, 2005 the Federal Defendants filed their most recent Motion to Dismiss or, in the Alternative, for Summary Judgment.

## II.   STANDARDS OF REVIEW

The Federal Defendants have moved to dismiss Plaintiffs' Complaint on the grounds that Plaintiffs have failed to state a claim for which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  The Court must accept all of Plaintiffs' factual allegations as true, *Gray v. Bell*, 712 F.2d 490, 493 n.2 (D.C. Cir. 1983), and give Plaintiffs the benefit of all inferences that can be derived from the facts Plaintiffs allege. *Kowal v. MCI Telecomm. Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994).

The Federal Defendants also seek summary judgment, which is appropriate only when the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the nonmoving party.  *Rogers v. England*, 362 F. Supp. 2d 269, 270 (D.D.C. 2005) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts

showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III.   ARGUMENT

The Federal Defendants contend that the Court should dismiss Plaintiffs' Complaint because, they argue: (1) Plaintiffs' constitutional claims against the Federal Defendants are barred by sovereign immunity; (2) Plaintiffs (a) lack standing to sue the Federal Defendants because the Federal Defendants' actions did not cause Plaintiffs' injuries; and (b) the Federal Defendants did not violate Plaintiffs' legal rights because either: (i) their actions did not constitute an arrest; or (ii) they were responding to the MPD's reasonable request for assistance; (3) Murphy is entitled to qualified immunity; (4) Plaintiffs' claims under 42 U.S.C. §§ 1985 and 1986 fail because the Federal Defendants' actions against Plaintiffs were not motivated by a race- or class-based animus; (5) the Federal Defendants did not conspire to injure Plaintiffs; and (6) Plaintiffs fail to state a claim based on violations of their rights to *Miranda* warnings and to counsel.  The Federal Defendants' arguments fail for the reasons set forth below.

> **A.   Sovereign Immunity Does Not Bar the Constitutional Claims Against the Federal Defendants.**
>
> **1.   Injunctive Relief is Available Against the National Park Service, the United States Park Police, and Richard Murphy in his Official Capacity.**

The Federal Defendants initially argue that Plaintiffs' claims should be dismissed because they are barred by sovereign immunity.  They base the argument on two grounds: first, that the Federal Torts Claim Act ("FTCA") (28 U.S.C. § 2671 *et seq.*) does not waive sovereign immunity for constitutional torts committed by federal employees, and, second, that the Administrative Procedure Act ("APA") (5 U.S.C. § 701 *et seq.*) does not waive sovereign immunity to claims for money damages.

The Federal Defendants' argument is misplaced.  Plaintiffs allege in their Complaint that the Federal Defendants committed both constitutional and nonconstitutional torts against Plaintiffs.  (Complaint ¶¶ 129-171.)  As discussed below, the APA waives sovereign immunity for claims seeking injunctive relief based on violations of constitutional rights.  Moreover, the FTCA specifically waives sovereign immunity for nonconstitutional torts such as false arrest and false imprisonment.  The Federal Defendants raise no argument, nor do they cite any case, to support dismissal of Plaintiffs' nonconstitutional tort claims on sovereign immunity grounds.[5/]

In addition to monetary relief for nonconstitutional tort claims, Plaintiffs also seek injunctive relief against the Federal Defendants, including:  (1) an order declaring the trap-and-arrest and confinement polices and practices described in Plaintiffs' Third Amended Complaint violate the First Amendment, Fourth Amendment, Fifth Amendment, Sixth Amendment, Fourteenth Amendment and 42 U.S.C. §§ 1983, 1985 and 1986; and (2) an order requiring clear and audible warnings to disperse at future protests with an opportunity for individuals to exit the protest area.  (*See* Complaint at 37.)

> **2.      Section 702 of the Administrative Procedure Act Waives Sovereign Immunity of Federal Agencies and Officers for Claims Seeking Injunctive Relief.**

Section 702 of the APA provides, in relevant part, that:

---

[5/] The Federal Defendants appear to suggest that sovereign immunity bars *all* of Plaintiffs' claims, regardless of whether Plaintiffs allege that the Federal Defendants violated their constitutional or nonconstitutional legal rights.  Such blanket immunity is not available to the Defendants.  The FTCA explicitly waives sovereign immunity for nonconstitutional torts.  As required by FTCA Section 2675, Plaintiffs properly presented their FTCA claims to the United States Department of the Interior, of which the NPS is a part.  On June 22, 2004, the Department of the Interior denied Plaintiffs' FTCA claims.  As a result, Plaintiffs exhausted their administrative remedies (*see Reynolds El v. Husk*, 273 F. Supp. 2d 11, 13 (D.D.C.  2002)) before filing their Third Amended Complaint, and the Court properly has jurisdiction over their FTCA claims based on the Federal Defendants' nonconstitutional tortious actions.

> An action in a court of the United States seeking relief other than
> money damages and stating a claim that an agency or an officer or
> employee thereof acted or failed to act in an official capacity or
> under color of legal authority shall not be dismissed nor relief
> therein be denied on the ground that it is against the United
> States....

5 U.S.C. § 702 (2005). This provision waives sovereign immunity for actions in which plaintiffs

seek injunctive relief against federal agencies and officers. This "waiver of sovereign immunity

applies to any suit whether under the APA or not." *Chamber of Commerce v. Reich*, 74 F.3d

1322, 1328 (D.C. Cir. 1996). For example, in *Schnapper v. Foley*, 667 F.2d 102 (D.C. Cir.

1981), the D.C. Circuit found that the doctrine of sovereign immunity did not insulate the United

States and its officers from a suit for injunctive relief. The court looked to the 1976 amendments

to Section 702 of the APA to guide its determination that sovereign immunity did not bar

plaintiff's claim for injunctive relief:

> [T]he legislative history of [the 1976 amendments] could not be
> more lucid. It states that this language was intended "to eliminate
> the defense of sovereign immunity with respect to any action in a
> court of the United States seeking relief other than money damages
> and based on the assertion of unlawful official action by a Federal
> officer ....

*Id.* at 107 (*citing* S. Rep. No. 996, 94th Cong., 2d Sess. at 2 (1976)).

The D.C. Circuit reiterated this rule in *Clark v. Library of Congress*, 750 F.2d 89 (D.C.

Cir. 1984), which the Federal Defendants cite. In that case, the D.C. Circuit cited *Schnapper* in

support of its conclusion that "the 1976 amendments to § 702 of the Administrative Procedure

Act, 5 U.S.C. § 702 eliminated the sovereign immunity defense in all actions for non-monetary

relief against a U.S. agency or officer acting in an official capacity." *Clark*, 750 F.2d at 102.

*See also Dronenburg v. Zech*, 741 F.2d 1388, 1389-92 (D.C. Cir. 1984) (finding subject matter

jurisdiction over the United States Navy despite a claim of sovereign immunity); *Sea-Land Serv.*

*Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981) (finding that Section 702 eliminates sovereign immunity defense in all actions for specific, non-monetary relief against a United States agency or officer acting in an official capacity).

### 3.     Plaintiffs' Claims for Relief Fall Within Section 702's Waiver of Sovereign Immunity.

The Federal Defendants' actions against Plaintiffs, by definition, constitute agency actions to which Section 702's waiver of sovereign immunity applies.  By its terms, Section 702 applies to "agency action" as defined in other sections of the APA.  The Federal Defendants' actions on September 27, 2002 fall squarely within this definition and, thus, Section 702's waiver of sovereign immunity applies to claims for injunctive relief based in those actions.

Defendant NPS qualifies as an "agency" as defined in the APA.  Section 701(b) provides as follows:

> 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia; (E) agencies composed of representatives of the parties or of organizations of the parties to the disputes determined by them; (F) representatives of courts martial and military commissions; (G) military authority exercised in the field in the time of war or in occupied territory; or (H) functions conferred by sections 1738, 1739, 1743 and 1744 of title 12 [Federal Housing Administration, now Department of Housing and Urban Development]; chapter 2 of title 41 [War Contracts]; subchapter II of Chapter 471 of title 49 [authority to transfer an interest in surplus property]; or sections 1884, 1891-1902 and former section 1641(b)(2), of title 50, appendix [rental of housing accommodations for veterans of World War II and the Korean conflict].

5 U.S.C. § 701(b) (2005).  The NPS is an authority of the United States government and is not one of the entities this provision excludes.  Accordingly, Section 702 of the APA waives sovereign immunity to claims based on the NPS's actions.

