**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
RAYMING CHANG, et al.,         )
                               )
         Plaintiffs,           )
                               )
     v.                        )    Civ. Action No. 02-2010 (EGS)
                               )
UNITED STATES, et al.,         )
                               )
         Defendants.           )
_____)
                               )
JEFFREY BARHAM, et al.,        )
                               )
         Plaintiffs,           )
                               )
     v.                        )    Civ. Action No. 02-2283 (EGS)
                               )
CHARLES H. RAMSEY, et al.,     )
                               )
         Defendants.           )
_____)
```

**MEMORANDUM OPINION**

On September 27, 2002, demonstrations occurred around the District of Columbia in connection with World Bank and International Monetary Fund ("IMF") meetings.  These related cases arise from a mass arrest in General John Pershing Park ("Pershing Park" or "Park") on that day.  Plaintiffs in Civil Action No. 02-2010 ("Chang plaintiffs") and Civil Action No. 02-2283 ("Barham plaintiffs") were among approximately 400 people arrested in the Park.  Plaintiffs allege various constitutional, statutory, and common law violations stemming from the arrests. Pending before the Court in the Barham (02-2283) and Chang (02-

2010) cases are motions by the federal defendants'[1] to dismiss or, in the alternative for summary judgment.  Also pending before the Court in the Chang case is defendant Fairfax County Sheriff's Department's ("FCSD") motion to dismiss, motion for summary judgment, or, in the alternative, motion for more definitive statement.  Upon review of the motions, responses and replies thereto, the applicable law, and the entire record, the Court **DENIES** the federal defendants' motion in the Barham case, **GRANTS IN PART AND DENIES IN PART** the federal defendants' motion in the Chang case, and **DENIES** Fairfax County's motion in the Chang case.

## I.    BACKGROUND

This Court's September 24, 2004 Memorandum Opinion in *Barham v. Ramsey*, 338 F. Supp. 2d 48 (D.D.C. 2004), and the D.C. Circuit's review of that decision, 434 F.3d 565 (D.C. Cir. 2006), detail the events at Pershing Park on the morning of September 27, 2002, the aftermath of such events, and the involvement of the District of Columbia Metropolitan Police Department ("MPD").

---

[1] The federal defendants named in Chang case (02-2010) are the United States, the National Park Service, Richard Murphy (who acted as Commander of the Special Forces Branch of the U.S. Park Police during the relevant period), and John and Jane Does 1-10 in their individual and official capacities.  The federal defendants named in the Barham case (02-2283) are the United States, Gale Norton, Director of the National Park Service, in her official capacity, Attorney General Alberto Gonzales, in his official capacity, Richard Murphy, in his official and individual capacity, and unidentified officers, supervisors, and law enforcement agencies, in their official and individual capacities.

This Memorandum Opinion focuses on the role of the federal defendants and Fairfax County Sheriff's Department officers.

### A.   United States Park Police

The National Park Service annually hosts more than 3,000 demonstrations and other special events.  As part of their routine procedures, they coordinate with other federal and local law enforcement agencies.  Barham Fed. Defs.' Statement of Material Facts ¶ 4; Chang Fed. Defs.' Statement of Material Facts ¶ 4.  Prior to the September 27 demonstrations, the Park Police and other law enforcement agencies participated in meetings to address how to respond to possible scenarios that could arise during predicted demonstrations.  Barham Fed. Defs.' Statement of Material Facts ¶ 8; Chang Fed. Defs.' Statement of Material Facts ¶ 5.

On September 27, 2002, Major Richard Murphy was the senior Park Police officer at Pershing Park.  Before his arrival at the Park, Murphy was informed that demonstrators left Freedom Plaza and were heading west toward Pershing Park.  Barham Fed. Defs.' Statement of Material Facts ¶ 15; Chang Fed. Defs.' Statement of Material Facts ¶ 10.  When Murphy arrived at the Park around 9:20 a.m., the entire Park was not closed off.  Murphy Dep. 228:10-14.  Murphy was asked by an MPD official to help "hold" persons in the

Park.  Murphy Dep. 177:14-16; 178:17-179:1; 206:13-19.[2]  In

response, Murphy radioed the following communication: "[C]ar 27,

have 901 deploy his personnel on the south side of Pershing Park.

We're going to enclose the demonstrators up here in Pershing Park

with Metropolitan Police."  Murphy Dep. 181:6-10.  The Park

Police (with the assistance of FCSD officers contracted to work

with them) proceeded to assist MPD officers in creating a police

line on the north and south sides of Pershing Park.  At 9:35

a.m., Murphy radioed the following communication to his fellow

Park Police officers: "[C]ar 27 for the officers who have just

been deployed in Pershing Park, we've established a police line.

We're going to keep the crowd inside Pershing Park.  We're not

going to allow them to come through the police line.  We're

working with Metropolitan on this."  *Id*. 193:6-12.  At some point

during this period, Murphy saw people coming and going from the

south side of the Park and he called additional units to deploy

there.  *Id*. 229:13-17.  At least as to the west end of the Park,

Murphy was also aware that people arrived separately and in

different groups.  Barham Pls.' Statement of Genuine Issues ¶ 16;

Barham Fed. Defs.' Resp. to Pls.' Statement of Genuine Issues

¶ 16.

_____

[2] Both parties rely extensively on the deposition testimony
of Major Murphy to support their accounts of the facts though the
parties dispute how such testimony should be characterized.

