## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
RAYMING CHANG et al.,                   )
                                        )
                Plaintiffs,             )
                                        )
vs.                                     )        Civil Action No. 1:02cv2010 (EGS/JMF)
                                        )
UNITED STATES OF AMERICA                )
et al.,                                 )
                                        )
                Defendants.             )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE *CHANG* PLAINTIFFS' MOTION FOR LEAVE TO FILE A FOURTH AMENDED COMPLAINT

Although the *Chang* case has been litigated for more than seven years, it has now become apparent that certain Defendants – the District of Columbia, the Mayor (in his official capacity), the Chief of Police (in her official capacity), former Chief Ramsey (in his personal capacity), Assistant Chief Newsham (in his official, individual, and personal capacity), and Assistant Chief Michael Fitzgerald (in his official, individual, and personal capacity) (collectively "District Defendants") – are responsible for severe and widespread discovery abuse. This abuse includes, but is not limited to, the destruction of key evidence, tampering with other evidence, and withholding tens of thousands of pages of discoverable documents for years. By this Motion, *Chang* Plaintiffs propose to amend their complaint to add a claim for the tort of spoliation and to add allegations of spoliation and evidentiary abuses to both the already existing due process and conspiracy counts.[1] These proposed amendments are obvious and represent a well-founded

---

[1] The proposed Fourth Amended Complaint is attached as Ex. 1. A red-lined version of the Complaint, as compared to the Third-Amended Complaint is attached as Ex. 2.

response to the flagrant efforts by the District Defendants to obstruct both Plaintiffs' rights to recovery and the civil processes of this Court.

While these discovery violations have arisen at every stage of this litigation, starting with the District Defendants' failure to preserve documents immediately after the arrests or even after the commencement of this litigation a month later, some of the most serious transgressions came to light only recently.  These included the recent revelation that the Office of General Counsel for the Metropolitan Police Department ("MPD") hid boxes of relevant documents in their offices for the last five years without producing them in the litigation.  Just over a week ago, at the sole request of Attorney General Nickles, Judge Stanley Sporkin released his report making clear that two areas of abuse – the loss of up to 13 hard copies and at least two digital versions of the so-called Joint Operations Command Center ("JOCC") Running Resume and the tampering with audio tapes of radio runs – were presumptively intentional acts of destruction.[2]  Even before all of these revelations had come to light, this Court presciently noted that the case had taken "on a new identity and it sounds more and more like the civil counterpart of Ted Stevens."  (Tr. of July 29, 2009 hearing at 6.)  While the Court indicated that it would wait to review the Sporkin report, it has stated that it was considering a referral of these matters to the U.S. Attorney's Office for criminal investigation.  As it now turns out, the information available then understated the full extent of the District Defendants' discovery abuses.

*Chang* Plaintiffs have sought, and continue to seek, appropriately severe sanctions against the District Defendants for this discovery abuse.  (*See* Dkt. No. 505)  The Court itself has repeatedly told the District that it can expect harsh sanctions to be issued against it.  (*See* Tr. of

---

[2] Judge Sporkin stated in his report, "We have no way of knowing whether [the discovery abuse analyzed was an] act of intentional mischief or reflects a benign action.  We do not believe it was the later [sic.]." (Dkt. No. 567 at 15.)  Judge Sporkin also commented that he found it "difficult to understand how something like this could occur innocently."  (*Id*. at 16.)

July 29, 2009 hearing at 8, 14-18, 20; *see also* Tr. of November 29, 2009 hearing at 14-16; Tr. of November 17, 2009 hearing at 20-21, 26-27.)

Even if granted, however, such sanctions may not be sufficient to put the *Chang* Plaintiffs back to where they should have been had key documents not been destroyed or tampered with but, instead, had been produced in a timely and orderly fashion upon request. The lost documents cannot be replaced, and, even with the aid of late-produced documents, witnesses' memories have faded after seven years. The District Defendants should not be permitted to benefit from what now is clearly established to have been a deliberate effort to frustrate this litigation, shield the District and its top officers from liability, and force Plaintiffs into a premature and inadequate settlement.[3] Moreover, the separate count for spoliation requires a full and independent accounting of the District Defendants' actions. In short, the *Chang* Plaintiffs allege that "the cover-up has (also) become the crime."

This lawsuit has always been about the illegal arrests at Pershing Park and the unlawful detention thereafter. There is a close nexus, however, between those illegal arrests and the abusive discovery measures taken later to destroy or withhold evidence related to those arrests. For example, some of the material withheld implicates former Chief of Police Charles Ramsey in giving the order to arrest those within Pershing Park. (This evidence is supported by the affidavit of a new witness – whom the District attempted to bar from being deposed – confirming that it was Ramsey who called for the mass arrest.) The destroyed evidence could have answered such questions directly as they were contemporary records of orders and observations made at the time of the arrests. Similarly, the discovery abuses demonstrate a clear desire by the

---

[3] Plaintiffs propose this amendment with the clear understanding that this case is likely to go to trial. Despite comments to the Court and in the press, Attorney General Nickles has only contacted *Chang* counsel days before the December 17, 2009 status hearing for a first meeting regarding settlement. That first meeting took place today on December 15, 2009, two days before the hearing.

District Defendants to frustrate efforts to establish what actually happened in connection with the arrests.  For example, Assistant Chief Peter Newsham authored at least one late-produced email in the aftermath of the September 27, 2002 arrests, which stated "I am very reluctant to share our tactics and strategies with defense attorneys."  (*See* DC 18515, attached as Ex. 3.)  Moreover, the District's (and the Attorney General's) purported efforts to identify and punish the wrong-doers throughout these episodes ring hollow.  Just as the District blamed officials who were later promoted for the false arrests, the Attorney General recently rewarded the attorney whom the District claimed was responsible for the discovery abuses.[4]  Thus, the officials assigned guilt for the mass arrests and the mass evidentiary abuses have been rewarded – supporting the view that their actions were not just condoned but encouraged.

Other than being required to finally recognize their malfeasance and compensate *Chang* Plaintiffs for the damages they have caused, these amendments will cause no prejudice to the District Defendants.  The factual issues raised by the proposed amendment are those already being explored during the resumed discovery period.  *Chang* Plaintiffs require no additional discovery and do not ask for an extension of the scheduled trial date.  Plaintiffs merely ask that they be allowed the opportunity to recover at trial for the District Defendants' discovery abuse, including the destruction and alteration of evidence, to the extent those actions hampered *Chang* Plaintiffs' proof of the true facts regarding the Pershing Park arrests.

---

[4]      The District has always assigned Assistant Chief Peter Newsham with primary responsibility for the mass arrests.  Newsham's only discipline for his involvement was a letter (PD 750) reprimanding him for failing to follow the guidelines in the mass demonstration handbook which was probably removed from his file after three years.  (*See* Tr. of Ramsey Dep. at 126-129, attached as Ex. 4.)  Likewise, Office of Attorney General attorney Thomas Koger was singled out by Attorney General Nickles as the individual primarily responsible for the discovery abuses in this case.  (*See* Dkt. 490-2 ¶ 14.)  Yet, Attorney General Nickels awarded Mr. Koger a bonus at about the same time he was replaced as lead counsel, despite the fact that the City Council specifically forbade bonus payments for fiscal year 2010 because of the City's financial difficulties.  (*See* Bill Myers, *Despite Ban, Fenty Bonuses Keep Rolling,* WASH. EXAMINER, Dec. 14, 2009.)

