```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2       -------------------------X
         RAYMING CHANG, ET AL          Docket No. 02-2010
 3                       Plaintiffs,
                    v.                 Washington, D.C.
 4                                     September 29, 2009
                                       11:15 a.m.
 5       UNITED STATES OF AMERICA, ET AL
                             Defendants;
 6       and

 7       JEFFREY BARHAM, ET AL         Docket No. 02-2283
                          Plaintiffs,
 8                   v.
         DISTRICT OF COLUMBIA, ET AL
 9                        Defendants.
         -------------------------X
10
                            STATUS HEARING
11           BEFORE THE HONORABLE EMMET G. SULLIVAN
                    UNITED STATES DISTRICT JUDGE
12

13       APPEARANCES:

14       For the Plaintiffs:   BRYAN CAVE, LLP
         RAYMING CHANG         By:  Mr. Daniel C. Schwartz
15                                  Mr. P.J. Meitl
                               1155 F Street, N.W.
16                             Suite 700
                               Washington, D.C.  20004
17                             202.508.6000
                               dcschwartz@bryancave.com
18                             pj.meitl@bryancave.com

19                             GEORGE WASHINGTON LAW SCHOOL
                               By:  Mr. Jonathan Turley
20                             2000 H Street, N.W.
                               Room E305
21                             Washington, D.C.  20052
                               202.94.7001
22                             jturley@law.gwu.edu

23

24

25
```

```
 1   APPEARANCES:  (CONT'D)
     JEFFREY BARHAM           PARTNERSHIP FOR CIVIL JUSTICE
 2                            By:  Ms. Mara E. Verheyden-Hilliard
                                   Mr. Carl. L. Messineo
 3                                 Ms. Radhika Miller
                              617 Florida Avenue, N.W.
 4                            Washington, D.C.  20001
                              202.232.1180
 5                            mvh@JusticeOnline.org
                              cm@JusticeOnline.org
 6                            rm@JusticeOnline.org

 7   For the Defendants:      U.S. DEPARTMENT OF JUSTICE, Civil Div.
                              By:  Mr. Brian P. Hudak
 8                                 Ms. Marina U. Braswell
                              555 Fourth Street, N.W.
 9                            Washington, D.C.  20530
                              202.514.7143
10                            brian.hudak@usdoj.gov
                              marina.braswell@usdoj.gov
11
                              U.S. DEPARTMENT OF THE INTERIOR
12                            By:  Mr. Randolph J. Myers
                              1849 C Street, N.W,  Room 3221
13                            Washington, D.C. 20240
                              202.208.4338
14                            Randolph.Myers@sol.doi.gov

15                            OFFICE OF THE ATTORNEY GENERAL
                               FOR THE DISTRICT OF COLUMBIA
16                            By:  Mr. Peter Nickles
                                   Ms. Ellen A. Efros
17                                 Mr. Chad Copeland
                                   Mr. George Valentine
18                            441 Fourth Street, N.W.
                              Suite 600S
19                            Washington, D.C.  20001
                              202.727.4170
20                            ellen.efros@dc.gov
                              chad.copeland@dc.gov
21

22   PETER J. NEWSHAM         DESO & BUCKLEY
                              By:  Mr. Robert E. Deso
23                            1828 L Street, N.W.
                              Suite 660
24                            Washington, D.C.  20036
                              202.822.6333
25                            redeso@dtswlaw.com
```

```
 1    APPEARANCES:   (CONT'D)

 2    FAIRFAX COUNTY          O'CONNELL, O'CONNELL & SARSFIELD
      SHERIFF'S DEPARTMENT    By:  Mr. Alexander Francuzenko
 3                            401 East Jefferson Street
                              Suite 204
 4                            Rockville, MD  20850
                              301.424.2300
 5                            alex@oconnelllaw.com

 6    CHARLES H. RAMSEY       VINSON & ELKINS, LLP
                              By:  Mr. Mark Tuohey
 7                                 Mr. Robert Boxie, III
                              1455 Pennsylvania Avenue, N.W.
 8                            Suite 600
                              Washington, D.C.  20004
 9                            202.639.6727
                              mtuohey@velaw.com
10                            rboxie@velaw.com

11    Court Reporter:         Catalina Kerr, RPR, CRR
                              U.S. District Courthouse
12                            Room 6716
                              Washington, D.C.  20001
13                            202.354.3258
                              catykerr@msn.com
14

15

16

17

18    Proceedings recorded by mechanical stenography, transcript

19    produced by computer.

20

21

22

23

24

25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2            (11:15 A.M.; OPEN COURT.)

 3            THE DEPUTY CLERK:  Civil Action 02-2010 Rayming

 4   Chang, et al versus National Park Service, et al, and Civil

 5   Action 02-2283, Jeffrey Barham, et al versus District of

 6   Columbia, et al.  Would counsel please identify yourselves for

 7   the record.

 8            MR. TURLEY:  Good morning, Your Honor, Jonathan

 9   Turley in the Chang case.  With me are my colleagues Daniel

10   Schwartz and P.J. Meitl.

11            THE COURT:  All right.  Good morning, Counsel.

12            MS. VERHEYDEN-HILLIARD:  Good morning, Your Honor.

13   Mara Verheyden-Hilliard on behalf of the Barham class action.

14   With me at counsel table are Carl Messineo and Radhika Miller.

15            THE COURT:  All right.  Good morning.

16            MR. EFROS:  Good morning, Your Honor.  Ellen Efros

17   for the District.  With me at counsel table are Attorney

18   General Peter Nickles and Deputy Attorney General George

19   Valentine.

20            THE COURT:  All right.  Good morning.

21            MR. EFROS:  And excuse me, Your Honor, I apologize,

22   and Assistant Attorney General Chad Copeland.

23            THE COURT:  All right.  Good morning.

24            MR. MR. TUOHEY:  Good morning, Your Honor.  Mark

25   Tuohey from Vinson & Elkins representing Chief Ramsey
```

1   individually, and with me, my colleague, Robert Boxie.   Thank

2   you.

3            THE COURT:   Good morning, Counsel.

4            MR. DESO:   Good morning, Your Honor.   Robert Deso

5   representing Assistant Chief Newsham.

6            THE COURT:   All right.   Good morning.

7            MR. FRANCUZENKO:   Good morning, Your Honor.   Alex

8   Francuzenko on behalf of the Fairfax County Sheriff's office.

9            THE COURT:   Good morning, Counsel.

10           MS. BRASWELL:   Good morning, Your Honor.   Marina

11   Braswell, and I have with my Brian Hudak, both of us from the

12   U.S. Attorney's Office, and also from the Park police,

13   Mr. Randolph Myers, and we're representing the Federal

14   Defendants in this case.

15           THE COURT:   Good morning, Counsel.   Is that it?

16   Anyone else?   All right.   It's good to see everyone.   I read

17   everything.   Let me hear from Plaintiffs first.

18           MS. VERHEYDEN-HILLIARD:   Good morning, Your Honor.

19           THE COURT:   Good morning.

20           MS. VERHEYDEN-HILLIARD:   As the Court knows, over

21   the last two months, since the last sanctions hearing, there

22   have been numerous submissions to this court.   Plaintiffs have

23   been endeavoring to go over the documents that the District is

24   piecemeal handing over at this late date.

25           We have received at this point more than 13,000

1   pages of documents.

2           THE COURT:  Are those new documents?

3           MS. VERHEYDEN-HILLIARD:  Yes, Your Honor.  The

4   production at this point is, since July 29th, more than

5   13,000 pages of materials.  Since discovery closed, since just

6   the day -- days before and since discovery closed, we've

7   received approximately 20,000 pages of material all in total,

8   and the responses from the District are very troubling for the

9   Plaintiffs, for the Barham class in this case, Your Honor.

10          It appears that far from recognizing the severity

11  and the import of what has happened, the enormous prejudice to

12  Plaintiffs, the enormous detriment to this case, to this

13  Court's docket, to everyone who has been involved in

14  litigating this matter for nearly seven years, it is now seven

15  years since 400 people were swept off of the street and

16  hogtied for 24 hours in stress and duress positions merely

17  because they were engaged in or in proximity of free speech

18  activities in the Nation's capitol.

19          And here we are seven years later and we're

20  receiving 13,000 pages of documents, which apparently, for the

21  most part, have been secreted within the very office of

22  Attorney General.

23          These documents have attorney's e-mails on them,

24  they were documents that were readily available.  The OAG has

25  admitted that they had them in their files, in their floors

1    and they just didn't turn them over to Plaintiffs during all

2    of the discovery that went on for all of these years.

3         They -- when the Plaintiffs raised the matter that

4    it was clear to us that we were not receiving the merit

5    materials to which we are entitled, raising this years ago and

6    presenting it before the Court in --

7         THE COURT:  The Attorney General's office knew these

8    documents existed and purposefully withheld production of

9    these documents; is that what you're arguing?

10        MS. VERHEYDEN-HILLIARD:  At this point, Your Honor,

11   we repeatedly asked the Attorney General's office, we wrote

12   specific letters, we said to the Attorney General's office,

13   "We believe that we have not received everything we're

14   entitled to."  We asked them to conduct sweeps to look for

15   documents, and in response, the Attorney General's office put

16   sworn affidavits before this court two years ago swearing,

17   both M.P.D. attorneys and attorneys in the Attorney General's

18   office, that they had conducted such sweeps.

19        If they had in fact conducted those sweeps at that

20   time, these materials would have been produced, so either they

21   conducted the sweeps and withheld the materials or they filed

22   affidavits that were materially false with regard to the

23   breadth of their efforts to find the documents.

