```
 1                  UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3   RAYMING CHANG, ET AL.          :
                                    :
 4             Plaintiffs,          :   Criminal Action
                                    :   No. CA 02-2010
 5       v.                         :
                                    :
 6   UNITED STATES OF AMERICA,      :   October 18, 2010
                                    :   Morning Session
 7   ET AL.,                        :   9:36 a.m.
                                    :
 8             Defendants.          :   Washington, D.C.
                                    :
 9                                  :
     .........................      :
10

11              TRANSCRIPT OF EVIDENTIARY HEARING
             BEFORE THE HONORABLE JOHN M. FACCIOLA
12          UNITED STATES DISTRICT MAGISTRATE JUDGE

13    APPEARANCES:

14   FOR THE PLAINTIFF        P.J. MEITL, ESQ.
     RAYMING CHANG:           Bryan Cave LLP
15                            1155 F Street N.W.
                              Washington, D.C. 20004
16
                              JONATHAN TURLEY, ESQ.
17                            The George Washington University
                               Law School
18                            2000 H Street, N.W.
                              Washington, D.C.  20052
19

20
     COURT REPORTER:          PATRICIA A. KANESHIRO-MILLER, RMR
21                            Certified Realtime Reporter
                              Official Court Reporter
22                            Room 4704B, U.S. Courthouse
                              Washington, D.C. 20001
23                            202-354-3243

24
                      (Appearances continued on next page)
25
```

(Appearances continued on next page)

```
 1                      APPEARANCES (CONTINUED)

 2    FOR THE FEDERAL          MARINA BRASWELL, ESQ.
      DEFENDANTS:              U.S. Department of Justice
 3                             Civil Division
                               555 Fourth Street, N.W.
 4                             Washington, D.C. 20530

 5    FOR THE D.C.             MONIQUE PRESSLEY, ESQ.
      GOVERNMENT:              SHANA L. FROST, ESQ.
 6                             Government of the District of Columbia
                               Office of the Attorney General
 7                             441 Fourth Street, N.W., 6th Floor South
                               Washington, D.C.  20001
 8

 9    FOR PETER J. NEWSHAM:    ROBERT E. DESO, ESQ.
                               Deso & Buckley, P.C.
10                             1828 I Street, N.W.
                               Suite 270
11                             Washington, D.C.

12    FOR CHARLES H.           LAUREN E. CURRY, ESQ.
      RAMSEY:                  Brown Rudnick
13                             601 Thirteenth Street, N.W.
                               Washington, D.C.  20005
14

15    FOR FAIRFAX COUNTY       ALEXANDER FRANCUZENKO, ESQ.
      SHERIFF'S DEPARTMENT:    KELLI FRANCUZENKO, ESQ.
16                             Cook Kitts & Francuzenko
                               3554 Chain Bridge Road
17                             Suite 402
                               Fairfax, Virginia  22030
18

19    FOR RONALD HARRIS:       JENNIFER M. BLUNT, ESQ.
                               Kutak Rock LLP
20                             1101 Connecticut Ave, N.W.
                               Washington, D.C.  20036
21

22

23

24

25
```

1                          CONTENTS

2      WITNESS                                        PAGE

3         RONALD B. HARRIS
                 Cross-Examination                      4
4                Redirect Examination                  52
                 Recross-Examination                   89
5
          THOMAS LOUIS KOGER
6                Examination by Judge Facciola         93

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        PROCEEDINGS
 2          THE CLERK:  This is Civil Case 02-2010, Raymond Chang,
 3     et al., versus United States, et al.
 4              This is an evidentiary hearing, day five.
 5                        RONALD B. HARRIS,
 6     having been previously duly sworn to tell the truth, the whole
 7     truth and nothing but the truth, was examined and testified
 8     further as follows:
 9                        CROSS-EXAMINATION
10          BY MS. PRESSLEY:
11     Q.  Good morning, Mr. Harris.
12     A.  Good morning.
13     Q.  How many years have you been an attorney in The
14     Metropolitan Police Department General Counsel's Office?
15     A.  25, 26 years.
16     Q.  Almost 26 years.  Now, during that time, was there a brief
17     break in service?
18     A.  Yes.
19     Q.  What period was that?
20     A.  From 1997 until 1999 I was in private practice.
21     Q.  You did criminal defense work?
22     A.  No, I was with an insurance defense firm.
23     Q.  Insurance defense?
24     A.  Yes.
25     Q.  Okay.  When you returned to the General Counsel's Office
```

1    in '99, who was the general counsel?

2    A.   Terry Ryan.

3    Q.   And he's been the general counsel up to the current day?

4    A.   Yes.

5    Q.   And in the fall of 2002, he was your direct supervisor?

6    A.   Yes.

7    Q.   Orders with respect to your job were received from him?

8    A.   Yes.

9    Q.   And directives that he gave you with respect to your job,

10   you followed?

11   A.   Yes.

12   Q.   Cases that you were assigned, those cases were assigned by

13   him?

14   A.   Yes.

15   Q.   Now, Mr. Ryan testified that one of your functions as his

16   assistant in the General Counsel's Office was to handle FOIA

17   requests.  Is that true?

18   A.   Yes.

19   Q.   Was that a function that you served in 2002?

20   A.   Yes.

21   Q.   He said that another responsibility or function you had

22   was related to the department's legal response to PERN cases?

23   A.   Yes.

24   Q.   What are PERN cases?

25   A.   Cases before the Public Employee Relations Board.  Those

1    are labor disputes heard by a hearing examiner at that agency.

2    Q.   And what was your responsibility with respect to those

3    cases?

4    A.   I would defend the department in those hearings.

5    Typically they involved complaints filed by either an employee

6    of a union or the labor organization itself.

7    Q.   Okay.   Another function was to be assigned specific cases

8    in which the department was part of the District of Columbia

9    civil suit; correct?

10   A.   That's correct.

11   Q.   And your function for those cases was to gather documents

12   and other materials in response to discovery requests that

13   came in for the cases?

14   A.   That's correct.

15   Q.   Mr. Ryan testified that in 2002 he had three assistant

16   attorneys in the General Counsel's Office.   Do you agree with

17   that?

18   A.   Yes.

19   Q.   So between the three of you, the bulk of the cases for

20   that year, new cases and existing cases would be distributed?

21   A.   That's correct.

22   Q.   He said that during 2002 he believed the General Counsel's

23   Office was handling upward of 200 cases per year.   Do you

24   agree with that?

25   A.   Yes.

1    Q.   That seems accurate?

2    A.   Yes.

3    Q.   You recall -- so this would mean that roughly 60-plus

4    cases were being handled per assistant?

5    A.   Yes.  Some of those cases were more complicated than

6    others, so the more experienced attorney would handle the more

7    complicated cases, yes.  Fairly, I would say so, yes.

8    Q.   So then you would say that you may have had a little more

9    than 60 cases --

10   A.   Yes.

11   Q.   -- at a time?

12   A.   Yes.

13   Q.   So your caseload was on overload; right?  It seems.

14   A.   I think that's fair to say, yes.

15   Q.   Counsel for the Chang Plaintiffs showed you a list of

16   seven cases, which they said represented the number of times

17   the MPD was sued in Federal Court in 2002.

18         Do you remember that?

19   A.   Yes.

20   Q.   Okay.  And those were cases in which the Metropolitan

21   Police Department had actually been named as a party in the

22   case; right?

23   A.   Yes.

24   Q.   Okay.  Isn't it true that the Metropolitan Police

25   Department cannot be sued as a separate entity in a civil

1    suit?

2    A.   Yes.   The Metropolitan Police Department is non sui juris,

3    meaning it cannot be sued as a separate entity as part of the

4    District of Columbia.

5    Q.   Because a suit against the Metropolitan Police Department

6    is really a suit against the District of Columbia; right?

7    A.   Right.

8    Q.   So when a litigant sues and attempts to serve the

9    Metropolitan Police Department, that's not good service

10   against the District; is it?

11   A.   That's correct.

12   Q.   So when the litigants, the seven litigants on that page

13   sued the Metropolitan Police Department, that was improper

14   suit against the District --

15   A.   Yes.

16   Q.   -- right?

17   A.   Yes.

18   Q.   Now, with respect to lawsuits that were actually filed

19   properly against the District of Columbia, that number would

20   be much larger than seven for the period 2002, for the year

21   2002; correct?

22   A.   Most definitely.

23   Q.   In fact, there were 91 new lawsuits in which Metropolitan

24   Police Department was involved just in the year 2002; correct?

25   A.   Yes.

1    Q.   Okay.  And then in 2003, there were 218 new lawsuits in

2    which the Metropolitan Police Department was involved;

3    correct?

4    A.   Yes.

5    Q.   Okay.  Would you agree with me that over 80 percent of the

6    lawsuits in those years were false arrest, excessive force

7    type cases?

8    A.   I would have no reason to dispute that.

9    Q.   Now, those are cases that are in Federal Court and in

10   Superior Court; correct?

11   A.   Yes.

12   Q.   The amount of discovery that's necessary for those cases

13   is not determined by which courthouse it's in; is it?

14   A.   It's been my experience that cases filed in Federal Court

15   are more labor-intensive, primarily because of the different

16   deadlines required to comply with discovery requests.  It's

17   just been my general experience.

18   Q.   So let's just talk about federal cases.  Were you

19   assigned, in 2002, the Becker litigation?

20   A.   Yes.

21   Q.   Okay.  That was a mass arrest case; right?

22   A.   Yes.

23   Q.   Okay.  Were you also assigned to International Action

24   Committee?

25   A.   Yes.

```
 1    Q.   That was mass arrest; right?

 2    A.   Yes.

 3    Q.   Were you assigned to the Barham v. Ramsey litigation?

 4    A.   Yes.

 5    Q.   Mass arrest?

 6    A.   Yes.

 7    Q.   Four hundred plaintiffs?

 8    A.   Yes.

 9    Q.   Okay.  Were you assigned to Chang versus the United

10    States?

11    A.   Yes.

12    Q.   Seven additional plaintiffs for the same set of

13    circumstances --

14    A.   Yes.

15    Q.   -- right?

16    A.   Yes.

17    Q.   Okay.  Did you also have the Bolger case?

18    A.   Yes.

19    Q.   What about Frucht?

20    A.   Yes.

21    Q.   Abbate, did you have Abbate versus United States?  Was

22    that your case?

23    A.   Correct.

24    Q.   So just related to mass arrest, you had seven cases in

25    Federal Court over the -- from the period 2000 to 2004; is
```

1    that correct?

2    A.   Yes.

3    Q.   Okay.  That's not including wrongful death cases or other

4    excessive force, false arrest cases?

5    A.   Yes.

6    Q.   All right.  Now, in addition to your regular caseload,

7    these mass arrest cases brought in additional labor-intensive

8    requirements; correct?

9    A.   Yes.

10   Q.   Just by sheer number of plaintiffs involved in the case;

11   correct?

12   A.   That's correct.

13   Q.   And then in addition to that, the 2002 Pershing Park

14   arrests led to council investigations; right?

15   A.   Correct.

16   Q.   And those were additional requests for information --

17   A.   Yes.

18   Q.   -- that you were dealing with at the same time you were

19   dealing with all of your other cases?

20   A.   That's correct.

21   Q.   The council request came in the form of subpoenas --

22   A.   Correct.

23   Q.   -- correct?

24        And that was -- those requests came after the arrests;

25   right?

1    A.   Yes.

2    Q.   But you were also involved in the General Counsel

3    assisting the Metropolitan Police Department with its response

4    to the CCTV legislation hearings that took place before the

5    arrests; correct?

6    A.   Yes.  Yes.

7    Q.   In 2002, were you familiar with the term "litigation hold

8    letter"?

9    A.   No.

10   Q.   You're familiar with it now?

11   A.   Quite, yes.

12   Q.   The department's use of litigation hold letters is a

13   recent change in policy.  Would you agree?

14   A.   Yes.

15   Q.   In 2002, I'm asking you to remember back, was there any

16   letter that was used by the General Counsel's Office similar

17   to a litigation hold letter?

18   A.   No.

19   Q.   No, okay.

20        Mr. Ryan testified that as opposed to a policy, he had

21   a practice in the office of when a new case came to the office

22   or the District had been served that he would contact the

23   command officials who were responsible for the areas

24   implicated by the litigation and that it was understood that

25   they would not only produce all relevant information to you

1    but preserve everything else.

2            Would you agree that that was the way that things were

3    done in 2002?

4    A.   Yes.

5    Q.   Okay.  He said that it was done that way because there was

6    often the need to do -- it was almost routine to have to

7    inform command officials due to the large number of cases that

8    you were handling; is that correct?

9    A.   That's correct.

10   Q.   Okay.  Mr. Ryan never in 2002 directed you to issue a

11   litigation hold letter regarding the Chang case; correct?

12   A.   That's correct.

13   Q.   Or with respect to any of your cases?

14   A.   That's correct.

15   Q.   To your knowledge, was the Office of the Corporation

16   Counsel, now the Office of the Attorney General, using

17   litigation hold letters in 2002?

18   A.   Not to my knowledge.

19   Q.   You didn't receive a litigation hold letter in connection

20   to the Chang case in 2002 from the Office of the Corporation

21   Counsel?

22   A.   No, I did not.

23   Q.   Okay.  Do you recall what a ten-day hold letter is?

24   A.   Yes.

25   Q.   What's that?

1    A.   I'm not quite sure it was called ten-day hold.

2    Q.   Ten-day letter?

3    A.   Right.

4    Q.   Thank you.

5    A.   It was a request to transmit associated documents with a

6    particular lawsuit to the Office of the Corporation Counsel;

7    and typically, the request was to do that within ten days,

8    within ten days of receipt of the letter.

9    Q.   And it would specify the type of information that the

10   office was requesting and for what particular case?

11   A.   Yes, generally that.  It was the general description.

12   Q.   So when you were asked questions -- not by the Court but

13   by Counsel for Chang Plaintiffs -- with respect to things that

14   you did and did not do to preserve documents and other

15   materials related to the Chang case, did you do anything

16   different with the Chang case or fail to do anything different

17   with the Chang case than the way you worked every single other

18   one of your cases?

19   A.   No.

20   Q.   You followed the same practice that you followed in the

21   office?

22   A.   That's correct.

23   Q.   So it's not the case that in other cases you would have

24   sent out a very specific litigation hold letter but in this

25   case you purposefully failed to do so?

1    A.   That's correct.

2    Q.   You had the same expectation with this case as for all of

3    your other cases that the department officials would not throw

4    anything away?

5    A.   That's correct.

6    Q.   Would not destroy anything?

7    A.   That's correct.

8    Q.   In fact, in your experience, when you had requested items

9    in the past, such as audiotapes, they were held long after you

10   needed them --

11   A.   That's correct.

12   Q.   -- correct?

13   A.   That's correct.

14   Q.   There did come a time after 2002 when your office began

15   using litigation hold letters; correct?

16   A.   Yes.

17   Q.   Okay.  And to your knowledge, a time when the Office of

18   the Attorney General began utilizing them as part of the

19   practice for each of its cases?

20   A.   Yes.

21   Q.   Okay.  In addition to the letter that was sent by the

22   Office of the Corporation Counsel, turned Office of the

23   Attorney General, your own office developed a very specific

24   request that would go to the departments within the

25   Metropolitan Police Department --

1    A.   Yes.

2    Q.   -- correct?

3    A.   Yes.

4    Q.   Or the divisions within the department?

5    A.   Yes.

6    Q.   And that included even a requirement that they sign,

7    confirming that they had sent in certain information and

8    preserved certain information?

9    A.   Yes.

10   Q.   And those policies exist today?

11   A.   Correct.

12   Q.   Let's discuss the running resume for a few minutes.  When

13   do you recall your earliest request being for the running

14   resume, for the JOCC running resume?

15   A.   My earliest recollection of the mention of that document

16   was the subpoena issued by the City Council.

17   Q.   At the time that you were requesting the running resume,

18   did you have an intricate knowledge of the computer systems or

19   servers being utilized in the JOCC?

20   A.   No.

21        THE COURT:  Excuse me.  This request by the City

22   Council, is it in the fall of 2002 or the fall of 2003?

23        THE WITNESS:  This would have been the fall of 2003.

24        THE COURT:  Were you aware of any City Council concern

25   about the arrests made on the weekend of the 26th through the

1     28th of September --

2           THE WITNESS:  Yes.

3           THE COURT:  -- that surfaced in October 2002?

4           THE WITNESS:  Yes.

5           THE COURT:  But that did not yield a request for

6     information from the council that involved you in producing

7     and finding information?

8           THE WITNESS:  That's correct.

9           THE COURT:  So there were no requests in the fall of

10    2002?

11          THE WITNESS:  In the fall of 2002, I received no

12    requests to produce information to the council.

13          THE COURT:  How did you learn of the council's

14    interest in 2002?

15          THE WITNESS:  I observed part of the City Council

16    hearing.  The hearing was to entertain, I guess, complaints

17    from some of the people that were arrested during the event.

18    That hearing took place either mid to late October 2002.

19          THE COURT:  The witnesses who testified, did they

20    include any of the people who are plaintiffs in this case, to

21    the best of your recollection?

22          THE WITNESS:  I don't understand your question.

23          THE COURT:  Did you know who testified --

24          THE WITNESS:  Oh, yes.

25          THE COURT:  -- before the council by name?

1          THE WITNESS:  No.  I recall the names of people who

2     testified as being part of the lawsuit once the lawsuit was

3     filed, that's correct.

4          THE COURT:  Which lawsuit?  There were several.

5          THE WITNESS:  Gosh.

6          THE COURT:  Specifically, this lawsuit, the Chang

7     Plaintiffs, the four students from GW?

8          THE WITNESS:  I don't recall the names.

9          THE COURT:  All right.  How about the large mass

10    arrest, the gigantic lawsuit that has already been settled?

11         THE WITNESS:  I recall, I believe, Julie Abbate was

12    one of the people who testified at the council hearing.

13         THE COURT:  And that seems to be the name of a case

14    pending in this court at one point?

15         THE WITNESS:  Yes, that's correct.

16         THE COURT:  At least some of the people who you

17    understood to be witnesses before the council in 2002 had

18    already filed suit in this court?

19         THE WITNESS:  Yes.

20         THE COURT:  Okay.  Did that occurrence cause anyone to

21    give you direction to collect information that was created

22    during the weekend of the demonstration?

23         THE WITNESS:  No.

24         THE COURT:  And the council made no request?

25         THE WITNESS:  That's correct.

1          THE COURT:  So the council simply heard witnesses and

2     did not demand of the MPD to produce documents that you

3     recall?

4          THE WITNESS:  Certainly not at the end of October, no.

5          THE COURT:  Not October of 2002?

6          THE WITNESS:  That's correct.

7          THE COURT:  But you do recall that occurring in

8     October of 2003?

9          THE WITNESS:  Fall 2003, yes.

10          THE COURT:  Thank you.

11          BY MS. PRESSLEY:

12     Q.  I'll step away from the running resumes for a minute.  In

13     addition to the council hearings being in fall of 2002, that

14     same time period was when Lynn Becker, then counsel for Chang

15     Plaintiffs, informed Terry Ryan that a lawsuit had been filed?

16          THE COURT:  Ms. Pressley, go back over what you just

17     said.  Becker couldn't have represented the Chang Plaintiffs.

18          BY MS. PRESSLEY:

19     Q.  Lynn Becker, who was assigned in October of 2002 -- sorry

20     -- to represent the District of Columbia in the suit against

21     the Chang Plaintiffs, that email correspondence went to you,

22     right, or went to Terry Ryan and then to you?

23     A.  Yes.

24     Q.  And that request, which was contemporaneous with the

25     filing of the Chang Plaintiffs' lawsuit, was for information

1    specific to the Plaintiffs themselves; correct?

2    A.   Yes.

3    Q.   You were asked to begin gathering information concerning

4    the plaintiffs', the seven plaintiffs' arrest records?

5    A.   I don't recall that specific request but --

6    Q.   What do you recall the request being?

7    A.   My first contact with Mr. Becker, I believe, was to obtain

8    a listing of the people that were arrested during the event.

9    Q.   Mr. Ryan testified that upon receipt of Mr. Becker's

10   email, which was directed to him, that he then forwarded that

11   same email to Mr. -- to then-Chief Broadbent.

12        Were you forwarded that email, do you recall?

13   A.   I don't recall, no.

14   Q.   So the initial assignment to Chief Broadbent came from

15   Mr. Ryan with respect to MPD officials who should work on the

16   case?

17   A.   Yes.

18   Q.   Do you recall Mr. Broadbent, then Chief Broadbent,

19   assigning someone to work with you on gathering information

20   for the Pershing Park cases?

21   A.   I believe that would have been Lieutenant Pavlik.

22   Q.   In 2002 would it have been Lieutenant Pavlik?

23   A.   I don't recall.

24   Q.   Who was his predecessor as Chief Broadbent's assistant?

25   Do you recall?

1    A.   It may have been Lieutenant Dave Jackson.

2    Q.   Turning back to the running resume, when you made the

3    request, your initial request fall '03 for the running resume,

4    was this a document that was consistently requested in false

5    arrest cases?

6    A.   No.

7    Q.   To your knowledge, was this a document in the, I guess,

8    200-and-something active cases that you had in that year --

9    how many times in, I guess, the preceding ten years had a

10   request been made for the running resume, the JOCC running

11   resume or the SOCC running resume?

12   A.   I recall only one other instance.

13   Q.   So the running resume at that time was not commonly

14   requested by litigants specifically, to your knowledge?

15   A.   That's correct.

16   Q.   And it was not commonly used by the District in defense of

17   litigation, either?

18   A.   That's correct.

19   Q.   It wasn't considered a seminal piece of information that

20   contained everything needed to know about a particular

21   event --

22   A.   That's correct.

23   Q.   -- is that right?

24        It was not something that your office automatically

25   knew to request when a lawsuit came in?

1    A.   That's correct.

2    Q.   The only reason you ever saw a hard copy of a running

3    resume was due to a litigation-related request; correct?

4    A.   Yes.

5    Q.   Now, there came a time when you were given information,

6    running resumes from Doug Jones; correct?

7    A.   Yes.

8    Q.   Okay.  He gave you the Bolger which was spring 2002,

9    running resume for the JOCC?

10   A.   Yes.

11   Q.   And he also gave you an Intel running resume for fall

12   2002; correct?

13   A.   Correct.

14   Q.   Okay.  When you received the two running resumes, you

15   turned those over to the council --

16   A.   That's correct.

17   Q.   -- correct?

18        All right.  Did you have enough specific information

19   at the time that you received them to know what should be in

20   one and what should be in the other?  Did you know what the

21   contents should be in the JOCC running resume?

22   A.   No.

23   Q.   Okay.  Did you know how the contents should be different

24   for an Intel running resume?

25   A.   No.  I mean, the -- my only frame of reference with

1    respect to the running resume was the one that I recall seeing

2    relating to another mass demonstration case that took place in

3    April of 2000.

4    Q.   Is that Becker?

5    A.   No, this -- the name of the case escapes me right now, but

6    it was litigation arising from the April 2000 -- it may have

7    been Becker -- the April 2000 litigation.

8    Q.   Is that International Action Committee?

9         No?

10        Okay.  You, through litigation --

11        THE COURT:  I'm sorry.  Pat, did you get an answer to

12   that question?

13        THE REPORTER:  No, I did not.

14        THE COURT:  All right.  Answer that question.

15        BY MS. PRESSLEY:

16   Q.   Do you know whether it was International Action Committee?

17   A.   I don't think it was the IAC, no.

18   Q.   Okay.  So this running resume you had seen prior?

19   A.   It was a written document, it was a written

20   version -- well, it was the written running resume for the

21   April 2000 mass protest.

22   Q.   And you came into contact with that through a request, a

23   discovery request?

24   A.   Yes.

25   Q.   Do you recall, for that running resume, who you went to,

1    the 2000 running resume, to request it?

2    A.   I presume it would have been Doug Jones or somebody in his

3    chain of command.

4    Q.   You don't have a specific recollection?

5    A.   No.

6    Q.   So --

7              THE COURT:  Excuse me.

8              Please go forward.  Keep going.  Why don't you finish

9    your questioning.  I have to take a brief call, but I don't

10   want to interrupt your interrogation.  Please go forward.

11             BY MS. PRESSLEY:

12   Q.   At the time you provided the running resumes that Doug

13   Jones had you give to the council, you had only seen one

14   running resume prior?

15   A.   Yes.

16             THE COURT:  Can we just take a second.

17             (Recess taken from 10:02 a.m. to 10:10 a.m.)

18             BY MS. PRESSLEY:

19   Q.   So when Lieutenant Jones provided SOCC and JOCC running

20   resumes per the council's request for such information, you

21   then provided that information to the council?

22   A.   That's correct.

23   Q.   You were unaware at the time that the resume that you

24   provided was an Intel running resume and not a JOCC or

25   specific SOCC resume?

1     A.   What was your question again?

2     Q.   You were unaware that you were not turning over two JOCC

3     running resumes at the time as opposed to one?

4     A.   I knew I was turning over two documents.  You know, I did

5     not have the JOCC running resume that was specifically

6     requested in the council's subpoena.

7     Q.   Well, the subpoena asked for SOCC and JOCC running

8     resumes; correct?

9     A.   That's correct.

10    Q.   And the Intel running resume was a part of the SOCC system

11    but was not the specific JOCC running resume --

12    A.   That's correct.

13    Q.   -- correct?

14         So when Council Member Cheh stated that a running

15    resume had been reviewed for fall 2002, that was correct?

16    A.   That was correct, yes.

17    Q.   But it was the Intel running resume, which included

18    information from the Intel point of view about things that

19    were happening all over the city?

20    A.   That's correct.

21    Q.   All right.  When did you learn that the JOCC running

22    resume was still at large or had not been located?

23    A.   Well, at the time that I submitted those two documents, I

24    had not received any response from anyone about the JOCC

25    running resume.  It wasn't until sometime after the council

1    investigation and hearing had concluded that I realized that I

2    had not made myself or made the agency clear in its response

3    that what was submitted was not the JOCC/SOCC running resume;

4    it was sometime long after the hearing had concluded or the

5    investigation had concluded.

6    Q.   And, actually, the SOCC/JOCC running resume, those are two

7    different things; correct?  I mean, there's a JOCC running

8    resume that is specific for the JOCC for events, for special

9    events; right?

10   A.   Yes.

11   Q.   And then there's a SOCC daily report that includes similar

12   information, but it happens 24/7 every day of the year; right?

13   A.   That's correct.

14   Q.   Did you know that at the time?  Did you know the

15   distinctions?

16   A.   No.  No.

17   Q.   As the attorney in the General Counsel's Office, you

18   depended on the client to provide you the correct information;

19   didn't you?

20   A.   Yes.

21   Q.   Okay.  And you depended on the client to know its own

22   computer systems; right?

23   A.   Yes.  Yes.

24   Q.   And you depended on the technology people to have a better

25   understanding than you of what to do to get the information

1    you were requesting; right?

2    A.   Yes.  They're the subject matter of experts in those

3    areas, yes.

4    Q.   And it, also, was their obligation to preserve such

5    information; wasn't it?

6    A.   Yes.

7    Q.   That information wasn't maintained in your office, for

8    instance?

9    A.   That's correct.

10   Q.   Okay.  No servers in the General Counsel's Office; right?

11   A.   No.

12   Q.   After that took place, there came a time where you started

13   actively searching again for the running resume; right?

14   A.   Yes.

15   Q.   Okay.  Now, at the time that you did that, did you realize

16   that the running resume could potentially be stored on two

17   separate -- at least two different locations as ESI or as

18   electronically stored information?

19   A.   I had no idea that that was a feature of the way the JOCC

20   was being operated, that's correct.

21   Q.   You just thought that you were looking for someone to

22   produce a hard copy document to you?

23   A.   Yes.

24   Q.   Because that's all you had ever seen?

25   A.   That's correct.

1   Q.   There came a time where you had a conversation with George

2   Crawford about this; correct?

3   A.   Yes.

4   Q.   And George Crawford informed you that there was

5   potentially a way to access the information through the

6   servers?

7   A.   Yes.

8   Q.   And you directed him to make phone calls to see if that

9   could still be done?

10  A.   That's correct.

11  Q.   So your interest at the point that you found out that they

12  could be available electronically was not to destroy such

13  information; was it?

14  A.   Oh, no.

15  Q.   Okay.  Your goal was to produce it --

16  A.   That's correct.

17  Q.   -- in any means that you could?

18  A.   Yes.

19  Q.   After you directed him to make those phone calls, that,

20  too, was unsuccessful?

21  A.   Yes.

22  Q.   Okay.  But it was unsuccessful at this point because the

23  persons determining budget determined that it was not an

24  expenditure that should be had in order to get the information

25  from E-Teams; correct?

1    A.   That's my understanding.  It was a -- I forgot the exact

2    amount that it would take, but I believe that was a

3    prohibitive amount of money at the time, yes.

4    Q.   And that decision was not made by you; was it?

5    A.   No, it wasn't.

6    Q.   With respect to audiotapes, you -- from the beginning days

7    shortly after the arrest -- made a request to the Office of

8    Unified Command for audiotapes?

9    A.   Yes.

10   Q.   For running -- for radio run tapes specifically for the

11   IMF event --

12   A.   That's correct.

13   Q.   -- right?

14   A.   That's correct.

15   Q.   That request was made days after the arrest?

16   A.   I'm not quite sure exactly when I made the request.  I

17   know -- it was my recollection I made it at some point during

18   the council hearing.

19   Q.   Which would have been October?

20   A.   Yes.

21   Q.   Okay.  And, again, with respect to the audiotapes, your

22   intention was not to destroy information related to the

23   audiotapes --

24   A.   That's correct.

25   Q.   -- right?