Moreover, APA Section 551 defines the term "agency action" used in Section 702.  "'Agency action' includes the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551 (13) (2005).  Section 551 also defines the term "sanction" as:

> [T]he whole or part of an agency (A) prohibition, requirement, limitation, or other condition affecting the freedom of a person; (B) withholding of relief; (C) imposition of a penalty or fine; (D) destruction, taking, seizure, or withholding of property; (E) assessment of damages, reimbursement, restitution, compensation, costs, charges or fees; (F) requirement, revocation or suspension of a license; or (G) taking other compulsory or restrictive action.

5 U.S.C. §551(10) (2005).  The Federal Defendants' actions on September 27, 2002 constitute a limitation or condition affecting Plaintiffs' freedom and, therefore, constitute "agency action" for which  Section 702 waives sovereign immunity.

### 4.      Sovereign Immunity Does Not Bar Suits Based on Unconstitutional Actions by Government Officials.

Courts have also held that sovereign immunity does not bar suits against government officials where a plaintiff alleges that an official's actions are unconstitutional or beyond the official's authority.  Plaintiffs' allegations that Murphy engaged in unconstitutional conduct must be taken as true for the purposes of deciding this motion.  As such, the claims against Murphy in his official capacity must be allowed to proceed.

In *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949), the Supreme Court explained that sovereign immunity does not bar suits against federal officers in their official capacity:

> [T]here may be, of course, suits for specific relief against officers of the sovereign which are not suits against the sovereign . . . The officer is not doing the business which the sovereign has empowered him to do or he is acting in a way which the sovereign has forbidden.  His actions are *ultra vires* his authority and therefore may be made the object of specific relief.

*Id.* at 689.[6/]  The D.C. Circuit has interpreted this to mean that "sovereign immunity does not bar suits against government officials where the challenged actions of the officials are unconstitutional or beyond the official's statutory authority."  *Clark*, 750 F.2d at 103.

**B.     The Federal Defendants Violated Plaintiffs' Constitutional and Legal Rights by Arresting Plaintiffs Without Probable Cause**

**1.     Dismissal or Summary Judgment is Inappropriate Where, as Here, Basic Facts, Properly Pleaded, are In Dispute**

The Federal Defendants base their Motion for Dismissal or Summary Judgment on a proposed set of "Undisputed Facts" that are, in large part, anything but undisputed.  Not only is there substantial, contrary evidence to the Federal Defendants' version of "Undisputed Facts," but some of the contradiction comes from Murphy's own various declarations, statements and

---

[6/]     The *Larson* court set forth a limitation on this rule, which does not apply in this case:

> [A] suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property.

337 U.S. at 691 n.11.  That limitation is inapposite in the present case because the relief sought against the Federal Defendants amounts simply to orders declaring that trap-and-arrest practices violate the Constitution and requiring the Federal Defendants to cease engaging in arrests without probable cause, and to provide adequate warnings and orders to disperse.

deposition testimony, from which the Federal Defendants selectively quote to state a categorical – but, in fact, highly disputed – version of what led up to and occurred that day.

Briefly, the collection of evidence so far describes the following set of events.  On the morning of September 27, 2002, Murphy arrived at Pershing Park where, at approximately 9:20 a.m., an unidentified member of the MPD asked Murphy to "help out" the MPD by "holding" everyone in Pershing Park in that location.  (Ex. A, Murphy Tr. 206:13-19.)  Based on that request, Murphy deployed USPP personnel on the south side of the Park for the express purpose of working with the MPD to enclose all persons in the Park at that time. (Ex. A, Murphy Tr. 177:04-21, 178:15-21, 206:13-19.)  Murphy also requested the FCSD to assist the MPD; the FCSD ultimately formed part of the enclosing line on the northern side of the Park. (Ex. A, Murphy Tr. 201:04-08, 271:21-272:12.)  By 9:35 a.m., the USPP, at Murphy's direction, had established a police line, together with the MPD, "to keep the crowd inside Pershing Park."  (Ex. A, Murphy Tr. 193:05-12.)

After the USPP and FCSD assisted the MPD in surrounding all persons within the Park, MPD Assistant Chief Peter J. Newsham ("Newsham") asked Murphy if the persons inside Pershing Park could be arrested for demonstrating without a permit. (Ex. A, Murphy Tr. 201:04-08, 215:12-13.)  Murphy replied that technically they could, but that the USPP would not arrest them for that. (*See* Ex. A, Murphy Tr. 215:05-17.)[7]  Murphy also informed Newsham that USPP procedures required notice of the violation and an opportunity to disperse before arresting individuals for demonstrating without a permit. (Ex. A, Murphy Tr. 219:03-15.)  Newsham then

---

[7]   Plaintiffs note that neither Newsham nor Murphy made any distinction between demonstrators in the Park and innocent bystanders trapped within.

informed Murphy that persons in the Park would be arrested if they attempted to cross the police line, and if they succeeded in crossing the police line, they would be arrested for parading without a permit.  (Ex. A, Murphy Tr. 219:16-22.)  Subsequently, Newsham informed Murphy that the people within the Park would be arrested for failing to obey a police order to get out of the street before they entered the Park.  (Ex. A, Murphy Tr. 227:05-17.)

Murphy knew that not all of the people inside Pershing Park entered the Park at the same time (*see* Ex. A, Murphy Tr. 229:13-15), and that he had no objective reason to believe that all persons in the Park had heard, much less failed to obey the order Newsham claimed had been given.  Nonetheless, Murphy not only maintained his personnel in their current positions, but also deployed additional units on Pennsylvania Avenue across from the southern end of the Park.  (Ex. A, Murphy Tr. 229:13-18.)  This additional unit formed a second line behind the original police line to protect MPD personnel conducting physical arrests from persons outside the Park who were protesting those arrests.  (Ex. A, Murphy Tr. 240:13-241:11.)  At 10:30 a.m., Murphy ordered his units to maintain the original police line around the perimeter of the Park while the MPD flexi-cuffed persons within the Park and took them into custody.  (Ex. A, Murphy Tr. 239:11-15.)  Thus, the USPP maintained these two police lines while all persons within the Park were herded into a smaller and smaller space by MPD and FCSD officers, flexi-cuffed, placed on buses and transported away from the Park by MPD officers.

### 2.   Plaintiffs Were Arrested When They Were First Surrounded and Confined Within Pershing Park.

Murphy and the USPP participated in trapping and arresting Plaintiffs by forming a significant portion of the police line that restrained their freedom of movement and prevented

13

them from leaving Pershing Park. Their actions were a proximate cause of Plaintiffs' injuries, all of which are traceable to these arrests.

> a.  Plaintiffs were "Arrested" When They Were Trapped in Pershing Park by the Police Perimeter.

The Federal Defendants' argument that they did not participate in Plaintiffs' arrests (*see* Fed. Br. at 19-21) fails as a matter of law. A person is "seized" whenever police "restrain[] his freedom to walk away." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). *See also United States v. Mendenhall*, 446 U.S. 544, 553 (1980) (a person is "seized" when "by means of physical force or a show of authority, his freedom of movement is restrained"). Thus, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. *See also United States v. White*, 648 F.2d 29, 33-34 (D.C. Cir. 1981) (quoting *Bailey v. United States*, 389 F.2d 305, 314 (D.C. Cir. 1967) (Leventhal, J., concurring)) ("Whether there has been an arrest turns on whether there has been an imposition of custody, and this is a determination made after examining both the objective circumstances and the subjective feeling those circumstances are likely to evoke.")

An arrest may take place "even where the person did not attempt to leave." *Mendenhall*, 446 U.S. at 554. Such a seizure could occur as a result of the "threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* All of these circumstances involve police conduct that would lead a reasonable person to believe that he is not free to leave.

14

Consistent with these principles, this and other circuits have held that an arrest occurs at the moment that an individual or group is surrounded by police and, thus, is no longer free to leave. *Smith v. United States*, 353 F.2d 838, 840 n.1 (D.C. Cir. 1965) (arrest made not when detective approached defendant's car, "but when the other police surrounded the car, thereby effectively precluding further movement of the car by [defendant]"); *United States v. Morgan*, 743 F.2d 1158, 1164 (6th Cir. 1984) (defendant "was placed under arrest … at the moment police encircled [his] residence"); *United States v. Beck*, 598 F.2d 497, 501-02 (9th Cir. 1979) (three occupants of taxi were arrested when police surrounded the vehicle — without drawing weapons); *United States v. Ward*, 488 F.2d 162, 169 (9th Cir. 1973) (defendant arrested when pulled over and surrounded by four FBI agents with badges); *United States v. Robertson*, 833 F.2d 777, 781 (9th Cir. 1987) ("[R]estriction of [defendant's] liberty of movement was complete upon … encirclement by officers who gave her orders at gunpoint."); *United States v. Maez*, 872 F.2d 1444, 1450 (10th Cir. 1989) (defendant was arrested when police surrounded his home).