Between 9:42 a.m. and 10:20 a.m., Murphy met with senior MPD officials on the scene including Assistant Chief Peter Newsham ("AC Newsham") and Assistant Chief Brian Jordan and he overheard conversations by then Commander Cathy Lanier.  *Id.* 213:7-18. Major Murphy had two separate encounters with AC Newsham between 9:42 and 10:20 a.m.  During the first encounter, Newsham asked Murphy if the group in the Park had a permit to demonstrate there and Murphy told him that they did not.  *Id.* 215:5-10.  Newsham then asked whether the individuals in the Park could be arrested for demonstrating without a permit.  Murphy responded that they technically could be arrested for demonstrating without a permit but the Park Police would not arrest individuals for that offense because it was Park Police policy to inform demonstrators of the violation and order them to disperse prior to any arrests.  *Id.* 218:22-219:13.  Murphy also commented to Newsham at that time that it appeared that individuals were being prevented from departing from the area at the time of their conversation.  *Id.* 219:13-15.  Newsham then paused and recounted that if the group attempted to go through police lines, they would be arrested for crossing police lines and if they made it to the street, they would be arrested for parading without a permit.  *Id.* 219:17-21. Murphy responded that this was Newsham's call.  *Id.* 220:2-3. That was the end of the first encounter between Newsham and Murphy.

A little while later, Murphy was again approached by Newsham who informed Murphy that the individuals in the Park were going to be arrested for failure to obey a police order, specifically a traffic regulation, before they entered the Park.  *Id.* 227:5-17. It is undisputed that all persons in the Park were "ultimately surrounded, enclosed, were not free to leave and were under arrest."  Barham Pls.' Statement of Genuine Issues ¶ 8; *see also* Barham Fed. Defs.' Resp. To Pls.' Statement of Genuine Issues ¶ 8 (noting no dispute).  The parties do dispute, however, the role of the Park Police in the arrest and their intent for being at Pershing Park.

## B.   Fairfax County Sheriff's Department

On September 23, 2002, the FCSD entered into an interagency agreement with the United States Park Police, which was effective from September 25-30, 2002.  FCSD's Statement of Material Facts ¶ 1.  The agreement calls for the FCSD to provide "law enforcement assistance on Federal parkland" during the IMF/World Bank demonstrations.  *Id.* ¶ 2.  The agreement provides that "[r]esponsibility for the overall law enforcement operations during this event on Federal parkland will remain with the Chief of the Force[3] or her designee."  Interagency Agreement ¶ 2.  The

---

[3] "The Force" is defined in the interagency agreement as the United States Park Police.  *See* Interagency Agreement between Fairfax County Sheriff's Office, Fairfax, Virginia and the United States Park Police ("Interagency Agreement") at 1, Ex. 1 to FCSD's Statement of Material Facts.

agreement further provides that the "Officer-in-charge of the Fairfax County Sheriff's Office personnel will have an integral part of any decision making process that could have an effect of its officers, including decisions made with other agencies that may be brought in and made part of the law enforcement detail." *Id.* ¶ 2.  The agreement also states that the Park Police were requesting the assistance of 26 FCSD officers.  *Id.* ¶ 4.

FCSD Commander Basilio Cachuela was the highest ranking officer on the scene at Pershing Park on September 27.  FCSD's Statement of Material Facts ¶ 8.  Cachuela claims that he "reported to" U.S. Park Police Lieutenant Tom Neider.  *Id.* ¶ 9. Lieutenant Neider told Commander Cachuela to deploy FCSD officers to Pershing Park and have those officers "form a perimeter" along the edge of the Park.  FCSD's Statement of Material Facts at ¶ 10; Chang Pls.' Resp. to FCSD's Statement of Material Facts ¶ 10; Cachuela Dep. 50:11-19.  After FCSD officers formed a perimeter on the north side of the Park, a D.C. police lieutenant said "[n]o one in, no one out."  Cachuela Dep. 53:14-15. Cachuela then "looked at the Lieutenant of the Park Police . . . and [the Park Police Lieutenant] just kind of nodded his head like, okay, we heard that, and then [Cachuela] told [his] guys, you know, we got the word, no one in, no one out."  *Id.* 53:14-19. FCSD officers remained along the perimeter as MPD officers "funnel[ed] the people in the crowd into Metro buses."  *Id.*

53:14-54:22.  Once the crowd got to a size where FCSD officers
were not needed anymore, they left.  *Id.* 54:10-11.

### C.    Federal Bureau of Investigation

The FBI is the lead federal agency responsible for
addressing threats or acts of terrorism and crisis management in
connection with weapons of mass destruction.  Barham Fed. Defs.'
Statement of Material Facts ¶¶ 5-6.  Prior to the September 27,
2002 demonstrations, the FBI participated in planning meetings
where responses to possible scenarios that could arise during
demonstrations were discussed.  *Id.* ¶ 8.  Based on prior
instances of rioting and violence at such events and expected
large crowds, the FBI also opened a Counter-Terrorism/Special
Events case regarding the IMF/World Bank meetings.  Rice Decl.
¶ 4.

During the September 27, 2002 demonstrations, FBI personnel
were responsible for various tasks.  Barham Fed. Defs.' Statement
of Material Facts ¶ 12.  FBI Joint Terrorism Task Force ("JTTF")
personnel engaged in intelligence gathering through crowd
surveillance.  Rice Decl. ¶ 7; Gardner Dep. 38:4-39:19.  The FBI
also provided "liaison and assistance, as requested, to local law
enforcement and fire-rescue personnel."  Rice Decl. ¶ 4; Barham
Fed. Defs.' Statement of Material Facts ¶ 7.  Specifically, the
FBI provided portable fingerprint processing equipment and
thirteen FBI employees from the Criminal Justice Information

System ("CJIS") Division to operate that equipment, in order to assist with post-arrest identification of those individuals arrested in Pershing Park.  Strait Decl. ¶¶ 4, 7; Rice Decl. ¶ 9.