A.      **Factual Background**

The *Chang* Plaintiffs are four former George Washington University students who were at Pershing Park in downtown Washington, D.C., on September 27, 2002, either as legal observers or as journalists for their independent school newspaper, *The Hatchet*.[5]   They were among approximately 400 other individuals who were corralled and trapped within Pershing Park, held for over 24 hours on buses and inside processing sites – right wrist flexi-cuffed to left-ankle – before ultimately being released on Saturday, September 28, 2002.  *Chang* Plaintiffs filed suit against the District of Columbia and others on October 15, 2002, alleging various constitutional violations.  (*See* Dkt. No. 1.)[6]   Despite being on clear notice of the litigation, the District and responsible MPD officials failed to issue a litigation hold to preserve potentially responsive documents and materials or to take any other measures to safeguard or preserve their own documents or materials, or to ensure the potentially responsive documents and materials of others under their commands were preserved.  The District Defendants had a clear, independent responsibility to preserve at least their own documents and documents in the possession of those under their commands, regardless of the failure of the District's counsel to issue a litigation

---

[5]   There were another three original Plaintiffs in the case.  During the period when the District was withholding and destroying evidence, however, the Defendants threatened all of these students with ruinous financial penalties under Rule 68.  The current *Chang* Plaintiffs have remained in the litigation, despite the distorted record presented at the time of the Rule 68 offers and the threat of heavy financial penalties *even if they prevailed against the District*.  Three plaintiffs have previously agreed to withdraw from the litigation and are no longer represented by *Chang* counsel.

[6]   As revealed by both news articles and internal actions within the District, it was well-understood within hours of the arrests, and certainly by early October 2002, that litigation was likely to result and would include challenges both to the individual arrests and to the procedures employed during the arrests.  Likely constitutional challenges to such trap-and-arrest practices were discussed in the media, both before and after they occurred.  *See, e.g.*, Manny Fernandez & David A. Fahrenthold, *All Sides Brace for World Bank Protests; D.C. Police Warn Commuters to Avoid Driving Tomorrow*, WASH. POST, Sept. 26, 2002, at B1 (discussing complaints over "unconstitutional police practices" in handling large demonstrations).

hold.[7]  *See Disability Rights Council v. WMATA*, 242 F.R.D. 139, 146 (D.D.C. 2007) (finding

that the failure to issue such a litigation hold "is indefensible").

The destruction of evidence appears to have started almost immediately.  With no

preservation orders in place, documents began being destroyed in accordance with the normal

retention policies of the MPD, including emails concerning the events sent or received by the

individual District Defendants.  (*See* Tr. of Thorpe Dep, at 47:16-48:16; 49:22-50:08; 84:12-15,

attached as Ex. 10.)

### 1.  The JOCC Running Resume

Even more directly, soon after the arrests and the initiation of this litigation, MPD

employees and individuals within the MPD Office of General Counsel began making unusual

requests for access to key evidence, particularly the stored version of the JOCC Running

Resume, which ultimately led to the destruction or alteration of such materials.  MPD Sergeant

Douglas Jones testified in his deposition, and has told Judge Sporkin, that his superior, Neil

---

[7] It appears that the District still has not issued a litigation hold letter in this litigation.  Former Chief Ramsey does "not recall issuing any litigation holds or notices to preserve documents from the Office of Chief of Police in this case."  (Ramsey Responses to Interrogatories, attached as Ex. 5.)  Ramsey states that he cannot "recall any specific measures that were undertaken to preserve or retain documents."  (*Id*. at 4.)  Ramsey gave no "orders, commands, or other instructions to retain, preserve, or safeguard relevant evidence."  (*See* Hunter (30(b)(6)) Tr. at 41-47, attached as Ex. 6; Crane (30(b)(6)) Tr. at 110:2-22, attached as Ex. 7.)  Similarly, Assistant Chief Newsham, who despite claiming he ordered the arrests and being a trained and licensed attorney, claims "[i]t was not my responsibility to preserve, protect, safeguard or retain documents that were in the District of Columbia's or Metropolitan Police Department's possession that were related to the September 27, 2002 Pershing Park arrests."  (Newsham Responses to Interrogatories at 5, attached as Ex. 8.).  Newsham gave no "instructions with respect to the retention, preservation, or destruction of documents."  (*Id*. at 6.)  Assistant Chief Fitzgerald, who was the second-highest ranking official in the MPD at the time of the arrests, denies taking any specific action or giving any orders related to the preservation of evidence.  (Fitzgerald Responses to Interrogatories, attached as Ex. 9.)  Defendants and line Officers DiGirolamo, Harrison, and Smith, all deposed over the past two weeks, report that they were never told by superiors to preserve relevant documents.  (The transcripts from these depositions have not yet been provided to *Chang* counsel by the Court reporter, but can be made available to the court upon receipt.)

6

Trugman, came to him in "October or November 2002" (the two months immediately after the arrests) with an "official" litigation-related request from the MPD Office of General Counsel, specifically seeking the data "path" to obtain access to the electronically stored version of the JOCC Running Resume and instructing Sergeant Jones not to e-mail the information to him.[8] (*See* Tr. of Jones Dep. at 28-30 & Dkt. No. 567 at 6, attached as Ex. 15.)  Sergeant Jones found this to be unusual because no one had asked previously for such information.  (Dkt. No. 567 at 6.)  Jones complied with the request, providing a hard copy of the JOCC Running Resume to Trugman along with instructions on how to access the document electronically, written on a piece of paper.  (*See* Tr. of Jones Dep. at 25-30, attached as Ex. 15.)  Jones also testified that additional hard copies of the Running Resume had been provided to other command MPD officials, an assertion supported by the reports of other individuals. (Tr. of Jones Dep. at 24-25, 47, attached as Ex. 15; *see also* Dkt. No. 567 at 12 (recounting MPD employee George Crawford stating that "[i]t was standard practice to produce hard copies for [his supervisor] (at least 15 copies)").)

---

[8] As stated in *Bolger v. District of Columbia*, 248 F.R.D. 339 (D.D.C. 2008), "[t]here is no reasonable question that the running resume [relating to the arrests in that case] was likely to contain highly relevant evidence . . . ." *Id.* at 346.  District deponents have stated that "[e]ssentially [the JOCC Running Resume] is the - - is a compilation of everything that occurred during the day; movement of people, movement of officers, decisions made by commanders, things that were decided at certain times on how to handle certain situations.  It is a log of the events of the day." (*See* Herold Tr. at 176:01-06, attached as Ex. 11.)  MPD Captain Herold stated that "all significant information" would have been placed into the JOCC Running Resume. (*Id.* at 177:04-09.)  Chief Ramsey stated unequivocally that "arrest orders or mass arrest orders [would] be recorded in the [JOCC] Running Resume" and that although he was not sure what was in this specific JOCC Running Resume, "it's possible" that it would have included a notation of the time he arrived at the Park.  (Sept. 19, 2007 Ramsey Tr. at 465:17-20; Sept. 18, 2007 Ramsey Tr. at 258:02-09, attached as Ex. 12.)  MPD Assistant Chief Broadbent stated that the JOCC Running Resume "would basically keep track of [] personnel" and "keep track of different activities" including the time that "prisoner processing buses" would have been called. (Broadbent Tr. at 40:20-41:10; 192:13-21, attached as Ex. 13.)  The Joint Operations Command Center Activation Procedures explicitly state that the JOCC is supposed to "document decisions . . . in [the] running resume."  (Ex. 14.)

Subsequently, Mr. Crawford, an IT specialist for the MPD, was ordered to discard boxes containing potentially relevant materials and possibly including copies of the JOCC Running Resume.  Mr. Crawford reports that he "shredded the papers and hit the tapes with magnets as instructed."  (Dkt. No. 567 at 12.)

In the end, the electronic versions of the JOCC Running Resume, and the various hard copies of the document, were destroyed.  Judge Sporkin concluded that it "is difficult to understand how something like this could occur innocently."  (Dkt. No. 567 at 16.)  To date, the District Defendants have not provided an explanation for the destruction of this crucial evidence.