24        Moving past the issue of secretion, Your Honor, onto

25   the issue of document loss and destruction, we have the

1   running resume, which had redundant electronic -- it's a

2   database.  It's a database with redundant electronic backup

3   and no less than 12 hard copies.  It was a document that was

4   specifically requested by the council of the District of

5   Columbia, by subpoena, in its investigation, which the OAG and

6   the M.P.D. represented to the council that they were

7   delivering and indeed delivered a completely different

8   document.

9          Now, they come before the Court and say, "We knew we

10  didn't have it.  It was lost.  It was lost back then.  We

11  didn't destroy it.  We didn't have it."  But if they didn't

12  have it and they knew they didn't have it, how could they have

13  represented to the council that it indeed existed?  Because if

14  they had told the council at that time that it did not exist,

15  the council would have engaged in its own investigation.  It

16  would have enforced the subpoena.  They had already said that

17  they would be enforcing subpoenas.  They likely would have

18  found that document.

19         That document is the central backbone compilation of

20  all realtime activities that were occurring during the day of

21  the arrest, and it is lost, and the prejudice is enormous for

22  that loss.  But it couldn't just go missing.  They say that

23  it's gone; that it's destroyed.

24         How could all those copies be destroyed?  It's a

25  centrally relevant document that at the time they themselves

1    acknowledge that they sought very early on.  They know the

2    importance of this document.  Where did it go?

3            And when it comes to the radio runs, Your Honor, the

4    radio runs are, across multiple channels, missing in time.

5    They appear to be edited across multiple channels.  Not just

6    one channel missing time, multiple channels all at the period

7    of time of arrest.  The District tells us they destroyed the

8    master copies so that that underlying information can't be

9    obtained.  Yet when we brought before the Court, two years

10   ago, the fact that these radio runs appear to be edited, they

11   supplied the Court with a materially false affidavit with

12   regard to the condition of the radio runs.

13           Thereafter, under deposition, we forced the District

14   to admit that the radio runs were indeed missing time and were

15   inadequate.  Thereafter, they suddenly produced new radio

16   runs.  Now, with the master copies destroyed, where do they

17   come up with new radio -- new copies, new radio runs?  And

18   yet, the new radio runs are still missing time across multiple

19   channels at the time of arrest.

20           Now, the D.C. Council, in its investigation, said

21   that they found that it appeared that there was an evidence of

22   a coverup, that there was an evidence of a coverup coming from

23   the M.P.D. and that they felt that this related to Chief

24   Ramsey's role in the arrests.

25           What it looks like now and what it appears from

1   what's happened in this case is that there may well have been

2   a coverup, but that as Plaintiffs fought this case and

3   diligently sought the discovery to which they were entitled,

4   it did not take at face value the representations that

5   material was just gone or missing or inexplicably

6   unattainable, that that coverup began to unravel and a new

7   coverup began.

8          And the new coverup goes to who edited those radio

9   runs?  Who lost and destroyed these documents?  How were there

10   more than 10,000 documents plainly available in the office of

11   Attorney General and they were never produced to Plaintiffs in

12   this case?  It's not a resource issue.  It's an issue that we

13   believe is poisonous, that permeates the process here, and we

14   are concerned, permeates other cases as well.

15          We already know that it's affecting the *Becker* class

16   action case.

17          THE COURT:  Well, that's not before me, so I don't

18   want to get into that.

19          MS. VERHEYDEN-HILLIARD:  In which --

20          THE COURT:  I don't want to get into that case.

21   That's before another judge, correct?

22          MS. VERHEYDEN-HILLIARD:  Correct.  It's before Judge

23   Friedman, but to make the point that it's not merely limited

24   to affecting this case, that if this is the conduct that is

25   being allowed to continue, then it's conduct that will affect,

1  quite potentially, many cases where Plaintiffs are harmed and

2  come before this court seeking remedy for their harms.

3        What we see from the District is no effort at

4  accountability.  No one is answering the question that was put

5  before the District, which was, how did this happen?  And who

6  allowed it to happen?  There's no investigation into

7  discipline or conduct or finding out exactly what it is that

8  happened to these materials, who had oversight, who had

9  knowledge.  I mean, we are left with this enormous prejudice

10  at this stage.

11        THE COURT:  You raised a couple of issues, and I

12  want to focus on those issues.  But it seems to me that there

13  are two principal issues before me right now.  What additional

14  discovery do you need, if any?  I'm not sure.  Have you

15  learned anything new from the new documents that you've

16  received?

17        MS. VERHEYDEN-HILLIARD:  We're endeavoring to go

18  through the documents, and my colleagues and Mr. Turley with

19  the Chang case will also be addressing their --

20        THE COURT:  And I need to separate out the issue of

21  discovery from the issue of sanctions.  I think I probably

22  agree, I don't think the City hardly disputes that they're --

23  that the system may well be in need of some repair, the

24  system, the document recovery and document retention and

25  document production system I'm referring to.

1        But I'm going to separate that out from the issues

2   before me, the litigation issues before me and whether or not

3   there's a need for discovery.  Now, I've given a lot of

4   thought to everything that's happened and not happened over

5   the past many years, and maybe it's appropriate for the Court

6   to share a couple of thoughts now.  You know, I query whether

7   there's any need for additional discovery.

8        I'm not quite -- I'm not confident that we'll ever

9   get all the discovery.  I just have no confidence in the fact

10  that everything that should be produced will ever be produced.

11  I just don't have it.  Maybe a month from now, two months from

12  now when we talk about the system, when we talk about how we

13  got to this point, how the City got to this point, when we

14  talk about what's needed to repair the problem, then -- then

15  maybe I'll have more confidence.

16       But right now, with documents still being discovered

17  and produced in discovery, I'm not at that point now where I

18  have confidence that we'll ever get -- that you'll ever get

19  everything that you're entitled to.  Which brings up the

20  point, how much more do you need?  How much more information

21  do you need?  Because absent a settlement, and I'm not

22  confident that there ever will be a settlement either, but

23  absent a settlement, this case is going to go to trial, and

24  it's going to go to trial probably in the months of February

25  and March next year.

1          It's not going to be another round of potentially

2     dispositive motions by anyone, Plaintiffs or Defendants.  I'm

3     not focusing on summary judgment.  No one's entitled to a

4     ruling on any motion for summary judgment.  I mean, the

5     Government's case will be tried before the Court nonjury.  The

6     Government -- anyone can file whatever they want to file, and

7     I'll rule on it when it's appropriate to rule on it, but I'm

8     not going to waste another year or two going over potentially

9     dispositive motions, just not going to do it.

10          So, absent a settlement, I'm going to put this case

11     in a posture and may already be in a posture for a trial on

12     damages, and that seems to me to be the only issue before the

13     Court because the Court of Appeals has already spoken at least

14     twice on the illegality of the arrests and detention.

15          This is a case about damages.  Seems to me this case

16     can be teed up very quickly for a trial on damages.  And I'm

17     sure that the former chief would like to file a motion for

18     summary judgment to persuade me that there are genuine issues

19     of fact, but this case is going to go to trial absent a

20     settlement.  I'm sure the Government would like to file a

21     motion.  It's going to go to trial.

22          So, how do we -- and maybe -- maybe there's a

23     serious disagreement by someone about whether this case is in

24     a posture for trial, and I'll welcome that and discuss that

25     with anyone who wants to take issue with what I believe to be

1   a rational decision.  This case is in a posture for trial in

2   February or March.  I mean, do you seriously disagree with

3   that?

4           Quite frankly, I don't think -- you don't get

5   anymore than what you already have in terms of discovery.  I'm

6   not quite sure what else remains will assist you with proving

7   your claim for damages.  That's what this case is about.

8   Damages and maybe liability.  Personal liability of the former

9   chief and some other police officers, it's a question with

10  respect to that.  It's a question with respect to liability of

11  the Federal Government for its Blue Line, holding these people

12  in Pershing Park, but those are issues that the

13  fact-finders -- and I'll be the fact-finder with respect to

14  the Federal Government's claim -- those are issues for

15  fact-finders to address, but maybe I'm wrong, and invite

16  anyone to tell me that I am wrong, this case is not in a

17  posture for trial absent a settlement, and I just don't see

18  that happening.  It's time to bring some closure to this case.

19          Now, having said all that, I'm not in the least bit

20  going to forego or forget sanctions.  I'm not going to do it.

21  I am seriously considering issuing orders to show cause why

22  attorney should not be held in contempt of court for failing

23  to comply with court orders.  I am seriously considering the

24  imposition of monetary sanctions to compensate for what could

25  arguably be flagrant disregard of court orders and the

 1    purposeful retention of discoverable documents, but I don't

 2    need to focus on that right now, but I'm not going to forego

 3    or forget that the issue of sanctions is a viable issue before

 4    the Court.

 5          But I have to separate out the two.  I want to bring

 6    some closure to the litigation.  I can tell you one sanction

 7    that the Court will impose, and I don't need any argument.

 8    I'll certainly listen to it, but I am going to insist and

 9    demand that the broken part of that system be fixed in the

10    Attorney General's office.

11          Now, let me say this:  I recognize the outstanding

12    attorneys, men and women who work in that office, and I've

13    seen them over the years and they are outstanding, and I'm not

14    criticizing them, but there's a part of the system within

15    which they work that's broken.  That needs to be repaired to

16    enable them to do their work on behalf of the citizens of the

17    District of Columbia whom they serve.  That's their client.

18          So, on the one hand, although it's tempting to think

19    about the imposition of significant monetary damages to

20    compensate Plaintiffs for the discovery abuses, that money

21    come out of the pocket and the pockets of the citizens of D.C.