```
 1              Your intention was to collect and preserve such
 2     information?
 3     A.   My purpose in doing that was to make my job easier to
 4     produce those tapes when they were asked for at some point
 5     during the council investigation.
 6     Q.   Because in your experience, if you waited, you didn't want
 7     to take the chance of them not being available later when a
 8     request came in?
 9     A.   That's correct.
10     Q.   Now, there was a good deal of questioning regarding a
11     request that came in from the Office of the Corporation
12     Counsel for duplicates of the tapes and your office's use of a
13     high-speed dubber in order to make copies of those tapes.
14     A.   I recall that, yes.
15     Q.   Was this the first time that a high-speed dubber or
16     duplicator had been used by your office to make copies of
17     radio run tapes?
18     A.   For this case, yes.
19     Q.   For any case?
20     A.   I believe on one or two other occasions I made a copy of
21     maybe one or two tapes for another case.  It wasn't related to
22     mass protests.
23     Q.   Now, this request or the actions taken by your office were
24     in response to what you perceived as the urgency of the
25     request by trial counsel --
```

1    A.   That's correct.

2    Q.   -- and the time-sensitive nature of that request --

3    A.   Yes.

4    Q.   -- correct?

5         If you had been given more time to produce additional

6    copies, you may have done it a different way?

7    A.   I most definitely would have done it a different way.

8    Q.   You viewed your role, then, as just trying to assist the

9    trial counsel as best as possible --

10   A.   Yes.

11   Q.   -- given the urgency of the matter?

12   A.   That's correct.

13   Q.   The same question, Mr. Harris, with respect to videotapes.

14   When do you recall the earliest request being, specific

15   request for video footage related to the fall 2002 IMF?

16   A.   I believe it would have been the -- one of the council's

17   subpoenas.

18   Q.   So that wasn't a litigation-related request; that was the

19   earliest request in time, but the earliest request was made

20   through the council?

21   A.   That's my recollection, yes.

22   Q.   And at that point you passed that request on in an effort,

23   again, to provide any information that you could?

24   A.   Yes.

25   Q.   At that time when that request was made, did you know that

1    the JOCC was maintaining or had the potential to maintain

2    digitally-stored images of the IMF event?

3    A.  No.

4    Q.  Did you know that the CCTV cameras that were in the JOCC

5    were digitally feeding and that that material could be

6    recorded?

7    A.  I knew at the time that there was a recording capability,

8    but I wasn't aware of its digital nature.  I'm not a -- you

9    know, I'm not an electronics aficionado, so no, I wasn't aware

10    of the nature of the system.

11    Q.  So even in knowing that it could record, you would think

12    tapes?

13    A.  Yes.

14    Q.  Okay.  And you would be looking for tapes?

15    A.  Yes.

16    Q.  But with respect to the 2002 footage, you did not believe

17    that the CCTV cameras were recording at all during that IMF?

18    A.  Yes.

19    Q.  Why is that?

20    A.  I received information from someone that the decision was

21    made not to record images during that event.

22    Q.  Okay.  Do you recall being in a meeting with then-Deputy

23    Mayor Margaret Nedelkoff Kellums regarding the fact that the

24    District would not be recording during that IMF?

25    A.  I recall a meeting in which a question arose as to whether

1    images were recorded.  This was after the event, though; and I

2    reminded her -- when she asked a question, I reminded her that

3    she gave a directive that we would not be recording.

4    Q.   You reminded her that she had given that directive?

5    A.   Yes.

6    Q.   Pursuant to negotiations and agreement with then-Council

7    Member Kathy Patterson?

8    A.   That was my understanding.

9         THE COURT:  And this agreement you understood to have

10   been made prior to September 26, 2002?

11        THE WITNESS:  Yes.

12        THE COURT:  Was it memorialized in any way?

13        THE WITNESS:  I have not seen any document

14   memorializing that.

15        THE COURT:  Were you told of that agreement by either

16   Kellums or whoever Kellums spoke to in the police department?

17        THE WITNESS:  I certainly was not told by her.  I

18   really don't recall where I got the information from, but that

19   was my understanding at the time, yes.

20        BY MS. PRESSLEY:

21   Q.   And that was not an area that you dealt with directly,

22   whether the JOCC would be recording or would not be recording,

23   those weren't decisions made in your office?

24   A.   That's correct.

25   Q.   Even if advice was sought in your office, no one sought

1    you for advice regarding that?

2    A.   That's correct.

3    Q.   So with the understanding that you had regarding what you

4    were looking for, your search for video entailed asking people

5    who were in charge to produce video --

6    A.   That's correct.

7    Q.   -- correct?

8         So you went to the people in the Office of Quality

9    Assurance --

10   A.   I believe so, yes.

11   Q.   -- and made a request?

12   A.   Yes.

13   Q.   And you also went to the Electronic Surveillance Unit --

14   A.   Yes.

15   Q.   -- or communicated with them and made a request?

16   A.   Yes.

17        THE COURT:  Did you specifically speak to Gaffigan?

18        THE WITNESS:  I don't recall if I did.

19        THE COURT:  Well, was a particular person pointed out

20   to you as the person most likely to have the information as to

21   whether or not the devices were recording that weekend?  Were

22   you told to speak to Gaffigan for the purpose of ascertaining

23   whether there had been recordings that weekend?

24        THE WITNESS:  No.

25        THE COURT:  Who did you speak to?

1              THE WITNESS:  It would have been somebody on his

2      staff.

3              THE COURT:  You don't remember the specific person?

4              THE WITNESS:  No.  It would have been, more than

5      likely --

6              THE COURT:  Did that person, whoever it was,

7      specifically tell you that pursuant to some agreement with the

8      D.C. City Council, there was to be no recording that weekend?

9              THE WITNESS:  I don't recall that conversation with

10     anyone.

11             THE COURT:  Well, how did you ascertain that there was

12     to be no recording that weekend?

13             THE WITNESS:  I just recall having that information.

14     I really don't remember who told me that.

15             BY MS. PRESSLEY:

16     Q.  And by no recording, you mean CCTV cameras; right?

17     A.  Yes, yes.

18     Q.  Okay.  But you knew that there were still Electronic

19     Surveillance Unit people who were potentially out there

20     recording --

21     A.  Yes.

22     Q.  -- footage?

23     A.  Yeah.

24     Q.  And that, perhaps, there were people in Intelligence who

25     had their own cameras and were recording footage?

```
1    A.   Yes.

2    Q.   Okay.  So you were going places where you knew people were

3    out there on the ground taking footage of MPD actions?

4    A.   I assumed they would be doing that, yes.

5    Q.   Because in your practice or your experience, that was

6    commonly done for those events?

7    A.   Yes.

8    Q.   So you went to those places and were asking for

9    information about them giving you whatever they had by way of

10   video?

11   A.   Yes.

12   Q.   Okay.  Looking for tapes?

13   A.   Yes.

14   Q.   And at some point, videos were turned in; correct?

15   A.   Yes.

16   Q.   From who?

17   A.   I recall videos being given or turned over to my office by

18   the Electronic Surveillance Unit.

19   Q.   Okay.  These were not originals that were turned over to

20   your office; correct?

21   A.   I don't recall ever receiving originals.  That's correct.

22   Q.   VHS --

23        THE COURT:  How would you tell an original from a

24   copy?

25        THE WITNESS:  I couldn't.
```

1          THE COURT:  That's the point.  How did you know they

2    were not originals?

3          THE WITNESS:  I never asked for original documents.  I

4    always asked for copies.

5          BY MS. PRESSLEY:

6    Q.   So your request was for copies of documents, and what you

7    received was VHS tapes; correct?

8    A.   Yes.

9    Q.   And what -- and you would have had no way of knowing at

10   that point that an original would have been a smaller tape, a

11   DV, if you will, as opposed to a VHS tape?

12   A.   Unless I was told that, I wouldn't know.

13   Q.   But you don't have a recollection of being told that?

14   A.   No.

15   Q.   Okay.  Mr. Hardy, when he was deposed, testified that the

16   cameras that were being used recorded, not onto VHS, but onto

17   either Mini DVs or Super VHS.

18          Would you have known anything about that at the time?

19   A.   No.

20   Q.   Okay.  Just whatever they turned over to you is what you

21   then produced to the Office of the Attorney General?

22   A.   Yes.

23   Q.   Did you view the images?  Did you review the tapes before

24   you turned them over to the Office of the Attorney General?

25   A.   I don't recall that I reviewed them.

1          I take that back.  I recall reviewing those images

2     either with representatives of the Office of the Attorney

3     General, maybe with Mr. Ryan in my office at some point.

4          THE COURT:  Before you turned them over or after?

5          THE WITNESS:  More than likely, before.

6          THE COURT:  Did you notice at that time whether the

7     images appeared to be a continuous recordation of an event?

8          THE WITNESS:  Well, they were -- I noticed that there

9     were -- they weren't time-stamped, they weren't date-stamped,

10    so I really couldn't tell whether the images were --

11         THE COURT:  Could you please show Mr. Harris what

12    you -- Mr. O'Connor showed us now?

13         MS. PRESSLEY:  Your Honor, what we have been shown is

14    not all of the tapes; this is just one specific tape.

15         THE COURT:  That's fine, but I want Mr. Harris'

16    recollection to be refreshed.

17         Mr. Harris, without even seeing them -- I can tell

18    you, we have seen them -- and in the lower left-hand corner,

19    there is a date and time stamp.

20         MS. PRESSLEY:  Your Honor, all of the tapes did not

21    have date and time stamps.

22         THE COURT:  Well, I want him to see --

23         MS. PRESSLEY:  One of the complaints is that they did

24    not.

25         THE COURT:  Okay.  Well, let's take a look at it.

1          Would someone please identify this for the record.

2          Would you please identify this by exhibit number.

3          MR. MEITL:  This is V1.

4          THE COURT:  All right.  That's fine.

5          Mr. Harris, look at the lower left-hand corner, see

6     what purports to be traditionally the way a date is depicted

7     and a time is depicted?

8          THE WITNESS:  Yes.

9          THE COURT:  Now, sir, these are not the videos you

10    saw?

11         THE WITNESS:  I recall seeing this, yes.

12         THE COURT:  But it is your recollection that it was

13    not video, date, and time-stamped?

14         THE WITNESS:  I recall seeing some portions of a video

15    that was not -- put it this way:  It was not accurately time-

16    and date-stamped.

17         THE COURT:  I want you to keep looking in the lower

18    left-hand corner, all right, as it goes forward.  Now, watch

19    what happens.  9/27/2002, 7:12 a.m.  Watch what happens as we

20    go through it.

21         MR. MEITL:  Your Honor, I jumped ahead to the

22    19-minute mark.  This is where one of those gaps occur.

23         THE COURT:  Good.  I remember this gentleman with the

24    pink hair.

25         Do you remember this gentleman with the pink hair?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  You do?

3          THE WITNESS:  Yes.

4          THE COURT:  So you must have seen these?

5          THE WITNESS:  Yes.

6          THE COURT:  Is this familiar to you, sir?

7          THE WITNESS:  No, I just recall the person with the

8     pink hair.  I don't remember anything other . . .

9          THE COURT:  Now, you notice what happened?  It jumped

10    to 10:24 --

11          THE WITNESS:  Yes.

12          THE COURT:  -- instantaneously.

13          Did you notice that, that it was -- whatever VHS tape

14    that you were seeing -- jumped from a particular time to

15    another time?

16          THE WITNESS:  Yes.

17          THE COURT:  All right.  Did you form a conclusion as

18    to whether this was a continuous videotape taken by a person

19    who turned the camera on and kept it going for an extended

20    period of time?

21          THE WITNESS:  No.

22          THE COURT:  What did you understand these were videos

23    of?

24          THE WITNESS:  Well --

25          THE COURT:  That's a poor way to put it.

1          How did you understand these videos came into

2     creation?

3          THE WITNESS:  Well, these were -- I believe this

4     was -- I don't remember if it was something we had produced

5     or -- I don't recall.  I do recall that there was a meeting in

6     which we were discussing the break in the time, but at the

7     time we were looking at it --

8          THE COURT:  So you recall a discussion of how it was

9     that the tapes jumped in time; is that right?

10          THE WITNESS:  Yeah, I recall a discussion where that

11     was --

12          THE COURT:  Where did that discussion take place?

13          THE WITNESS:  I believe it took place in my office.

14     I'm just not sure.

15          THE COURT:  Before or after you gave the tapes to

16     Plaintiffs' counsel?

17          THE WITNESS:  I'm not sure.  I believe one of the

18     trial counsel was present while we were looking at this.  I

19     really don't recall at what point the production was made.

20          THE COURT:  Thank you very much.

21          Ms. Pressley.

22          You can shut it off.  Thank you.

23          BY MS. PRESSLEY:

24     Q.  Actually, Mr. Harris, you've had an opportunity to view

25     that footage quite a few times; correct?

1   A.   Yes.

2   Q.   Okay.  You've viewed that footage, perhaps, before you

3   produced it but certainly several times after it has been

4   produced; right?

5   A.   Yes.

6   Q.   And that's because Plaintiffs' counsel complained about

7   the gaps in the tape; right?

8   A.   Yes.

9   Q.   And representatives from my office, including myself and

10   Ms. Frost, asked you to view that footage again; correct?

11   A.   Yes.

12   Q.   And one of the reasons was to attempt to determine which

13   tapes were -- had gaps because the user had stopped and

14   started the camera and which tapes, if any, had gaps because

15   potentially it was edited; right?

16          MR. TURLEY:  Objection.  It is not in evidence that

17   these gaps were caused by someone turning on and off the

18   camera.

19          MS. PRESSLEY:  I asked a question.

20          THE COURT:  And I will allow the question, but so you

21   don't suggest the answer:  Do you recall a discussion with

22   anyone, including Ms. Pressley and Ms. Frost, as to why it

23   was, as you've just seen, that it jumps in time --

24          THE WITNESS:  Yes.

25          THE COURT:  -- substantially while there are only

 1    seconds while it's being shown?

 2         THE WITNESS:  Yes.

 3         THE COURT:  And in what context did that discussion

 4    take place?  What complaint were you made aware of that these

 5    Plaintiffs' counsel had made?

 6         THE WITNESS:  Well, they -- I believe the assertion

 7    was that the tapes were improperly edited; that the full

 8    recording material was not being produced to them, and I

 9    believe there was also an assertion that, perhaps, it was

10    doctored in some fashion.

11         THE COURT:  And during the course of those

12    discussions, did you express any view as to whether you had

13    any awareness that someone had taken a complete tape and

14    edited portions of it?

15         THE WITNESS:  No.  Because I had no knowledge about

16    how the tape was produced.

17         THE COURT:  But when you secured the tapes, did you

18    understand that they were taken by a person who turned the

19    device on and kept it on for a substantial period of time as

20    opposed to a person who started it, stopped it, and started it

21    again?

22         THE WITNESS:  No.  I mean that was not -- that was not

23    something that I was focusing on.

24         THE COURT:  All right.  But you didn't focus on, did

25    someone say, but look at the lower left-hand corner, it just

1    jumped an hour in two seconds?  Did anyone say that?

2              THE WITNESS:  You mean at that --

3              THE COURT:  At any meeting where you were discussing

4    this?

5              THE WITNESS:  Yes.

6              THE COURT:  And what did you say in response?

7              THE WITNESS:  I don't believe the question was asked

8    of me because I certainly did not know or could explain the

9    gap.

10             THE COURT:  So whoever gave you the tapes to produce

11   to Plaintiffs' counsel did not tell you that they were the

12   edited version of something else?

13             THE WITNESS:  That's correct.

14             THE COURT:  Did that person make any representation to

15   you with reference to whether the tapes were edited by another

16   human being?

17             THE WITNESS:  No.

18             THE COURT:  And when did you first become aware of the

19   phenomenon we just saw, that the time jumps an hour but it

20   only takes us seconds when we're looking at it?  When did you

21   first become aware of that?

22             At a meeting with someone else?

23             THE WITNESS:  I really don't recall.  It may have been

24   when counsel for the city first inquired about it.  I just

25   don't remember.

1          THE COURT:  Thank you.

2          MS. PRESSLEY:  For the record, Your Honor, with

3     respect to this particular tape that was shown counsel, trial

4     counsel for the Attorney General's Office informed Chang

5     Plaintiffs' counsel in writing and verbally of the person who

6     took that footage, and that person has been available for

7     deposition, his name is Mr. Donald Yates.

8          THE COURT:  Is he a police officer?

9          MS. PRESSLEY:  He is a retired police officer and has

10    been available for deposition.

11         He was also suggested on our witness list when we

12    responded to the desire of Chang Plaintiffs for a designee.

13    We suggested, instead, that the people who actually took the

14    footage be deposed, and he's one of those people.

15         MR. MEITL:  Your Honor, I just object.  It has never

16    been represented that that footage has been taken by

17    Mr. Yates.  There are three individuals the District has

18    represented have taken portions of various video footage

19    presented to us.  There's another individual they cannot

20    identify.  It has never been set out who took what footage of

21    what part.

22         THE COURT:  Thank you very much, Counsel.

23         Proceed, Ms. Pressley.

24         BY MS. PRESSLEY:

25    Q.  Now, your role with respect to the videotapes had nothing

1    to do with any potential editing of the videotapes; correct?

2    A.   That's correct.

3    Q.   You received information from the ESU unit, you received

4    the tapes?

5    A.   Yes.

6    Q.   And then you turned them over?

7    A.   That's correct.

8    Q.   Okay.  And any information that you gained after that, you

9    gained through other means, not through something that was

10   done in your office; correct?

11   A.   Correct.

12   Q.   Okay.  You also checked other places, such as the

13   Intelligence Unit for potential video footage?

14   A.   Yes.

15   Q.   Did you receive any?

16   A.   No.

17   Q.   Did you receive any information confirming that other

18   footage existed from the IAD or from Intel?

19   A.   No.

20   Q.   Mr. Harris, with respect to the actions that you took for

21   production of discovery in the Chang case, did you at any

22   point intentionally destroy documents or materials?

23   A.   Absolutely not.

24   Q.   Did you ever instruct anyone to do so?

25   A.   No.

1    Q.   Okay.  Do you have knowledge of another person destroying

2    audio, video, or the running resume with respect to this case?

3    A.   No.

4    Q.   In fact, there is a retention policy of the Metropolitan

5    Police Department that aims at preserving information;

6    correct?

7    A.   Yes.

8    Q.   And that's like a 70-page booklet of information; right?

9    A.   How many pages?

10   Q.   Is it 70?  Is it more than that?  Correct me.

11   A.   It's probably at least 70.

12   Q.   At least 70.

13        And there are specific retention guidelines for

14   specific types of documents?

15   A.   Yes.

16   Q.   And even within those guidelines, a particular form or

17   type of document could be saved in one location for a year and

18   then be saved in another location for longer than that --

19   A.   Correct.

20   Q.   -- just as an example?

21   A.   Yes.

22   Q.   So in addition to all of the retention policies or

23   guidelines that MPD has, there is also a general order with

24   respect to potentially discoverable material; right?

25   A.   Yes.

1    Q.   And that general order directs all of the Metropolitan

2    Police Department to preserve documents, tangible items,

3    tapes, transcripts that could potentially be used in a

4    criminal case?

5    A.   That's correct.

6    Q.   And anytime that there is an arrest in the city, in the

7    District, rather, and there is potential for there to be a

8    need of that information for the criminal case, this

9    particular general order is in effect?

10   A.   That's correct.

11   Q.   You had no reason to believe in 2002 that those -- that

12   the retention policy would not be followed; did you?

13   A.   That's correct.

14   Q.   And you had no reason to believe that the general order

15   would not be followed; correct?

16   A.   Also correct.

17        MS. PRESSLEY:  I don't have anything further.

18        THE COURT:  Mr. Harris, I have two things, and I hope

19   this is not unfair, but let me see if I can probe a bit by

20   sharing an experience.

21        On Saturday, I went up to the Eastern Shore to visit a

22   friend who is an artist, and I wanted to take some pictures of

23   her work.  Now, before I left for the day, I made sure my

24   camera had two things in it:  a battery and a memory card.

25   And that memory card has got to be in the camera to capture

1    the images.

2            What I don't understand, Mr. Harris, as I hear this

3    testimony is:  How do you prevent a video device from

4    recording what it is seeing?

5            Pursuant to this understanding, as I understand it,

6    you've explained to me, there was an understanding not to

7    record.  What mystifies me is:  How do you do that?  How do

8    you stop it from recording?

9            THE WITNESS:  I'm not a technician, Your Honor.

10           THE COURT:  Okay.  I know you're not.  But do you own

11   a digital camera?

12           THE WITNESS:  Yes.

13           THE COURT:  You use it to take pictures of your

14   family?

15           THE WITNESS:  Yes.

16           THE COURT:  And you know there is a device in there

17   that captures the image?

18           THE WITNESS:  Yes.

19           THE COURT:  You appreciate that if that is not in the

20   camera, the camera warns you it's not there; right?

21           THE WITNESS:  Yes.

22           THE COURT:  So it would seem to follow that devices

23   that capture video, capture that video to the device's memory.

24   They have to, don't they, Mr. Harris?

25           THE WITNESS:  I -- yes.  But again, I had no knowledge

1    as to how the camera system operated at the time.

2              THE COURT:  All right.

3              THE WITNESS:  I just wasn't a part of those

4    discussions.

5              THE COURT:  Now, the second thing is, this policy of

6    which you were made aware, this retention policy, is it

7    specifically tied to what is known as the Brady obligation to

8    collect and maintain evidence that would tend to exculpate

9    people?

10             THE WITNESS:  Yes.

11             THE COURT:  We just saw the video a moment ago, and I

12   saw a police officer with a white helmet push a young woman.

13   She seems to have been the young woman we saw a moment ago

14   giving the peace sign.  Now, if, as I suspect, that is the

15   moment when that young woman is being pushed towards another

16   place to be arrested, just before that occurs, what has

17   occurred between her and the police officer, isn't that

18   evidence of her commission of the crime?

19             THE WITNESS:  Yes.

20             THE COURT:  And if it would show that she did nothing

21   wrong and the police nevertheless arrested her, it would tend

22   to exculpate her; wouldn't it?

23             THE WITNESS:  Yes.

24             THE COURT:  Why didn't anybody keep it?  Isn't it

25   Brady evidence?

1          THE WITNESS:  Yes, but again, I don't know.  I mean, I

2     have no control, I have no idea why certain things were done

3     or not done, I mean.  I'm the counsel for the department.  I'm

4     not on the scene.  No one has told me that there's certain

5     things they want to keep and not turn over.  I've never been

6     told that.  I don't know.

7          THE COURT:  But --

8          THE WITNESS:  I can only rely on what the people are

9     telling me when I request information.

10         THE COURT:  I understand that.  But Ms. Pressley

11    brought your attention to this retention policy.  Now, as I

12    see it, there would be two forms of information coming into

13    the department:  information in the ordinary course and

14    information that would tend to inculpate or exculpate a

15    person.  The latter is evidence, is it not --

16         THE WITNESS:  Yes.

17         THE COURT:  -- subject to a requirement to be

18    maintained at least until the case is disposed of?

19         THE WITNESS:  I would say yes.

20         THE COURT:  But in this particular instance, from what

21    we can tell after a week, no one retained the precise evidence

22    of what that young woman did moments before she was arrested,

23    even though it would tend to inculpate her, for example, if

24    she was striking the police officer, or exculpate her if she

25    was doing nothing but was nevertheless arrested.  Therefore,

1    it falls within the category of evidence; doesn't it?

2              THE WITNESS:  Yes.

3              THE COURT:  And wouldn't you expect someone to keep

4    it?

5              THE WITNESS:  I would have expected any police

6    officer, official, to make sure that any evidence, any

7    evidence, is preserved.

8              THE COURT:  Thank you.

9              Redirect.

10                        **REDIRECT EXAMINATION**

11             BY MR. TURLEY:

12   Q.   Good morning, Mr. Harris.

13   A.   Good morning.

14   Q.   I want to clarify a couple of things.  First of all,

15   counsel for the District asked you about a bunch of cases that

16   you were presented with in 2002 and early 2003.

17             Do you recall her naming some of those cases?

18   A.   Yes.

19   Q.   Okay.  Now, isn't it true that the cases that she

20   referenced and you affirmed named Abbate, Barham, Chang, and

21   Jones were consolidated for purposes of discovery?

22   A.   I guess that's fair to say.

23   Q.   Okay.  Now, you had stated that you had taken a hiatus or

24   you had stopped working at the MPD at some point and you did

25   some insurance defense work.  Was I correct about that?

1    A.   Yes.

2    Q.   Can you tell us when you first heard of the term

3    "litigation hold letter," when you first became aware of a

4    thing called a "litigation hold letter"?

5    A.   It was certainly sometime after 2002.  I don't recall

6    being made aware of litigation hold letters before then.

7    Q.   So is it correct to say that before 2002, you had no

8    knowledge of a standard letter going out that requires people

9    to preserve evidence?

10   A.   At that time, no.

11   Q.   Thank you.

12         Now, you had told the Court that you believe that you

13   received a subpoena from the City Council in the fall of 2003;

14   correct?

15   A.   That was my first recollection of a specific request for

16   the running resume.  It was in the council's subpoena.  I

17   assume that it was the fall subpoena.  I don't have it in

18   front of me, so . . .

19   Q.   Isn't it true that you received that in July 2003, in the

20   summer?

21   A.   Well, it may have been July.  I'm just -- I'm just not

22   sure.

23   Q.   Well, is that your recollection, you received it in the

24   summer --

25   A.   Without looking at the subpoena, I really can't tell you

1    which subpoena it was.  There were several subpoenas.

2    Q.   I want to make sure we're clear on that point because this

3    is a critical period.  We're going to bring that up.

4         This is the wrong document we're going to kick over

5    there.

6         Okay.  I'm showing you a letter that is to Chief

7    Charles Ramsey.  I believe we may have looked at this before

8    if you recall.

9         Do you recall seeing this letter?

10   A.   Yes.

11   Q.   If you look in the upper corner, it says July 15, 2003.

12        Do you see that?

13   A.   Yes.

14   Q.   And is this your recollection of the subpoena you were

15   referencing?

16   A.   No.

17   Q.   It is not.  So which subpoena are you referencing as the

18   one that effectively put you on notice for this production?

19   A.   I believe you just posted it.  It was the September 29th

20   subpoena.

21   Q.   Okay.  So the first subpoena that came up on the screen is

22   the one that you believe put you on notice of that production?

23   A.   For the JOCC running resume?

24   Q.   Yeah.

25   A.   Yes.

1    Q.   Okay.  I want to return to your discussion with the Court

2    about the -- you described it as an order given not to

3    videotape from the JOCC.

4         Do you recall that discussion?

5    A.   Yes.

6    Q.   Okay.  Now, the exchange was going on pretty fast, and I

7    want to make sure I understand this.  You had testified in my

8    examination that you were told in the JOCC that there would be

9    no recording.  Wasn't that correct?

10   A.   No.

11   Q.   Okay.  So your testimony is that before the demonstrations

12   occurred, you knew that there would be no recording from the

13   JOCC?

14   A.   It was my -- yes, it was my understanding that there would

15   be no recording.

16   Q.   I wasn't asking about your understanding.  I was actually

17   asking when you had that understanding.  Is it your testimony

18   that you were aware before the demonstration the decision had

19   been made not to allow videotaping -- not to allow, I should

20   say, taping to be recorded from the JOCC?

21   A.   It was my understanding, yes, before the event, a decision

22   had been made not to record.

23   Q.   Now, was that decision made by Ms. Kellums?  Was that your

24   understanding?

25   A.   That was my understanding, yes.

1    Q.   Now, Councilwoman Patterson's name was mentioned in the

2    discussion with the judge.  Was it your understanding that

3    Councilwoman Patterson had said she doesn't want videotaping

4    of the demonstration?

5    A.   That was my understanding; that there was some discussion

6    between Council Member Patterson, and Deputy Mayor Kellums had

7    indicated to her that there would be no recording of that

8    event.

9    Q.   And this was before the demonstrations, is your

10   recollection?

11   A.   That's my understanding.

12   Q.   Can you -- can you inform the Court as to when you were

13   informed of this meeting or who may have been present when you

14   were informed of this meeting?

15   A.   I have no idea who was present at that meeting or if there

16   was a meeting.  It could have been a discussion.  I don't

17   know.

18   Q.   Now, let's take a step back because this is something that

19   we have not heard of before, so I'm just trying to get some

20   helpful details so we can pursue it.

21        Is it your recollection that you were -- that this

22   earlier order was conveyed to you in a meeting of some type?

23   A.   No.  I really don't recall who told me that.  I just know

24   that it was my understanding we would not be recording.  I

25   don't recall it being in a meeting where that was discussed.

1    Q.   All right.  Now, in any mass demonstration case in your

2    career, can you give me an example of where there was an order

3    not to record a footage in the JOCC during the mass

4    demonstration beyond this example?

5    A.   No.

6    Q.   Okay.  And just to close the circle, when the

7    demonstrations began and you were visiting the JOCC -- we

8    talked about that earlier -- at that time you certainly knew

9    that images coming to the JOCC were not being recorded;

10   correct?

11   A.   Yes.

12   Q.   Okay.  And finally, if you knew that an order had been

13   given not to record in the JOCC, who else, to your knowledge,

14   likely was aware of that order?

15   A.   Oh, I would think the people who are operating the

16   machinery there, the cameras.

17   Q.   How about Mr. Ryan; do you believe he was aware of that

18   order?

19   A.   Perhaps.  I don't know.

20   Q.   And was any explanation given to you why they decided not

21   to allow recording in the JOCC?

22   A.   No, other than, you know, there was some understanding

23   between Ms. Patterson and Ms. Kellums that there would be no

24   recording.  Other than that, I have no other knowledge.

25   Q.   Now, District counsel had asked you a series of questions

1    about the running resume.  Just to be clear, before this

2    litigation, had you previously handled a mass arrest case

3    where there was a dispute as to who gave the order for mass

4    arrest?

5    A.   No.

6    Q.   And before 2003, you knew what a running resume was;

7    correct?

8    A.   Yes.

9    Q.   Now, counsel asked you about Council Member Cheh stating

10   at one point that she had reviewed the running resume for that

11   day.  Do you remember that exchange with District counsel?

12   A.   Yes.

13   Q.   And District counsel asked you something along the lines

14   of, well, isn't it true that Council Member Cheh did review a

15   running resume, and you answered correct.  Do you remember

16   that answer?

17   A.   No, I don't.

18   Q.   Well, let me just cut to the chase:  To your knowledge,

19   the running resume that Councilwoman Cheh reviewed was not the

20   running resume from the JOCC; correct?

21   A.   That's correct.

22   Q.   Indeed, did you later have an occasion to learn that

23   Council Member Patterson objected that they were not informed

24   that the running resume that was given to the City Council was

25   not, in fact, the one from the JOCC?

1    A.   I recall seeing a copy of a letter that she transmitted

2    to -- I forgot who she sent the letter to, but she indicated

3    that she thought that she had received the JOCC running

4    resume.  I don't know who the letter went to, but she did send

5    that letter to someone.

6    Q.   Now, just to follow up on another exchange you had, you

7    said it was not your decision to spend money to back up the

8    system that would have contained the running resume.

9    A.   Yeah.

10   Q.   Do you remember that exchange with District counsel?

11   A.   Yes.

12   Q.   So whose decision was it?

13   A.   I presume that would have been the head of, I guess, our

14   technology office, and I believe the decision was also related

15   to whether it would actually produce the running resume.

16   There was some question or some doubt.

17          THE COURT:  Now, this is a request made, or decision

18   made to ask ET Systems to probe its system to find the running

19   resume?

20          THE WITNESS:  Yeah, that's my understanding.

21          THE COURT:  And the decision is made that that's too

22   expensive?

23          THE WITNESS:  I believe the decision was predicated on

24   not just expense, but whether it would produce the actual

25   running resume.

1          THE COURT:  You weren't as careful as you should have

2     been in listening to the question because Professor Turley

3     asked you about a decision made in the inception at the

4     demonstration about whether it would cost more to record.

5          Did you understand that question?

6          THE WITNESS:  No.

7          THE COURT:  That's what he asked you.

8          MR. TURLEY:  Well, let me focus on --

9          THE COURT:  Pat, go back and please read it.

10         Mr. Harris, please listen to the question carefully.

11         (The record was read by the court reporter)

12         THE COURT:  Mr. Harris, we're talking about two

13    different things here and it's crucial you understand the

14    difference.  Did someone make a decision that during the

15    demonstrations, the system maintained by -- or sold to the

16    District of Columbia by ET Systems would not be backed up; is

17    that what you meant?

18         THE WITNESS:  No.

19         THE COURT:  Well, that's what you said.

20         THE WITNESS:  Well, I said that --

21         I'll ask Professor Turley to clarify what his question

22    is, so you can answer it correctly.

23         Go ahead, Professor.

24         MR. TURLEY:  Thank you, Your Honor.

25         BY MR. TURLEY:

1    Q.   Let's focus on the backup system that would contain the

2    running resume.

3    A.   All right.

4    Q.   Okay.  Was it your understanding that at some point, it

5    was decided not to back up that system which would contain the

6    running resume from the JOCC?

7    A.   No.

8    Q.   Okay.

9         THE COURT:  But was the decision made to ask ET

10   Systems if they could probe their system and find the running

11   resume?

12        THE WITNESS:  That's what I was talking about --

13        THE COURT:  Did you --

14        THE WITNESS:  -- when I was ask them that.

15        THE COURT:  Did you personally ask of ET Systems to

16   probe their system to see if the running resume was available

17   from it?

18        THE WITNESS:  I asked George Crawford to contact E

19   Systems, whatever the name of that company was, to see if they

20   could retrieve the data.

21        THE COURT:  And Crawford reported back to you that was

22   too expensive?

23        THE WITNESS:  I don't know if he did or at some later

24   point it was determined that cost was a factor.

25        THE COURT:  Okay.  You put that in the passive voice.

1    Professor Turley is trying to figure out who made that

2    decision.

3            THE WITNESS:  I'm not exactly sure who made it, but

4    certainly it was discussed with Mr. Ryan, with Mr. Travis

5    Hudnall, who was Mr. Crawford's superior.

6            THE COURT:  So at that point, somebody made a decision

7    that ET Systems, which now no longer had a contract with the

8    District, would not go back and try to find the running

9    resume?

10           THE WITNESS:  I think a factor was whether ET Systems

11   even had --

12           THE COURT:  That's a different question.  Listen to my

13   question.

14           THE WITNESS:  All right.

15           THE COURT:  Do you understand (a) that someone,

16   Crawford, probably Crawford, called the people at ET Systems

17   and asked them how much it would cost to probe their system to

18   find the running resume?

19           THE WITNESS:  I don't recall if Crawford told me that

20   ET Systems gave him a dollar amount.  I don't recall him

21   telling me that.  I do recall that a dollar amount was

22   discussed after he had made inquiry to E Systems.  He did

23   not -- to my recollection -- tell me what the amount was.

24           THE COURT:  So as you testified now, you don't know

25   what that amount is?

1          THE WITNESS:  No.

2          THE COURT:  And you don't know who specifically made

3     the decision not to spend that money, no matter what it was?

4          THE WITNESS:  I believe there was some discussion as

5     to when it should be done.  I don't recall a specific person

6     saying, no, we should not do it.  As I testified earlier, I

7     believe Mr.  Hudnall would have been involved in discussion,

8     as well as Mr. Ryan.

9          THE COURT:  Thank you.

10         Professor.

11         MR. TURLEY:  Thank you, Your Honor.

12         BY MR. TURLEY:

13    Q.  Let me just close that particular circle.  You mentioned

14    two individuals there, including Mr. Ryan.  Were members of

15    the Office of Attorney General present for that meeting?

16    A.  I don't think so.

17    Q.  Was the Office of Attorney General informed of this

18    decision?

19    A.  I don't know.

20    Q.  All right.  Were there any emails in your system related

21    to this question of getting these -- getting the running

22    resume to be retrieved and the costs associated with it?

23    A.  I'm not sure, no.

24    Q.  Thank you.

25         Now, counsel asked you at one point -- and I'm

1    paraphrasing, of course -- whether it was your, quote,

2    client's, closed quote, responsibility to maintain evidence.

3    You remember that exchange?

4    A.   Yes.

5    Q.   And you said yes, it was; right?

6    A.   Yes.

7    Q.   Do you also have an independent duty to preserve evidence

8    after the filing of a lawsuit?

9    A.   Yes.

10   Q.   Now, let's go to the clients.  By "clients," are you

11   referring, for example, to Chief Ramsey?

12   A.   I'm referring to -- yes.  I'm referring to everybody that

13   is a member of the agency.

14   Q.   A member of the?

15   A.   Of the agency.

16   Q.   Thank you.

17        Now, in the exchange about reviewing the tapes with

18   members of the OAG, there was an exchange about reviewing the

19   tapes with the OAG before turning them over in a meeting.  Do

20   you recall that discussion?

21   A.   Yeah.

22   Q.   Okay.  The Court had asked you about your review, but I

23   wanted to try to nail down who you recollect was in that

24   meeting with you reviewing those tapes.

25   A.   It would have been counsel for the -- the trial counsel.

1    Q.   And who was that?

2    A.   Ms. Pressley, Ms. Ross.  I believe Lieutenant Pavlik.  I

3    believe a Sergeant Madison was present.

4    Q.   Anyone else?  How about Mr. Ryan?

5    A.   Yeah, Mr. Ryan was present, as well.

6    Q.   And we were a little bit unclear, in your discussion, you

7    had made reference to reviewing the videotapes, but I wasn't

8    clear if that was the first time you reviewed the videotapes

9    or whether there might have been a prior occasion.

10   A.   There may have been a prior occasion when I first got

11   them.  I probably looked at them to see what was on them.

12   Probably when I first received the tapes, yes.

13   Q.   Do you recall when you first received the tapes?

14   A.   No.

15   Q.   Do you recall at that time who might have been present

16   with you when you reviewed the tapes?

17   A.   I reviewed them in my office.  Typically, I would use the

18   machine at Mr. Ryan's office.  He may have seen parts of it.

19   I don't recall him being present specifically.

20   Q.   Okay.  My colleague is going to bring up a videotape.  I

21   wanted to ask you about an exchange that you had with

22   Ms. Pressley; and if you recall, it was an exchange that

23   produced an objection from me.  There was a reference to

24   turning on and off the camera that might have been the reason

25   for these gaps or these movements in time.  Do you remember

1    that exchange?

2    A.   Yes.

3    Q.   Okay.  I'm going to show you a video, and if you look at

4    the stamp in the left bottom corner closely, you will actually

5    see, I will represent to you, that the recording appears not

6    just to spring forward but to spring back.

7         Did you just see that change?

8    A.   Yes.

9    Q.   Okay.  Now, did you just see it spring back in time?

10   A.   Yes.

11   Q.   Okay.  So, that wouldn't happen, to your knowledge, with

12   someone just turning on and off the camera; right?

13   A.   I wouldn't think so.

14   Q.   Now, counsel for the District asked you about this general

15   order and whether it was in effect during the litigation.  Do

16   you remember her asking you about that?

17   A.   Yes.

18   Q.   Okay.  So, and your answer, if I recall, was that it was

19   your understanding that the general order was in place, and

20   that would require the preservation of tapes.  Is that

21   correct?

22   A.   The preservation of any evidence.

23   Q.   Including the tapes?

24   A.   Yes.

25   Q.   So, Mr. Harris, if the general order, you know, required

```
 1    the preservation of the audiotapes, why were the originals

 2    destroyed, to your knowledge?