Here, it is undisputed that the USPP officers formed part of the police line that "prevent[ed] the people in Pershing Park from leaving the Park." (Fed. SOF ¶ 11.) To this end, as the Federal Defendants claim, Murphy ordered the USPP officers to form "a static police line on the north and south street sides of Pershing Park." (*Id.* ¶ 13.) (In fact, it was the FCSD officers – present that day as a result of a cooperation agreement with the USPP – that formed the northwestern corner and the northern boundary of the police line around the Park.)[8/] At the

---

[8/]   That the FCSD has cross-claimed against the USPP shows the inevitable culpability of the United States, the USPP and Murphy for the actions of the FCSD, both in forming part of the police line around the Park, and forcing the people in the Park toward the southwestern corner, where they were flexi-cuffed. This does not, however, do anything to diminish the FCSD's own liability to Plaintiffs for its actions. *See* Plaintiffs' Opposition to FCSD Motions.

time, his stated intent was to "keep the crowd inside Pershing Park." (Ex. A, Murphy Tr. 193:03-12, 179:01-181:10.)  (*See* Pl. SOF ¶ 11-12.)  Plaintiffs were not allowed to leave Pershing Park by USPP and other officers stationed on the perimeter as part of the police line.  (*See* Ex. C, Lee Tr. 166:11 - 167:12; Ex. D, Enright Tr. 71:16 – 72:08; Ex. E, Young Tr. 136:04-14; Ex. F, Zarconi Tr. 59:05-13.)  The police line formed, in part, by USPP personnel sealed Pershing Park and prevented Plaintiffs and most others from leaving before they were flexi-cuffed and removed on buses by MPD officers.  (Fed. SOF ¶ 18; Pl. SOF ¶ 18.)  Plaintiffs were seized and arrested at the moment the police line formed around them and confined them within the Park.

<blockquote>b. The Federal Defendants Are Not Entitled to Judgment Based on <em>United States v. White</em>.</blockquote>

The Federal Defendants mistakenly rely on *United States v. White*, 648 F.2d 29 (D.C. Cir. 1981), which involves an entirely different set of facts and legal issues.  The court set out the following framework in *White*:

> Whether there has been an arrest turns on whether there has been an imposition of custody, and this is a determination made after examining both the objective circumstances and the subjective feeling those circumstances are likely to evoke.

*Id.* at 33-34 (quoting *Bailey v. United States*, 389 F.2d 305, 314 (D.C. Cir. 1967) (Leventhal, J., concurring)).  The court also listed circumstances relevant to determining whether there has been an arrest or merely an investigatory stop:

> [T]he officer's intent in stopping the citizen; the impression conveyed to the citizen as to whether he was in custody or only briefly detained for questioning; the length of the stop; the questions, if any, asked; and the extent of the search, if any, made.

*Id.* at 34.  The court noted, for example, that an arrest is more likely to have occurred when police had no intention of asking questions.  *Id.* at 34 n.22.  According to the *White* court, "[t]he lines drawn are not always sharp ones," because "[e]ach situation is unique, involving the weighing and measuring of contrary indicators."  *Id.* at 34.

The facts in *White* are obviously distinguishable from the facts of this case, which calls for an altogether different analysis.  The police officers in *White* approached narcotics trafficking suspects in a stationary vehicle with the intent to question them after receiving an anonymous tip.  *Id.* at 30-31.  The car was not completely surrounded and it was possible for the suspects to escape by driving away.  *Id.* at 37-38.  One of the arresting officers testified that "he was concerned that the suspects might be armed" and "his prior experiences gave him reason to be concerned about his safety."  *Id.* at 35.  Given the difficulty and danger of conducting an investigatory stop of individuals seated in a vehicle, the court concluded that it was reasonable for the officers to approach with guns drawn and order the suspects to exit the vehicle:

> Since an officer's view of a suspect seated in a car is always partially obscured, the officer is at a disadvantage both when he approaches the occupant and when he tries to question him through a car window.  He cannot scrutinize the suspect's movements as he can a pedestrian's; there is consequently a greater opportunity for the suspect in a car to pull out a hidden weapon.  Moreover, the frisk component of a Terry "stop and frisk" is not available to protect the policeman if a suspect is sitting inside a closed car and the officer is on the outside.  Finally, the possibility always exists that a driver may try to start his car and drive off, thereby endangering the officer and members of the public.  In this case, although the suspects' car was partially blocked by the police car so that it would have been difficult for them to drive off quickly, such an escape was possible.  Moreover, the officer testified the suspect's car's ignition was on as he approached it.

*Id.* at 37-38. The *White* court held that an investigatory stop does not convert to an arrest under these circumstances.

In this case, however, there is no reasonable basis for suggesting that Plaintiffs were subject to an investigatory stop before they were arrested or that the police intended to question them before making a formal arrest. In fact, if there was any probable cause for arresting Plaintiffs (which there was not) it was developed *before* some people (referred to frequently, generically and often incorrectly as "demonstrators") entered the Park. In any case, no such allegations applied to the *Chang* Plaintiffs. Nor has it ever been alleged that Plaintiffs posed a danger to the police officers who surrounded them at the Park. Rather, all occupants of Pershing Park were confined within a police perimeter and arrested without probable cause at the moment when they were so confined. The police intended to and did arrest Plaintiffs at the moment the police line sealed them inside Pershing Park and they were no longer free to leave. The effect of applying flexi-cuffs and loading the people in the Park was a mere formality of an ongoing arrest; the additional deprivation of freedom was only marginal compared to not being free to leave the Park altogether.

### 3. Providing Assistance to Another Law Enforcement Agency Does Not Limit the Federal Defendants' Liability.

The Federal Defendants claim that, even if their actions "amounted to an arrest or seizure of plaintiffs" they "cannot be held liable" for violating Plaintiffs' civil rights because they "relied in good faith on the apparently reasonable request of another law enforcement organization." (Fed. Br. at 22-40.) They claim that "numerous cases stand for the proposition that such reliance is proper," and therefore they did not violate Plaintiffs' legal rights. (Fed. Br. at 23.)

18

As a preliminary matter, only one of the Federal Defendants' litany of cases concerns a government agency's civil liability for relying upon another entity's request for aid. *See Wahhab v. City of New York*, 386 F. Supp. 2d 277 (S.D.N.Y. 2005).[9] In *Wahhab*, uniformed police officers responded to an emergency call placed by a shopping mall's security guard. *Id.* at 282, 287. When the officers arrived, a mall security officer "reported to them that a crime had been committed and gave a brief description of [an] altercation that had occurred" between the officer and a mall patron. *Id.* at 287.

In response to the plaintiff's claim that he had been falsely arrested by New York City police officers, the court held that the primary question was whether the arresting officers had probable cause. *Id.* at 286. The *Wahhab* court held that probable cause is established when an "arresting officer has 'knowledge or reasonably trustworthy information *sufficient to warrant a person of reasonable caution in the belief that an offense has been committed.*'" *Id.* at 286 (emphasis added). The court concluded that the police officers' reliance upon the security officer's statement that a crime had been committed, and the security officer's brief description of that crime, was sufficient to establish probable cause. *Id.* at 287.

---

[9] Indeed, the majority of the Federal Defendants' cases do not deal with civil liability at all. *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560 (1971) (criminal proceeding); *United States v. Hensley*, 469 U.S. 221 (1985) (criminal proceeding); *United States v. Robinson*, 536 F.2d 1298 (9th Cir. 1976) (criminal proceeding); *Terry v. Ohio*, 392 U.S. 1 (1968) (criminal proceeding); *Smith v. United States*, 358 F.2d 833 (D.C. Cir. 1966) (criminal proceeding). Those which discuss civil liability do so only in the context of an individual officer's claim for qualified immunity. *See Turner v. Raynes*, 611 F.2d 92 (5th Cir. 1980). As is described at greater length below, these cases are further distinguishable because the assisting officers in many of these cases were provided with the suspect's charge and facts supporting that charge before being asked to make an arrest. Furthermore, unlike here, in most of these cases the assisting officer had no independent information concerning the validity of the charge, and no opportunity to request additional information.