On September 27, 2002, the CJIS "fly-away team" operated portable fingerprint processing stations at the MPD Academy gymnasium where arrestees were detained after their arrest in Pershing Park.  Strait Decl. ¶¶ 8, 10.  CJIS personnel digitally scanned all fingerprint cards for fingerprints taken by the MPD and entered identification data from the cards into the Integrated Automated Fingerprint Identification System ("IAFIS") -- an FBI database that matches scanned fingerprints against existing fingerprints in the system.  Strait Decl. ¶¶ 5, 8.  One purpose of the IAFIS system is to provide a rapid means of confirming the identity of each arrested individual.  *Id*. ¶ 9.

The FBI criminal history databases contain information regarding the arrest of at least some of the named plaintiffs who were arrested on September 27, 2002.  *Id*. ¶¶ 16-18.  Such information is maintained in the FBI's Fingerprint Identification Records System ("FIRS") and the National Crime Information Center ("NCIC") Interstate Identification Index ("III").  *Id*. ¶ 14.

Finally, some CJIS personnel took pictures in the MPD gymnasium with their own cameras.  *Id*. ¶ 12.  Some of the arrestees appear in some of these photographs.  *Id*.  The FBI claims, however, that these photographs are not of individual

arrestees, were not taken at the direction of FBI personnel or
with FBI equipment.  *Id*.

### D.   Pending Motions

The federal defendants have filed motions to dismiss
pursuant to Rules 12(b)(1) and/or 12(b)(6) of the Federal Rules
of Civil Procedure or, in the alternative, for summary judgment
pursuant to Rule 56 of the Federal Rules of Civil Procedure.  In
the Barham case, Civil Action No. 02-2283, the federal defendants
argue in their motion that plaintiffs lack standing to bring
claims for injunctive relief against the federal defendants, that
the Park Police's actions did not constitute an arrest or
seizure, or, alternatively, that the Park Police legitimately
responded to a request for assistance from another law
enforcement agency.  As to the FBI, the federal defendants in the
Barham case argue that none of the actions taken by the FBI in
processing fingerprints violated any rights of any plaintiffs.
Finally, the federal defendants in the Barham case also argue
that claims brought against Richard Murphy in his individual
capacity should be dismissed on qualified immunity grounds.

In the Chang case, Civil Action No. 02-2010, the federal
defendants also argue lack of standing, that the Park Police did
not arrest or seize anyone or, alternatively, responded to a
legitimate request from law enforcement, and that Murphy is
entitled to qualified immunity.  In addition, the federal

defendants in the Chang case argue that any claims for money damages against federal organizations and individual defendants in their official capacities are barred on sovereign immunity grounds.  The federal defendants in the Chang case further argue that plaintiffs' claims under 42 U.S.C. §§ 1985 and 1986 lack merit and plaintiffs' Due Process, *Miranda*, and right to counsel claims should be dismissed for failure to state a claim.

The FCSD filed its own motion to dismiss, for summary judgment, or for a more definitive statement in the Chang case. In addition to incorporating the arguments of the federal defendants by reference, the FCSD argues that it should be dismissed from this case based on the application of the borrowed servant doctrine.

## II.   STANDARD OF REVIEW

### A.   Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure tests whether the Court has subject matter jurisdiction over the action.  *Bernard v. U.S. Dep't of Def.*, 362 F. Supp. 2d 272, 277 (D.D.C. 2005).  The plaintiff bears the burden of establishing that the Court has subject matter jurisdiction.  *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), *aff'd*, 346 F.3d 192 (D.C. Cir. 2003).  In evaluating a motion to dismiss for lack of subject matter jurisdiction, the Court must accept the complaint's well-pleaded factual allegations as true and construe

11

all reasonable inferences in the plaintiff's favor. *Thompson v. Capitol Police Bd.*, 120 F. Supp. 2d 78, 81 (D.D.C. 2000). "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Rann*, 154 F. Supp. 2d at 64 (citations omitted). In deciding a Rule 12(b)(1) motion, a court may "'consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case.'" *Sweeney v. Am. Registry of Pathology*, 287 F. Supp. 2d 1, 3 (D.D.C. 2003) (citations omitted).

**B.    Rule 12(b)(6)**

Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must present "enough facts to state a claim to relief that is plausible on its face," and "above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 1974 (2007). The Court will accept as true all factual allegations in the complaint, and give the plaintiff the benefit of all inferences that can be drawn from the facts alleged. *See id.* at 1965; *Atchinson v. Dist. of Columbia*, 73 F.3d 418, 422 (D.C. Cir. 1996).

**C.    Rule 56**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if the moving party has

shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. ANALYSIS

### A.   Sovereign Immunity in the Chang Case (02-2010)

The federal defendants in the Chang case seek dismissal and/or summary judgment on sovereign immunity grounds as to plaintiffs' claims for money damages based on any alleged constitutional violations by federal agencies or individual federal defendants acting in their official capacities.  To the extent that plaintiffs seek any damages against the federal law enforcement agencies or individual federal defendants acting in their official capacities for constitutional violations, the Court grants the federal defendants' motion.