## 2.  The Radio Runs

Much of what would have appeared in the JOCC Running Resume would have also been reflected in the audio tapes that contained radio runs and MPD communications from September 27, 2002 (the "radio runs").  Shortly after the arrests, in October 2002, MPD Deputy General Counsel Ronald Harris "contacted then-Captain James Crane, who was in charge of the department's communications unit, and requested that he provide [Harris] with copies of radio communications related to the IMF/WB demonstrations that occurred on September 27, 2002." (Harris Decl., Dkt. No. 490-4 in *Chang*, ¶ 3.)  Harris stated that he "realized the radio communications would be important to retain after hearing witnesses testify at a District of Columbia Council Judiciary Committee hearing about police misconduct."  (*Id.*)  Plaintiffs subsequently requested copies of all radio runs from the District.  (*See* Plaintiffs' First Set of Joint Requests for Production of Documents From Defendant District of Columbia, served in January 2004, attached as Ex. 16.)  In response, the District produced a handful of tapes – but not the full set.[9]  Amazingly, District lead counsel at the time, Thomas Koger, and MPD Deputy

---

[9] In an affidavit filed with the Court, the District states that there were at least eighteen audio tapes containing Radio Runs from September 27, 2002.  (*See* Alexander Declaration, attached as

General Counsel Harris, have each stated that they did not review the radio runs prior to their production.  (*See* Dkt. No. 567 at 13-14.)

The radio runs that were produced, on the District's own admission, contained numerous suspicious gaps, such as:

- On the 2-d Channel, there is a 2 hour and 48 minute gap from 7:17 a.m. to 10:05 a.m.

- On the 1-d Channel, there is a 24 minute gap between 9:35 a.m. and 9:59 a.m.

- On the Tact 1 Channel, there is 23 minute gap between 9:41 a.m. to 10:04 a.m.

- On the Tact 2 Channel, there is a 53 minute gap between 9:19 a.m. and 10:12 a.m.

Critically, these gaps in the tapes coincide with the time periods of greatest import in establishing the intent and knowledge of the District and the individual Defendants leading up to the mass arrests.

In response to Plaintiffs counsels' questions regarding these deficiencies, the Court ordered District counsel to supplement their production of recorded police channel communications to account for any technical deficiencies, questions regarding authenticity, or unaccounted for periods of time in the produced audio tapes.  (*See* Dkt. No. 351 in *Barham*.)  In response to the Court order, the District filed the declaration of Denise Alexander, a Training Instructor for the District of Columbia Office of Unified Communication.  (*See* Ex. 17.)  Ms. Alexander stated that she and two other employees were tasked with reviewing the audio tapes, provided to them by MPD Deputy General Counsel Harris, to determine whether there was anything out of the ordinary concerning the recordings, including gaps in transmission, equipment, and unaccounted for periods of time.  Ms. Alexander declared, under oath, that "there

---

Ex. 17.)  District 30(b)(6) witnesses testified that the District did not know how many audio tapes were created capturing MPD activity on September 27, 2002, but that there would have been more than eighteen tapes.  (Crane (30(b)(6)) Tr. at 71:01-72:21, attached as Ex. 7.)  To date, the District has produced to the *Chang* Plaintiffs only four of those eighteen or more audio tapes.

is nothing unusual or deficient" about the transmissions or recordings, despite the apparent compression of two hours of events into one hour of recordings and her own acknowledgement in her notes of gaps in the recordings.  (Alexander Decl. ¶ 5, attached as Ex. 17.)  In fact, however, the District later admitted that it did "recognize there's an issue with the lack of recordings." (Crane (30(b)(6)) Tr. at 102:06-107:02, attached as Ex. 7.)  Despite this, to date, the District has not withdrawn the Alexander Declaration from the Court record.[10]

### 3.  Further Spoliation Revealed During Resumed Discovery

Because of the wide-ranging and blatant nature of these abuses, coupled with the significant impact the abuses had on the litigation, *Chang* Plaintiffs moved for sanctions against the District and the various District officials.  (*See* Dkt. Nos. 418 and 505.)  In September of this year, the Court permitted the resumption of discovery for a period of six months and, despite the District Defendants' strong objections, specifically provided that the Plaintiffs were allowed to inquire into the spoliation issues.  (*See* Minute Order dated September 29, 2009 and Tr. of November 17, 2009 hearing at 22-23.)  During this period of resumed discovery, a vast array of significant new discovery abuses have come to light.

- A District 30(b)(6) witness testified that Chief Ramsey's MPD-issued computer was never searched for relevant documents and was destroyed or wiped clean when he left the department.  (*See* Tr. of Thorpe Dep. at 80-81; 165-66, attached as Ex. 10.)

- In 2004, at the direction of the MPD Office of General Counsel, the District performed a nominal search of various electronic documents but utilized only eleven search terms and

---

[10]   During Judge Sporkin's investigation, he sought to speak with Ms. Alexander about her affidavit but was told she was unavailable because she was on personal leave.  The day after the Sporkin Report was issued, members of the press contacted Ms. Alexander at her desk in the Office of Unified Communication, confirming her availability and suggesting that Judge Sporkin had been given incorrect or false information regarding Alexander's availability.  *See* Jason Cherkis, *Pershing Park Case: Sporkin Report Reviewed In Detail*, WASH. CITY PAPER, Dec. 7, 2009.

used software that could only search the subjects of emails and the titles of documents, not the contents of such documents.  (*Id*. at 130-145, 189-190, 208-211.)

    o  Beyond the search terms and limited software capability, this search was further limited by the fact that the District had not preserved documents or issued any document holds, meaning that the normal deletion policies for electronic documents was still in effect and was actively deleting relevant documents on a daily basis.  (*Id*. at 49-50, 80-81, 84, 174-175, 217, 234.)

    o  Despite these inherent and obvious limitations, the search produced approximately six banker boxes worth of materials.  (Conversation with District counsel on October 26, 2009.)  However, despite their obvious relevance, these documents were not turned over to the Plaintiffs on a timely basis.  Instead, the boxes of materials were delivered to the MPD Office of General Counsel.  The boxes then sat there for five years, before Plaintiffs uncovered their existence through deposition testimony.[11]

- Since the close of discovery, the District has produced over 22,000 pages of relevant material, more than double the amount that was produced during the normal discovery period.  (*See* Ex. 18, listing and detailing the District Productions since November 14, 2007.)  These productions only came about after the Plaintiffs filed a motion for sanctions and the Court ordered the District to review how the various discovery abuses

---

[11] In fact, the District sought to cancel this deposition and prevent it from taking place, forcing the Plaintiffs to submit an emergency motion to the Court (Dkt. No. 522.), which was subsequently granted, ordering the deposition to go forward.  (*See* Minute Order dated October 22, 2009.)

occurred.[12]  Even these late productions are marred by gaps in documents, redactions that are not described or justified on privilege logs, and references to still other discoverable material that has yet to be produced.

- Further discovery abuse lies in the District's failure to produce all relevant video footage from September 27, 2002.  The District has produced only two unique videotapes that contain footage of the events on September 27, 2002 – both of which contain crucial gaps in the footage that correspond to the timing of the arrests at Pershing Park – even though four different MPD officers were assigned to take such video; the JOCC designated six cameras to record events; the MPD helicopter had the ability to take footage; and the District utilized various observation posts on that day.  Moreover, the District claims one individual filmed all of the footage that is contained on the two videotapes that have been produced – yet the footage contains two different sets of footage shot from different locations at the exact same times, according to time stamps on the videos.

**4.  The Explanation of this Spoliation Will Only Come in this Litigation (or Referral).**

*Chang* Plaintiffs have sought additional discovery and have attempted to depose persons responsible for the discovery abuses, including District attorneys.  In opposition, the District has filed a flurry of motions for protective orders, submitting five different motions in a two-week period before the Court hearing on November 17, 2009.  (*See* Dkt Nos. 530, 532, 534, 539, 557.) A number of these motions are pending before Magistrate Judge Facciola.