22    The Attorney General's office has not properly served those

23    citizens because of these apparent discovery disputes, so is

24    it fair to penalize the citizens of D.C. by taking money out

25    of their pockets to compensate Plaintiffs for the broken

1    system?  I'm not so sure that's the fair approach.  I'm not

2    ruling that out, but there's a lot to consider.  That's the

3    easy way out, to order payment of money for the abuses, but

4    the system still is in need of repair, in the *Becker* case and

5    in the other cases.

6           So, that's going to happen.  The system is going to

7    be repaired, it's going to be fixed and I'm going to see to

8    that.  That's definitely a sanction the Court is going to

9    impose.  I want a plan to ensure that this never happens again

10   in this court or the courts of my colleagues, and it's very

11   easy to remedy.  It's very easy to remedy.

12          Mr. Nickles knows how.  He comes from a major law

13   firm.  There are policies for how information is gathered, how

14   it's documented, how it's filed, how it's Bate stamped, how

15   it's turned over, and if he needs help, maybe he can get an

16   army of attorneys from his former law firm to help him out.

17   Maybe the D.C. bar can step up to the plate.  I wouldn't have

18   any problems calling the president of the D.C. bar and say,

19   "The D.C. Government needs some help to developing policies

20   for whatever it is, document retention, preparation,

21   dissemination, et cetera."

22          But I can assure everyone that the problem is going

23   to be repaired.  That's definitely a sanctions.  It's going to

24   be repaired, and it's not going to be repaired over the next

25   several years.  It's going to be repaired over the next

1  several weeks.  That's a definite sanction.  Now, whatever

2  else I do, you know, we'll talk about, but I'm going to put on

3  the back-burner for the time being sanctions, and the City, in

4  fairness, is entitled to file a response to your motion for

5  sanctions.  That's due.  And this is not a hearing to argue

6  the merits or, you know, the opposition to the imposition of

7  sanctions, but the things I'm considering are orders to show

8  cause, why people shouldn't be held in contempt, monetary

9  sanctions, Rule 68 sanctions, instructions to jury, this

10 entire panoply of appropriate available sanctions this court

11 can impose for what could arguably be purposeful, intentional

12 violation of a court order or negligent, gross negligence,

13 could be, I don't know, but I want to focus on trial.

14       What would it take to -- Do you agree, first of all?

15 Don't just, you know, sit there and agree with me.  If you

16 disagree, tell me.  Do you agree or not this case, right now,

17 is in a posture to go forward on a trial of damages?

18       MS. VERHEYDEN-HILLIARD:  Your Honor, I obviously

19 would need to consult with counsel in the Chang case, and I

20 cannot speak for them.  But I can say that we very much

21 agree --

22       THE COURT:  When I say "now," I don't mean right

23 this minute, but I mean, with some additional preparation.

24       MS. VERHEYDEN-HILLIARD:  Right, Your Honor.  We

25 would agree very much that we would like not to see further

 1   delay, that we would like to see this case brought to trial,

 2   and if it could be brought to trial next year, we would be

 3   completely agreeable with that.

 4        THE COURT:  Absent settlement, it's going to be

 5   brought to trial next spring.  That's a promise.  That's

 6   another thing I'm certain about.  Two things, the system is

 7   going to be fixed; this case is going to go to trial absent a

 8   settlement.  And I'm not going to be inundated and deluged by

 9   cross motions for potentially dispositive leave.  I'm just not

10   going to do it.  It's high time for this case to be tried, and

11   if it's appropriate for the Court to rule on motions

12   requesting relief during the course of the trial, I'll do so.

13        But we're going to summon citizens of the District

14   of Columbia to come in and have a voice in this litigation.

15        MS. VERHEYDEN-HILLIARD:  The issue that we face with

16   regard to ongoing discovery, we agree with Your Honor

17   completely, that there is not only no way that we will ever

18   know that we've received everything, we know for a fact --

19        THE COURT:  I'm not so sure there's another way.  I

20   think in two months we'll have an answer, in two months, but

21   I'm just not going to wait around for it, but the problem is

22   going to be fixed.  I just don't have confidence now that

23   everything that should have been produced has been produced.

24   I just don't.  I mean, when you're telling me you received,

25   what, 13,000 documents?

1          MS. VERHEYDEN-HILLIARD:  Yes, Your Honor.

2          THE COURT:  And much of that is nonrepetitive; is

3    that correct?

4          MS. VERHEYDEN-HILLIARD:  Yes, Your Honor.  The

5    problem is, Your Honor, that in fact we do -- we do know for a

6    fact that we will never receive everything we're entitled to

7    because we know that, for example, the running -- and not

8    getting into sanctions, but we know that there's material that

9    they acknowledge is lost and destroyed.  We know, based on

10   their own submissions --

11         THE COURT:  You'd be surprised what surfaces

12   sometimes, you know.

13         MS. VERHEYDEN-HILLIARD:  And that goes to the issue

14   of discovery.  Much of what they're giving us references other

15   documents, references other material that we think is central

16   material that goes to the heart of Plaintiffs' claims.

17         While we proposed six months of additional

18   discovery, and we believe that's ambitious, we actually do not

19   have an interest in doing endless and endless and endless

20   discovery.  That doesn't serve the interest of Plaintiffs in

21   this case.  We do believe that there is additional discovery

22   that is necessary.  It's necessary based on what we're seeing

23   and what we're receiving.  It would be unfair to Plaintiffs

24   not to proceed without it.

25         We agree with Your Honor that liability merely is

1  established, and certainly with common law liability, the

2  District has conceded it.  If the District is not conceding

3  liability, there are issues of punitive damages, and as Your

4  Honor noted, there are also issues with regard to individual

5  liability.

6         And for Plaintiffs to proceed on those claims, they

7  need to have, even though we will not be able to get over the

8  complete prejudice, which then goes to the issue of sanctions

9  and adverse inferences or whatever we need to address at

10 trial, we do need an intermediate, to have some measure of

11 discovery so that we can try and do the best we can with some

12 of the new information that we're receiving, so that we can

13 take the depositions we need to take again, so that we can

14 pursue some of these documents or references that we have

15 because we -- we're not only not having confidence -- not

16 having confidence that we haven't received everything, we know

17 we haven't received everything.

18        THE COURT:  Right.  But there is some suggestion in

19 someone's pleading that discovery just be reopened for

20 everyone.  Now, that doesn't sound like the rational approach.

21 It may well be that some people will have to be redeposed.  I

22 don't know that to be, and I'm not going to unreasonably --

23 Well, I'll deal with that issue if it's presented to the

24 Court, but just to reopen up all discovery doesn't sound to be

25 the rational approach to this.

1            MS. VERHEYDEN-HILLIARD:  The issue for us is that

2    much of what we're receiving is very central, and truth be

3    told, these documents would have been used in practically

4    every deposition we did, but we do not have an interest in

5    redoing every deposition we did because we don't want or

6    desire to do four more years of discovery either.  That's not

7    in the interest of Plaintiffs, but we can't allow the District

8    to take advantage --

9            THE COURT:  No, I totally agree with you.

10            MS. VERHEYDEN-HILLIARD:  -- of this loss and

11    destruction.  And I think with regard to the Court's question

12    about the D.C. taxpayers, the District does need a penalty.

13    It does need a penalty for its conduct, and I would not

14    suggest that the Plaintiffs are enjoying some windfall.  The

15    Plaintiffs here have been stalwart and principled --

16            THE COURT:  I'm not suggesting that at all.  I mean,

17    I thought -- you know, I haven't ruled on it, but you're --

18    basically your argument is compensate, you know, you for your

19    time that you spent in discovery that you may have to redo.  I

20    mean, that's not -- I don't want to make a finding of fact or

21    a conclusion.  That's not patently unreasonable.  I'm not here

22    to decide the merits of that, but I understand.

23            I know what's -- and this court is not in the

24    business of handing out windfalls to anyone anyway.

25            MS. VERHEYDEN-HILLIARD:  The Plaintiffs in this

1    case, because they have worked so hard in pursuing this and

2    haven't walked away, have in fact uncovered this major

3    problem, which I think is a great benefit to the residents and

4    the taxpayers in the District of Columbia to uncover this, to

5    find this out, and the fact that the District ties up --

6            THE COURT:  And it hurts to find out that the system

7    is broken, I understand that, it hurts, but you know, now is

8    the time to fix it.

9            MS. VERHEYDEN-HILLIARD:  And the fact that the

10   District ties up public interest attorneys for years and years

11   in scorched earth litigation should not go as a benefit to

12   them.  I mean, the fact is the attorneys present here at

13   Plaintiffs' counsel's table do a broad range of public

14   interest litigation, and were the District stepping up as it

15   should have years ago and taken responsibility for this case

16   or even stepping up now and taking responsibility, that is

17   work also that would go in support of other people that need

18   that kind of public interest help.

19           And the fact is the District does try and draw out

20   these cases.  They do scorched earth litigation.  They want to

21   make these cases as unpalatable as possible, and we don't

22   believe the way they conducted discovery when we were raising

23   with them over and over again politely, please look for these

24   documents, we know they're missing, where are they, and their

25   response to us was to file materially false affidavits with

the Court to end the discussion.  We think at that point that

in fact the District is responsible for those costs and fees

related to those efforts because it would be unfair to the

Plaintiffs and it's unfair to the process, in fact.

          At this point, the District is willfully -- you

know, they write checks to counsel for Former Chief Ramsey and

for Chief Newsham, you know, every few months as consent and

they've paid more than $1.2 million, and that's apparently not

been troubling them in terms of the taxpayer fund, so we don't

think that the burden should just fall on the Plaintiffs at

this point.