 3    A.   I have no idea.

 4    Q.   If that general order was in place and that required the

 5    preservation of evidence, why do you think the JOCC running

 6    resume is lost or destroyed?

 7              MS. PRESSLEY:  Objection.  Foundation.

 8              THE COURT:  I'm sorry?  What is your objection?

 9              MS. PRESSLEY:  Objection.  Foundation.  We don't know

10    that the JOCC running resume is destroyed.

11              MR. TURLEY:  I didn't say destroyed; I said lost or

12    destroyed, Your Honor.

13              THE COURT:  That's fine.  We don't know where it is.

14    Take that as a given.  After one week, we can take that as a

15    given.  Now the professor is going to ask you a question.

16              Go ahead.

17              BY MR. TURLEY:

18    Q.   How would that happen with the general order in place?

19    A.   I have no idea.

20    Q.   Okay.  Now, Mr. Harris, counsel had asked you about your

21    role in discovery for producing evidence in this case.

22              Do you recollect her asking questions about that?

23    A.   Yes.

24    Q.   All right.  And you had testified about the audiotapes,

25    and I want to go back and ask you something along those lines.
```

1    When -- when you had -- when you were dealing with the

2    audiotape portion of the production, you had occasion to work

3    with Ms. Alexander; did you not?

4    A.   Yes.

5         MS. PRESSLEY:  Objection.  Not covered in my

6    examination, Your Honor.  It was covered previously in

7    Mr. Turley's examination.

8         THE COURT:  Overruled.

9         MR. TURLEY:  Thank you, Your Honor.

10        BY MR. TURLEY:

11   Q.   Do you -- do you recall that before you worked with

12   Ms. Alexander on the audiotapes there had been a filing of a

13   motion to compel in this case to get those audiotapes?  Do you

14   recall that?

15   A.   No.

16   Q.   Okay.  Let me throw it up to see if it will refresh your

17   memory.  And we're going to hand out copies.  This is Exhibit

18   85.

19        Now this is a filing in the Barham case that you had

20   discussed with Ms. Pressley, and I want to direct your

21   attention to the upper stamp that indicates the date of the

22   filing.

23        You might be able to see it, but I'm going to make it

24   larger for you.

25        What was the date that this was filed, according to

1    that stamp?

2    A.   October 1, 2007.

3    Q.   Okay.  Now, take a look at this.  Do you recall seeing a

4    motion to compel for production of running resumes and

5    recorded police channel communications?

6    A.   I don't recall.

7    Q.   I'm sorry?

8    A.   I don't recall.

9    Q.   Do you recall generally a motion to compel for audiotapes

10   in this litigation?

11   A.   I recall being asked by the trial counsel that a motion to

12   compel had been filed to produce the running resume.  I

13   believe there was a court order issued by Judge Sullivan.

14   Q.   So do you recollect that after that request or order

15   you -- that was when you had dealings with Ms. Alexander?  Or

16   do you believe that you had dealings with her before in

17   transcribing the audiotapes?

18   A.   I don't really recall exactly when I first made contact

19   with Ms. Alexander.

20   Q.   Fair enough.

21        I'm going to bring up another exhibit to you to

22   refresh your memory.  This is Exhibit 20.  This is, I will

23   represent to you, an email dated Friday, November 16, 2004,

24   from -- I'm sorry -- 2007, from Denise Alexander to you,

25   Mr. Harris.

1          Do you remember seeing this email previously?

2     A.   Yes.

3     Q.   Now, in your best recollection, was this the sole email

4     you received from Ms. Alexander on her work with these

5     audiotapes?  Or do you recall other emails?

6     A.   I don't recall other emails.

7     Q.   Now, you ultimately drafted a declaration for

8     Ms. Alexander; correct?

9     A.   Correct.

10    Q.   Okay.  And was it your understanding that that declaration

11    was in response to efforts from the Plaintiffs to get copies

12    of the audiotapes and to analyze those tapes?

13    A.   It was in response to the issue raised by attorneys that

14    there were gaps in the audiotapes.

15    Q.   Okay.  And is that what this email addressed?

16    A.   Yes.

17    Q.   Okay.  Now, let me point -- just direct your

18    attention -- I'm not going to go through this whole email.

19    I'm sure you'll be happy to know that, just so you can leave.

20    But I'm going to direct your attention to the middle of the

21    first page where it says 1-D, and then it is followed by

22    another 1-D.  This is in the fourth category.

23          Do you see that?

24    A.   Yes.

25    Q.   Now, do you understand 1-D to be a specific police

1    communication channel?

2    A.   Yes.

3    Q.   And you'll see over in the second column, there is a date

4    of 9/27/2002.

5         Do you see that?

6    A.   Yes.

7    Q.   I want you to look at the first 1-D channel reference.  It

8    has beginning and ending in the first column.

9         Do you see that?

10   A.   Yes.

11   Q.   And you see how it says 0935 hours is when it ended?

12   A.   Yes.

13   Q.   Okay.  I want you to look down at the second 1-D reference

14   from that day.

15        Do you see that second one below it?

16   A.   Yes.

17   Q.   Okay.  Now, do you see where it says, beginning, it says

18   beginning 0959 hours?

19        Do you see that?

20   A.   Yes.

21   Q.   Okay.  So that's a gap of 14 minutes; right?

22   A.   Yes.

23   Q.   Now, let me just show one more example.  If you look at

24   the second page of this email and memo, I want you to look

25   down, if you would, at the second reference to Tact-1 in the

1     fourth column.

2              Do you see that?

3     A.   Yes.

4     Q.   Now, do you also understand Tact-1 to be a communication

5     channel used by the MPD?

6     A.   Yes.

7     Q.   And you'll notice, also, over in the second column, it

8     says 9-27-2002.

9              Do you see that?

10    A.   Yes.

11    Q.   Now, look at the ending time on that.  It says 0941 hours.

12             You see that?

13    A.   Yes.

14    Q.   Now, what I would like to direct your attention to, in the

15    next Tact-1 reference below it, I'd like you to look at the

16    beginning time, which says 1004 hours.

17             Do you see that?

18    A.   Yes.

19    Q.   So that indicates another gap in time, this one 33

20    minutes.  Correct?

21    A.   Yes.

22    Q.   Now, do you recollect when you received this email noting

23    these gaps?

24    A.   No.

25    Q.   But after receiving this email, did you set about drafting

1    a declaration for Ms. Alexander?

2    A.   This email, I believe, was an attachment to the

3    declaration.

4    Q.   But after receiving -- did you receive this email before

5    or after you started to draft the declaration for

6    Ms. Alexander?

7    A.   This was after.

8    Q.   Oh, so this email you received after?

9    A.   Yes.

10   Q.   Okay.  So let's go back then.  Did you have previous

11   communications with Ms. Alexander as to what she had found

12   on -- what she and others had found on these audiotapes?

13   A.   Yes.

14   Q.   Were those communications by email, or were they oral?

15   A.   I had, I believe, two conversations with Ms. Alexander

16   before I started drafting the declaration.

17   Q.   And were those oral conversations or email?

18   A.   Oral.

19   Q.   Were they in person or on the phone?

20   A.   On the phone.

21   Q.   How long do you think those discussions lasted?

22   A.   Oh, perhaps 10, 15 minutes.

23   Q.   Total for both of them or each?

24   A.   No more than 15 minutes each.

25   Q.   Each, okay.

1              Mr. Harris, I'm going to show you the declaration, and

2    I'm going to specifically direct your attention to the date of

3    the declaration, which is on the second page.

4              And first of all, let me show you the first page, just

5    so we can make sure you recollect this declaration.  Do you

6    remember, is this the declaration that was filed from

7    Ms. Alexander?

8    A.   Yes.

9    Q.   And was this the declaration you remember drafting?

10   A.   Yes.

11   Q.   Let's take a look at the second page on that date.  Do you

12   see where it says executed 11/16/07?

13   A.   Yes.

14   Q.   Okay.  Now, I want to -- we had just previously seen that

15   this email that was sent to you was sent on November 16, 2007;

16   correct?

17   A.   Yes.

18   Q.   That's the same day; right?

19   A.   Yes.

20   Q.   What time does it show this email was sent to you?

21   A.   12:05 a.m.

22   Q.   Okay.  So do you think that this email from Ms. Alexander

23   was given to you after you first drafted the declaration or

24   before?

25   A.   I don't recall having this attachment before I was

1    drafting the declaration.

2    Q.   All right.  Let's go back to the declaration.  You had

3    stated that you wrote the declaration from discussions with

4    Ms. Alexander; correct?

5    A.   After discussing her analysis of the tapes, I started

6    drafting the declaration, that's correct.

7    Q.   And have you reviewed this declaration since it was filed?

8    A.   Yes.

9    Q.   Have you reviewed it a number of times?

10   A.   I looked once or twice.

11   Q.   Okay.  Now, do you believe that the Alexander declaration,

12   from what you understand, is fully true and accurate in terms

13   of the facts represented within it?

14   A.   They were true and accurate at the time that I drafted it

15   pursuant to my discussions with Ms. Alexander.

16   Q.   Now, when you say they were true and accurate at the time

17   you drafted it, do you mean true and accurate to your best

18   understanding?

19   A.   Based on what she was telling me, correct.

20   Q.   But from what you now know about the case, do you believe

21   that this declaration is true and accurate?

22   A.   I believe that there may be a factual misstatement in the

23   declaration with respect to the manner in which the

24   transmissions were recovered from the master tape.

25   Apparently, there's some issue with respect to tapes being

1    prepared pursuant to a Dictaphone system.  That's my

2    understanding as to what may not be accurate.

3    Q.  And that's the only thing you believe in this declaration

4    that you know of that would be considered false or inaccurate?

5    A.  I'm not aware of any other portion of the declaration

6    that's considered false or inaccurate.

7    Q.  Let me specifically direct your attention to the second

8    page, which is paragraph 5, and the second line of that

9    paragraph, where Ms. Alexander states, "I did not detect

10   anything technically deficient with the recordings."

11        Do you see that?

12   A.  Yes.

13   Q.  Do you believe that that is a still a fair and accurate

14   representation of the tapes?

15   A.  I believe that that is what she determined.

16   Q.  But how about as a factual matter; do you -- is it your

17   understanding that there was nothing technically deficient

18   with the recordings?

19   A.  Commander Crane has, I believe, given testimony that there

20   was some problem with the copies that were produced.

21   Q.  Now, going back to that email, you've reviewed this email

22   since you've filed it in court; have you not?

23   A.  I didn't file it in court.

24   Q.  I mean, after it was filed in court.  Have you not?

25   A.  Yes.

1    Q.   Okay.  And you were aware at some point before today that

2    there were gaps shown in the tapes; were you not?

3    A.   There were gaps shown in the tapes that she reviewed, yes.

4    Q.   Is it your understanding that that represents technical

5    deficiencies in the tapes?

6    A.   It's my understanding that based on Commander Crane's

7    analysis, it's his opinion that the gaps may have been caused

8    by duplicating error or human error in producing the copies.

9    Q.   Human error?

10   A.   Or human error.  I believe that's what he testified to.

11   Q.   Did you previously have discussions about these gaps

12   before your testimony today with members of the MPD?

13   A.   Yes.

14   Q.   Did you have meetings that looked into these tapes and

15   tried to explain these gaps?

16   A.   There were certainly a number of meetings and discussions

17   concerning the allegation that gaps were in those

18   communications tapes, yes.

19   Q.   Now, did you ever suggest that perhaps the tapes should be

20   sent for some type of forensic work to see if information

21   could still be retrieved from the tapes?

22   A.   Did I suggest it?

23   Q.   Yes.

24   A.   No.

25   Q.   Did anyone, to your knowledge, suggest that?

1 A. I believe that was certainly a possibility; that in order

2 to resolve the issue definitively that a forensic expert

3 should review the tapes.

4 Q. Sure. Mr. Harris, as an experienced lawyer, you have to

5 forgive me, but I've got to try to get you to answer the

6 specific question. I wasn't really talking about a

7 possibility; I was talking about whether it was, in fact,

8 proposed to enlist the help of some forensic firm that might

9 be able to restore the tapes or regain any missing audio

10 recordings?

11 A. Yes. There was discussion with trial counsel that perhaps

12 they should be sent to another location for analysis, yes.

13 Q. Who is trial counsel you're referring to?

14 A. Mr. Koger.

15 Q. Mr. Koger. So then that was when Mr. Koger was still

16 counsel in the case?

17 A. I believe so.

18 Q. And what year would you recollect that that would be the

19 case?

20 A. I'm not quite sure.

21 Q. Well, I'll represent to you that Mr. Koger left the case

22 in 2009. So is it your recollection that it had to be 2009 or

23 earlier?

24 A. Again, in my recollection, I don't know who was trial

25 counsel at the time, but certainly, whoever trial counsel was,

1    it was a discussion.

2    Q.   Oh, so I want to make sure I understand.  So you're not

3    saying it was Mr. Koger?

4    A.   I believe it was Mr. Koger, but certainly I may be

5    incorrect.  I'm not sure.

6    Q.   Well, this email that you received from Ms. Alexander is

7    dated 2007.  Do you recall any discussion about enlisting some

8    type of forensic research in 2007 that might restore the tapes

9    if, in fact, there were portions missing?

10    A.   No.

11    Q.   Do you have any specific recollection of anything in 2008

12    to do that?

13    A.   No.  I mean, I just know that present counsel, present

14    trial counsel, we've had discussions about submitting those

15    tapes to an outside expert.

16    Q.   At some time, you're saying?

17    A.   Yes.

18    Q.   Okay.  Now, let me bring back up the Alexander

19    declaration.  I would like to follow up with something that

20    you had said.  And I'd like to direct your attention to

21    paragraph 5.  This is just a line down from the one I just

22    read to you on detecting anything technically deficient.  If

23    you look closely, there is a line that says, when the -- when

24    the tapes were first prepared, a Dictaphone system was used to

25    segregate the relevant transmissions from the master

1    recording.

2            I want to make sure.  Was that what you were

3    referencing as to something that was not accurate in the

4    declaration?

5    A.   I believe there was an assertion that that might not be

6    accurate by counsel in the case.

7    Q.   Is it your understanding that that is an accurate

8    statement or an inaccurate statement by what you know today?

9    A.   It's my understanding that that may not be accurate.

10   Q.   Okay.  Now, who -- did you come up with that line, or was

11   that given to you by Ms. Alexander?

12   A.   That was given to me by Ms. Alexander.

13   Q.   Indeed, it's your testimony that everything in this

14   declaration was given to you by Ms. Alexander; is that

15   correct?

16   A.   Yes.

17   Q.   Now, one last thing on this paragraph.  If you look down

18   towards the end, this is two lines from the bottom, there is a

19   line that says, "There is nothing unusual or deficient about

20   this transmission or recording."

21           Do you see that?

22   A.   Yes.

23   Q.   By what you know today, do you believe that is a true and

24   accurate statement?

25   A.   No.  Based on Commander Crane's analysis, that is not

1    accurate.

2    Q.   Now, I would like to direct your attention to -- I can

3    simply read this to you and represent to you what was said.

4         Judge, we tried to make copies of this one page from

5    the deposition, but we were unable to.  We can bring it up on

6    the screen.  My apologies to counsel, but they have seen this

7    before.

8         With the indulgence of the Court, I think it may be

9    easier for the witness to see it on the screen.

10        THE COURT:  That's fine.

11        BY MR. TURLEY:

12   Q.   Now, Mr. Harris, you recall my asking you whether anyone

13   had given you a copy of the Alexander deposition?  Do you

14   recall me asking that?

15   A.   Yes.

16   Q.   And do you recall me asking whether anyone had told you

17   whether Ms. Alexander had questioned the accuracy or meaning

18   of lines in her declaration?

19   A.   Yes.

20   Q.   Okay.  Now, counsel for the District made the Court aware

21   at the end of your Direct Examination that, in fact, this

22   declaration has not been withdrawn and is still part of the

23   record that counsel cited the Court to.

24        MS. PRESSLEY:  I did?

25        MR. TURLEY:  I'm sorry.  I believe that you did.

1           MS. PRESSLEY:  I don't remember making any

2      representation --

3           THE COURT:  The record will speak for itself.  Come

4      on.          BY MR. TURLEY:

5      Q.  Let me turn to page 94 on this transcript.  And I'd like

6      to read you a couple of portions from this.

7           If you look in the middle of the quadrant for page 94,

8      there is a question where I ask Ms. Alexander:

9           "I'd like to direct your attention back to Exhibit 1,

10     which is your declaration, on page 2.  If you look at

11     paragraph 5 in the second line, it says:  I did not detect

12     anything technically deficient in the recordings.  Do you see

13     that?"

14          She responds, "Yes."

15          I then asked:  "Now, did you state that in your email

16     to Mr. Harris?

17          "Answer:  No."

18          I then asked:  "Did you ask him to put that line in?"

19          "Answer:  No."

20          "Was that line in the declaration when it was given to

21     you to sign?

22          "Yes, he typed this.

23          "Did you orally ask him to put that line in any point

24     during your conversations?

25          "Answer:  No."

1          Now, were those answers from Ms. Alexander true, to

2     your knowledge?

3     A.   I drafted the declaration based on what she told me in my

4     conversations with her.  I sent her a copy of the declaration,

5     the draft declaration for her to review, and to let me know

6     whether there were inaccuracies or whether she wanted to

7     change any portion of the declaration.  At no time did she

8     tell me that there was anything inaccurate about the

9     declaration.  I don't believe that she indicated to me that

10    there were any errors.  I do recall sending her the initial

11    draft, and then I sent her another copy because I think there

12    were some minor typos that were corrected.

13    Q.   Okay.  I'm going to return to my questioning, but what I

14    will do is break it up to make it more, perhaps, direct.

15         She is stating here, as you can see, that she never

16    told you to put in a line that said:  "I did not detect

17    anything technically deficient in the recording, either in

18    email or orally."

19         Is that statement made by Ms. Alexander true, to your

20    recollection?

21    A.   No.

22    Q.   I'm going to direct your attention down, on page 95, where

23    that same quadrant or that last exchange ended, and there is a

24    question, two from the bottom, where I ask:

25         Now, if you look down there a couple of lines, it

1    says, when the tape were first prepared -- forgive me for

2    that -- a Dictaphone system was used to segregate the relevant

3    transmissions.

4            Was that in your email?

5            Answer:  No.

6            Did you ask for that line to be put in your

7    declaration?

8            Answer:  No.

9            Then there's an objection from her counsel.

10           But I just want to ask you:  If Ms. Alexander

11   testified that she did not tell you to put that line in the

12   declaration, would that testimony be true, in your view?

13   A.   She did not tell me to put any specific information into

14   the declaration.  During my conversations with her, I asked

15   her certain questions.  I asked her:  Would it be appropriate

16   to state X, Y, Z with respect to your analysis?  She said,

17   yes, no problem, or words to that effect.

18           I, then, drafted the declaration based on what she

19   told me.

20   Q.   I'm going to return to one aspect of the question again.

21   I understand that you've testified that you created this

22   declaration out of conversations you had with Ms. Alexander.

23   A.   Yes.

24   Q.   Here she is denying that she asked you to put this into

25   her declaration.  Is it true that she never asked you to put

1   this -- or represented to you that this should be put into the

2   declaration?

3          MS. PRESSLEY:  Objection.  Asked and answered twice

4   now.  The first thing he said was she did not tell me.

5          THE COURT:  Overruled.  Go ahead.

6          THE WITNESS:  I don't recall her specifically asking

7   me to put anything in the declaration.  In my discussions with

8   her, I asked her again a certain number of questions:  Is it

9   fair to say that what your analysis was that the tapes were

10  defective or technically deficient?  I would ask her questions

11  like that.  Based on her response, I then drafted the

12  declaration indicating X, Y, Z.

13         BY MR. TURLEY:

14  Q.  Okay.  Now, is it true that she, in those discussions,

15  gave you this information, which you then put into the

16  declaration?

17  A.  Yes.

18  Q.  I'm going to direct your attention to page 96, which, if

19  you -- you see an objection from Mr. Light, and then I resume

20  with a question, this is the first question in that quadrant:

21         Did you discuss that point with Mr. Harris before he

22  wrote the declaration?

23         Ms. Alexander says, no.

24         Is that answer true according to your recollection?

25         MS. PRESSLEY:  Objection.  What point did you discuss

 1    that point --

 2            THE COURT:  I think it is clear from the deposition.

 3    You understand the point, don't you, what the words "that

 4    point" means?  Do you?

 5            MS. PRESSLEY:  There were several points.

 6            THE WITNESS:  I don't understand what point he's

 7    referencing.

 8            THE COURT:  Let's go back before the objection.

 9            BY MR. TURLEY:

10    Q.   I'm going to read you the whole exchange.  Now, if you

11    look down a couple of lines it says:

12            "When the tape were first prepared, a Dictaphone

13    system was used to segregate the relevant transmissions.  Was

14    that in your email?

15            "No.

16            "Did you ask for that line to be put into your

17    declaration?

18            "No.

19            "Did you discuss that point" -- meaning what we had

20    just discussed -- "with Mr. Harris before he wrote the

21    declaration?

22            "No."

23            Now, is that last answer true, according to your

24    knowledge?

25    A.   No.

```
1              MR. TURLEY:  I only have a couple more questions, Your

2     Honor.

3              THE COURT:  Well, our reporter needs a break.

4              MR. TURLEY:  Oh, we can certainly break.

5              THE COURT:  Well, if you have five minutes more, then

6     we'll stop there.

7              MR. TURLEY:  Okay.

8              THE COURT:  We have to get Koger here.  If you have

9     more than that, let me know, and we'll stop now.

10             MR. TURLEY:  I'm going to ask a couple more of these,

11    and then I think we'll be finished.

12             BY MR. TURLEY:

13    Q.  I'm going to direct your attention right after that last

14    answer of "no."

15             "Question:  Now if you look down on that paragraph,

16    there is a line that says, there is nothing unusual or

17    deficient about this transmission or recording.  Do you see

18    that?"

19             Ms. Alexander says:  "Yes."

20             "Question:  Had you told Mr. Harris that before he

21    wrote the declaration?

22             "Ms. Alexander:  No."

23             Okay.  Now, she is here saying she did not tell you

24    that there was -- forgive the double negative -- nothing

25    unusual or deficient about this transmission or recording.  Is
```

1    that answer, to your knowledge, true?

2    A.   No.

3    Q.   Okay.  Now the question below that is:

4         "Now, the line after that reads:  Marsha King and

5    Tammie Creamer both indicated to me that they did not detect

6    anything unusual about the recordings they were given to

7    review.  Did you tell that to Mr. Harris before he wrote this

8    declaration?

9         "Answer:  No."

10        Is that last answer true, according to your

11   recollection?

12   A.   No.

13   Q.   Now, finally, if you look down, I say:

14        "Now I'd like to return you to the second page of your

15   declaration, on page 4.  It says, I, along with Dispatchers

16   Marsha King and Tammie Creamer listened to tapes to ascertain

17   whether there was anything out of the ordinary concerning the

18   recordings, including gaps in transmissions, equipment, and

19   unaccounted for periods of time?

20        "Do you see that line?

21        "Yes.

22        "Did you say that to Mr. Harris before he wrote this

23   declaration?

24        "No."

25        Is that last "no" true, according to your knowledge?

```
 1    A.   No.

 2    Q.   And then finally:

 3              "In fact, did you tell Mr. Harris who had worked on

 4    these tapes?

 5              "Answer:  After -- well, he knows now.  I mean, he

 6    knew."

 7              Let me just cut to the chase on this.  Do you recall

 8    her telling you specifically who worked on these tapes?

 9    A.   Yes.

10    Q.   Was that done by email?

11    A.   No, conversation.

12              MR. TURLEY:  Okay.  Your Honor, thank you for your

13    indulgence.

14              I thank the stenographer for her indulgence.

15              THE COURT:  Do you have anything else, Ms. Pressley?

16              MS. PRESSLEY:  Yes.

17              THE COURT:  All.  We will take our break, and then

18    we'll get Mr. Koger up her.

19              (Recess taken from 11:39 a.m. to 11:51 a.m.)

20              THE COURT:  Ms. Pressley, I believe you had some

21    questions.