No such "knowledge or reasonably trustworthy information" was sought by Murphy or the USPP before they engaged in the illegal arrests. The proposition set forth by the Federal Defendants would have the effect of creating a new level of qualified immunity for police officers: illegal and abusive actions they cannot take directly without liability could be taken as long as requested to do so by some other police officer or agency. Fortunately, that is not the law and the mere fact that a fellow law enforcement officer has represented that certain facts exist to warrant an arrest or detainment "in no way negates a police officer's duty to reasonably inquire or investigate these reported facts," nor does it negate a police officer's duty to consider contrary facts that the officer has personally observed before performing an action. *See Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1293 n.16 (9th Cir. 1999). *See also Baptiste v. J.C. Penney Co.*, 147 F.3d 1252 (10th Cir. 1998). Specifically, an officer's reliance upon the representations of another police officer, or even a judicial officer, do not make his actions *per se* reasonable because the reasonableness of an officer's actions depends upon *all the "information that the officer possesses or to which he has reasonable access." Berg v. County of Allegheny*, 219 F.3d 261, 273 (3d Cir. 2000) (emphasis added).

### 4. The MPD's Request for Assistance in Arresting Individuals Within Pershing Park Was Objectively *Un*reasonable.

In light of all of the information known and reasonably available to the Federal Defendants on September 27, 2002, the MPD's request for assistance arresting individuals within Pershing Park was objectively unreasonable.

The MPD's first oral request for assistance in arresting the individuals within the Park came at approximately 9:20 a.m. on September 27, 2002. (Ex. A, Murphy Tr. 206:13-19.) An unnamed MPD officer approached Murphy, asked for his assistance in "hold[ing] [the people in the Park] here and stop[ping] them here." (Ex. A, Murphy Tr. 178:15-179:10, 184:17-185:04,

206:13-19.) Murphy "immediately started making radio transmissions and deploying personnel" to "enclose the demonstrators" in Pershing Park. (Ex. A, Murphy Tr. 179:01-181:10.) Twenty minutes later, Murphy reiterated his orders to USPP officers stating: "We're going to keep the crowd inside Pershing Park. We're not going to allow them to come through the police line. We're working with Metropolitan [Police Department] on this." (Ex. A, Murphy Tr. 193:03-12.)

The MPD's second oral request for assistance came at approximately 10:00 a.m. (Ex. A, Murphy Tr. 224:20-228:09.) At that time, Newsham informed Murphy that the individuals within Pershing Park would be charged with "failure to obey" orders purportedly given to them "before they ever entered Pershing Park." (Ex. A, Murphy Tr. 227:02-17.) Murphy chose not to inquire into the basis for the MPD's charge:

> Q:   There were hundreds of persons inside Pershing Park that were now subject to arrest, is that a fair approximation?
> A:   Yes.
>
> Q:   You did not know – did you know what order each of them failed to obey?
> A:   No.
>
> Q:   Did you – and you've already testified you don't know where that order was given?
> A:   No.
>
> Q:   Did you ask Newsham what order is it that the persons are alleged to have failed to obey?
> A:   No.
>
> Q:   Did you ask Newsham whether each and every person that was now subject to arrest had, in fact, violated a specific order?
> A:   No.
>
> Q:   Did you undertake any independent, and by "independent," I mean of your own initiative, any independent efforts to evaluate whether probable cause to exist – whether probable cause to arrest existed for this group?
> A:   No.

(Ex. A, Murphy Tr. 232:03-233:06.)   Instead, shortly after his discussion with Newsham, Murphy spoke to MPD Assistant Chief Brian K. Jordan ("Jordan") about the possibility of using the USPP's mounted officers to move the crowd from the south side of Pershing Park to the north side of the Park so that the individuals could be restrained and transported.   (Ex. A, Murphy Tr. 235:05-236:21.)   Murphy advised Jordan that the processing should be conducted on the south side of the Park instead:

> Basically at that point, I just said to him [Jordan], you know, because basically he was indicating that they were going to process or start to make the arrests on E Street, which was on the north side, I said, Chief, I don't know why you just don't do it on Pennsylvania Avenue?   You've got much more room here on Pennsylvania Avenue . . . .

(Ex. A, Murphy Tr. 236:14-20.)   Murphy refused to use the mounted officers to drive individuals to the Park's north side for safety reasons (it would force the officers to move up a wet embankment), not because it was improper and illegal to confine further the people in the Park, or to force them into a smaller area where they could be flexi-cuffed and transported.   In fact, he agreed to maintain an impermeable line on the south side of the Park to prevent individuals from escaping. (Ex. A, Murphy Tr. 235:08-236:21;  Fed. SOF ¶ 18.)

Murphy's own testimony makes clear he completely neglected his "duty to reasonably inquire or investigate" whether probable cause existed to charge individuals within the Park for failure to obey an order.   (Ex. A, Murphy Tr. 232:03-233:06.)   *See Mendocino Envtl. Ctr.*, 192 F.3d at 1293.   Murphy did not ask whether each of the individuals within the Park had failed to obey a police order, he did not ask what order had been given, and he did not ask when that order had been given.[10/]

---

[10/]   Murphy's failure to inquire about the cause for conducting arrests is even more inexplicable considering the fact that whatever exigency may have existed at the time of the MPD's first request had long since passed. By the time of the MPD's second request for the USPP to assist in restraining the people in the Park, those

Furthermore, the circumstances surrounding the arrests and independent information known to Murphy strongly indicated that no probable cause existed to support the charge. First, when Murphy arrived at Pershing Park he observed "citizens coming and going" from the Park. (Ex. A, Murphy Tr. 229:13-15.)   Because the composition of the people within the Park remained fluid until the MPD, FCSD and USPP had completely encircled the Park, Murphy knew that it was impossible (or at least extremely improbable) that all of the hundreds of individuals currently within the Park could have been together at a different location over an hour earlier when they were allegedly given a police order. Moreover, he simply never asked.

Second, the Federal Defendants imply that Murphy's reliance upon Newsham was reasonable because the MPD was "on the scene to observe the conduct of people entering the park." (Fed. Br. at 37.)   The Federal Defendants ignore the fact that Murphy's own USPP officers were also "on the scene" to observe the conduct of people entering the park. (Ex. A, Murphy Tr. 172:12-174:15.)   None of these officers had reported that individuals entering the Park had failed to obey any order. (Ex. A, Murphy Tr. 172:12-174:15.)   Furthermore, those officers reported that individuals were traveling from Freedom Park to Pershing Park in *different* groups. (Ex. A, Murphy Tr. 172:12-174:15.)   The fact that the individuals within the Park had likely originated from different locations and entered the Park at different times made it even less likely that all of the individuals had been given an order which they had failed to obey.

Finally, reliance on the varying rationales proposed by Newsham was unreasonable on its face.   Newsham was clearly "fishing" for a basis on which to arrest the people in the Park. Murphy described an initial conversation with Newsham in which Newsham asked whether the

---

individuals had already been entirely prevented from leaving; and individuals outside of the Park were entirely prevented from entering. (Ex. A, Murphy Tr. 218:18-219:15.)

individuals within the Park could be charged with demonstrating without a permit.  (Ex. A, Murphy Tr. 215:03-220:03.)  According to Murphy, at that time Newsham was interested with "what, if anything . . . could [the people in the Park] be charged with."  (Ex. A, Murphy Tr. 220:20-221:01.)   When Murphy said the USPP would not participate in arrests based on demonstrating without a permit, Newsham proposed simply enclosing the people in the Park and arresting those who tried to cross the police line.  Only when that did not suffice did Newsham propose arresting everyone for their alleged failure to obey a police order at another time and place.  A reasonable officer would have inquired why, if the individuals within the Park had in fact not obeyed a lawfully given order, Newsham did not initially consider such a charge of failure to obey. *See  Barham v. Ramsey*, 338 F. Supp. 2d 48, 57-58 (D.D.C. 2004) (holding that Newsham's "'failure to obey' charge is nothing short of ludicrous").