Sovereign immunity bars all suits against the United States unless there is an explicit statutory waiver to such immunity. *Lane v. Pena*, 518 U.S. 187, 192 (1996).  The scope of any such explicit waiver is strictly construed in favor of the government. *Id*.  Moreover, the sovereign immunity bar extends beyond the

government itself to federal employees named as defendants in their official capacities.  *See Clark v. Library of Congress*, 750 F.2d 89, 103 (D.C. Cir. 1984) (finding that sovereign immunity "bar[s] suits for money damages against officials in their *official* capacity absent a specific waiver by the government").

Neither the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, nor the FTCA, 28 U.S.C. §§ 2679(b)(1)-(2), provide for waiver of the federal government's immunity from suit for damages for any constitutional torts committed by federal employees acting in their official capacities.  *See Scanwell Laboratories, Inc. v. Thomas*, 521 F.2d 941, 948 (D.C. Cir. 1975) ("The Administrative Procedure Act, by itself, is not a waiver of sovereign immunity in suits seeking money damages against the United States."); *Kline v. Republic of El Salvador*, 603 F. Supp. 1313, 1317 (D.D.C. 1985) ("[T]he Federal Tort Claims Act does not waive sovereign immunity with respect to constitutional torts." (citing *Laswell v. Brown*, 683 F.2d 261, 267-68 (8th Cir.1982); *Birnbaum v. United States*, 588 F.2d 319, 327-28 (2d Cir.1978)). Plaintiffs provide no other statutory basis for a waiver of sovereign immunity that would allow claims for money damages based on alleged constitutional torts.  Accordingly, to the extent plaintiffs attempt to seek any money damages for alleged constitutional violations committed by federal government

agencies or officials acting in their official capacities, such relief is barred.[4]

**B.    Standing for Injunctive Relief Claims in the Barham (02-2283) and Chang (02-2010) Cases**

The federal defendants in both the Chang and Barham cases argue that plaintiffs lack standing to bring their claims for injunctive relief against the federal defendants.  The Court disagrees.

There are three requirements to establish the "irreducible constitutional minimum" of standing: (1) an alleged injury in fact -- a concrete, actual or imminent harm; (2) causation -- "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant"; and (3) redressibility -- "a likelihood that the requested relief will redress the alleged injury."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  The party invoking federal jurisdiction bears the burden of establishing standing.  *Id*. at 104.  When the plaintiff himself is the object of the alleged injurious government action, however, "there is ordinarily little question that the action . . . has caused him injury, and that a

---

[4] In their opposition brief, plaintiffs argue that sovereign immunity does not bar plaintiffs' claims for injunctive relief or nonconstititutional torts against the federal defendants. Plaintiffs do not address, however, defendants' argument that money damages are not available for alleged constitutional torts committed by federal law enforcement agencies and individuals acting in their official capacities.  Thus, the Court treats plaintiffs' silence as a concession as to this argument.

judgment preventing . . . the action will redress it."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In this case, the federal defendants argue that plaintiffs fail to prove the causation element required for standing.  The federal defendants claim that the decision to prevent plaintiffs from further engaging in First Amendment activities was made by the District of Columbia MPD alone and any arrests were also carried out by the MPD alone.  As discussed in more detail below, however, the Park Police officers in Pershing Park on the morning of September 27, 2002 were not merely innocent bystanders.  They formed portions of two sides of a box of officers around Pershing Park that prevented hundreds of people from leaving.  The Court agrees with plaintiffs that the federal defendants "caused" plaintiffs to be arrested when Park Police officers (and Fairfax County police officers contracted to work with them) encircled the Park thereby restraining plaintiffs' freedom to leave.  Accordingly, to the extent the federal defendants challenge plaintiffs' standing, their motions are denied.

### C.   Arrests in Barham (02-2283) and Chang (02-2010) Cases

MPD, Park Police, and FCSD officers jointly participated in the arrest of plaintiffs.  A person is arrested or "seized" when a police officer "restrains his freedom to walk away."  *Terry v. Ohio*, 392 U.S. 1, 16 (1968); *see also Kaupp v. Texas*, 538 U.S. 626, 629 (2003) ("A seizure of the person within the meaning of

16

the Fourth and Fourteenth Amendments occurs when taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." (citations and internal quotation marks omitted)); *United States v. Mendenhall*, 446 U.S. 544, 553 (1980) (finding that a person is "seized" when, "by means of physical force or show of authority, his freedom of movement is restrained").  Ultimately, "[w]hether there has been an arrest turns on whether there has been an imposition of custody, and this is a determination made after examining both the objective circumstances and the subjective feeling those circumstances are likely to evoke."  *United States v. White*, 648 F.2d 29, 33-34 (D.C. Cir. 1981) (citation and internal quotation marks omitted). "[T]he threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" may be enough to constitute an arrest, as a reasonable person may believe he is not free to leave under such circumstances. *Mendenhall*, 446 U.S. at 554.

Under the circumstances in this case, a reasonable person encircled by law enforcement officers on all sides would not have felt free to leave.  This is evident from the statements of

17

individuals who were enclosed in Pershing Park by the Park
Police, MPD, and FCSD.  For example, plaintiff Sally Norton
recounts that police, some of whom were in full riot gear, began
tightening the circle around individuals within the Park and were
yelling at people within the perimeter to "move in."
Interrogatory Responses of Sally Norton at 7-8, Ex. 24 to Pls.'
Opp'n to Fed. Defs.' Mot. (Barham case).  Police also yelled at
individuals:  "You cannot leave, move, move" while people were
moving backward into the center of the Park.  *Id*.  Moreover, the
federal defendants do not dispute that an arrest occurred.
Instead, they just argue that Park Police did not conduct the
arrest.