Despite his stated commitment to do so, Attorney General Nickles has failed to undertake a comprehensive investigation of these discovery abuses.  He appointed Judge Sporkin to serve as his advisor and counselor and asked Judge Sporkin to look only into two matters: the loss of

---

[12] As Judge Sullivan stated, many of these productions were "last minute production[s] on the eve of a hearing [or other Court imposed deadlines] to determine sanctions."  (Tr. of July 29, 2009 hearing at 11.)

the JOCC Running Resume and the apparently tampered-with radio runs.  Judge's Sporkin's investigation notably excluded other abuses, such as the video tapes and the withholding of over 22,000 pages of evidence for years during the litigation.   Judge Sporkin's investigation reaffirmed Plaintiffs' allegations but did not determine the cause of the spoliation or the identity of the persons directly responsible for it.  The City Council had threatened to perform its own investigation but has recently indicated that one was unlikely with City Council members publicly stating that they are relying on Plaintiffs' efforts to uncover the abuses.   (*See* Jason Cherkis, *Pershing Park Case: Council Hearings Unlikely*, WASH. CITY PAPER, Nov. 12, 2009.) (reporting that Judiciary Chair Phil Mendelson argued "the bulk of any investigation into the disappearing evidence is already coming from the plaintiffs attorneys.  Mendelson's just not sure what more he could discover from holding a public hearing on the case.")  Councilmember Mary Cheh has stated that "[t]his disappearance of documents appears to be an extraordinary cover-up."  (Ian Urbina, *Inquiry Raises More Questions in Case of Arrests After '02 Protest in Capital*, N.Y. TIMES, December 7, 2009.)   Councilwoman Cheh, as well as D.C. Police Union Chief Kristopher Baumann, have called for these abuses to be referred to criminal authorities.  (*See* Jason Cherkis, *Police Union Chief Calls For DOJ To Investigate Pershing Park*, WASH. CITY PAPER, Dec. 8, 2009, stating that Baumann believes the matter should be referred to the Department of Justice, as opposed to the U.S. Attorney's Office.)   *Chang* Plaintiffs support referral of these matters but not in a way that would compromise their claims or their ability to bring their complaint, as amended further, to trial.

It has become clear that these discovery abuses are not aberrations or simple missteps. Rather, they form a pattern that closely tracks the underlying constitutional violations that took place on September 27, 2002, to frustrate Plaintiffs' ability to obtain relief that will prevent, once and for all, mass trap-and-arrest practices in the District of Columbia ruled illegal by the D.C.

Circuit over thirty years ago.[13]  *See Dellums v. Powell*, 566 F.2d 167, 183 (D.C. Cir. 1977).  The discovery abuses are, on their own, deliberate acts taken by the District against the Plaintiffs to deprive them of their constitutional, statutory and common law rights to obtain reasonable damages and attorneys' fees stemming from this long line of abuses that continues through this litigation itself.

## B.      Legal Standard

Pursuant to Rule 15(a)(2) of Fed. R. Civ. P., "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see also Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  "The grant or denial of a motion for leave to amend is within the Court's discretion, but it is an abuse of discretion to deny leave to amend unless there is sufficient reason, such as 'undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies by previous amendments, undue prejudice to the opposing party, or futility of amendment.'"  *In re Vitamins Litig.*, 217 F.R.D. 30, 32 (D.D.C. 2003) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (granting leave to amend because the non-movant had not shown that it would be unfairly disadvantaged or suffer prejudice sufficient for denial).

## C.      Proposed Amendments

*Chang* Plaintiffs seek to amend the Third Amended Complaint in four ways.  First, they seek to add thirteen paragraphs containing new factual allegations, all relating to the spoliation of evidence.  These proposed paragraphs in the amended complaint summarize and re-state the

---

[13] In fact, other Judges in the District have faced the exact same issues.  *See Bolger v. District of Columbia*, 248 F.R.D. 339, 345 (D.D.C. 2008).  In that case, as in this one, the District repeatedly failed to comply with basic discovery obligations.  As a result, this Court found that the District had engaged in a "clear case of sanctionable discovery misconduct" and ordered the District to pay monetary sanctions.

factual description above.  The parties already have briefed much of this extensively in connection with the motions for sanctions.

Second, *Chang* Plaintiffs seek to add a new count (what would now be the Ninth Claim for Relief) to the Complaint, in the form of an alternative pleading, alleging that the District Defendants have committed the tort of spoliation.  This tort has been recognized by this Court and applies to the facts of this case.  *Chang* Plaintiffs only allege this count as to the following Defendants: the District of Columbia, Adrian M. Fenty in his official capacity as Mayor of the District of Columbia, Catherine Lanier in her official capacity as Chief of Police, Charles Ramsey in his personal capacity, Peter Newsham in his official, individual, and personal capacity, and Michael Fitzgerald in his official, individual, and personal capacity.[14]  *Chang* Plaintiffs have also added four additional paragraphs regarding the alleged injuries naturally occurring from these newly alleged violations.

Third, *Chang* Plaintiffs seek to add additional language to two existing counts (renumbered as the Third Claim for Relief and the Eighth Claim for Relief) based on the destruction of evidence and the overall pattern of discovery abuse in this case.  *Chang* Plaintiffs allege that the evidence adduced in this action regarding (1) the destruction of relevant materials, (2) tampered evidence, and (3) deliberate delays in the production of relevant evidence, are tied to the District Defendants' underlying constitutional and common law violations.  *Chang* Plaintiffs only seek for these additions to apply to the following Defendants: the District of Columbia, Adrian M. Fenty in his official capacity as Mayor of the District of Columbia,

---

[14] Although *Chang* Plaintiffs do not allege this count against Assistant Chief Jordan, this is not an indication that *Chang* Plaintiffs do not believe that the full set of previously requested sanctions should not apply to him.  *Chang* Plaintiffs do believe Assistant Chief Jordan had an obligation to protect and preserve evidence.  Further, his attorneys are the same attorneys for the District and Assistant Chief Fitzgerald.  Nonetheless, *Chang* Plaintiffs choose not to allege the tort against Jordan.

Catherine Lanier in her official capacity as Chief of Police, Charles Ramsey in his personal capacity, Peter Newsham in his official, individual, and personal capacity, and Michael Fitzgerald in his official, individual, and personal capacity.  The same four additional paragraphs that were discussed above regarding the injuries for the newly alleged spoliation claims apply to the additions made in the due process and conspiracy claims as well.

Fourth, *Chang* Plaintiffs seek to clarify and make clerical corrections to the Third Amended Complaint.  For example, since the filing of the Third Amended Complaint, three of the original "*Chang* Plaintiffs" (Amy Chastain, Elizabeth Young, and Meghan Enright) have settled with the District and the District Defendants.  Counsel for the remaining *Chang* Plaintiffs no longer represent these individuals.  In addition, the remaining *Chang* Plaintiffs have dropped what was the Fourth Claim for Relief (Failure to Provide *Miranda* Warnings) and the Fifth Claim for Relief (Right to Counsel) from the Third Amended Complaint.  The remaining counts for relief have been accordingly renumbered.  Additional similar corrections have been inserted into the proposed Fourth Amended Complaint.

As previously mentioned, *Chang* Plaintiffs have attached both the proposed Fourth Amended Complaint and a red-lined version comparing the Third Amended Complaint to the newly proposed Fourth Amended Complaint.  (*See* Exs. 1 and 2.)

**D.      The Proposed Amendments are Made in Good Faith and Without a Dilatory Motive, Will Cause No Undue Delay, and Will Not Cause Prejudice.**

*Chang* Plaintiffs seek, in good faith, to add the requested amendments so as to conform the Complaint to the existing evidence.  *Chang* Plaintiffs have moved swiftly to amend the Complaint in light of the most recent evidence of spoliation and Judge Sporkin's confirmation that the destruction of and tampering with some of that evidence appears to have been

intentional.  The proposed amendments will not cause any party undue prejudice and will not delay ongoing discovery or the start of trial in this matter.