          THE COURT:  No, I'm not suggesting that at all.  I'm

just suggesting that there's a wide range of remedies

available, but you agree that, you know, I can very

appropriately segregate out discovery and trial and sanctions

and separate those two out.

          MS. VERHEYDEN-HILLIARD:  And I appreciate that, Your

Honor.

          THE COURT:  All right.

          MS. VERHEYDEN-HILLIARD:  And I want to allow

Mr. Turley to speak because I obviously am not, you know,

speaking on behalf of their interest with regard to your

questions as to discovery.

          THE COURT:  All right.  And maybe it's not

appropriate.  I picked February and March.  Maybe that's too

1  idealistic to think that this case could be in a posture to go

2  to trial, but it's high time to put some closure here.  It's

3  going to be tried at some point next year, early next year.

4  I'm not picking a date right now, although maybe I should pick

5  a date.  Judge Friedman picked a date in the *Becker* case, did

6  he?

7          MS. VERHEYDEN-HILLIARD:  We are going back before

8  Judge Friedman on Tuesday.  Judge Friedman had raised the

9  issue with the District as to efforts as to settlement.

10          THE COURT:  How long will it take the Plaintiffs to

11  put on their case?

12          MS. VERHEYDEN-HILLIARD:  Well, we have two different

13  trials here, obviously.  The *Barham* trial is different than

14  the *Chang* trial.  I need to consult with my counsel, but I

15  would assume --

16          THE COURT:  Should they be consolidated or not for

17  trial purposes?

18          MS. VERHEYDEN-HILLIARD:  No, because they're

19  different.  One is a class action and they have different

20  theories of the case, so the class action needs to proceed

21  with the class representatives.

22          THE COURT:  How long will it take your clients to --

23  how long will it take you to present your case-in-chief?

24          MS. VERHEYDEN-HILLIARD:  We would think

25  approximately two weeks for a case-in-chief.

1         THE COURT:  All right.  Thank you.

2         MS. VERHEYDEN-HILLIARD:  Thank you, Your Honor.

3         MR. TURLEY:  Thank you, Your Honor.  Jonathan Turley

4 for the *Chang* Plaintiffs.

5         THE COURT:  Good morning, Counsel.

6         MR. TURLEY:  First of all, I want to thank the Court

7 for trying to move the case along and to bring closure.  We

8 all want that.  Seven years is a long time.  I know I've had

9 two children in that time, and it's a measure of how long this

10 case has gone.  But I'd like to address a couple of things

11 that the Court has raised.

12         First of all, in terms of --

13         THE COURT:  Can I do this?  I invited you up.  There

14 are two attorneys, one of whom has been here for over an hour.

15 I just need to pick date in a trial.

16         MR. TURLEY:  Absolutely.

17         THE COURT:  And I'll give you your time, okay, but

18 let's bring them up.  No one has to move anywhere.

19         (ANOTHER CASE ON CALENDAR CALLED AND THEN THE

20 FOLLOWING PROCEEDINGS CONTINUED:)

21         THE COURT:  Mr. Turley.

22         MR. TURLEY:  Thank you, Your Honor.  I'd like to

23 address a couple of things that the Court stated.  I can't

24 disagree with the Court when it says that the Court may never

25 see all the evidence in this case.  It's a pretty sad

1    statement.  It's actually the first in a couple of decades of

2    practice, on my part, to hear a federal judge say that, but

3    unfortunately, I believe it is true.

4           But I'd like to address what the -- what the Court

5    was focusing on.  You know, we have the sanctions issue.  The

6    Court raised a number of issues on sanctions that we can

7    address obviously in that hearing.  But first of all, the

8    Court asked my colleague whether we believe that the District

9    knew about this, which is obviously a question that many of us

10   have.

11          And if you read the Government's positions in the

12   past and what they've said in hearings, it's almost as if

13   you've got this creationism intelligent design debate that

14   they're saying that suddenly all these problems happened

15   because of road operators, because they were negligent because

16   they were understaffed.  When if you look at the evidence,

17   there appears to in fact be an intelligent design.  It just so

18   happens that the evidence that has been missing happens to be

19   the core evidence.

20          You've got radio runs that mysteriously have the

21   same critical point removed.  You've got the running resume

22   with an officer of the District saying there were 12 copies,

23   they're gone.

24          But more importantly, the material that we have

25   received, since the end of discovery, contains extremely

1    important material, material that we in fact have been looking

2    for.  And I'd like to give an example of that.  We've cited

3    some in our case before.  We have in Exhibit 1 to our filing a

4    rather lengthy list of documents that we have received, over

5    16,000.

6         Your Honor, you practiced law and you can imagine

7    what it is like to practice in a case in closed depositions

8    and have 16,000 pages of documents turned over just in this

9    last group of disclosures, not long before this hearing.

10        THE COURT:  And these again are new documents; is

11   that correct?

12        MR. TURLEY:  Yes.  This is an example of one of them

13   that came in.  This is the second time we've received this,

14   but the first time was only in the previous document dump that

15   we got in July, but this is a document that's a "stay away"

16   request, and it tells officers, it gives them, quote,

17   arguments to make during these protests.  It says that, first

18   of all, tells the officers that place the arrest, was, quote,

19   happenstance, and it tells them how to get even law-abiding

20   citizens away from these areas, telling them to leave and

21   asking them why would they want to be there unless they are

22   protesters.

23        This is the type of document that any litigator

24   would present to virtually every witness in this case to find

25   out, first, who wrote this?  Who saw it?  Is this what they

 1    were told?  This came to us for the first time in July in this

 2    case.  We have e-mails that come from the parties in the case.

 3    We're not talking about third parties.  We're talking about

 4    people like Newsham.  E-mails that presumably if you simply

 5    got on the e-mail system and printed out stuff that came up

 6    with a search of just key words, they would come up with these

 7    e-mails.

 8         We just are now seeing e-mails that are extremely

 9    damaging, in our view, to the District.  We've e-mails from

10    Newsham saying that he doesn't want to give information to a

11    lawyer working with the District because he doesn't want to

12    expose, quote, their tactics.  We have references to the Chief

13    of Police, to Ramsey that we have not seen before.  We've got

14    one document that we've seen which refers to the Chief

15    ordering arrests.  What does that mean?  Does it mean

16    assistant chief or the chief?  Well, we don't know because we

17    haven't been able to ask any officers.

18         None of us want to prolong this case.  As you know,

19    I have said in previous hearings that we really needed to go

20    to trial, but these documents are precisely what we've been

21    looking for, and I asked -- I asked the judge, how is a

22    litigator supposed to deal with this?  We have very important

23    documents that affect virtually all of these witnesses.

24         On one hand we can say, "Well, you know what, you're

25    going to have to just sort of pick your witnesses," and in

1   that sense the District wins.  The District -- this is nothing

2   new for public interest attorneys.  The District has done this

3   type of tactic in case after case after case.

4          They delay litigation, they try to get attorneys and

5   firms to burn out.  They basically threaten, you'll be here

6   until the Rapture before you ever get into trial, they

7   withhold documents, none of this is new.  We put in our filing

8   a statement from Judge Lamberth years ago which actually Judge

9   Lamberth finally loses his temper in this case and says, "I

10  don't want to hear your excuses of lack of resources or

11  incompetence," because he just didn't believe them anymore.

12         That was years ago.  And so every time the District

13  follows this tactic, they come in, they do a "mi culpa," they

14  throw someone under the bus, and then they say, but let's not

15  make the cat walk backwards.  Let's just take limited

16  discovery.  They do that, they win, because documents like

17  this, we don't know what the -- whether they've seen documents

18  like this.  We should know, because otherwise we're going to

19  turn the trial into a sort of expanded discovery.

20         What we've suggested is that the Court resume

21  discovery, allow us to call the witnesses we need.  The

22  District cannot call any witnesses.  The Court already talked

23  about that in the last hearing.  We have every interest to

24  expedite this, and to call witnesses and bring them forth and

25  not have the District argue asked and answered objections,

1    that we should be able to ask those witnesses about 16,000

2    pages of evidence and what it talks about, their role and

3    their knowledge, and then we'll be not only be prepared for

4    trial but the District also is not going to come out of this

5    with an incentive to do it again.

6        That's why they do this.  They do it because no one

7    hits them with sanctions.  They do it because it works.  You

8    know, we've seen stuff settle in this case.  We've seen people

9    give up the ghost in this case.  It's been hard for the

10   attorneys to keep on going for seven years.  This case is a

11   huge burden, and they know it.

12       And ultimately, it is true, the people of the

13   District of Columbia will pay for this, but that's always what

14   the District argues.  They use them like a human shield.  They

15   say, "Well, we know that we did all this, but you don't want

16   these people to have to pay for what we did."

17       Well, until we do, they're going to keep on doing

18   it.  And what we've asked for in this case is that we resume

19   discovery, we're allowed to explore these documents in a way

20   that they did not permit us to, we'll deal with sanctions

21   separately in terms of the costs that they have imposed on

22   everyone and we set six months as our goal.  And you know,

23   before, to be honest with you, the six months we looked at --

24   and that's going to be a pretty herculean effort.

25       THE COURT:  For more discovery?

 1          MR. TURLEY:  Yeah, it's going to be tough, but we

 2    think that we can do it as long as the District does not

 3    engage in the objections and delays and the dilatory tactics

 4    that they have.  We've got privilege assertions here which are

 5    absolutely bizarre.  We, as I mentioned in one of our filings,

 6    we have one that is the immaculate redaction.  It is a

 7    document that only has -- come in redacted form.  Nobody

 8    apparently remembers what the document originally said, why it

 9    was redacted.  It's just an immaculate redaction, and they

10    gave it to us.