22                        RECROSS-EXAMINATION

23              BY MS. PRESSLEY:

24    Q.   Mr. Harris, just a few questions.

25              You were asked by counsel for Chang Plaintiffs some
```

1    questions about Ms. Alexander's declaration.

2    A.   Yes.

3    Q.   Okay.  That declaration was drafted by you; correct?

4    A.   Yes.

5    Q.   But it was drafted after you had conversations with her --

6    A.   Yes.

7    Q.   -- right?

8         She was asked by you, she and several of her fellow

9    colleagues were asked to review tapes, which they did; right?

10   A.   Yes.

11   Q.   You recall they actually worked overtime to finish that

12   review?

13   A.   Yes.

14   Q.   And then when they finished that review, it was actually

15   after midnight when Ms. Alexander sent you the email saying

16   that was the results of the work that they had done?

17   A.   That's correct.

18   Q.   All right.  And then that same day, later that day after

19   you had received that information, you had sent to

20   Ms. Alexander the draft of her declaration --

21   A.   Correct.

22   Q.   -- correct?

23        And that draft was based on things that she had said

24   to you; right?

25   A.   Yes.

1    Q.   But the declaration was not necessarily in her words, it

2    was in your words as the drafter; correct?

3    A.   Yes.

4    Q.   Okay.  That wasn't the first time you had drafted a

5    declaration for someone in your job; correct?

6    A.   That's correct.

7    Q.   Okay.  It wasn't the first time that you took the

8    information that they gave you and put it in words in the

9    declaration as the attorney who was drafting it; correct?

10   A.   Yes.

11   Q.   But your practice was to then show the declaration to the

12   person who was going to be signing that it was true; correct?

13   A.   Yes.

14   Q.   And you did that with Ms. Alexander; right?

15   A.   Yes.

16   Q.   And when you showed it to her, she made a correction for

17   her title; didn't she?

18   A.   I believe there was a minor correction.  I don't recall

19   whether it was her title, but there was a minor correction,

20   yes.

21   Q.   But other than the minor correction, after she had

22   communicated to you that that communication -- that that

23   correction needed to be made, she dated and signed the

24   declaration; didn't she?

25   A.   Yes.

1    Q.   And in signing it, she was affirming that it was true and

2    accurate; correct?

3    A.   Yes.

4    Q.   Okay.  And that's not something you told her she had to do

5    or she would be fired; right?

6    A.   That's correct.

7    Q.   And that's not something you told her she had to do or she

8    would get in any other kind of trouble; correct?

9    A.   Correct.

10   Q.   Okay.  She did that freely; right?

11   A.   Yes.

12        MS. PRESSLEY:  Okay.  No further questions.

13        THE COURT:  Thank you, Mr. Harris.  You may stand

14   down.

15        Mr. Kroger, please.

16        MS. PRESSLEY:  Your Honor, before Mr. Koger comes in,

17   can we approach briefly?

18        THE COURT:  Yes.

19        (Bench conference as follows:)

20        MS. PRESSLEY:  Mr. Koger is an insulin-dependent

21   diabetic, so normally whether it's for a trial or in this

22   situation as a witness, he carries a little pouch with him

23   with his insulin and some candy and just something in case his

24   sugar gets low if he's on the stand a long time.  I just

25   wanted permission for him to carry that with him --

1           THE COURT:  Of course.

2           MS. PRESSLEY:  -- and for you to also know what that

3    was.

4           THE COURT:  Certainly.  And if he needs the nurse,

5    tell me, I'll get her.

6           Thank you.

7           (Bench conference concluded)

8                    THOMAS LOUIS KOGER,

9    having been first duly sworn to tell the truth, the whole

10   truth and nothing but the truth, was examined and testified as

11   follows:

12          THE COURT:  Would you state your full name, please.

13          THE WITNESS:  Thomas Louis Koger, Your Honor.

14          THE COURT:  Good morning, Mr. Koger.

15          THE WITNESS:  Good morning, Your Honor.

16          THE COURT:  Mr. Koger, how long have you been a member

17   of the bar?

18          THE WITNESS:  Since December 1988.

19          THE COURT:  And your present position, sir?

20          THE WITNESS:  I'm an Assistant Attorney General in the

21   Office of the Attorney General of the District of Columbia.

22          THE COURT:  And are you assigned to a particular

23   division?

24          THE WITNESS:  Civil Litigation Division, Your Honor.

25          THE COURT:  Were you so assigned such that you at one

1    point were counsel in the case before the Court?

2            THE WITNESS:  Yes, Your Honor.

3            THE COURT:  Whom did you represent?

4            THE WITNESS:  In Chang, I represented the District of

5    Columbia.  For a period, I represented Chief Ramsey in his

6    individual capacity and ultimately only in his official

7    capacity.  I represented Mr. Michael Fitzgerald, Brian Jordan,

8    Brian DiGirolamo, and Andre Harrison, and Michael Smith.

9            THE COURT:  Did you represent a man named Newsham,

10   Chief Newsham?

11           THE WITNESS:  No, Your Honor.

12           Well, in his official capacity.  I'm sorry, Your

13   Honor.

14           THE COURT:  So I understand, if an action is brought

15   against police officers and it seeks damages from the police

16   officers individually, is it the practice of the Attorney

17   General's Office to extend representation to such persons?

18           THE WITNESS:  Either directly by Assistant Attorneys

19   General such as myself or by providing for their

20   representation by outside counsel, yes, Your Honor.

21           THE COURT:  But you believed yourself to have an

22   attorney-client relationship with the persons you've just

23   indicated?

24           THE WITNESS:  That I represented in their individual

25   capacities, yes, Your Honor.

1          THE COURT:  All right.  When you took over the

2     representation of those persons, this lawsuit was already in

3     existence?

4          THE WITNESS:  As to -- actually, the individuals were

5     added after I took on the case.  I believe they were added by

6     Amended Complaints, Your Honor.

7          THE COURT:  But did there come a time when you had a

8     responsibility as counsel to participate in the discovery

9     process in this case?

10          THE WITNESS:  Yes, Your Honor.

11          THE COURT:  Was it -- when you took the case over, was

12     that process going on?

13          THE WITNESS:  No, it commenced on, I believe

14     December 9th of the year I took the case.  I started on

15     August 25th.

16          THE COURT:  Of what year, sir?

17          THE WITNESS:  I'm sorry.  2003.

18          THE COURT:  All right.  So your understanding was

19     discovery began when?

20          THE WITNESS:  December 9th, I believe, of 2003.

21          THE COURT:  When you began to work on the discovery

22     case, had another lawyer for your office collected or

23     accumulated a file of documents and electronically stored

24     information that pertained to the case?

25          THE WITNESS:  Not that I am aware of, Your Honor, no.

1          THE COURT:  So you began the process of responding to

2     certain discovery demands.

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  And did those demands include a request to

5     produce documents?

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  Did you understand that the request to

8     produce documents included within the word "documents" things

9     other than pieces of paper?

10          THE WITNESS:  Yes, Your Honor.

11          THE COURT:  Did you understand it to include

12     electronically stored information?

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  Did you understand it to include video or

15     audiotapes?

16          THE WITNESS:  Yes, Your Honor.

17          THE COURT:  All right.  With reference to the events

18     in issue, on the weekend of September 26th, 27th, and 28th of

19     2002, were you in Metropolitan Police Department headquarters

20     during the demonstrations that were held in the city?

21          THE WITNESS:  No, I was not, Your Honor.

22          THE COURT:  You were not on duty that day?

23          THE WITNESS:  I was employed by a different employer

24     than the District of Columbia in those days.

25          THE COURT:  So you, during the day, had absolutely no

1     occasion to enter the part of the premises known as the JOCC?

2             THE WITNESS:  That is correct, Your Honor.

3             THE COURT:  Now, did there come a time when you,

4     pursuant to your responsibility for discovery, had occasion to

5     discuss the capabilities and operations of computers that were

6     installed and being used in the JOCC and in another part,

7     which was called the SOCC, the JOCC and the SOCC?

8             THE WITNESS:  I don't recall having that conversation

9     in any technical fashion.  I just knew that such equipment

10    existed and that data could be input there, in those two

11    locations.

12            THE COURT:  All right.  So you never saw the system

13    actually operating when it was activated during a

14    demonstration?

15            THE WITNESS:  I have seen it operating during the 2009

16    inauguration and perhaps during the 2005 inauguration.

17            THE COURT:  Prior to the demonstrations in this case,

18    you had never been in the JOCC to see how it operated; is that

19    right?

20            THE WITNESS:  Not while it was operational.  I don't

21    believe I had been at all, but I'm not sure.

22            THE COURT:  Prior to your work on this case, had there

23    ever been a discovery demand that you had to respond to that

24    spoke to or seemed to demand output of computers that were on

25    the premises in the Metropolitan Police Department in the JOCC

1    or the SOCC?

2         THE WITNESS:  Yes, Your Honor.

3         THE COURT:  All right.  And did you know of the

4    computer's capability to produce what was known as a running

5    resume?

6         THE WITNESS:  I understood that at least as -- I don't

7    know that the JOCC was operational at the time of the case --

8    for instance, the Alliance case, now known as Becker, which

9    occurred in April 2000 -- I don't believe the JOCC was

10   operational at that time.  I believe that came from either the

11   SOCC or the IOCC.

12        THE COURT:  When you learned of the operational

13   capabilities of these computers, did you learn of their

14   operational capability from a police officer or a person in

15   the Metropolitan Police Department?

16        THE WITNESS:  It would have been from a person in the

17   Metropolitan Police Department, yes, Your Honor.  I could not

18   tell you offhand.

19        THE COURT:  And when did you first become aware of the

20   capability of the system to produce a running resume?

21        THE WITNESS:  I think I learned that, Your Honor, by

22   virtue of having received it in production for Alliance -- I'm

23   sorry -- for Becker v. The District of Columbia.

24        THE COURT:  And did the production you make in Becker,

25   did that precede the discovery demands in this case or was it

1    simultaneous?

2          THE WITNESS:  I believe that we had that information

3    from Becker previously, Your Honor.

4          THE COURT:  All right.  Now, specifically, we have

5    been made to understand that the system is designed to take

6    input that is coming into the system from various sources, to

7    input it into the system so that all of that information is in

8    one place and then that the system is programmed so it can

9    produce a document called the running resume.

10         THE WITNESS:  This I have been told, Your Honor, yes.

11         THE COURT:  All right.  Now, did you understand that

12    the discovery demands in this case, as promulgated by the

13    Plaintiffs in this case, called for the production of the

14    running resume created over the weekend of September 26th,

15    27th, and 28th?

16         THE WITNESS:  Yes, Your Honor.

17         THE COURT:  Knowing of that request or demand, first

18    of all, did you assert on behalf of your clients any objection

19    to its production that you recall?

20         THE WITNESS:  Your Honor, to the extent that I did

21    object to it, it would have been in the context to the extent

22    that it sought law enforcement privileged information but not

23    a general objection.

24         THE COURT:  All right.  So it, therefore, appears as

25    opposed to awaiting the Court's resolution of an objection,

1       you began an effort to find it?

2               THE WITNESS:  That is true, Your Honor.

3               THE COURT:  Now, we have been using various dates here

4       to help us understand proceedings; and the first thing we

5       understand, as your declaration indicates, is that it looks

6       like there's a hearing almost within a month of the

7       demonstration by the D.C. City Council Committee on the

8       Judiciary.

9               THE WITNESS:  I understood that to have taken place on

10      or about October 24, 2002, Your Honor.

11              THE COURT:  Okay.  And were you then employed by the

12      District of Columbia.

13              THE WITNESS:  No, Your Honor.

14              THE COURT:  All right.  But you were -- you later

15      became aware of this hearing?

16              THE WITNESS:  Yes, Your Honor.

17              THE COURT:  Now, we also understand that there is then

18      a second consideration by that committee, and that is dated

19      roughly in the summer of 2003, from the date of the subpoena

20      we have seen.  Were you then working for the District of

21      Columbia?

22              THE WITNESS:  My understanding, Your Honor, is that

23      the first subpoenas issued in July, and I came to work for the

24      District of Columbia on August 25th, 2003.

25              THE COURT:  All right.  Upon going to work for the

1      District of Columbia, had you been -- were you made aware that

2      there had been an earlier effort to find the running resume

3      for that weekend?

4              THE WITNESS:  I don't recall that specifically, Your

5      Honor.

6              THE COURT:  Okay.  Did you make an effort to find the

7      running resume?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  All right.  Did you begin that -- during

10     the course of that effort which you detailed at great length

11     in your declaration, did you have occasion to meet a man named

12     Sergeant Douglas Jones.

13             THE WITNESS:  I don't recall meeting Douglas Jones in

14     that process.  I remember I met -- I spoke with then-Sergeant

15     Jones, I believe, in 2007, in the context of him being prepped

16     by one of my colleagues for a deposition, but I don't recall

17     as I sit here today having met with him early in the context

18     of seeking the running resume.

19             THE COURT:  Irrespective of whether you spoke to

20     Jones, can you tell us of the first efforts you made to find

21     the running resume?

22             THE WITNESS:  The first efforts were shortly after I

23     came to the Office of the Attorney General.  I went over to

24     the Office of the General Counsel, and I believe it was -- I

25     was present in that office at the time; and anticipating that

1    discovery would be significant and voluminous in the case, I

2    requested that the Office of the General Counsel obtain all

3    relevant materials for me, to include the running resume.  The

4    running resume, it seemed to me, based on my experience in

5    Becker, would be kind of a baseline document that I would want

6    to have as soon as possible.

7         THE COURT:  As you understood the operation of the

8    computer systems in the JOCC, you understood them to have,

9    obviously, the capability to produce a running resume?

10        THE WITNESS:  That was my understanding, Your Honor.

11        THE COURT:  Did you understand that, in addition to

12   the capability, obviously, of causing a printed copy, that any

13   commander could have access to the running resume provided

14   that commander had a user name and password that permitted him

15   or her to access the system?

16        THE WITNESS:  I don't know at what point I became

17   aware that any commander could access it.  It was my

18   understanding that the data was electronically stored within

19   the system.

20        THE COURT:  When you became aware of it being

21   electronically stored within the system, did you make any

22   efforts, either directly or through Mr. Ryan and Mr. Harris,

23   to see if the system could cause -- could be -- I'm sorry --

24   if you could cause the system to produce, for your

25   consideration, a running resume?

1              THE WITNESS:  I anticipated, Your Honor, that that's

2    what would happen.  When I made -- when I made the request, I

3    did not assume one way or the other whether there was a hard

4    copy.  I just expected one to be printed.

5              THE COURT:  Was one ever printed?

6              THE WITNESS:  No.  At least I never got one.  I know

7    of none.

8              THE COURT:  What explanation, if any, were you ever

9    given as to why your requests could not be fulfilled?

10             THE WITNESS:  The explanation I remember is from -- I

11   believe he was then-Captain Brito, which I think in my

12   declaration I speak of speaking with him in 2004, which in

13   fact is a typo; I believe correctly it was 2005.  I met with

14   then-Captain Brito, and I believe his assistant was Lieutenant

15   Erich Miller in the premises that had previously, I believe,

16   been occupied by Ms. Rai Howell to discuss where is this

17   report, why can't I have the report.  It was explained to

18   me -- I was shown a document, which by comparison to my

19   experience in running resumes from April 2000, for instance,

20   was very short, organized very differently.  And when I say

21   "short," I recall it as being two or three pages, Your Honor.

22             THE COURT:  Uh-huh.

23             THE WITNESS:  When I say organized very differently,

24   my recollection of the running resume that I anticipated

25   seeing was a pure chronological document.  In the margin,

1    there would be an indication of a time in military time.  And

2    then there would be an entry of information.  And it would

3    just be a series of these.  This had headings.  And if I

4    recall correctly, "Gun recovery" may have been a heading,

5    something to do with various specific criminal activities I

6    believe were headings; and it was inconsistent, in my

7    observation, with what I anticipated seeing and a document

8    that was dedicated to an event.  And I was told that there had

9    been a -- there had been a transition, if you will, in the

10   systems used to produce these documents that I'm calling a

11   running resume and that what I was being shown was the output.

12        THE COURT:  And did Miller and Brito refer to this as

13   a running resume?

14        THE WITNESS:  I'm not sure if it was a running resume

15   or if it was an overnight report.

16        THE COURT:  And you understood there to be a

17   difference between those two things?

18        THE WITNESS:  No, Your Honor, in that -- when I say

19   "no," I mean, I'm looking at something which is clearly not

20   what I'm seeking, but I'm also being clear to them that I'm

21   looking for the running resume, and they are telling me, this

22   is as close as there now is under our new system.

23        THE COURT:  Now, these new systems -- we've heard

24   other testimony which explained that there were two systems:

25   One was called GroupSystems the other was called E-Teams

1    Systems.  We understand that GroupSystems, which apparently

2    was created by a company called GroupWise, was found as the

3    years went by to be deficient, and it was replaced by E-Teams

4    Systems because, among many reasons, E-Teams Systems, being

5    web-based, permitted everyone to have access to it.

6         THE WITNESS:  This is what I have been advised Your

7    Honor, yes.

8         THE COURT:  So when you met with Brito and Miller,

9    were they showing you output from the E-Teams system?

10        THE WITNESS:  I was told it was from the E-Teams

11   system.

12        THE COURT:  The output you were showing, did it appear

13   to have been related and to have been done during the weekend

14   of September 26th through 28th of 2002?

15        THE WITNESS:  If I recall correctly, there was some

16   data relating to that weekend, if not all of the data.

17        THE COURT:  Did you believe, when you were shown this

18   information, that it was, in fact, what you were looking for?

19        THE WITNESS:  I believed, based upon representations

20   of Captain Brito, that it is what they had.  It was clear to

21   me that it was certainly not a document that captured the

22   information that I wanted.

23        THE COURT:  Did you then make other efforts to attempt

24   to find the document for which you were looking?

25        THE WITNESS:  Over a period, I did repeat requests to

1    the office.  I would say, though, that my initial response to

2    being provided the information by Captain Brito that this is

3    what the new system provides as a running resume was that, in

4    light of my experience with IT issues over the decade that I

5    had worked for the District of Columbia Government prior to

6    this, I was dismayed but not surprised.

7            THE COURT:  Now, I want to direct your attention

8    particularly to page 3 of your declaration, paragraph 7.

9    Specifically, you say, and I quote, "MPD Sergeant Douglas

10   Jones has testified to his belief that the JOCC running resume

11   generated may have been used as a template and written over as

12   a running resume for an IMF/WB meeting operation following the

13   September 27th to 29th, 2002 weekend."

14           Did you -- when you say "Jones has testified," had you

15   read his testimony, and was that the source of your

16   representation?

17           THE WITNESS:  Yes, Your Honor.

18           THE COURT:  Did you find that explanation adequate as

19   an explanation for why the running resume with which you were

20   familiar was not available?

21           THE WITNESS:  It -- if Jones were correct, it made

22   sense to me.

23           THE COURT:  So that we understand each other, a

24   template describes a document that can usually be produced by

25   programming the computer.  And a template is designed to be

1    used again and again and again, so that if I open a template

2    and put information into it, the computer warns me that if I

3    want to save the template, I better save it by a different

4    name, so there will now exist on my computer system the

5    template and the document I produced by using that template.

6    That, for example, is how I do judicial orders, I have

7    templates.  So if I put in the words, "It is ordered that the

8    motion is granted and the parties shall submit their briefs by

9    October 3rd" and use a template, I had better be careful to

10   save the order under a different name so I can use the

11   template again.

12        Is that what you understood Jones to be telling you or

13   to have testified to?

14        THE WITNESS:  I don't -- I did not understand Jones to

15   indicate that there would be a warning component in the

16   writing -- in the overwriting of the template, but I

17   understood it in the same sense that you discuss it or as I

18   pull up a letterhead to write a letter that if I do not save

19   it differently, I will have lost my starting point.

20        THE COURT:  All right.  Now, in addition -- so then

21   you made the efforts to find the running resume that are

22   detailed in your declaration; and unfortunately, they never do

23   produce it.

24        THE WITNESS:  That's true, Your Honor.

25        THE COURT:  Now, did there come a time when you recall

1      a discussion with anybody within the Metropolitan Police

2      Department, including Mr. Ryan and Mr. Harris, as to the

3      existence of videotapes of the demonstration that may have

4      been taken over the weekend, that weekend in 2002?

5              THE WITNESS:  The only ones I recall having discussed

6      were videotapes that I produced, I believe, in March of 2004

7      for the first time.  I don't recall discussion of other

8      videotapes having been produced.  To the contrary, it had been

9      my understanding from conversations -- and I honestly don't

10     recall if it were with Mr. Ryan or Mr. Harris, it is my

11     understanding that the department was not videotaping these in

12     response to a request from a council member.

13             THE COURT:  So at some point you were advised that a

14     council member had indicated that it would be inappropriate

15     for the Metropolitan Police Department to record events over

16     that weekend?

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  Were you aware that a fairly sophisticated

19     stationary camera system was set up all over the city and was,

20     in fact, sending a live video feed back to the JOCC?

21             THE WITNESS:  No, Your Honor.

22             THE COURT:  Okay.  But it would not surprise you to

23     learn that in the past week we have heard testimony from

24     people who entered the JOCC that morning and could see what

25     was happening?  Indeed, I think one of them testified he

1        actually saw the arrests being made in Pershing Park.  Did you

2        become aware of the existence of that system?

3                THE WITNESS:  I had been advised that, in fact, a

4        system of cameras such as you have described was utilized.  I

5        learned that some months ago in conversations within the

6        office, and I should be clear that what I understood was not

7        to take place was a recording.

8                THE COURT:  So as you understood, it was explained to

9        you or you understood from the discussions you had that while

10       the system was providing a video feed pursuant to some request

11       by some council member, the system was specifically programmed

12       not to record what was occurring?

13               THE WITNESS:  I can't say that I was aware that the

14       system was operational.  The first information I had, rightly

15       or wrongly, was we didn't record the demonstrations, and I

16       didn't think much more about it from that point because my

17       interest was I didn't have evidence of what happened in the

18       streets.

19               THE COURT:  Was that statement to you consistent or

20       inconsistent with your experience in other similar situations?

21               THE WITNESS:  I had no other situations --

22               THE COURT:  Okay.

23               THE WITNESS:  Well, I had -- I had learned after I

24       came back to the office that, of course, in the context of the

25       inaugural events, there is a great deal of recording, a great

1      deal of video recording.  In terms of the only like example

2      comparable event that I was aware of were the April 2000 IMF

3      events, and I did not know of rooftop cameras or any

4      significant videotaping of those events.

5              THE COURT:  So in the 2000 demonstrations, you never

6      became aware of stationary cameras that were capturing events

7      around the city?

8              THE WITNESS:  That's right.  As I recall, no, I did

9      not.

10             THE COURT:  All right.  Did there, nevertheless, come

11     a time in your capacity as counsel that you made videotapes

12     available to these Plaintiffs' counsel?

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  What was the source of those videotapes?

15             THE WITNESS:  There was what's called the ESU, the

16     Electronic Surveillance Unit, there was a tape which was

17     provided by -- attributed to the Baltimore Police Department.

18     Those are the sources that I recall.

19             THE COURT:  Okay.  Were you aware that there were

20     police officers throughout the city who had been issued video

21     recording devices the mornings of the weekend we're talking

22     about and were, in fact, using them to record events?

23             THE WITNESS:  I understood that the ESU tapes derived

24     from that source.

25             THE COURT:  Okay.  Did you get the copy -- did you get

1    whatever you made available to these Plaintiffs' counsel from

2    either Harris or Ryan in terms of videotapes?

3              THE WITNESS:  Yes.

4              THE COURT:  Did you view them before you turned them

5    over?

6              THE WITNESS:  I believe I did.

7              THE COURT:  Did you notice anything -- well, first of

8    all, when you reviewed them, did they appear to you to be a

9    continuous recording of events as they transpired from the

10   moment the machine was turned on until it was shut off?

11             THE WITNESS:  No.  It appeared to me that they were

12   snippets.

13             THE COURT:  Snippets.  So, therefore -- we have seen

14   it.  So I take it you appreciate, then, that while in realtime

15   a few seconds go by, in the lower left-hand corner, the time

16   jumps from 7:15 to 8:44?

17             THE WITNESS:  I have no doubt, Your Honor.

18             THE COURT:  You have no doubt?

19             THE WITNESS:  I simply don't recall, but I have no

20   doubt.

21             THE COURT:  No doubt that that occurred?

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  So when you turned those over, having

24   observed them, did anybody give you a contemporaneous

25   explanation as to why there were snippets as opposed to a

1    continuous recording?

2            THE WITNESS:  I don't recall that.  I assumed people

3    were turning the camera on and off.

4            THE COURT:  Yes.  Did there come a time when these

5    Plaintiffs' counsel complained to you about the videotapes and

6    made some assertion as to their legitimacy or authenticity or

7    use?

8            THE WITNESS:  I am trying to remember when I heard

9    that.  There were concerns expressed to me as to their having

10   received all the videotapes.  I believe it was at or about the

11   point at which I was leaving the cases that the issue arose as

12   to whether these tapes had been edited.

13           THE COURT:  All right.  Do you recall if during the

14   case a request was made of you in your capacity as counsel for

15   tapes of so called radio runs?  First of all, let me ask you

16   this:  Are you aware that there is a police frequency and

17   transmissions on it are recorded?

18           THE WITNESS:  Yes, Your Honor.

19           THE COURT:  All right.  Being aware of that, did you

20   make any efforts in this case to cause such radio runs and

21   other communications over the police frequency to be made

22   available to these Plaintiffs?

23           THE WITNESS:  Yes, Your Honor.

24           THE COURT:  And how did you go about doing that?

25           THE WITNESS:  I requested copies of the radio runs for

1    the relevant time period from the Office of the General

2    Counsel.

3              THE COURT:  And that would be either Ryan or Harris?

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  And it would be typical in these instances

6    that if you made the request of Ryan, he would delegate it to

7    Harris?

8              THE WITNESS:  In the contest of this case, yes.

9              THE COURT:  Did Harris produce such videotapes?

10             THE WITNESS:  I got them from the Office of General

11   Counsel.  I presume they came from Mr. Harris.

12             THE COURT:  Did you listen to them?

13             THE WITNESS:  I did not.

14             THE COURT:  Did you make them available to Plaintiffs'

15   counsel.

16             THE WITNESS:  I provided them to counsel for the

17   Abbate, Chang, and Diamond Plaintiffs pursuant to the

18   instructions, the request for production of documents in the

19   first eight or nine days of March 2004.

20             THE COURT:  After that occurred, did you again hear or

21   were there made known to you complaints about the authenticity

22   of the audiotapes and the complaints, for example, that

23   portions of them could not be found?

24             THE WITNESS:  Based on -- this is based on having a

25   -- on having read a copy of an email from Mr. Messineo to me,

1    which was in the court file, because I don't remember the

2    specific time it was first raised with me, but I believe it

3    was in October of 2007 Mr. Messineo specifically expressed

4    concerns that the lengths of the tapes in the sense of the

5    recorded time that he was able to hear were inconsistent with

6    the times identified for the tapes.

7         THE COURT:  And learning of that -- for the purposes

8    of the record, I think you should explain who Mr. Messineo is.

9         THE WITNESS:  I'm sorry.  Mr. Messineo was counsel and

10   is counsel for the Plaintiffs in Barham versus Ramsey.

11        THE COURT:  After you heard of his complaint, what, if

12   anything, did you do?

13        THE WITNESS:  I'm trying to -- I'm trying to remember

14   whether I checked to see if this were a function of

15   compression, as I had heard in other radio runs that I had had

16   in more conventional cases that -- where there is no

17   transmission, there is no recording, and so you have a tape,

18   the run time of which is shorter than the assigned time for.

19   Ultimately, I requested that tapes be provided which

20   would -- which would satisfy the Plaintiffs' need.  I recall

21   having sent my set of tapes back to the Office of General

22   Counsel.

23        THE COURT:  Do you know what happened thereafter, or

24   was that at a time when you were leaving the case?

25        When did you leave the case, by the way?

1        THE WITNESS:  I left the case -- I withdrew my

2   appearance on September 30, 2009.  The -- these events

3   transpired in the context of discovery having reopened in the

4   summer of 2007, there having been a large number of

5   depositions noted by Plaintiffs, and the responsibility for

6   various aspects of discovery were split among myself and three

7   of my colleagues.  I believe that Ms. Taylor handled the

8   related 30(b)(6) topics with Commander James Crane; and I

9   believe that she, in essence, to the extent the matter came

10  ultimately to be resolved did that.

11       THE COURT:  Mr. Koger, we are known to each other.

12       THE WITNESS:  Yes, Your Honor.

13       THE COURT:  You've handled matters before me both in

14  settlement and in trial; is that right, sir?

15       THE WITNESS:  Yes -- well, I don't know if I've had an

16  opportunity to try a case, but I know I've settled some with

17  your assistance.

18       THE COURT:  And therefore, you know that I have

19  respect for you as a member of the bar and as an attorney; and

20  I don't in any way mean to ask the next set of questions to

21  embarrass you --

22       THE WITNESS:  Thank you, Your Honor.

23       THE COURT:  -- it's the furthest thing from my mind,

24  but unfortunately I must.

25       There came a time in this case when Mr. Nickles, the

1    Attorney General, submitted a declaration; and I understand

2    that, thereafter, he appeared in court.  And he publicly

3    announced that he was taking you off the case.  And in his

4    declaration, specifically in paragraph 14 -- would you be so

5    kind as to show that to Mr. Koger?

6         Thank you.

7         In this paragraph, he details as I read it, at least,

8    some deficiencies he found in your performance, which led him

9    to relieve you of responsibility and assign other lawyers.

10        THE WITNESS:  Yes, Your Honor.

11        THE COURT:  Now, as I read paragraph 14, the

12   accusations against you that he credited, found to be

13   meritorious, none of them as I read this have to do with (a)

14   the inability to find the running resume or any controversy

15   between Plaintiffs' counsel and your office with reference to

16   videotapes or oral recordings.  Am I correct in my reading of

17   Mr. Nickles' declaration.

18        THE WITNESS:  I'm --

19        THE COURT:  Take your time.

20        THE WITNESS:  Thank you.

21        No, Your Honor, it does not speak to loss or inability

22   to locate the running resume or the tapes.

23        THE COURT:  Now, obviously, I know from the record in

24   this case there came a time when Mr. Nickles appeared before

25   Judge Sullivan and recounted what is in this declaration and

1    other matters.  Were you present in court when he did that?

2           THE WITNESS:  No, Your Honor.  I believe that was

3    September 29th, and I was not in the courtroom.

4           THE COURT:  All right.  But did you ever see

5    thereafter a transcription of Mr. Nickles' comments on that

6    day?

7           THE WITNESS:  I honestly can't recall whether I have

8    or not.

9           THE COURT:  Okay.  But as you understand his

10   representations to Judge Sullivan, did any of them deal with

11   any deficiencies in your performance with reference to the

12   running resume and the oral and the videotapes?

13          THE WITNESS:  Not that I'm aware of, Your Honor.

14          THE COURT:  In his declaration, which was filed on

15   August 12, 2009, he speaks of several events that are about to

16   occur.  First of all, he speaks of an investigation he is

17   causing to be done of how discovery was managed in this case.

18   Pursuant to his representations in the declaration, did he

19   cause such an investigation to be done so that you were

20   interrogated or questioned by someone who was conducting such

21   an investigation?

22          THE WITNESS:  Yes, I was questioned by Judge Stanley

23   Sporkin and a gentleman who was assisting him.

24          THE COURT:  Were you ever spoken to by a person named

25   Ellen Efros?

```
 1                  THE WITNESS:  Well, I was spoken to by Ellen Efros on

 2      a regular basis in that she was then and is now my direct

 3      supervisor.

 4                  THE COURT:  But she had no responsibility for the

 5      investigation to which Mr. Nickles referred?

 6                  THE WITNESS:  I don't -- I don't believe so, no.  She

 7      questioned me in the context of a supervisor-to-supervisee

 8      investigation.

 9                  THE COURT:  May I direct your attention to paragraph

10      11, in which Mr. Nickles recounts what he has -- what

11      Ms. Efros has done.  She, as you'll see, quotes, "again

12      directed MPD to make inquiry of all relevant personnel,

13      present and former MPD officers and officials with knowledge

14      or involvement in the Pershing Park mass arrests," end of

15      quotes.

16                  THE WITNESS:  My --

17                  THE COURT:  Just a minute.  I haven't asked a question

18      yet.

19                  To your knowledge, did Ms. Efros conduct such an

20      investigation and did you assist her in conducting it or were

21      you interviewed during the course of her investigation?

22                  THE WITNESS:  Ms. Efros, to my knowledge, made such an

23      investigation, it was spoken of as being a scrub of the

24      discovery efforts at the Metropolitan Police Department.  I

25      was not -- I was not questioned with regard to that, as I
```

1      recall.

2              THE COURT:  All right.  But by the time -- this is

3      August 12th, and you're going to leave the case on

4      September 30th.  When you leave the case, are you aware that

5      Ms. Efros has completed her investigation and given the

6      results of it to Mr. Nickles?

7              THE WITNESS:  In fairness, Your Honor, as I sit here

8      today, I can't tell you if I knew that to be the status or

9      not.

10             THE COURT:  But as your understanding, it is

11     now -- obviously, a year has gone by -- do you know if the

12     investigation Mr. Nickles indicated he was going to undertake

13     or have other people undertake on his behalf, whether it is

14     now ended and has culminated in any kind of a report?

15             THE WITNESS:  I do not -- I have not seen such a

16     report, Your Honor.

17             THE COURT:  Okay.  And he has not advised you that

18     such a report has been produced and, on the basis of it, he

19     wishes to speak to you?

20             THE WITNESS:  I'm not sure if this is responsive to

21     your question, Your Honor, but he did speak to me.  An

22     investigation was done of my handling of documents, and there

23     was a document as a result of that.  I don't know if -- I

24     don't --

25             THE COURT:  Did you say there was a document as to

1    that?  When he finished his interview with you, do you know if

2    thereafter someone put together all that this investigation

3    revealed and put it in writing so that it could be shared by

4    other people?

5          THE WITNESS:  No, Your Honor.  I'm thinking of a much

6    narrower investigation and a much narrower document.  What I'm

7    thinking of and the conversation that I've had with

8    Mr. Nickles was limited to my actions in the handling of

9    discovery.

10         THE COURT:  All right.  And his criticism, as I

11   understand it from paragraph 14 and others, had to do that

12   there were certain documents that should have been turned over

13   to Plaintiffs' counsel sooner than they were but were not

14   because at least according to Mr. Nickles you didn't have a

15   system in place that permitted you to quickly retrieve them

16   and make them available.  Is that a fair summary of what he

17   said here?

18         THE WITNESS:  That's a charitable summary, Your Honor.

19         THE COURT:  All right.  During the course of your work

20   on the case, did you have occasion to speak to persons within

21   the Metropolitan Police Department yourself as opposed to

22   awaiting the receipt of documents from Ryan or Harris?  I'm

23   specifically interested in whether you spoke to Gaffigan.

24         THE WITNESS:  I don't recall ever having spoken to

25   Gaffigan.

1           THE COURT:  Okay.  Now, there came a time during this

2    case when I think you were still on it when the depositions of

3    many of the people who have been testified before me in this

4    past week were given.  Did you prepare them for those

5    depositions?

6           THE WITNESS:  I prepared a number of witnesses for

7    depositions.  I'm trying to think of who has testified before

8    you and whether I prepared any of them.  I believe by the

9    time --

10          THE COURT:  Maybe I can help you.  Jones?

11          THE WITNESS:  No.

12          THE COURT:  Gaffigan?

13          THE WITNESS:  No.

14          THE COURT:  Trugmen?

15          THE WITNESS:  No.

16          THE COURT:  Crane?

17          THE WITNESS:  I met with Crane, and I spoke with

18    Crane, but I did not prepare him for his deposition.

19          THE COURT:  Broadbent.

20          THE WITNESS:  Yes, I did prepare Al Broadbent.

21          THE COURT:  Costas, Jim Costas?

22          THE WITNESS:  No, Your Honor.

23          THE COURT:  Peter Newsham?

24          THE WITNESS:  No, Your Honor.

25          THE COURT:  Terry Ryan himself?

```
 1              THE WITNESS:  Terry Ryan?  No.

 2              THE COURT:  And Ramsey himself?

 3              THE WITNESS:  No.  By that time, he had changed

 4    representation.

 5              THE COURT:  And he was now represented by new counsel?

 6              THE WITNESS:  Yes, Your Honor.

 7              THE COURT:  All right.  We're going to break there for

 8    lunch.  I'm completed.

 9              Thank you very much, Mr. Koger.

10              1:45, everybody.

11              Mr. Koger, please do not discuss your testimony with

12    anyone over the luncheon hour.

13              THE WITNESS:  I will not, Your Honor.

14              THE COURT:  1:45.

15              THE CLERK:  The Court stands adjourned until 1:45.

16         (Luncheon recess taken at 12:40 p.m.)