*Wahhab* illustrates the unreasonableness of the MPD's requests.  In *Wahhab,* police officers who were not present at the time of the alleged altercation properly acceded to the security guard's request only after the security guard stated that a crime had been committed, and after the security guard gave the police officers a description of that crime. *Wahhab*, 386 F. Supp. 2d at 287.  The requirement that, at a minimum, an objectively reasonable request requires a statement of the charge and a description of the facts supporting that charge is supported by almost all of the cases the Federal Defendants cite.  For instance, in *Whiteley v. Warden, Wyo. State Penitentiary,* the assisting officer was informed that the suspects were charged with breaking and entering, and was given specific information concerning the amount of money that was taken and the types of old coins that were taken.  *Whiteley v. Warden, Wyo. State Penetentiary*, 401 U.S. 560, 563 (1971).  Similarly, in *United States v. Hensley*, the assisting officer was informed that the suspects were wanted in connection with an armed robbery, and

24

received information concerning the date and location of the robbery.  *United States v. Hensley*, 469 U.S. 221, 223 (1985).

In stark contrast, the MPD requested that the USPP "hold" hundreds of people within Pershing Park without informing Murphy that the individuals within the Park had committed, or were suspected to have committed, any crime.  Not only did the MPD officer who initially requested assistance not make *any* representation that factors existed to warrant arrest, but Murphy did not request any such explanation (in fact, Murphy did not even know who the MPD officer was, much less whether he had a sound and reasonable basis for making the request). (Ex. A, Murphy Tr. 181:32-06.)  Unlike the assisting officers in *Wahhab*, *Whiteley* and *Hensley*, Murphy did not rely upon any representation that probable cause existed to arrest the individuals within the Park.

A further distinction exists between the instant controversy and the facts in *Wahhab, Whiteley* and *Hensley*.  In *Wahhab, Whiteley* and *Hensley,* the assisting police officers had no additional information to either support or discount the other officer's request as the assisting officers were not present at the time, or at the place, of the alleged infraction.  For instance, in *Whiteley* and *Hensley,* the alleged infraction occurred days before the assisting officer's involvement.

Conversely, USPP officers were stationed at neighboring Freedom Park earlier that day and were actively monitoring individuals entering Pershing Park.  (Ex. A, Murphy Tr. 172:12-174:15.) Other USPP officers were stationed, in plainclothes, within the Park.  (Ex. A, Murphy Tr. 482:10-12.)  None of these officers reported any grounds for detaining the individuals that entered Pershing Park. As *Baptiste* (one of the Federal Defendants' cited cases) notes, where an officer has "the benefit of observing the very conduct which they knew served as the basis for

25

the" requesting officer's allegations, the officer is not entitled to rely upon another's allegations as a basis for making an arrest or conducting a search. *Baptiste*, 147 F.3d at 1257.

A final distinction separates several of the Federal Defendants' cited cases from this situation. In both *Whiteley* and *Hensley*, the arresting officers were forced to make quick decisions and were not reasonably able to request additional information because of physical distance. In this case, no temporal or geographic barrier prevented the Federal Defendants from requesting additional information from the MPD before acceding to the MPD's request to participate in arresting the people in the Park. Murphy had physical access to the MPD officer who originally requested assistance as well as Newsham, with whom he spoke twice. (Ex. A, Murphy Tr. 178:15-179:10, 184:17-185:04.) Furthermore, Murphy stated that deploying sufficient USPP forces to accede to the first request took at least ten minutes. (Ex. A, Murphy Tr. 206:13-19, 193:03-12) (stating that first order to encircle was given at 9:20 a.m., and that the police line was established by 9:35 a.m.) At no time during (or after) this deployment did Murphy ask the reason for, or the basis of, the MPD's desire to arrest the hundreds of individuals in the Park.

### 5. The Rationale of Protecting the White House Grounds Cannot Justify Otherwise False Arrests

Perhaps recognizing the facially unreasonable nature of the MPD's request, the Federal Defendants assert that Murphy had an independent reasonable basis for responding to the MPD's request insofar as "his only purpose in coming to Pershing Park . . . was to ensure that demonstrators present in the Park . . . did not move westward toward the White House complex." (Fed. Br. at 35.) Remarkably, though the Federal Defendants now claim this was Murphy's "only purpose" in coming to Pershing Park, it cannot be found in Murphy's previous

Declarations as the reason for coming to the Park and participating in forming the police line that prevented the persons inside the police line from leaving the Park.[11/]

Moreover, the Federal Defendants' argument fails on even a cursory glance at the geography of the events. Murphy testified that the White House complex was located at the western end of Pershing Park. (Ex. A, Murphy Tr. 179:08-10). The USPP and the FCSD, however, were deployed, not on the western end of the Park, but on its southern and northern ends. (Ex. A, Murphy Tr. 177:04-21, 178:15-21, 206:13-19, 201:04-08, 271:21-272:12.) In fact, Murphy specifically ordered his units to move from protective positions at the White House gates and White House Visitors Center to positions around Pershing Park for the express purpose of enclosing the Park and detaining all people within the Park. (Ex. A, Murphy Tr. 191:17-193:02, 176:19-21, 200:12-15.) Further, when the MPD began making individual arrests, additional USPP officers moved to the southern side of the Park, along Pennsylvania Avenue, to protect the MPD officers from persons assembled across Pennsylvania Avenue, not to the western side of the Park where they could have protected the White House complex. (Ex. A, Murphy Tr. 241:05-11.) In light of Murphy's, the USPP's, and the FCSD's actions, the Federal Defendants cannot credibly claim that their actions were motivated in "primary" part by a desire to protect the White House complex. Despite Murphy's vociferous claims to the contrary, the objective evidence shows that the Federal Defendants acted for the express purpose of enclosing and detaining people within Pershing Park, and then protecting the MPD while that agency

---

[11/]     Previous Murphy declarations state that the USPP had responsibility for protecting the White House grounds and other federal parkland (including Pershing Park) but do not point to that responsibility as the "only reason" for coming to the Park. (*See* Ex. M, Doc. 14-2, January 15, 2003 Declaration of Richard Murphy ¶ 2-6; Ex. N, Doc. 61-2 October 15, 2003 Declaration of Richard Murphy ¶ 3-6.) In fact, this "reason" became evident only when Murphy was deposed, after he learned that Plaintiffs would seek to amend their complaint to name him not only in his official capacity but also in his personal capacity.

restrained each of the individuals in the Park.  (Ex. A, Murphy Tr. 179:01-181:10, 193:03-12, 241:05-11.  *See generally*, Pl. SOF ¶ 13.)

Furthermore, this belated justification fails logically as a basis for detaining individuals within Pershing Park.  In his deposition, Murphy testified that protecting the White House required only that individuals not be allowed to move west toward the complex. (Ex. A, Murphy Tr. 182:12-184:05.)  Murphy admitted that he did not think it necessary to engage in the far more invasive measure of detaining individuals within the Park in order to protect the White House complex. (Ex. A, Murphy Tr. 288:12 – 289:15.)  Indeed, Murphy testified that, in retrospect, his actual intention was *not* to accede to the MPD's request that he "hold" individuals within Pershing Park; he claims that he intended only to prevent individuals from "moving further west [toward the White House] than they had already gotten." (Ex. A, Murphy Tr. 183:13-15.) Nonetheless, the facts are clear:  the USPP participated in detaining the people in the Park.

### C.    Murphy Is Not Entitled to Qualified Immunity

As this Court has stated, an officer is not entitled to qualified immunity if he "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury." *Barham v. Ramsey,* 338 F. Supp. 2d 48, 55 (quoting *Harlow v Fitzgerald,* 457 U.S. 800, 815 (1982)).  The evidence indicates that both grounds defeat Murphy's claim for qualified immunity.

### 1.    Murphy Should Have Known that His Actions Would Violate Plaintiffs' Constitutional Rights.

The Federal Defendants imply that Murphy did not know that his actions would violate Plaintiffs' constitutional rights because he "relied in good faith on the apparently reasonable request of another law enforcement organization" to hold and arrest individuals within Pershing

Park.  (Fed. Br. at 22.)  It is firmly established that the request of a law enforcement officer to arrest or detain an individual "in no way negates a police officer's duty to reasonably inquire or investigate [the] reported facts" justifying that request, nor does it negate a police officer's duty to consider contrary facts that the officer has personally observed. *See Mendocino Envtl. Ctr.*, 192 F.3d at 1293 n.16.  Succinctly put, a reasonable officer must evaluate all of the "information that the officer possesses or to which he has reasonable access . . . ." *Berg,* 219 F.3d at 273.