The Park Police's arguments that they did not effect an
arrest because they had no intent to arrest anyone and they did
not prevent individuals from leaving the Park entirely are
unavailing.  An arrest is an "intentional acquisition of physical
control" and the "detention or taking itself must be willful."
*Brower v. County of Inyo*, 489 U.S. 593, 596 (1989).  Whether or
not the Park Police had an intent to arrest anyone is a fact-
intensive question that is, at a minimum, disputed.  The federal
defendants point to the D.C. Circuit's earlier characterization
of the evidence in the *Barham* case to argue lack of intent.
Specifically, they argue that Major Murphy told MPD AC Newsham
that the Park Police "would not initiate arrests" and that the

18

Park Police were only enlisted to "provide backup." *Barham*, 434
F.3d 569.  As the Circuit Court was not faced with the question
of whether or not the Park Police participated in the arrest,
reliance on these characterizations are unpersuasive.

Just looking at the testimony of Major Murphy alone raises
disputed questions of fact as to the intent of the Park Police in
Pershing Park on September 27, 2002.  Murphy testified that the
Park Police were "[n]ot maintaining the arrest of . . .
individuals" and were "basically securing a perimeter while
arrests were being made by other individuals."  Murphy Dep.
243:1-8.  Yet, he also testified that he gave orders through
various radio transmissions to other Park Police officers to help
encircle the individuals within the Park.  *See* Murphy Dep. 181:6-
10 ("We're going to enclose the demonstrators up here in Pershing
Park with Metropolitan Police."); *Id.* 193:9-12 ("We're going to
keep the crowd inside Pershing Park.  We're not going to allow
them to come through the police line.  We're working with
Metropolitan on this."); *Id.* 321:12-18 (admitting that Park
Police, MPD and other law enforcement "contained" individuals
within Pershing Park).  These radio transmissions raise some
dispute as to the nature of the Park Police's actions and their
intent in being at Pershing Park.

The fact that the Park Police may have initially had an
independent ground for stationing officers at or near Pershing

19

Park other than the mass arrest -- namely, to ensure the security

of the White House complex -- does not free the Park Police from

liability for their participation in the arrest.  Although the

federal defendants argue that the Park Police acted only to

prevent demonstrators from moving westward into the White House

complex, the facts in evidence create some dispute as to this

contention.  Park Police and FCSD officers lined portions of both

the north and south side of the Park even though the White House

was to the west.  Moreover, Major Murphy's radio transmissions

directed his officers to encircle individuals within the Park

alongside the MPD and the radio transmissions do not direct

officers only to prevent individuals from moving in the direction

of the White House.  Given the evidence presented thus far in the

case, the Court cannot say that there is no dispute as to the

intent of Murphy and his fellow Park Police officers in

participating in the encirclement of individuals within Pershing

Park.

The mere fact that the Park Police responded to a request

from a high-level MPD official to help enclose the people in

Pershing Park rather than independently deciding to take such

action does not shield the Park Police from liability for claims

of illegal arrest without probable cause.  In some circumstances,

all of which are distinguishable from this case, officers can

rely on another officer's (or magistrate judge's) probable cause

determination as a basis for an arrest even if the arresting officer was not present when probable cause was established.  *See Whiteley v. Warden*, 401 U.S. 560, 568 (1971) (finding that officers who assist another officer in executing a warrant "are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause"); *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) (finding that an arresting officer in a large police department "might not be aware of all the underlying facts that provided probable cause or reasonable suspicion, but may nonetheless act reasonably in relying on information received by other law enforcement officials"). Probable cause for arrest does not necessarily have to develop in front of the officer who makes the arrest.  For example, in *Wahab v. City of New York*, 386 F. Supp. 2d 277, 287 (S.D.N.Y. 2005), the court found that police had probable cause to arrest an individual involved in an altercation in a mall based on a report from a mall security guard that a crime had been committed and a brief description of the altercation.  The court held that probable cause is established "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Id*. at 286 (citations and internal quotation marks omitted).

In this case, the federal defendants argue that the Park Police could rely on the MPD's claim of probable cause because AC Newsham told Murphy that individuals were being arrested for disobeying a police order prior to their arrival at Pershing Park.  A person of reasonable caution faced with what Major Murphy witnessed himself at Pershing Park would not believe there was probable cause to arrest every single person in the Park. The reasonableness of an officer's actions is determined based on, among other things, the "information that the officer possesses or to which he has reasonable access." *Berg v. County of Allegheny*, 219 F.3d 261, 273 (3d Cir. 2000).  Although an officer may rely on information obtained from fellow officers, "this in no way negates a police officer's duty to reasonably inquire or investigate these reported facts." *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1293 n.16 (9th Cir. 1999).

When Murphy arrived at Pershing Park around 9:20 a.m. on the morning of September 27, 2002, he was immediately asked for assistance in holding people in the Park.  He deployed Park Police personnel, along with FCSD officers contracted to work with the Park Police, to the north and south sides of the Park without inquiring about the basis for such enclosure.  Only after the Park Police, FCSD and MPD began forming a police line to keep the crowd in the Park did Assistant Chief Newsham ask Murphy if

the persons inside the Park could be arrested for demonstrating without a permit.  Upon being told that the Park Police do not arrest people for demonstrating without a permit without first giving an order to disperse, Newsham then informed Murphy that anyone who got through the police line could be arrested for parading without a permit.  Only after exploring these two possible bases for arrest did Newsham tell Murphy that individuals within the Park would be arrested for failing to obey police orders purportedly given to them before they entered the Park.