**1.  There Will Be No Undue Delay as a Result of the Amendments.**

Federal Rule of Civil Procedure 15 does not proscribe a time limit on leave to amend, and a court should not deny leave to amend based solely on the amount of time that has elapsed between the complaint and the request for leave to amend, or on the prolonged nature of a case. *See Atchinson v. District of Columbia*, 73 F.3d 418, 426 (D.C. Cir. 1996) (finding court should not deny leave to amend based solely on time elapsed between the filing of the complaint and the request for leave to amend); *see also* Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*: Civil 2d § 1488, at 652, 659, 662-69 (1990 & Supp. 1997) ("Rule 15(a) does not prescribe any time limit within which a party may apply to the court for leave to amend.").

Leave to amend to add a spoliation count should be granted where plaintiffs, as here, did not obtain evidence to prove sufficiently the claim until well into the discovery process. *Schmidt Pontiac-GMC Truck, Inc. v. DaimlerChrysler Motors Co.*, 538 F. Supp. 2d 1032, 1037 (D. Ohio 2008) (allowing leave to add a spoliation claim nine months after plaintiff became aware of the relevant evidence).  In *Schmidt*, the court noted that plaintiff had not "discovered the alleged spoliation [until] long after filing the original complaint." *Id.*; *see also Morrison v. Stephenson*, Case No. 2:06-cv-0283, 2007 U.S. Dist. LEXIS 60559, at **9-10 (D. Ohio Aug. 17, 2007) (granting leave to amend to add spoliation claim in part because the request was made "as soon as possible after the facts supporting the new claims were discovered").

This Court has held that undue delay did not exist where plaintiff sought leave to amend after "new information" was publicly released by defendants that had not been available when the initial complaint was filed. *In re Sunrise Senior Living Derivative Litig.*, 550 F. Supp. 2d 1,

5-6 (D.D.C. 2008) (granting leave to amend and rejecting defendant's claim of plaintiff's "gamesmanship" or that resolution of case would be delayed).

*Chang* Plaintiffs have moved swiftly to amend their Complaint upon discovering the enormity of the District Defendants' discovery abuses. *Chang* Plaintiffs were made aware of the District's destruction of the JOCC Running Resume in the weeks after the filing of the Koger Declaration on November 16, 2007, the same day that general discovery in this case closed. (*See* Dkt. No. 367 in *Barham*.) In the following weeks, *Chang* Plaintiffs also became aware that the District had failed to produce the full set of relevant radio runs and that the radio runs which had been produced contained significant and suspicious gaps. Very soon thereafter, this litigation was stayed by the Court. (*See* Minute Order, dated January 30, 2008.) *Chang* Plaintiffs were precluded from pursuing further the District Defendants' discovery abuses during that period. The stay was lifted and the case re-opened 11 months later. (*See* Minute Order, dated January 7, 2009.) *Chang* Plaintiffs immediately filed their initial Motion for Sanctions on January 16, 2009. (Dkt. No. 418.) In the ensuing months and in the days before a scheduled hearing on July 29, 2009, the District produced hundreds of pages of documents to the Plaintiffs. (*See* Dkt. Nos. 483, 485.) These late productions have continued up until the last few weeks (the most recent coming on November 30, 2009), totaling over 22,000 pages of late-produced material.

Subsequently, the Court ordered *Chang* Plaintiffs to file renewed Motions for Sanctions. (*See* Dkt. No. 486.) *Chang* Plaintiffs filed the renewed Motions on September 15, 2009. (Dkt. No. 505.) At a subsequent hearing, the Court reopened discovery for a period of six months, to conclude on March 29, 2010. (*See* Minute Order, dated September 29, 2009.) During the first two and half months, despite an intense effort by District Defendants to obstruct *Chang* Plaintiffs' discovery efforts, considerable new discovery abuse, as detailed above, has come to light. For example, during the Thorpe 30(b)(6) deposition of the District, which was taken on

18

October 23, 2009, *Chang* Plaintiffs learned that the District had destroyed a large cache of electronic evidence, including the material stored on Chief Ramsey's MPD-issued computer. Interrogatory responses from the individual District Defendants, disclosing they took no actions to preserve responsive documents, were received by the Plaintiffs only on November 16, 2009, less than a month ago.  Judge Sporkin's report, which found that the discovery abuses appeared to be the result of intentional acts, was provided to the Plaintiffs on December 4, 2009.  (*See* Dkt. No. 567.)

In summary, since learning only of the destruction of the JOCC Running Resume, the *Chang* Plaintiffs have had:

- less than a year of active litigation to amend their complaint;
- less than five months since the District **began** producing countless pages of relevant material well after the close of discovery;
- less than two months since learning of the destruction of electronic evidence during the Thorpe deposition;
- less than a month since receiving interrogatory responses from individual District Defendants setting out their failure to take any actions to preserve documents despite the existence of litigation;
- less than three weeks since the most recent District production; and
- less than two weeks since the issuance of the Sporkin Report.

There has clearly been no undue delay by the *Chang* Plaintiffs in seeking this amendment.  In fact, the full breadth of the District's and the individual District Defendants' discovery abuses has still probably not been fully revealed.  Nonetheless, *Chang* Plaintiffs feel confident that they can move, at this point in time, to amend the Complaint as they have sufficient facts to warrant the allegations contained in the proposed amendment.

**2.  There Will Be No Undue Prejudice as a Result of the Amendments.**

Granting this motion to amend will not cause undue prejudice to the District Defendants. *See Djourabchi v. Self,* 240 F.R.D. 5, 13 (D.D.C. 2006).  To determine if potential prejudice to the opposing party is significant enough to deny leave to amend, the court should consider whether the opposing party has shown "that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been timely."  *In re Vitamins Litig.*, 217 F.R.D. at 32.  A court may also find prejudice where the amendment "substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation."  *Djourabchi,* 240 F.R.D. at 13 (citations omitted).

This analysis includes giving weight to whether amendment of the complaint would require additional discovery.  *Alley v. Resolution Trust Corp.*, 984 F.2d 1201, 1208 (D.C. Cir. 1993) (remanding to district court to allow amendment where there was no need for additional discovery).  To show prejudice, the non-movant must demonstrate "unfairness in procedure or timing preventing the non-movant from properly responding."  *In re Vitamins Litig.*, 217 F.R.D. at 32.

The District Defendants will not suffer any undue prejudice as a result of the proposed amendments.  There is no unfairness in the procedure or timing of the proposed amendments here that would prevent the District Defendants from properly responding to these claims before trial, which is currently set for October 2010 – a full ten months from now.

The Court has already authorized *Chang* Plaintiffs to seek discovery regarding the discovery abuses and that type of discovery is in full swing.  *Chang* Plaintiffs do not request a delay of the already scheduled trial date or believe that such a delay is warranted.

The amount of further discovery by the District Defendants necessary to defend against these claims is limited, if there is any at all. The amendments relate solely to the District Defendants' actions and do not implicate the actions of any of the Plaintiffs or other defendants in this case. As pled, the spoliation claim is an alternative pleading to the primary Section 1983 claims; in effect, whatever damages Plaintiffs could be entitled to, but do not achieve in litigation of the Section 1983 claims, would constitute the damages from the spoliation claim. Therefore, no new discovery regarding damages is required.

The other Defendants in the case (i.e., the National Park Service, former-Major Richard Murphy, the Fairfax County Sherriff's Department, Assistant Chief Jordan, and the individual line officer Defendants – Bryan DiGirolamo, Andre Harrison, and Michael Smith) are unaffected by the proposed amendments, as the Plaintiffs have specifically stated that the proposed amendments are not made against those Defendants.