11          Well, stuff like that, we'd like to look in

12    discovery and find out if anyone knows.  And so what we submit

13    to the Court is that the way to respond to this misconduct,

14    without getting into the sanctions, is to say, "When you

15    produce 16,000 pages of documents and you make all these

16    privilege assertions and you produce documents like this one,

17    you're going to have to do discovery again on your dime," and

18    we're willing to set a trial date and make that date.

19          I long for the opportunity to be in this room and to

20    hold the trial on this case.  I'd like to do it before my

21    children go to college.  And so what we would submit to the

22    Court is that we believe we put forward a reasonable proposed

23    order that would resume discovery.  The Court can set a date,

24    if it wants, for a status review to make sure that we're not

25    taking any -- you know, we're not being overly litigious, but

1    we would like the ability to pick our -- those deposition

2    witnesses, do some witnesses and see who we need to call,

3    exactly what we had the right to do before discovery was

4    abused.  And that would be our position, Your Honor.

5             THE COURT:  All right.  You share that, that belief,

6    six months?

7             MS. VERHEYDEN-HILLIARD:  Yes, Your Honor.

8             THE COURT:  All right.  Mr. Nickles.  You've been

9    sitting anxiously.  Good morning.

10            MR. NICKLES:  Good morning, Your Honor.  It's good

11   to be back in your courtroom.

12            Let me say a few things, and one is that I'm not

13   going to engage in argument about the details of discovery.

14            THE COURT:  It's good to have you back as well.

15            MR. NICKLES:  Thank you, Your Honor.  With respect

16   to the radio runs and the running resumes, I asked Judge

17   Sporkin to do an independent investigation of those mysteries

18   that have been mysteries for a long time, going back through a

19   number of mayors and a number of attorneys generally.

20            I have put no limitations on Judge Sporkin.  He has

21   talked to the Plaintiffs.  He's received whatever he wants.

22   I've asserted no privilege, and I want him to tell me and tell

23   you and tell the Plaintiffs what he has determined with

24   respect to those two what I call mysteries.

25            Secondly, I have reconstituted the trial team, and I

 1   am heading the trial team, and I will --

 2          THE COURT:  For this case?

 3          MR. NICKLES:  To this case and for all of the cases

 4   involving demonstrations, and I will enter appearances for

 5   those lawyers who will be representing the City in these

 6   demonstration cases.

 7          Thirdly, I do think it's important to echo what I

 8   heard the Court say about the fact that we have a -- we have a

 9   tremendous number of very good lawyers, good people, and so I

10   take objection to all the comments that are being made about

11   the City and about patterns of abuse.  If there's a need for

12   additional discovery, then I suggest a magistrate be asked to

13   look at the documents that have been produced that should have

14   been produced before, have some kind of showing, minimal

15   showing, if necessary, that the document needs to precipitate

16   additional discovery.  I understand there has been, I don't

17   know, 50, 60 depositions, thousands of documents previously

18   produced.

19          THE COURT:  But that's another layer.

20          MR. NICKLES:  That's another layer.

21          THE COURT:  And that's a burden on the magistrate

22   judges, and I'm not really enthusiastic about burdening them.

23          MR. NICKLES:  Let me say this, Your Honor.  My

24   primary objective is to see if I can settle these cases.  I've

25   met with the Plaintiffs in the *Barham* case.  I've not been

1   able to find the time that would be convenient to the *Chang*

2   Plaintiffs, but I intend to meet with them.  I've met with the

3   colleagues in the *Becker* case and I intend to meet with them

4   in the *Bolger* case.

5          THE COURT:  Now, the City expressed this more than a

6   year ago, the City's desire to settle the case.  I think it

7   was in January '08 or '07.  The years tend to run together.

8          MR. NICKLES:  Well, your --

9          THE COURT:  But wait a minute.  And everyone in good

10  faith said they wanted to sit down and settle the case and

11  they wanted -- thinking back now, they wanted an independent

12  mediator and the parties agreed on one and there was some

13  conflict, I believe, and then the parties -- it was February,

14  I recall.  It was February of '08, and we sent the case out

15  and got a bill back from a mediator that I had to force the

16  lawyers to split and pay, but nothing happened.  Nothing

17  happened.  And that's --

18         MR. NICKLES:  I recall, Your Honor, I think the last

19  time I was in your courtroom on a fairly major case, you said

20  how about Judge Shugart.  Well --

21         THE COURT:  I suggested her.

22         MR. NICKLES:  I don't know what Judge Shugart is

23  doing right now, maybe she could help us but I --

24         THE COURT:  Well, we could talk about that.

25         MR. NICKLES:  But Your Honor, there were, in my

1   view, two important breakthroughs in our discussions thus far

2   that had not previously be on the table so to speak.  I won't

3   get into those because those are confidential, and I think I

4   am more confident.  I intend to make a counterproposal to the

5   Plaintiffs in *Becker* and in *Barham* within the next week.

6           THE COURT:  What about *Chang?*

7           MR. NICKLES:  I haven't -- I've been trying to get a

8   meeting with the *Chang* lawyers.  I assume that I will meet

9   with them when it's possible and I will see what I can do

10  there.  I also want to discuss, I think, with some of the same

11  lawyers, the *Bolger* case, which is set for trial November 30.

12          These cases, however they got to the point where

13  they are, are a disaster.  They reflect badly on all of us.

14          THE COURT:  Not on the Court.

15          MR. NICKLES:  Not on the Court, Your Honor.

16          THE COURT:  The Court's done everything -- seriously

17  though, the Court has done everything it possibly could do to

18  ensure that the Plaintiffs receive everything that they're

19  entitled to.

20          MR. NICKLES:  Absolutely.  But you notice the

21  comment, and to say Judge Lamberth said something, that was

22  over ten years ago.  And I know the Chief has made himself

23  clear in the last two or three years about the tremendous

24  improvement we've had in the office of the Attorney General,

25  and every moment that I spend is to improve the office.

1          And Your Honor, to tell you about the document

2   management system, which I have been after for a long time.  I

3   have now, with your help actually, imposed my will.  I have to

4   read a little bit from this, Your Honor, because some of the

5   technical jargon is a little -- my grandkids understand it.

6          We have this concordance system.  We have initiated

7   the procurement process for this so that beginning October 1

8   and to be completed in 60 days, I will be in a position to

9   convert all paper documents relating to the demonstrations

10  into electronic form.  I'm hopeful that both for these cases

11  and for other cases we'll be better able to keep track of what

12  has been produced.  I don't even think, as I review the

13  situation, we know whether the documents we're producing now

14  were previously produced.

15         I have sat on the police department and I have now,

16  for the first time, I think, a complete index of all the

17  documents relevant and produced.  I mean, how can you tell if

18  you've produced documents before if you don't have an index of

19  what you produced in this concordance system, I'm told.  And I

20  know at Covington, you know, we -- we had a great system, and

21  I just don't want to have lost, Your Honor, in this discussion

22  and in the press and in the media, because it's important, I

23  think, for the City to maintain credibility.

24         Now, when it does things, and I've said in my

25  affidavit, that relate to discovery that in my view are

1   inexcusable, I take action.  I do it with respect to my own

2   office and I do it with respect to every agency I come into

3   contact with in this city.  Some people don't like it, but

4   Your Honor, I have nothing to lose.  I have not taken this job

5   to run for mayor or to make a lot of money.  This is a job

6   I've taken in order to do justice for the citizens of the

7   City.

8          This has not gone the way it should have, and ever

9   since I started getting into it, we have been doing things,

10  we've been scrubbing floors, we have gone into closets, and

11  these people right here, Ms. Efros and Mr. Valentine and Jack

12  Copeland, they're doing a great job.  I want the Court to know

13  that they're doing a great job, and I don't want the comments

14  of my distinguished colleagues on the other side who are

15  arguing things -- Your Honor, I read, over the weekend, the

16  motions for increased sanctions.  I mean, it reads to me like

17  something out of Tolstoy.

18         I mean, there were so many footnotes and so many --

19  if that -- that is -- those are not motions that you can

20  comprehensively respond to.  I don't know how a court -- how

21  the parties can understand it.  We're going to get these cases

22  settled.

23         THE COURT:  You're optimistic.

24         MR. NICKLES:  I am optimistic.

25         THE COURT:  How much time do you need, in good

1    faith, to try and settle these cases?

2         MR. NICKLES:  Well, I'm going to make a counter, and

3    I hope it will be responded to positively.

4         Your Honor, the other thing I have to think about is

5    I've got a billion-dollar-and-a-half deficit for Fiscal '11.

6    I've had 900 million in Fiscal '10, and I'm going to protect

7    the taxpayers money, but I am not going to be insensitive to

8    the fact that there's liability under the D.C. Circuit opinion

9    in the common law area.  And so it makes sense, and I settled

10   a lot of cases over 45 years of practice at Covington, to get

11   it behind us.

12        THE COURT:  How much time do you need, in good

13   faith, to try and settle this case?  And the second part of

14   that -- Well, why --

15        MR. NICKLES:  I want to settle all these cases.

16   That's the other thing, Your Honor.  I can't settle -- and I

17   told my distinguished colleagues.  I can't settle their case

18   and then have Mr. Turley come at me and have the *Bolger* case

19   and have the *Becker* case and there may be a couple others.  I

20   need to settle them all.  And that's my purpose, to settle

21   them all.