17

18

19

20

21

22

23

24

25
```

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3         I, Patricia A. Kaneshiro-Miller, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7    ----------------------------------------      ------------
                PATRICIA A. KANESHIRO-MILLER                DATE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'03** [1] - 21:3
**'99** [1] - 5:1

**0**

**02-2010** [1] - 4:2
**0935** [1] - 71:11
**0941** [1] - 72:11
**0959** [1] - 71:18

**1**

**1** [2] - 69:2, 82:9
**1-D** [5] - 70:21, 70:22,
  70:25, 71:7, 71:13
**10** [1] - 73:22
**1004** [1] - 72:16
**10:02** [1] - 24:17
**10:10** [1] - 24:17
**10:24** [1] - 40:10
**11** [1] - 118:10
**11/16/07** [1] - 74:12
**11:39** [1] - 89:19
**11:51** [1] - 89:19
**12** [1] - 117:15
**12:05** [1] - 74:21
**12:40** [1] - 122:16
**12th** [1] - 119:3
**14** [4] - 71:21, 116:4,
  116:11, 120:11
**15** [3] - 54:11, 73:22,
  73:24
**16** [2] - 69:23, 74:15
**19-minute** [1] - 39:22
**1988** [1] - 93:18
**1997** [1] - 4:20
**1999** [1] - 4:20
**1:45** [3] - 122:10,
  122:14, 122:15

**2**

**2** [1] - 82:10
**20** [1] - 69:22
**200** [1] - 6:23
**200-and-something**
  [1] - 21:8
**2000** [10] - 10:25, 23:3,
  23:6, 23:7, 23:21,
  24:1, 98:9, 103:19,
  110:2, 110:5
**2002** [43] - 5:5, 5:19,
  6:15, 6:22, 7:17,
  8:20, 8:21, 8:24,
  9:19, 11:13, 12:7,
  12:15, 13:3, 13:10,
  13:17, 13:20, 15:14,
  16:22, 17:3, 17:10,

**17:11, 17:14, 17:18,**
  18:17, 19:5, 19:13,
  19:19, 20:22, 22:8,
  22:12, 25:15, 31:15,
  32:16, 33:10, 48:11,
  52:16, 53:5, 53:7,
  96:19, 100:10,
  105:14, 106:13,
  108:4
**2003** [14] - 9:1, 16:22,
  16:23, 19:8, 19:9,
  52:16, 53:13, 53:19,
  54:11, 58:6, 95:17,
  95:20, 100:19,
  100:24
**2004** [5] - 10:25,
  69:23, 103:12,
  108:6, 113:19
**2005** [2] - 97:16,
  103:13
**2007** [8] - 69:2, 69:24,
  74:15, 79:7, 79:8,
  101:15, 114:3, 115:4
**2008** [1] - 79:11
**2009** [5] - 78:22,
  97:15, 115:2, 117:15
**218** [1] - 9:1
**24** [1] - 100:10
**24/7** [1] - 26:12
**25** [1] - 4:15
**25th** [2] - 95:15,
  100:24
**26** [3] - 4:15, 4:16,
  33:10
**26th** [4] - 16:25, 96:18,
  99:14, 105:14
**27th** [3] - 96:18, 99:15,
  106:13
**28th** [4] - 17:1, 96:18,
  99:15, 105:14
**29th** [3] - 54:19,
  106:13, 117:3

**3**

**3** [1] - 106:8
**30** [1] - 115:2
**30(b)(6** [1] - 115:8
**30th** [1] - 119:4
**33** [1] - 72:19
**3rd** [1] - 107:9

**4**

**4** [1] - 88:15

**5**

**5** [3] - 76:8, 79:21,
  82:11

**6**

**60** [1] - 7:9
**60-plus** [1] - 7:3

**7**

**7** [1] - 106:8
**70** [3] - 47:10, 47:11,
  47:12
**70-page** [1] - 47:8
**7:12** [1] - 39:19
**7:15** [1] - 111:16

**8**

**80** [1] - 9:5
**85** [1] - 68:18
**8:44** [1] - 111:16

**9**

**9-27-2002** [1] - 72:8
**9/27/2002** [2] - 39:19,
  71:4
**91** [1] - 8:23
**94** [2] - 82:5, 82:7
**95** [1] - 83:22
**96** [1] - 85:18
**9th** [2] - 95:14, 95:20

**A**

**a.m** [6] - 24:17, 39:19,
  74:21, 89:19
**Abbate** [5] - 10:21,
  18:11, 52:20, 113:17
**able** [3] - 68:23, 78:9,
  114:5
**above-entitled** [1] -
  123:5
**absolutely** [2] - 46:23,
  96:25
**access** [5] - 28:5,
  102:13, 102:15,
  102:17, 105:5
**according** [6] - 68:25,
  85:24, 86:23, 88:10,
  88:25, 120:14
**accumulated** [1] -
  95:23
**accuracy** [1] - 81:17
**accurate** [15] - 7:1,
  75:12, 75:14, 75:16,
  75:17, 75:21, 76:2,
  76:13, 80:3, 80:6,
  80:7, 80:9, 80:24,
  81:1, 92:2
**accurately** [1] - 39:15
**accusations** [1] -
  116:12

**action** [1] - 94:14
**Action** [3] - 9:23, 23:8,
  23:16
**actions** [4] - 30:23,
  36:3, 46:20, 120:8
**activated** [1] - 97:13
**active** [1] - 21:8
**actively** [1] - 27:13
**activities** [1] - 104:5
**actual** [1] - 59:24
**added** [2] - 95:5
**addition** [7] - 11:6,
  11:13, 15:21, 19:13,
  47:22, 102:11,
  107:20
**additional** [4] - 10:12,
  11:7, 11:16, 31:5
**addressed** [1] - 70:15
**adequate** [1] - 106:18
**adjourned** [1] - 122:15
**advice** [2] - 33:25,
  34:1
**advised** [4] - 105:6,
  108:13, 109:3,
  119:17
**affirmed** [1] - 52:20
**affirming** [1] - 92:1
**aficionado** [1] - 32:9
**agency** [4] - 6:1, 26:2,
  64:13, 64:15
**ago** [3] - 50:11, 50:13,
  109:5
**agree** [6] - 6:16, 6:24,
  9:5, 12:13, 13:2
**agreement** [4] - 33:6,
  33:9, 33:15, 35:7
**ahead** [4] - 39:21,
  60:23, 67:16, 85:5
**aims** [1] - 47:5
**AI** [1] - 121:20
**al** [2] - 4:3
**Alexander** [35] - 68:3,
  68:12, 69:15, 69:19,
  69:24, 70:4, 70:8,
  73:1, 73:6, 73:11,
  73:15, 74:7, 74:22,
  75:4, 75:11, 75:15,
  76:9, 79:6, 79:18,
  80:11, 80:12, 80:14,
  81:13, 81:17, 82:8,
  83:1, 83:19, 84:10,
  84:22, 85:23, 87:19,
  87:22, 90:15, 90:20,
  91:14
**Alexander's** [1] - 90:1
**allegation** [1] - 77:17
**Alliance** [2] - 98:8,
  98:22
**allow** [4] - 42:20,
  55:19, 57:21

**almost** [3] - 4:16,
  13:6, 100:6
**Amended** [1] - 95:6
**amount** [7] - 9:12,
  29:2, 29:3, 62:20,
  62:21, 62:23, 62:25
**analysis** [6] - 75:5,
  77:7, 78:12, 80:25,
  84:16, 85:9
**analyze** [1] - 70:12
**Andre** [1] - 94:8
**announced** [1] - 116:3
**answer** [18] - 23:11,
  42:21, 58:16, 60:22,
  66:18, 78:5, 82:17,
  82:19, 82:25, 84:5,
  84:8, 85:24, 86:23,
  87:14, 88:1, 88:9,
  88:10, 89:5
**Answer** [1] - 23:14
**answered** [2] - 58:15,
  85:3
**answers** [1] - 83:1
**anticipated** [3] -
  103:1, 103:24, 104:7
**anticipating** [1] -
  101:25
**anytime** [1] - 48:6
**apologies** [1] - 81:6
**appear** [2] - 105:12,
  111:8
**appearance** [1] -
  115:2
**appeared** [4] - 38:7,
  111:11, 116:2,
  116:24
**appreciate** [2] - 49:19,
  111:14
**approach** [1] - 92:17
**appropriate** [1] -
  84:15
**April** [7] - 23:3, 23:6,
  23:7, 23:21, 98:9,
  103:19, 110:2
**area** [1] - 33:21
**areas** [2] - 12:23, 27:3
**arising** [1] - 23:6
**arose** [2] - 32:25,
  112:11
**arrest** [15] - 9:6, 9:21,
  10:1, 10:5, 10:24,
  11:4, 11:7, 18:10,
  20:4, 21:5, 29:7,
  29:15, 48:6, 58:2,
  58:4
**arrested** [6] - 17:17,
  20:8, 50:16, 50:21,
  51:22, 51:25
**arrests** [6] - 11:14,
  11:24, 12:5, 16:25,

109:1, 118:14
**artist** [1] - 48:22
**ascertain** [2] - 35:11, 88:16
**ascertaining** [1] - 34:22
**aspect** [1] - 84:20
**aspects** [1] - 115:6
**assert** [1] - 99:18
**assertion** [4] - 43:6, 43:9, 80:5, 112:6
**assign** [1] - 116:9
**assigned** [11] - 5:12, 6:7, 9:19, 9:23, 10:3, 10:9, 19:19, 93:22, 93:25, 114:18
**assigning** [1] - 20:19
**assignment** [1] - 20:14
**assist** [2] - 31:8, 118:20
**assistance** [1] - 115:17
**assistant** [5] - 5:16, 6:15, 7:4, 20:24, 103:14
**Assistant** [2] - 93:20, 94:18
**assisting** [2] - 12:3, 117:23
**associated** [2] - 14:5, 63:22
**assume** [2] - 53:17, 103:3
**assumed** [2] - 36:4, 112:2
**Assurance** [1] - 34:9
**attachment** [2] - 73:2, 74:25
**attempt** [2] - 42:12, 105:23
**attempts** [1] - 8:8
**attention** [15] - 51:11, 68:21, 70:18, 70:20, 72:14, 74:2, 76:7, 79:20, 81:2, 82:9, 83:22, 85:18, 87:13, 106:7, 118:9
**attorney** [6] - 4:13, 7:6, 26:17, 91:9, 94:22, 115:19
**Attorney** [14] - 13:16, 15:18, 15:23, 37:21, 37:24, 38:2, 45:4, 63:15, 63:17, 93:20, 93:21, 94:16, 101:23, 116:1
**attorney-client** [1] - 94:22
**attorneys** [2] - 6:16,

70:13
**Attorneys** [1] - 94:18
**attributed** [1] - 110:17
**audio** [2] - 47:2, 78:9
**audiotape** [1] - 68:2
**audiotapes** [17] - 15:9, 29:6, 29:8, 29:21, 29:23, 67:1, 67:24, 68:12, 68:13, 69:9, 69:17, 70:5, 70:12, 70:14, 73:12, 96:15, 113:22
**August** [4] - 95:15, 100:24, 117:15, 119:3
**authenticity** [2] - 112:6, 113:21
**automatically** [1] - 21:24
**available** [11] - 28:12, 30:7, 45:6, 45:10, 61:16, 106:20, 110:12, 111:1, 111:22, 113:14, 120:16
**awaiting** [2] - 99:25, 120:22
**aware** [31] - 16:24, 32:8, 32:9, 43:4, 44:18, 44:21, 50:6, 53:3, 53:6, 55:18, 57:14, 57:17, 76:5, 77:1, 81:20, 95:25, 98:19, 100:15, 101:1, 102:17, 102:20, 108:18, 109:2, 109:13, 110:2, 110:6, 110:19, 112:16, 112:19, 117:13, 119:4
**awareness** [1] - 43:13

**B**

**backed** [1] - 60:16
**backup** [1] - 61:1
**Baltimore** [1] - 110:17
**bar** [2] - 93:17, 115:19
**Barham** [4] - 10:3, 52:20, 68:19, 114:10
**based** [12] - 75:19, 77:6, 80:25, 83:3, 84:18, 85:11, 90:23, 102:4, 105:5, 105:19, 113:24
**baseline** [1] - 102:5
**basis** [2] - 118:2, 119:18
**battery** [1] - 48:24

**became** [5] - 53:3, 100:15, 102:16, 102:20, 110:6
**Becker** [12] - 9:19, 19:14, 19:17, 19:19, 20:7, 23:4, 23:7, 98:8, 98:23, 98:24, 99:3, 102:5
**Becker's** [1] - 20:9
**become** [4] - 44:18, 44:21, 98:19, 109:2
**began** [7] - 15:14, 15:18, 57:7, 95:19, 95:21, 96:1, 100:1
**begin** [2] - 20:3, 101:9
**beginning** [5] - 29:6, 71:8, 71:17, 71:18, 72:16
**behalf** [2] - 99:18, 119:13
**belief** [1] - 106:10
**below** [3] - 71:15, 72:15, 88:3
**Bench** [2] - 92:19, 93:7
**best** [4] - 17:21, 31:9, 70:3, 75:17
**better** [3] - 26:24, 107:3, 107:9
**between** [6] - 6:19, 50:17, 56:6, 57:23, 104:17, 116:15
**beyond** [1] - 57:4
**bit** [2] - 48:19, 65:6
**Board** [1] - 5:25
**Bolger** [2] - 10:17, 22:8
**booklet** [1] - 47:8
**bottom** [3] - 66:4, 80:18, 83:24
**Brady** [2] - 50:7, 50:25
**break** [7] - 4:17, 41:6, 83:14, 87:3, 87:4, 89:17, 122:7
**Brian** [2] - 94:7, 94:8
**brief** [2] - 4:16, 24:9
**briefly** [1] - 92:17
**briefs** [1] - 107:8
**bring** [5] - 54:3, 65:20, 69:21, 79:18, 81:5
**Brito** [6] - 103:11, 103:14, 104:12, 105:8, 105:20, 106:2
**Broadbent** [6] - 20:11, 20:14, 20:18, 121:19, 121:20
**Broadbent's** [1] - 20:24
**brought** [3] - 11:7, 51:11, 94:14

**budget** [1] - 28:23
**bulk** [1] - 6:19
**bunch** [1] - 52:15
**BY** [22] - 4:10, 19:11, 19:18, 23:15, 24:11, 24:18, 33:20, 35:15, 37:5, 41:23, 45:24, 52:11, 60:25, 63:12, 67:17, 68:10, 81:11, 82:4, 85:13, 86:9, 87:12, 89:23

**C**

**camera** [13] - 40:19, 42:14, 42:18, 48:24, 48:25, 49:11, 49:20, 50:1, 65:24, 66:12, 108:19, 112:3
**cameras** [9] - 32:4, 32:17, 35:16, 35:25, 37:16, 57:16, 109:4, 110:3, 110:6
**candy** [1] - 92:23
**cannot** [3] - 7:25, 8:3, 45:19
**capabilities** [2] - 97:5, 98:13
**capability** [6] - 32:7, 98:4, 98:14, 98:20, 102:9, 102:12
**capacities** [1] - 94:25
**capacity** [5] - 94:6, 94:7, 94:12, 110:11, 112:14
**Captain** [4] - 103:11, 103:14, 105:20, 106:2
**capture** [3] - 48:25, 49:23
**captured** [1] - 105:21
**captures** [1] - 49:17
**capturing** [1] - 110:6
**card** [2] - 48:24, 48:25
**career** [1] - 57:2
**careful** [2] - 60:1, 107:9
**carefully** [1] - 60:10
**carries** [1] - 92:22
**carry** [1] - 92:25
**Case** [1] - 4:2
**case** [69] - 7:22, 9:21, 10:17, 10:22, 11:10, 12:21, 13:11, 13:20, 14:10, 14:15, 14:16, 14:17, 14:23, 14:25, 15:2, 17:20, 18:13, 20:16, 23:2, 23:5, 30:18, 30:19, 30:21, 46:21, 47:2, 48:4,

48:8, 51:18, 57:1, 58:2, 67:21, 68:13, 68:19, 75:20, 78:16, 78:19, 78:21, 80:6, 92:23, 94:1, 95:5, 95:9, 95:11, 95:14, 95:22, 95:24, 97:17, 97:22, 98:7, 98:8, 98:25, 99:12, 99:13, 102:1, 112:14, 112:20, 113:8, 114:24, 114:25, 115:1, 115:16, 115:25, 116:3, 116:24, 117:17, 119:3, 119:4, 120:20, 121:2
**caseload** [2] - 7:13, 11:6
**cases** [43] - 5:12, 5:22, 5:24, 5:25, 6:3, 6:7, 6:11, 6:13, 6:19, 6:20, 6:23, 7:4, 7:5, 7:7, 7:9, 7:16, 7:20, 9:7, 9:9, 9:12, 9:14, 9:18, 10:24, 11:3, 11:4, 11:7, 11:19, 13:7, 13:13, 14:18, 14:23, 15:3, 15:19, 20:20, 21:5, 21:8, 52:15, 52:17, 52:19, 112:11, 114:16
**category** [2] - 52:1, 70:22
**caused** [2] - 42:17, 77:7
**causing** [2] - 102:12, 117:17
**CCTV** [4] - 12:4, 32:4, 32:17, 35:16
**certain** [8] - 16:7, 16:8, 51:2, 51:4, 84:15, 85:8, 96:2, 120:12
**certainly** [14] - 19:4, 33:17, 42:3, 44:8, 53:5, 57:8, 62:4, 77:16, 78:1, 78:25, 79:4, 87:4, 93:4, 105:21
**CERTIFICATE** [1] - 123:1
**certify** [1] - 123:3
**chain** [1] - 24:3
**chance** [1] - 30:7
**Chang** [21] - 4:2, 7:15, 10:9, 13:11, 13:20, 14:13, 14:15, 14:16, 14:17, 18:6, 19:14, 19:17, 19:21, 19:25,

45:4, 45:12, 46:21, 52:20, 89:25, 94:4, 113:17
**change** [3] - 12:13, 66:7, 83:7
**changed** [1] - 122:3
**channel** [4] - 69:5, 71:1, 71:7, 72:5
**charge** [1] - 34:5
**charitable** [1] - 120:18
**Charles** [1] - 54:7
**chase** [2] - 58:18, 89:7
**checked** [2] - 46:12, 114:14
**Cheh** [4] - 25:14, 58:9, 58:14, 58:19
**Chief** [8] - 20:11, 20:14, 20:18, 20:24, 54:6, 64:11, 94:5, 94:10
**chronological** [1] - 103:25
**circle** [2] - 57:6, 63:13
**circumstances** [1] - 10:13
**cited** [1] - 81:23
**city** [7] - 25:19, 44:24, 48:6, 96:20, 108:19, 110:7, 110:20
**City** [8] - 16:16, 16:21, 16:24, 17:15, 35:8, 53:13, 58:24, 100:7
**civil** [3] - 6:9, 7:25, 93:24
**Civil** [1] - 4:2
**clarify** [2] - 52:14, 60:21
**clear** [8] - 26:2, 54:2, 58:1, 65:8, 86:2, 104:20, 105:20, 109:6
**clearly** [1] - 104:19
**CLERK** [2] - 4:2, 122:15
**client** [3] - 26:18, 26:21, 94:22
**client's** [1] - 64:2
**clients** [3] - 64:10, 99:18
**close** [3] - 57:6, 63:13, 104:22
**closed** [1] - 64:2
**closely** [2] - 66:4, 79:23
**colleague** [1] - 65:20
**colleagues** [3] - 90:9, 101:16, 115:7
**collect** [3] - 18:21, 30:1, 50:8
**collected** [1] - 95:22

**Columbia** [15] - 6:8, 8:4, 8:6, 8:19, 19:20, 60:16, 93:21, 94:5, 96:24, 98:23, 100:12, 100:21, 100:24, 101:1, 106:5
**column** [4] - 71:3, 71:8, 72:1, 72:7
**coming** [3] - 51:12, 57:9, 99:6
**Command** [1] - 29:8
**command** [3] - 12:23, 13:7, 24:3
**Commander** [4] - 76:19, 77:6, 80:25, 115:8
**commander** [3] - 102:13, 102:14, 102:17
**commenced** [1] - 95:13
**comments** [1] - 117:5
**commission** [1] - 50:18
**Committee** [4] - 9:24, 23:8, 23:16, 100:7
**committee** [1] - 100:18
**commonly** [3] - 21:13, 21:16, 36:6
**communicated** [2] - 34:15, 91:22
**communication** [3] - 71:1, 72:4, 91:22
**communications** [5] - 69:5, 73:11, 73:14, 77:18, 112:21
**company** [2] - 61:19, 105:2
**comparable** [1] - 110:2
**comparison** [1] - 103:18
**compel** [4] - 68:13, 69:4, 69:9, 69:12
**complained** [2] - 42:6, 112:5
**complaint** [2] - 43:4, 114:11
**complaints** [5] - 6:5, 17:16, 38:23, 113:21, 113:22
**Complaints** [1] - 95:6
**complete** [1] - 43:13
**completed** [2] - 119:5, 122:8
**complicated** [2] - 7:5, 7:7
**comply** [1] - 9:16
**component** [1] -

107:15
**compression** [1] - 114:15
**computer** [6] - 16:18, 26:22, 102:8, 106:25, 107:2, 107:4
**computer's** [1] - 98:4
**computers** [3] - 97:5, 97:24, 98:13
**concern** [1] - 16:24
**concerning** [2] - 20:3, 77:17, 88:17
**concerns** [2] - 112:9, 114:4
**concluded** [4] - 26:1, 26:4, 26:5, 93:7
**conclusion** [1] - 40:17
**conduct** [1] - 118:19
**conducting** [2] - 117:20, 118:20
**conference** [2] - 92:19, 93:7
**confirming** [2] - 16:7, 46:17
**connection** [1] - 13:19
**consideration** [2] - 100:18, 102:25
**considered** [2] - 21:19, 76:4, 76:6
**consistent** [1] - 109:19
**consistently** [1] - 21:4
**consolidated** [1] - 52:21
**contact** [5] - 12:22, 20:7, 23:22, 61:18, 69:18
**contain** [2] - 61:1, 61:5
**contained** [2] - 21:20, 59:8
**contemporaneous** [2] - 19:24, 111:24
**contents** [2] - 22:21, 22:23
**contest** [1] - 113:8
**context** [7] - 43:3, 99:21, 101:15, 101:17, 109:24, 115:3, 118:7
**continuous** [4] - 38:7, 40:18, 111:9, 112:1
**contract** [1] - 62:7
**contrary** [1] - 108:8
**control** [1] - 51:2
**controversy** [1] - 116:14
**conventional** [1] - 114:16
**conversation** [5] -

28:1, 35:9, 89:11, 97:8, 120:7
**conversations** [9] - 73:15, 73:17, 82:24, 83:4, 84:14, 84:22, 90:5, 108:9, 109:5
**conveyed** [1] - 56:22
**copies** [11] - 30:13, 30:16, 31:6, 37:4, 37:6, 68:17, 70:11, 76:20, 77:8, 81:4, 112:25
**copy** [12] - 22:2, 27:22, 30:20, 36:24, 59:1, 81:13, 83:4, 83:11, 102:12, 103:4, 110:25, 113:25
**corner** [7] - 38:18, 39:5, 39:18, 43:25, 54:11, 66:4, 111:15
**Corporation** [5] - 13:15, 13:20, 14:6, 15:22, 30:11
**correct** [134] - 6:9, 6:10, 6:14, 6:21, 8:11, 8:21, 8:24, 9:3, 9:10, 10:23, 11:1, 11:8, 11:11, 11:12, 11:15, 11:20, 11:22, 11:23, 12:5, 13:8, 13:9, 13:11, 13:12, 13:14, 14:22, 15:1, 15:5, 15:7, 15:11, 15:12, 15:13, 15:15, 16:2, 16:11, 17:8, 18:3, 18:15, 18:25, 19:6, 20:1, 21:15, 21:18, 21:22, 22:1, 22:3, 22:6, 22:12, 22:13, 22:16, 22:17, 24:22, 25:8, 25:9, 25:12, 25:13, 25:15, 25:16, 25:20, 26:7, 26:13, 26:18, 27:9, 27:20, 27:25, 28:2, 28:10, 28:16, 28:25, 29:12, 29:14, 29:24, 30:9, 31:1, 31:4, 31:12, 33:24, 34:2, 34:6, 34:7, 36:14, 36:20, 36:21, 37:7, 41:25, 42:10, 44:13, 46:1, 46:2, 46:7, 46:10, 46:11, 47:6, 47:10, 47:19, 48:5, 48:10, 48:13, 48:15, 48:16, 52:25, 53:7, 53:14, 55:9, 57:10, 58:7, 58:15, 58:20,

58:21, 66:21, 70:8, 70:9, 72:20, 74:16, 75:4, 75:6, 75:19, 80:15, 90:3, 90:17, 90:21, 90:22, 91:2, 91:5, 91:6, 91:9, 91:12, 92:2, 92:6, 92:8, 92:9, 97:2, 106:21, 116:16, 123:4
**corrected** [1] - 83:12
**correction** [5] - 91:16, 91:18, 91:19, 91:21, 91:23
**correctly** [4] - 60:22, 103:13, 104:4, 105:15
**correspondence** [1] - 19:21
**cost** [3] - 60:4, 61:24, 62:17
**Costas** [1] - 121:21
**costs** [1] - 63:22
**Council** [14] - 16:16, 16:22, 16:24, 17:15, 25:14, 33:6, 35:8, 53:13, 56:6, 58:9, 58:14, 58:23, 58:24, 100:7
**council** [20] - 11:14, 11:21, 17:6, 17:12, 17:25, 18:12, 18:17, 18:24, 19:1, 19:13, 22:15, 24:13, 24:21, 25:25, 29:18, 30:5, 31:20, 108:12, 108:14, 109:11
**council's** [5] - 17:13, 24:20, 25:6, 31:16, 53:16
**Councilwoman** [3] - 56:1, 56:3, 58:19
**Counsel** [14] - 7:15, 12:2, 13:16, 13:21, 14:6, 14:13, 15:22, 30:12, 45:22, 101:24, 102:2, 113:2, 113:11, 114:22
**counsel** [55] - 5:1, 5:3, 19:14, 30:25, 31:9, 41:16, 41:18, 42:6, 43:5, 44:11, 44:24, 45:3, 45:4, 45:5, 51:3, 52:15, 57:25, 58:9, 58:11, 58:13, 59:10, 63:25, 64:25, 66:14, 67:20, 69:11, 78:11, 78:13, 78:16, 78:25, 79:13, 79:14,

80:6, 81:6, 81:20, 81:23, 84:9, 89:25, 94:1, 94:20, 95:8, 110:11, 110:12, 111:1, 112:5, 112:14, 113:15, 113:16, 114:9, 114:10, 116:15, 120:13, 122:5
**Counsel's** [8] - 4:14, 4:25, 5:16, 6:16, 6:22, 12:16, 26:17, 27:10
**couple** [6] - 52:14, 82:6, 83:25, 86:11, 87:1, 87:10
**course** [8] - 43:11, 51:13, 64:1, 93:1, 101:10, 109:24, 118:21, 120:19
**court** [10] - 18:14, 18:18, 60:11, 69:13, 76:22, 76:23, 76:24, 114:1, 116:2, 117:1
**Court** [15] - 7:17, 9:9, 9:10, 9:14, 10:25, 14:12, 53:12, 55:1, 56:12, 64:22, 81:8, 81:20, 81:23, 94:1, 122:15
**COURT** [252] - 16:21, 16:24, 17:3, 17:5, 17:9, 17:13, 17:19, 17:23, 17:25, 18:4, 18:6, 18:9, 18:13, 18:16, 18:20, 18:24, 19:1, 19:5, 19:7, 19:10, 19:16, 23:11, 23:14, 24:7, 24:16, 33:9, 33:12, 33:15, 34:17, 34:19, 34:25, 35:3, 35:6, 35:11, 36:23, 37:1, 38:4, 38:6, 38:11, 38:15, 38:22, 38:25, 39:4, 39:9, 39:12, 39:17, 39:23, 40:2, 40:4, 40:6, 40:9, 40:12, 40:17, 40:22, 40:25, 41:8, 41:12, 41:15, 41:20, 42:20, 42:25, 43:3, 43:11, 43:17, 43:24, 44:3, 44:6, 44:10, 44:14, 44:18, 45:1, 45:8, 45:22, 48:18, 49:10, 49:13, 49:16, 49:19, 49:22, 50:2, 50:5, 50:11, 50:20, 50:24, 51:7, 51:10, 51:17, 51:20,

52:3, 52:8, 59:17, 59:21, 60:1, 60:7, 60:9, 60:12, 60:19, 61:9, 61:13, 61:15, 61:21, 61:25, 62:6, 62:12, 62:15, 62:24, 63:2, 63:9, 67:8, 67:13, 68:8, 81:10, 82:3, 85:5, 86:2, 86:8, 87:3, 87:5, 87:8, 89:15, 89:17, 89:20, 92:13, 92:18, 93:1, 93:4, 93:12, 93:14, 93:16, 93:19, 93:22, 93:25, 94:3, 94:9, 94:14, 94:21, 95:1, 95:7, 95:11, 95:16, 95:18, 95:21, 96:1, 96:4, 96:7, 96:11, 96:14, 96:17, 96:22, 96:25, 97:3, 97:12, 97:17, 97:22, 98:3, 98:12, 98:19, 98:24, 99:4, 99:11, 99:17, 99:24, 100:3, 100:11, 100:14, 100:17, 100:25, 101:6, 101:9, 101:19, 102:7, 102:11, 102:20, 103:5, 103:8, 103:22, 104:12, 104:16, 104:23, 105:8, 105:12, 105:17, 105:23, 106:7, 106:18, 106:23, 107:20, 107:25, 108:13, 108:18, 108:22, 109:8, 109:19, 109:22, 110:5, 110:10, 110:14, 110:19, 110:25, 111:4, 111:7, 111:13, 111:18, 111:21, 111:23, 112:4, 112:13, 112:19, 112:24, 113:3, 113:5, 113:9, 113:12, 113:14, 113:20, 114:7, 114:11, 114:23, 115:11, 115:13, 115:18, 115:23, 116:11, 116:19, 116:23, 117:4, 117:9, 117:14, 117:24, 118:4, 118:9, 118:17, 119:2, 119:10, 119:17, 119:25,

120:10, 120:19, 121:1, 121:10, 121:12, 121:14, 121:16, 121:19, 121:21, 121:23, 121:25, 122:2, 122:5, 122:7, 122:14, 123:1
**Court's** [1] - 99:25
**courthouse** [1] - 9:13
**courtroom** [1] - 117:3
**covered** [2] - 68:5, 68:6
**crane** [1] - 121:16
**Crane** [4] - 76:19, 115:8, 121:17, 121:18
**Crane's** [2] - 77:6, 80:25
**Crawford** [7] - 28:2, 28:4, 61:18, 61:21, 62:16, 62:19
**Crawford's** [1] - 62:5
**Creamer** [2] - 88:5, 88:16
**created** [4] - 18:21, 84:21, 99:14, 105:2
**creation** [1] - 41:2
**credited** [1] - 116:12
**crime** [1] - 50:18
**criminal** [4] - 4:21, 48:4, 48:8, 104:5
**critical** [1] - 54:3
**criticism** [1] - 120:10
**cROSS** [1] - 4:9
**cROSS-EXAMINATION** [1] - 4:9
**crucial** [1] - 60:13
**culminated** [1] - 119:14
**current** [1] - 5:3
**cut** [2] - 58:18, 89:7

# D

**D.C** [2] - 35:8, 100:7
**daily** [1] - 26:11
**damages** [1] - 94:15
**data** [5] - 61:20, 97:10, 102:18, 105:16
**date** [12] - 38:9, 38:19, 38:21, 39:6, 39:13, 39:16, 68:21, 68:25, 71:3, 74:2, 74:11, 100:19
**DATE** [1] - 123:7
**date-stamped** [2] - 38:9, 39:16
**dated** [1] - 69:23,

79:7, 91:23, 100:18