In this case, Murphy abrogated his responsibility to investigate the MPD's request to arrest hundreds of individuals.  Indeed, in sharp contrast to *Wahhab*, *Whiteley*, and *Hensley*, the cases on which the Federal Defendants rely, Murphy agreed to the MPD's request to "hold" and "stop" individuals within Pershing Park without receiving (or requesting) an explanation as to why those individuals were being arrested.  (Ex. A, Murphy Tr. 178:15-179:10, 184:17-185:04.) *Compare, Wahhab* 386 F. Supp. 2d at 287.; *Whiteley,* 401 U.S. at 563; *United States v. Hensley*, 469 U.S. at 223.

Furthermore, unlike the officers in *Wahhab*, *Whiteley*, and *Hensley*, Murphy had immediate access to information that indicated that no crimes had been committed.  USPP officers who had been stationed at or around Pershing Park from earlier that morning did not report any conduct that warranted an arrest.  (Ex. A, Murphy Tr. 172:12-174:15.)  Similarly, plainclothes USPP officers within Pershing Park reported no grounds for an arrest.  (Ex. A, Murphy Tr. 482:10-12.)  Murphy provides no explanation for why he did not ask the MPD officer for an explanation as to the MPD's request in light of this contradictory evidence.  Moreover, he does not assert that any temporal or geographic barriers prevented such an inquiry.  In fact, the record indicates that he was in close physical proximity to the requesting officer, and that he had several minutes before his orders to the USPP to encircle the Park could be carried

out.  (Ex. A, Murphy Tr. 178:15-179:10, 184:17-185:04, 176:70-21, 193:03-12) (first order to encircle was given at 9:20 a.m., and police line was established by 9:35 a.m.).)  Murphy's blind acquiescence and his refusal to conduct the most cursory investigation can lead to no other conclusion than that he neglected his duty to conduct any inquiry into the propriety of the MPD's request.

The events immediately following the MPD's request further demonstrate the unreasonable nature of the request and Murphy's failure to conduct the most basic of inquiries. After deploying USPP officers to "keep the crowd in Pershing Park," Murphy was approached by Newsham, and in the course of their conversation he discovered that the MPD had no probable cause to arrest the individuals within the Park.  (Ex. A, Murphy Tr. 215:03-220:03.) Indeed, Murphy describes Newsham asking him whether the individuals within the Park could be arrested for demonstrating without a permit.  (*Id.*)  Murphy described the conversation as Newsham brainstorming "what, if anything . . . could [the demonstrators] be charged with." (Ex. A, Murphy Tr. 220:20-221:01.)

In fact, at that point, Murphy clearly indicated that arresting the people in the Park *was* improper and doing so could violate USPP procedures.  Murphy specifically informed Newsham that the individuals within the Park could not be arrested by the USPP for demonstrating without a permit because such charge required that the individuals be advised "of the infraction, the violation, they were committing and [be] asked ... to cease and desist and that – and depart the vicinity, depart from the area."  (Ex. A, Murphy Tr. 219:08-15.)  Neither USPP nor MPD took any of those required steps to protect the interests of the people in the Park.

30

The charge upon which the arrests were finally based was first communicated to Murphy more than forty minutes after he had began to assist in detaining the people in the Park. (Ex. A, Murphy Tr. 224:20-228:09.)  At that time, Newsham informed Murphy that the individuals within Pershing Park would be charged with "failure to obey" orders purportedly given to them "before they ever entered Pershing Park."  (Ex. A, Murphy Tr. 227:02-17.)  Murphy had numerous reasons to doubt the validity of this charge.  First, Murphy personally observed "citizens coming and going" before the Park was completely sealed, negating the inference that all of the individuals currently within the Park were together at a previous location to receive an order.  (Ex. A, Murphy Tr. 229:13-15.)  Second, none of the USPP officers "on the scene" at Freedom Plaza, the place where many of the individuals within the Park had come from, reported that individuals had failed to obey an order.  (Ex. A, Murphy Tr. 172:12-174:15.)  Finally, Newsham had failed to proffer such a charge during their earlier conversation, indicating that Newsham had not believed, just minutes earlier, that there was cause to believe that all of the individuals within the Park had failed to obey an order.  (*See* Ex. A, Murphy Tr. 215:03-220:03.) Despite the facial infirmities of the MPD's charge, Murphy chose not to inquire about its basis. Specifically, Murphy decided not to ask what order the individuals had purportedly failed to obey, not to ask where the order was given, and not to ask if there was cause to support the charge against each and every person within the Park.  (Ex. A, Murphy Tr. 232:03-233:06.)

The Federal Defendants claim that holding Murphy liable for "not questioning in sufficient depth [Newsham] a senior member of another law enforcement agency" would result in "mini-depositions between police officers" and "could paralyze efforts to deal with an evolving or static situation warranting law enforcement response." (Fed. Br. at 39.)  They imply that officers must be allowed to rely completely, in all cases, upon the representations of fellow

31

officers.  This standard would effectively eviscerate an officer's personal responsibility to *reasonably* inquire, and *reasonably* investigate facts and allegations of another officer.  It would allow officers to abandon their personal responsibility to protect the Constitution so long as someone else was willing to give the order or "make the call."  Indeed, it would countenance an officer, as in this case, to blatantly close his eyes to facts which directly contradict the validity of the other officer's request.

Nowhere is this better seen than in the present case.  When Murphy was finally told a charge for the arrests – on Newsham's third try and long after Murphy had directed the Federal Defendants to trap persons within the Park – Murphy failed to question that charge despite the fact that all the evidence known to Murphy indicated that Newsham lacked any foundation to support the charge, and despite Murphy's knowledge that a proper arrest necessitated giving warnings and an opportunity to disperse.  Immunity for such blatantly unconstitutional actions would give officers a blank check to act illegally so long as it is done at another's request, no matter how manifestly unreasonable that request appears.

### 2. The Evidence Indicates that Murphy Intended to Violate the Plaintiffs' Constitutional Rights

The Federal Defendants argue that Murphy did not *want* to fully comply with the MPD's request to arrest and detain individuals within the Park.  They claim that "it was not his intent to keep the demonstrators in Pershing Park" (Fed. Br. at 35), and they imply that Murphy's order to enclose the Park and not "allow [individuals] to come through the police line" was unintentional. (Ex. A, Murphy Tr. 185:05-11; 193:09-12.)  According to the Federal Defendants, Murphy would have been "perfectly satisfied, and in fact preferred, if [the demonstrators within the Park] had left Pershing Park and returned, eastward away from the White House complex, to Freedom Plaza."  (Fed. Br. at 35.)

32

Murphy's new-found version of his "intent" at the time is contradicted by his contemporaneous words and orders to the USPP officers. At the time, Murphy ordered the USPP to "enclose the demonstrators up here in Pershing Park with Metropolitan Police," to "keep the crowd inside Pershing Park" and not "allow them to come through the police line." (Ex. A, Murphy Tr. 181:06-10, 193:09-12, 206:13-19.) Although Murphy claims (after the fact) that he did not intend for his orders to be interpreted as preventing individuals from exiting Pershing Park from the Park's east side, his orders on September 27, 2002 to "enclose demonstrators up here in Pershing Park with Metropolitan Police" and to "keep the crowd inside Pershing Park," provide a far more valuable basis for a jury to find that Murphy's intentions were to detain individuals within Pershing Park. (Ex. A, Murphy Tr. 181:06-10, 185:05-11, 193:09-12.) For the purposes of this Motion, therefore, it is clearly a "disputed fact" appropriate for the jury whether Murphy intended exactly what he ordered – to "keep the crowd inside Pershing Park."[12]

---

[12] The Federal Defendants' claim that Murphy "was not even aware that there was a police line in existence on the eastern side of Pershing Park preventing exit from the Park at that location" directly contradicts Murphy's testimony that he informed Newsham that the individuals within the Park were being detained. (*Compare* Fed. Br. at 35 to Ex. A, Murphy Tr. 218:18-219:15.) Further evidence indicates that a jury could easily find that Murphy knew (or should have known) that the east side had been closed. Murphy admits to deploying USPP (and FCSD) officers on the north and south sides of Pershing Park. (Ex. A, Murphy Tr. 206:04-07.) Although Murphy claims that he never visited the east side of the park, and was geographically obstructed from seeing whether MPD officers had blocked the east side (Ex. A, Murphy Tr. 208:07-08, 229:13-22), it is hard to imagine that all of the USPP officers stationed on the north and south sides of the Park did not see that MPD officers blocked the east side. In addition, the Federal Defendants produced videotapes during discovery depicting individuals within the Park loudly shouting "let us go… let us go." A jury could easily find that all within earshot could hear these shouts, and would realize that all sides of the Park had been closed.