Although failure to obey a police order is a valid basis for arrest, *see* D.C. Code § 50-2302.02(19), Murphy admits that he had no knowledge of what order each individual failed to obey, when and where such order was given, or whether each and every person subject to arrest had, in fact, violated a specific order. Murphy Dep. 232:3-22.  Murphy also admits that he undertook no independent assessment to determine whether probable cause existed to arrest each individual that happened to be in the Park at the time the law enforcement officers encircled them.  *Id*. 233:1-6.  Moreover, when Murphy arrived at the Park, individuals were freely coming and going from the Park.  Under these circumstances, Murphy cannot point to undisputed facts that suggest that the Park Police had a basis for believing that Pershing Park contained only individuals for whom there was

23

probable cause to make an arrest.  *See Maryland v. Pringle*, 540 U.S. 366, 372-73 (2003) (recounting holding in *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), that a "person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause" as to that person and that "seizure of a person must be supported by probable cause particularized with respect to that person"); *cf. Barham*, 434 F.3d at 577 (finding a genuine issue of fact preventing summary judgment based on whether Chief Ramsey "knew there was no basis for believing Pershing Park contained only individuals for whom there was probable cause to make an arrest").  Accordingly, the federal defendants are not entitled to summary judgment based on an argument that the Park Police were relying on a probable cause determination already made by Newsham.

### D.   Major Murphy's Immunity Claim for Pershing Park Arrests in  Barham (02-2283) and Chang (02-2010) Cases

Murphy, who has been sued in his individual capacity, claims that he is entitled to qualified immunity.  "Qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Int'l Action Ctr. v. United States*, 365 F.3d 20, 24 (D.C. Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982)).  In *Barham*, when rejecting qualified immunity

for Newsham, the D.C. Circuit reaffirmed the Supreme Court's two-

part inquiry in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), for

determining whether a government official is protected by

qualified immunity.  *See Barham*, 434 F.3d at 572.  First, the

Court must address a "threshold question:  Taken in the light

most favorable to the party asserting the injury, do the facts

alleged show the officer's conduct violated a constitutional

right?"  *Saucier*, 533 U.S. at 201.  Second, and only if the first

question is answered in the affirmative, the Court asks "whether

the right was clearly established."  *Id*.  In evaluating the

second prong of the inquiry, the "contours of the right must be

sufficiently clear that a reasonable official would understand

that what he is doing violates that right."  *Anderson v.*

*Creighton*, 483 U.S. 635, 640 (1987).  The relevant inquiry in

determining whether a right is clearly established is "whether it

would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted."  *Saucier*, 533 U.S. at

202.

As to Newsham, the D.C. Circuit held that the threshold

question of whether the officer's conduct violated a

constitutional right must be answered in the affirmative.

*Barham*, 434 F.3d at 572-73.  The Circuit also held that the "mass

arrest at Pershing Park violated the clearly established rights

25

of plaintiffs by detaining them without probable cause." *Barham*,
434 F.3d at 573.  The Circuit rejected Newsham's argument that
there was probable cause for the arrests based on the failure of
plaintiffs to obey a police order.  *Id.* at 574.  The Circuit held
that Newsham had presented "no facts capable of supporting the
proposition that Newsham had reasonable, particularized grounds
to believe every one of the 386 people arrested was observed
committing a crime."  *Id*.  The Circuit also points to the
fluidity of movement in and around the park preceding the arrests
as a further basis for discrediting any attempt to argue probable
cause.  *Id*.

With the Circuit having already decided that qualified
immunity was not warranted for Newsham's conduct, this Court must
determine whether Murphy's role in the arrests on September 27,
2002 differs in any significant way that suggests that he should
receive qualified immunity when Newsham did not.  The Court finds
no relevant distinction in Murphy's conduct that calls for such
immunity.  When Murphy arrived at the Park, he saw people coming
and going from the Park.  Murphy undertook no independent
assessment to determine whether probable cause was warranted
prior to ordering his officers to help encircle the approximately
400 individuals in the Park.  Murphy knew that no order to
disperse had been given.  Murphy also saw no violent activity by
individuals within the Park.  Murphy was told by Newsham that

individuals in the Park were being arrested for failure to obey a
police order but he did not know which order, who disobeyed or
when or where this disobedience occurred.  Based on Murphy's own
observations preceding and during the mass arrest of the
individuals in the Park, it was objectively unreasonable for him
to participate in the mass arrest solely relying on Newsham's
representations that all of the individuals in the Park were
being arrested for failure to obey a police order.  It was not
reasonable for Murphy to believe that there was particularized
probable cause to arrest every individual in the Park or that he
did not have a duty to reasonably inquire or investigate what was
told to him by Newsham.  *See Mendocino Envt'l Ctr.*, 192 F.3d at
1293 n.16 (noting that the 9th Circuit has denied qualified
immunity "to police officers who indisputably relied on
information obtained from other law enforcement officials, when
[the court] concluded that they violated their duty to conduct
further investigation").  Murphy cannot participate in a mass
arrest not supported by probable cause and then shift all
responsibility to Newsham, whom he did not question despite his
own observations.  Accordingly, the Court denies qualified
immunity to Murphy.

**E.   Section 1983 Claim Against Murphy in Barham Case
       (02-2283)**

Plaintiffs seek compensatory and punitive damages from
Murphy pursuant to *Bivens* or, in the alternative, pursuant to 42

U.S.C. § 1983.  Defendants argue that plaintiffs' alternative
claim against Murphy under 42 U.S.C. § 1983 must be dismissed
because there is no evidence that Murphy was acting under color
of state law at the time of the events alleged in plaintiffs'
Third Amended Complaint.  The Court disagrees.