### 3. Plaintiffs' Motion to Amend is Being Made in Good Faith and without Dilatory Motive.

The amendments are predictable and good-faith responses to the new evidence of abuses by the District. The Fifth Circuit recently defined "bad faith" as "'a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive' and 'implies the conscious doing of a wrong because of dishonest purpose or moral obliquity.'" *Burnsed Oil Co. v. Grynberg*, No. 08-60333, 320 Fed. Appx. 222, 2009 (5th Cir. Mar. 25, 2009) (quoting Mississippi law and Black's Law Dictionary). Additionally, the Third Circuit defined bad faith "as intentional advancement of a baseless contention that is made for an ulterior purpose, e.g., harassment or delay." *Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir. 1986) "Dilatory" has been defined as "tending or intended to cause delay or to gain time or to put off a decision." *Josephat v. St. Croix Alumina,*

*LLC*, Civ. No. 1999-0036, 2000 U.S. Dist. LEXIS 13102, at *44 (D.V.I. Aug. 7, 2000) (quoting

Black's Law Dictionary 457 (6th ed. 1990)).

A movant can defeat claims of "bad faith or dilatory motive" by showing a good faith and

non-dilatory reason for amending their complaint. *See In re Sunrise Senior Living Derivative*

*Litig.*, 550 F. Supp. 2d at 5. *Chang* Plaintiffs seek to amend their complaint for the good faith,

non-dilatory reason that new information regarding the District's discovery abuses has been

revealed since the *Chang* Plaintiffs previously amended their Complaint – all of which has been

made known to the *Chang* Plaintiffs in only the last 12 months of active discovery (although,

because of the nearly one-year long stay, more calendar time has transpired since the first

indications of severe discovery abuse).

There is no ulterior motive, such as purposeful delay or harassment. *Chang* Plaintiffs do

not seek to delay this litigation in any way. In fact, *Chang* Plaintiffs would oppose any effort to

postpone the date for the start of the trial. *Chang* Plaintiffs do not seek to harass the District

Defendants – little will change for these Defendants as result of the amendments, other than they

will be required to defend their discovery abuses before a jury. This is effectively no more than

what District Defendants have been doing since the sanctions motions were filed.

There is evidence of bad faith in this case, but it is on the part of the District Defendants.

They are the parties who destroyed evidence, waited years to produce relevant discovery, and

have been found to have engaged in intentional acts of abuse. They will have the ability to

attempt to justify these actions before a jury and should not be allowed to exclude such

misconduct from trial.

**E.**     **The Amendments Would Not Be Futile.**

Finally, this motion for leave to amend is well supported and would not be futile. An

amendment will be considered futile if it "merely restates the same facts as the original

complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss." *Sperling ex rel. Estate of Oxlaj-Gonzales v. WMATA*, 542 F. Supp. 2d 76, 80 (D.D.C. 2008) (citation omitted) (granting leave to amend because proper notice was given so that the claim would survive motion to dismiss).

The proposed amendments are not futile because they add a new claim to the Complaint and amend two existing claims based on newly discovered facts – the destruction and alteration of documents by the District Defendants (as opposed to restating facts in different terms). The Court has not ruled previously on these issues although they are similar to issues raised in the Motions for Sanctions. The Motions for Sanctions, however, do not set out new or revised causes of action. The proposed amendments state a legal theory which this Court has previously recognized and, as discussed below, these proposed claims would survive a motion to dismiss.

### 1. Spoliation Claim

District of Columbia courts have recognized the tort of spoliation. The District of Columbia Court of Appeals first recognized the claim in *Holmes v. Amerex Rent-A-Car*, 710 A.2d 846, 848 (D.C. 1998), where it acknowledged that parties have "a legally protectable interest in the preservation of evidence required for securing recovery in a civil case."  In *Holmes*, the court found a special relationship existed between the plaintiff and third-party rental company, making the company liable for reckless or negligent spoliation when it failed to preserve a wrecked car plaintiff had purchased as evidence for a case against defendants. The court explained, "[s]ome remedy … should be available to those whose expectancy of recovery has been eliminated or severely hampered  through the negligent acts of another." *Holmes*, 710 A.2d at 849.

Several other jurisdictions also recognize the tort of spoliation. Courts have noted there is no "uniform body of case law that has developed on the precise contours of this tort." *Rizzuto*

*v. Davidson Ladders, Inc.*, 905 A.2d 1165, 1178 (Conn. 2006) (citations omitted).[15]  Thirty jurisdictions have addressed the question of whether to recognize a cause of action for spoliation of evidence – and eight jurisdictions have "clearly" done so, including the District of Columbia, Connecticut, Ohio and West Virginia.  Each recognizes as a tort some combination of first- or third-party negligent spoliation, or first- or third-party intentional spoliation.  *Rizzuto*, 905 A.2d at 1178 (recognizing tort of intentional spoliation as an independent claim because "the existing nontort remedies are insufficient to compensate victims of spoliation and deter future spoliation when a first party defendant destroys evidence intentionally with the purpose and effect of precluding a plaintiff from fulfilling his burden of production in a pending or impending case"); *Diana v. NetJets Servs., Inc.*, 974 A.2d 841, 850 (Conn. Super. Ct. 2007) (extending intentional spoliation of the evidence in the jurisdiction from first to third parties); *Smith v. Atkinson*, 771 So. 2d 429 (Ala. 2000) (recognizing tort of third-party negligent spoliation).

As described in *Holmes*, the elements of spoliation are: (1) the existence of a potential civil action; (2) a legal or contractual duty to preserve evidence which is relevant to that action; (3) destruction of that evidence by the duty-bound defendant; (4) a significant impairment in the ability to prove the potential civil action; (5) a proximate relationship between the impairment of the underlying suit and the availability of the destroyed evidence; (6) a significant possibility of success of the potential civil action if the evidence were available; and (7) damages adjusted for the estimated likelihood of success in the potential civil action.  *Holmes*, 710 A.2d at 854; *see*

---

[15] Although *Smith v. Superior Court*, 198 Cal. Rptr. 829 (Cal. Ct. App. 1984) was the first case explicitly recognizing a tort for the "intentional spoliation of evidence," tort liability for evidence destruction was far from unprecedented.  For example, in *Fox v. Hale & Norcross Silver Mining Co.*, 41 P. 308, 322 (Cal. 1895), the California Supreme Court referred to the spoliation of evidence as a "tortious act."  In Smith, mentioned supra, the California Court of Appeal held that because "a prospective civil action . . . is a valuable 'probable expectancy,'" the plaintiffs are entitled to "legal protection  . . . against alleged intentional spoliation of evidence even though there damages cannot be stated with certainty."  198 Cal. Rprt. At 837..

*also Mazloum v. District of Columbia Metro. Police Dep't*, 522 F. Supp. 2d 24, 55 (D.D.C 2007)
(acknowledging that although spoliation is recognized in the District, the Court could not reach
an analysis of whether all the elements of the claim were met because plaintiff was unable to
establish that defendants, who were alleged third-party spoliators, had a special relationship with
plaintiff creating a legal duty to preserve evidence for use in future litigation); *Fletcher v.
District of Columbia*, No. 01-0297 (RMU), 2005 U.S. Dist. LEXIS 5013, at **25-26 (D.D.C.
Mar. 22, 2005) (holding plaintiff failed to meet elements of spoliation claim against defendants
because, at the very least, plaintiff could not show (1) how the alleged spoliation would help his
underlying case, (2) a proximate relationship between the impairment in the suit and the
destroyed evidence, and (3) did not allege that "anyone in particular" had a duty to preserve the
evidence in question.).