22        And I was -- let me say to my colleagues.  I was

23   very pessimistic, having heard the numbers and the numbers are

24   big, before I had the conversation, and I'm much more

25   heartened by the conversation.

1    THE COURT:  How many of these cases are pending?

2  Five or so?

3    MR. EFROS:  Your Honor, there is three that are

4  active, which are these two -- I should say four.  These two,

5  *Becker* and *Bolger,* those are the most active.

6    MR. NICKLES:  And so -- and the thing I liked about

7  Judge Shugart is that she didn't give up.

8    THE COURT:  When you're fixing the problem -- Just a

9  suggestion.  When you're fixing the problems in your office,

10  you might also want to take a look at how the police respond

11  to people exercising their First Amendment right in the

12  District of Columbia.

13    MR. NICKLES:  Absolutely, Your Honor.

14    THE COURT:  You have four major class actions in the

15  City where people come to express their views, is outrageous.

16    MR. NICKLES:  One of the things -- let me say there,

17  Your Honor, because I completely agree with that, is that the

18  Use of Force Agreement that the Justice Department imposed on

19  the City because of abuses in the police department was

20  released, removed, terminated early.  I think it was within

21  the last year, Your Honor.  I'd be happy to give you the

22  details because the Justice Department was convinced of the

23  progress that was made by the police department, and there are

24  all kinds of requirements now in effect as a result of that

25  agreement with the Department of Justice, and some of the

 1    actions taken by Chief Lanier.

 2              So, I am not going to be sparing in my criticisms of

 3    my own lawyers or the police department lawyers or anyone else

 4    that may have behaved negligently or in any way improperly,

 5    and that's why I just figured, because the Plaintiffs' lawyers

 6    would never believe me if I were to supervise the

 7    investigation of the running resumes and the audiotapes, I

 8    don't know it.  I read Mr. Koger's affidavit, I read their

 9    affidavits, and so I asked Judge Sporkin, who's a good man.

10    He doesn't need this either, but he's interested in the City

11    and the welfare of the City, and he said, "I'll do it."  And

12    he's going to help me on settlement also, Your Honor.

13              THE COURT:  Give me a time frame, though.  That's

14    your goal to settle.  Unless you can settle all these cases,

15    there's no interest in settling any one or two cases.

16              MR. NICKLES:  I would say by Thanksgiving.  I should

17    either be able to have them settled by Thanksgiving or know

18    that there's no hope in trying to settle, and then let's go to

19    trial.  I'd be happy to try a case again in your courtroom.

20              THE COURT:  I'm sorry, I was just reading a note.  I

21    need to give the court reporter a break.  I'm sorry.  Your

22    response was what?  What month?

23              MR. NICKLES:  By Thanksgiving.

24              THE COURT:  And without the -- without the

25    assistance of anyone else?  Just you and the lawyers?  You and

1   the attorneys?

2       MR. NICKLES:  Your Honor, I'd like to try it with

3   the attorneys.  I think what happens too often with mediators

4   is they -- and this comes from my experience, Your Honor.  It

5   may be unique.  Is that they get a demand from the Plaintiff,

6   they get a demand from the Defendants and they say, "Okay,

7   somewhere in between we can do something."

8       And two of the gut issues that I perceive, when I

9   looked at the cases in terms of settlement, wishes I raised

10  with my colleagues, and if they're response had been negative,

11  I would say said let's get ready for trial, but their response

12  was positive and it makes me hopeful that I can come up with

13  something that will both be fair, will protect the taxpayers

14  of the City and will put this behind us, because this is a

15  long -- it's been going on a long time, Your Honor.

16      We have a lot of other cases where we're doing great

17  work, and that's what I want the reputation --

18      THE COURT:  This would involve your face-to-face

19  communication with counsel then.  I mean, you're in the room

20  with them.

21      MR. NICKLES:  They were in my office, Mr. Messineo

22  and Ms. -- it's a long time, but they were very professional.

23  And I met with Mr. Valentine on one and Ms. Efros and the

24  other, was just the four of us.

25      THE COURT:  I need to -- I'm not going to cut you

1   off.  I'm going to give you the same time, but I need to give

2   the court reporter a short recess.

3            MR. NICKLES:  I'm done.  I'm done, Your Honor.

4            THE COURT:  You're done?

5            MR. NICKLES:  The only other relevant thing I have

6   to say, Your Honor, is there was an argument very recently in

7   the *Carr* case, the demonstration case before the D.C. Circuit.

8            THE COURT:  Let me give the court reporter a short

9   recess.  I'm going to hear from you.  We'll take a ten-minute

10  recess.  No need to stand.  We'll take a ten-minutes recess.

11            (A BRIEF RECESS WAS TAKEN.)

12            THE DEPUTY CLERK:  Please remain seated and come to

13  order.

14            THE COURT:  All right.  Mr. Nickles.

15            MR. NICKLES:  In summary, what makes sense to me and

16  what I suggest to the Court is that, A, you permit us to focus

17  on three things.  Discovery through Judge Sporkin.

18            THE COURT:  I'm sorry, discovery through Judge

19  Sporkin?

20            MR. NICKLES:  Well, whatever Judge Sporkin needs to

21  give us his views on the running resumes and the audio -- the

22  radio runs.

23            Secondly, that I think both the parties could inform

24  the Court next week if they think an outsider would be

25  helpful.  I certainly -- the reason I suggest Judge Shugart is

1   that twice she persisted, you know, and followed us as we

2   would leave the room and chased us down and made us come back

3   and think about where this matter was going.

4        I'm sure there are other very good mediators.  And

5   then finally, if we get to a point of resume general

6   discovery, I think, with all deference to the Plaintiffs, I

7   think there should be some kind of showing that this document

8   that has been produced that Mr. Turley suggested, well, here's

9   a document, that there be some showing, whatever that showing

10  should be, that that is going to require taking the

11  depositions of 50 people again.  I just don't think it's

12  automatic.  I've been in cases where there are tens of

13  thousands of documents produced, so that's my suggestion, Your

14  Honor.

15       I'd be happy to report back to the Court by

16  conference call with the parties on a regular basis as to how

17  we're doing, whether we need help, but I think it's in all of

18  our interest to try and settle the case -- cases.

19       THE COURT:  All right.  Anyone else?  Yes, Counsel.

20  Briefly.  I need to hear from anyone else on this side, but

21  briefly.

22       MR. TURLEY:  Thank you, Your Honor.  I know my

23  colleague would also like to make a couple of comments.  But I

24  just want to note, just to correct a few things.  First of

25  all, the only response we had from the District, after this

1    Court made clear that it wanted serious settlement

2    discussions, was to schedule a 30-minute time slot with

3    Mr. Nickles, which the District later canceled, and then asked

4    us to set a new time, which we're trying to do now.  That's

5    the reason we have not spoken to them.

6         Second, when the -- when the District says we need

7    to focus on this and we might need a mediation and we should

8    look at settlement, if you take what Mr. Nickles just said and

9    white-out his name and put in Mr. Koger's name, you would have

10   the transcript from 2008.  That's exactly what the District

11   said.  They said, "Let's stop everything.  Let's go to

12   settlement."  And they tried to change the mediators.  We've

13   had two sets of mediators.  They keep on going through

14   mediators and then trying to get a new one.

15        We just had Judge Levy, who's respected by all

16   parties.  I welcome Mr. Nickles saying that he will meet with

17   us directly.  I think that is a very good thing, but the one

18   thing I want to emphasize is that the District should not

19   continue to kick this can down the road.  We have now

20   almost -- we have fully briefed the discovery issue.  We're

21   almost completed on the sanctions issues.  We feel strongly

22   those things go forward, and indeed, I think that they will

23   assist in settlement so the District knows that it can't just

24   simply delay this.

25        Now, I want to address the Sporkin issue.  We did

1  meet with Judge Sporkin and we asked him directly what his

2  role was.  He has a single piece of paper with about two

3  paragraphs on it that he read to us.  We didn't get a copy of

4  it, but he confirmed that he was not an independent

5  investigation.

6        And by the way, the District never called us as to

7  who we would like to have for an independent investigator.

8  They have never responded to our requests to simply tell us

9  what connections that Judge Sporkin has to this, Mr. Nickles'

10  past connections to this case, Ms. Efros' past connection.  We

11  have mentioned that now in repeated filings.  They simply

12  refuse to give us that information, standard information you

13  would have before you go into any mediation or an independent

14  investigation, but Judge Sporkin confirmed he's not

15  independent and he's part of the OAG, he's advising Mr.

16  Nickles, he's the person that Mr. Nickles selected.  He also

17  confirmed he hasn't asked for privileged documents.  His

18  investigation has really barely started.

19        He also suggested that he might not have full

20  authority to engage in settlement discussions, and all of this

21  is simply for this conclusion.  Whatever we do, we're

22  interested in having a settlement.  I'd be interested in

23  trying a case against Mr. Nickles in this courtroom.  Maybe

24  one of those two options will come about, but we do ask the

25  Court that the District should not be allowed to delay the

1   pending motions again with a promise that they are now going

2   to engage in meaningful settlement negotiation.  I know my

3   colleague also wants to add a point.

4           MR. NICKLES:  Your Honor, I'd like to address that

5   before -- because -- Sit down, Mr. Turley.

6           I resent the suggestion that somehow I am lying to

7   the Court.  If Judge Sporkin needs to submit something, I have

8   spoken to Judge Sporkin.  I have told Judge Sporkin that he is

9   to do this independently.  He has said he would.  He has

10  questioned people on my staff.  He has questioned people in

11  the M.P.D.  He has talked to the Plaintiffs.