**dates** [1] - 100:3
**Dave** [1] - 21:1
**days** [6] - 14:7, 14:8, 29:6, 29:15, 96:24, 113:19
**deadlines** [1] - 9:16
**deal** [4] - 30:10, 109:25, 110:1, 117:10
**dealing** [3] - 11:18, 11:19, 68:1
**dealings** [2] - 69:15, 69:16
**dealt** [1] - 33:21
**death** [1] - 11:3
**decade** [1] - 106:4
**December** [3] - 93:18, 95:14, 95:20
**decided** [2] - 57:20, 61:5
**decision** [18] - 29:4, 32:20, 55:18, 55:21, 55:23, 59:7, 59:12, 59:14, 59:17, 59:21, 59:23, 60:3, 60:14, 61:9, 62:2, 62:6, 63:3, 63:18
**decisions** [1] - 33:23
**declaration** [70] - 70:7, 70:10, 73:1, 73:3, 73:5, 73:16, 74:1, 74:3, 74:5, 74:6, 74:9, 74:23, 75:1, 75:2, 75:3, 75:6, 75:7, 75:11, 75:21, 75:23, 76:3, 76:5, 79:19, 80:4, 80:14, 81:18, 81:22, 82:10, 82:20, 83:3, 83:4, 83:5, 83:7, 83:9, 84:7, 84:12, 84:14, 84:18, 84:22, 84:25, 85:2, 85:7, 85:12, 85:16, 85:22, 86:17, 86:21, 87:21, 88:8, 88:15, 88:23, 90:1, 90:3, 90:20, 91:1, 91:5, 91:9, 91:11, 91:24, 100:5, 101:11, 103:12, 106:8, 107:22, 116:1, 116:4, 116:17, 116:25, 117:14, 117:18
**dedicated** [1] - 104:8
**defective** [1] - 85:10
**defend** [1] - 6:4
**defense** [5] - 4:21, 4:22, 4:23, 21:16,

52:25
**deficiencies** [3] - 77:5, 116:8, 117:11
**deficient** [10] - 76:10, 76:17, 79:22, 80:19, 82:12, 83:17, 85:10, 87:17, 87:25, 105:3
**definitely** [2] - 8:22, 31:7
**definitively** [1] - 78:2
**delegate** [1] - 113:6
**demand** [4] - 19:2, 97:23, 97:24, 99:17
**demands** [4] - 96:2, 96:4, 98:25, 99:12
**demonstration** [10] - 18:22, 23:2, 55:18, 56:4, 57:1, 57:4, 60:4, 97:14, 100:7, 108:3
**demonstrations** [8] - 55:11, 56:9, 57:7, 60:15, 96:20, 97:17, 109:15, 110:5
**Denise** [1] - 69:24
**denying** [1] - 84:24
**department** [8] - 6:4, 6:8, 15:3, 16:4, 33:16, 51:3, 51:13, 108:11
**Department** [22] - 4:14, 7:21, 7:25, 8:2, 8:5, 8:9, 8:13, 8:24, 9:2, 12:3, 15:25, 47:5, 48:2, 96:19, 97:25, 98:15, 98:17, 108:2, 108:15, 110:17, 118:24, 120:21
**department's** [2] - 5:22, 12:12
**departments** [1] - 15:24
**depended** [3] - 26:18, 26:21, 26:24
**dependent** [1] - 92:20
**depicted** [2] - 39:6, 39:7
**deposed** [2] - 37:15, 45:14
**deposition** [7] - 45:7, 45:10, 81:5, 81:13, 86:2, 101:16, 121:18
**depositions** [4] - 115:5, 121:2, 121:5, 121:7
**Deputy** [2] - 32:22, 56:6
**derived** [1] - 110:23
**described** [2] - 55:2,

109:4
**describes** [1] - 106:24
**description** [1] - 14:11
**designed** [2] - 99:5, 106:25
**designee** [1] - 45:12
**desire** [1] - 45:12
**destroy** [4] - 15:6, 28:12, 29:22, 46:22
**destroyed** [5] - 67:2, 67:6, 67:10, 67:11, 67:12
**destroying** [1] - 47:1
**detailed** [2] - 101:10, 107:22
**details** [2] - 56:20, 116:7
**detect** [4] - 76:9, 82:11, 83:16, 88:5
**detecting** [1] - 79:22
**determine** [1] - 42:12
**determined** [4] - 9:13, 28:23, 61:24, 76:15
**determining** [1] - 28:23
**developed** [1] - 15:23
**device** [3] - 43:19, 49:3, 49:16
**device's** [1] - 49:23
**devices** [3] - 34:21, 49:22, 110:21
**diabetic** [1] - 92:21
**Diamond** [1] - 113:17
**Dictaphone** [4] - 76:1, 79:24, 84:2, 86:12
**difference** [2] - 60:14, 104:17
**different** [13] - 9:15, 14:16, 22:23, 26:7, 27:17, 31:6, 31:7, 60:13, 62:12, 96:23, 107:3, 107:10
**differently** [3] - 103:20, 103:23, 107:19
**DiGirolamo** [1] - 94:8
**digital** [2] - 32:8, 49:11
**digitally** [2] - 32:2, 32:5
**digitally-stored** [1] - 32:2
**Direct** [1] - 81:21
**direct** [17] - 5:5, 68:20, 70:17, 70:20, 72:14, 74:2, 76:7, 79:20, 81:2, 82:9, 83:14, 83:22, 85:18, 87:13, 106:7, 118:2, 118:9
**directed** [5] - 13:10,

20:10, 28:8, 28:19, 118:12
**direction** [1] - 18:21
**directive** [2] - 33:3, 33:4
**directives** [1] - 5:9
**directly** [3] - 33:21, 94:18, 102:22
**directs** [1] - 48:1
**discoverable** [1] - 47:24
**discovery** [21] - 6:12, 9:12, 9:16, 23:23, 46:21, 52:21, 67:21, 95:8, 95:19, 95:21, 96:2, 97:4, 97:23, 98:25, 99:12, 102:1, 115:3, 115:6, 117:17, 118:24, 120:9
**discuss** [8] - 16:12, 85:21, 85:25, 86:19, 97:5, 103:16, 107:17, 122:11
**discussed** [6] - 56:25, 62:4, 62:22, 68:20, 86:20, 108:5
**discussing** [3] - 41:6, 44:3, 75:5
**discussion** [19] - 41:8, 41:10, 41:12, 42:21, 43:3, 55:1, 55:4, 56:2, 56:5, 56:16, 63:4, 63:7, 64:20, 65:6, 78:11, 79:1, 79:7, 108:1, 108:7
**discussions** [11] - 43:12, 50:4, 73:21, 75:3, 75:15, 77:11, 77:16, 79:14, 85:7, 85:14, 109:9
**dismayed** [1] - 106:6
**Dispatchers** [1] - 88:15
**disposed** [1] - 51:18
**dispute** [2] - 9:8, 58:3
**disputes** [1] - 6:1
**distinctions** [1] - 26:15
**distributed** [1] - 6:20
**District** [30] - 6:8, 8:4, 8:6, 8:10, 8:14, 8:19, 12:22, 19:20, 21:16, 32:24, 45:17, 48:7, 52:15, 57:25, 58:11, 58:13, 59:10, 60:16, 62:8, 66:14, 81:20, 93:21, 94:4, 96:24, 98:23, 100:12, 100:20, 100:24,

101:1, 106:5
**division** [1] - 93:23
**Division** [1] - 93:24
**divisions** [1] - 16:4
**doctored** [1] - 43:10
**document** [20] - 16:15, 21:4, 21:7, 23:19, 27:22, 33:13, 47:17, 54:4, 99:9, 102:5, 103:18, 103:25, 104:7, 105:21, 105:24, 106:24, 107:5, 119:23, 119:25, 120:6
**documents** [20] - 6:11, 14:5, 14:14, 19:2, 25:4, 25:23, 37:3, 37:6, 46:22, 47:14, 48:2, 95:23, 96:5, 96:8, 104:10, 113:18, 119:22, 120:12, 120:22
**dollar** [2] - 62:20, 62:21
**Donald** [1] - 45:7
**done** [17] - 13:3, 13:5, 28:9, 31:6, 31:7, 36:6, 46:10, 51:2, 51:3, 63:5, 89:10, 90:16, 105:13, 117:17, 117:19, 118:11, 119:22
**double** [1] - 87:24
**doubt** [5] - 59:16, 111:17, 111:18, 111:20, 111:21
**Doug** [3] - 22:6, 24:2, 24:12
**Douglas** [3] - 101:12, 101:13, 106:9
**down** [11] - 64:23, 71:13, 71:25, 79:21, 80:17, 83:22, 83:25, 86:11, 87:15, 88:13, 92:14
**draft** [5] - 73:5, 83:5, 83:11, 90:20, 90:23
**drafted** [10] - 70:7, 74:23, 75:14, 75:17, 83:3, 84:18, 85:11, 90:3, 90:5, 91:4
**drafter** [1] - 91:2
**drafting** [6] - 72:25, 73:16, 74:9, 75:1, 75:6, 91:9
**dubber** [2] - 30:13, 30:15
**due** [2] - 13:7, 22:3
**duly** [2] - 4:6, 93:9

**duplicates** [1] - 30:12
**duplicating** [1] - 77:8
**duplicator** [1] - 30:16
**during** [27] - 4:16, 6:22, 17:17, 18:22, 20:8, 29:17, 30:5, 32:17, 32:21, 32:24, 43:11, 57:3, 60:14, 66:15, 82:24, 84:14, 96:20, 96:25, 97:13, 97:15, 97:16, 101:9, 105:13, 112:13, 118:21, 120:19, 121:1
**duty** [2] - 64:7, 96:22
**DV** [1] - 37:11
**DVs** [1] - 37:17

# E

**E-Teams** [6] - 28:25, 104:25, 105:3, 105:4, 105:9, 105:10
**earliest** [5] - 16:13, 16:15, 31:14, 31:19
**early** [2] - 52:16, 101:17
**easier** [2] - 30:3, 81:9
**Eastern** [6] - 48:21
**edited** [5] - 42:15, 43:7, 43:14, 44:12, 44:15, 112:12
**editing** [1] - 46:1
**effect** [3] - 48:9, 66:15, 84:17
**effectively** [1] - 54:18
**effort** [5] - 31:22, 100:1, 101:2, 101:6, 101:10
**efforts** [8] - 70:11, 101:20, 101:22, 102:22, 105:23, 107:21, 112:20, 118:24
**Efros** [6] - 117:25, 118:1, 118:11, 118:19, 118:22, 119:5
**eight** [1] - 113:19
**either** [12] - 6:5, 17:18, 21:17, 33:15, 37:17, 38:2, 83:17, 94:18, 98:10, 102:22, 111:2, 113:3
**Electronic** [4] - 34:13, 35:18, 36:18, 110:16
**electronically** [6] - 27:18, 28:12, 95:23, 96:12, 102:18, 102:21

**electronics** [1] - 32:9
**Ellen** [2] - 117:25, 118:1
**email** [30] - 19:21, 20:10, 20:11, 20:12, 69:23, 70:1, 70:3, 70:15, 70:18, 71:24, 72:22, 72:25, 73:2, 73:4, 73:8, 73:14, 73:17, 74:15, 74:20, 74:22, 76:21, 79:6, 82:15, 83:18, 84:4, 86:14, 89:10, 90:15, 113:25
**emails** [3] - 63:20, 70:5, 70:6
**embarrass** [1] - 115:21
**employed** [2] - 96:23, 100:11
**Employee** [1] - 5:25
**employee** [1] - 6:5
**employer** [1] - 96:23
**end** [4] - 19:4, 80:18, 81:21, 118:14
**ended** [3] - 71:11, 83:23, 119:14
**ending** [2] - 71:8, 72:11
**enforcement** [1] - 99:22
**enlist** [1] - 78:8
**enlisting** [1] - 79:7
**entailed** [1] - 34:4
**enter** [1] - 97:1
**entered** [1] - 108:24
**entertain** [1] - 17:16
**entitled** [1] - 123:5
**entity** [2] - 7:25, 8:3
**entry** [1] - 104:2
**equipment** [2] - 88:18, 97:9
**Erich** [1] - 113:15
**error** [4] - 77:8, 77:9, 77:10
**errors** [1] - 83:10
**escapes** [1] - 23:5
**ESI** [1] - 27:17
**essence** [1] - 115:9
**ESU** [3] - 46:3, 110:15, 110:23
**et** [2] - 4:3
**ET** [8] - 59:18, 60:16, 61:9, 61:15, 62:7, 62:10, 62:16, 62:20
**event** [12] - 17:17, 20:8, 21:21, 29:11, 32:2, 32:21, 33:1, 38:7, 55:21, 56:8, 104:8, 110:2

**events** [13] - 26:8, 26:9, 36:6, 96:17, 108:15, 109:25, 110:3, 110:4, 110:6, 110:22, 111:9, 115:2, 117:15
**evidence** [16] - 42:16, 50:8, 50:18, 50:25, 51:15, 51:21, 52:1, 52:6, 52:7, 53:9, 64:2, 64:7, 66:22, 67:5, 67:21, 109:17
**evidentiary** [1] - 4:4
**exact** [1] - 29:1
**exactly** [3] - 29:16, 62:3, 69:18
**examination** [3] - 55:8, 68:6, 68:7
**EXAMINATION** [3] - 4:9, 52:10, 89:22
**Examination** [1] - 81:21
**examined** [2] - 4:7, 93:10
**examiner** [1] - 6:1
**example** [9] - 47:20, 51:23, 57:2, 57:4, 64:11, 71:23, 107:6, 110:1, 113:22
**excessive** [2] - 9:6, 11:4
**exchange** [12] - 55:6, 58:11, 59:6, 59:10, 64:3, 64:17, 64:18, 65:21, 65:22, 66:1, 83:23, 86:10
**exculpate** [4] - 50:8, 50:22, 51:14, 51:24
**excuse** [2] - 16:21, 24:7
**executed** [1] - 74:12
**exhibit** [2] - 39:2, 69:21
**Exhibit** [3] - 68:17, 69:22, 82:9
**exist** [2] - 16:10, 107:4
**existed** [2] - 46:18, 97:10
**existence** [3] - 95:3, 108:3, 109:2
**existing** [1] - 6:20
**expect** [1] - 52:3
**expectation** [1] - 15:2
**expected** [2] - 52:5, 103:4
**expenditure** [1] - 28:24
**expense** [1] - 59:24
**expensive** [2] - 59:22, 61:22

**experience** [10] - 9:14, 9:17, 15:8, 30:6, 36:5, 48:20, 102:4, 103:19, 106:4, 109:20
**experienced** [2] - 7:6, 78:4
**expert** [2] - 78:2, 79:15
**experts** [1] - 27:2
**explain** [3] - 44:8, 77:15, 114:8
**explained** [4] - 49:6, 103:17, 104:24, 109:8
**explanation** [6] - 57:20, 103:8, 103:10, 106:18, 106:19, 111:25
**express** [1] - 43:12
**expressed** [2] - 112:9, 114:3
**extend** [1] - 94:17
**extended** [1] - 40:19
**extent** [3] - 99:20, 99:21, 115:9

### F

**fact** [14] - 8:23, 15:8, 32:23, 47:4, 58:25, 78:7, 79:9, 81:21, 89:3, 103:13, 105:18, 108:20, 109:3, 110:22
**factor** [2] - 61:24, 62:10
**facts** [1] - 75:13
**factual** [2] - 75:22, 76:16
**fail** [1] - 14:16
**failed** [1] - 14:25
**fair** [6] - 7:14, 52:22, 69:20, 76:13, 85:9, 120:16
**fairly** [2] - 7:7, 108:18
**fairness** [1] - 119:7
**fall** [7] - 4:5, 16:22, 16:23, 17:9, 17:11, 19:9, 19:13, 21:3, 22:11, 25:15, 31:15, 53:13, 53:17
**falls** [1] - 52:1
**false** [5] - 9:6, 11:4, 21:4, 76:4, 76:6
**familiar** [4] - 12:7, 12:10, 40:6, 106:20
**family** [1] - 49:14
**fashion** [2] - 43:10, 97:9

**fast** [1] - 55:6
**feature** [1] - 27:19
**Federal** [4] - 7:17, 9:9, 9:14, 10:25
**federal** [1] - 9:18
**feed** [2] - 108:20, 109:10
**feeding** [1] - 32:5
**fellow** [1] - 90:8
**few** [4] - 16:12, 41:25, 89:24, 111:15
**figure** [1] - 62:1
**file** [3] - 76:23, 95:23, 114:1
**filed** [13] - 6:5, 8:18, 9:14, 18:3, 18:18, 19:15, 68:25, 69:12, 74:6, 75:7, 76:22, 76:24, 117:14
**filing** [5] - 19:25, 64:8, 68:12, 68:19, 68:22
**finally** [3] - 57:12, 88:13, 89:2
**fine** [4] - 38:15, 39:4, 67:13, 81:10
**finish** [2] - 24:8, 90:11
**finished** [3] - 87:11, 90:14, 120:1
**fired** [1] - 92:5
**firm** [2] - 4:22, 78:8
**first** [42] - 20:7, 30:15, 44:18, 44:21, 44:24, 52:14, 53:2, 53:3, 53:15, 54:21, 65:8, 65:10, 65:12, 65:13, 69:18, 70:21, 71:7, 71:8, 74:4, 74:23, 79:24, 84:1, 85:4, 85:20, 86:12, 91:4, 91:7, 93:9, 98:19, 99:17, 100:4, 100:23, 101:20, 101:22, 108:7, 109:14, 111:7, 112:15, 113:19, 114:2, 117:16
**Fitzgerald** [1] - 94:7
**five** [2] - 4:4, 87:5
**focus** [3] - 43:24, 60:8, 61:1
**focusing** [1] - 43:23
**FOIA** [1] - 5:16
**follow** [3] - 49:22, 59:6, 79:19
**followed** [6] - 5:10, 14:20, 48:12, 48:15, 70:21
**following** [1] - 106:12
**follows** [3] - 4:8, 92:19, 93:11

**footage** [10] - 31:15, 32:16, 35:22, 35:25, 36:3, 41:25, 42:2, 42:10, 45:6, 45:14, 45:16, 45:18, 45:20, 46:13, 46:18, 57:3
**force** [2] - 9:6, 11:4
**foregoing** [1] - 123:4
**forensic** [4] - 77:20, 78:2, 78:8, 79:8
**forgive** [2] - 78:5, 84:1, 87:24
**forgot** [2] - 29:1, 59:2
**form** [3] - 11:21, 40:17, 47:16
**former** [1] - 118:13
**forms** [1] - 51:12
**forward** [4] - 24:8, 24:10, 39:18, 66:6
**forwarded** [2] - 20:10, 20:12
**foundation** [2] - 67:7, 67:9
**four** [2] - 10:7, 18:7
**fourth** [2] - 70:22, 72:1
**frame** [1] - 22:25
**freely** [1] - 92:10
**frequency** [2] - 112:16, 112:21
**Friday** [1] - 69:23
**friend** [1] - 48:22
**front** [1] - 53:18
**Frost** [2] - 42:10, 42:22
**Frucht** [1] - 10:19
**fulfilled** [1] - 103:9
**full** [2] - 43:7, 93:12
**fully** [1] - 75:12
**function** [5] - 5:19, 5:21, 6:7, 6:11, 114:14
**functions** [1] - 5:15
**furthest** [1] - 115:23

### G

**Gaffigan** [5] - 34:17, 34:22, 120:23, 120:25, 121:12
**gained** [2] - 46:8, 46:9
**gap** [3] - 44:9, 71:21, 72:19
**gaps** [15] - 39:22, 42:7, 42:13, 42:14, 42:17, 65:25, 70:14, 72:23, 77:2, 77:3, 77:7, 77:11, 77:15, 77:17, 88:18
**gather** [1] - 6:11
**gathering** [2] - 20:3,

20:19
**General** [27] - 4:14, 4:25, 5:16, 6:16, 6:22, 12:2, 12:16, 13:16, 15:18, 15:23, 26:17, 27:10, 37:21, 37:24, 38:3, 63:15, 63:17, 93:20, 93:21, 94:19, 101:23, 101:24, 102:2, 113:1, 113:10, 114:21, 116:1
**general** [14] - 5:1, 5:3, 9:17, 14:11, 47:23, 48:1, 48:9, 48:14, 66:14, 66:19, 66:25, 67:4, 67:18, 99:23
**General's** [2] - 45:4, 94:17
**generally** [2] - 14:11, 69:9
**generated** [1] - 106:11
**gentleman** [3] - 39:23, 39:25, 117:23
**George** [3] - 28:1, 28:4, 61:18
**gigantic** [1] - 18:10
**given** [22] - 22:5, 31:5, 31:11, 33:4, 36:17, 55:2, 57:13, 57:20, 58:24, 67:14, 67:15, 74:23, 76:19, 80:11, 80:12, 80:14, 81:13, 82:20, 88:6, 103:9, 119:5, 121:4
**goal** [1] - 28:15
**gosh** [1] - 18:5
**Government** [1] - 106:5
**granted** [1] - 107:8
**great** [3] - 101:10, 109:25
**ground** [1] - 36:3
**GroupSystems** [2] - 104:25, 105:1
**GroupWise** [1] - 105:2
**guess** [5] - 17:16, 21:7, 21:9, 52:22, 59:13
**guidelines** [3] - 47:13, 47:16, 47:23
**gun** [1] - 104:4
**GW** [1] - 18:7

### H

**hair** [3] - 39:24, 39:25, 40:8
**hand** [6] - 38:18, 39:5, 39:18, 43:25, 68:17,

111:15
**handle** [2] - 5:16, 7:6
**handled** [4] - 7:4,
58:2, 115:7, 115:13
**handling** [4] - 6:23,
13:8, 119:22, 120:8
**happy** [1] - 70:19
**hard** [3] - 22:2, 27:22,
103:3
**hardy** [1] - 37:15
**HARRIS** [1] - 4:5
**Harris** [37] - 4:11,
31:13, 38:11, 38:17,
39:5, 41:24, 46:20,
48:18, 49:2, 49:24,
52:12, 60:10, 60:12,
66:25, 67:20, 69:25,
74:1, 78:4, 81:12,
82:16, 85:21, 86:20,
87:20, 88:7, 88:22,
89:3, 89:24, 92:13,
102:22, 108:2,
108:10, 111:2,
113:3, 113:7, 113:9,
113:11, 120:22
**Harris'** [1] - 38:15
**Harrison** [1] - 94:8
**head** [1] - 59:13
**heading** [1] - 104:4
**headings** [2] - 104:3,
104:6
**headquarters** [1] -
96:19
**hear** [3] - 49:2,
113:20, 114:5
**heard** [9] - 6:1, 19:1,
53:2, 56:19, 104:23,
108:23, 112:8,
114:11, 114:15
**hearing** [11] - 4:4, 6:1,
17:16, 17:18, 18:12,
26:1, 26:4, 29:18,
100:6, 100:15
**hearings** [3] - 6:4,
12:4, 19:13
**held** [2] - 15:9, 96:20
**helmet** [1] - 50:12
**help** [3] - 78:8, 100:4,
121:10
**helpful** [1] - 56:20
**hiatus** [1] - 52:23
**high** [2] - 30:13, 30:15
**high-speed** [2] -
30:13, 30:15
**himself** [2] - 121:25,
122:2
**hold** [13] - 12:7, 12:12,
12:17, 13:11, 13:17,
13:19, 13:23, 14:1,
14:24, 15:15, 53:3,

53:4, 53:6
**honestly** [2] - 108:9,
117:7
**Honor** [76] - 38:13,
38:20, 39:21, 45:2,
45:15, 49:9, 60:24,
63:11, 67:12, 68:6,
68:9, 87:2, 89:12,
92:16, 93:13, 93:15,
93:24, 94:2, 94:11,
94:13, 94:20, 94:25,
95:6, 95:10, 95:25,
96:3, 96:6, 96:10,
96:13, 96:16, 96:21,
97:2, 98:2, 98:17,
98:21, 99:3, 99:10,
99:16, 99:20, 100:2,
100:10, 100:13,
100:16, 100:22,
101:5, 101:8,
102:10, 103:1,
103:21, 104:18,
105:7, 106:17,
107:24, 108:17,
108:21, 110:13,
111:17, 111:22,
112:18, 112:23,
113:4, 115:12,
115:22, 116:10,
116:21, 117:2,
117:13, 119:7,
119:16, 119:21,
120:5, 120:18,
121:22, 121:24,
122:6, 122:13
**hope** [1] - 48:18
**hour** [3] - 44:1, 44:19,
122:12
**hours** [4] - 71:11,
71:18, 72:11, 72:16
**Howell** [1] - 103:16
**Hudnall** [2] - 62:5,
63:7
**human** [4] - 44:16,
77:8, 77:9, 77:10
**hundred** [1] - 10:7

I

**IAC** [1] - 23:17
**IAD** [1] - 46:18
**idea** [5] - 27:19, 51:2,
56:15, 67:3, 67:19
**identified** [1] - 114:6
**identify** [3] - 39:1,
39:2, 45:20
**image** [1] - 49:17
**images** [9] - 32:2,
32:21, 33:1, 37:23,
38:1, 38:7, 38:10,

49:1, 57:9
**IMF** [6] - 29:11, 31:15,
32:2, 32:17, 32:24,
110:2
**IMF/WB** [1] - 106:12
**implicated** [1] - 12:24
**improper** [1] - 8:13
**improperly** [1] - 43:7
**inability** [2] - 116:14,
116:21
**inaccuracies** [1] -
83:6
**inaccurate** [4] - 76:4,
76:6, 80:8, 83:8
**inappropriate** [1] -
108:14
**inaugural** [1] - 109:25
**inauguration** [2] -
97:16
**inception** [1] - 60:3
**include** [5] - 17:20,
96:4, 96:11, 96:14,
102:3
**included** [3] - 16:6,
25:17, 96:8
**includes** [1] - 26:11
**including** [7] - 11:3,
42:9, 42:22, 63:14,
66:23, 88:18, 108:2
**inconsistent** [3] -
104:6, 109:20, 114:5
**incorrect** [1] - 79:5
**inculpate** [2] - 51:14,
51:23
**indeed** [3] - 58:22,
80:13, 108:25
**independent** [1] - 64:7
**indicate** [1] - 107:15
**indicated** [7] - 56:7,
59:2, 83:9, 88:5,
94:23, 108:14,
119:12
**indicates** [3] - 68:21,
72:19, 100:5
**indicating** [1] - 85:12
**indication** [1] - 104:1
**individual** [3] - 45:19,
94:6, 94:24
**individually** [1] -
94:16
**individuals** [3] -
45:17, 63:14, 95:4
**indulgence** [3] - 81:8,
89:13, 89:14
**inform** [2] - 13:7,
56:12
**information** [61] -
11:16, 12:25, 14:9,
16:7, 16:8, 17:6,
17:7, 17:12, 18:21,

19:25, 20:3, 20:19,
21:19, 22:5, 22:18,
24:20, 24:21, 25:18,
26:12, 26:18, 26:25,
27:5, 27:7, 27:18,
28:5, 28:13, 28:24,
29:22, 30:2, 31:23,
32:20, 33:18, 34:20,
35:13, 36:9, 46:3,
46:8, 46:17, 47:5,
47:8, 48:8, 51:9,
51:12, 51:13, 51:14,
77:20, 84:13, 85:15,
90:19, 91:8, 95:24,
96:12, 99:2, 99:7,
99:22, 104:2,
105:18, 105:22,
106:2, 107:2, 109:14
**informed** [7] - 19:15,
28:4, 45:4, 56:13,
56:14, 58:23, 63:17
**initial** [4] - 20:14, 21:3,
83:10, 106:1
**input** [2] - 97:10, 99:6,
99:7
**inquired** [1] - 44:24
**inquiry** [2] - 62:22,
118:12
**installed** [1] - 97:6
**instance** [5] - 21:12,
27:8, 51:20, 98:8,
103:19
**instances** [1] - 113:5
**instantaneously** [1] -
40:12
**instead** [1] - 45:13
**instruct** [1] - 46:24
**instructions** [1] -
113:18
**insulin** [2] - 92:20,
92:23
**insulin-dependent** [1]
- 92:20
**insurance** [3] - 4:22,
4:23, 52:25
**Intel** [7] - 22:11, 22:24,
24:24, 25:10, 25:17,
25:18, 46:18
**Intelligence** [2] -
35:24, 46:13
**intensive** [2] - 9:15,
11:7
**intention** [2] - 29:22,
30:1
**intentionally** [1] -
46:22
**interest** [3] - 17:14,
28:11, 109:17
**interested** [1] - 120:23
**International** [3] -

9:23, 23:8, 23:16
**interrogated** [1] -
117:20
**interrogation** [1] -
24:10
**interrupt** [1] - 24:10
**interview** [1] - 120:1
**interviewed** [1] -
118:21
**intricate** [1] - 16:18
**investigation** [16] -
26:1, 26:4, 30:5,
117:16, 117:19,
117:21, 118:5,
118:8, 118:20,
118:21, 118:23,
119:5, 119:12,
119:22, 120:2, 120:6
**investigations** [1] -
11:14
**involved** [7] - 6:5,
8:24, 9:2, 11:10,
12:2, 17:6, 63:7
**involvement** [1] -
118:14
**IOCC** [1] - 98:11
**irrespective** [1] -
101:19
**issue** [6] - 13:10,
70:13, 75:25, 78:2,
96:18, 112:11
**issued** [4] - 16:16,
69:13, 100:23,
110:20
**issues** [1] - 106:4
**IT** [1] - 106:4
**items** [2] - 15:8, 48:2
**itself** [2] - 6:6, 82:3

J

**Jackson** [1] - 21:1
**James** [1] - 115:8
**Jim** [1] - 121:21
**job** [4] - 5:7, 5:9, 30:3,
91:5
**JOCC** [46] - 16:14,
16:19, 21:10, 22:9,
22:21, 24:19, 24:24,
25:2, 25:5, 25:7,
25:11, 25:21, 25:24,
26:7, 26:8, 27:19,
32:1, 32:4, 33:22,
54:23, 55:3, 55:8,
55:13, 55:20, 57:3,
57:7, 57:9, 57:13,
57:21, 58:20, 58:25,
59:3, 61:6, 67:5,
67:10, 97:1, 97:6,
97:7, 97:18, 97:25,

98:7, 98:9, 102:8, 106:10, 108:20, 108:24

**JOCC/SOCC** [1] - 26:3

**Jones** [15] - 22:6, 24:2, 24:13, 24:19, 52:21, 101:12, 101:13, 101:15, 101:20, 106:10, 106:14, 106:21, 107:12, 107:14, 121:10

**Jordan** [1] - 94:7

**Judge** [4] - 69:13, 116:25, 117:10, 117:22

judge [2] - 56:2, 81:4

judicial [1] - 107:6

**Judiciary** [1] - 100:8

**Julie** [1] - 18:11

**July** [4] - 53:19, 53:21, 54:11, 100:23

jumped [5] - 39:21, 40:9, 40:14, 41:9, 44:1

jumps [3] - 42:23, 44:19, 111:16

juris [1] - 8:2

## K

**Kaneshiro** [1] - 123:3

**KANESHIRO** [1] - 123:7

**Kaneshiro-Miller** [1] - 123:3

**KANESHIRO-MILLER** [1] - 123:7

**Kathy** [1] - 33:7

keep [5] - 24:8, 39:17, 50:24, 51:5, 52:3

**Kellums** [6] - 32:23, 33:16, 55:23, 56:6, 57:23

kept [2] - 40:19, 43:19

kick [1] - 54:4

kind [4] - 92:8, 102:5, 116:5, 119:14

**King** [2] - 88:4, 88:16

knowing [3] - 32:11, 37:9, 99:17

knowledge [23] - 13:15, 13:18, 15:17, 16:18, 21:7, 21:14, 43:15, 47:1, 49:25, 53:8, 57:13, 57:24, 58:18, 66:11, 67:2, 77:25, 83:2, 86:24, 88:1, 88:25, 118:13, 118:19, 118:22

known [7] - 37:18, 50:7, 97:1, 98:4, 98:8, 113:21, 115:11

knows [1] - 89:5

**Koger** [16] - 78:14, 78:15, 78:21, 79:3, 79:4, 87:8, 89:18, 92:16, 92:20, 93:13, 93:14, 93:16, 115:11, 116:5, 122:9

koger [1] - 122:11

**KOGER** [1] - 93:8

**Kroger** [1] - 92:15

## L

labor [4] - 6:1, 6:6, 9:15, 11:7

labor-intensive [2] - 9:15, 11:7

large [4] - 13:7, 18:9, 25:22, 115:4

larger [2] - 8:20, 68:24

last [6] - 80:17, 83:23, 86:23, 87:13, 88:10, 88:25

lasted [1] - 73:21

late [1] - 17:18

latter [1] - 51:15

law [1] - 99:22

lawsuit [11] - 14:6, 18:2, 18:4, 18:6, 18:10, 19:15, 19:25, 21:25, 64:8, 95:2

lawsuits [4] - 8:18, 8:23, 9:1, 9:6

lawyer [2] - 78:4, 95:22

lawyers [1] - 116:9