33

### 3.   Murphy Violated Clearly Established Constitutional Rights.

The Federal Defendants also assert that Murphy is entitled to qualified immunity because no "clearly established constitutional rights" were violated.  (Fed. Br. at 37.)  This argument blatantly ignores established caselaw.  In the related case of *Barham v. Ramsey*, this Court correctly held that "there simply isn't any ambiguity as to the established law." *Barham*, 338 F. Supp. 2d at 59.  According to the Court, "the binding authority in this Circuit," established by *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977), is the "'bright-line rule' that 'where a group contains persons who have not been violent or obstructive, police may not mass arrest the demonstration as a group without fair warning or notice and the opportunity to come into compliance and disperse.'" *Barham*, 338 F. Supp. 2d at 58 (citing *Barham* Plaintiffs with approval).  "In light of *Dellums*, 'no reasonable officer could claim to be unaware' of the need to give a warning to disperse before arresting a crowd of lawful protestors." *Id.* at 59 (*citation omitted*).

The fact that "no reasonable officer" could be "unaware of the need to give a warning" is only confirmed by the fact that Murphy *knew* that a warning needed to be given in order to arrest the individuals within the Park.  Murphy clearly stated to Newsham that the individuals within the Park could not be arrested without giving a warning to disperse.  (Ex. A, Murphy Tr. 213:19-223:02.)  Despite knowing that warnings were required and had not been given, Murphy directed the USPP to assist in the mass arrests.  (Ex. A, Murphy Tr. 263:10-21.)

The Federal Defendants point only to *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977), as evidence that D.C. Circuit law does not require that police

officers give a warning before conducting a mass arrest.[13/] (Fed. Br. 36-39.)  As this Court has

correctly noted, *Dellums* and *Cullinane* are not in conflict.  *Barham*, 338 F. Supp. 2d at 56.  As

the *Dellums* court required, the police in *Cullinane* issued warnings to demonstrators to disperse

before conducting mass arrests.  *Cullinane*, 566 F.2d at 112 (specifically finding that police

"ordered the demonstrators to disperse").  Indeed, the *Cullinane* court specifically confirmed that

a constitutional mass arrest could occur only when notice and an opportunity to comply had been

given:

> We do not suggest of course that one who has violated no law may
> be arrested for the offenses of those who have been violent or
> obstructive.  As we have seen, however, the police may validly
> order violent or obstructive demonstrators to disperse or clear the
> streets.  If any demonstrator or bystander *refuses to obey such an
> order after fair notice and opportunity to comply,* his arrest does
> not violate the Constitution even though he has not previously been
> violent or obstructive.

*Cullinane*, 566 F.2d at 120 (emphasis added); *accord Barham*, 338 F. Supp. 2d at 120.

### D.       Plaintiffs Have Standing to Request Injunctive Relief

USPP personnel caused Plaintiffs to be arrested by participating in a show of authority

that restrained their freedom to walk away from Pershing Park.  As such, Plaintiffs have standing

to pursue their claims for injunctive relief against the Federal Defendants.  Plaintiffs suffered an

"injury in fact," and there is "a causal connection between the injury and the conduct complained

---

[13/]      Although the Federal Defendants list several decisions from other circuits as support for their argument that
a "clearly established constitutional right" was not violated, none of these cases discuss the law applicable
within the District of Columbia. (Fed. Br. at 37.)  Furthermore, none of these cases discuss the
constitutional right of protestors, or individuals near a protest, to be free from arrest. *See Wilson v. City of
Boston*, 421 F.3d 45, 48 (1st Cir. 2005) (involving mass arrests of individuals believed to have outstanding
arrest warrants); *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157 (10th Cir. 2003) (involving
vehicular traffic stops made on account of race); *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252 (10th Cir.
1998) (involving search of an alleged shoplifter); *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022 (9th
Cir. 2002) (involving search of plaintiff's home), *aff'd*, 540 U.S. 551 (2004).

of." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Furthermore, it is "likely" – not "merely speculative" – that Plaintiffs' injuries will be "redressed by a favorable decision." *Id.* As the Supreme Court has observed, if the "plaintiff is himself an object of the action . . . at issue[,] … there is ordinarily little question that the action … has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 562-63.

The Federal Defendants' sole argument on this point is that there is no causal connection between their actions and Plaintiffs' injuries. As set forth above, however, there is a clear causal connection between Plaintiffs' injuries and the role that Murphy and the USPP officers at Pershing Park played in their arrests. The Federal Defendants caused Plaintiffs to be arrested when they helped encircle Pershing Park, confining those inside the Park and restraining their freedom to leave.

Plaintiffs' requests for injunctive relief are designed to prevent such conduct in the future and it is likely that the requested relief would prevent the USPP from participating in future unconstitutional mass arrests. In particular, Plaintiffs ask the Court to declare that trap-and-arrest practices are unconstitutional and order that clear and audible warnings to disperse be given at future protests with a subsequent opportunity for individuals to disperse. (Complaint at 37.) The requested relief would enjoin the Federal Defendants from participating in future illegal mass arrests by erecting safeguards to protect Plaintiffs' and others' constitutional rights.

### E.    The Federal Defendants Seek to Deprive Plaintiffs the Opportunity of Proving Properly Alleged Violations of Sections 1985 and 1986.

The Federal Defendants struggle to dismiss Plaintiffs' claim under 42 U.S.C. § 1985 on a sweeping theory that police can never be sued for abuses directed at virtually any group other than African-Americans. (Fed. Br. 41.) They also attempt to dismiss Plaintiffs' claim under 42

36

U.S.C. § 1986 based on the purported lack of a colorable Section 1985(3) claim.  (Fed. Br. 42-43.)  This effort occurs before Plaintiffs have had the opportunity to complete discovery to establish that the United States government did indeed seek to "deprive a person of equal protection of the law" under Section 1985(3).  While such questions may be revisited at the end of discovery, Plaintiffs have properly alleged violations under Sections 1985 and 1986 and should be allowed to marshal the complete record in support of that allegation.

Given the inherent difficulty in all conspiracy allegations, full discovery is often necessary to establish the facts proving the existence of the conspiracy.  "The very nature of a conspiracy obscures most, if not all, information about the alleged conspirators' agreement . . . in a section 1985(3) action, the complaint must simply plead sufficient facts from which a conspiracy can be inferred; the facts detailing the conspiratorial agreement can be pleaded generally . . . ."  *Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir. 1985).  *See also Farber v. City of Paterson*, CIV 03-4535 (DRD), 2004 U.S. Dist. LEXIS 13060, at *63 (D.N.J. July 14, 2004).

Notably, the Federal Defendants only allege in a single line that Plaintiffs have not presented sufficient evidence to support this allegation at this stage.  (Fed. Br. 42.)  In reality, Plaintiffs have gathered considerable evidence establishing the underlying facts asserted in their Section 1985 claim.  (Complaint at 31-33.)  What remains is the most difficult evidence described in cases like *Quinones* – proof of a conspiracy to target the specific class or classes subject to the unlawful conduct.  While great progress has been made in gathering this evidence, the Federal Defendants' attempt to convince the Court to dismiss this claim before discovery is

completed is untimely, particularly where, as here, Plaintiffs' ability to obtain evidence of Federal Defendants' motive and intent is in Defendants' hands.[14/]

The Federal Defendants' primary argument against the Section 1985 claim is that the Supreme Court has effectively narrowed the meaning of a protected "class" under Section 1985(3) to African Americans and little more.   Nevertheless, the Federal Defendants begrudgingly admit that the D.C. Circuit recognizes that the scope of the statute extends beyond that one class. (Fed. Br. 41.)  The test is whether Plaintiffs have properly alleged that there is "some class-based" discrimination by police, which they clearly have done in their Complaint. *See Hoai v. Vo*, 935 F.2d 308, 314 (D.C. Cir. 1991).