To sustain a Section 1983 claim, a plaintiff must show that
the defendant was acting "under color of" state law.  42 U.S.C.
§ 1983; *see also Williams v. United States*, 396 F.3d 412, 414-415
(D.C. Cir. 2005).  Circuit courts that have looked at whether
defendants have acted under color of state law have "focused on
whether these defendants are state officials or have conspired
with state officials in committing the alleged illegal acts."
*Williams*, 396 F.3d at 414.  A joint conspiracy between federal
and state officials can form the basis of a Section 1983 action
when the state or its officials play a significant role in the
violation at issue.  See *Kletschka v. Driver*, 411 F.2d 436, 448-
49 (2d Cir. 1969).

In this case, there is evidence that state and federal
officials acted in concert to seize the individuals within
Pershing Park without probable cause.  State officials certainly
played a significant role in the alleged violation of
constitutional rights as has already been determined by the D.C.
Circuit in *Barham*, 434 F.3d 565.  Murphy himself asserts that his
actions in ordering officers to form part of the line encircling

individuals within the Park were at the encouragement and request of D.C. officials.  As such, the Court denies summary judgment to defendants on plaintiffs' Section 1983 claim against Murphy.

**F.  Equitable Relief Against the FBI in the Barham Case (02-2283)**

In their Third Amended Complaint, plaintiffs allege that the FBI used the mass arrests in Pershing Park as a mass intelligence gathering operation.  Third Am. Compl. at ¶ 2.  Plaintiffs further allege that federal agents worked in concert with the MPD to collect photographs, fingerprints, and other information about political activists.  *Id.* at ¶¶ 11, 152.  As a result, plaintiffs seek equitable relief that would expunge all arrest records and derivative records, including intelligence records, that were derived from the September 27, 2002 arrests.  Plaintiffs seek to prevent reputational and other harms as a result of these records.  Plaintiffs also note that there has been little deposition discovery on this issue because of the general stay on discovery that was in place.

The FBI counters that plaintiffs' claim against the FBI fails because the FBI only performed the task of processing fingerprints in the ordinary course of business and did not engage in any violations of plaintiffs' rights.  At this stage, without full discovery on this issue, the Court finds that defendants' motion is premature.  As the FBI has control of the records plaintiffs wish to have expunged, the FBI is a proper

party in this case, at least for the time being.  Accordingly,

the Court denies the federal defendants' motion to the extent

that it seeks to dismiss the FBI from the case.  This denial is

without prejudice to reconsideration at the close of discovery.

### G. Remaining Claims Against Federal Defendants in the Chang Case (02-2010)

The federal defendants in the Chang case also move for

dismissal of or judgment on plaintiffs' claims of conspiracy

under 42 U.S.C. §§ 1985 and 1986, and claims involving violations

of Due Process, the right to counsel, and *Miranda* rights.  The

Court finds that it is premature to address the conspiracy and

Due Process claims until after the close of discovery.  The right

to counsel and *Miranda* claims, however, fail to state a claim

upon which relief can be granted and are therefore dismissed.[5]

Plaintiffs claim that defendants violated their rights by

failing to inform plaintiffs of their *Miranda* rights prior to

their arrest.  No cause of action exists, however, for the

failure to provide *Miranda* warnings prior to an arrest.  Instead,

*Miranda* merely provides for the exclusion from trial of

statements made by a criminal defendant during a custodial

interrogation if those statements were obtained in the absence of

_____

[5] The Chang plaintiffs admit in their opposition brief that the federal defendants "have a strong objection to these counts and, indeed, [p]laintiffs are considering a voluntary waiver of these claims as to them."  Chang Pls.' Opp'n to Fed. Defs.' Renewed Mot. to Dismiss, or, in the Alternative, for Summ. J. at 41.

procedural safeguards designed to protect the defendant's Fifth Amendment privilege against self-incrimination.  *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  The right to receive *Miranda* warnings is not a constitutional right in and of itself.  *See Chavez v. Martinez*, 538 U.S. 760, 772 (2003) (finding that "Chavez's failure to read *Miranda* warnings to Martinez did not violate Martinez's constitutional rights and cannot be grounds for a § 1983 action").

Plaintiffs' claimed violation of the right to counsel also fails.  The right to counsel "attaches only at or after the time adversary judicial proceedings have been initiated against a person."  *Kirby v. Illinois*, 406 U.S. 682, 688 (1972).  In this case, there is no dispute that no adverse judicial proceedings were ever brought against any of the plaintiffs.  Accordingly, the Court grants the federal defendants' motion in the Chang case to the extent it seeks dismissal of the right to counsel and *Miranda* claims.

### H.   FCSD's Motion in the Chang Case (02-2010)

In its motion to dismiss, motion for summary judgment, or, in the alternative, motion for a more definitive statement, the FCSD incorporates by reference the motions filed by the federal defendants in the Chang case.  The Court has already ruled on these motions as indicated above and accordingly addresses only FCSD's argument under the borrowed servant doctrine in this

section.  For the reasons stated below, the Court denies FCSD's motion as to the borrowed servant doctrine.[6]

### 1.   Borrowed servant doctrine

Under the law of agency, "a person who is generally the servant of one master[] can become the 'borrowed' servant of another."  *Dellums v. Powell*, 566 F.2d 216, 220 (D.C. Cir. 1977). If the "borrowed servant commits a tort while carrying out the bidding of the borrower, vicarious liability for that tort attaches to the borrower and not the general master."  *Id*. However, "[a] person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve the abandonment of service to the other." Restatement (Second) of Agency § 226.[7]  Whether one party is the "sole master to whom liability can attach . . . is usually a question of fact, generally to be decided by the jury."  *Dellums*, 566 F.2d at 220; *see also* Restatement (Third) of Agency § 7.03

---

[6] Because the Court has considered the extrinsic evidence submitted by the parties in support of their briefs, the Court treats this motion as one for summary judgment.  Plaintiffs were on notice that FCSD's motion was at least potentially one for summary judgment and they submitted their own evidence in support of their opposition.  *See Colbert v. Potter*, 471 F.3d 158, 168 (D.C. Cir. 2006).