In contrast to those cases, here Plaintiffs have adequately alleged all the elements of
spoliation set forth in *Holmes*. The District was named as a defendant in 2002; Chief Ramsey
and Assistant Chief Newsham were named as Defendants in September 2003, although they,
along with Assistant Chief Fitzgerald, were clearly aware of the pending litigation and other
proceedings for which documents should have been preserved, such as the D.C. City Council
investigation, at a much earlier time. It is axiomatic that parties to civil litigation have a legal
duty to preserve evidence relevant to the case, and plaintiffs have a recognized interest in
preservation of that evidence. *Jeanblanc v. Oliver T. Carr Co.*, No. 91-0128 (JHG), 1992 WL
189434, at *2 (D.D.C. July 24, 1992), aff'd. No. 94-7118, 1995 WL 418667 (D.C. Cir. June 21,
1995); *see also Holmes*, 710 A.2d at 849 (recognizing ability of fact-finder to draw adverse
inference from failure of party to preserve evidence). The details of the District Defendants'
discovery abuses, including the intentional destruction and alteration of evidence, are discussed
in detail above.

25

The evidence that was destroyed or altered because of the District Defendants' intentional or negligent actions impairs *Chang* Plaintiffs' case in numerous ways, particularly as a result of the significance of the lost evidence.  For an extended discussion of the importance of the JOCC Running resume, for example, see footnote 8, *supra*.  This evidence is now lost, and other key evidence has been altered, requiring Plaintiffs to expend considerable resources in an attempt to reconstruct the events of September 27, 2002.  This effort is further hampered by the fact that, due to the Defendants' delaying this litigation, memories of key witness continue to fade.  The destroyed or altered evidence would have been used as important evidence for every remaining claim in the Complaint, as the actions of top officials and the timing of those actions is of paramount importance to these counts.

Without the ability to introduce missing evidence, Plaintiffs are left to make inferences about the missing evidence at trial, reducing their likelihood of success.  Had the evidence not been destroyed, the Plaintiffs would have a "significant probability" of proving the underlying claims.  *See Holmes*, 710 A.2d at 852 (holding that plaintiff must demonstrate "a substantial and realistic possibility of succeeding, but need not cross the threshold of demonstrating that such success was more likely than not").  This is precisely why the proposed tort count has been pleaded as a claim in the alternative.  If the Plaintiffs are unable to succeed on their other claims without this evidence, the tort claim, as an alternative pleading, would then come into play, as Plaintiffs allege that without the spoliation, they would have otherwise succeeded.

## 2.  Due Process Claim

The spoliation and other actions by the District Defendants is not just a tort against the *Chang* Plaintiffs.  It is also a deprivation of a property right without due process of law. Accordingly, *Chang* Plaintiffs move to amend the Third Claim for Relief (Due Process) to add the following allegation:

> The destruction or alteration or late production of relevant evidence, the submission of false declarations, and other actions by the District, the Mayor of the District of Columbia, the Chief of Police of the MPD, Charles Ramsey, Peter Newsham, and Michael Fitzgerald violate Plaintiffs' rights guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution.  These same Defendants (the District, the Mayor of the District of Columbia, the Chief of Police of the MPD, Charles Ramsey, Peter Newsham, and Michael Fitzgerald) are liable for such violations pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment.

(*See* Ex. 1 ¶ 140.)

The District Defendants' destruction of and tampering with key evidence, withholding of and delays in production of evidence, and submission (and refusal to retract) boldly false declarations to the Court all exhibit a course of conduct clearly meant to deprive the Plaintiffs of their right to pursue fully their cause of action under § 1983.  In addition, the District Defendants have gone beyond simply disregarding the Court's rules and procedures but have also threatened *Chang* Plaintiffs with financial ruin from potential Rule 68 sanctions if they failed to accept inadequate and deceitful Offers of Judgment.  The clear purpose of many of these actions is to try to defeat Plaintiffs' efforts to demonstrate high-level command involvement in the decision to illegally arrest *Chang* Plaintiffs and over 400 others in Pershing Park.  Thus, while the District has conceded common law false arrest liability in this case (*see* Tr. of January 9, 2008 hearing at 5-6), it has never accepted *Monell* liability under § 1983, with all of its implications for damages and the awarding of attorneys' fees and costs, and apparently hopes that such liability can be avoided by these improper actions.

The proposed amendment to the *Chang* Plaintiffs' Complaint will defeat District Defendants' purpose by providing that any inability by the Plaintiffs to establish § 1983 and *Monell* liability – stemming from the District Defendants' spoliation efforts, submission of false declarations, and Rule 68 threat – is itself an independent violation of *Chang* Plaintiffs' Fifth Amendment rights, which is compensable under § 1983.

27

Plaintiffs' motion for leave to amend the Third Claim for Relief is timely pleaded and would survive any potential challenges brought by the District Defendants in a motion to dismiss.  This proposed amendment stems from the same facts as does the proposed addition of the new Ninth Claim for Relief alleging the tort of spoliation.  This claim has only become apparent within the last year of active litigation, and the intentional nature of the District Defendants' actions have only been confirmed since the issuance of Judge Sporkin's Report within the last two weeks.  While closely related, the due process claim does not duplicate the tort of spoliation claim because of the additional relief available under § 1983.

The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law."  Similarly, the Fourteenth Amendment to the Constitution bars states from depriving "any person of life, liberty, or property without due process of law."  The proposed amendment alleges that the *Chang* Plaintiffs' procedural due process rights were violated when the District Defendants failed to retain evidence, such as their electronic records and emails; destroyed evidence, such as the JOCC Running Resume in hard-copy and electronic forms; and altered evidence, including the audio and video tapes.  The District Defendants also submitted to the Court false declarations (including one from Denise Alexander) and threatened *Chang* Plaintiffs with financial ruin through deceptive Rule 68 offers.

"'[P]roperty' interests subject to procedural due process protection are not limited by a few rigid, technical forms," *Perry v. Sinderman*, 408 U.S. 593, 601 (1972), and extend "well beyond actual ownership of real estate, chattels, or money," *Board of Regents v. Roth*, 408 U.S. 564, 572 (1972).  Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings." *Perry v. Sinderman*, 408 U.S. at 601.  The types of interests protected are varied and include intangibles.  *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982).  *See, e.g., id.* (right to pursue employment discrimination claim); *Barry v. Barchi*, 443

U.S. 55 (1979) (horse trainer's license); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978) (termination of utility services); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (disability benefits); *Goss v. Lopez*, 419 U.S. 565 (1975) (high school education); *Arnett v. Kennedy*, 416 U.S. 134 (1974) (government employment); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (welfare benefits).

For purposes of a procedural due process analysis, a property interest is defined as "a legitimate claim of entitlement" arising either by operation of state law or pursuant to a mutually explicit understanding. *Board of Regents v. Roth*, 408 U.S. at 577. *Chang* Plaintiffs' cause of action arising from their false arrests and other denials of Constitutional rights is a recognized "property right" which cannot be taken without due process. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 320 (1950); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) (a cause of action is a "species of property."). The Court in *Logan* held that when the property right to a cause of action is jeopardized, the Due Process Clauses apply because they "protect civil litigants who seek recourse in the courts, either as defendants hoping to protect their property or as plaintiffs attempting to redress grievances." *Id.* at 429.

While *Chang* Plaintiffs have not been deprived of their cause of action entirely through the District Defendants' actions, the value of the recovery they might be able to achieve is potentially diminished by those actions. It is clear that the diminution of the value of a property right, without due process, can itself constitute an unconstitutional taking. *See United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 19-20 (1977) (holding that legislation passed by New York and New Jersey impairing the value of a bondholder's contract and resulting in a diminution of pledged revenues, can constitute a "taking"); *see also A.A. Profiles, Inc. v. City of Ft. Lauderdale,* 253 F.3d 576, 583-84 (11th Cir. 2001) (partial "taking" of real property can occur when regulation "diminishes but does not destroy" the market value of real property);

*Philip Morris, Inc. v. Reilly,* 312 F.3d 24, 41, 47 (1st Cir. 2002) (legislation requiring disclosure of tobacco companies' trade secrets is a "taking" because it diminishes the value of the trade secrets). Similarly, the diminution of the value of *Chang* Plaintiffs' action against the District Defendants, if diminished as a result of their discovery abuses and other actions, is a "taking" of property without due process in violation of the Fifth Amendment, for which relief may be granted under § 1983.