12          I will decide settlement.  I will get his advice on

13  settlement, but on the two issues of the running resumes and

14  the audiotapes, he's authorized me to say, and if he needs to

15  come into this courtroom and say, that he is doing an

16  independent investigation of those matters, and I have told

17  him, "If anyone gives you any trouble, you tell me because

18  then they're in big trouble, and I will not assert any

19  privilege."

20          Now, as to the connection, I have no connection to

21  Judge Sporkin.

22          THE COURT:  Right.

23          MR. NICKLES:  None.  And I have no connection to the

24  Covington and Burling role in the *Abadi* case.  This kind of

25  coverup for the sake of making that accusation, that troubles

 1   me.   That brings out my old litigator instincts and not my

 2   politician instincts.   Sorry, Your Honor.

 3          THE COURT:   All right.   I just want to stay focused

 4   on the issues before me.

 5          MS. VERHEYDEN-HILLIARD:   May I make just a brief

 6   comment, Your Honor?

 7          THE COURT:   Yes.

 8          MS. VERHEYDEN-HILLIARD:   Thank you.   I appreciate

 9   the Court's indulgence.   I will just say very briefly that we

10   have not met with Judge Sporkin yet, though we have had two

11   brief phone calls.   The first question posed to Judge Sporkin

12   was what is your role, and he did tell us that he was not

13   engaged in a comprehensive investigation.   I'm not casting

14   espursions on what Mr. Nickles is saying, but that is in fact

15   what he told us, that he's not investigating these things,

16   that he's not -- that he may be looking to see if he can find

17   missing documents, but he's not looking at the underlying

18   issues as to what occurred and who did what, the who, what,

19   where that we think really requires an independent

20   investigation with an independent prosecutor.

21          With regard to mediation or settlement, we've had

22   very excellent mediators in this case.   We do not believe that

23   mediation at this stage is potentially going to be different

24   than it was before, but we are very agreeable to sitting down

25   and sitting down with Mr. Nickles, as I believe he's

1    indicated.  We don't see that it would take till the end of

2    November.  We know what these cases involve.  We are willing

3    to clear our calendars and --

4            THE COURT:  I don't think it should take to the end

5    of November.

6            MS. VERHEYDEN-HILLIARD:  -- sit down for two hours

7    every day next week.  If we sat down face to face and

8    continued discussion, we will know whether these cases are

9    going to settle.  We in fact have provided a framework,

10   without getting into it, to the District in these cases.  We

11   have had no response.  We are not the obstacle of settlement.

12   There's not something new that came up in our discussions, and

13   I won't get into it, but that's not what's happening here,

14   Your Honor.  We have provided frameworks.  We've had no

15   response.  When they --

16           THE COURT:  Regardless of what it was, it was

17   something of interest to the Government, and that's fine.

18           MS. VERHEYDEN-HILLIARD:  And that's good.  We're

19   happy with that.  We're glad if there was some connections.

20   But we have the *Becker* case, the *Bolger* case, the *Frucht* case

21   and the *Barham* case.  They're referencing three.  There's

22   actually four that are very active right now.

23           THE COURT:  And it's not as if these are the first

24   demonstration cases with the potential for settlement.  These

25   cases have been brought over the years.  By and large, most

 1   have settled.  There have been jury verdicts.  So, there's a

 2   track regard.  There are other cases that people can look at,

 3   the *Abadi* case and other -- and it may not be on all fours,

 4   but there's some guidance out there with respect to

 5   settlement.

 6          MS. VERHEYDEN-HILLIARD:  We in fact were able to

 7   settle a major case that related to the 2001 inauguration

 8   before this administration took office.  I believe that Mr.

 9   Valentine was involved in those discussions, and we have a

10   good track record of settling cases fairly.

11          But without get into pointing fingers, I think the

12   issue is going forward, we need to sit down, we need to sit

13   down face to face, we have to clear calendars and make this a

14   priority.  We will know in short order whether these are

15   settling, but we don't want to see more delay.  We need to

16   move forward with the discovery without additional layers,

17   without additional burdens being placed on presenting each

18   document and deciding --

19          THE COURT:  I totally agree, and let me just say

20   this, and then I'll hear from Mr. Tuohey or anyone else, Ms.

21   Braswell and anyone else who wants to be heard.

22          Discovery is going to go forward.  I'm going to give

23   the Plaintiffs the six months they want.  I'm not going to tie

24   any strings to that discovery request.  They get the six

25   months discovery.  They're entitled to it.  The parties want

1    to discuss settlement, they can.

2         And if this is going to work at all, though, let me

3    just say a couple of things about it.  It's going to have to

4    be with Mr. Nickles' direct involvement in the settlement in

5    the room.  One of the things that magistrate judges tell us is

6    very frustrating and said, sometimes agreements are worked out

7    with the City and then they're rejected when they get back to

8    the higher echelons, so I don't want to go through that

9    process that way.  But if the parties want to sit down face to

10   face -- in fact, you've indicated your willingness to that,

11   correct, Mr. Nickles?

12        MR. NICKLES:  Only be one person talking settlement,

13   that will be me.

14        THE COURT:  All right.  I'm going to take you at

15   your word, Counsel, that's fine.  But I'm not going to hold up

16   discovery.  Discovery is going to go forward.  In fact, the

17   *Barham* trial date is September the 1st.  I wanted it to go

18   early on in the year, but the Plaintiffs have convinced me

19   they're entitled to that discovery, and they're going to get

20   it, which takes us to March.

21        Pretrial proceedings with all the requests for

22   sanctions, special instructions is going to be a task, so I

23   think it would be a mistake to set a trial date sooner than

24   September for the *Barham* case.  The *Chang* case will be October

25   the 1st.  Those are firm dates, and I'm not going to change

 1    those dates.

 2         So, they're firm trial dates for both cases.

 3    There's a firm discovery period, and I'm not going to rule out

 4    the possibility that that could be extended briefly for a good

 5    cause.  And the parties want to discuss settlement, and I

 6    accept Mr. Nickles' representations that he will speak for the

 7    City with respect to settlement.

 8         I don't need to sit here and say you only have

 9    through September -- I mean, you only have through

10    Thanksgiving.  There's no need to do it.  Discovery is going

11    to go forward.  There's going to be a trial.  There's going to

12    be a lot of pretrial activity.  I can assure everyone of that.

13    But I don't need to sit here and say you only have through

14    Thanksgiving, because I'm not going to stay.  If I was going

15    to stay everything, I would do that, I'd say, okay, I'll give

16    it through Thanksgiving, we'll see what happens then, and then

17    we'll talk about the need for discovery.

18         Discovery is going to go forward.  So, those are the

19    terms.  If you settle the case, that's fine.  If not, we have

20    firm trial dates.

21         Now, Mr. Tuohey or anyone else?

22         MR. TUOHEY:  Your Honor, on behalf of Chief Ramsey,

23    we do not quarrel with the request by the Plaintiffs for

24    discovery on documents that have just recently been produced.

25    We don't quarrel with that.

 1          I read into Your Honor's order a reason -- a rule of

 2     reason that if there's going to be further inquiry by way of

 3     written or oral discovery, that it will relate to the

 4     documents that they recently received.  We don't quarrel with

 5     that at all.  We understand those rights.  That's how we read

 6     the spirit of the Court's order, and we will abide by it.

 7          THE COURT:  All right.  Let me just say one thing.

 8     I want to be reasonable about it.  Obviously, if you folks are

 9     scheduled for a trial on September 1st or October 1st, anyone,

10     I need to know that, but that's far enough in the future, I

11     doubt that, but are you?

12          All right.  Then those dates are really firm now.

13     All right.  Ms. Braswell, anything?

14          Good morning.  Good afternoon.  How are you?

15          MS. BRASWELL:  Hello, Your Honor.  I would actually

16     like the Court to give some consideration to the issue of

17     discovery because it does affect not just the District and the

18     Plaintiffs, but it affects all the other parties.  And we have

19     discovered that some of the documents that the District has

20     turned over have been turned over to the Plaintiffs before.

21     They're not all new.  And so this issue of a discovery plan

22     which the Court has indicated that it does not want to pursue,

23     I would ask the Court --

24          THE COURT:  That's another layer.  That's going to

25     require them to spend, you know, tens of hours preparing a

1    plan, and I'm just not going to burden them with that.  If

2    someone's deposition is noted and there's a good faith basis

3    to oppose that, it shouldn't go forward for some reason, let

4    me know.  The parties can let me know.  No one is going to be

5    abused.

6            MS. BRASWELL:  Well, then, Your Honor, if I might

7    request on behalf of my clients that if in fact the Plaintiffs

8    seek to depose any federal employees --

9            THE COURT:  My guess is that people are going to be

10   redeposed.  That's my guess.  That's my calculated guess, and

11   I'm sure that's yours as well.  I'm not going to tie their

12   hands and say, "Well, you know, you can't redepose the former

13   chief or you can't do this."  If they want to spend their six

14   months doing it and there's a good faith basis for it, they're

15   entitled to it.

16           MS. BRASWELL:  All I'm asking, Your Honor, is with

17   respect to any federal employees, if they intend to note their

18   depositions, that they be required to tell us the areas that

19   will be covered that will be new, because there have been

20   numerous federal employees that have already been deposed, and

21   then that would give us an opportunity to actually come to

22   this court and say, "We don't think this is a basis for an

23   additional deposition."

24           THE COURT:  Maybe the area of inquiry is not new.

25   Maybe it's for impeachment purposes.  I don't know.  I'm not

1   going to saddle them with that responsibility.  I don't think

2   that's appropriate.