learn [5] - 17:13, 25:21, 58:22, 98:13, 108:23

learned [4] - 98:12, 98:21, 109:5, 109:23

learning [1] - 114:7

least [9] - 18:16, 27:17, 47:11, 47:12, 51:18, 98:6, 103:6, 116:7, 120:14

leave [4] - 70:19, 114:25, 119:3, 119:4

leaving [2] - 112:11, 114:24

led [2] - 11:14, 116:8

left [9] - 38:18, 39:5, 39:18, 43:25, 48:23, 66:4, 78:21, 111:15, 115:1

left-hand [5] - 38:18, 39:5, 39:18, 43:25,

111:15

legal [1] - 5:22

legislation [1] - 12:4

legitimacy [1] - 112:6

length [1] - 101:10

lengths [1] - 114:4

letter [20] - 12:8, 12:16, 12:17, 13:11, 13:19, 13:23, 14:2, 14:8, 14:24, 15:21, 53:3, 53:4, 53:8, 54:6, 54:9, 59:1, 59:2, 59:4, 59:5, 107:18

letterhead [1] - 107:18

letters [4] - 12:12, 13:17, 15:15, 53:6

**Lieutenant** [6] - 20:21, 20:22, 21:1, 24:19, 65:2, 103:14

**Light** [1] - 85:19

light [1] - 106:4

likely [4] - 34:20, 35:5, 38:5, 57:14

limited [1] - 120:8

line [16] - 76:8, 79:21, 79:23, 80:10, 80:19, 82:11, 82:18, 82:20, 82:23, 83:16, 84:6, 84:11, 86:16, 87:16, 88:4, 88:20

lines [2] - 58:13, 67:25, 80:18, 81:18, 83:25, 86:11

list [2] - 7:15, 45:11

listen [3] - 60:10, 62:12, 113:12

listened [1] - 88:16

listening [1] - 60:2

listing [1] - 20:8

litigant [1] - 8:8

litigants [3] - 8:12, 21:14

**Litigation** [1] - 93:24

litigation [23] - 9:19, 10:3, 12:7, 12:12, 12:17, 12:24, 13:11, 13:17, 13:19, 14:24, 15:15, 21:17, 22:3, 23:6, 23:7, 23:10, 31:18, 53:3, 53:4, 53:6, 58:2, 66:15, 69:10

litigation-related [2] - 22:3, 31:18

live [1] - 108:20

locate [1] - 116:22

located [1] - 15:22

location [3] - 47:17, 47:18, 78:12

111:15

locations [2] - 27:17, 97:11

look [21] - 38:25, 39:5, 43:25, 54:11, 66:3, 69:3, 71:7, 71:13, 71:23, 71:24, 72:11, 72:15, 74:11, 79:23, 80:17, 82:7, 82:10, 83:25, 86:11, 87:15, 88:13

looked [4] - 54:7, 65:11, 75:10, 77:14

looking [13] - 27:21, 32:14, 34:4, 36:12, 39:17, 41:7, 41:18, 44:20, 53:25, 104:19, 104:21, 105:18, 105:24

looks [1] - 100:5

loss [1] - 116:21

lost [3] - 67:6, 67:11, 107:19

**LOUIS** [1] - 93:13

**Louis** [1] - 93:13

low [1] - 92:24

lower [5] - 38:18, 39:5, 39:17, 43:25, 111:15

lunch [1] - 122:8

luncheon [1] - 122:12

**Luncheon** [1] - 122:16

**Lynn** [2] - 19:14, 19:19

## M

machine [2] - 65:18, 111:10

machinery [1] - 57:16

**Madison** [1] - 65:3

maintain [3] - 32:1, 50:8, 64:2

maintained [3] - 27:7, 51:18, 60:15

maintaining [1] - 32:1

man [2] - 94:9, 101:11

managed [1] - 117:17

manner [1] - 75:23

**March** [2] - 108:6, 113:19

**Margaret** [1] - 32:23

margin [1] - 103:25

mark [1] - 39:22

**Marsha** [1] - 88:4, 88:16

mass [14] - 9:21, 10:1, 10:5, 10:24, 11:7, 18:9, 23:2, 23:21, 30:22, 57:1, 57:3, 58:2, 58:3, 118:14

master [2] - 75:24, 79:25

material [3] - 32:5, 43:8, 47:24

materials [4] - 6:12, 14:15, 46:22, 102:3

matter [6] - 27:2, 31:11, 63:3, 76:16, 115:9, 123:5

matters [2] - 115:13, 117:1

**Mayor** [2] - 32:23, 56:6

mean [14] - 7:3, 22:25, 26:7, 35:16, 43:22, 44:2, 51:1, 51:3, 75:17, 76:24, 79:13, 89:5, 104:19, 115:20

meaning [3] - 8:3, 81:17, 86:19

means [2] - 28:17, 46:9, 86:4

meant [1] - 60:17

meet [1] - 101:11

meeting [16] - 32:22, 32:25, 41:5, 44:3, 44:22, 56:13, 56:14, 56:15, 56:16, 56:22, 56:25, 63:15, 64:19, 64:24, 101:13, 106:12

meetings [2] - 77:14, 77:16

**MEITL** [3] - 39:3, 39:21, 45:15

member [7] - 64:13, 64:14, 93:16, 108:12, 108:14, 109:11, 115:19

**Member** [6] - 25:14, 33:7, 56:6, 58:9, 58:14, 58:23

members [3] - 63:14, 64:18, 77:12

memo [1] - 71:24

memorialized [1] - 33:12

memorializing [1] - 33:14

memory [5] - 48:24, 48:25, 49:23, 68:17, 69:22

mention [1] - 16:15

mentioned [2] - 56:1, 63:13

meritorious [1] - 116:13

**Messineo** [4] - 113:25, 114:3, 114:8, 114:9

met [5] - 101:14, 101:17, 103:13, 105:8, 121:17

**Metropolitan** [21] -

4:14, 7:20, 7:24, 8:2,
8:5, 8:9, 8:13, 8:23,
9:2, 12:3, 15:25,
47:4, 48:1, 96:19,
97:25, 98:15, 98:17,
108:1, 108:15,
118:24, 120:21
**Michael** [2] - 94:7,
94:8
**mid** [1] - 17:18
**middle** [2] - 70:20,
82:7
**midnight** [1] - 90:15
**might** [7] - 65:9,
65:15, 65:24, 68:23,
78:8, 79:8, 80:5
**military** [1] - 104:1
**MILLER** [1] - 123:7
**Miller** [4] - 103:15,
104:12, 105:8, 123:3
**mind** [1] - 115:23
**Mini** [1] - 37:17
**minor** [4] - 83:12,
91:18, 91:19, 91:21
**minute** [2] - 19:12,
118:17
**minutes** [6] - 16:12,
71:21, 72:20, 73:22,
73:24, 87:5
**missing** [2] - 78:9,
79:9
**misstatement** [1] -
75:22
**moment** [4] - 50:11,
50:13, 50:15, 111:10
**moments** [1] - 51:22
**money** [3] - 29:3, 59:7,
63:3
**month** [1] - 100:6
**months** [1] - 109:5
**morning** [7] - 4:11,
4:12, 52:12, 52:13,
93:14, 93:15, 108:24
**mornings** [1] - 110:21
**most** [3] - 8:22, 31:7,
34:20
**motion** [5] - 68:13,
69:4, 69:9, 69:11,
107:8
**movements** [1] -
65:25
**MPD** [11] - 7:17, 19:2,
20:15, 36:3, 47:23,
52:24, 72:5, 77:12,
106:9, 118:12,
118:13
**MR** [24] - 39:3, 39:21,
45:15, 52:11, 60:8,
60:24, 60:25, 63:11,
63:12, 67:11, 67:17,

68:9, 68:10, 81:11,
81:25, 82:4, 85:13,
86:9, 87:1, 87:4,
87:7, 87:10, 87:12,
89:12
**MS** [32] - 4:10, 19:11,
19:18, 23:15, 24:11,
24:18, 33:20, 35:15,
37:5, 38:13, 38:20,
38:23, 41:23, 42:19,
45:2, 45:9, 45:24,
48:17, 67:7, 67:9,
68:5, 81:24, 82:1,
85:3, 85:25, 86:5,
89:16, 89:23, 92:12,
92:16, 92:20, 93:2
**must** [2] - 40:4,
115:24
**mystifies** [1] - 49:7

# N

**nail** [1] - 64:23
**name** [10] - 17:25,
18:13, 23:5, 45:7,
56:1, 61:19, 93:12,
102:14, 107:4,
107:10
**named** [5] - 7:21,
52:20, 94:9, 101:11,
117:24
**names** [2] - 18:1, 18:8
**naming** [1] - 52:17
**narrower** [2] - 120:6
**nature** [3] - 31:2, 32:8,
32:10
**necessarily** [1] - 91:1
**necessary** [1] - 9:12
**Nedelkoff** [1] - 32:23
**need** [3] - 13:6, 48:8,
114:20
**needed** [3] - 15:10,
21:20, 91:23
**needs** [2] - 87:3, 93:4
**negative** [1] - 87:24
**negotiations** [1] - 33:6
**never** [12] - 13:10,
37:3, 45:15, 45:20,
51:5, 83:15, 84:25,
97:12, 97:18, 103:6,
107:22, 110:5
**nevertheless** [3] -
50:21, 51:25, 110:10
**new** [8] - 6:20, 8:23,
9:1, 12:21, 104:22,
104:23, 106:3, 122:5
**Newsham** [3] - 94:9,
94:10, 121:23
**next** [2] - 72:15,
115:20

**Nickles** [8] - 115:25,
116:24, 118:5,
118:10, 119:6,
119:12, 120:8,
120:14
**Nickles'** [2] - 116:17,
117:5
**nine** [1] - 113:19
**non** [1] - 8:2
**none** [2] - 103:7,
116:13
**normally** [1] - 92:21
**noted** [1] - 115:5
**nothing** [9] - 4:7,
45:25, 50:20, 51:25,
76:17, 80:19, 87:16,
87:24, 93:10
**notice** [7] - 38:6, 40:9,
40:13, 54:18, 54:22,
72:7, 111:7
**noticed** [1] - 38:8
**noting** [1] - 72:22
**November** [2] - 69:23,
74:15
**number** [10] - 7:16,
8:19, 11:10, 13:7,
39:2, 75:9, 77:16,
85:8, 115:4, 121:6
**nurse** [1] - 93:4

# O

**O'Connor** [1] - 38:12
**OAG** [2] - 64:18, 64:19
**object** [2] - 45:15,
99:21
**objected** [1] - 58:23
**objection** [14] - 42:16,
65:23, 67:7, 67:8,
67:9, 68:5, 84:9,
85:3, 85:19, 85:25,
86:8, 99:18, 99:23,
99:25
**obligation** [2] - 27:4,
50:7
**observation** [1] -
104:7
**observed** [2] - 17:15,
111:24
**obtain** [2] - 20:7,
102:2
**obviously** [4] - 102:9,
102:12, 116:23,
119:11
**occasion** [8] - 58:22,
65:9, 65:10, 68:2,
97:1, 97:4, 101:11,
120:20
**occasions** [1] - 30:20
**occupied** [1] - 103:16

**occur** [2] - 39:22,
117:16
**occurred** [5] - 50:17,
55:12, 98:9, 111:21,
113:20
**occurrence** [1] - 18:20
**occurring** [2] - 19:7,
109:12
**occurs** [1] - 50:16
**October** [11] - 17:3,
17:18, 19:4, 19:5,
19:8, 19:19, 29:19,
69:2, 100:10, 107:9,
114:3
**OF** [1] - 123:1
**offhand** [1] - 98:18
**office** [27] - 12:21,
14:10, 14:21, 15:14,
15:23, 21:24, 27:7,
30:16, 30:23, 33:23,
33:25, 36:17, 36:20,
38:3, 41:13, 42:9,
46:10, 59:14, 65:17,
65:18, 95:22,
101:25, 106:1,
109:6, 109:24,
116:15
**Office** [32] - 4:14,
4:25, 5:16, 6:16,
6:23, 12:16, 13:15,
13:16, 13:20, 14:6,
15:17, 15:22, 26:17,
27:10, 29:7, 30:11,
34:8, 37:21, 37:24,
38:2, 45:4, 63:15,
63:17, 93:21, 94:17,
101:23, 101:24,
102:2, 113:1,
113:10, 114:21
**office's** [1] - 30:12
**officer** [7] - 45:8, 45:9,
50:12, 50:17, 51:24,
52:6, 98:14
**officers** [4] - 94:15,
94:16, 110:20,
118:13
**official** [3] - 52:6,
94:6, 94:12
**OFFICIAL** [1] - 123:1
**officials** [5] - 12:23,
13:7, 15:3, 20:15,
118:13
**often** [1] - 13:6
**once** [2] - 18:2, 75:10
**one** [44] - 5:15, 14:18,
18:12, 18:14, 21:12,
22:20, 23:1, 24:13,
25:3, 30:20, 30:21,
31:16, 33:25, 38:14,
38:23, 39:22, 41:17,

42:12, 45:14, 47:17,
51:4, 51:21, 54:18,
54:22, 58:10, 58:25,
63:25, 67:14, 71:15,
71:23, 72:19, 79:21,
80:17, 81:4, 84:20,
93:25, 99:8, 101:16,
103:3, 103:4, 103:5,
103:6, 104:25,
108:25
**ones** [1] - 108:5
**open** [1] - 107:1
**operated** [3] - 27:20,
50:1, 97:18
**operating** [3] - 57:15,
97:13, 97:15
**operation** [2] - 102:7,
106:12
**operational** [6] -
97:20, 98:7, 98:10,
98:12, 98:14, 109:14
**operations** [1] - 97:5
**opinion** [1] - 77:7
**opportunity** [2] -
41:24, 115:16
**opposed** [7] - 12:20,
25:3, 37:11, 43:20,
99:25, 111:25,
120:21
**oral** [5] - 73:14, 73:17,
73:18, 116:16,
117:12
**orally** [2] - 82:23,
83:18
**order** [22] - 28:24,
30:13, 47:23, 48:1,
48:9, 48:14, 55:2,
56:22, 57:2, 57:12,
57:14, 57:18, 58:3,
66:15, 66:19, 66:25,
67:4, 67:18, 69:13,
69:14, 78:1, 107:10
**ordered** [1] - 107:7
**orders** [2] - 5:7, 107:6
**ordinary** [2] - 51:13,
88:17
**organization** [1] - 6:6
**organized** [2] -
103:20, 103:23
**original** [3] - 36:23,
37:3, 37:10
**originals** [4] - 36:19,
36:21, 37:2, 67:1
**output** [4] - 97:24,
104:11, 105:9,
105:12
**outside** [2] - 79:15,
94:20
**overload** [1] - 7:13
**overnight** [1] - 104:15

**overruled** [2] - 68:8, 85:5
**overtime** [1] - 90:11
**overwriting** [1] - 107:16
**own** [4] - 15:23, 26:21, 35:25, 49:10

# P

**p.m** [1] - 122:16
**page** [16] - 8:12, 70:21, 71:24, 74:3, 74:4, 74:11, 76:8, 81:4, 82:5, 82:7, 82:10, 83:22, 85:18, 88:14, 88:15, 106:8
**pages** [2] - 47:9, 103:21
**paper** [1] - 96:9
**paragraph** [12] - 76:8, 76:9, 79:21, 80:17, 82:11, 87:15, 106:8, 116:4, 116:7, 116:11, 118:9, 120:11
**paraphrasing** [1] - 64:1
**Park** [4] - 11:13, 20:20, 109:1, 118:14
**part** [11] - 6:8, 8:3, 15:18, 17:15, 18:2, 25:10, 45:21, 50:3, 81:22, 97:1, 97:6
**participate** [1] - 95:8
**particular** [11] - 14:6, 14:10, 21:20, 34:19, 40:14, 45:3, 47:16, 48:9, 51:20, 63:13, 93:22
**particularly** [1] - 106:8
**parties** [1] - 107:8
**parts** [1] - 65:18
**party** [1] - 7:21
**passed** [1] - 31:22
**passive** [1] - 61:25
**password** [1] - 102:14
**past** [3] - 15:9, 108:23, 121:4
**pat** [1] - 60:9
**Pat** [1] - 23:11
**Patricia** [1] - 123:3
**pATRICIA** [1] - 123:7
**Patterson** [5] - 33:7, 56:3, 56:6, 57:23, 58:23
**Patterson's** [1] - 56:1
**Pavlik** [3] - 20:21, 20:22, 65:2
**peace** [1] - 50:14

**pending** [1] - 18:14
**people** [24] - 17:17, 17:20, 18:1, 18:12, 18:16, 20:8, 26:24, 34:4, 34:8, 35:19, 35:24, 36:2, 45:13, 45:14, 50:9, 51:8, 53:8, 57:15, 62:16, 108:24, 112:2, 119:13, 120:4, 121:3
**per** [3] - 6:23, 7:4, 24:20
**perceived** [1] - 30:24
**percent** [1] - 9:5
**performance** [2] - 116:8, 117:11
**perhaps** [9] - 35:24, 42:2, 43:9, 57:19, 73:22, 77:19, 78:11, 83:14, 97:16
**period** [10] - 4:19, 8:20, 10:25, 19:14, 40:20, 43:19, 54:3, 94:5, 105:25, 113:1
**periods** [1] - 88:19
**permission** [1] - 92:25
**permitted** [3] - 102:14, 105:5, 120:15
**PERN** [2] - 5:22, 5:24
**Pershing** [4] - 11:13, 20:20, 109:1, 118:14
**person** [19] - 34:19, 34:20, 35:3, 35:6, 40:7, 40:18, 43:18, 43:20, 44:14, 45:5, 45:6, 47:1, 51:15, 63:5, 73:19, 91:12, 98:14, 98:16, 117:24
**personally** [1] - 61:15
**personnel** [1] - 118:12
**persons** [5] - 28:23, 94:17, 94:22, 95:2, 120:20
**pertained** [1] - 95:24
**Peter** [1] - 121:23
**phenomenon** [1] - 44:19
**phone** [4] - 28:8, 28:19, 73:19, 73:20
**pictures** [2] - 48:22, 49:13
**piece** [1] - 21:19
**pieces** [1] - 96:9
**pink** [3] - 39:24, 39:25, 40:8
**place** [15] - 12:4, 17:18, 23:2, 27:12, 41:12, 41:13, 43:4, 50:16, 66:19, 67:4, 67:18, 99:8, 100:9,

109:7, 120:15
**places** [3] - 36:2, 36:8, 46:12
**Plaintiffs** [15] - 7:15, 14:13, 18:7, 19:15, 19:17, 19:21, 20:1, 45:12, 70:11, 89:25, 99:13, 112:22, 113:17, 114:10, 115:5
**plaintiffs** [4] - 10:7, 10:12, 11:10, 17:20
**Plaintiffs'** [13] - 19:25, 41:16, 42:6, 43:5, 44:11, 45:5, 110:12, 111:1, 112:5, 113:14, 114:20, 116:15, 120:13
**plaintiffs'** [2] - 20:4
**point** [36] - 18:14, 25:18, 28:11, 28:22, 29:17, 30:4, 31:22, 36:14, 37:1, 37:10, 38:3, 41:19, 46:22, 52:24, 54:2, 58:10, 61:4, 61:24, 62:6, 63:25, 70:17, 77:1, 82:23, 85:21, 85:25, 86:1, 86:3, 86:4, 86:6, 86:19, 94:1, 102:16, 107:19, 108:13, 109:16, 112:11
**pointed** [1] - 34:19
**points** [1] - 86:5
**Police** [22] - 4:14, 7:21, 7:24, 8:2, 8:5, 8:9, 8:13, 8:24, 9:2, 12:3, 15:25, 47:5, 48:2, 96:19, 97:25, 98:15, 98:17, 108:1, 108:15, 110:17, 118:24, 120:21
**police** [16] - 33:16, 45:8, 45:9, 50:12, 50:17, 50:21, 51:24, 52:5, 69:5, 70:25, 94:15, 98:14, 110:20, 112:16, 112:21
**policies** [2] - 16:10, 47:22
**policy** [7] - 12:13, 12:20, 47:4, 48:12, 50:5, 50:6, 51:11
**poor** [1] - 40:25
**portion** [3] - 68:2, 76:5, 83:7
**portions** [6] - 39:14, 43:14, 45:18, 79:9,

82:6, 113:23
**position** [1] - 93:19
**possibility** [2] - 78:1, 78:7
**possible** [2] - 31:9, 102:6
**posted** [1] - 54:19
**potential** [4] - 32:1, 46:1, 46:13, 48:7
**potentially** [6] - 27:16, 28:5, 35:19, 42:15, 47:24, 48:3
**pouch** [1] - 92:22
**practice** [7] - 4:20, 12:21, 14:20, 15:19, 36:5, 91:11, 94:16
**precede** [1] - 98:25
**preceding** [1] - 21:9
**precise** [1] - 51:21
**predecessor** [1] - 20:24
**predicated** [1] - 59:23
**premises** [3] - 97:1, 97:25, 103:15
**prepare** [3] - 121:4, 121:18, 121:20
**prepared** [6] - 76:1, 79:24, 84:1, 86:12, 121:6, 121:8
**prepped** [1] - 101:15
**present** [14] - 41:18, 56:13, 56:15, 63:15, 65:3, 65:5, 65:15, 65:19, 79:13, 93:19, 101:25, 117:1, 118:13
**presented** [2] - 45:19, 52:16
**preservation** [4] - 66:20, 66:22, 67:1, 67:5
**preserve** [7] - 13:1, 14:14, 27:4, 30:1, 48:2, 53:9, 64:7
**preserved** [2] - 16:8, 52:7
**preserving** [1] - 47:5
**PRESSLEY** [32] - 4:10, 19:11, 19:18, 23:15, 24:11, 24:18, 33:20, 35:15, 37:5, 38:13, 38:20, 38:23, 41:23, 42:19, 45:2, 45:9, 45:24, 48:17, 67:7, 67:9, 68:5, 81:24, 82:1, 85:3, 85:25, 86:5, 89:16, 89:23, 92:12, 92:16, 92:20, 93:2
**Pressley** [10] - 19:16,

41:21, 42:22, 45:23, 51:10, 65:2, 65:22, 68:20, 89:15, 89:20
**presume** [3] - 24:2, 59:13, 113:11
**pretty** [1] - 55:6
**prevent** [1] - 49:3
**previous** [1] - 73:10
**previously** [8] - 4:6, 58:2, 68:6, 70:1, 74:14, 77:11, 99:3, 103:15
**primarily** [1] - 9:15
**printed** [3] - 102:12, 103:4, 103:5
**private** [1] - 4:20
**privileged** [1] - 99:22
**probe** [5] - 48:19, 59:18, 61:10, 61:16, 62:17
**problem** [2] - 76:20, 84:17
**proceed** [1] - 45:23
**PROCEEDINGS** [1] - 4:1
**proceedings** [2] - 100:4, 123:5
**process** [4] - 95:9, 95:12, 96:1, 101:14
**produce** [22] - 12:25, 17:12, 19:2, 27:22, 28:15, 30:4, 31:5, 34:5, 44:10, 59:15, 59:24, 69:12, 96:5, 96:8, 98:4, 98:20, 99:9, 102:9, 102:24, 104:10, 107:23, 113:9
**produced** [13] - 37:21, 41:4, 42:3, 42:4, 43:8, 43:16, 65:23, 76:20, 106:24, 107:5, 108:6, 108:8, 119:18
**producing** [3] - 17:6, 67:21, 77:8
**production** [11] - 41:19, 46:21, 54:18, 54:22, 68:2, 69:4, 98:22, 98:24, 99:13, 99:19, 113:18
**professor** [2] - 63:10, 67:15
**Professor** [4] - 60:2, 60:21, 60:23, 62:1
**programmed** [2] - 99:8, 109:11
**programming** [1] - 106:25
**prohibitive** [1] - 29:3

**promulgated** [1] - 99:12
**properly** [1] - 8:19
**proposed** [1] - 78:8
**protest** [1] - 23:21
**protests** [1] - 30:22
**provide** [2] - 26:18, 31:23
**provided** [9] - 24:12, 24:19, 24:21, 24:24, 102:13, 106:2, 110:17, 113:16, 114:19
**provides** [1] - 106:3
**providing** [2] - 94:19, 109:10
**Public** [1] - 5:25
**publicly** [1] - 116:2
**pull** [1] - 107:18
**pure** [1] - 103:25
**purports** [1] - 39:6
**purpose** [2] - 30:3, 34:22
**purposefully** [1] - 14:25
**purposes** [2] - 52:21, 114:7
**pursuant** [9] - 33:6, 35:7, 49:5, 75:15, 76:1, 97:4, 109:10, 113:17, 117:18
**pursue** [1] - 56:20
**push** [1] - 50:12
**pushed** [1] - 50:15
**put** [22] - 39:15, 40:25, 54:18, 54:22, 61:25, 82:18, 82:23, 83:16, 84:6, 84:11, 84:13, 84:24, 84:25, 85:1, 85:7, 85:15, 86:16, 91:8, 107:2, 107:7, 120:2, 120:3

## Q

**quadrant** [3] - 82:7, 83:23, 85:20
**Quality** [1] - 34:8
**questioned** [5] - 81:17, 117:20, 117:22, 118:7, 118:25
**questioning** [3] - 24:9, 30:10, 83:13
**questions** [12] - 14:12, 57:25, 67:22, 84:15, 85:8, 85:10, 87:1, 89:21, 89:24, 90:1, 92:12, 115:20
**quickly** [1] - 120:15

**quite** [5] - 12:11, 14:1, 29:16, 41:25, 78:20
**quote** [3] - 64:1, 64:2, 106:9
**quotes** [2] - 118:11, 118:15

## R

**radio** [6] - 29:10, 30:17, 112:15, 112:20, 112:25, 114:15
**Rai** [1] - 103:16
**raised** [2] - 70:13, 114:2
**Ramsey** [6] - 10:3, 54:7, 64:11, 94:5, 114:10, 122:2
**rather** [1] - 48:7
**Raymond** [1] - 4:2
**read** [11] - 60:9, 60:11, 79:22, 81:3, 82:6, 86:10, 106:15, 113:25, 116:7, 116:11, 116:13
**reading** [1] - 116:16
**reads** [1] - 88:4
**realize** [1] - 27:15
**realized** [1] - 26:1
**really** [10] - 8:6, 33:18, 35:14, 38:10, 41:19, 44:23, 53:25, 56:23, 69:18, 78:6
**realtime** [1] - 111:14
**reason** [5] - 9:8, 22:2, 48:11, 48:14, 65:24
**reasons** [2] - 42:12, 105:4
**receipt** [3] - 14:8, 20:9, 120:22
**receive** [4] - 13:19, 46:15, 46:17, 73:4
**received** [22] - 5:7, 17:11, 22:14, 22:19, 25:24, 32:20, 37:7, 46:3, 53:13, 53:19, 53:23, 59:3, 65:12, 65:13, 70:4, 72:22, 73:8, 79:6, 90:19, 98:22, 112:10
**receiving** [3] - 36:21, 72:25, 73:4
**recent** [1] - 12:13
**Recess** [2] - 24:17, 89:19
**recess** [1] - 122:16
**recollect** [6] - 64:23, 67:22, 69:14, 72:22, 74:5, 78:18

**recollection** [22] - 16:15, 17:21, 24:4, 29:17, 31:21, 37:13, 38:16, 39:12, 53:15, 53:23, 54:14, 56:10, 56:21, 62:23, 70:3, 78:22, 78:24, 79:11, 83:20, 85:24, 88:11, 103:24
**record** [19] - 32:11, 32:21, 39:1, 45:2, 49:7, 55:22, 57:3, 57:13, 60:4, 60:11, 81:23, 82:3, 108:15, 109:12, 109:15, 110:22, 114:8, 116:23, 123:4
**recordation** [1] - 38:7
**recorded** [8] - 32:6, 33:1, 37:16, 55:20, 57:9, 69:5, 112:17, 114:5
**recording** [35] - 32:7, 32:17, 32:24, 33:3, 33:22, 34:21, 35:8, 35:12, 35:16, 35:20, 35:25, 43:8, 49:4, 49:8, 55:9, 55:12, 55:15, 56:7, 56:24, 57:21, 57:24, 66:5, 80:1, 80:20, 83:17, 87:17, 87:25, 109:7, 109:25, 110:1, 110:21, 111:9, 112:1, 114:17
**recordings** [8] - 34:23, 76:10, 76:18, 78:10, 82:12, 88:6, 88:18, 116:16
**records** [1] - 20:4
**recounted** [1] - 116:25
**recounts** [1] - 118:10
**recovered** [1] - 75:24
**recovery** [1] - 104:4
**RECROSS** [1] - 89:22
**RECROSS-EXAMINATION** [1] - 89:22
**redirect** [1] - 52:9
**REDIRECT** [1] - 52:10
**refer** [1] - 104:12
**reference** [11] - 22:25, 44:15, 65:7, 65:23, 71:7, 71:13, 71:25, 72:15, 96:17, 116:15, 117:11
**referenced** [1] - 52:20
**referencing** [4] - 54:15, 54:17, 80:3, 86:7

**referred** [1] - 118:5
**referring** [4] - 64:11, 64:12, 78:13
**refresh** [2] - 68:16, 69:22
**refreshed** [1] - 38:16
**regain** [1] - 78:9
**regard** [1] - 118:25
**regarding** [5] - 13:11, 30:10, 32:23, 34:1, 34:3
**regular** [2] - 11:6, 118:2
**related** [12] - 5:22, 10:24, 14:15, 22:3, 29:22, 30:21, 31:15, 31:18, 59:14, 63:20, 105:13, 115:8
**relating** [2] - 23:2, 105:16
**Relations** [1] - 5:25
**relationship** [1] - 94:22
**relevant** [7] - 12:25, 79:25, 84:2, 86:13, 102:3, 113:1, 118:12
**relieve** [1] - 116:9
**rely** [1] - 51:8
**remember** [24] - 7:18, 12:15, 35:3, 35:14, 39:23, 39:25, 40:8, 41:4, 44:25, 58:11, 58:15, 59:10, 64:3, 65:25, 66:16, 70:1, 74:6, 74:9, 82:1, 101:14, 103:10, 112:8, 114:1, 114:13
**reminded** [1] - 33:2, 33:4
**reopened** [1] - 115:3
**repeat** [1] - 105:25
**replaced** [1] - 105:3
**report** [2] - 26:11, 103:17, 104:15, 119:14, 119:16, 119:18
**reported** [1] - 61:21
**reporter** [2] - 60:11, 87:3
**REPORTER** [2] - 23:13, 123:1
**represent** [7] - 19:20, 66:5, 69:23, 78:21, 81:3, 94:3, 94:9
**representation** [8] - 44:14, 76:14, 82:2, 94:17, 94:20, 95:2, 106:16, 122:4
**representations** [3] - 105:19, 117:10,

117:18
**representatives** [2] - 38:2, 42:9
**represented** [11] - 7:16, 19:17, 45:16, 45:18, 75:13, 85:1, 94:4, 94:5, 94:7, 94:24, 122:5
**represents** [1] - 77:4
**request** [51] - 11:21, 14:5, 14:7, 15:24, 16:13, 16:21, 17:5, 18:24, 19:24, 20:5, 20:6, 21:3, 21:10, 21:25, 22:3, 23:22, 23:23, 24:1, 24:20, 29:7, 29:15, 29:16, 30:8, 30:11, 30:23, 30:25, 31:2, 31:14, 31:15, 31:18, 31:19, 31:22, 31:25, 34:11, 34:15, 37:6, 51:9, 53:15, 59:17, 69:14, 96:4, 96:7, 99:17, 103:2, 108:12, 109:10, 112:14, 113:6, 113:18
**requested** [7] - 15:8, 21:4, 21:14, 25:6, 102:2, 112:25, 114:19
**requesting** [3] - 14:10, 16:17, 21:7
**requests** [9] - 5:17, 6:12, 9:16, 11:16, 11:24, 17:9, 17:12, 103:9, 105:25
**require** [1] - 66:20
**required** [3] - 9:16, 66:25, 67:4
**requirement** [2] - 16:6, 51:17
**requirements** [1] - 11:8
**requires** [1] - 53:8
**research** [1] - 79:8
**resolution** [1] - 99:25
**resolve** [1] - 78:2
**resolved** [1] - 115:10
**respect** [21] - 5:7, 5:9, 6:2, 8:18, 13:13, 14:13, 20:15, 23:1, 29:6, 29:21, 31:13, 32:16, 45:3, 45:25, 46:20, 47:2, 47:24, 75:23, 75:25, 84:16, 115:19
**respond** [1] - 97:23
**responded** [1] - 45:12
**responding** [1] - 96:1

**responds** [1] - 82:14
**response** [12] - 5:22,
6:12, 12:3, 25:24,