Plaintiffs allege that the Federal Defendants engaged in a conspiracy to conduct a mass arrest and to deprive certain citizens of their constitutional rights. (Complaint at 31.)  Discovery has already shown many weeks of meetings between federal and district officials in preparation for their joint enforcement effort. (*See, e.g.*, Ex. A, Murphy Tr. 86:01-91:21; Ex. G, Muldoon Tr. 16:14-22:16.)  Discovery has further shown that the United States government played a substantial role in closing off the area for used to trap and arrest hundreds of citizens.  At the same time, Plaintiffs have established that certain classes of persons – such as non-student journalists – were allowed to leave the captive zone created by the federal government and other governmental forces. (Ex. H, Choi Tr. 100:14-21, 103:01-10; Ex. F, Zarconi Tr. 61:13-20.)  The arrested individuals were deprived of their freedom and subject to other unconstitutional deprivations because they were identified as presumptive protestors. (Ex. I, Fitzgerald Tr. 144:17-145:01, 146:20-147:03.)  Plaintiffs were specifically denied their freedom when they

---

[14/]     As the Court is aware, the parties now have until January 31, 2006, to bring discovery disputes – of which there are many – to the Magistrate Judge for resolution.

were identified as student journalists and observers. (Ex. H, Choi Tr. 100:14-21, 103:01-10; Ex. J, Chastain Tr. 48:09-49:12; Ex. F, Zarconi Tr. 60:02-61:22.)

The Federal Defendants' reliance on *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) is misplaced. As a threshold matter, it is worth noting that the plaintiffs in that case were allowed both discovery and a trial before the court ruled on whether a conspiracy and a protected class had been established. *Id.* at 266-67. Unlike *Bray*, the Federal Defendants here ask the Court to dismiss Plaintiffs' allegations of a conspiracy before Plaintiffs are allowed to establish its existence. The legal viability of an alleged class cannot be fully addressed in the abstract. It depends on marshalling the available evidence of the Federal Defendants' actions and intent to reveal "some class-based" discrimination. *See Hoai*, 935 F.2d at 314.

The Federal Defendants are also mistaken in their sweeping interpretation of *Bray*. In *Bray*, the Supreme Court found that the alleged class of women was unproven because "there are common and respectable reasons for opposing [abortion], other than hatred of, or condescension toward . . . women as a class." *Id.* at 270. The Court did not hold that gender or political views or other defined classes would not suffice for a Section 1985 claim. Indeed, political preferences have been found to satisfy the class requirement. *See, e.g., Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir. 1975) (police officers tearing down one candidate's posters was enough to satisfy a class definition). S*ee also Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984); *Keating v. Carey*, 706 F.2d 377, 387-88 (2d Cir. 1983). Courts look to see if a class has been shown in discovery or trial with evidence that the class was "a distinctive and identifiable group." *Aulson v. Blanchard*, 83 F.3d 1, 5-6 (1st Cir. 1996). The Supreme Court has never held that political views or other non-race criteria cannot shape a viable class under Section 1985. *Farber*, 2004 U.S. Dist. LEXIS 13060 at *65.

39

Not surprisingly, this effort to dismiss Plaintiffs' Section 1985 claim occurs when discovery is beginning to uncover the substantial role the Federal Defendants played in the planning and execution of the plan to trap and arrest citizens. Plaintiffs have already established that hundreds of individuals were deprived of core constitutional protections by a trap-and-arrest technique. The Federal Defendants played a vital role in that operation despite their implausible claims of passive participation. (*See, e.g.,* Ex. A, Murphy Tr. 179:14-16; 181:06-10; 186:01-11, 193:03-12.) That participation was the result of weeks of planning and coordination. While other demonstrations by pro-life groups and other political organizations have not been subject to mass arrests, the demonstrations against globalization and the Bush Administration's policies were met with this extraordinary and extra-constitutional measure. The trapped individuals were identified by their presumed political activities as protesters and then divided further into classes, including, but not limited to, older journalists versus student journalists. This record should be more than ample to allow Plaintiffs to complete their discovery and present a full record for review. Instead, citing their own unproven assertions, the Federal Defendants seek to dismiss this claim before Plaintiffs can present evidence to rebut those assertions. As in *Bray*, Plaintiffs should be allowed to complete discovery to prove the existence of a conspiracy under Section 1985.

Moreover, the Federal Defendants' attempt to dismiss Plaintiffs' Section 1986 claim directly depends on their contention that Plaintiffs fail to allege a violation of Section 1985. Specifically, the Federal Defendants allege that: (1) Plaintiffs do not allege a colorable Section 1985 claim; (2) that Plaintiffs fail to allege that the Federal Defendants knew of the conspiracy; (3) that the Federal Defendants had the power to prevent the conspiracy; or (4) that they failed to prevent the conspiracy. On the contrary, as discussed above, Plaintiffs have properly alleged a

Section 1985 claim, and the Federal Defendants are not entitled to dismissal of that claim at this time. Further, Plaintiffs have specifically alleged that the Federal Defendants were aware of the plan to conduct unjustifiable mass arrests before those arrests took place (Complaint ¶¶ 140-142, 149-150, 155-151); that the Federal Defendants could have prevented those arrests by refusing to participate in detaining and arresting the people in Pershing Park, and that they failed to prevent those unlawful arrests.  (Complaint ¶ 150.)  As a result, the Federal Defendants are also not entitled to dismissal of Plaintiffs' Section 1986 claim.

> **F.   Violations of Plaintiffs' Miranda Rights and Right to Counsel**

Finally, the Federal Defendants contend that Plaintiffs fail to state a claim against them based on violations of their *Miranda* rights and their Sixth Amendment right to counsel. Plaintiffs acknowledge that the NPS and Murphy have a strong objection to these counts and, indeed, Plaintiffs are considering a voluntary waiver of these claims as to them. Nonetheless, Plaintiffs oppose dismissal at this time for the obvious reason that discovery is not yet complete. The precise role of all federal personnel, including the FBI and the U.S. Marshall's Service, is still the subject of discovery and the scope of the term "arresting officer" remains a matter in dispute.  Moreover, the knowing or intentional failure to comply with these constitutional rights is central to the alleged premeditated misconduct. For example, the failure to give *Miranda* supports the view that the district and federal governments never intended to actually prosecute individuals. Instead, it appears that the USPP and its law enforcement partners decided to use a trap-and-arrest tactic to simply remove hundreds of people from the street.

Finally, these issues are likely to be part of any proposed order or injunctive relief.  While the USPP may not have taken physical custody of the Plaintiffs after their departure from the Park, there remains an important question as to the obligations of participating officers to ensure

that arrests are conducted properly. Plaintiffs hope to establish that officers cannot simply watch as bystanders as other officers ignore basic police procedures on issues like *Miranda*.

Rather than dismiss these counts are this stage, Plaintiffs ask that discovery be allowed to proceed and, once a full record is established, the counts may be reexamined. At that point, if the record shows no involvement or culpability by some of the Federal Defendants, Plaintiffs will seek the dismissal of the two counts as to them.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny in part the Federal Defendants' Renewed Motion to Dismiss or, in the Alternative, for Summary Judgment.

Respectfully submitted,

/s/

Jonathan Turley (D.C. Bar No. 417674)
2000 H Street, N.W.
Washington, D.C. 20052
(202) 994-7001


Daniel C. Schwartz (D.C. Bar No. 017749)
Nikki Ott (D.C. Bar No. 495047)
BRYAN CAVE LLP
700 Thirteenth Street, N.W.
Suite 700
Washington, D.C. 20005
(202) 508-6000

Counsel for the *Chang* Plaintiffs

Dated: December 14, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2005, I caused copies of the foregoing Opposition

to be served by electronic means, upon the following:

Counsel for the Federal Defendants

        Marina Braswell
        Assistant United States Attorney
        Office of the U.S. Attorney
        For the District of Columbia
        555 4th Street, N.W., Room 10-413
        Washington, D.C. 20530

Counsel for the District Defendants

        Thomas Koger
        Lori S. Parris
        Office of the Corporation Counsel
        441 4th Street, N.W. – 6th Floor
        Washington, D.C. 20001

Counsel for the MPD Officers

        Thomas Koger
        Lori S. Parris
        Office of the Corporation Counsel
        441 4th Street, N.W. – 6th Floor
        Washington, D.C. 20001

Counsel for Defendant Peter J. Newsham

        Robert E. Deso, Esq.
        1828 L Street, N.W., Suite 600
        Washington, D.C. 20004

Counsel for Defendant Charles H. Ramsey

        Mark H. Tuohey III
        John M. Faust
        Justin M. Shellaway
        Vinson & Elkins LLP
        The Willard Officer Building
        1455 Pennsylvania Avenue, N.W.
        Washington, D.C. 20004-1008

Counsel for Defendant Fairfax County Sheriff's Department

43

Kevin J. O'Connell
Alex Francuzenko
O'Connell, O'Connell & Sarsfield
401 East Jefferson Street
Suite 204
Rockville, MD  20850

Nikki A. Ott