[7] Although the Restatement (Second) of Agency has been superceded by the Restatement (Third) of Agency, the latter still recognizes the borrowed servant doctrine and the possibility that both the general employer and the borrowed (or special) employer can be liable for the same act.  *See* Restatement (Third) of Agency § 7.03 cmt. d.

cmt. d(2) ("It is a question of fact whether a general or a special employer, or both, have the right to control an employee's conduct.").

In this case, the facts are in dispute as to whether the Park Police, FCSD, or both, were in control of FCSD officers at Pershing Park on September 27, 2002. Although the Interagency Agreement entered into between the Park Police and FCSD provides that "[r]esponsibility for overall law enforcement events will remain with the Chief" of the Park Police, Interagency Agreement at 1, it also provides that "[t]he Officer-in-charge of the Fairfax County Sheriff's Office personnel will have an *integral part of any decision making process* that could have an effect on its officers . . . ." Interagency Agreement ¶ 2 (emphasis added). Under the terms of the Interagency Agreement, FCSD did not give up all direction and control over its officers to the Park Police.

The testimony of the officers on the scene at Pershing Park on the morning of September 27, 2002 also raises a factual dispute as to whether the Park Police were in sole or shared control of the FCSD officers. Major Murphy testified in his deposition that the "Fairfax County Sheriff's Office was under the control and direction of the Park Police during the demonstrations," Murphy Dep. 514:2-5, and that Murphy could "essentially order the Fairfax County Sheriff's Office to deploy

33

in particular ways," *id*. 514:8-11.  Murphy also testified,
however, that Park Police Lieutenant Nieder, not Murphy, was the
one coordinating with the FCSD officers on September 27, *id*.
521:12-19, that the FCSD officers had their own command
structure, *id*. 523:21-524:4, and that FCSD officers remained
together in a cohesive unit, *id*. 524:8-12.  Moreover, Basillo
Cachuela -- ranking commander of the FCSD on September 27 --
testified that he told his guys "no one in, no one out" after
hearing such a command from a D.C. police lieutenant and getting
just a nod from the Park Police lieutenant, Cachuela Dep. 53:14-
20, suggesting that Cachuela was still in command of and gave
orders to his own officers, even if that command and control was
shared with the Park Police.

The Court finds that there are genuine issues of material
fact as to who was in control of the FCSD officers and whether
such control was shared or joint.  Accordingly, the Court denies
summary judgment to FCSD based on the borrowed servant doctrine.[8]

---

[8] Based on FCSD's claim that it was just a borrowed servant
of the Park Police and that its officers were deputized by the
U.S. Marshal's Service, FCSD claims that it is entitled to
dismissal of plaintiffs' case based on sovereign immunity and the
protections of the Federal Tort Claims Act.  Because the facts
underlying the applicability of the borrowed servant doctrine are
in dispute, the Court declines to extend sovereign immunity or
FTCA protection to the FCSD at this time.

### 2.   Proximate cause and standing

FCSD argues that plaintiffs cannot establish a proximate cause between the actions of inactions of FCSD officers and plaintiffs' injuries and that plaintiffs do not have standing to bring any claims for injunctive relief against FCSD.   To the same extent that the Park Police were involved in plaintiffs' arrest and/or seizure, FCSD was also involved.   Accordingly, the Court rejects FCSD's arguments that plaintiffs do not have standing and/or cannot show a proximate cause between their alleged injuries and FCSD's conduct.

### 3.   More definitive statement

Pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, FCSD argues that plaintiffs should be required to provide a more definitive statement as to which allegations in the Third Amended Complaint apply to which defendants.   Rule 12(e) provides that motions for a more definitive statement are appropriate only where a pleading is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."   Fed. R. Civ. P. 12(e).   In general, motions for a more definitive statement are "looked upon with disfavor and are rarely granted in light of the notice-pleading framework of the federal rules."   *Towers Tenant Ass'n v. Towers Ltd. P'ship*, 563 F. Supp. 566, 569 (D.D.C. 1983).   "[M]ere lack of detail" is not

a sufficient basis for granting a motion for a more definitive
statement.  *Id*. at 569.

The complaint in this case is more than sufficient to meet
the requirements of Rule 8(a) of the Federal Rules of Civil
Procedure.  All defendants are on notice as to the factual
allegations underlying plaintiffs' claims for relief.
Accordingly, the Court denies FCSD's motion to the extent it
seeks a more definitive statement from plaintiffs.

**IV.  CONCLUSION**

For the foregoing reasons, the Court **DENIES** the federal
defendants' motion in the Barham case (Civ. Action No. 02-2283),
**GRANTS IN PART AND DENIES IN PART** the federal defendants' motion
in the Chang case (Civ. Action No. 02-2010), and **DENIES** Fairfax
County's motion in the Chang case (Civ. Action No. 02-2010).  An
appropriate Order accompanies this Memorandum Opinion.


**Signed:     Emmet G. Sullivan**
             **United States District Judge**
             **July 10, 2007**