In addition, *Chang* Plaintiffs have a "legitimate claim of entitlement" to discoverable information in a civil case. In fact, the Federal Rules of Civil Procedure explicitly provide for it. *See* Fed. R. Civ. P 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense"); *see also Navajo Nation v. Peabody Holding Co.*, 255 F.R.D. 37 (D.D.C. 2009) (citing same).

In *Molloy v. Monsanto*, Civ. No. 1994-30, 1994 U.S. Distr. LEXIS 8445, 30 V.I. 164 (D.V.I. June 9, 1994), the Court found that when there is a clear legitimate claim of entitlement, individuals could be found to have a "property interest" in information withheld from them. In that case, the plaintiffs, members of the Employees Retirement System of the Government of the Virgin Islands ("GERS") sued the Board of Trustees of GERS on the grounds that the Board refused to demand timely payment of employer and employee contributions, thereby depriving past, present, and future government employees of benefits to which they are entitled under law. *Id*. at 166. Plaintiffs argued, among other things, that by virtue of the existence of local law requiring the GERS to prepare and furnish to members of the Retirement System an annual report reflecting the financial condition of the GERS, they had a "property" interest in receiving such information and that defendants have deprived them of this right without due process of law. *Id*. at 178. In analyzing the issue, the Court found that although there are only a "few reported cases that consider under what circumstances, if at all, individuals obtain a property

interest in the receipt of information . . . local law does set forth in detail the content and timing of these annual reports, thereby providing a basis for a finding that these members have a 'legitimate claim of entitlement' -- and thus, a property interest -- in receiving such reports." *Id*. at 178-79.   Accordingly, the Court declined to grant the defendants' motion to dismiss that portion of the plaintiffs' complaint. *Id*.

In *Shaner v. United States*, 976 F.2d 990 (6th Cir. 1992), the Sixth Circuit indicated that an individual might have a due process "property right" in information omitted from a government form to which they were entitled.   The Court found that "[i]t is well-established that due process 'is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property'" but that they might have such a property right if the destruction was because of "grossly negligent" actions or "deliberate or intentional" conduct. *Id*. at 995 (citations omitted).

### 3.   Common Law Conspiracy

*Chang* Plaintiffs propose adding the following two paragraphs to the already existing common law conspiracy count (previously the Eight Claim for Relief; in proposed Fourth Amended compliant, it is the Sixth Claim for Relief).

> The District of Columbia, Chief Charles Ramsey, Peter Newsham, Michael Fitzgerald, and others, conspired, through agreements with each other and others within the MPD to destroy and/or alter relevant and critical evidence related to the claims made in this and previous complaints submitted by the *Chang* Plaintiffs. The District of Columbia, Chief Charles Ramsey, Peter Newsham, Michael Fitzgerald negligently failed to preserve and retain such evidence or instruct subordinates to preserve, retain, safeguard, and not destroy such evidence.

> Individuals employed by the District of Columbia or the MPD, acting outside the scope of their employment and not as part of routine police decision-making, took additional steps in furtherance of this conspiracy, including, but not limited to, the intentional or negligent destruction of various hard copies the JOCC Running Resume; the intentional or negligent destruction of the underlying electronic versions of the JOCC Running Resume; the intentional or negligent alteration of audio tapes containing radio runs that recorded police communications from

31

September 27, 2002; the submission of and failure to withdraw false statements in declarations filed with the Court; and the destruction of other relevant electronic evidence, such as email communications by, to and among the named defendants.

(*See* Ex. 1 ¶¶ 160-61.)   These proposed amendments would not be futile.   There is already a considerable amount of existing evidence regarding these claims.   Common law conspiracy is well-recognized by this Court.   *See Mazloum v. District of Columbia*, 442 F. Supp. 2d 1 (D.D.C. 2006).   *Chang* Plaintiffs have adequately pled the underlying tortious actions (i.e., destruction and alteration of evidence) to support the claim of conspiracy.

Because the District Defendants' actions regarding these abuses would fall outside the scope of their employment, any defenses based on the intra-corporate conspiracy doctrine would not apply.   At the very least, the question of whether the District Defendants were acting within the scope of their employment is a question of fact for the jury.   As Judge Friedman recently noted "the intracorporate conspiracy doctrine was created '[t]o shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory' and therefore has been held by most courts not to shield defendants from conspiracy claims brought under Section 1983 based on police misconduct."   *Kivanc v. Ramsey*, 407 F. Supp. 2d 270, 275-76 (D.D.C. 2006) (citing *Newsome v. James*, No. 96-c-7680, 2000 U.S. Dist. LEXIS 5678, at *46 (N.D. Ill. Apr. 25, 2000)).   Judge Friedman also noted that the Court "has failed to find a ruling by any court of appeals applying the intracorporate conspiracy doctrine to Section 1983 actions."   *Id*. at 276 n.4.

## CONCLUSION

*Chang* Plaintiffs have been forced to endure years of litigation that were prolonged by a pattern of obstruction, spoliation, and deceit.   They are facing prohibitive financial penalties under Rule 68 that the District threatens to impose *even if they prevail*.   Evidence that they were entitled to as a matter of law has been destroyed or altered – hampering their efforts to establish

32

the full record on their arrests and confinement.   Accordingly, *Chang* Plaintiffs respectfully
request leave of the Court to submit the Fourth Amended Complaint.


        Respectfully submitted,

        Jonathan Turley (D.C. Bar No. 417674)
        2000 H Street, N.W.
        Washington, DC 20052
        (202) 994-7001

        _____/s/_____
        Daniel C. Schwartz (D.C. Bar No. 017749)
        P.J. Meitl (D.C. Bar No. 502391)
        Ivan J. Snyder (D.C. Bar No. 498461)
        Seyi Iwarere (D.C. Bar No. 986461)
        Bryan Cave LLP
        1155 F Street, N.W., Suite 700
        Washington, DC 20004
        (202) 508-6000


        Counsel for the *Chang* Plaintiffs

Dated: December 15, 2009

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 15, 2009, I caused copies of the foregoing to be served

by electronic means, upon the following:

>            Counsel for the District and OAG Individual Defendants and Assistant
>            Chief Newsham in his Official Capacity

Ellen Efros
Assistant Deputy Attorney General
Office of the Attorney General
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001

Chad Copeland
Office of the Attorney General
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001

Monique Pressley
Office of the Attorney General
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001

Shana Frost
Office of the Attorney General
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001

>            Counsel for the Federal Defendants

Marina Braswell
Brian Hudak
Office of the U.S. Attorney
For the District of Columbia
555 4th Street, N.W., Room 10-413
Washington, D.C. 20530

>            Counsel for Defendant Peter J. Newsham

Robert E. Deso, Esq.
1828 L Street, N.W., Suite 600
Washington, D.C. 20004

>            Counsel for Defendant Charles H. Ramsey

Mark H. Tuohey III
John M. Faust
Vinson & Elkins LLP
The Willard Office Building
1455 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-1008


       Counsel for Defendant Fairfax County Sheriff's Department

Alex Francuzenko
Cook, Kitts & Francuzenko, PLLC
3554 Chain Bridge Road
Suite 402
Fairfax, VA 22030



       /s/ P.J. Meitl

       BRYAN CAVE LLP
       1155 F Street, N.W., Suite 700
       Washington, D.C. 20004
       (202) 508-6043

       Counsel for the *Chang* Plaintiffs