3            MS. BRASWELL:  But it's not fair with the federal

4   defendants, Your Honor.  We had nothing to do with documents

5   being given to the Plaintiffs after the close of discovery, so

6   it seems to me that simply giving us some notice so that we

7   would have an opportunity to seek recourse before this

8   court --

9            THE COURT:  What about that?  Is that unfair?

10           MS. BRASWELL:  -- it would be fair to the federal

11  defendants.

12           THE COURT:  What about that?  They weren't involved

13  in the document --

14           MR. TURLEY:  Your Honor, we haven't said that the

15  feds have been involved in it, but the Federal Government was

16  working hand in hand with the District.  They were working for

17  the same purposes.  These documents do have bearing on their

18  witnesses.  To say that we won't go over the same areas, the

19  same area is the protest, it's their involvement, it's what

20  they saw, it's what they heard, it's what they did before.

21           We have 16,000 pages here.  We haven't even gone

22  through them all yet.  Yeah, there's a few duplicates but the

23  main body, as the District has already represented, they had

24  to produce after discovery.  We're going through it.  There's

25  a great deal of new material.  Some of it, obviously, is

1    bearing on the federal agents.

2           To suggest that we're not going to go over these

3    same areas -- of course, we're going to go over the same

4    areas.  We have 16,000 pages that relate to the mass arrest.

5    And so the standard that my esteemed colleague is suggesting

6    is an impossible one.

7           Every single witness we would call, we would say, of

8    course, we're going to go over what they saw, what they heard,

9    what they did in light of 16,000 pages of new evidence.  And

10   as this court has already said, if Ms. Braswell believes that

11   we're abusing the process, she can raise it with the Court.

12   We're not going to let that happen because we know that we

13   need to maintain this court's view of our work as credible,

14   faithful and in good faith, and we intend to continue to do

15   that.

16          THE COURT:  All right.  If need be, I'll appoint a

17   magistrate judge.  I really don't want to burden our

18   magistrate judges with discovery, and you know, I just want to

19   keep the parties before me and keep their feet to the fire and

20   get discovery concluded.  And if there's not going to be

21   settlement, start preparing for trial, so I don't want to

22   unduly burden our magistrate judges because that's another

23   layer.  I don't want to do that.  They've worked very hard up

24   to this point.  I'm not ruling out the possibility they could

25   be helpful with respect to settlement discussions, they could

 1 | be, but I'm not going to burden them, not going to make a

 2 | referral to them.

 3 | If the parties want to enlist their aid, they can do

 4 | that.  Counsel, no one is going to be abused.  If you believe

 5 | that anyone is abusing the process, you know how to reach me.

 6 | MS. BRASWELL:  Okay.

 7 | THE COURT:  Anyone else?

 8 | MR. FRANCUZENKO:  Your Honor, may I be heard?

 9 | THE COURT:  Sure.

10 | MR. FRANCUZENKO:  Again, Your Honor, Alex

11 | Francuzenko on behalf of Fairfax County Sheriff's office.

12 | Your Honor mentioned that no dispositive motions would be

13 | considered further in the case, and from my perspective, I'm a

14 | small player in this case.  I'm only in the *Chang* case.

15 | Fairfax has not been sued in the *Barham* class action, but I

16 | think there are legal, strictly legal issues related to

17 | Fairfax based on undisputed material facts that may eliminate

18 | me from the case completely or at least parts of the case that

19 | I would hope the Court would permit.

20 | THE COURT:  I'm not going to be unreasonable about

21 | it.  I'm just not really thinking that I want to devote two or

22 | three more years resolving potentially dispositive motions,

23 | but I'll give that some more thought, but not at the pretrial

24 | stage now.  And it may well be appropriate for the Court to

25 | put in place a schedule for the filing of potentially

1    dispositive motions.  It may well be.

2         I mean, for instance, the Federal Government's case

3    will be tried nonjury.  It's not unusual for a judge,

4    especially a federal judge, to allow the motion to be filed,

5    take it under advisement and hear the evidence and rule as

6    appropriate at any point in time during the trial or after the

7    trial.

8         So, I'm not going to be unreasonable about it.  It's

9    not my desire to be inundated with another round of motions.

10   This case has been up to the circuit.  Both these cases have

11   been up to the circuit, what, three times or so, or twice.

12   I've lost count.

13        MR. FRANCUZENKO:  I understand.

14        THE COURT:  Twice.  And the circuit has already

15   affirmed --

16        MR. FRANCUZENKO:  And those aren't the issues that

17   Fairfax would be addressing, Your Honor.

18        THE COURT:  I understand.  We could talk about that

19   at some point, Counsel, but I'm not going to just summarily

20   dismiss your request, all right.

21        MR. FRANCUZENKO:  Thank you.

22        THE COURT:  I'm not going to do that at all.

23        MR. FRANCUZENKO:  Thank you, Your Honor.

24        THE COURT:  All right.  Anyone else?

25        MR. DESO:  Good afternoon, Your Honor.  With respect

 1    to Assistant Chief Newsham, I agree with Mr. Tuohey's position

 2    that if good sense and reason is used, there is no objection

 3    in terms of the additional discovery in terms of any newly

 4    discovered documents, and to the extent that they may impact

 5    on subjects previously gone over; however, I know he has

 6    had --

 7               THE COURT:  Someone has their phone on.  I'd ask you

 8    to turn it off because it interferes with our recording.

 9    You're not in trouble, but if you don't turn it off, you'll be

10    in trouble.  So please turn it off.

11               MR. DESO:  That's all, Your Honor.

12               THE COURT:  All right.  Did you want to say

13    something else?  Do I need to schedule another status?  Maybe

14    I should schedule another status hearing.

15               MS. VERHEYDEN-HILLIARD:  [Inaudible because of

16    interference of cell phone.]

17               COURT REPORTER:  I'm sorry, but I can't hear you.

18               THE COURT:  Somebody's got a cell phone.  I'm not

19    even looking out there, so go ahead and turn it off.

20               (LAUGHTER.)

21               THE COURT:  Okay.  It's off, I think.

22               MS. VERHEYDEN-HILLIARD:  Your Honor, we would

23    request a follow-up status.  We think it's very important and

24    helpful.

25               THE COURT:  What time frame?  What makes sense here?

1          MS. VERHEYDEN-HILLIARD:  Will the Court be

2    evaluating -- all the sanctions motions will be briefed by mid

3    November, I believe.  The Court will have heard from the

4    Government and from the Plaintiffs again.

5          THE COURT:  I'm not so sure that I'm going to be

6    prepared for a hearing.  The motions will be fully briefed by

7    mid November; is that right?  Maybe I should --

8          MR. NICKLES:  We may ask for extension of time to

9    respond, obviously, because of --

10         THE COURT:  I'm not going to grant it.  I'll deny

11   it.  You can file it, but I'm going to deny it.  Save yourself

12   some time, focus on settlement.  I'm not going to extend the

13   time.  I think I made that clear when I put in place that

14   scheduling order.

15         MR. NICKLES:  This is in response to the motion on

16   discovery and the other motion on sanctions.  If the Court's

17   going to take those up, we're going to need time to respond.

18   It was a-hundred-and-some pages.

19         THE COURT:  Wait a minute, there's a briefing

20   schedule in place for the motion for sanctions, correct?

21         MS. VERHEYDEN-HILLIARD:  Correct, Your Honor.

22         THE COURT:  When is your response due?

23         MR. EFROS:  I'm sorry, Your Honor.  I believe the

24   Defendants' response is due on the 15th of October.

25         THE COURT:  That's what I thought.  I'm not inclined

1   to extend that time, Counsel.  I'm just not going to do it.

2   So that's denied.  Request is denied.  I'll treat it as a

3   motion, oral motion to extend the time past October 15th.

4   Deny it.

5           I'll schedule a status hearing in both cases for

6   November the 17th.  That's a week before Thanksgiving at

7   10:00 o'clock.  Bad date or bad time?

8           MS. VERHEYDEN-HILLIARD:  That would be fine.

9           THE COURT:  That's not going to be a hearing on the

10  sanctions, but I'm not going to extend the briefing schedule

11  for that.

12          MS. VERHEYDEN-HILLIARD:  The 17th would be fine

13  for Plaintiffs, Your Honor.

14          THE COURT:  Just so it's clear, the six months runs

15  from this date forward for discovery, and I'm not going to

16  reconsider that.  And we have firm trial dates.  Those are

17  firm trial dates.  I'm not going to move them either.

18          I'll issue pretrial orders at the appropriate time.

19  It will probably be before the next status hearing.  I'm not

20  going to be inclined to extend time for any reason.  I'm just

21  not going to do it.

22          It's time to bring about some closure, either

23  settlement of these cases or a resolution by a jury and/or a

24  judge in this court.

25          MR. TURLEY:  Thank you, Your Honor.

1          MS. VERHEYDEN-HILLIARD:  Thank you, Your Honor.

2          THE COURT:  Mr. Nickles, it's good to see you.  I

3   hope you come back in November and tell us good news; if not

4   before then.

5          MR. NICKLES:  I hope I will, Your Honor.  It's my

6   intention to.

7          THE COURT:  All right.  Everyone have a wonderful

8   day.  All right.  Thank you.

9          (PROCEEDINGS END AT 12:45 P.M.)

10                      *-*-*-*

11

12

13              **CERTIFICATE OF REPORTER**

14          I, Catalina Kerr, certify that the foregoing is a

15   correct transcript from the record of proceedings in the

16   above-entitled matter.

17

18

19

20

21   _____    _____

22   Catalina Kerr                     Date

23

24

25