26:2, 30:24, 44:6,
70:11, 70:13, 85:11,
106:1, 108:12
**responsibility** [8] -
5:21, 6:2, 64:2, 95:8,
97:4, 115:5, 116:9,
118:4
**responsible** [1] -
12:23
**responsive** [1] -
119:20
**restore** [2] - 78:9, 79:8
**result** [1] - 119:23
**results** [2] - 90:16,
119:6
**resume** [88] - 16:12,
16:14, 16:17, 21:2,
21:3, 21:10, 21:11,
21:13, 22:3, 22:9,
22:11, 22:21, 22:24,
23:1, 23:18, 23:20,
23:25, 24:1, 24:14,
24:23, 24:24, 24:25,
25:5, 25:10, 25:11,
25:15, 25:17, 25:22,
25:25, 26:3, 26:6,
26:8, 27:13, 27:16,
47:2, 53:16, 54:23,
58:1, 58:6, 58:10,
58:15, 58:19, 58:20,
58:24, 59:4, 59:8,
59:15, 59:19, 59:25,
61:2, 61:6, 61:11,
61:16, 62:9, 62:18,
63:22, 67:6, 67:10,
69:12, 85:19, 98:5,
98:20, 99:9, 99:14,
101:2, 101:7,
101:18, 101:21,
102:3, 102:4, 102:9,
102:13, 102:25,
103:24, 104:11,
104:13, 104:14,
104:21, 106:3,
106:10, 106:12,
106:19, 107:21,
116:14, 116:22,
117:12
**resumes** [9] - 19:12,
22:6, 22:14, 24:12,
24:20, 25:3, 25:8,
69:4, 103:19
**retained** [1] - 51:21
**retention** [6] - 47:4,
47:13, 47:22, 48:12,
50:6, 51:11
**retired** [1] - 45:9

**retrieve** [2] - 61:20,
120:15
**retrieved** [2] - 63:22,
77:21
**return** [4] - 55:1,
83:13, 84:20, 88:14
**returned** [1] - 4:25
**revealed** [1] - 120:3
**review** [9] - 37:23,
58:14, 64:22, 78:3,
83:5, 88:7, 90:9,
90:12, 90:14
**reviewed** [2] - 25:15,
37:25, 58:10, 58:19,
65:8, 65:16, 65:17,
75:7, 75:9, 76:21,
77:3, 111:8
**reviewing** [5] - 38:1,
64:17, 64:18, 64:24,
65:7
**rightly** [1] - 109:14
**role** [3] - 31:8, 45:25,
67:21
**RONALD** [1] - 4:5
**rooftop** [1] - 110:3
**Ross** [1] - 65:2
**roughly** [2] - 7:3,
100:19
**routine** [1] - 13:6
**run** [3] - 29:10, 30:17,
114:18
**running** [95] - 16:12,
16:13, 16:14, 16:17,
19:12, 21:2, 21:3,
21:10, 21:11, 21:13,
22:2, 22:6, 22:9,
22:11, 22:14, 22:21,
22:24, 23:1, 23:18,
23:20, 23:25, 24:1,
24:12, 24:14, 24:19,
24:24, 25:3, 25:5,
25:7, 25:10, 25:11,
25:14, 25:17, 25:21,
25:25, 26:3, 26:6,
26:7, 27:13, 27:16,
29:10, 47:2, 53:16,
54:23, 58:1, 58:6,
58:10, 58:15, 58:19,
58:20, 58:24, 59:3,
59:8, 59:15, 59:18,
59:25, 61:2, 61:6,
61:10, 61:16, 62:8,
62:18, 63:21, 67:5,
67:10, 69:4, 69:12,
98:4, 98:20, 99:9,
99:14, 101:2, 101:7,
101:18, 101:21,
102:3, 102:4, 102:9,
102:13, 102:25,
103:19, 103:24,

104:11, 104:13,
104:14, 104:21,
106:3, 106:10,
106:12, 106:19,
107:21, 116:14,
116:22, 117:12
**runs** [4] - 112:15,
112:20, 112:25,
114:15
**Ryan** [25] - 5:2, 5:15,
6:15, 12:20, 13:10,
19:15, 19:22, 20:9,
20:15, 38:3, 57:17,
62:4, 63:8, 63:14,
65:4, 65:5, 102:22,
108:2, 108:10,
111:2, 113:3, 113:6,
120:22, 121:25,
122:1
**Ryan's** [1] - 65:18

# S

**satisfy** [1] - 114:20
**Saturday** [1] - 48:21
**save** [4] - 107:3,
107:10, 107:18
**saved** [2] - 47:17,
47:18
**saw** [8] - 22:2, 39:10,
44:19, 50:11, 50:12,
50:13, 97:12, 109:1
**scene** [1] - 51:4
**screen** [3] - 54:21,
81:6, 81:9
**scrub** [1] - 118:23
**search** [1] - 34:4
**searching** [1] - 27:13
**second** [15] - 24:16,
50:5, 71:3, 71:13,
71:15, 71:24, 71:25,
72:7, 74:3, 74:11,
76:7, 76:8, 82:11,
88:14, 100:18
**seconds** [4] - 43:1,
44:1, 44:20, 115:15
**secured** [1] - 43:17
**see** [42] - 28:8, 38:22,
39:5, 48:19, 51:12,
54:12, 61:16, 61:19,
65:11, 66:5, 66:7,
66:9, 68:16, 68:23,
70:23, 71:3, 71:5,
71:9, 71:11, 71:15,
71:17, 71:19, 72:2,
72:9, 72:12, 72:17,
74:12, 76:11, 77:20,
80:21, 81:9, 82:12,
83:15, 85:19, 87:17,
88:20, 97:18,

102:23, 108:24,
114:14, 117:4,
118:11
**seeing** [12] - 23:1,
38:17, 39:11, 39:14,
40:14, 49:4, 54:9,
59:1, 69:3, 70:1,
103:25, 104:7
**seeking** [2] - 101:18,
104:20
**seeks** [1] - 94:15
**seem** [1] - 49:22
**segregate** [3] - 79:25,
84:2, 86:13
**seminal** [1] - 21:19
**send** [1] - 59:4
**sending** [2] - 83:10,
108:20
**sense** [3] - 106:22,
107:17, 114:4
**sensitive** [1] - 31:2
**sent** [14] - 14:24,
15:21, 16:7, 59:2,
74:15, 74:20, 77:20,
78:12, 83:4, 83:11,
90:15, 90:19, 114:21
**separate** [3] - 7:25,
8:3, 27:17
**September** [10] - 17:1,
33:10, 54:19, 96:18,
99:14, 105:14,
106:13, 115:2,
117:3, 119:4
**Sergeant** [4] - 65:3,
101:12, 101:14,
106:9
**series** [2] - 57:25,
104:3
**serve** [1] - 8:8
**served** [2] - 5:19,
12:22
**servers** [3] - 16:19,
27:10, 28:6
**service** [2] - 4:17, 8:9
**set** [6] - 10:12, 45:20,
72:25, 108:19,
114:21, 115:20
**settled** [2] - 18:10,
115:16
**settlement** [1] -
115:14
**seven** [6] - 7:16, 8:12,
8:20, 10:12, 10:24,
20:4
**several** [6] - 18:4,
42:3, 54:1, 86:5,
90:8, 117:15
**shall** [1] - 107:8
**shared** [1] - 120:3
**sharing** [1] - 48:20

**sheer** [1] - 11:10
**Shore** [1] - 48:21
**short** [2] - 103:20,
103:21
**shorter** [1] - 114:18
**shortly** [2] - 29:7,
101:22
**show** [9] - 38:11,
50:20, 66:3, 71:23,
74:1, 74:4, 74:20,
91:11, 116:5
**showed** [2] - 7:15,
38:12, 91:16
**showing** [3] - 54:6,
105:9, 105:12
**shown** [8] - 38:13,
43:1, 45:3, 77:2,
77:3, 103:18,
104:11, 105:17
**shut** [2] - 41:22,
111:10
**sign** [3] - 16:6, 50:14,
82:21
**signed** [1] - 91:23
**significant** [2] - 102:1,
110:4
**signing** [2] - 91:12,
92:1
**similar** [3] - 12:16,
26:11, 109:20
**simply** [3] - 19:1, 81:3,
111:19
**simultaneous** [1] -
99:1
**single** [1] - 14:17
**sit** [2] - 101:17, 119:7
**situation** [1] - 92:22
**situations** [2] -
109:20, 109:21
**smaller** [1] - 37:10
**Smith** [1] - 94:8
**snippets** [3] - 111:12,
111:13, 111:25
**SOCC** [10] - 21:11,
24:19, 24:25, 25:7,
25:10, 26:11, 97:7,
98:1, 98:11
**SOCC/JOCC** [1] - 26:6
**sold** [1] - 60:15
**sole** [1] - 70:3
**someone** [16] - 20:19,
27:21, 32:20, 39:1,
42:17, 43:13, 43:25,
44:22, 52:3, 59:5,
60:14, 62:15, 66:12,
91:5, 117:20, 120:2
**sometime** [3] - 25:25,
26:4, 53:5
**soon** [1] - 102:6
**sooner** [1] - 120:13

**sophisticated** [1] - 108:18
**sorry** [11] - 19:19, 23:11, 67:8, 69:7, 69:24, 81:25, 94:12, 95:17, 98:23, 102:23, 114:9
**sought** [3] - 33:25, 99:22
**source** [3] - 106:14, 110:14, 110:24
**sources** [2] - 99:6, 110:18
**speaking** [1] - 103:12
**speaks** [2] - 117:15, 117:16
**special** [1] - 26:8
**specific** [23] - 6:7, 14:24, 15:23, 20:1, 20:5, 22:18, 24:4, 24:25, 25:11, 26:8, 31:14, 35:3, 38:14, 47:13, 47:14, 53:15, 63:5, 70:25, 78:6, 79:11, 84:13, 104:5, 114:2
**specifically** [20] - 18:6, 21:14, 25:5, 29:10, 34:17, 35:7, 50:7, 63:2, 65:19, 74:2, 76:7, 85:6, 89:8, 99:4, 101:4, 106:9, 109:11, 114:3, 116:4, 120:23
**specify** [1] - 14:9
**speed** [2] - 30:13, 30:15
**spend** [2] - 59:7, 63:3
**split** [1] - 115:6
**spoken** [4] - 117:24, 118:1, 118:23, 120:24
**Sporkin** [1] - 117:23
**spring** [4] - 22:8, 66:6, 66:9
**staff** [1] - 35:2
**stamp** [4] - 38:19, 66:4, 68:21, 69:1
**stamped** [4] - 38:9, 39:13, 39:16
**stamps** [1] - 38:21
**stand** [2] - 92:13, 92:24
**standard** [1] - 53:8
**stands** [1] - 122:15
**Stanley** [1] - 117:22
**started** [8] - 27:12, 42:14, 43:20, 73:5, 73:16, 75:5, 95:14
**starting** [1] - 107:19

**state** [3] - 82:15, 84:16, 93:12
**statement** [5] - 80:8, 80:24, 83:19, 109:19
**States** [3] - 4:3, 10:10, 10:21
**states** [1] - 76:9
**stating** [2] - 58:9, 83:15
**stationary** [2] - 108:19, 110:6
**status** [1] - 119:8
**stenographer** [1] - 89:14
**step** [2] - 19:12, 56:18
**still** [8] - 25:22, 28:9, 35:18, 76:13, 77:21, 78:15, 81:22, 121:2
**stop** [3] - 49:8, 87:6, 87:9
**stopped** [3] - 42:13, 43:20, 52:24
**stored** [7] - 27:16, 27:18, 32:2, 95:23, 96:12, 102:18, 102:21
**streets** [1] - 109:18
**striking** [1] - 51:24
**students** [1] - 18:7
**subject** [2] - 27:2, 51:17
**submit** [1] - 107:8
**submitted** [3] - 25:23, 26:3, 116:1
**submitting** [1] - 79:14
**subpoena** [13] - 16:16, 25:6, 25:7, 53:13, 53:16, 53:17, 53:25, 54:1, 54:14, 54:17, 54:20, 54:21, 100:19
**subpoenas** [4] - 11:21, 31:17, 54:1, 100:23
**substantial** [1] - 43:19
**substantially** [1] - 42:25
**sued** [4] - 7:17, 7:25, 8:3, 8:13
**sues** [1] - 8:8
**sugar** [1] - 92:24
**suggest** [4] - 42:21, 77:19, 77:22, 77:25
**suggested** [2] - 45:11, 45:13
**sui** [1] - 8:2
**suit** [7] - 6:9, 8:1, 8:5, 8:6, 8:14, 18:18, 19:20
**Sullivan** [3] - 69:13, 116:25, 117:10

**summary** [2] - 120:16, 120:18
**summer** [4] - 53:20, 53:24, 100:19, 115:4
**Super** [1] - 37:17
**Superior** [1] - 9:10
**superior** [1] - 62:5
**supervisee** [1] - 118:7
**supervisor** [3] - 5:5, 118:3, 118:7
**supervisor-to-supervisee** [1] - 118:7
**surfaced** [1] - 17:3
**surprise** [1] - 108:22
**surprised** [1] - 106:6
**Surveillance** [4] - 34:13, 35:19, 36:18, 110:16
**suspect** [1] - 50:14
**sworn** [2] - 4:6, 93:9
**system** [39] - 25:10, 32:10, 50:1, 59:8, 59:18, 60:15, 61:1, 61:5, 61:10, 61:16, 62:17, 63:20, 76:1, 79:24, 84:2, 86:13, 97:12, 98:20, 99:5, 99:6, 99:7, 99:8, 102:15, 102:19, 102:21, 102:23, 102:24, 104:22, 105:9, 105:11, 106:3, 107:4, 108:19, 109:2, 109:4, 109:10, 109:11, 109:14, 120:15
**Systems** [13] - 59:18, 60:16, 61:10, 61:15, 61:19, 62:7, 62:10, 62:16, 62:20, 62:22, 105:1, 105:4
**systems** [6] - 16:18, 26:22, 102:8, 104:10, 104:23, 104:24

## T

**Tact-1** [3] - 71:25, 72:4, 72:15
**Tammie** [2] - 88:5, 88:16
**tangible** [1] - 48:2
**tape** [13] - 37:10, 37:11, 38:14, 40:13, 42:7, 43:13, 43:16, 45:3, 75:24, 84:1, 86:12, 110:16,

114:17
**tapes** [60] - 29:10, 30:4, 30:12, 30:13, 30:17, 30:21, 32:12, 32:14, 36:12, 37:7, 37:23, 38:14, 38:20, 41:9, 41:15, 42:13, 42:14, 43:7, 43:17, 44:10, 44:15, 46:4, 48:3, 64:17, 64:19, 64:24, 65:12, 65:13, 65:16, 66:20, 66:23, 70:12, 75:5, 75:25, 76:14, 77:2, 77:3, 77:5, 77:14, 77:18, 77:19, 77:21, 78:3, 78:9, 79:8, 79:15, 79:24, 85:9, 88:16, 89:4, 89:8, 90:9, 110:23, 112:12, 112:15, 114:4, 114:6, 114:19, 114:21, 116:22
**taping** [1] - 55:20
**Taylor** [1] - 115:7
**Teams** [6] - 28:25, 104:25, 105:3, 105:4, 105:9, 105:10
**technical** [2] - 77:4, 97:9
**technically** [6] - 76:10, 76:17, 79:22, 82:12, 83:17, 85:10
**technician** [1] - 49:9
**technology** [2] - 26:24, 59:14
**template** [10] - 106:11, 106:24, 106:25, 107:1, 107:3, 107:5, 107:9, 107:11, 107:16
**templates** [1] - 107:7
**ten** [6] - 13:23, 14:1, 14:2, 14:7, 14:8, 21:9
**ten-day** [3] - 13:23, 14:1, 14:2
**tend** [4] - 50:8, 50:21, 51:14, 51:23
**term** [2] - 12:7, 53:2
**terms** [3] - 75:12, 110:1, 111:2
**Terry** [5] - 5:2, 19:15, 19:22, 121:25, 122:1
**testified** [24] - 4:7, 5:15, 6:15, 12:20, 17:19, 17:23, 18:2, 18:12, 20:9, 37:15, 55:7, 62:24, 63:6, 67:24, 77:10, 84:11,

84:21, 93:10, 106:10, 106:14, 107:13, 108:25, 121:3, 121:7
**testimony** [11] - 49:3, 55:11, 55:17, 76:19, 77:12, 80:13, 84:12, 104:24, 106:15, 108:23, 122:11
**THE** [469] - 4:2, 16:21, 16:23, 16:24, 17:2, 17:3, 17:4, 17:5, 17:8, 17:9, 17:11, 17:13, 17:15, 17:19, 17:22, 17:23, 17:24, 17:25, 18:1, 18:4, 18:5, 18:6, 18:8, 18:9, 18:11, 18:13, 18:15, 18:16, 18:19, 18:20, 18:23, 18:24, 18:25, 19:1, 19:4, 19:5, 19:6, 19:7, 19:9, 19:10, 19:16, 23:11, 23:13, 23:14, 24:7, 24:16, 33:9, 33:11, 33:12, 33:13, 33:15, 33:17, 34:17, 34:18, 34:19, 34:24, 34:25, 35:1, 35:3, 35:4, 35:6, 35:9, 35:11, 35:13, 36:23, 36:25, 37:1, 37:3, 38:4, 38:5, 38:6, 38:8, 38:11, 38:15, 38:22, 38:25, 39:4, 39:8, 39:9, 39:11, 39:12, 39:14, 39:17, 39:23, 40:1, 40:2, 40:3, 40:4, 40:5, 40:6, 40:7, 40:9, 40:11, 40:12, 40:16, 40:17, 40:21, 40:22, 40:24, 40:25, 41:3, 41:8, 41:10, 41:12, 41:13, 41:15, 41:17, 41:20, 42:20, 42:24, 42:25, 43:2, 43:3, 43:6, 43:11, 43:15, 43:17, 43:22, 43:24, 44:2, 44:3, 44:5, 44:6, 44:7, 44:10, 44:13, 44:14, 44:17, 44:18, 44:23, 45:1, 45:8, 45:22, 48:18, 49:9, 49:10, 49:12, 49:13, 49:15, 49:16, 49:18, 49:19, 49:21, 49:22, 49:25, 50:2, 50:3, 50:5, 50:10, 50:11, 50:19, 50:20, 50:23, 50:24, 51:1,

51:7, 51:8, 51:10,
51:16, 51:17, 51:19,
51:20, 52:2, 52:3,
52:5, 52:8, 59:17,
59:20, 59:21, 59:23,
60:1, 60:6, 60:7,
60:9, 60:12, 60:18,
60:19, 60:20, 61:9,
61:12, 61:13, 61:14,
61:15, 61:18, 61:21,
61:23, 61:25, 62:3,
62:6, 62:10, 62:12,
62:14, 62:15, 62:19,
62:24, 63:1, 63:2,
63:4, 63:9, 67:8,
67:13, 68:8, 81:10,
82:3, 85:5, 85:6,
86:2, 86:6, 86:8,
87:3, 87:5, 87:8,
89:15, 89:17, 89:20,
92:13, 92:18, 93:1,
93:4, 93:12, 93:13,
93:14, 93:15, 93:16,
93:18, 93:19, 93:20,
93:22, 93:24, 93:25,
94:2, 94:3, 94:4,
94:9, 94:11, 94:14,
94:18, 94:21, 94:24,
95:1, 95:4, 95:7,
95:10, 95:11, 95:13,
95:16, 95:17, 95:18,
95:20, 95:21, 95:25,
96:1, 96:3, 96:4,
96:6, 96:7, 96:10,
96:11, 96:13, 96:14,
96:16, 96:17, 96:21,
96:22, 96:23, 96:25,
97:2, 97:3, 97:8,
97:12, 97:15, 97:17,
97:20, 97:22, 98:2,
98:3, 98:6, 98:12,
98:16, 98:19, 98:21,
98:24, 99:2, 99:4,
99:10, 99:11, 99:16,
99:17, 99:20, 99:24,
100:2, 100:3, 100:9,
100:11, 100:13,
100:14, 100:16,
100:17, 100:22,
100:25, 101:4,
101:6, 101:8, 101:9,
101:13, 101:19,
101:22, 102:7,
102:10, 102:11,
102:16, 102:20,
103:1, 103:5, 103:6,
103:8, 103:10,
103:22, 103:23,
104:12, 104:14,
104:16, 104:18,
104:23, 105:6,

105:8, 105:10,
105:12, 105:15,
105:17, 105:19,
105:23, 105:25,
106:7, 106:17,
106:18, 106:21,
106:23, 107:14,
107:20, 107:24,
107:25, 108:5,
108:13, 108:17,
108:18, 108:21,
108:22, 109:3,
109:8, 109:13,
109:19, 109:21,
109:22, 109:23,
110:5, 110:8,
110:10, 110:13,
110:14, 110:15,
110:19, 110:23,
110:25, 111:3,
111:4, 111:6, 111:7,
111:11, 111:13,
111:17, 111:18,
111:19, 111:21,
111:22, 111:23,
112:2, 112:4, 112:8,
112:13, 112:18,
112:19, 112:23,
112:24, 112:25,
113:3, 113:4, 113:5,
113:8, 113:9,
113:10, 113:12,
113:13, 113:14,
113:16, 113:20,
113:24, 114:7,
114:9, 114:11,
114:13, 114:23,
115:1, 115:11,
115:12, 115:13,
115:15, 115:18,
115:22, 115:23,
116:10, 116:11,
116:18, 116:19,
116:20, 116:23,
117:2, 117:4, 117:7,
117:9, 117:13,
117:14, 117:22,
117:24, 118:1,
118:4, 118:6, 118:9,
118:16, 118:17,
118:22, 119:2,
119:7, 119:10,
119:15, 119:17,
119:20, 119:25,
120:5, 120:10,
120:18, 120:19,
120:24, 121:1,
121:6, 121:10,
121:11, 121:12,
121:13, 121:14,
121:15, 121:16,

121:17, 121:19,
121:20, 121:21,
121:22, 121:23,
121:24, 121:25,
122:1, 122:2, 122:3,
122:5, 122:6, 122:7,
122:13, 122:14,
122:15
**themselves** [1] - 20:1
**then-Captain** [2] -
103:11, 103:14
**then-Chief** [1] - 20:11
**then-Council** [1] -
33:6
**then-Deputy** [1] -
32:22
**then-Sergeant** [1] -
101:14
**thereafter** [4] - 114:23,
116:2, 117:5, 120:2
**therefore** [4] - 51:25,
99:24, 111:13,
115:18
**thinking** [1] - 120:5,
120:7
**THOMAS** [1] - 93:8
**Thomas** [1] - 93:13
**three** [5] - 6:15, 6:19,
45:17, 103:21, 115:6
**throughout** [1] -
110:20
**throw** [2] - 15:3, 68:16
**tied** [1] - 50:7
**time-sensitive** [1] -
31:2
**time-stamped** [2] -
38:9, 39:13
**title** [2] - 91:17, 91:19
**today** [7] - 16:10, 77:1,
77:12, 80:8, 80:23,
101:17, 119:8
**together** [1] - 120:2
**took** [14] - 12:4, 17:18,
23:2, 27:12, 41:13,
45:6, 45:13, 45:20,
46:20, 91:7, 95:1,
95:5, 95:11, 95:14
**topics** [1] - 115:8
**total** [1] - 73:23
**towards** [2] - 50:15,
80:18
**traditionally** [1] - 39:6
**transcribing** [1] -
69:17
**transcript** [2] - 82:5,
123:4
**transcription** [1] -
117:5
**transcripts** [1] - 48:3
**transition** [1] - 104:9

**transmission** [4] -
80:20, 87:17, 87:25,
114:17
**transmissions** [6] -
75:24, 79:25, 84:3,
86:13, 88:18, 112:17
**transmit** [1] - 14:5
**transmitted** [1] - 59:1
**transpired** [2] - 111:9,
115:3
**Travis** [1] - 62:4
**trial** [13] - 30:25, 31:9,
41:18, 45:3, 64:25,
69:11, 78:11, 78:13,
78:24, 78:25, 79:14,
92:21, 115:14
**tried** [2] - 77:15, 81:4
**trouble** [1] - 92:8
**true** [25] - 5:17, 7:24,
52:19, 53:19, 58:14,
75:12, 75:14, 75:16,
75:17, 75:21, 80:23,
83:1, 83:19, 84:12,
84:25, 85:14, 85:24,
86:23, 88:1, 88:10,
88:25, 91:12, 92:1,
100:2, 107:24
**Trugmen** [1] - 121:14
**truth** [6] - 4:6, 4:7,
93:9, 93:10
**try** [4] - 62:8, 64:23,
78:5, 115:16
**trying** [7] - 31:8,
56:19, 62:1, 112:8,
114:13, 121:7
**Turley** [3] - 60:2,
60:21, 62:1
**TURLEY** [22] - 42:16,
52:11, 60:8, 60:24,
60:25, 63:11, 63:12,
67:11, 67:17, 68:9,
68:10, 81:11, 81:25,
82:4, 85:13, 86:9,
87:1, 87:4, 87:7,
87:10, 87:12, 89:12
**Turley's** [1] - 68:7
**turn** [2] - 51:5, 82:5
**turned** [15] - 15:22,
22:15, 36:14, 36:17,
36:19, 37:20, 37:24,
38:4, 40:19, 43:18,
46:6, 111:4, 111:10,
111:23, 120:12
**turning** [8] - 21:2,
25:2, 25:4, 42:17,
64:19, 65:24, 66:12,
112:3
**twice** [2] - 75:10, 85:3
**two** [22] - 22:14, 25:2,
25:4, 25:23, 26:6,

27:16, 27:17, 30:20,
30:21, 44:1, 48:18,
48:24, 51:12, 60:12,
63:14, 73:15, 80:18,
83:24, 97:10,
103:21, 104:17,
104:24
**type** [6] - 9:7, 14:9,
47:17, 56:22, 77:20,
79:8
**typed** [1] - 82:22
**types** [1] - 47:14
**typical** [1] - 113:5
**typically** [3] - 6:5,
14:7, 65:17
**typo** [1] - 103:13
**typos** [1] - 83:12

## U

**ultimately** [4] - 70:7,
94:6, 114:19, 115:10
**unable** [1] - 81:5
**unaccounted** [1] -
88:19
**unaware** [2] - 24:23,
25:2
**unclear** [1] - 65:6
**under** [2] - 104:22,
107:10
**understood** [14] -
12:24, 18:17, 33:9,
98:6, 100:9, 102:7,
102:8, 104:16,
107:12, 107:17,
109:6, 109:8, 109:9,
110:23
**undertake** [2] -
119:12, 119:13
**unfair** [1] - 48:19
**unfortunately** [1] -
107:22, 115:24
**Unified** [1] - 29:8
**union** [1] - 6:6
**Unit** [5] - 34:13, 35:19,
36:18, 46:13, 110:16
**unit** [1] - 46:3
**United** [3] - 4:3, 10:9,
10:21
**unless** [1] - 37:12
**unsuccessful** [1] -
28:20, 28:22
**unusual** [4] - 80:19,
87:16, 87:25, 88:6
**up** [19] - 5:3, 48:21,
54:3, 54:21, 59:6,
59:7, 60:16, 61:5,
65:20, 68:16, 69:21,
79:18, 79:19, 80:10,
81:5, 83:14, 89:18,

107:18, 108:19
**upper** [2] - 54:11,
68:21
**upward** [1] - 6:23
**urgency** [2] - 30:24,
31:11
**user** [2] - 42:13,
102:14
**utilized** [2] - 16:19,
109:4
**utilizing** [1] - 15:18

## V

**V1** [1] - 39:3
**various** [5] - 45:18,
99:6, 100:3, 104:5,
115:6
**verbally** [1] - 45:5
**version** [2] - 23:20,
44:12
**versus** [4] - 4:3, 10:9,
10:21, 114:10
**VHS** [6] - 36:22, 37:7,
37:11, 37:16, 37:17,
40:13
**video** [19] - 31:15,
34:4, 34:5, 36:10,
39:13, 39:14, 45:18,
46:13, 47:2, 49:3,
49:23, 50:11, 66:3,
96:14, 108:20,
109:10, 110:1,
110:20
**videos** [5] - 36:14,
36:17, 39:9, 40:22,
41:1
**videotape** [3] - 40:18,
55:3, 65:20
**videotapes** [16] -
31:13, 45:25, 46:1,
65:7, 65:8, 108:3,
108:6, 108:8,
110:11, 110:14,
111:2, 112:5,
112:10, 113:9,
116:16, 117:12
**videotaping** [4] -
55:19, 56:3, 108:11,
110:4
**view** [7] - 25:18,
37:23, 41:24, 42:10,
43:12, 84:12, 111:4
**viewed** [2] - 31:8, 42:2
**virtue** [1] - 98:22
**visit** [1] - 48:21
**visiting** [1] - 57:7
**voice** [1] - 61:25
**voluminous** [1] -
102:1

## W

**waited** [1] - 30:6
**warning** [1] - 107:15
**warns** [2] - 49:20,
107:2
**watch** [1] - 39:18
**Watch** [1] - 39:19
**web** [1] - 105:5
**web-based** [1] - 105:5
**week** [4] - 51:21,
67:14, 108:23, 121:4
**weekend** [16] - 16:25,
18:22, 34:21, 34:23,
35:8, 35:12, 96:18,
99:14, 101:3,
105:13, 105:16,
106:13, 108:4,
108:16, 110:21
**white** [1] - 50:12
**whole** [4] - 4:6, 70:18,
86:10, 93:9
**wishes** [1] - 119:19
**withdrawn** [1] - 81:22
**withdrew** [1] - 115:1
**witness** [3] - 45:11,
81:9, 92:22
**WITNESS** [215] -
16:23, 17:2, 17:4,
17:8, 17:11, 17:15,
17:22, 17:24, 18:1,
18:5, 18:8, 18:11,
18:15, 18:19, 18:23,
18:25, 19:4, 19:6,
19:9, 33:11, 33:13,
33:17, 34:18, 34:24,
35:1, 35:4, 35:9,
35:13, 36:25, 37:3,
38:5, 38:8, 39:8,
39:11, 39:14, 40:1,
40:3, 40:5, 40:7,
40:11, 40:16, 40:21,
40:24, 41:3, 41:10,
41:13, 41:17, 42:24,
43:2, 43:6, 43:15,
43:22, 44:2, 44:5,
44:7, 44:13, 44:17,
44:23, 44:9, 49:12,
49:15, 49:18, 49:21,
49:25, 50:3, 50:10,
50:19, 50:23, 51:1,
51:8, 51:16, 51:19,
52:2, 52:5, 59:20,
59:23, 60:6, 60:18,
60:20, 61:12, 61:14,
61:18, 61:23, 62:3,
62:10, 62:14, 62:19,
63:1, 63:4, 85:6,
86:6, 93:13, 93:15,
93:18, 93:20, 93:24,

94:2, 94:4, 94:11,
94:18, 94:24, 95:4,
95:10, 95:13, 95:17,
95:20, 95:25, 96:3,
96:6, 96:10, 96:13,
96:16, 96:21, 96:23,
97:2, 97:8, 97:15,
97:20, 98:2, 98:6,
98:16, 98:21, 99:2,
99:10, 99:16, 99:20,
100:2, 100:9,
100:13, 100:16,
100:22, 101:4,
101:8, 101:13,
101:22, 102:10,
102:16, 103:1,
103:6, 103:10,
103:23, 104:14,
104:18, 105:6,
105:10, 105:15,
105:19, 105:25,
106:17, 106:21,
107:14, 107:24,
108:5, 108:17,
108:21, 109:3,
109:13, 109:21,
109:23, 110:8,
110:13, 110:15,
110:23, 111:3,
111:6, 111:11,
111:17, 111:19,
111:22, 112:2,
112:8, 112:18,
112:23, 112:25,
113:4, 113:8,
113:10, 113:13,
113:16, 113:24,
114:9, 114:13,
115:1, 115:12,
115:15, 115:22,
116:10, 116:18,
116:20, 117:2,
117:7, 117:13,
117:22, 118:1,
118:6, 118:16,
118:22, 119:7,
119:15, 119:20,
120:5, 120:18,
120:24, 121:6,
121:11, 121:13,
121:15, 121:17,
121:20, 121:22,
121:24, 122:1,
122:3, 122:6, 122:13
**witnesses** [4] - 17:19,
18:17, 19:1, 121:6
**woman** [4] - 50:12,
50:13, 50:15, 51:22
**word** [1] - 96:8
**words** [6] - 84:17,
86:3, 91:1, 91:2,

91:8, 107:7
**write** [1] - 107:18
**writing** [3] - 45:5,
107:16, 120:3
**written** [4] - 23:19,
23:20, 106:11
**wrongful** [1] - 11:3
**wrongly** [1] - 109:15
**wrote** [6] - 75:3,
85:22, 86:20, 87:21,
88:7, 88:22

## Y

**Yates** [2] - 45:7, 45:17
**year** [11] - 6:20, 6:23,
8:20, 8:24, 21:8,
26:12, 47:17, 78:18,
95:14, 95:16, 119:11
**years** [6] - 4:13, 4:15,
4:16, 9:6, 21:9,
105:3
**yield** [1] - 17:5
**young** [4] - 50:12,
50:13, 50:15, 51:22
**yourself** [2] - 94:21,
120:1