UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
----------------------------X

RAYMING CHANG, et al.,

          Plaintiffs

              v.              Civil Action No. 02-2010-EGS-JMF

UNITED STATES OF AMERICA, et al,

          Defendants
----------------------------X      Washington, D.C.
                                   Friday, November 9, 2012
                                   9:30 A.M.

              TRANSCRIPT OF EVIDENTIARY HEARING
          BEFORE THE HONORABLE JOHN M. FACCIOLA
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs: Jonathan Turley, Esq.
                    GEORGE WASHINGTON LAW SCHOOL
                    2000 H Street, NW, Room E305
                    Washington, DC 20052
                    (202) 994-7001

                    Nicholas S. Sloey, Esq.
                    Daniel C. Schwartz, Esq.
                    Daniel T. O'Connor, Esq.
                    Philip James Meitl, Esq.
                    BRYAN CAVE LLP
                    1155 F Street, NW, Suite 700
                    Washington, DC 20004
                    (202) 508-6000

Court Reporter:            Lisa Walker Griffith, RPR
                           U.S. District Courthouse
                           Room 6507
                           Washington, D.C.  20001
                           (202) 354-3247

Proceedings recorded by mechanical stenography, transcript
 produced by computer.

```
APPEARANCES:   (Cont'.d)

For the Defendants:  William F. Causey, AAG
                     Shana Frost, AAG
                     OFFICE OF THE ATTORNEY GENERAL - D.C.
                     441 4th Street, NW, 6th Floor
                     Washington, DC 20001
                     (202) 724-6610

                     Marina Utgoff Braswell, AUSA
                     U.S. ATTORNEYS OFFICE -- D.C.
                     555 Fourth Street, NW, Room E4818
                     Washington, DC 20530
                     (202) 514-7226

                     Robert Deso, Esq.
                     DESO & BUCKLEY, P.C.
                     1828 L Street, NW, Suite 270
                     Washington, DC 20036
                     (202) 822-6333

                     Alexander Francuzenko, Esq.
                     COOK, CRAIG & FRANCUZENKO, PLLC
                     3050 Chain Bridge Road, Suite 200
                     Fairfax, VA 22030
                     (703) 865-7480

ALSO PRESENT:        Natalie Olivia Ludaway, Esq.
                     LEFTWICH & LUDAWAY
                     1400 K Street, NW, Suite 1000
                     Washington, DC 20005
                     (202) 434-9103
```

1          P R O C E E D I N G S

2          THE DEPUTY CLERK:  This is Civil Action 02-2010.

3  Rayming Chang versus United States of America, et al.  This

4  is an evidentiary hearing.

5          Would the parties please identify yourselves for the

6  record beginning with the plaintiffs.

7          MR. TURLEY:  Thank you. Good morning, Your Honor.

8  My name is Jonathan Turley.  I'm representing the Chang

9  plaintiffs.  With me at plaintiff's table is Dan Schwartz,

10  Dan O'Connor, P.J. Meitl, and Nick Sloey from the law firm of

11  Bryan Cave.

12          THE COURT:  Thank you.

13          MR. CAUSEY:  Good morning, Your Honor.  William

14  Causey and Shana Frost on behalf of the District defendants.

15          THE COURT:  Thank you.

16          MR. DESO:  Good morning, Your Honor.  Robert Deso

17  for Chief Newsham.

18          MS. LUDAWAY:  Good morning, Your Honor.  I entered

19  my appearance yesterday on behalf of Monique Pressley.

20          THE COURT:  And you are?

21          MS. LUDAWAY:  Natalie Ludaway.  I'm sorry.

22          THE COURT:  And Ms. Braswell.

23          MS. BRASWELL:  Good morning, Your Honor.  Marina

24  Braswell on behalf of the federal defendants.

25          THE COURT:  I'm glad to see you.

1        MR. FRANCUZENKO:  Good morning, Your Honor.  Alex

2   Francuzenko on behalf of Fairfax County Sheriff's Department.

3        THE COURT:  Good morning.

4        You may proceed.

5        MR. TURLEY:  Thank you, Your Honor.

6        (Terrance Ryan, witness for the plaintiffs,

7   previously sworn)

8                   DIRECT EXAMINATION (Resumed)

9   BY MR. TURLEY:

10  Q   Good morning, Mr. Ryan.

11  A   Good morning, Mr. Turley.

12  Q   Why don't we pick up where we left off, and then I'm

13  going to take us into a different area.  But just to return

14  to the issue where we left off yesterday, you discussed that

15  you had relied upon what you were told by Mr. Harris,

16  Mr. Koger and Ms. Quan as to whether this was a discoverable

17  material that had been delivered by Officer Strader.  Do you

18  recall testifying to that end?

19  A   Yes, in the sense of the 2000 -- the September 27, 2002,

20  running resume.

21  Q   And to that extent, you said that you were not concerned,

22  in your testimony yesterday, that two officers separately,

23  Capt. Herold and Officer Strader ultimately said that the

24  book that was shown to them was not the book that they gave

25  to your office.  Do you recall that testimony?

1    A    Yes.

2    Q    Now, the District has -- I want to be sure we get this

3    timeline correct as we go forward.  The District claims that

4    Capt. Herold delivered the book that Officer Strader had

5    found in the fall of 2009.  Do you remember that discussion?

6    A    Yes.

7    Q    Okay.  And the dates that we worked on yesterday and we

8    confirmed in your testimony was some time between October 7,

9    2009, the District agrees to this, and December 31, 2009?

10   A    Yes.

11   Q    Okay.  Now, are you aware that Mr. Koger had withdrawn

12   from this litigation on September 30th, 2009?

13   A    I didn't know the precise date, but, yes, I knew he was

14   out of the case.

15   Q    Well, let me show you the notice of withdrawal so that we

16   make sure we're going forward on our confirmed dates.  This

17   is Docket Number 510.  It's marked as Exhibit 47.  And this

18   is entitled withdrawal of appearance.  And you'll see the

19   date on this document for the withdrawal of Thomas Koger is

20   9-30-09.  Do you see that?

21   A    Yes, sir, I do.

22   Q    Okay.  Now this withdrawal coincided with a letter sent

23   on the same day by Assistant Attorney General Ellen Efros.

24   Are you familiar with that letter that was given to the

25   Court?

1    A    I don't know that I've seen it.  I may have.

2    Q    This is Exhibit 48.  And we're showing it to you now.

3    And I want to direct your attention to, and you'll notice

4    that this is a letter to Thomas Koger, September 29, 2009.

5    And I want to direct your attention to a part of this letter

6    that refers to the violations that Mr. Koger was found to

7    have committed in this case.

8         And specifically where it says that, "As a result

9    --" and you'll see it highlighted.  Let me start from the

10    beginning of the sentence.

11         "This disciplinary action is being taken as a result

12    of your serious omissions in failing to identify and provide

13    to plaintiffs documents that had been sought over a number of

14    years in two class action lawsuits."  Do you see that line?

15    A    Yes, I see it.

16    Q    Now does this refresh your memory?  Have you seen this

17    letter before?

18    A    I don't believe I've ever seen this letter.

19    Q    Were you aware of this disciplinary action?

20    A    Yes.

21    Q    Okay.  This letter goes on to say, state in the last

22    paragraph, quote, "Your conduct illustrates a disregard for

23    the rules of the U.S. District Court governing discovery,

24    court orders requiring the conclusion of discovery by

25    established guidelines and the expectation of the OAG that

1    attorneys, as officers of the court, will conduct discovery

2    in a professional, forthcoming and appropriate manner."  Do

3    you see that?

4    A   I see it.

5    Q   Okay.  So, here you have a disciplinary action that you

6    said that you were aware of, specifically disciplining this

7    attorney for the failure to identify discovery and to meet

8    basic professional standards with regard to discoverable

9    material.  But that's the attorney that you repeatedly cited

10   yesterday as someone that you relied on in terms of the book

11   delivered by Officer Strader and whether it contained

12   discoverable material.  Is that correct?

13        MR. CAUSEY:  Objection, Your Honor, we covered this

14   yesterday.

15        THE COURT:  Overruled.  No, we didn't.

16        THE WITNESS:  He is one of the attorneys, yes.

17   BY MR. TURLEY:

18   Q   And I asked you yesterday whether you were concerned at

19   all about relying on an attorney who was the subject of these

20   types of allegations.  And now we have this letter that

21   you've just reviewed again or maybe for the first time I

22   should say.

23        MR. CAUSEY:  Again, we did cover this yesterday.

24        MR. TURLEY:  I'm directing it to the letter that we

25   just showed him.

1          THE COURT:  I'll do the talking, okay, gentlemen?

2          The objection is overruled.  Go ahead, proceed.

3    BY MR. TURLEY:

4    Q   So you see in this letter that this attorney was

5    specifically disciplined in terms of his role in discovery

6    and failure to meet basic standards of professional conduct.

7    Do you stick by your testimony that you still felt that you

8    could rely on him?

9    A   At the time that I was found or was handed this document,

10   I was not aware of this letter.

11   Q   So, you weren't -- but didn't you testify yesterday that

12   you were aware at that time that Mr. Koger had been accused

13   of these allegations?

14   A   Yes.

15   Q   But would this letter have made a difference to you if

16   you had read this letter?

17   A   I think if this is the proposed notice to take an action

18   against him, I would have waited until the conclusion of the

19   proceedings to find out.

20   Q   And then what would you have done at the conclusion of

21   the proceedings?

22   A   I'm not sure I understand the context.

23   Q   You said that you would have waited for the conclusion of

24   proceedings.  And I just wanted to know how would that have

25   changed your conduct in terms of the reliance on Mr. Koger?

1   A   Well, I guess in the future I would have to be a little

2   more circumspect about relying on his conduct or

3   representations.

4   Q   So when you say circumspect, does that mean that you

5   would still consult with him as you did or would you have no

6   consultation with him?

7   A   No, I could still consult with him.  He was still

8   employed by the Office of the Attorney General.

9   Q   So you consider, even with this letter, it would have

10   still been appropriate for him to review that discovery and

11   to rely to some extent on his views?

12   A   But again, I didn't know about this letter at the time.

13   Q   Yes.  But I'm trying to understand when you say that, if

14   you waited for the conclusion of these proceedings, had you

15   waited for the conclusion of the proceedings with Mr. Koger,

16   would you have still consulted and relied on his view as to

17   this document?

18   A   If it had happened later in time, if the document had

19   been produced in the aftermath that was concluded,

20   potentially, yes.

21   Q   Potentially yes, you would have relied on him?

22   A   That I would have been a little more concerned about it,

23   yes.

24   Q   I wasn't asked about concern.  But would you have relied

25   on him even if you were aware of the outcome of this?

1   A   Well, again, in the context of Mr. Koger's

2   representation, I knew that he was familiar with the document

3   that was part of the document that was produced by Officer

4   Strader so that I knew he had knowledge about that particular

5   document.  I also know or knew at the time, that he was

6   looking for the resume from September 27, 2002, so, as we all

7   were.  So I think I would have relied on his representation

8   to me because of the resume was connected with the Bolger

9   case for which he did not receive any discipline, that it

10  would be reasonable.

11  Q   All right.  Let me just parse that up a bit so I

12  understand fully what you're conveying to the Court.

13          First of all, in terms of what you knew when you

14  relied on Mr. Koger with regard to the Strader document, you

15  had already testified that you knew that he had been subject

16  to these allegations and that there were serious questions of

17  contempt, potential contempt and obstruction, correct?

18  A   Yes.

19  Q   But that, you stated, did not raise concerns with you as

20  to the reliance on Mr. Koger?

21  A   I've known Tom Koger for a lot of years.  I don't

22  distrust the man.

23  Q   Even in light of all those previous proceedings we talked

24  about?

25  A   Right.

1   Q   Now, just to address something you said at the end of

2   your last statement, you said that your reliance on Koger in

3   part was because he had not been disciplined in another case.

4   Do you remember you stating that?

5   A   In the Bolger case.

6   Q   Right.

7   A   Yes.

8   Q   So in your mind, does that mean that, because he was not

9   subject to these allegations in a case that was moving in

10  tandem, not together but was moving at the same time, that

11  you considered him still to be, his judgment to be unaffected

12  because he was not specifically disciplined in the other

13  case?

14  A   No, I think what I was trying to suggest to you is that

15  there was no flag there to signal to me in the context of the

16  Bolger case, which is the resume that was actually in the

17  document, that there would be any problem with relying on his

18  representation.

19  Q   So there is no problem with relying on an attorney who

20  has been subject to serious allegations of potential contempt

21  and obstruction in a related case because he had not been

22  subject to those same allegations in a second case?

23  A   No, I'm trying to separate the Bolger case because that

24  document was -- the resume from that case was actually in the

25  document that Strader had produced to Capt. Herold.

1    Q   Mr. Ryan, what I'm asking you about is not the document

2    but the attorney, the attorney is the same person.  So the

3    same person, who was subject to these allegations of

4    egregious abuse, was the same attorney in both cases.  But

5    you believe it's significant that the cases still were

6    separate on the docket in terms of relying on that attorney's

7    judgment?

8    A   Yes, in the context of what he was identifying, that that

9    resume was the resume from the other case.

10   Q   Now, Mr. Ryan, you said you also relied on Mr. Harris'

11   judgment as to the contents of this document, correct?

12   A   Yes.

13   Q   Now, I want to note that, do you recall on the tours we

14   referred to yesterday with Officer Strader that, at the time

15   of the tour when you were holding the book, do you recall

16   Officer Strader saying or agreeing that that was the book

17   that he had turned over at that time?

18   A   No, I don't remember him saying that.

19   Q   Is it because you have no clear recollection or you

20   specifically, you have a recollection of that discussion but

21   you don't recollect him ever saying that?

22   A   I have a recollection of the tour.  I may have had the

23   book with me, as I think I testified yesterday, but I don't

24   remember him saying 'Oh, I agree that's the book,' because I

25   don't think I asked him that question.

1    Q    Now, you said you relied on Mr. Harris, that you

2    described yesterday of flipping through the book.  Do you

3    remember that testimony?

4    A    Yes.

5    Q    Okay.  And this was part of what you said was a really

6    good joke.  Do you remember saying that?

7    A    I didn't say good joke.  I was trying to communicate to

8    you that it was done in a jesting kind of way.

9    Q    But you thought it was funny you said yesterday?

10   A    Yes.

11   Q    Okay.  Not a good joke but a joke?

12   A    Yes.

13   Q    Okay.  But you relied on Mr. Harris during this funny

14   moment with Strader's document in saying that this wasn't the

15   2002, September 2002 running resume?

16   A    Yes.

17   Q    Now, do you remember when your office transmitted to the

18   City Council in November 2003, what it said was the JOCC

19   running resume from September 2002 protest, this was a matter

20   that was covered in your previous testimony before Judge

21   Facciola?

22   A    I remember, yes.

23   Q    Now, do you recall that that office, that that

24   transmission from your office was signed by Ron Harris?

25   A    There was one letter I think that was signed by me or he

1   signed it for me.  I don't remember.  I'd have to see the

2   letter.

3   Q   I think that's correct.  I think that's consistent with

4   your testimony.  And this is Exhibit 76.  Oh, it's 49.  I'm

5   sorry.  This will now be Exhibit 49.  It was previously

6   Exhibit 76.

7           MR. TURLEY:  Your Honor, this was introduced in the

8   last set of hearings.

9   BY MR. TURLEY:

10  Q   And we're bringing up that letter for you now, Mr. Ryan,

11  so we can refresh your memory if that's necessary.  You'll

12  see that the letter is dated November 21, 2003.  Do you see

13  that?

14  A   Yes.

15  Q   And it says "regarding productions pursuant to subpoena."

16  Do you see that?

17  A   Yes.

18  Q   Okay.  Now, we're going to go to page five of that

19  document.  That in response to a formal subpoena from the

20  City Council, this letter states that the city was producing

21  a number of documents including the SOCC/JOCC running

22  resumes.  Do you see that?

23  A   Yes.

24  Q   Now let's take a look at the name on that letter at the

25  very bottom.  Now this is your name, but you can see that

1    it's signed by who?

2    A    Ronald Harris.

3    Q    Okay.  Now, was that letter true?  What it was

4    representing, was that true that you had in fact delivered

5    the SOCC/JOCC running resume?

6    A    Apparently there was an error, and he had produced the

7    intel running resume.

8                THE COURT:  He had produced the what?

9                THE WITNESS:  Intel running resume.

10               THE COURT:  What's the difference?

11               THE WITNESS:  It's not the running resume that

12   everybody's looking for.

13   BY MR. TURLEY:

14   Q    It's a completely different running resume, correct?

15   A    Yes.

16   Q    But nobody informed the City Council, correct, after the

17   discovery had been made, that this was the wrong running

18   resume.  Isn't that correct?

19   A    I don't know the answer to that question, whether that

20   was ever done.

21   Q    Are you aware of Mr. Harris ever sending a letter on his

22   behalf or your behalf saying, by the way, that's actually not

23   the right running resume?

24   A    I don't know if there was ever any communication about

25   that.

1   Q   And yet, this is the individual you stated you were also

2   relying upon in terms of the review of the Strader document

3   as we've been calling it?

4   A   Yes, for the same reason that he was involved in the

5   Bolger case and he knew the Bolger resume.

6   Q   So to recap, you relied on one attorney who was subject

7   to serious professional misconduct allegations on the

8   identification and production of discovery and then you

9   relied on another attorney, who had previously given, under

10  subpoena, something that he said was the relevant running

11  resume that wasn't the running resume.  Is that your

12  testimony?

13  A   Yes.

14  Q   All right.  Mr. Ryan, I'd like to direct your --

15        MR. TURLEY:  Can we move to admit those exhibits,

16  Your Honor?

17        THE COURT:  Certainly.  They will be admitted,

18  hearing no objection.  Specify which ones for the record.

19        MR. TURLEY:  Exhibits 47, 48 and 49.

20        THE COURT:  Exhibits 47, 48 and 49 are admitted.

21        (Plaintiff's Exhibit No. 47, 48 and 49 were admitted

22  into evidence.)

23        MR. TURLEY:  Thank you, sir.

24        THE COURT:  You're welcome.

25

1    BY MR. TURLEY:

2    Q    Let's go to May 3, 2011.  Now, on May 3, 2011, were you

3    made aware that certain data had been recovered from the E

4    Team system related to September 27, 2002?

5    A    Made aware that it had actually been recovered?

6    Q    Made aware that certain data had been recovered?

7    A    That was the day that we had retained the services of a

8    representation from the E Team, actually NC4, to come and see

9    if they could identify whether the data still resided on the

10   server and its backup server.

11   Q    And was that individual named Marc Bynum?

12   A    Yes, that's correct.

13   Q    Okay, well let's start there and then we'll work forward

14   so we're on the same page.  So Mr. Bynum came in to try to

15   see if data could be recovered from the E Team systems; is

16   that correct?

17   A    Yes, he did.

18   Q    Now, do you recall being, meeting with Mr. Bynum on that

19   day?

20   A    Yes, I do.

21   Q    And were you present when Mr. Bynum indicated that he was

22   able to retrieve some data from the system?

23           I'm sorry.  You've got to let me finish.

24   A    Excuse me.

25   Q    No, it's quite all right.

1         Were you present when he stated that he could in

2    fact retrieve some data from that system?

3    A    Yes.

4    Q    Okay.  And, in fact, didn't Bynum also say that he found

5    evidence of what he referred to as, quote "deletion,"

6    correct?

7    A    Yes, that's correct.

8    Q    Okay.  What exactly did he say to your recollection?

9    A    After they got the server running and got the password to

10   get into the server, he, you know, did what he needed to do

11   to identify where in the folder he could locate the IMF/World

12   Bank, September 26, 27, 28 -- if those are the right dates --

13   2002 data.  And while he was identifying that, he indicated

14   that someone with the administrator number of 070 had

15   attempted to delete the information.

16   Q    And indeed, at that time, weren't you also informed that

17   information regarding the September 2002 events may have been

18   lost or deleted?

19   A    I'm not sure I quite understand the question because,

20   when Mr. Bynum was informing us about this, he also indicated

21   that they didn't understand, whoever was doing this, whatever

22   they were doing, that that didn't result in the loss of the

23   data because it doesn't erase the data.  The data would still

24   be there.

25   Q    But isn't it true you didn't know at that time, neither

1  did Mr. Bynum, whether data had been successfully deleted?

2  A    No, I didn't know.

3  Q    So that was a possibility when you first heard this

4  information?

5  A    Correct.

6  Q    By the way, when you were hearing this from Mr. Bynum,

7  was this in person or over the phone?

8  A    No, I was in the room.

9  Q    Which room was that?

10  A    It's on the first floor at police headquarters at 300

11  Indiana, Room 11 something.  I don't remember the exact room

12  number.

13  Q    And what's that room used for?

14  A    It's part of a complex that's where all of the computer

15  servers are located, most of them.  I don't want to say all,

16  because there are obviously other computers throughout the

17  building.

18  Q    So is this like a room that has computers set next to

19  each other on long tables?  Could you describe it?

20  A    No, this was a work room where there may have been some

21  other miscellaneous computers, but they actually brought the

22  servers into that room, set them up on the table.  Now, the

23  servers are not a typical computer that you would be familiar

24  with.  They're approximately this wide and perhaps that long,

25  if I can show you that, and maybe about that thick.

1    (Indicating)  They're pretty big.

2    Q    These are pretty big objects?

3    A    Yes.

4         THE COURT:  All right.  Are they, I don't know if

5    there's a desk top.  Are they bigger than this?

6         THE WITNESS:  Oh, absolutely.

7         THE COURT:  Noting for the record that the Court is

8    pointing to the computer monitor.  I'm trying to look for

9    something in the room to which you could compare it.  Look on

10   my Clerk's desk.  See that device over there, which is

11   obviously the operating system for the computer?

12        THE WITNESS:  Which one, Judge?

13        THE COURT:  To her immediate right.

14        THE WITNESS:  It is much bigger than that.

15   BY MR. TURLEY:

16   Q    Would you say that it's about the size of that display

17   board?

18        THE COURT:  Pointing to the white board.

19        MR. TURLEY:  About the size of the Court's white

20   board.

21        THE COURT:  So you're saying about four by four?

22        THE WITNESS:  It's big.

23        THE COURT:  Four by four, four feet by four feet?

24        THE WITNESS:  I don't know precisely, Judge.

25        THE COURT:  Is that close enough?

1           THE WITNESS:  Yes.

2           THE COURT:  All right.  Four feet by four feet.

3      Go ahead.

4           MR. TURLEY:  Thank you, Your Honor.

5   BY MR. TURLEY:

6   Q   Who was, who do you recall being in the room with you at

7   that point?

8   A   Mr. Bynum was there.  George Crawford from the

9   Metropolitan Police Department was there, myself, Monique

10  Pressley.  There was somebody else too, but I don't --

11  Officer Steven Bias was there.

12  Q   Were there any other -- was Ms. Frost there, for example?

13  A   She came later I believe.

14  Q   So she was not there when --

15  A   At the very beginning.

16  Q   And did he make this disclosure at the very beginning?

17  A   Pretty early on in the process.  I don't know if it was

18  like 10 minutes into it, 20 minutes into it.  I couldn't

19  remember that.

20  Q   Let me try to get an idea then.  You have this server

21  that is brought in and it is attached to a screen, is it not?

22  A   There must have been some kind of monitor because he had

23  to be able to see what he was doing.

24  Q   And so, would you say that, from the point that it was

25  attached where you could see it on the monitor to the point

1   that he noted that there was an attempt of deletion, was that

2   less than 30 minutes?

3   A   I couldn't really tell today with precision,

4   approximately.

5   Q   You think approximately around 30 minutes or less?

6   A   Something like that.

7   Q   Okay.  Now, what was your -- I mean, did his stating that

8   there had been an attempt to delete data, did that concern

9   you?

10  A   Absolutely.

11  Q   And so what did you do when he told you that?

12  A   I asked him to stop what they were doing, and I

13  immediately called the assistant chief in charge of the

14  Office of Internal Affairs.  Actually, it's called the

15  Internal Affairs Bureau.

16  Q   Now, so, to get the chronology correct, he hooks up the

17  monitor.  He looks at the data.  It's about or less than 30

18  minutes.  He tells you that someone clearly was trying to

19  delete and explains all that to you.  At that point, did you

20  tell him to turn it off?

21  A   No, I don't think I said turn it off.  I said stop what

22  you're doing.

23  Q   Stop what you're doing?

24  A   I'm not even sure if I said stop.  I just said we've got

25  to stop what we're doing, and I have to call Internal

1  Affairs.

2  Q   Now, did everyone get up at that point or what did they

3  do when you told them that?

4  A   I actually had to get up and leave the room because the

5  cell phone didn't work in that area of the building.  I had

6  to go find I think a, I think I used a land line to make the

7  contact.

8  Q   Do you remember that clearly?

9  A   Pretty much, yeah.

10  Q   And what were the other people doing at that point, do

11  you recall?

12  A   I was in a different room.  I had to actually get up and

13  walk out of the room.

14  Q   So, who did you contact?  I'll refer to it as the IAD.

15  A   Yeah, I contacted Assistant Chief Michael Anzallo.

16  Q   And who is Officer Anzallo?

17  A   Assistant Chief Anzallo is the official in charge of the

18  Internal Affairs Bureau.

19  Q   You say that you contacted him with a land line outside

20  of the room?

21  A   I think it was a land line.

22  Q   What time of day do you think that was?

23  A   I don't know.  We started at 9:30, maybe 10:00.  I'm not

24  sure.

25  Q   So early in the morning?

1    A    Yes.

2    Q    Okay.  Now what did you say to Assistant Chief Anzallo?

3    A    I don't remember the exact words.  I think I just

4    informed him that we had discovered a potential problem with

5    the data in the server and that it appears that someone may

6    have attempted to delete it.  And he said, okay, I'll have

7    Commander LoJacono, who is the official.  That's Christopher

8    LoJacono.  His last name is spelled L-o-J-a-c-o-n-o.

9    Q    So, when you told the Assistant Chief about this, did you

10   also mention that this was evidence that had been sought by a

11   federal court?

12   A    I don't know if I specifically said that.

13   Q    How did you think you described the evidence on the

14   server and why you were looking at it?

15   A    I don't know if I got into that with him.

16   Q    Did you express why you were concerned?  Obviously, it

17   wouldn't be a concern for you that information was deleted on

18   any system.  Did you explain why you were concerned that

19   someone had tried to delete information on this system?

20   A    I don't have a specific recollection of what I said to

21   him.  I presumably said it in the context of we're working on

22   the Pershing Park cases, something about that.  I don't

23   remember the exact words.

24   Q    But generally you remember you identified the ongoing

25   litigation?

1    A    I think so.

2    Q    Did you make a specific request to Anzallo?

3    A    My recollection is that he would have Commander LoJacono,

4    who was in charge of the actual Internal Affairs Division,

5    which is within his bureau, get an agent to come to us.

6    Q    Now, to give us an idea of how that came about, do you at

7    least recall whether you called him and asked him to take a

8    specific action, or did you just call him to say, this is

9    what just happened, what do you want to do about it?

10   A    No, I wanted to alert him to what I perceived to be a

11   potentially big problem.  If in fact somebody had attempted

12   to delete the information on that server, that could be a

13   huge problem.

14   Q    But did you ask him to send an agent over?

15   A    Well, I was alerting the Internal Affairs Bureau because

16   I had, in my mind, identified potential misconduct, and we

17   needed to get someone involved in investigating it.

18   Q    So, did you specifically ask him to send an agent over or

19   take any action?

20   A    I called him to alert him to the problem.  He said he

21   would send -- he would contact Commander LoJacono, who would

22   then assign an agent to come to us.

23   Q    Now, from that recollection, is it accurate to say that

24   you did not ask him to initiate an investigation or did you

25   ask him to initiate an investigation?

1   A    I was alerting him to a potential problem.  You know, he

2   sent an agent, so I assumed that they were opening a case.

3   Q    Was this a brief conversation?

4   A    It wasn't very long.

5   Q    And so, your recollection is that you left the

6   conversation assuming he would send someone over and

7   investigate?

8   A    We were waiting for the agent to show up.

9   Q    So he had already told you that someone was coming?

10  A    Again, he was going to communicate with Commander

11  LoJacono, and then LoJacono would take, you know,

12  subordinates to him to come to see us.

13  Q    So it was your understanding that you were waiting for

14  someone?

15  A    Yes.

16  Q    Now, did you ask Anzallo in that conversation or after

17  the, or ask his subordinates to specifically determine

18  whether something had been tampered with on the computer?

19  A    Did I ask who again?

20  Q    Did you ask Anzallo or one of his subordinates to

21  specifically investigate whether someone had tampered with

22  this evidence?

23  A    I don't know if I used tampering because the agent

24  eventually showed up.  I don't know what time he arrived.

25  His name is Sylvan Altieri.  And I briefed him about what was

1   going on.

2   Q   How do you spell Altieri's name?

3   A   A-L-T-I-E-R-I I believe is the spelling.

4   Q   And how long did you have to wait for Altieri?

5   A   I don't remember the time that went by.

6   Q   But you all remained in the room during that time?

7   A   Yes.

8   Q   Did anyone arrive while you waited?

9   A   Yes.

10  Q   And who was that?

11  A   Altieri.  And I didn't know who was going to be coming.

12  He just arrived and then he identified himself.

13  Q   By that point, had Ms. Frost arrived?

14  A   I think Ms. Frost arrived when I was talking on the phone

15  with Assistant Chief Anzallo.

16  Q   So Ms. Frost arrived not that long after the discovery

17  and while you were on the phone?

18  A   I think so.

19  Q   Okay.

20  A   Or just before I got on the phone, somewhere around

21  there.

22  Q   How long do you think you had to wait?  I mean, do you

23  think that you were waiting for 30 minutes, an hour?

24  A   I don't have a clear recollection of how much time it

25  took.

1    Q    Was it before noon?

2    A    He could have arrived before noon.

3    Q    But you have no recollection?

4    A    No, not really.

5    Q    What were you doing during that time?  Were you chatting

6    with folks or were you standing aside?

7    A    Yeah, there was no further work being done on the

8    project.  I think he was identifying --

9    Q    I'm sorry, I wasn't clear.  Judging from where your

10   answer is going, I should, I don't mean to cut you off.  But,

11   while you were waiting for the arrival of the officer, did

12   you go back in the room and talk to the other folks in the

13   room?

14   A    Yes.

15   Q    And what did you tell them?

16   A    That I had alerted IAD, and they were going to be sending

17   an agent.

18   Q    And was there any discussion at that point as to the

19   ramifications of a tampering or deletion of this material?

20   A    I don't know if we had that discussion.

21   Q    What did you discuss?

22   A    Well, I remember we were trying to figure out who were

23   some of the people that might have been potentially involved.

24   And I have some names in my mind of people who were working

25   in the SOCC/JOCC complex or in the quality assurance world

1    that would have had access to that server.

2    Q    And who were those people that you mentioned?

3    A    People like Mark Beach, Steven Bias, Stephen Gaffigan,

4    Anna Moss Davis, who's a police officer up in that quality

5    assurance area, Neil Trugman, a sergeant named Sean Pipia.

6    Another Guy Poreh was another name.  He was a detective.  Rai

7    Howell, who is a civilian, I think she was the deputy

8    director to Stephen Gaffigan, a number of different names

9    like that.

10   Q    Did you come up with all these names or did other people

11   suggest some?

12   A    I think we were probably bantering them back and forth.

13   I actually really don't remember how we came up with all

14   those names.

15   Q    Now what was your understanding as to access to this

16   system when it was online of who would have access to the

17   ability to try to delete something?

18   A    You had to have, I think, been authorized to get into the

19   system.  So you were assigned an identification to get into

20   it.

21   Q    Now, what was your understanding at that time when you

22   were coming up with these names as to the size of the number

23   of officers that had such authorization?

24   A    I don't know that it was large in the sense of hundreds

25   of people.  I think it was not that many, because my memory

1   is that there were 13 or 14 names that were identified.

2   Q   Could high-ranking officers in the department get access

3   to this system?

4   A   I don't know the answer to that question.

5   Q   Did you ask to see a list of people with access to the

6   system?

7   A   No, I did not.

8   Q   Did you ask if there was such a list available?

9   A   I don't remember asking that question, no.

10  Q   Now, in your contacting the IAD, you stated that that was

11  entirely your decision, correct?

12  A   Yes.

13  Q   No one ordered you to do it?

14  A   No.

15  Q   Okay.  And when you left the room where everyone was

16  standing around the server, did you tell them I'm going to go

17  call IAD?

18  A   I think I told Monique Pressley that's what I was doing.

19  I don't know if I said it out loud to everybody else.  I

20  really don't remember.

21  Q   But you recall saying it to Ms. Pressley?

22  A   I think so, yes.

23  Q   Now, at that time, since you had information that there

24  was an attempt to delete, did you also contact the special

25  master in this case, Judge Facciola?

1  A    No, I did not.

2  Q    Now, it is true, correct, that you fully understood that

3  this was information that had been the subject of various

4  hearings and had been sought for for a long time in this

5  case, correct?

6  A    Correct.

7  Q    Now, did you have discussions with anyone in the hours

8  following this discovery about whether Judge Facciola should

9  be informed of this event?

10        MR. CAUSEY:  Your Honor, objection to the extent

11 that the suggestion may solicit attorney-client privilege.

12        THE COURT:  It's just a fact, overruled.  Repeat the

13 question.  Answer yes or no.

14        THE WITNESS:  Yes.

15        MR. TURLEY:  Your Honor, I'd like to ask with whom

16 he had that discussion and the time.

17        THE COURT:  With whom did you have such discussions?

18        THE WITNESS:  I remember that there was a meeting

19 later in the day with Chief Anzallo and Chief Lanier early

20 evening at which I think that Chief Anzallo may have said

21 that this is something that should be handled by judge,

22 referred back to the judge in the case.

23 BY MR. TURLEY:

24 Q    Now, we're going get to that in a second.  I just want to

25 make sure we understand the timeline.  Is that the first time

1    you recollect anyone raising the issue of informing Judge

2    Facciola?

3    A    In terms of the discussions with the attorneys for the

4    District of Columbia, I don't remember precisely when, but

5    there were certainly some discussions with them about

6    informing the Court.  I just don't remember when.

7    Q    Who are you referring to as them?

8    A    That would have been Monique Pressley and Shana Frost.

9    Q    But is your recollection that there was some discussion

10   during that day of that question?

11   A    I don't know if it was that day or later.

12   Q    When you say later, I'm trying get an idea of the time

13   period.  Are you talking the next day or within that day?

14   A    I really don't remember.  I just knew in my mind that

15   there was going to be a communication to the Court at some

16   point to inform the judge about what had, had initially been

17   perceived to be an attempt to delete the information.

18   Q    So you have no recollection of being asked or told of the

19   disclosure to Judge Facciola before your meeting with Chief

20   Lanier?

21   A    I don't have a specific recollection of that today, no.

22   Q    And do you have a general recollection of it?

23   A    I really don't remember.

24          THE COURT:  But one thing, when the agent arrives,

25   right, he arrives and he identifies himself, is there at that

1    point a discussion of what is going to happen next, whether

2    it's to report it to me or anything else?  Does the agent

3    say, for example, I've got to take these out of here?

4              THE WITNESS:  Oh, no, he didn't say that, Judge.

5              THE COURT:  All right.  But what did he do?

6              THE WITNESS:  He monitored what we were doing that

7    day just to, you know, see what was happening.

8              THE COURT:  No, but you've told everybody to stop

9    doing everything until he arrives.  When he arrives, you

10   don't resume doing what you were doing, do you?  Bynum

11   doesn't do that, does he?

12             THE WITNESS:  I think Bynum was on hold for a long

13   time, Judge.  I mean, we sent him out --

14             THE COURT:  That's crucial.  Does anyone return to

15   the computer and do anything after Bynum advises everyone

16   there was an attempt to, there seems to be an attempt to

17   delete data?  Does anyone touch that, does anyone use any

18   kind of a computer device, whether it was a keyboard or a

19   mouse or anything else, to access the data on the server

20   that's now been brought into the room?

21             THE WITNESS:  Judge, I don't remember if anybody

22   touched the keyboard or did anything like that.

23             THE COURT:  Did the agent?

24             THE WITNESS:  No, the agent did not.

25             THE COURT:  Did Bynum?

1          THE WITNESS:  I can't answer that question.  I don't

2     know.

3          THE COURT:  Is there ever a time when the server is

4     in the room, you're in the room and Bynum is in the room and

5     you see Bynum do anything that causes the server to go back

6     into operation.

7          THE WITNESS:  The server was like running, Judge.

8          THE COURT:  All right.  Admittedly, it's running.

9          THE WITNESS:  Yes.

10          THE COURT:  Because nobody has turned it off yet.

11          THE WITNESS:  Correct.

12          THE COURT:  But, if you look over at the reporter,

13     her computer is running.  But it was taking in point because

14     she is striking the keys.  That's my point.  Does Bynum ever

15     strike a key?

16          THE WITNESS:  I was sitting back further away from

17     it than you were.  I don't remember if he did or didn't.

18          THE COURT:  Well, Mr. Ryan, you would appreciate,

19     would you not, that anyone who touches it at that point and

20     causes the server to operate contaminates the server as it

21     existed the moment Bynum made his, from the moment Bynum made

22     his discovery?

23          THE WITNESS:  Yes.

24          THE COURT:  Okay.  Well then, the point is did Bynum

25     say or did you say or did anybody say, hey, don't touch

1    anything?

2              THE WITNESS:  I think we did, because my

3    recollection is that Bynum, you know, had to be sent out of

4    the room.  He was anxious because he wanted to get the work

5    done.  But, you know, the sequence of when that happened,

6    Judge, I can't really remember today.

7              THE COURT:  But do you have any recollection of

8    anyone in the room, whether lawyer, police official or anyone

9    saying do not touch, stop?

10             THE WITNESS:  I think I asked him to stop when I

11   first got up to make the contact.

12             THE COURT:  All right.  So you contact the agent.

13   The agent arrives.  Does anyone countermand your direction to

14   stop and resume operations?

15             THE WITNESS:  I really don't remember now, Judge.

16             THE COURT:  Thank you.

17   BY MR. TURLEY:

18   Q   But I want to just follow up something the judge said.

19   You didn't secure the computer yourself, correct?

20   A   No.

21   Q   So, you didn't order for the computer to be, for the

22   server to be set aside or turned off or moved to a secure

23   location?

24   A   It was in a secure location.

25   Q   So, you felt that having it simply in that room it was

1    secure as evidence?

2    A    Yeah, that was a locked room.

3    Q    But it was a locked room with people in it, correct?

4    A    Oh, yes, I agree.

5    Q    But you still felt that it was secure just to leave it

6    running?

7    A    I didn't know what we had at first.  And at the same time

8    Mr. Bynum was explaining to us that you cannot delete the

9    data.  You just deleted the link.  It does not erase the

10   data.  The data was there.

11   Q    Well, actually you just testified that you didn't know

12   whether the data --

13   A    Well, that's what he was telling us, it should be there.

14   Excuse me, I meant to say should be there.

15   Q    So you didn't know at that time?

16   A    Not yet.

17   Q    And in fact you left the room, so you don't know what

18   happened at the computer when you were outside the room,

19   right?

20   A    No, I couldn't know that.

21   Q    Did you stay in the room all the time after you got off

22   the phone with the IAD?

23   A    I came back into the room, yes.

24   Q    But did you stay there the whole time before the person

25   arrived?

1    A    Before IAD arrived?

2    Q    IAD arrived.

3    A    I think so, yes.

4    Q    But you have no recollection how long that was?

5    A    No, I don't.

6    Q    Now, do you recall actually asking the IAD, either

7    Anzallo or his subordinates, to determine if something had

8    been tampered with in terms of evidence on the server?

9    A    I may have said that to Chief Anzallo when I first talked

10   to him, but I really don't remember.

11   Q    Do you recall informing Chief Anzallo that this was a

12   potential criminal act?

13   A    I don't know if I used that phrasing.  I just wanted to

14   alert him that there was a potential problem and I needed

15   some assistance.

16   Q    Mr. Ryan, I know it's -- I want to just probe your

17   recollection a little more.  I understand if you say that you

18   don't have any recollection.  But the terminology is

19   important, correct?  I mean you acknowledge that there are

20   problems like a leak in a ceiling and problems like there's a

21   criminal in the building.  All right.  So, let me ask you

22   specifically.  Did you convey to Chief Anzallo that this was

23   a potential criminal matter?

24   A    I think so, yes.

25   Q    And you did that in your conversation with him on the

1    phone?

2    A    I think so.  But again, I don't have a specific

3    recollection of the words that were used.

4    Q    Now, did you discuss that point of a potential crime with

5    anyone other than Assistant Chief Anzallo, either before or

6    after you returned to the office?

7    A    I don't know if I discussed it with Monique and Shana.  I

8    think I perhaps did.

9    Q    When you say perhaps, is that anything could happen or

10   you have a general recollection you did?

11   A    General, not specific.

12   Q    Well, Mr. Ryan, as general counsel of the MPD, you

13   understand what a crime scene is, correct?

14   A    Yes.

15   Q    And you understand that one of the first things that you

16   do at a potential crime scene is to secure the scene so it's

17   not contaminated, correct?

18   A    Yes.

19   Q    Did you take any efforts to treat this as a potential

20   crime scene?

21   A    I was waiting for the investigator to arrive.

22   Q    And that's the full extent of what you did?

23   A    Yes, because nothing was happening that I can remember

24   to, you know.  I didn't see anybody touch that computer.  But

25   again I was out of the room for a while.

1    Q    Right.  After the investigator or agent, as the judge

2    referred to it, arrived, what did he do next?

3    A    I sort of told him what we were doing and he just sat

4    there.  I don't know if he had a notebook with him.  I think

5    afterwords I asked, had he ever generated any reports or

6    notes, and he said, no, he didn't have any.

7    Q    Now, when you said you told him what you were doing, what

8    did you tell him you were doing?

9    A    That we were attempting to recover data in a civil case

10   and that the person who had been retained from NC4 to do it

11   had informed us that it appeared that someone was attempting

12   to delete it.

13   Q    Now, you had just stated that you had conveyed that this

14   was a potential crime.  Did you convey that to the

15   investigator that this was a potential criminal matter?

16   A    I don't know if I said that.  I really don't.

17   Q    Do you think that would be relevant when an investigator

18   comes on a scene to tell him that he's dealing with a

19   potential crime as opposed to a computer problem?

20   A    Well, IAD typically comes when there's a potential crime

21   involved.  And then, if it turns out to be administrative,

22   they might send it to the unit that is involved to do the

23   administrative investigation.  That's been my experience.

24   Q    So, in your view, IAD doesn't investigate non criminal

25   matters?

1    A    Generally speaking, they don't, but there are some,

2    certainly some instances when they do.

3    Q    But do you recall ever explaining to him the nature of

4    this potential crime, that there are pending court orders and

5    years of hearings and investigations?  Did you explain that

6    to the investigator so he knows the context in which he is

7    investigating this?

8    A    I don't think I talked about the court orders, no.

9    Q    Did you talk about the litigation?

10   A    I may have said something to him to put it in the

11   context, but I don't really remember.

12   Q    Did you mention there is a special master, a federal

13   special master, a federal judge, investigating this matter?

14   A    I don't remember that.

15   Q    So, what did he do after you explained it to him,

16   whatever you explained about the circumstances?  What did he

17   do after that?

18   A    I know that we sent Bynum out to get lunch at some point

19   because we were waiting.  And then he wasn't going to be able

20   to do anything further with the device that day.  Then later

21   on in the day, we briefed the chief of police about it.

22             THE COURT:  Who is the we in that sentence?

23             THE WITNESS:  That would have been Shana and Monique

24   and myself.

25

1   BY MR. TURLEY:

2   Q   Let me go at that briefly in a second.  You remember

3   Bynum's likely lunch.  But do you remember anything else as

4   the general counsel at the scene that was done by the

5   investigator?

6   A   No.

7   Q   Did you issue any orders for your staff to assist the

8   investigator, seal off the scene, take any specific action in

9   your power to assist him?

10  A   No.

11  Q   Now are you aware that, at some point after the

12  investigator or agent arrived, Assistant Chief Anzallo had

13  stated that he believed that the IAD should not perform an

14  investigation due to the special master's involvement?

15  A   Yes.

16  Q   So in fact, isn't it true that there was never an IAD

17  investigation of this case?

18  A   I learned that subsequently, yes.

19          THE COURT:  Now IAD came and you summoned them

20  because they have a particular responsibility for potential

21  criminal behavior by police officers?

22          THE WITNESS:  Yes.

23          THE COURT:  And therefore it follows as the night to

24  day that since everyone, or since most of the people who had

25  access to the computer were employed by the Metropolitan

1   Police Department, this felt peculiarly within IAD's

2   responsibility?

3            THE WITNESS:  Yes.

4            THE COURT:   Thank you.

5   BY MR. TURLEY:

6   Q    Now, just before I get to the briefing of the chief, at

7   this point, and the point I'm talking about is the agent

8   arriving and at the scene, you were still at the scene when

9   he arrived, correct?

10  A    Yes.

11  Q    How long did you linger there or how long were you there?

12  A    Oh, I don't remember the time span.

13  Q    Could you give me an idea of an hour, two hours, the

14  whole day?

15  A    We were there for a good portion of the day.

16  Q    What were you watching or what were you doing?

17  A    Waiting.

18  Q    Waiting for what?

19  A    You mean after the agent came?

20  Q    Yes, that was my question.

21  A    Actually, I don't remember what we were doing after that.

22  Q    You have no recollection of what you were doing after an

23  investigator came in a potential crime scene?

24  A    I don't know if we asked, if we shut down the room, not

25  shut down the room but left the room to go brief the chief

1   about what was happening.  I don't remember quite frankly.

2           THE COURT:  Well, but does Bynum do anything to

3   either shut the system down or to keep it operating and

4   prevent its being shut down?

5           THE WITNESS:  I think there was some real concern at

6   the time, judge, because these were ancient servers.

7           THE COURT:  We've heard that.

8           THE WITNESS:  That, if they started them, there was

9   a real question whether they, once you got them -- even, A,

10  could you get them started.  And B, once they started, were

11  they going to continue functioning.  So, they wanted to keep

12  them rolling.  I remember that.

13          THE COURT:  So Bynum makes the decision to keep them

14  rolling, not to shut them off?

15          THE WITNESS:  I don't know that it was Bynum that

16  did that but --

17          THE COURT:  Right.  But a decision is made.  You

18  would agree with me, the only person in that room who has

19  technical competence is Bynum.  Right?

20          THE WITNESS:  No, I think he was the specialist that

21  was hired from NC4 to come and recover the data.

22          THE COURT:  All right.  Who else was --

23          THE WITNESS:  There were other people, like Officer

24  Steven Bias, who knew how to make the computer function.

25          THE COURT:  Right.  Well does Bias make the decision

1    to keep them on?

2              THE WITNESS:  I don't remember who did that.  But I

3    remember some of that discussion.

4              THE COURT:  All right.  Now how much time elapses

5    between your calling the agent and your going to wherever you

6    have to go to brief the chief?

7              THE WITNESS:  An hour or two.

8              THE COURT:  But we know Bynum went for lunch?

9              THE WITNESS:  Bynum left the room at some point.

10   When he came, we didn't allow him to do any of the work that

11   he needed to do to recover the data that day.

12             THE COURT:  Right, but --

13             THE WITNESS:  And it was the next day, Judge, that

14   we actually contacted you.  I think it was around 11:00 in

15   the morning.  There was a conference call.  And I think you

16   got on.  It started around 11:10, and that was on the 5th.

17   And then you got on at about 11:15 if I remember correctly.

18   And you, you know, listened to Monique's representations

19   about what was happening.

20             And you gave us some explicit instructions about

21   making sure that the back-up server, because there were two

22   servers, one was a production server and one was a back-up

23   server.  You had directed us to preserve the back-up server

24   in violate.  Not to let anything happen to that one.  You

25   instructed us to go ahead and make an image of the production

1   model and make sure that that's made available, and in a

2   format, if I remember correctly, that a person without

3   specific computer knowledge would be able to understand or

4   work with the material.  And you said put it on a DVD or put

5   it on a hard drive, whatever was the appropriate way to do

6   it.

7              It was one other thing that you directed us to do.

8   But at that point, we were then able to go forward and make

9   the image of the document, excuse me, of the server.

10              THE COURT:  Thank you.

11              MR. TURLEY:  Thank you, Your Honor.

12   BY MR. TURLEY:

13   Q   Let me return you then to the scene.  When the agent

14   arrives and you're still there, correct?

15   A   Yes.

16   Q   Okay.  Now, at that point, you've indicated that you

17   believe there was a potential crime here.  Correct?

18   A   Yes.

19   Q   Now, you gave us a list of people that you thought might

20   have been responsible.  I'm not going to have you repeat that

21   list.  But all of those people were either officers or

22   employees of the MPD, were they not?

23   A   Yes, I think that's correct.

24   Q   And you stated that you don't know beyond those people

25   specifically who else could have had access, correct?

1    A    No, I didn't.

2    Q    So, the potential crime we were discussing here might

3    have been committed by any number of people who were in the

4    building at that time, correct?

5    A    Correct.

6    Q    Okay.  Now, are you aware that Mr. Bynum accessed the

7    system that day or was it your understanding that he didn't

8    access the system any more that day?

9    A    He was able to tell us that the data was there.  But I

10   don't remember if this was before or after he reveals that

11   someone attempted to delete it.

12   Q    Let me show you what is Exhibit 24.  This is from the

13   District.  This is the amended and supplemental responses and

14   objections to plaintiff's second set of interrogatories.  And

15   you can see the cover page, the heading on your screen.  I

16   actually want to just direct your attention to Page 10, in

17   the middle of a paragraph on Page 10.  And I'll read it to

18   you and perhaps you can see where I'm reading.  Let me wait

19   for it to get up on the screen.

20        Okay.  And you'll see in the middle of the

21   paragraph, there's a line that says, "Later that day, after

22   Mr. Bynum accessed the E team server and was able to

23   determine that all of the running resume was on the server,

24   Assistant Chief Anzallo decided not to open a formal IAD

25   investigation because he was aware of published reports in

1    the press that U.S. Magistrate Judge, Judge Facciola, was

2    conducting an investigation at the direction of U.S. District

3    Judge Emmet Sullivan into the discovery activities in the

4    Chang case including September 2002 IMF JOCC running resume."

5    Do you see that?

6    A    Yes.

7    Q    Does that refresh your memory?  Do you recall that?

8    A    Yes.

9    Q    So, is your recollection that, later in that very day,

10   Bynum accessed the system?

11   A    Yes.

12   Q    Were you present?

13   A    I probably was, yes.

14   Q    Once again, I'm going to have to ask you, you say you

15   probably were.  Do you have any recollection of being

16   present?

17   A    Yes, I was there.

18   Q    Okay.  And who else was there when he accessed the system

19   for the second time?

20   A    Well, when you say access the system for the second time,

21   he would have gotten into the system at the beginning of the

22   day.

23   Q    That would be the first time?

24   A    Right.  And so it wasn't -- he was already in the system.

25   Q    Okay.  So --

1    A    So he didn't access it a second time.

2    Q    When you said he was already in the system, are you

3    suggesting that the system, that the page had remained on the

4    screen that entire time and was just left there?

5    A    I can't answer that.  I don't know.

6    Q    Well, I'm trying to understand because you wanted to

7    stress the importance that he didn't access it a second time.

8    Is it your understanding that he didn't actually go into the

9    system again?  It was just there?

10   A    I don't know how to answer the question.  I'm not a

11   technician.  I don't know what the computer was doing.

12   Q    What are you trying to convey by saying that you weren't

13   comfortable with the idea of accessing the system a second

14   time?

15   A    All I wanted to communicate was that the system had been

16   fired up, was running.  They used the password that Steven

17   Bias had to get into the system.  And then, some time during

18   the course of that process, he is opening up folders and

19   trying to find stuff.  And it's when he says, you know, he

20   opens up that World Bank IMF folder and says, you know, at

21   some point, but it's -- I don't know.  I'm not a computer

22   technician, whether the system is there and he can now tell

23   us that the data is there or not.  It's just there.

24   Q    Now, is that a description of the first review before the

25   IAD call or is that later in the day?

1   A    That's at the beginning of the day, before IAD.

2   Q    So, you say that you know you were present later in the

3   day.  Had you, had you left the room between those two

4   events?

5   A    I think so.  But obviously I had to leave the room to go

6   make the phone call.

7   Q    And that's the only recollection you have between the

8   event in the morning that you just described and this event

9   later in the day with Mr. Bynum?

10   A    Yes.

11   Q    So you have no recollection of your movements between

12   those two events?

13   A    Not really.

14   Q    Did you consider this a serious issue, one that required

15   serious action on your part?

16   A    Yes.  And alerting Internal Affairs was the action that I

17   took.

18   Q    So you can't remember if, when you came back to the room

19   later in the day or what brought you there when Bynum, as

20   referenced here, quote, accessed the E system server?

21   A    Not really, no.

22          MR. CAUSEY:  Your Honor, may I raise an objection

23   please?

24          THE COURT:  Sure.

25          MR. CAUSEY:  I think, with all due respect,

```
 1    Mr. Turley is misconstruing that sentence.  If you read the

 2    sentence, it says, Later that day, comma, after Mr. Bynum had

 3    accessed the system.  Later that day refers to the actions of

 4    Assistant Chief Anzallo, not Mr. Bynum.

 5         MR. TURLEY:  Your Honor, I would object.  This is a

 6    speaking objection.  If he can raise it --

 7         THE COURT:  I can read it.

 8         Mr. Ryan, look at the phrasing again.  Let's see if

 9    you can help us here.

10         Anzallo informs LoJacono of your request.  LoJacono

11    sends Altieri to your room.  Then you say, later that day,

12    after Bynum accessed the server.  That's the timing there is

13    a bit jumbled.  It wasn't later that day when Bynum accessed

14    the E team server.  He had started the day by accessing the E

15    team server.

16         THE WITNESS:  Correct.

17         THE COURT:  So the chronology of events are, Bynum

18    accesses the E team server and finds the, what he thinks, is

19    the running resume?

20         THE WITNESS:  Yes.

21         THE COURT:  But he tells the people in that room

22    there has been an effort to delete the data?

23         THE WITNESS:  Correct.

24         THE COURT:  You learn that Altieri shows up?

25         THE WITNESS:  Yes.
```

1          THE COURT:  And Mr. Turley is trying to figure out

2     and so am I, now we're at that point in the day.  We have

3     some business about Bynum going for lunch.  The question is,

4     now that Altieri has come and gone, what happens next?  Does

5     Bynum continue to work to find whatever he can on this

6     system?

7          THE WITNESS:  I don't know if he was doing any

8     additional work, Judge.  I can't remember today.

9          THE COURT:  So then you have no specific

10    recollection of anyone in that room, including yourself,

11    issuing an interdiction against continuing to do anything

12    until a decision is made as to what to do with this server,

13    whether made by Altieri, Chief Lanier or somebody named

14    Facciola, right?

15          THE WITNESS:  Right.

16          THE COURT:  But we won't know if Bynum went back on?

17          THE WITNESS:  I don't really remember, Judge.

18    BY MR. TURLEY:

19    Q    To continue that, when you just stated that you remember

20    later in the day being with Bynum, you no longer have that

21    recollection?

22    A    Again, it's a, it was a long time ago now.  And I really

23    have no specific recollection.

24    Q    All right.  But you did say that you have recollection,

25    and correct me if I'm wrong, I believe you said of briefing

1    the chief with Ms. Frost and Ms. Pressley.  Was that your

2    previous testimony?

3    A    Again, I don't know if it was that day or the next day

4    because there was a hearing.  No, I'm thinking of the July

5    hearing now.  Excuse me.

6              THE COURT:  This is May.

7              THE WITNESS:  Yeah, this is May.  We definitely

8    briefed the chief of police or I did.  I think we all did.

9    BY MR. TURLEY:

10   Q    That day?

11   A    Yes.

12   Q    And your general recollection is then Ms. Pressley and

13   Ms. Frost was with you at that time?

14   A    I think so.

15   Q    Now, is this the same meeting that you had with Assistant

16   Chief Anzallo?

17   A    No.

18   Q    So, there is a separate briefing that occurred with the

19   chief with Frost and Pressley.  Was that before the meeting

20   with Anzallo and the chief or after?

21   A    Before.

22   Q    Okay.  Did you go to the chief's office or was it by

23   phone?

24   A    I don't remember.  Probably went to her office, but I

25   don't really remember.

1    Q    And do you recall what you informed the chief of at that

2    time?

3    A    That there was a potential problem with someone

4    attempting to delete information from the computer.

5    Q    And by potential problem, did you tell the chief that

6    this problem was a potential criminal problem?

7    A    I don't know if I said that.

8    Q    Well, how did you describe the problem?

9    A    That someone attempted to delete the information.

10   Q    And did you explain what the information was?

11   A    The resume.

12   Q    And did you explain the importance of the resume to the

13   federal court?

14   A    No, I didn't.  Do you mean to the chief?

15   Q    Yes.

16   A    No, I'm sorry.  I don't remember that being discussed,

17   no.  But she was aware of the efforts that had been made over

18   the years to locate the resume.

19   Q    And so what was her reaction?

20   A    I don't remember her reaction.

21   Q    So you went and told the chief of a potential criminal

22   matter, and you don't remember the reaction of the chief of

23   police?

24   A    Well, she was, you know, okay, thank you very much.  And

25   now we're going to, I've alerted IAD.  They've come.  And

1   then later in the day, there is a meeting with, I'm called up

2   to the office with the chief and Anzallo.

3   Q    Okay.  I'll get to that in a second.  So your

4   recollection is she said, okay, thank you very much?

5   A    Again, I don't remember her specific response.

6   Q    But that was your recollection generally of how she

7   responded?

8   A    I think she was concerned because of what was, the

9   allegation that the information had been deleted.

10  Q    When you say, I think she was concerned, did she express

11  something that gave you that impression?

12  A    I don't remember.

13  Q    You have no recollection?

14  A    No.

15  Q    Do you recollect her giving you any specific orders at

16  that time?

17  A    Not today, no, I don't.

18          THE COURT:  Did she ask any questions that you

19  recall?

20          THE WITNESS:  Not really, Judge, because I had

21  already alerted IAD.

22          THE COURT:  Did she speak to whether this should be

23  reported to Sullivan or Facciola?

24          THE WITNESS:  No, I don't remember that at all.

25          THE COURT:  Did either name come up?

1          THE WITNESS:  No, that I remember, Judge.  Again, I

2     don't remember the exact conversation, but definitely later

3     in the evening.

4          THE COURT:  We'll get to that, but the first

5     briefing, there is no discussion of whether or not to do

6     anything besides the IAD investigation?

7          THE WITNESS:  Again, I don't remember the exact

8     conversation.

9          THE COURT:  But your views are not sought by the

10    chief as to whether some formal report should be made by her

11    or anyone else as to what was learned that day?

12         THE WITNESS:  No, I mean, I knew at some point there

13    was going to be a report made to the Court.  I knew that.

14         THE COURT:  But there was no discussion.  Now, when

15    you were briefing the chief, are attorneys for the District

16    of Columbia sitting next to you?

17         THE WITNESS:  Again, Judge --

18         THE COURT:  Do Frost and Pressley come with you?

19         THE WITNESS:  I think so, but I really don't

20    remember.

21         THE COURT:  And in their presence or otherwise, does

22    anyone in that room discuss the necessity of reporting this

23    to the Court to Sullivan or Facciola or both?

24         THE WITNESS:  Again, I don't remember that.

25         THE COURT:  Thank you.

1            MR. TURLEY:  Thank you, Your Honor.

2   BY MR. TURLEY:

3   Q   Now, just to clarify one thing, the chief, this was a

4   regular day for the chief as you recall, correct?

5   A   Yes.

6   Q   And you understood that she was meeting with lots of

7   different officers and employees on different matters that

8   day?

9   A   I didn't know what her schedule was, but, yeah, she is a

10  very busy woman.

11  Q   And that's typical, she meets with lots of folks around

12  the MPD during any given working day?

13  A   Yes, uh-huh.

14  Q   You said yes?

15  A   Yes, I'm sorry.

16  Q   Now, you had just stated that you had this long list of

17  possible people that might have attempted to delete it and

18  that the list was probably longer and that some of these

19  people could be in the building.  Did you warn the chief that

20  the possible person responsible might be an MPD employee or

21  officer?

22  A   I have no recollection of doing that, no.

23  Q   So as far as you knew, she could be meeting with the

24  person that was responsible for this, correct?

25  A   She could have.

```
1    Q   Did you ask for an order from her as chief of police to

2    seal off the area and take steps necessary to make sure that

3    no one tampered further with the evidence if they had

4    tampered with it?

5    A   I knew at some point afterwards that an order had been

6    given by the chief of police to seal that room.  But I don't

7    remember when that occurred.

8    Q   But did you inform her of some of the people that you did

9    think of as possible persons that might have caused this

10   deletion so she knew about it as chief of police?

11   A   No, I don't think I mentioned any names.

12   Q   How long after this briefing with, that you generally

13   recall with Ms. Frost and Ms. Pressley did you have the

14   meeting with Assistant Chief Anzallo and the chief of police?

15   A   That was much later in the day.  Probably I was called

16   up, I'm guessing somewhere after 6:30 or so, or between 6:30

17   and 7:00 P.M.

18   Q   Now, in that interim, between that earlier briefing and

19   that meeting, was it your understanding that the Office of

20   Attorney General would take any action, specific action?

21   A   Well, there was going to be a conference call with the

22   judge, but I don't remember -- that's Judge Facciola, sorry.

23   But I don't remember if that was discussed before that

24   meeting on not with Monique and Shana Frost, Monique Pressley

25   and Shana Frost.
```

1    Q    So did you give any orders to the Office of Attorney

2    General as to actions that needed to be taken before your

3    meeting with the, the second meeting with the chief and

4    Assistant Chief Anzallo?

5    A    No, I didn't give any orders to the Attorney General.

6    Q    Okay.  Now, you said that this meeting with Anzallo and

7    the chief occurred later that evening.  Do you have an idea

8    of when it was?

9    A    Between 6:30 and 7:00 approximately.

10   Q    6:30 and 7:00, and who arranged that meeting?

11   A    I was called upstairs.

12   Q    So it wasn't you?

13   A    No.

14   Q    Who called you?

15   A    I don't know if it was the chief herself or Anzallo, but

16   I was told to come up to the 5th floor.

17   Q    Were you told what it was about?

18   A    No.

19   Q    And so, you get this call and you go up to the fifth

20   floor right away or was it later that evening?

21   A    No, I went right away.  Whenever they called me, it was

22   probably about 6:30 or so, and I went right upstairs.

23   Q    Did you have an inkling about what it was about?

24   A    I presumed it was related to this, but I didn't know.

25   Q    And why did you presume that?

```
1    A    Because that was a hot topic.

2    Q    When you say hot topic, can you explain, it was a hot

3    topic in conversation or could you explain that?

4    A    It was a hot topic because of the potential deletion of

5    the data.

6    Q    So you go up to the fifth floor and who else was, if

7    anyone, was in the meeting besides the chief and Assistant

8    Chief Anzallo?

9    A    Just the three of us that I remember.

10   Q    So you go into the chief's office.  Did you close the

11   door behind you?

12   A    The door may have been closed, but I don't really

13   remember that.  Sometimes it's opened.  Sometimes it's

14   closed.

15   Q    Was Chief Anzallo already there?

16   A    Yes.

17   Q    So, what occurred after you entered the room?

18   A    We had a brief discussion about where things were, what

19   was going to be happening.  And the chief was obviously

20   anxious about the whole thing.  I know that Anzallo, that

21   they both, Anzallo was explaining why he thought we should

22   not be doing an investigation because of the potential that

23   it would be perceived that the government, which is accused

24   of not producing the information or losing the information,

25   shouldn't be investigating this, roughly speaking.  Not exact
```

1    words.

2    Q    And did you have anything to say to that effect?

3    A    I listened, acknowledged that.

4    Q    When you say acknowledged that, you agreed --

5    A    I understood.  I didn't say I agreed.  I understood what

6    they were saying, yes.

7    Q    They didn't solicit your opinion?

8    A    I don't remember if they asked my opinion.

9    Q    So, did you view your presence there as primarily to

10   receive an order or instructions?

11   A    It was just to discuss what was happening, what was going

12   to go on.

13   Q    Did you discuss this personally?  Did you make any

14   statements?

15   A    I may have said a couple of things.  But I don't remember

16   what I would have said.  No, not today.

17   Q    You have no recollection of what you told the chief and

18   Assistant Chief in that meeting about this potential crime?

19   A    Not really, no, no.

20   Q    Now, before I ask you a little more about what Anzallo

21   said, I just wanted to tack back on one question.  And that

22   is you had earlier discussed how you briefed the chief with

23   possibly Ms. Frost and Ms. Pressley, right?

24   A    Uh-huh, yes.

25   Q    Whose idea was that?

```
 1    A    I don't know if, probably my idea but -- it was just to

 2    keep her apprised of what was going on.

 3    Q    Why did you think you had to keep her apprised?

 4    A    It was a important issue.

 5    Q    And why was it an important problem?

 6    A    Because it was a potential problem in the litigation.

 7    Q    And it's true it was also a potential crime, correct?

 8    A    Could have been, yes.

 9    Q    Now, did you also take steps to brief Chief Lanier or the

10    chief of police staff about the allegations by Captain Herold

11    and Officer Strader that your office had switched books in

12    terms of the Strader document?

13    A    I don't agree with your characterization that we switched

14    books, but no, I didn't.

15    Q    Let's take a step back, because I don't want my

16    characterization to get in the way of your testimony.  You

17    were aware that Officer Strader said the book that was shown

18    to him by Ms. Quan was not the book that he gave your office,

19    correct?

20    A    Yes.

21    Q    And you are aware, are you not, that Officer Strader said

22    that he saw you with the book that he had delivered on the

23    day of your tour.  Are you aware now that he said that?

24    A    Yes, yes.

25    Q    Okay.  And you're also aware that Capt. Herold then
```

1    separately said, indeed that is not the Strader document,

2    correct?

3    A    I don't know if he said it's indeed not the book, but he

4    said that's not the one that he remembered bringing.

5    Q    And what's the distinction that you're trying to draw

6    there?

7    A    You said indeed not the book.

8            THE COURT:  He doesn't like indeed.

9            MR. TURLEY:  Okay.  I'm sorry.

10   BY MR. TURLEY:

11   Q    So, when you were informed at some point that two

12   respected officers had said that your office had presented a

13   book different from the one that they either gave to Capt.

14   Herold or gave to your office, did you call the chief to

15   brief the chief that these allegations had been made?

16   A    No.

17   Q    Now, let me ask you this.  Would you believe that it's --

18   if these officers are correct, would you agree that

19   substituting a book, if it was intentional of this kind,

20   would constitute a potential crime?

21   A    It could I guess, sure.

22   Q    You guess.  You don't think that's clearly a potential

23   crime?

24   A    It could be.

25   Q    So you didn't feel on that potential crime that you had

1    to inform the chief?

2    A    Again, I didn't think it was a crime, because I didn't

3    think the book was the exact book that was delivered to my

4    office.

5    Q    And you weren't told by anyone else that maybe we should

6    brief the chief that we've got two officers saying that the

7    original book has disappeared?

8    A    No.

9    Q    At any time you were not told that a briefing was

10   necessary?

11   A    At any time what?  I'm sorry.

12   Q    After Herold and Strader had made clear their position,

13   you don't have any recollection of anyone saying we need to

14   go brief the chief because this could be a potential crime or

15   an act of contempt?

16   A    No, I don't remember doing that.

17   Q    When you said, I don't remember doing that, I just want

18   to make sure because my question was whether you remember

19   anyone else suggesting a briefing?

20   A    I don't remember anybody saying that, no.

21   Q    Thank you.

22        So, we were there with Assistant Chief Anzallo, and

23   you had stated that he didn't think that an IAD investigation

24   should be launched, correct?

25        THE COURT:  This is with the briefing with Lanier at

```
 1    6:30?
 2           THE WITNESS:  Right, that night on the third.  Yeah,
 3    I didn't get the distinct impression that there was going to
 4    be no investigation.  He, I got the impression from both that
 5    we should not be doing this investigation.
 6    BY MR. TURLEY:
 7    Q    Why did he take that position?
 8    A    I'm sorry?
 9    Q    Why did he take a position that it wouldn't be right for
10    the IAD to do an investigation?
11    A    Again, I think because of the potential perception that
12    there would be a conflict with the agency that is suspected
13    of having tampered with or destroyed it would be
14    investigating it.
15    Q    Now, before he said that, had you raised that issue?
16    A    He didn't say it like that, but that's my
17    characterization of it.
18    Q    Before he said something along those lines, had you
19    previously raised this issue of the appearance of impropriety
20    of effectively that the MPD investigating itself in this
21    matter?
22    A    No, because in the world that I live in, when there is
23    perceived misconduct within the agency, you are obligated to
24    report that to Internal Affairs, and that's what I did.
25    Q    And so this concern, you didn't have this concern that
```

```
1    Assistant Chief Anzallo had?

2    A    No.

3    Q    Okay.  Now, I may be wrong in this, but didn't Assistant

4    Chief Newsham have some role in internal investigations

5    during his career at the MPD?

6    A    He was in charge of Internal Affairs at one time, yes.

7    Q    Do you remember when he was in charge of internal

8    affairs?

9    A    I don't remember the exact dates, no.

10   Q    Was it relatively close to this event or overlapping this

11   event?

12   A    It was during the event that he was in charge of Internal

13   affairs.  The event that we're referring to is the September

14   2002, correct?

15   Q    No, no, I'm talking about the, when this, when the

16   discovery of the potential deletion occurred.

17   A    Oh, no, he was not in Internal Affairs then.

18   Q    I'm trying to understand.  How long before that do you

19   think he had stopped being the head of the Internal Affairs?

20   A    I don't remember the exact date.

21   Q    Was it a matter of years, months?

22   A    This was in 2009?  I really don't know.

23   Q    But he had been the head of this office, correct, at the

24   time?

25   A    Correct, he was.  Yes, before that.
```

1   Q    And some of the folks at this office may have been his

2   subordinates, correct?

3   A    Yes.

4   Q    And yet, and you knew he was a defendant in this case,

5   correct?

6   A    I did.

7   Q    And yet that didn't raise any concerns with you?

8   A    No.

9   Q    Why not?

10  A    Because most of the people in the police -- I think all

11  of the people in the police department are men and women of

12  integrity and they'll do the job.

13  Q    Even though at that point you said that whoever tried to

14  delete information of the server, a potential crime, was

15  possibly a member of the MPD?

16  A    Yes, could have been.

17  Q    Now, did Assistant Chief Anzallo say anything beyond his

18  view that it wouldn't be appropriate for IAD to investigate.

19  Was there any other thing that was discussed in this meeting?

20  A    No, that's what I remember from it.

21       THE COURT:  Did Anzallo tell Lanier he was a

22  defendant in this case?

23       THE WITNESS:  Anzallo is not a defendant.

24       THE COURT:  No, the gentleman he was talking to.

25       MR. TURLEY:  Newsham?

1              THE COURT:  Newsham, did he tell him that Newsham

2      was a defendant in the case?

3              THE WITNESS:  I don't remember that being discussed.

4              THE COURT:  Thank you.

5      BY MR. TURLEY:

6      Q   So there was nothing else discussed in your memory except

7      that an investigation by IAD would not be appropriate?

8      A   Right.

9      Q   And what did Chief Lanier say?

10     A   She agreed with him.

11     Q   And that's it?  Just no investigation, no one else do

12     anything?

13     A   No, no, no, no, you misunderstand.  Earlier I think I

14     said, and if I didn't let me make it clear, that Chief

15     Anzallo was advocating that this had to be referred to the

16     Court because it was their case, their matter.  He was aware

17     of that, and that's where it should go.

18     Q   And was there any discussion of alerting the FBI or

19     taking any other effort besides informing Judge Facciola?

20     A   Not that day, the next day.

21     Q   Now, what's happening to the server right now?  It's

22     6:30.  What's happening to the server?

23     A   It's in a secured room on the first floor of the police

24     headquarters.

25     Q   Is that the same room you left from earlier in the

1    morning?

2    A    Yes, uh-huh.

3    Q    When you say it's secured, it's because, as you described

4    earlier, only officers can get into that area?

5    A    Actually, you have to have a special card to be able to

6    get into the area.

7    Q    Now, did you confirm that the server had been

8    disconnected from the monitor?

9    A    No, I think it was still -- actually, I don't know.  I

10   think it was still running though.

11   Q    So, your meeting with Chief Lanier that night and

12   Assistant Chief Anzallo says this is not something that we

13   should be investigating.  And to your knowledge, at that time

14   it is still downstairs hooked up to a monitor and running?

15   A    I believe so, because I don't think it was turned off

16   until after the judge gave us the order the next day.  Then

17   we spent the next, up until mid day the following day

18   actually trying to extract the data or image the server, I

19   should say, image the hard drive.

20   Q    So as far as you know, anybody could have sat down and

21   seen the screen that had been brought up from the server?  As

22   far as you know, they could have done that, right?

23   A    I thought the room was secured when we left.

24   Q    I didn't ask about secure room, because we don't know who

25   is getting into the room.  I'm saying if it's running, as far

1   as you know, anyone could have sat down and seen what was on

2   the screen, correct?

3   A    Anything is potential, potentially possible, sure.

4   Q    But that didn't raise any concerns with you?

5   A    No, because it was in a secured area.

6   Q    And by the way, you would view that, your response in

7   allowing it to continue to run in that way in that room, you

8   would consider that to be a professional and appropriate act,

9   position for your subordinates as well, correct?

10  A    I'm not sure I understand the context.

11  Q    That is, the idea of leaving potential criminal evidence

12  running, connected to a monitor, you view it as entirely

13  appropriate, correct?

14  A    Again, in the context of that server being an ancient

15  device that was potentially risky to turn it on and off, that

16  I was informed it may not start, it may not stop.  If you

17  turn it off again, it may not be able to start again, that

18  was a real concern of mine.  Because then, if we got into a

19  position where that device couldn't function any more, then

20  we would then be accused of tampering with the evidence

21  again.  So once it's up and running, you've got to let it

22  run.

23  Q    Okay, let's look at that statement.  First of all, you

24  keep on referring to this as an ancient device.  And since

25  this was device was used when I was involved in this case, I

1    might be overly sensitive, but this is a computer server that

2    existed in 2002, correct?

3    A    Yes.

4    Q    And you just stated you are not an expert in computers,

5    right?

6    A    I am not.

7    Q    So apparently somebody informed you that there was a huge

8    risk of your turning off the server and removing it?

9    A    There was a risk that it would not start.  There was a

10   risk it may not continue to run.  And so there was a risk

11   that, if you turned it off, it may not start again.

12   Q    And you're not basing that on your knowledge because you

13   just said you're not a computer expert, right?  Who told you

14   that?

15   A    It was probably George Crawford who was present.  I don't

16   know if the Officer Steven Bias, who has some knowledge about

17   computers, whether he made any comments like that.  But I

18   definitely got the impression that there was risk involved.

19   Q    So you distinctly remember at least someone in that room

20   telling you don't turn off this server, leave it as it is?

21   A    Yes.

22   Q    But you don't recollect who?

23   A    No, I don't.

24         THE COURT:  But computer expert or not, you are

25   aware that, if a computer is operating and you shut it off

1    suddenly, you may obliterate what was previously on the

2    screen?

3            THE WITNESS:  That's a potential problem.

4            THE COURT:  And you appreciate then, when you start

5    it up again, that may be gone?

6            THE WITNESS:  Correct.

7            THE COURT:  Were you conscious of that problem as

8    well?

9            THE WITNESS:  I don't know if I was thinking about

10   that judge, but.  Because I'm relying on the computer people

11   to be the ones that know that.

12   BY MR. TURLEY:

13   Q   Now, at this point, you said you were aware that it was

14   downstairs running.  You were also aware, as you said, that

15   there were people in the building that could have been

16   responsible for the deletion.  Since it was running, did you

17   give orders for someone to stand at the door or change the

18   code so no one could go into that room?

19   A   I think the chief of police had at some point that day

20   given a direction that nobody was to enter that room.

21   Q   Now, I just asked you whether the chief of police had

22   given any orders.  Now was that, you believe that the, an

23   order was in fact given by Chief Lanier that day?

24   A   But not to me that I remember, no.  But I found out

25   subsequently that, when George Crawford let us back into the

1    room, she was not happy because she had given a direction

2    that nobody, and that included me, should be in that room.

3    Q   But you did not ask for that order?

4    A   No.

5    Q   And in fact you weren't aware of the order?

6    A   No, I wasn't.

7    Q   When did you become aware of the order?

8    A   I don't remember the day, but I know that George Crawford

9    was facing some difficulties because he let us back in the

10   room.

11   Q   What type of difficulties?

12   A   Potential discipline but nothing happened to him that I

13   remember.

14   Q   And who did he allow into the room?

15   A   Myself, Monique, I think Shana, but I don't remember

16   when.

17   Q   But was this order given between your briefing with Frost

18   and Pressley and the meeting you had with Anzallo?

19   A   I don't know when the order was given.

20   Q   Was it given that day?

21   A   I don't know when the order was given.

22            THE COURT:  Who was the source of the order again

23   please?  Who gave the order?

24            THE WITNESS:  I believe it was the chief.

25            THE COURT:  When you say you believe it was a chief,

```
 1    did someone put a sign on the door, by order of?

 2            THE WITNESS:  No, I think the order was given to

 3    Crawford.

 4            THE COURT:  And Crawford said don't let anybody in

 5    this room, Lanier says that.  And then Crawford gets in

 6    trouble later because he disobeys the order.

 7            THE WITNESS:  Yes.

 8            THE COURT:  But the source of the order is not

 9    Anzallo.  It's the chief herself?

10            THE WITNESS:  I think so.

11    BY MR. TURLEY:

12    Q   But you don't remember if it was that day or another day?

13    A   No.

14    Q   Well, when did you, you said Crawford got in trouble for

15    letting you and, did you say, Pressley into the room?

16    A   And I think Shana the next day.

17    Q   And Frost the next day?

18    A   I think it was on the 5th, because we were going down

19    there.  And then we were going to brief.  There was going to

20    be a conference call with you, Judge, at 11:00 or

21    thereabouts.  That was the 4th.

22    Q   So you finish your meeting in the evening with Assistant

23    Chief Anzallo and Chief Lanier.  And the only things you

24    recall, correct, is a decision that Judge Facciola -- can we

25    call it a decision?  Was there an order to inform Judge
```

1    Facciola?

2    A    No, I think just the Court, the judge.  I don't know if

3    they were thinking of Judge Sullivan more than Judge

4    Facciola.

5    Q    But you distinctly remember that you were given a

6    direction to inform the Court, correct?

7    A    I hesitate to say that I was given a direction.  I think

8    it was more the discussion in the sense that that the Court

9    should be informed about this.

10   Q    Well, Mr. Ryan, when the chief of police is standing

11   there with her general counsel and the head of IAD and says

12   someone has to inform the Court, you didn't view that as a

13   reference to you?

14   A    No, the Attorney General's office.

15   Q    But the Attorney General's office wasn't there, was it?

16   A    No.

17   Q    And Anzallo was just the head of the IAD, right?

18   A    Yes, that's correct.

19   Q    So Anzallo wasn't in the habit of informing federal

20   courts, correct, of anything?

21   A    No, nor am I.

22   Q    So, was it your impression that frankly this was just an

23   expression that nobody was expected to act upon?

24   A    No, but everybody knew that there was going to be a

25   communication between the Attorney General's office and the

1    Court at some point.

2    Q    How did everyone know that?

3    A    Because we knew we had to inform the Court.

4    Q    But how do you know that that notice would be given?

5    A    I'm not sure I understand your question.  How do I know

6    that notice would be given?

7    Q    Well, you said everyone understood the Court would be

8    informed.  The chief says Court should be informed.  There

9    are only two people in the room with the chief.  And you

10   said, well, we all knew that the Court would be informed.

11   How did you know that?

12   A    Because the Office of the Attorney General would be

13   communicating with the Court at some point.

14   Q    And was that discussed with the chief that the OAG had

15   already said they would inform the Court?

16   A    No, I don't remember that being discussed.

17   Q    So once again, how would you know that the Court would be

18   informed if you didn't know at that point that the OAG was

19   going to do it?

20   A    Because I, working with the Attorney General's office, I

21   would assume that they would be informing the Court.

22   Q    Why did you assume that at that meeting?

23   A    Because it was important.

24   Q    Had you discussed this with the OAG?

25   A    I knew that there was going to be a conference call the

1    next day.

2    Q    So, it was your assumption that the Court would be

3    informed the next day?

4    A    I didn't know when they would do it, but I was expecting

5    it to be the next day.

6    Q    And the chief didn't express any particular concern that

7    this, that the Court be informed and that this be done?

8    A    No, she, as I described earlier, she said yes, and she

9    agreed with Assistant Chief Anzallo that this should be

10   referred to the Court.

11   Q    Did she basically say, look, just inform the court at

12   some time or did she say this needs to be done immediately?

13   A    I don't remember the exact words, no.

14   Q    But it wasn't your impression that she was saying I want

15   this done as soon as possible?

16   A    No, I didn't have that impression as soon as possible.

17   Q    Now, are you a D.C. Bar member by the way?

18   A    Yes.

19   Q    In addition to being general counsel, you're a D.C. Bar

20   member.  And you're aware that Judge Facciola is

21   investigating this.  Did you believe that you had an

22   obligation as a member of the Bar to inform the Court?

23   A    Well through the Office of the Attorney General, sure.

24   Q    What steps did you take that night to be assured that

25   this would occur the following morning?

1  A   I didn't take any steps that night.

2  Q   What steps did you take before the conference call to

3  ensure that Judge Facciola would be informed?

4  A   I didn't take any steps.

5  Q   Why didn't you?

6  A   Because I was relying on the Attorney General's office to

7  communicate with the Court.  I don't communicate directly

8  with the Court.

9  Q   But you had not communicated to the OAG to make that

10  disclosure, had you?

11  A   I didn't ask them to do it the next day, no.

12  Q   So, Mr. Ryan, how could you be confident that the

13  disclosure would be made?

14  A   I knew eventually it would be disclosed.

15  Q   By eventually, do you mean that day?

16  A   No.

17  Q   So you didn't think that it was important that the Court

18  be informed, if not the day of the discovery, during the

19  telephone conference?

20  A   I didn't know what Attorney General's office was going to

21  communicate to the Court.

22  Q   I didn't ask that.  I asked whether you believed that it

23  was essential or important that the Court be informed no

24  later than the next day in the telephone conference?

25  A   I think it would be important for the Court to be

1    notified.  I don't know if it has to be that day or the next

2    day.  I don't know that that is necessarily the important

3    thing.  I think the Court needed to be informed.

4    Q    Eventually?

5    A    And the Court was informed.

6    Q    When was that the Court informed?

7    A    In July.

8    Q    And you considered that to be fast enough?

9    A    Not my position.

10   Q    I didn't ask for your position.  I'm asking for your

11   view.  Did you believe that informing Judge Facciola the

12   following July was sufficiently responsive to that meeting

13   with Chief Lanier?

14   A    I don't know that I have a formal opinion about that, not

15   really.  I think it was important to inform the Court.  I

16   don't know if it was important to inform them the day of the

17   event, or the next day or 30 days because, by that time, we

18   had already had the judge's direction to preserve the

19   evidence.  The evidence was preserved.

20   Q    All right.  By the way, just to make clear, do you think

21   Chief Lanier took the same position that, as long as the

22   Court was informed that any, you know, at some point like in

23   July --

24   A    No, I think the chief was probably expecting it to be

25   done fairly quickly.

```
1    Q    Is she your boss?

2    A    Yes, she is.

3    Q    So, she made it clear that she wanted it done quickly,

4    but you didn't feel that you were under a directive to do

5    that?

6    A    I said I think she probably felt it should have been done

7    quickly.  I don't remember being directed to do it quickly.

8              THE COURT:  And the it in this sentence is to tell

9    Facciola or Sullivan or both of them that IAD had concluded

10   it would not investigate the possibility that a member of the

11   police department or a person employed by the police

12   department had attempted to delete the data?

13             THE WITNESS:  No, judge, because I didn't think that

14   the IAD investigation had actually stopped.  I was not aware

15   of that.

16             THE COURT:  Right, but you said it.  I'm trying to

17   parse the word it.  What is Sullivan or Facciola going to be

18   told?

19             THE WITNESS:  The alleged tampering, I'm sorry.

20             THE COURT:  All right.  But there are two things

21   that happened on that day as I understand it.  Bynum finds

22   what he believes is the data, the E team data.  And he also

23   says there seems to be an effort to delete, right?

24             THE WITNESS:  Yes.

25             THE COURT:  The decision is made to tell Facciola
```

1    the first but not the second; is that right?

2            THE WITNESS:  I don't know that it was a decision

3    not to tell you.

4            THE COURT:  Well, we don't know if it was a

5    decision, Mr. Ryan.  But you would agree with me that's in

6    fact what occurred?

7            THE WITNESS:  Yes.

8            THE COURT:  Because when somebody calls me the next

9    day, nobody says anything to me about attempting to delete

10   the data?

11           THE WITNESS:  Right.

12           THE COURT:  So sometime between Bynum's uttering of

13   the words, there's been an attempt to delete the data, and

14   the phone call to Facciola, somebody on earth makes the

15   decision not to tell Facciola of the attempt to delete the

16   data?

17           THE WITNESS:  Right.

18           THE COURT:  Madam clerk, may I see you?

19           (There was a pause in the proceedings.)

20           THE COURT:  10 minutes please, 11:15.

21           (A brief recess was taken.)

22   BY MR. TURLEY:

23   Q   Before we took the break, you had, correct me if I'm

24   wrong, you had said at the time of the telephone conference

25   with the Court that following day that we've been discussing,

```
1   you were not aware that the IAD investigation was not

2   proceeding; is that correct?

3   A   Correct.

4   Q   So you thought that there was still an IAD investigation

5   going on?

6   A   Yes.

7   Q   But the night before you had just said that the Chief and

8   Assistant Chief Anzallo had decided that it would not be

9   appropriate to have an IAD investigation?

10  A   But, again, my recollection was that we shouldn't be

11  doing not that we are not going to do it.

12  Q   Did you feel like you were under any obligation as the

13  general counsel to specifically understand what it was the

14  chief was deciding?

15  A   I don't know that I would say that it was a decision.  It

16  was a discussion.  All I knew that I needed to do during that

17  day was to inform the Internal Affairs division that there

18  was a potential matter that required their investigation.

19  And I was under the impression when I left the meeting that,

20  yes, we should not be doing it.  But not that we were not

21  doing it.

22  Q   And as general counsel, you didn't feel that you were

23  under an obligation in that meeting to confirm who was going

24  to inform the Court, or confirm that there was no IAD

25  investigation proceeding?
```

1   A    No.

2   Q    What was your role in that meeting?

3   A    They called me upstairs just to discuss what was

4   happening that day and what their understanding was, and I

5   didn't understand or realize that they were not going to

6   investigate it.  I learned that subsequently.

7   Q    But you clearly understood that the chief did not want an

8   IAD investigation, correct?

9   A    When the Court was going to be informed, then it was

10   going to be up to the Court to decide who should be

11   conducting the investigation.

12   Q    But was there any doubt in your minds at that meeting

13   that the chief had said that she does not want an IAD

14   investigation?

15   A    I was under the impression we shouldn't be doing it, not

16   doing it.

17   Q    So you didn't feel she felt strongly about that?

18   A    Well, I think she probably had strong feelings.

19   Q    When you say probably, did you think that she felt

20   strongly about that?

21   A    Yes.

22   Q    So she conveyed her strong view that no IAD investigation

23   would go forward to the head of the IAD.  And the head of the

24   IAD said that he didn't think an IAD investigation should go

25   forward, but you thought it probably did continue to go

1   forward?

2   A   I don't remember being told it was not going to go

3   forward.

4   Q   And you didn't ask?

5   A   No.

6   Q   Is that something that, as the general counsel, you

7   should probably know?

8   A   I was under the impression it was going to continue until

9   the Court was informed.

10   Q   So what does it take then for the chief to get you to

11   take action?  What was missing here?  Did she have to say,

12   Mr. Ryan, do X, Y and Z for you to take action?

13   A   No, not necessarily, depends on the circumstances and

14   what we're talking about and what needs to be done.

15   Q   So, where did she go wrong in this conversation?  What

16   does she fail to do to get you to take action?

17   A   She didn't fail to do anything.

18   Q   But you just said that she strongly wanted the IAD

19   investigation not to go forward and for the Court to be

20   informed.  What else should she have done to make sure that

21   you did those two, guaranteed those two things?

22   A   I don't know that she was counting on me to do it.  I was

23   under the impression that it was going to be the Office of

24   the Attorney General when they were communicating with the

25   Court, because I don't communicate directly with the Court.

1    Q    Okay.  So after the meeting, you communicated to the OAG

2    for them to immediately inform the Court of this discovery?

3    A    I didn't say immediately.  I said inform the Court.

4    Q    Oh, so you did tell the OAG?

5    A    No, I didn't say that.  I don't have a recollection of

6    discussing that after the meeting that night with Monique

7    Pressley or Shana Frost.

8    Q    Do you recall before the telephone conference ever

9    telling the OAG, we have to inform the Court immediately and

10   there will be no IAD investigation?

11   A    Again, I didn't know there was going to be no IAD

12   investigation.  I was under the impression at least that that

13   investigation was open and, at a minimum, sitting there

14   waiting until the Court was informed.

15   Q    All right.  Let's separate those two positions then.  Did

16   you take any action after the meeting with the chief of

17   police and before the telephone conference with Judge

18   Facciola to say the chief wants the judge informed?

19   A    I don't know if I said that directly in my conversations

20   with the Attorney General's office.

21   Q    You have no recollection at all?

22   A    I don't recall saying that directly.  I know we had

23   discussions about what we were going to do the next day with

24   the judge.  That was either that morning before the

25   conference call.

```
 1   Q    But what was your understanding of what would happen

 2   before the judge?

 3   A    That's not my call about what OAG is going to communicate

 4   to the Court.

 5   Q    So, it's not your call to determine what the OAG is going

 6   to tell the Court.  But it's also not your call to confirm

 7   with your boss that these two strong views on her part are

 8   carried out?

 9   A    I knew eventually they would be carried out.

10   Q    How did you know that?

11   A    Because once the Attorney General's office informed the

12   Court, the Court was going to then make a decision about what

13   we should do next.

14   Q    And did you tell the Office of Attorney General that this

15   is what the chief wanted?

16   A    Again, I don't remember saying those words, no.

17   Q    How about any words that conveyed that information?

18   A    No, I don't remember that.

19          THE COURT:  If I may, when the meeting with the

20   chief adjourns, you go home for the evening?

21          THE WITNESS:  I probably went back to my office for

22   a while.

23          THE COURT:  All right.

24          THE WITNESS:  I don't remember what time I left the

25   office that night.
```

1          THE COURT:  Do you recall the first moment at which

2     you communicated after that with a member of the Attorney

3     General's office?

4          THE WITNESS:  No, I don't remember that today,

5     Judge.  It could have been the next morning.

6          THE COURT:  It's about 7 o'clock in the evening?

7          THE WITNESS:  Yes.

8          THE COURT:  All right.  There then comes a time the

9     next day we know where a conference call was held with

10    Facciola?

11         THE WITNESS:  Yes.

12         THE COURT:  Between those two events, to whom did

13    you speak in the Attorney General's office?

14         THE WITNESS:  I probably spoke both with Shana and

15    Monique.

16         THE COURT:  At the same time or at different times?

17         THE WITNESS:  I don't remember, Judge.

18         THE COURT:  What did you say to them?

19         THE WITNESS:  I don't have a recollection of the

20    specific discussions we had.

21         THE COURT:  All right.  Well, did you communicate to

22    them, as Mr. Turley just indicated, that you had received

23    directions from the chief of police as to what to be done?

24         THE WITNESS:  I probably told them, although I don't

25    really remember saying this, that the chief and Anzallo were

1  not, did not think this would be a good idea for MPD to

2  conduct the investigation.

3       THE COURT:  Did you have a discussion with Pressley

4  and with Frost as to whether Facciola should be told that

5  Bynum had detected an effort to delete something?

6       THE WITNESS:  I don't remember a specific

7  conversation where you should be told.

8       THE COURT:  All right.  Me or Sullivan?

9       THE WITNESS:  Not really, no.

10      THE COURT:  Not really.  So between your departing

11  from Lanier's and Anzallo meeting and when the call is made

12  to Facciola, did you communicate to Frost or Pressley or

13  anyone else in the Attorney General's office that Facciola

14  should be told something and what he should be told?

15      THE WITNESS:  Yes, I think we did have a discussion

16  about that.

17      THE COURT:  And what was that discussion?

18      THE WITNESS:  I don't remember the exact words, but,

19  you know, I was always under the impression that at some

20  point the Attorney General's office was going to communicate

21  this to you.

22      THE COURT:  Communicate what?

23      THE WITNESS:  That there was a potential deletion of

24  information in the server.

25      THE COURT:  So you thought that in the conversation

1   that would be held in May, the day after this meeting,

2   somebody would tell Facciola, A, Bynum believes he has

3   detected the presence on the server of the E team data, and,

4   B, he has also detected an attempt by someone to delete data?

5         THE WITNESS:  Yes.

6         THE COURT:  And you thought, after you spoke to

7   Frost and Pressley, Facciola would be told both?

8         THE WITNESS:  Yes.

9         THE COURT:  Thank you.

10  BY MR. TURLEY:

11  Q   But in fact, Judge Facciola wasn't told for 70 days;

12  isn't that correct?

13  A   Yes, that's correct.

14  Q   But you said that, in your view, he could be just

15  informed eventually.  You didn't believe he had to be

16  informed the next day, right?

17  A   It wasn't my decision when to inform him.

18  Q   But you testified earlier that you thought that he could,

19  as long as he was informed eventually, you didn't see why it

20  had to be the next day, right?

21  A   Because, by that time, the server had been isolated.

22  Remember there are two servers and they had been preserved.

23  So there was no risk at that point, from my perspective, that

24  the evidence that would be necessary for the investigation

25  had been compromised.

1          THE COURT:  Excuse me.  That is pursuant to

2     Facciola's order, right, that preservation?

3          THE WITNESS:  Yes, Judge.

4          THE COURT:  And you would appreciate that, Mr. Ryan,

5     if I had not been told of the effort to delete it, my order

6     doesn't take that into account in any way?

7          THE WITNESS:  Yes, I understand that.

8          THE COURT:  Did that concern you?

9          THE WITNESS:  That day, I don't know that I really

10    thought about that, no.

11         THE COURT:  So now, after the phone conversation to

12    Facciola in May, you know two things.  Facciola has been told

13    that the E team data has been retrieved or at least Bynum

14    believes it is.

15         THE WITNESS:  Yes.

16         THE COURT:  And Facciola issues certain orders with

17    reference to its continued preservation?

18         THE WITNESS:  Yes.

19         THE COURT:  Those orders are complied with?

20         THE WITNESS:  Yes.

21         THE COURT:  But there is this loose end?

22         THE WITNESS:  Yes.

23         THE COURT:  Facciola has not been told that Bynum

24    has detected that someone tried to delete the data?

25         THE WITNESS:  Correct.

1          THE COURT:  Does it concern you that nobody told

2     Facciola that?

3          THE WITNESS:  Yes.

4          THE COURT:  Did you ever express that concern to

5     Pressley or Frost?

6          THE WITNESS:  I don't know if I said it that way.

7          THE COURT:  Well, did you have occasion to speak to

8     Pressley and Frost and say, could you please tell me why

9     Facciola was told A but not B?

10          THE WITNESS:  No, I don't remember doing it that

11     way.

12          THE COURT:  Did you ever consider calling

13     Mr. Nathan, the Attorney General of the District of Columbia,

14     to express your concerns?

15          THE WITNESS:  No.

16          THE COURT:  Were you concerned that what the chief

17     had directed had not been accomplished?

18          THE WITNESS:  No, in the sense that the next day,

19     Judge, my recollection is, Sylvan Altieri, the detective from

20     Internal Affairs, wondered, and this is the day that you had

21     given us the direction, whether he should come back.  And I

22     distinctly remember that we said, no, I don't think it's

23     necessary for you to come back now because we're just going

24     to be following your orders to replicate the server, you

25     know, to create the image.

1          THE COURT:  But at that point there are now people

2     in the Attorney General's office and you who know that

3     Facciola does not know of the attempt to delete it?

4          THE WITNESS:  Yes.

5          THE COURT:  I thought the chief had directed that

6     Facciola was to be told that?

7          THE WITNESS:  Yes, the Court was supposed to be

8     informed.

9          THE COURT:  Okay.  The Court, this is the Court.

10    I'm Facciola, okay?

11         THE WITNESS:  Yes.

12         THE COURT:  Did someone say tell Facciola?  I know

13    my name is hard to pronoun.  But did it occur to someone to

14    tell Facciola?

15         THE WITNESS:  Again, Judge, it was the Office of the

16    Attorney General communicating with you, not me.

17         THE COURT:  Okay.  Thank you.

18         MR. TURLEY:  Judge, I should note that, as we drill

19    down on this issue, new information has come out.  And

20    despite my respect for Ms. Frost, she may be now a potential

21    witness, and she is in the room listening to the testimony.

22         THE COURT:  She will leave the room.

23         Ms. Frost, you must leave.

24         (There was a pause in the proceedings.) (Ms. Frost

25    exits the room).

 1              THE COURT:  Before you go any further, Mr. Turley,

 2      Mr. Ryan, I want to say this.  Do you feel any need to

 3      consult with counsel of your own choosing other than Mr.

 4      Causey?

 5              THE WITNESS:  I don't know, Judge, do I need to take

 6      a break?

 7              MR. CAUSEY:  Your Honor, may we take a break?

 8              THE COURT:  I think it would be a very good idea,

 9      11:45.

10              (A brief recess was taken.)

11              THE COURT:  Yes, Mr. Causey.  Did you want to

12      address the Court?

13              MR. CAUSEY:  Your Honor, yes.  In light of the

14      Court's suggestion, during the break I communicated with my

15      office.  And it is our considered recommendation that Mr.

16      Ryan obtain independent counsel at this point.  We have

17      advised Mr. Ryan of that fact.  He's agreed with that.  In

18      light of this development, we would ask that we suspend for

19      the balance of the day.

20              THE COURT:  All right.  Now let's, so that we do

21      this all at once, will you give similar guidance to Ms. Quan,

22      Ms. Frost and Ms. Pressley?

23              MR. CAUSEY:  We will certainly discuss that, Your

24      Honor.

25              THE COURT:  I believe you must.

1          MR. CAUSEY:  I hear the Court.

2          THE COURT:  All right.  Because it is now my

3   intention, whatever my original intentions were, to now hear

4   from Frost and Pressley as well as Quan.  And if Frost and

5   Pressley feel the need to consult with counsel, I would

6   appreciate that they would do so, and you would advise me on

7   what lawyers will be entering their appearance.

8          MR. CAUSEY:  Ms. Pressley does have counsel.

9          THE COURT:  I know.  All right.

10         MR. CAUSEY:  Your Honor, it would also be our

11  recommendation that we retain the schedule for November 28

12  and 29.

13         THE COURT:  Unquestionably.

14         MR. CAUSEY:  I think that's an independent issue.

15         THE COURT:  But I wish you -- 'you' to use the word

16  collectively -- that we would all give some thought to the

17  applicability of the crime forward exception to any work

18  product or attorney/client privilege claim.

19         MR. CAUSEY:  I understand.

20         THE COURT:  I assure you I will begin thinking about

21  that over the weekend.  And I may ask for supplemental briefs

22  on that issue.

23         MR. CAUSEY:  Your Honor, we will advise the Court as

24  expeditiously as possible as to --

25         THE COURT:  These people have the unequivocal right

1    to consult with counsel of their own choosing.  Also, Mr.

2    Causey, I don't think it concerns Ms. Braswell.  But,

3    Mr. Causey, you have ethical obligations with reference to

4    making sure that their interests are fully protected because

5    your interests in protecting the District of Columbia may now

6    deviate from their protections.

7            MR. CAUSEY:  I understand.

8            THE COURT:  So you have ethical obligations as well

9    that have to be complied with.  All right.  With reluctance

10   we will adjourn for the day.  I will be in touch with counsel

11   soon with further orders about any supplemental briefing.  Is

12   that acceptable?

13           Anything else to come before the Court?

14           MR. TURLEY:  Thank you, Your Honor.

15           THE COURT:  We have the understanding and Mr. Ryan

16   will have to discuss these issues with any counsel he

17   retains.  And that will not be in any way a violation of any

18   obligation he has not to discuss this with anyone else until

19   he resumes his testimony.  Do we all have that understanding?

20   Ms Braswell, does everybody, is that acceptable to everyone?

21           MR. TURLEY:  We do, Your Honor.

22           THE COURT:  Thank you, good day.

23           (Whereupon, at 11:51 a.m. the hearing concluded.)

24

25

C O N T E N T S

| **WITNESS** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |

(Plaintiff)

TERRANCE RYAN

By Mr. Turley      4

ooOoo

EXHIBITS

PAGE:

Plaintiffs:

47, 48 and 49            16

ooOoo

CERTIFICATE OF REPORTER

    I, Lisa Walker Griffith, certify that the foregoing

is a correct transcript from the record of proceedings in the

above-entitled matter.

_____     _____

Lisa Walker Griffith                   Date

**'**
'OH [1] 12/24
'you' [1] 93/15

------------------------X [1] 1/7
------------------------X [1] 1/2

**0**
02-2010 [1] 3/2
02-2010-EGS-JMF [1] 1/5
070 [1] 18/14
09 [1] 5/20

**1**
10 [4] 21/18 46/16 46/17
 80/20
1000 [1] 2/18
10:00 [1] 23/23
11 [1] 19/11
1155 [1] 1/17
11:00 [2] 44/14 73/20
11:10 [1] 44/16
11:15 [2] 44/17 80/20
11:45 [1] 92/9
11:51 [1] 94/23
13 [1] 30/1
14 [1] 30/1
1400 [1] 2/18
16 [1] 95/11
1828 [1] 2/10

**2**
20 [1] 21/18
200 [1] 2/14
2000 [2] 1/13 4/19
20001 [2] 1/23 2/4
20004 [1] 1/18
20005 [1] 2/18
2002 [11] 4/19 10/6 13/15
 13/15 13/19 17/4 18/13
 18/17 47/4 65/14 70/2
2003 [2] 13/18 14/12
20036 [1] 2/10
20052 [1] 1/13
2009 [6] 5/5 5/9 5/9 5/12 6/4
 65/22
2010 [1] 3/2
2011 [2] 17/2 17/2
2012 [1] 1/8
202 [7] 1/14 1/18 1/24 2/4
 2/7 2/11 2/19
20530 [1] 2/7
21 [1] 14/12
22030 [1] 2/14
24 [1] 46/12
26 [1] 18/12
27 [4] 4/19 10/6 17/4 18/12
270 [1] 2/10
28 [2] 18/12 93/11
29 [2] 6/4 93/12

**3**
30 [5] 22/2 22/5 22/17 27/23
 78/17
300 [1] 19/10
3050 [1] 2/14
30TH [1] 5/12
31 [1] 5/9
3247 [1] 1/24
354-3247 [1] 1/24

**4**
434-5103 [1] 2/18
441 [1] 2/3
47 [5] 5/17 16/19 16/20
 16/21 95/11
48 [5] 6/2 16/19 16/20 16/21
 95/11
49 [6] 14/4 14/5 16/19 16/20
 16/21 95/11
4TH [2] 2/3 73/21

**5**
508-6000 [1] 1/18
510 [1] 5/17
514-7226 [1] 2/7
555 [1] 2/6
5TH [3] 44/16 58/16 73/18

**6**
6000 [1] 1/18
6333 [1] 2/11
6507 [1] 1/23
6610 [1] 2/4
6:30 [7] 57/16 57/16 58/9
 58/10 58/22 64/1 67/22
6TH [1] 2/3

**7**
70 [1] 88/11
700 [1] 1/17
7001 [1] 1/14
703 [1] 2/15
7226 [1] 2/7
724-6610 [1] 2/4
7480 [1] 2/15
76 [2] 14/4 14/6
7:00 [3] 57/17 58/9 58/10

**8**
822-6333 [1] 2/11
865-7480 [1] 2/15

**9**
9-30-09 [1] 5/20
9103 [1] 2/9
994-7001 [1] 1/14
9:30 [2] 1/8 23/23

**A**
A-L-T-I-E-R-I [1] 27/3
A.M [2] 1/8 94/23
AAG [2] 2/2 2/2
ABILITY [1] 29/17
ABLE [9] 17/22 21/23 40/19
 45/3 45/8 46/9 46/22 68/5
 69/17
ABOUT [62] 7/19 9/2 9/12 9/22
 9/24 10/4 10/24 12/1 15/24
 18/20 19/25 20/16 20/19
 20/21 22/17 24/9 24/22 25/6
 25/9 26/25 31/8 32/5 32/16
 40/8 40/9 40/16 40/21 42/7
 43/1 44/17 44/19 44/20 51/3
 57/10 58/7 58/22 58/23
 58/23 59/18 59/20 60/18
 60/20 61/10 65/15 68/24
 70/16 71/9 74/8 74/9 80/9
 82/17 82/20 83/14 84/23
 85/3 85/12 85/17 86/6 87/16
 89/10 93/20 94/11
ABOVE [1] 95/20
ABOVE-ENTITLED [1] 95/20
ABSOLUTELY [2] 20/6 22/10
ABUSE [1] 12/4
ACCEPTABLE [2] 94/12 94/20
ACCESS [12] 29/1 29/15 29/16
 30/2 30/5 33/19 41/25 45/25
 46/8 47/20 48/1 48/7
ACCESSED [8] 46/6 46/22
 47/10 47/18 49/20 50/3
 50/12 50/13
ACCESSES [1] 50/18
ACCESSING [2] 48/13 50/14
ACCOMPLISHED [1] 90/17
ACCOUNT [1] 89/6
ACCURATE [1] 25/23
ACCUSED [3] 8/12 59/23 69/20
ACKNOWLEDGE [1] 37/19
ACKNOWLEDGED [2] 60/3 60/4
ACT [4] 37/12 63/15 69/8
 74/23
ACTION [18] 1/5 3/2 6/11 6/14
 6/19 7/5 8/17 25/8 25/19
 41/8 49/15 49/16 57/20
 57/20 83/11 83/12 83/16
 84/16
ACTIONS [2] 50/3 58/2
ACTIVITIES [1] 47/3
ACTUAL [1] 25/4
ACTUALLY [20] 11/16 11/24
 15/22 17/5 17/8 19/21 22/14
 23/4 23/12 29/13 36/11 37/6
 42/21 44/14 46/16 48/8 68/5
 68/9 68/18 79/14
ADDITION [1] 76/19
ADDITIONAL [1] 51/8
ADDRESS [2] 11/1 92/12
ADJOURN [1] 94/10
ADJOURNS [1] 85/20
ADMINISTRATIVE [2] 39/21
 39/23
ADMINISTRATOR [1] 18/14
ADMIT [1] 16/15
ADMITTED [3] 16/17 16/20
 16/21
ADMITTEDLY [1] 34/8
ADVISE [2] 93/6 93/23
ADVISED [1] 92/17
ADVISES [1] 33/15
ADVOCATING [1] 67/15
AFFAIRS [15] 22/14 22/15 23/1
 23/18 25/4 25/15 49/16
 64/24 65/6 65/8 65/13 65/17
 65/19 81/17 90/20
AFTER [31] 15/16 18/9 26/16
 27/16 33/15 36/21 38/6 39/1
 40/15 40/17 41/11 42/19
 42/21 42/22 46/10 46/21
 50/2 50/12 52/20 57/12
 57/16 59/17 63/12 68/16
 84/1 84/6 84/16 86/2 88/1
 88/6 89/11
AFTERMATH [1] 9/19
AFTERWARDS [1] 57/5
AFTERWORDS [1] 39/5
AGAIN [32] 7/21 7/23 9/12
 10/1 26/10 26/19 38/2 38/25
 47/14 48/9 50/8 51/22 52/3
 54/5 55/1 55/7 55/17 55/24
 63/2 64/11 69/14 69/17
 69/17 69/21 70/1 71/5
 72/22 75/17 81/10 84/11
 85/16 91/15
AGAINST [2] 8/18 51/11
AGENCY [2] 64/12 64/23
AGENT [20] 25/5 25/14 25/18

**A**

AGENT... [17] 25/22 26/2 26/8
26/23 28/17 32/24 33/2
33/23 33/24 35/12 35/13
39/1 41/12 42/7 42/19 44/5
45/13
AGO [1] 51/22
AGREE [6] 12/24 36/4 43/18
61/13 62/18 80/5
AGREED [5] 60/4 60/5 67/10
76/9 92/17
AGREEING [1] 12/16
AGREES [1] 5/9
AHEAD [3] 8/2 21/3 44/25
AL [3] 1/3 1/6 3/3
ALERT [3] 25/10 25/20 37/14
ALERTED [3] 28/16 53/25
54/21
ALERTING [4] 25/15 26/1 49/16
67/18
ALEX [1] 4/1
ALEXANDER [1] 2/13
ALL [48] 7/19 10/6 10/11
10/13 10/23 16/14 17/25
19/14 19/15 20/4 21/2 22/19
27/6 29/10 29/13 33/5 34/8
35/12 36/21 37/21 43/22
44/4 45/21 46/23 48/15
49/25 51/24 52/8 54/24
66/10 69/23 75/10 78/20
79/20 81/16 84/15 84/21
85/23 86/8 86/21 87/8 92/20
92/21 93/2 93/9 93/16 94/9
94/19
ALLEGATION [1] 54/9
ALLEGATIONS [10] 7/20 8/13
10/16 11/9 11/20 11/22 12/3
16/7 61/10 62/15
ALLEGED [1] 79/19
ALLOW [2] 44/10 72/14
ALLOWING [1] 69/7
ALONG [1] 64/18
ALREADY [8] 10/15 26/9 47/24
48/2 54/21 59/15 75/15
78/18
ALSO [18] 2/17 10/5 12/10
16/1 18/4 18/16 18/20 24/10
30/24 61/7 61/9 61/25 71/14
79/22 85/6 88/4 93/10 94/1
ALTHOUGH [1] 86/24
ALTIERI [8] 26/25 27/4 27/11
50/11 50/24 51/4 51/13
90/19
ALTIERI's [1] 27/2
ALWAYS [1] 87/19
AM [3] 51/2 70/6 74/21
AMENDED [1] 46/13
AMERICA [2] 1/6 3/3
ANCIENT [3] 43/6 69/14 69/24
ANNA [1] 29/4
ANOTHER [5] 11/3 16/9 29/6
29/6 73/12
ANSWER [7] 15/19 28/10 30/4
31/13 34/1 48/5 48/10
ANXIOUS [3] 4/3 4 59/20
ANY [55] 10/9 11/17 15/24
21/12 24/18 25/19 28/18
33/17 35/7 37/18 38/19 39/5
39/6 41/7 41/8 44/10 46/3
46/8 47/15 51/7 54/15 54/18
56/12 57/11 57/20 58/1 58/5
60/13 63/9 63/11 63/13 66/7
66/19 67/18 67/19 69/4
69/19 70/17 71/22 75/6 77/11
77/4 78/22 81/7 12 82/10
84/16 85/17 89/6 92/1 92/2
93/17 94/11 94/16 94/17
94/17
ANYBODY [6] 33/21 34/25
38/24 63/20 68/20 73/4
ANYONE [21] 27/8 31/7 32/1
33/14 33/17 33/17 34/19
35/8 35/8 35/13 38/5 51/10
55/11 55/22 59/7 63/5 63/13
63/19 69/1 87/13 94/18
ANYTHING [21] 33/2 33/15
33/19 33/22 34/5 35/1 38/9
40/20 41/3 43/2 44/24 51/11
55/6 60/2 66/17 67/12 69/3
74/20 80/9 83/17 94/13
ANZALLO [47] 23/15 23/16
23/17 24/2 25/2 26/16 26/20
27/15 31/19 31/20 37/7 37/9
37/11 37/22 38/5 41/12
46/24 50/4 50/10 52/16
52/20 54/2 57/14 54/58/6
58/15 59/8 59/15 59/20
59/21 60/20 63/22 65/1
66/17 66/21 66/23 67/15
68/12 72/18 73/9 73/23
74/17 74/19 76/9 81/8 86/25
87/11
APPARENTLY [2] 15/6 70/7
APPEARANCE [4] 3/19 5/18
64/19 93/7
APPEARANCES [2] 1/11 2/1
APPEARED [1] 39/11
APPEARS [1] 24/5
APPLICABILITY [1] 93/17
APPRECIATE [4] 34/18 71/4
89/4 93/6
APPRISED [2] 61/2 61/3
APPROPRIATE [8] 7/2 9/10 45/5
66/18 67/7 69/8 69/13 81/9
APPROXIMATELY [4] 19/24 22/4
22/5 58/9
ARE [41] 3/20 5/11 5/24
15/21 16/20 18/12 19/15
19/16 19/23 20/2 20/4 20/5
32/7 32/13 37/19 40/1 40/4
41/11 46/6 48/2 48/12 50/17
55/9 55/15 61/21 61/21
61/23 62/18 64/23 66/11
70/4 70/24 75/9 76/17 79/20
81/11 85/7 88/22 89/19 91/1
94/4
AREA [4] 13 23/5 29/5 57/2
68/4 68/6 69/5
AROUND [6] 22/5 27/20 30/16
44/14 44/16 56/11
ARRANGED [1] 58/10
ARRIVAL [1] 28/11
ARRIVE [2] 27/8 38/21
ARRIVED [12] 26/24 27/12
27/13 27/14 27/16 28/2
36/25 37/1 37/2 39/2 41/12
42/9
ARRIVES [6] 32/24 32/25 33/9
33/9 35/13 45/14
ARRIVING [1] 42/8
AS [78] 4/16 5/3 5/17 6/8
6/11 7/1 7/10 9/5 9/16 10/6
10/19 12/11 12/23 16/5 18/6
23/14 28/18 29/15 29/22
32/7 34/20 36/1 38/12 38/19
39/1 39/19 41/3 41/23 49/19
51/12 55/1 10 55/11 56/4
56/25 56/23 57/1 57/9 57/10
58/2 60/9 68/3 68/20 68/20
68/21 68/22 68/25 69/1 69/9
69/12 69/24 70/20 71/7
71/14 74/12 76/8 76/15
76/15 76/16 76/16 76/22
78/21 78/21 79/21 81/12
81/22 83/6 86/22 86/23 87/4
88/19 88/19 91/18 93/4 93/4
93/23 93/24 93/24 94/8
ASIDE [2] 28/6 35/22
ASK [25] 25/14 25/18 25/24
25/25 26/16 26/17 26/19
26/20 30/5 30/8 31/15 37/21
47/14 54/18 57/1 60/20
62/17 68/24 72/3 77/11
77/22 78/10 83/4 92/18
93/21
ASKED [12] 7/18 9/24 12/25
22/12 25/7 32/18 35/10 39/5
42/24 60/8 71/21 77/22
ASKING [4] 12/1 30/9 37/6
78/10
ASSIGN [1] 25/22
ASSIGNED [1] 29/19
ASSIST [2] 41/7 41/9
ASSISTANCE [1] 37/15
ASSISTANT [24] 5/23 22/13
23/15 23/17 24/2 24/9 27/15
38/5 41/12 46/24 50/4 52/15
57/14 58/4 59/7 60/18 63/22
65/1 65/3 66/17 68/12 73/22
76/9 81/8
ASSUME [2] 75/21 75/22
ASSUMED [1] 26/2
ASSUMING [1] 26/6
ASSUMPTION [1] 76/2
ASSURANCE [2] 28/25 29/5
ASSURE [1] 93/20
ASSURED [1] 76/24
ATTACHED [2] 21/21 21/25
ATTEMPT [10] 22/1 22/8 30/24
32/17 33/16 33/16 80/13
80/15 88/4 91/3
ATTEMPTED [7] 18/15 24/6
25/11 46/11 53/9 56/17
79/12
ATTEMPTING [4] 39/9 39/11
53/4 80/9
ATTENTION [3] 6/3 6/5 46/16
ATTORNEY [37] 2/3 5/23 7/7
7/9 7/19 8/4 9/8 11/19 12/2
12/2 12/4 16/6 16/9 31/11
57/20 58/1 58/5 74/14 74/15
74/25 75/12 75/23 76/2 83/3
77/6 77/20 83/24 84/20
85/11 85/14 86/2 86/13
87/13 87/20 90/13 91/2
91/16 93/18
ATTORNEY's [1] 12/6
ATTORNEY-CLIENT [1] 31/11
ATTORNEY/CLIENT [1] 93/18
ATTORNEYS [5] 2/6 7/1 7/16
32/3 55/15
AUSA [1] 2/5
AUTHORIZATION [1] 29/23
AUTHORIZED [1] 29/18
AVAILABLE [2] 30/8 45/1
AWARE [27] 5/11 6/19 7/6
8/10 8/12 9/25 15/21 17/3
17/5 17/6 41/11 46/6 46/25

## A

AWARE... [14] 53/17 61/17
61/21 61/23 61/25 67/16
70/25 71/13 71/14 72/5 72/7
76/20 79/14 81/1
AWAY [3] 34/16 58/20 58/21

## B

BACK [18] 28/12 29/12 31/22
34/5 34/16 36/23 44/21
44/22 44/23 49/18 51/16
60/21 61/15 71/25 72/9
85/21 90/21 90/23
BACK-UP [3] 44/21 44/22 44/23
BACKUP [1] 17/10
BALANCE [1] 92/19
BANK [2] 18/12 48/20
BANTERING [1] 29/12
BAR [3] 76/17 76/19 76/22
BASIC [2] 7/8 8/6
BASICALLY [1] 76/11
BASING [1] 70/12
BE [133]
BEACH [1] 29/3
BECAUSE [67] 10/8 11/3 11/8
11/12 11/21 11/23 12/19
12/24 18/19 18/23 19/16
21/22 23/4 25/15 26/23
29/25 34/10 34/13 35/2 35/4
38/23 40/19 41/20 43/6
44/21 46/25 48/6 52/4 54/8
54/20 59/1 59/4 59/22 61/6
61/15 63/2 63/14 63/18
64/11 64/22 66/10 67/16
68/3 68/15 68/24 69/5 69/18
70/12 71/10 72/1 72/9 73/6
73/18 75/3 75/12 75/20
75/23 77/6 78/17 79/13 80/8
83/25 85/11 88/21 90/23
93/2 94/4
BECOME [1] 72/7
BEEN [61] 4/17 6/13 8/12
9/10 9/19 9/22 10/15 11/3
11/20 11/21 15/17 16/3 17/3
17/5 17/6 18/17 19/1 19/20
21/22 22/8 24/10 26/18
28/23 29/18 31/3 31/4 32/8
32/16 33/20 37/8 39/10
39/23 40/23 45/20 46/3
48/15 50/22 53/17 54/9 57/5
59/12 61/8 62/15 65/23 66/1
66/16 68/7 68/21 71/15 79/6
80/13 80/25 86/5 88/21
88/22 88/25 89/5 89/12
89/13 89/23 90/17
BEFORE [32] 1/10 6/17 13/20
27/20 28/1 28/2 32/19 36/24
37/1 38/5 42/6 46/10 48/24
49/1 52/19 52/1 57/23 58/2
65/25 77/2 80/23 81/7 84/8
84/17 84/24 85/2 92/1 94/13
BEGIN [1] 93/20
BEGINNING [6] 3/6 6/10 21/15
21/16 47/21 49/1
BEHALF [6] 3/14 3/19 3/24 4/2
15/22 15/22
BEHAVIOR [1] 41/21
BEHIND [1] 59/11
BEING [16] 6/11 17/18 21/6
28/7 32/18 43/4 47/15 51/20
53/16 65/19 67/3 69/14

BELIEVE [15] 6/18 12/5 21/13
27/3 45/17 51/7 55/7 62/17
68/15 71/22 72/24 74/2/25
76/21 78/11 88/15 92/25
BELIEVED [2] 41/7 77/22
BELIEVES [3] 79/22 88/2 89/14
BESIDES [3] 55/6 59/7 67/19
BETWEEN [13] 5/8 44/5 49/3
49/7 49/11 57/16 57/18 58/9
72/17 74/25 80/12 86/12
87/10
BEYOND [2] 45/24 66/17
BIAS [6] 21/11 29/3 43/24
43/25 48/17 70/16
BIG [4] 20/1 20/2 20/22 25/11
BIGGER [2] 20/5 20/14
BIT [2] 10/11 50/13
BOARD [3] 20/17 20/18 20/20
BOLGER [6] 10/8 11/5 11/16
11/23 16/5 16/5
BOOK [18] 4/24 4/24 5/4 7/10
12/15 12/16 12/23 13/2
61/17 61/18 61/22 62/3 62/7
62/13 62/19 63/3 63/3 63/7
BOOK,' [1] 12/24
BOOKS [2] 61/11 61/14
BOSS [2] 79/1 85/7
BOTH [7] 12/4 55/23 59/21
64/4 79/9 86/14 88/7
BOTTOM [1] 14/25
BRASWELL [5] 2/5 3/22 3/24
94/2 94/20
BREAK [4] 80/23 92/6 92/7
92/14
BRIDGE [1] 2/14
BRIEF [11] 26/3 42/25 44/6
59/18 61/9 62/15 63/6 63/14
73/19 80/21 92/10
BRIEFED [4] 26/25 40/21 52/8
60/22
BRIEFING [12] 42/6 51/25
52/18 55/5 55/15 57/12
57/18 63/9 63/19 63/25
72/17 94/11
BRIEFLY [1] 41/2
BRIEFS [1] 93/21
BRINGING [2] 14/10 62/4
BROUGHT [5] 19/21 21/21
33/20 49/19 68/21
BRYAN [2] 1/17 3/11
BUCKLEY [1] 2/9
BUILDING [9] 16/19 17/23/5 37/21
46/4 56/19 71/15
BUREAU [4] 22/15 23/18 25/5
25/15
BUSINESS [1] 51/3
BUSY [1] 56/10
BYNUM [47] 17/11 17/14 17/18
17/21 18/4 18/20 19/1 19/6
21/8 33/10 33/12 33/15
33/25 34/4 34/5 34/14 34/21
34/21 34/24 35/3 36/8 40/18
43/2 43/13 43/15 43/19 44/8
44/9 46/6 46/22 47/10 49/9
49/19 50/2 50/4 50/12 50/13
50/17 51/3 51/5 51/16 51/20
79/21 87/5 88/2 89/13 89/23
BYNUM's [2] 41/3 80/12

## C

CALL [20] 22/25 25/8 30/17
44/15 48/25 49/6 57/21

58/19 62/14 73/20 73/25
75/25 77/2 80/1 84/4 84/25 85/3
85/5 85/6 86/7 87/11
CALLED [10] 22/13 22/14 25/7
25/20 54/1 57/15 58/11
58/14 58/21 82/3
CALLING [3] 16/3 44/5 90/12
CALLS [1] 80/8
CAME [10] 17/14 21/13 25/6
29/13 36/23 41/19 42/19
42/23 44/10 49/18
CAN [15] 14/11 16/15 16/15
19/25 38/23 46/15 46/18
48/22 50/6 50/7 50/9 51/5
59/2 68/4 73/24
CAN'T [5] 34/1 35/6 48/5
49/18 51/8
CANNOT [1] 36/8
CAPT [4] 23/5/4 11/25
61/25 62/13
CAPTAIN [1] 61/10
CARD [1] 68/5
CAREER [1] 65/5
CARRIED [2] 85/8 85/9
CASE [26] 5/14 6/7 10/9 11/3
11/5 11/9 11/13 11/16 11/21
11/22 11/23 11/24 12/9 16/5
26/2 30/25 31/5 31/22 32/2 39/9
41/17 47/4 66/4 66/22 67/2
67/16 69/25
CASES [3] 12/4 12/5 24/22
CAUSED [1] 57/9
CAUSES [2] 34/5 34/20
CAUSEY [6] 2/2 3/14 92/4
92/11 94/2 94/3
CAVE [2] 1/17 3/11
CEILING [1] 37/20
CELL [1] 23/5
CERTAIN [3] 17/3 17/6 89/16
CERTAINLY [4] 16/17 32/5 40/2
92/23
CERTIFICATE [1] 95/16
CERTIFY [1] 95/18
CHAIN [1] 2/14
CHANG [4] 1/3 3/3 3/8 47/4
CHANGE [1] 71/17
CHANGED [1] 8/25
CHARACTERIZATION [3] 61/13
61/16 64/17
CHARGE [6] 22/13 23/17 25/4
65/6 65/7 65/12
CHATTING [1] 28/5
CHIEF [101]
CHIEF's [2] 52/22 59/10
CHOOSING [2] 92/3 94/1
CHRISTOPHER [1] 24/7
CHRONOLOGY [2] 22/16 50/17
CIRCUMSPECT [2] 9/2 9/4
CIRCUMSTANCES [2] 40/16
83/13
CITED [1] 7/9
CITY [4] 13/18 14/20 14/20
15/16
CIVIL [3] 1/5 3/2 39/9
CIVILIAN [1] 29/7
CLAIM [1] 93/18
CLAIMS [1] 5/3
CLARIFY [1] 56/3
CLASS [1] 6/14
CLEAR [7] 12/19 27/24 28/9
63/12 67/14 78/20 79/3
CLEARLY [4] 22/18 23/8 62/22
82/7

## C

CLERK [1] 80/18
CLERK'S [1] 20/10
CLIENT [2] 31/11 93/18
CLOSE [3] 20/25 59/10 65/10
CLOSED [2] 59/12 59/14
CODE [1] 71/18
COINCIDED [1] 5/22
COLLECTIVELY [1] 93/16
COLUMBIA [5] 1/1 32/4 55/16 90/13 94/5
COME [15] 17/8 25/5 25/22 26/12 29/10 43/21 51/4 53/25 54/25 55/18 58/16 90/21 90/23 91/19 94/13
COMES [3] 39/18 39/20 86/8
COMFORTABLE [1] 48/13
COMING [3] 26/9 27/11 29/22
COMMA [1] 50/2
COMMANDER [4] 24/7 25/3 25/21 26/10
COMMENTS [1] 70/17
COMMITTED [2] 6/7 46/3
COMMUNICATE [12] 13/7 26/10 48/15 77/7 77/7 77/21 83/25 85/3 86/21 87/12 87/20 87/22
COMMUNICATED [4] 77/9 84/1 86/2 92/14
COMMUNICATING [3] 75/13 83/24 91/16
COMMUNICATION [3] 15/24 32/15 74/25
COMPARE [1] 20/9
COMPETENCE [1] 43/19
COMPLETELY [1] 15/14
COMPLEX [2] 19/14 28/25
COMPLIED [2] 89/19 94/9
COMPROMISED [1] 88/25
COMPUTER [25] 1/25 19/14 19/23 20/8 20/11 26/18 33/15 33/18 34/13 35/19 35/21 36/18 38/24 39/19 41/25 43/24 45/3 48/11 48/21 53/4 70/1 70/13 70/24 70/25 71/10
COMPUTERS [5] 19/16 19/18 19/21 70/4 70/17
CONCERN [11] 9/24 22/8 24/17 43/5 64/25 64/25 69/18 76/6 89/8 90/1 90/4
CONCERNED [8] 4/21 7/18 9/22 24/16 24/18 54/8 54/10 90/16
CONCERNS [5] 10/19 66/7 69/4 90/14 94/2
CONCLUDED [3] 9/19 79/9 94/23
CONCLUSION [6] 6/24 8/18 8/20 8/23 9/14 9/15
CONDUCT [6] 6/22 7/1 8/6 8/25 9/2 87/2
CONDUCTING [2] 47/2 82/11
CONFERENCE [12] 44/15 57/21 73/20 75/25 77/2 77/19 77/24 80/24 84/8 84/17 84/25 86/9
CONFIDENT [1] 77/12
CONFIRM [4] 68/7 81/23 81/24 85/6
CONFIRMED [2] 5/8 5/16
CONFLICT [1] 64/12

CONNECTED [2] 10/8 69/12
CONSCIOUS [1] 78/7
CONSIDER [4] 9/9 49/14 69/8 90/12
CONSIDERED [3] 11/11 78/8 92/15
CONSISTENT [1] 14/3
CONSTITUTE [1] 62/20
CONSULT [5] 9/5 9/7 92/3 93/5 94/1
CONSULTATION [1] 9/6
CONSULTED [1] 9/16
CONT'.D [1] 2/1
CONTACT [6] 23/7 23/14 25/21 30/24 35/11 35/12
CONTACTED [3] 23/15 23/19 44/14
CONTACTING [1] 30/10
CONTAINED [1] 7/11
CONTAMINATED [1] 38/17
CONTAMINATES [1] 34/20
CONTEMPT [4] 10/17 10/17 11/20 63/15
CONTENTS [1] 12/11
CONTEXT [9] 8/22 10/1 11/15 12/8 24/21 40/6 40/11 69/10 69/14
CONTINUE [7] 43/11 51/5 51/19 69/7 70/10 82/25 83/8
CONTINUED [1] 89/17
CONTINUING [1] 51/11
CONVERSATION [11] 26/3 26/6 26/16 37/25 55/25 58/6 59/3 83/15 87/7 87/25 89/11
CONVERSATIONS [1] 84/20
CONVEY [3] 37/22 39/14 48/12
CONVEYED [3] 39/13 82/22 85/17
CONVEYING [1] 10/12
COOK [1] 2/13
CORRECT [63] 5/3 7/12 10/17 12/11 14/3 15/14 15/16 15/18 17/12 17/16 18/6 18/7 19/5 22/16 30/11 31/2 31/5 31/6 34/11 35/19 36/3 37/19 38/13 38/17 42/9 45/14 45/17 45/23 45/25 46/4 46/5 50/16 50/23 51/25 56/4 56/24 61/7 61/19 62/2 62/18 63/24 65/14 65/23 65/25 66/2 66/5 69/2 69/6 69/13 70/2 71/6 73/2 74/6 74/18 74/20 80/23 81/2 81/3 82/8 88/12 88/13 89/25 95/19
CORRECTLY [2] 44/17 45/2
COULD [35] 8/8 9/7 17/9 17/15 18/1 18/11 19/19 20/9 21/25 25/12 28/2 30/2 38/9 42/13 43/10 45/25 56/19 56/23 56/25 59/3 61/8 62/21 62/24 63/14 66/16 68/20 68/22 69/1 71/15 71/18 77/12 86/5 88/14 88/18 90/8
COULDN'T [4] 21/18 22/3 36/20 69/19
COUNCIL [3] 13/18 14/20 15/16
COUNSEL [14] 38/12 41/4 74/11 76/19 81/13 81/22 83/6 92/3 92/16 93/5 93/8 94/1 94/10 94/16
COUNTERMAND [1] 35/13
COUNTING [1] 83/22

COUNTY [1] 4/2
COUPLE [1] 60/15
COURSE [1] 48/18
COURT [69] 1/1 1/22 5/25 6/23 6/24 7/1 10/12 20/7 24/11 32/6 32/15 40/4 40/8 53/13 55/13 55/23 67/16 74/2 74/6 74/8 74/12 75/1 75/3 75/7 75/8 75/10 75/13 75/15 75/17 75/21 76/2 76/7 76/10 76/11 76/22 77/1 77/8 77/17 77/21 77/23 77/25 78/3 78/5 78/6 78/15 78/22 80/25 81/24 82/9 82/10 83/9 83/19 83/25 83/25 84/2 84/3 84/9 84/14 85/4 85/6 85/12 91/7 91/9 91/9 92/12 93/1 93/23 94/13
COURT'S [2] 20/19 92/14
COURTHOUSE [1] 1/22
COURTS [1] 74/20
COVER [2] 7/23 46/15
COVERED [2] 7/13 13/20
CRAIG [1] 2/13
CRAWFORD [8] 21/8 70/15 71/25 72/8 73/3 73/4 73/5 73/14
CREATE [1] 90/25
CRIME [20] 38/4 38/13 38/16 38/20 39/14 39/19 39/20 40/4 42/23 45/17 46/2 60/18 61/7 62/20 62/23 62/25 63/2 63/14 66/14 93/17
CRIMINAL [9] 37/12 37/21 37/23 39/15 39/24 41/21 53/6 53/21 69/11
CROSS [1] 95/2
CRUCIAL [1] 33/14
CUT [1] 28/10

## D

D.C [6] 1/7 1/23 2/3 2/6 76/17 76/19
DAN [2] 2/4 9/3/10
DANIEL [2] 1/15 1/16
DATA [38] 17/3 17/6 17/9 17/15 17/22 18/2 18/13 18/23 18/23 18/23 19/1 22/8 22/17 24/5 33/17 33/19 36/9 36/10 36/10 36/12 39/9 43/21 44/11 46/9 48/23 50/22 59/5 68/18 79/12 79/22 79/22 80/10 80/13 80/16 88/3 88/4 89/13 89/24 95/25
DATE [4] 5/13 5/19 65/20 95/25
DATED [1] 14/12
DATES [4] 5/7 5/16 18/12 65/9 29/4
DAVIS [1] 29/4
DAY [84] 5/23 17/7 17/19 23/22 31/19 32/10 32/11 32/13 32/13 33/7 40/20 40/21 41/24 42/14 42/15 44/11 44/13 46/7 46/8 46/21 47/9 47/22 48/25 49/1 49/3 49/9 49/19 50/9 50/2 50/3 50/11 50/13 50/14 51/21 50/23 52/3 52/3 52/10 54/1 55/11 56/4 56/8 56/12 57/15 61/23 67/20 67/20 68/16 68/17 68/17 71/19 71/23 72/8 72/20 73/12 73/13 73/16 73/17 76/1 76/3 76/5 77/11

# D

**DAY...** [23] 77/15 77/16 77/24
78/1 78/2 78/16 78/17 79/21
80/9 80/25 81/17 82/4 84/23
86/9 88/1 88/16 88/20 89/9
90/18 90/20 92/19 94/10
94/22
**DAYS** [2] 78/17 88/11
**DC** [6] 1/13 1/18 2/4 2/7 2/10
2/18
**DEALING** [1] 39/18
**December** [1] 5/9
**DECIDE** [1] 82/10
**DECIDED** [2] 46/24 81/8
**DECIDING** [1] 81/14
**DECISION** [14] 30/11 43/13
43/17 43/25 51/12 73/24
73/25 79/25 80/2 80/5 80/15
81/15 85/12 88/17
**DEFENDANT** [4] 66/4 66/22
66/23 67/2
**DEFENDANTS** [4] 1/7 2/3 3/14
3/24
**DEFINITELY** [3] 52/7 55/2 70/18
**DELETE** [28] 18/15 22/8 22/19
24/6 24/19 25/12 29/17
30/24 32/17 33/17 36/8
39/12 46/11 50/22 53/4 53/9
56/17 66/14 79/14 79/23
80/9 80/13 80/15 87/5 88/4
89/5 89/24 91/3
**DELETED** [5] 18/18 19/1 24/17
36/9 54/9
**DELETION** [8] 18/5 22/1 28/19
57/10 59/4 65/16 71/16
87/23
**DELIVERED** [6] 4/17 5/4 7/11
15/4 61/22 63/3
**DEPARTING** [1] 87/10
**DEPARTMENT** [7] 4/2 21/9 30/2
42/1 66/11 79/11 79/12
**DEPENDS** [1] 83/13
**DEPUTY** [2] 29/7
**DESCRIBE** [2] 19/19 53/8
**DESCRIBED** [5] 13/2 24/13 49/8
68/3 76/8
**DESCRIPTION** [1] 48/24
**DESK** [2] 20/5 20/10
**Deso** [3] 2/9 2/9 3/16
**DESPITE** [1] 91/20
**DESTROYED** [1] 64/13
**DETECTED** [4] 87/5 88/3 88/4
89/24
**DETECTIVE** [2] 29/6 90/19
**DETERMINE** [4] 26/17 37/7
46/23 85/5
**DEVELOPMENT** [1] 92/18
**DEVIATE** [1] 94/6
**DEVICE** [7] 20/10 33/18 40/20
69/15 69/19 69/24 69/25
**DID** [155]
**DIDN'T** [72] 5/13 7/15 8/11
9/12 13/7 18/4 18/21 18/22
18/25 19/2 23/5 27/11 33/4
34/17 35/19 35/21 36/7
36/11 36/15 38/24 39/6
44/10 46/1 46/7 48/1 48/7
48/8 53/14 56/9 58/5 58/24
60/5 60/7 61/14 62/25 63/2
63/2 63/23 64/3 64/16 64/25
65/3 66/7 67/14 68/24 69/4
74/12 75/18 76/4 76/6 76/16

77/1 77/4 77/5 77/11 77/17
77/20 77/22 78/10 79/4
79/13 81/22 82/5 82/17
82/24 83/4 83/17 84/3 84/5
84/11 88/15 88/19
**DIFFERENCE** [2] 8/15 15/10
**DIFFERENT** [8] 4/13 15/14
23/12 29/8 56/7 56/7 62/13
86/16
**DIFFICULTIES** [2] 72/9 72/11
**DIRECT** [6] 4/8 6/3 6/5 16/14
46/16 95/2
**DIRECTED** [5] 44/23 45/7 79/7
90/17 91/5
**DIRECTING** [1] 7/24
**DIRECTION** [8] 35/13 47/2
71/20 72/1 74/6 74/7 78/18
90/21
**DIRECTIONS** [1] 86/23
**DIRECTIVE** [1] 79/4
**DIRECTLY** [4] 77/7 83/25 84/19
84/22
**DIRECTOR** [1] 29/8
**DISAPPEARED** [1] 63/7
**DISCIPLINARY** [3] 6/11 6/19 7/5
**DISCIPLINE** [2] 10/9 72/12
**DISCIPLINED** [3] 8/5 11/3 11/12
**DISCIPLINING** [1] 7/6
**DISCLOSED** [1] 77/14
**DISCLOSURE** [4] 21/16 32/19
77/10 77/13
**DISCONNECTED** [1] 68/8
**DISCOVERABLE** [3] 4/16 7/8
7/12
**DISCOVERED** [1] 24/4
**DISCOVERY** [15] 6/23 6/24 7/1
7/7 7/8 7/9 9/10 15/17 16/8
27/16 31/8 34/22 47/3 65/16
77/18 84/2
**DISCUSS** [9] 28/21 38/4 55/22
60/11 60/13 82/3 92/23
94/16 94/18
**DISCUSSED** [11] 4/14 38/7
53/16 57/23 60/22 66/19
67/3 67/6 75/14 75/16 75/24
**DISCUSSING** [3] 46/2 80/25
84/6
**DISCUSSION** [17] 5/5 12/20
28/18 28/20 31/16 32/9 33/1
44/3 55/5 55/14 59/18 67/18
74/8 81/16 87/3 87/15 87/17
**DISCUSSIONS** [6] 31/7 31/17
32/3 32/5 84/23 86/20
**DISOBEYS** [1] 73/6
**DISPLAY** [1] 20/16
**DISREGARD** [1] 6/22
**DISTINCT** [1] 64/3
**DISTINCTION** [1] 62/5
**DISTINCTLY** [3] 70/19 74/5
90/22
**DISTRICT** [14] 1/1 1/1 1/22
3/14 5/2 5/3 5/9 6/23 32/4
46/13 47/2 55/15 90/13 94/5
**DISTRUST** [1] 10/22
**DIVISION** [2] 25/4 81/17
**DO** [102]
**DOCKET** [2] 5/17 12/6
**DOCUMENT** [19] 5/19 8/9 9/17
9/18 10/2 10/3 10/5 10/14
11/17 11/24 11/25 12/1
12/11 13/14 14/19 16/2 45/9
61/12 62/1
**DOCUMENTS** [2] 6/13 14/21

**DOES** [23] 6/16 9/4 11/8 33/2
33/11 33/14 33/17 33/17
34/14 35/13 36/9 43/2 43/25
47/7 51/4 55/21 82/13 83/10
83/16 90/1 91/3 93/8 94/20
**DOESN'T** [5] 18/23 33/11 39/24
62/8 89/6
**DOING** [33] 18/21 18/22 21/23
22/12 22/22 22/23 22/25
23/10 28/5 30/18 33/6 33/9
33/10 33/10 39/3 39/7 39/8
42/16 42/21 42/22 48/11
51/7 56/22 59/22 63/16
63/17 64/5 81/11 81/20
81/21 82/15 82/16 90/10
**DON'T** [159]
**DONE** [16] 8/20 13/8 15/20
28/7 35/5 41/4 68/22 76/7
76/12 76/15 78/25 79/3 79/6
83/14 83/20 86/23
**DOOR** [4] 59/11 59/12 71/17
73/1
**DOUBT** [1] 82/12
**DOWN** [8] 42/24 42/25 43/3
43/4 68/20 69/1 73/18 91/19
**DOWNSTAIRS** [2] 68/14 71/14
**DRAW** [2] 62/5
**DRILL** [1] 91/18
**DRIVE** [2] 45/5 68/19
**DUE** [2] 41/14 49/25
**DURING** [11] 13/13 27/6 28/5
32/10 48/17 56/12 65/5
65/12 77/18 81/16 92/14
**DVD** [1] 45/4

# E

**E305** [1] 1/13
**E4818** [1] 2/6
**EACH** [1] 19/19
**EARLIER** [7] 57/18 60/22 67/13
67/25 68/4 76/8 88/18
**EARLY** [3] 21/17 23/25 31/19
**EARTH** [1] 80/14
**EFFECT** [1] 60/2
**EFFECTIVELY** [1] 64/20
**EFFORT** [5] 50/22 67/19 79/23
87/5 89/5
**EFFORTS** [2] 38/19 53/17
**Efros** [1] 5/23
**EGREGIOUS** [1] 12/4
**EGS** [1] 1/5
**EITHER** [7] 37/6 38/5 43/3
45/21 54/25 62/13 84/24
**ELAPSES** [1] 44/4
**Ellen** [1] 5/23
**ELSE** [18] 21/10 30/19 33/2
33/19 41/3 43/22 45/25
47/18 55/11 59/6 63/5 63/19
67/6 67/11 83/20 87/13
94/13 94/18
**Emmet** [1] 47/3
**EMPLOYED** [3] 9/8 41/25 79/11
**EMPLOYEE** [1] 56/20
**EMPLOYEES** [2] 45/22 56/7
**END** [3] 4/18 11/1 89/21
**ENOUGH** [2] 20/25 78/8
**ENSURE** [1] 77/3
**ENTER** [1] 71/20
**ENTERED** [2] 3/18 59/17
**ENTERING** [1] 93/7
**ENTIRE** [1] 48/4
**ENTIRELY** [2] 30/11 69/12
**ENTITLED** [2] 5/18 95/20

## E

ERASE [2] 18/23 36/9
ERROR [1] 15/6
Esq [8] 1/12 1/15 1/15 1/16
1/16 2/9 2/13 2/17
ESSENTIAL [1] 77/23
ESTABLISHED [1] 6/25
ET [3] 1/3 1/6 3/3
ETHICAL [2] 94/3 94/8
EVEN [6] 9/9 9/25 10/23 22/24
43/9 66/13
EVENING [7] 31/20 55/3 58/7
58/20 73/22 85/20 86/6
EVENT [8] 31/9 49/8 49/8
65/10 65/11 65/12 65/13
78/17
EVENTS [5] 18/17 49/4 49/12
50/17 86/12
EVENTUALLY [7] 26/24 77/14
77/15 78/4 85/9 88/15 88/19
EVER [12] 6/18 12/21 15/20
15/21 15/24 34/3 34/14 39/5
40/3 84/8 90/4 90/12
EVERYBODY [4] 30/19 33/8
74/24 94/20
EVERYBODY's [1] 15/12
EVERYONE [7] 23/2 30/15
33/15 41/24 75/2 75/7 94/20
EVERYTHING [1] 33/9
EVIDENCE [13] 16/22 18/5
24/10 24/13 26/22 36/1 37/8
57/3 69/11 69/20 78/19
78/19 88/24
EVIDENTIARY [2] 1/9 3/4
EXACT [11] 19/11 24/3 24/23
55/2 55/7 59/25 63/3 65/9
65/20 76/13 87/18
EXACTLY [1] 18/8
EXAMINATION [1] 4/8
EXAMPLE [2] 21/12 33/3
EXCEPT [1] 67/6
EXCEPTION [1] 93/17
EXCUSE [5] 17/24 36/14 45/9
52/5 89/1
Exhibit [7] 5/17 6/2 14/4 14/5
14/6 16/21 46/12
EXHIBITS [4] 16/15 16/19
16/20 95/8
EXISTED [2] 34/21 70/2
EXITS [1] 91/25
EXPECTATION [1] 6/25
EXPECTED [1] 74/23
EXPECTING [2] 76/4 78/24
EXPEDITIOUSLY [1] 93/24
EXPERIENCE [1] 39/23
EXPERT [3] 70/4 70/13 70/24
EXPLAIN [6] 24/18 40/5 53/10
53/12 59/2 59/3
EXPLAINED [2] 40/15 40/16
EXPLAINING [3] 36/8 40/3
59/21
EXPLAINS [1] 22/19
EXPLICIT [1] 44/20
EXPRESS [5] 24/16 54/10 76/6
90/4 90/14
EXPRESSION [1] 74/23
EXTENT [4] 4/21 9/11 31/10
38/22
EXTRACT [1] 68/18

## F

FACCIOLA [42] 1/10 13/21
30/25 31/8 32/2 32/19 47/1
51/14 54/23 55/23 57/22
67/19 73/24 74/1 74/4 76/20
77/3 78/11 79/9 79/17 79/25
80/14 80/15 84/18 86/10
87/4 87/12 87/13 88/2 88/7
88/11 89/12 89/12 89/16
89/23 90/2 90/9 91/3 91/6
91/10 91/12 91/14
Facciola's [19] 89/2
FACING [1] 72/9
FACT [12] 15/4 18/2 18/4
25/11 31/12 36/17 41/16
71/23 72/5 80/6 88/11 92/17
FAIL [2] 83/16 83/17
FAILING [1] 6/12
FAILURE [2] 7/7 8/6
FAIRFAX [2] 2/14 4/2
FAIRLY [1] 78/25
FALL [1] 5/5
FAMILIAR [3] 5/24 10/2 19/23
FAR [4] 56/23 68/20 68/22
68/25
FAST [1] 78/8
FBI [1] 67/18
FEDERAL [6] 3/24 24/11 40/12
40/13 53/13 74/19
FEEL [7] 62/25 79/4 81/12
81/22 82/17 92/2 93/5
FEELINGS [1] 82/18
FEET [4] 20/23 20/23 21/2
21/2
FELT [7] 8/7 35/25 36/5 42/1
79/6 82/17 82/19
FIFTH [2] 58/19 59/6
FIGURE [2] 28/22 51/1
FIND [4] 8/19 12/6 48/19 51/5
FINDS [2] 50/18 79/21
FINISH [2] 17/23 73/22
FIRED [1] 48/16
FIRM [1] 3/10
FIRST [16] 7/21 10/13 19/3
19/10 31/25 35/11 36/7 37/9
38/15 47/23 48/24 55/4
67/23 69/23 80/1 86/1
FIVE [1] 14/18
FLAG [1] 11/15
FLIPPING [1] 13/2
FLOOR [6] 2/3 19/10 58/16
58/20 59/6 67/23
FOLDER [2] 18/11 48/20
FOLDERS [1] 48/18
FOLKS [4] 28/6 28/12 56/11
66/1
FOLLOW [1] 35/18
FOLLOWING [6] 31/8 68/17
76/25 78/12 80/25 90/24
FOLLOWS [1] 41/23
FOREGOING [1] 95/18
FORMAL [4] 14/19 46/24 55/10
78/14
FORMAT [1] 45/2
FORTH [1] 29/12
FORTHCOMING [1] 7/2
FORWARD [10] 5/3 5/16 17/13
45/8 82/23 82/25 83/1 83/3
83/19 93/17
FOUND [5] 5/5 6/6 8/9 18/4
71/24
FOUR [8] 20/21 20/21 20/23
20/23 20/23 20/23 21/2 21/2
FOURTH [1] 2/6
FRANCUZENKO [3] 2/13 2/13

4/2
FRANKLY [2] 43/1 74/22
FRIDAY [1] 1/8
FROST [29] 2/3 14/21 21/12
27/13 27/14 27/16 32/8 52/1
52/13 52/19 55/18 57/13
57/24 57/25 60/23 72/17
73/17 84/7 87/4 87/12 88/7
90/5 90/8 91/20 91/23 91/24
92/22 93/4 93/4
FULL [1] 38/22
FULLY [3] 10/12 31/2 94/4
FUNCTION [2] 43/24 69/10
FUNCTIONING [1] 43/11
FUNNY [2] 13/9 13/13
FURTHER [6] 28/7 34/16 40/20
57/3 92/1 94/11
FUTURE [1] 9/1

## G

GAFFIGAN [2] 29/3 29/8
GAVE [9] 4/24 44/20 45/19
54/11 61/18 62/13 62/14
68/16 72/23
GENERAL [23] 2/3 5/23 9/8
32/22 38/10 38/11 38/12
41/4 52/12 57/20 58/2 58/5
74/11 75/12 76/19 76/23
81/13 81/22 83/6 83/24
85/14 90/1 91/16
General's [13] 74/14 74/15
74/25 75/20 77/6 77/20
84/20 85/11 86/3 86/13
87/13 87/20 91/2
GENERALLY [4] 24/24 40/1
54/6 57/12
GENERATED [1] 39/5
GENTLEMAN [1] 66/24
GENTLEMEN [1] 8/1
GEORGE [5] 1/12 21/8 70/15
71/25 72/8
GET [29] 5/2 18/10 21/20
22/16 23/2 23/4 23/12 25/5
25/17 29/18 29/19 30/2
31/24 32/12 35/4 40/18 42/6
43/10 46/19 48/17 54/3 55/4
58/19 61/16 64/3 68/4 68/6
83/10 83/16
GETS [1] 73/5
GETTING [1] 68/25
GIVE [7] 25/6 42/13 58/1 58/5
71/17 92/21 93/16
GIVEN [18] 5/24 16/9 56/12
57/6 71/20 71/22 71/23 72/1
72/17 72/19 72/20 72/21
73/2 74/5 74/7 75/4 75/6
90/21
GIVING [1] 54/15
GLAD [1] 3/25
GO [32] 5/3 8/2 14/18 17/2
21/3 23/6 28/12 30/16 34/5
41/2 42/25 44/6 44/25 45/8
48/8 49/5 52/22 58/19 59/6
59/10 60/12 63/14 67/17
71/18 82/23 82/24 82/25
83/2 83/15 83/19 85/20 92/1
GOES [1] 6/21
GOING [49] 4/13 5/16 14/18
26/10 27/1 27/11 28/10
28/16 30/16 31/24 32/15
33/1 40/19 43/11 44/5 45/20
47/14 51/3 53/25 55/13
57/21 59/19 60/11 61/2 64/3

## G

GOING... [24] 73/18 73/19
73/19 74/24 75/19 75/25
77/20 79/17 81/5 81/11
81/23 82/5 82/9 82/10 83/2
83/8 83/23 84/11 84/23 85/3
85/5 85/12 87/20 90/23
GONE [2] 51/4 71/5
GOOD [16] 3/7 3/13 3/16 3/18
3/23 4/1 4/3 4/10 4/11 13/6
13/7 13/11 42/15 87/1 92/8
94/22
GOT [18] 17/23 18/9 18/9
22/24 24/15 27/20 33/3
35/11 36/21 43/9 44/16
44/17 63/6 64/4 69/18 69/21
70/18 73/14
GOTTEN [1] 47/21
GOVERNING [1] 6/23
GOVERNMENT [1] 59/23
GRIFFITH [3] 1/22 95/18 95/25
GUARANTEED [1] 83/21
GUESS [3] 9/1 62/21 62/22
GUESSING [1] 57/16
GUIDANCE [1] 92/21
GUIDELINES [1] 6/25
Guy [1] 29/6

## H

HABIT [1] 74/19
HAD [138]
HANDED [1] 8/9
HANDLED [1] 31/21
HAPPEN [4] 33/1 38/9 44/24
85/1
HAPPENED [6] 9/18 25/9 35/5
36/18 72/12 79/17
HAPPENING [9] 33/7 38/23
43/1 44/19 59/19 60/11
67/21 67/22 82/4
HAPPENS [1] 51/4
HAPPY [1] 72/1
HARD [3] 45/5 68/19 91/13
HARRIS [6] 4/15 13/1 13/13
13/24 15/12 15/21
HARRIS' [1] 12/10
HAS [19] 5/2 11/20 19/18
34/10 43/18 50/22 51/4 63/7
70/16 74/12 78/1 88/2 88/4
89/12 89/13 89/23 89/24
91/19 94/21
HAVE [122]
HAVING [2] 35/25 64/13
HE [152]
HE's [2] 39/18 92/17
HEAD [6] 65/19 65/23 74/11
74/17 82/23 82/23
HEADING [1] 46/15
HEADQUARTERS [2] 19/10 67/24
HEAR [2] 93/1 93/3
HEARD [2] 19/3 43/7
HEARING [7] 1/9 3/4 16/18
19/6 52/4 52/5 94/23
HEARINGS [3] 14/8 31/4 40/5
HELD [2] 86/9 88/1
HELP [1] 50/9
HER [16] 20/13 34/13 52/24
53/19 53/20 54/5 54/15
55/10 56/9 57/1 57/8 61/2
61/3 74/11 82/22 85/7
HERE [7] 7/5 33/3 45/17 46/2
49/20 50/9 83/11

HEROLD [7] 4/23 5/4 11/25
61/1 61/1 62/3 62/12
HERSELF [2] 58/15 73/9
HESITATE [1] 74/7
HEY [1] 34/25
HIGH [1] 30/2
HIGH-RANKING [1] 30/2
HIGHLIGHTED [1] 6/9
HIM [53] 7/25 8/8 8/18 9/5
9/6 9/7 9/10 9/21 9/25
11/11 12/18 12/21 12/24
12/25 22/12 22/20 23/19
24/4 24/15 24/21 25/7 25/7
25/8 25/10 25/14 25/18
25/20 25/20 25/24 25/25
26/1 26/12 26/25 33/13
35/10 37/10 37/14 37/25
39/3 39/4 39/7 39/8 39/18
40/3 40/10 40/15 41/9 44/10
61/18 67/1 67/10 72/12
88/17
HIMSELF [2] 27/12 32/25
HIRED [1] 43/21
HIS [21] 8/5 9/2 9/11 9/16
10/7 11/11 11/17 15/21 22/7
24/8 25/5 26/17 26/20 26/25
34/21 34/22 37/7 65/5 66/1
66/17 94/19
HOLD [1] 33/12
HOLDING [1] 12/15
HOME [1] 85/20
Honor [24] 3/7 3/13 3/16
3/18 3/23 4/1 4/5 7/13 14/7
16/16 21/4 31/10 31/15
45/11 49/22 50/5 56/1 92/7
92/13 92/24 93/10 93/23
94/14 94/21
HONORABLE [1] 1/10
HOOKED [1] 68/14
HOOKS [1] 22/16
HOT [4] 59/1 59/2 59/2 59/4
HOUR [3] 27/23 42/13 44/7
HOURS [2] 31/7 42/13
HOW [27] 8/24 24/13 25/6
27/2 27/4 27/22 27/24 29/13
37/4 42/11 42/11 43/24 44/4
48/10 53/8 54/6 57/12 60/22
65/18 75/2 75/4 75/5 75/11
75/17 77/12 85/10 85/17
Howell [1] 29/7
HUGE [2] 25/13 70/7
HUH [3] 56/13 60/24 68/2
HUNDREDS [1] 29/24

## I

I'D [3] 14/1 16/14 31/15
I'LL [6] 8/1 23/14 24/6 46/17
54/3
I'M [45] 3/8 3/21 3/25 4/12
7/24 8/22 9/13 11/23 12/1
14/4 17/23 18/19 20/8 22/24
23/23 28/9 30/16 32/12 42/7
45/20 46/18 47/14 48/6
48/10 48/21 51/25 52/4
53/16 54/1 56/15 57/16 62/9
63/11 64/18 65/15 65/18
68/25 69/10 71/10 75/5
78/10 79/16 79/19 80/23
91/10
I've [5] 6/1 6/18 10/21 33/3
53/25
IAD [40] 23/14 28/16 30/10
30/17 36/22 37/1 37/2 37/6

39/20 39/24 41/13 41/16
41/19 46/24 48/25 49/1
53/25 54/21 55/6 63/23
64/10 66/18 67/7 74/11
74/17 79/9 79/14 81/1 81/4
81/9 81/24 82/8 82/13 82/22
82/23 82/24 82/24 83/18
84/10 84/11
IAD's [1] 42/1
IDEA [11] 21/20 25/6 32/12
42/13 48/13 58/7 60/25 61/1
69/11 87/1 92/8
IDENTIFICATION [2] 16/8 29/19
IDENTIFIED [4] 24/24 25/16
27/12 30/1
IDENTIFIES [1] 32/25
IDENTIFY [5] 3/5 6/12 7/7 17/9
18/11
IDENTIFYING [3] 12/8 18/13
28/8
ILLUSTRATES [1] 6/22
IMAGE [5] 44/25 45/9 68/18
68/19 90/25
IMF [3] 18/11 47/4 48/20
IMF/World [1] 18/11
IMMEDIATE [1] 20/13
IMMEDIATELY [5] 22/13 76/12
84/2 84/3 84/9
IMPORTANCE [2] 48/7 53/12
IMPORTANT [10] 37/19 61/4
61/5 75/23 77/17 77/23
77/25 78/2 78/15 78/16
IMPRESSION [13] 54/11 64/3
64/4 70/18 74/22 76/14
76/16 81/19 82/15 83/8
83/23 84/12 87/19
IMPROPRIETY [1] 64/19
INCLUDED [1] 72/2
INCLUDING [3] 14/21 47/4
51/10
INDEED [5] 18/16 62/1 62/3
62/7 62/8
INDEPENDENT [2] 92/16 93/14
INDIANA [1] 19/11
INDICATED [5] 17/21 18/13
18/20 45/16 86/22
INDICATING [1] 20/1
INDIVIDUAL [2] 16/1 17/11
INFORM [18] 32/16 57/8 63/1
73/25 74/6 74/12 75/3 75/15
76/11 76/22 78/15 78/16
81/17 81/24 84/2 84/3 84/9
88/17
INFORMATION [19] 18/15 18/17
19/4 24/17 24/19 25/12
30/23 31/3 32/17 53/4 53/9
53/10 54/9 59/24 59/24
66/14 85/17 87/24 91/19
INFORMED [33] 15/16 18/16
24/4 31/9 39/11 53/1 62/11
69/16 70/7 74/9 75/8 75/8
75/10 75/18 76/3 76/7 77/3
77/18 77/23 78/3 78/5 78/6
78/22 82/9 83/9 83/20 84/14
84/18 85/11 88/15 88/16
88/19 91/8
INFORMING [8] 18/20 32/1 32/6
37/11 67/19 74/19 75/21
78/11
INFORMS [1] 50/10
INITIALLY [1] 32/16
INITIATE [2] 25/24 25/25
INKLING [1] 58/23

# I

INSTANCES [1] 46/2
INSTRUCTED [1] 44/25
INSTRUCTIONS [2] 44/20 60/10
INTEGRITY [1] 66/12
INTEL [2] 15/7 15/9
INTENTION [1] 93/3
INTENTIONAL [1] 62/19
INTENTIONS [1] 93/3
INTERDICTION [1] 51/11
INTERESTS [2] 94/4 94/5
INTERIM [1] 57/18
INTERNAL [16] 22/14 22/15
22/25 23/18 25/4 25/15
49/16 64/24 65/4 65/6 65/7
65/12 65/17 65/19 81/17
90/20
INTERROGATORIES [1] 46/14
INTRODUCED [1] 14/7
INVESTIGATE [6] 26/7 26/21
39/24 66/18 79/10 82/6
INVESTIGATING [8] 25/17 40/7
40/13 59/25 64/14 64/20
68/13 76/21
INVESTIGATION [32] 25/24
25/25 39/23 41/14 41/17
46/25 47/2 55/6 59/22 63/23
64/4 64/5 64/10 67/7 67/11
79/14 81/1 81/4 81/18 81/18
81/25 82/8 82/11 82/14
82/22 82/24 83/19 84/10
84/12 84/13 87/2 88/24
INVESTIGATIONS [2] 40/5 65/4
INVESTIGATOR [9] 38/2 39/1
39/15 39/17 40/6 41/5 41/8
41/12 42/23
INVOLVED [7] 16/4 25/17 28/23
39/21 39/22 69/25 70/18
INVOLVEMENT [1] 41/14
IS [146]
ISN'T [4] 15/18 18/25 41/16
88/12
ISOLATED [1] 88/21
ISSUE [10] 4/14 32/1 41/7
49/14 61/4 64/15 64/19
91/19 93/14 93/22
ISSUES [2] 89/16 94/16
ISSUING [1] 51/11
IT [245]
IT'S [38] 5/17 12/5 14/4 15/1
15/11 15/14 17/25 19/10
19/14 20/16 20/22 22/14
22/17 31/12 33/2 34/8 37/16
38/16 48/19 48/21 48/23
51/22 59/13 59/13 61/7 62/3
62/17 67/21 67/23 68/3 68/3
68/25 69/21 73/9 85/5 85/6
86/6 90/22
ITS [3] 17/10 43/4 89/17
ITSELF [1] 64/20

# J

JAMES [1] 1/16
JESTING [1] 13/8
JMF [1] 1/5
JOB [1] 66/12
JOCC [5] 13/18 14/21 15/5
28/25 47/4
JOHN [1] 1/10
JOKE [4] 13/6 13/7 13/11
13/11
JONATHAN [2] 1/12 3/8

JUDGE [57] 1/10 13/20 20/12
20/24 30/25 31/8 31/21
31/22 32/1 32/16 32/19 33/4
33/13 33/21 34/7 35/6 35/15
35/18 39/1 40/13 43/6 44/13
47/1 47/1 47/3 51/8 51/17
54/20 55/1 55/17 57/22
57/22 67/19 68/16 71/10
73/20 73/24 73/25 74/2 74/3
74/3 76/20 77/3 78/17 81/19
84/17 84/18 84/24 85/2 86/5
86/17 88/1 88/3 90/19
91/15 91/18 92/5
JUDGE'S [1] 78/18
JUDGING [1] 28/9
JUDGMENT [3] 11/11 12/7
12/11
JULY [4] 52/4 78/7 78/12
78/23
JUMBLED [1] 50/13
JUST [54] 4/13 7/21 7/25 8/24
10/11 11/1 22/24 24/3 25/8
25/9 27/12 27/20 31/12
31/24 32/6 32/14 33/7 35/18
36/5 36/9 36/11 37/13 37/16
39/3 39/13 42/6 46/16 48/4
48/9 48/23 49/8 51/19 56/3
56/16 59/9 60/21 61/2 61/7
63/17 67/11 70/4 70/13
71/21 74/2 74/17 74/22
76/11 78/20 81/7 82/7 83/18
86/22 88/14 90/23

# K

KEEP [7] 43/3 43/11 43/13
44/1 61/2 61/3 69/24
KEY [1] 34/15
KEYBOARD [2] 33/18 33/22
KEYS [1] 34/14
KIND [4] 13/8 21/22 33/18
62/19
KNEW [22] 5/13 10/2 10/4
10/5 10/13 10/15 16/5 32/14
43/24 55/12 55/13 56/23
57/5 57/10 66/4 74/24 75/3
75/10 75/25 77/14 81/16
85/9
KNOW [111]
KNOWLEDGE [5] 10/4 45/3
68/13 70/12 70/16
KNOWN [1] 10/21
KNOWS [1] 40/6
KOGER [12] 4/16 5/11 5/19
6/4 6/8 12/8 25/9 15
10/14 10/20 10/21 11/2
KOGER'S [1] 10/1

# L

L-O-J-A-C-O-N-O [1] 24/8
LAND [3] 23/6 23/19 23/21
LANIER [13] 31/19 32/20
51/13 61/9 63/25 66/21 67/9
68/11 71/23 73/5 73/23
78/13 78/21
LANIER'S [1] 87/11
LARGE [1] 29/24
LAST [4] 6/21 11/2 14/8 24/8
LATER [24] 9/18 21/13 31/19
32/11 32/12 40/20 46/21
47/9 48/25 49/2 49/9 49/19
50/2 50/3 50/11 51/3 51/20
54/1 55/2 57/15 58/7 58/20
73/6 77/24

LAUNCHED [1] 63/24
LAW [8] 1/16 3/10
LAWSUITS [1] 6/14
LAWYER [1] 35/8
LAWYERS [1] 93/7
LEAK [1] 37/20
LEARN [1] 50/24
LEARNED [3] 41/18 55/11 82/6
LEAST [4] 25/7 70/19 84/12
89/13
LEAVE [6] 23/4 36/5 49/5
70/20 91/22 91/23
LEAVING [1] 69/11
LEFT [13] 4/12 4/14 26/5
30/15 36/17 42/25 44/9 48/4
49/3 67/25 68/23 81/19
85/24
LEFTWICH [1] 2/17
LESS [3] 22/2 22/5 22/17
LET [17] 5/15 6/9 10/11 17/23
21/20 37/21 41/2 44/24
45/13 46/12 46/18 62/17
67/14 69/21 71/25 72/9 73/4
LET'S [8] 14/24 17/2 17/13
50/8 61/15 69/23 84/15
92/20
LETTER [23] 5/22 5/24 6/4 6/5
6/17 6/18 6/21 7/20 7/24
8/4 8/10 8/15 8/16 9/9 9/12
13/25 14/2 14/10 14/12
14/20 14/24 15/3 15/21
LETTING [1] 73/15
LIGHT [3] 10/23 92/13 92/18
LIKE [17] 16/14 19/18 21/18
22/6 29/3 29/9 31/15 33/22
34/7 37/20 37/20 43/23 62/8
64/16 70/17 78/22 81/12
LIKELY [1] 41/3
LINE [6] 6/14 23/6 23/19
23/21 46/21
LINES [1] 64/18
LINGER [1] 42/11
LINK [1] 36/9
LISA [3] 1/22 95/18 95/25
LIST [6] 30/5 30/8 45/19
45/21 56/16 56/18
LISTENED [2] 44/18 60/3
LISTENING [1] 91/21
LITIGATION [4] 5/12 24/25 40/9
61/6
LITTLE [4] 9/1 9/22 37/17
60/20
LIVE [1] 64/22
LLP [1] 1/17
LOCATE [2] 18/11 53/18
LOCATED [1] 19/15
LOCATION [2] 35/23 35/24
LOCKED [2] 36/2 36/3
LOJACONO [8] 24/7 24/8 25/3
25/21 26/11 26/11 50/10
50/10
LONG [17] 19/19 19/24 26/4
27/4 27/16 27/22 31/4 33/12
37/4 42/1 42/11 51/1 22
56/16 57/12 65/18 78/21
88/19
LONGER [2] 51/20 56/18
LOOK [17] 19/19 19/24 26/4
34/12 50/8 69/23 76/11
LOOKING [3] 10/6 15/12 24/14
LOOKS [1] 22/17
LOOSE [1] 89/21
LOSING [1] 59/24

## L

**Loss [1]** 18/22
**Lost [1]** 18/18
**Lot [1]** 10/21
**Lots [2]** 56/6 56/11
**Loud [1]** 30/19
**Ludaway [3]** 2/17 2/17 3/21
**Lunch [4]** 40/18 41/3 44/8 51/3

## M

**Madam [1]** 80/18
**Made [21]** 8/15 15/17 17/3 17/5 17/6 34/21 34/21 43/17 45/1 51/12 51/13 53/17 55/10 55/13 62/15 63/12 70/17 77/13 79/3 79/25 87/11
**Magistrate [2]** 1/10 47/1
**Make [20]** 5/16 21/16 23/6 25/2 31/25 35/11 43/24 43/25 44/25 45/1 45/8 49/6 57/2 60/13 63/18 67/14 77/9 78/20 83/20 85/12
**Makes [2]** 43/13 80/14
**Making [2]** 44/21 94/4
**Man [1]** 10/22
**Manner [1]** 7/2
**Many [1]** 29/25
**Marc [1]** 17/11
**Marina [2]** 2/5 3/23
**Mark [1]** 29/3
**Marked [1]** 5/17
**Master [3]** 30/25 40/12 40/13
**Master's [1]** 41/14
**Material [5]** 4/17 7/9 7/12 28/19 45/4
**Matter [10]** 13/19 37/23 39/15 40/13 53/22 64/21 65/21 67/16 81/18 95/20
**Matters [2]** 39/25 56/7
**May [34]** 4/4 6/1 12/22 17/2 17/2 18/17 19/20 24/5 31/11 31/20 37/9 40/10 49/22 52/6 52/7 59/12 60/15 65/3 66/1 69/16 69/16 69/17 70/10 70/11 71/1 71/5 80/18 85/19 88/1 89/12 91/20 92/7 93/21 94/5
**Maybe [4]** 7/21 19/25 23/23 63/5
**Me [40]** 3/9 5/15 6/9 10/8 10/11 11/15 12/23 13/25 14/1 17/23 17/24 21/20 33/2 36/14 37/21 41/2 42/13 43/18 45/5 45/13 46/12 46/18 51/25 52/5 58/21 62/17 67/14 71/24 72/2 80/5 80/8 80/9 80/23 82/3 83/22 87/8 89/1 90/8 91/16 93/6
**Mean [11]** 9/4 11/8 22/7 27/22 28/10 33/13 37/19 42/19 53/14 55/12 77/15
**Meant [1]** 36/14
**Mechanical [1]** 1/25
**Meet [2]** 7/7 8/6
**Meeting [33]** 17/18 31/18 32/19 52/15 52/19 54/1 56/6 56/23 57/14 57/19 57/24 58/3 58/3 58/6 58/10 59/7 60/18 66/19 68/11 72/18 73/22 75/22 78/12 81/19

**81/23 82/2 82/12 84/1 84/6 84/16 85/19 87/3 88/1**
**Meets [1]** 56/11
**Meitl [2]** 1/16 3/10
**Member [6]** 66/15 76/17 76/20 76/22 79/10 86/2
**Memory [5]** 6/16 14/11 29/25 47/7 67/6
**Men [1]** 66/11
**Mention [2]** 24/10 40/12
**Mentioned [2]** 29/2 57/11
**Metropolitan [2]** 21/9 41/25
**Michael [1]** 23/15
**Mid [1]** 68/17
**Middle [2]** 46/17 46/20
**Might [8]** 28/23 39/22 45/19 46/2 56/17 56/20 57/9 70/1
**Mind [4]** 11/8 25/16 28/24 32/14
**Minds [1]** 82/12
**Mine [1]** 69/18
**Minimum [1]** 84/13
**Minutes [7]** 21/18 21/18 22/2 22/5 22/18 27/23 80/20
**Miscellaneous [1]** 19/21
**Misconduct [3]** 16/7 25/16 64/23
**Misconstruing [1]** 50/1
**Missing [1]** 83/11
**Misunderstand [1]** 67/13
**Model [1]** 45/1
**Moment [4]** 13/14 34/21 34/21 86/1
**Monique [11]** 3/19 21/9 30/18 32/8 38/7 40/23 57/24 57/24 72/15 84/6 86/15
**Monique's [1]** 44/18
**Monitor [7]** 20/8 21/22 21/25 22/17 68/8 68/14 69/12
**Monitored [1]** 33/6
**Months [1]** 65/21
**More [8]** 9/2 9/22 37/17 46/8 60/20 69/19 74/3 74/8
**Morning [16]** 3/7 3/13 3/16 3/18 3/23 4/1 4/3 4/10 4/11 23/25 44/15 49/8 68/1 76/25 84/24 86/5
**Moss [1]** 29/4
**Most [3]** 19/15 41/24 66/10
**Mouse [1]** 33/19
**Move [1]** 16/15
**Moved [1]** 35/22
**Movements [1]** 49/11
**Moving [2]** 11/9 11/10
**MPD [8]** 38/12 45/22 56/12 56/20 64/20 65/5 66/15 87/1
**Mr [28]** 4/10 4/11 12/1 12/10 14/10 16/14 17/18 17/21 18/20 19/1 21/8 34/18 37/16 38/12 50/8 74/10 77/12 80/5 83/12 89/4 92/2 92/3 92/11 92/15 92/17 94/1 94/15 95/15
**Mr. [28]** 4/15 4/16 5/11 6/6 8/12 8/25 9/15 10/1 10/14 10/20 12/10 13/1 13/13 15/21 17/14 19/6 36/6 46/6 46/22 49/9 50/1 50/2 50/4 51/1 86/22 90/13 92/1 94/3 93/1
**Mr. Bynum [8]** 17/14 19/6 36/8 46/6 46/22 49/9 50/2 50/4
**Mr. Causey [1]** 94/3
**Mr. Harris [4]** 4/15 13/1

**13/13 15/21**
**Mr. Harris's [1]** 12/10
**Mr. Koger [8]** 4/16 5/11 6/6 8/12 8/25 9/15 10/14 10/20
**Mr. Koger's [1]** 10/1
**Mr. Nathan [1]** 90/13
**Mr. Turley [4]** 50/1 51/1 86/22 92/1
**Ms [12]** 3/22 4/16 30/21 52/1 57/13 57/13 61/18 92/21 92/22 93/8 94/2 94/20
**Ms. [13]** 21/12 27/13 27/14 27/16 52/1 52/12 52/13 60/23 60/23 91/20 91/23 91/24 92/22
**Ms. Frost [11]** 21/12 27/13 27/14 27/16 52/1 52/13 60/23 91/20 91/23 91/24 92/22
**Ms. Pressley [2]** 52/12 60/23
**Much [7]** 20/14 23/9 27/24 44/4 53/24 54/4 57/15
**Must [3]** 21/22 91/23 92/25
**My [32]** 3/8 3/19 20/10 25/3 25/16 28/24 29/25 32/14 34/14 35/2 39/23 42/20 60/8 61/1 61/15 63/3 63/18 64/16 78/9 81/10 84/19 85/3 85/21 88/17 88/23 89/5 90/19 91/13 91/20 92/14 93/2 93/3
**Myself [3]** 21/9 40/24 72/15

## N

**Name [9]** 3/8 14/24 14/25 24/8 26/25 27/2 29/6 54/25 91/13
**Named [3]** 17/11 29/5 51/13
**Names [7]** 28/24 29/8 29/10 29/14 29/22 30/1 57/11
**Natalie [2]** 2/17 3/21
**Nathan [1]** 90/13
**Nature [1]** 40/3
**NC4 [3]** 17/8 39/10 43/21
**Necessarily [2]** 78/2 83/13
**Necessary [5]** 14/11 57/2 63/10 88/24 90/23
**Necessity [1]** 55/22
**Need [4]** 63/13 92/2 92/5 93/5
**Needed [7]** 18/10 25/17 37/14 44/11 58/2 78/3 81/16
**Needs [2]** 76/12 83/14
**Neil [1]** 29/5
**Neither [1]** 18/25
**Never [1]** 41/16
**New [1]** 91/19
**Newsham [5]** 3/17 65/4 66/25 67/1 67/1
**Next [28]** 19/18 32/13 33/1 39/2 44/13 51/4 52/3 55/16 67/20 68/16 68/17 73/16 73/17 76/1 76/3 76/5 77/11 77/24 78/1 78/17 80/8 84/23 85/13 86/5 86/9 88/16 88/20 90/18
**Nicholas [1]** 1/15
**Nick [1]** 3/10
**Night [8]** 41/23 64/2 68/11 76/24 77/1 81/7 84/6 85/25
**No [136]**
**Nobody [7]** 15/16 34/10 71/20 72/2 74/23 80/9 90/1
**Non [1]** 39/24

**N**

NOON [2] 28/1 28/2
NOT [127]
NOTE [2] 12/13 91/18
NOTEBOOK [1] 39/4
NOTED [1] 22/1
NOTES [1] 39/6
NOTHING [3] 38/23 67/6 72/12
NOTICE [5] 5/15 6/3 8/17 75/4 75/6
NOTIFIED [1] 78/1
NOTING [1] 20/7
NOVEMBER [4] 1/8 13/18 14/12 93/11
NOW [83] 5/2 5/11 5/22 6/2 6/16 7/20 11/1 12/10 12/13 13/1 13/17 13/23 14/5 14/10 14/18 14/24 14/25 15/3 17/2 17/18 19/22 22/7 22/16 23/2 24/2 25/6 25/23 26/16 29/15 29/21 30/1 30/23 31/7 31/24 33/20 35/15 37/6 38/4 39/7 39/13 41/11 41/19 42/6 44/4 45/16 45/19 46/6 48/22 48/24 51/2 51/4 51/22 52/5 52/15 53/2 55/14 56/3 56/16 57/18 58/6 60/20 61/9 61/23 62/17 64/15 65/3 66/17 67/21 67/21 68/7 71/13 71/21 71/22 76/17 89/11 90/23 91/1 91/20 92/20 93/2 93/3 94/5
NUMBER [8] 5/17 6/13 14/21 18/14 19/12 29/8 29/22 46/3 NW [6] 1/13 1/17 2/3 2/6 2/10 2/18

**O**

O'CLOCK [1] 86/6
O'CONNOR [2] 1/16 3/10
OAG [10] 6/25 75/14 75/18 75/24 77/9 84/1 84/4 84/9 85/3 85/5
OBJECT [1] 50/5
OBJECTION [6] 7/13 8/2 16/18 31/10 49/22 50/6
OBJECTIONS [1] 46/14
OBJECTS [1] 20/2
OBLIGATED [1] 64/23
OBLIGATION [4] 76/22 81/12 81/23 94/18
OBLIGATIONS [2] 94/3 94/8
OBLITERATE [1] 71/1
OBSTRUCTION [2] 10/17 11/21
OBTAIN [1] 92/16
OBVIOUSLY [5] 19/16 20/11 24/16 49/5 59/19
OCCASION [1] 90/7
OCCUR [2] 76/25 91/13
OCCURRED [6] 52/18 57/7 58/7 59/17 65/16 80/6
OCTOBER [1] 5/8
OFF [18] 4/12 4/14 22/20 22/21 28/10 34/10 35/22 36/21 41/8 43/14 57/22 68/15 69/15 69/17 70/8 70/11 70/20 70/25
OFFICE [43] 2/3 2/6 4/25 9/8 13/17 13/23 13/24 22/14 38/6 52/22 52/24 54/2 57/19 58/1 59/10 61/11 61/18 62/12 62/14 63/4 65/23 66/1

74/14 74/14 74/25 75/12 75/20 76/23 77/6 77/20 83/23 84/20 85/1 85/14 85/21 85/25 86/3 86/13 87/13 87/20 91/2 91/15 92/15
OFFICER [17] 4/17 4/23 5/4 7/11 10/3 12/14 12/16 21/11 23/16 28/11 29/4 43/23 56/21 61/11 61/17 61/21 70/16
OFFICERS [11] 4/22 7/1 29/23 30/2 41/21 45/21 56/7 62/12 62/18 63/6 68/4
OFFICIAL [3] 23/17 24/7 35/8
OH [7] 14/4 20/6 33/4 36/4 42/12 65/17 84/4
OKAY [38] 5/7 5/11 5/22 6/21 7/5 8/1 13/5 13/11 13/13 14/18 15/3 17/13 18/4 18/8 22/7 24/2 24/6 27/19 30/15 34/24 45/16 46/6 46/20 47/18 47/25 52/22 53/24 54/3 54/4 58/6 61/25 62/9 65/3 69/23 84/1 91/9 91/10 91/17
OLIVIA [1] 2/17
OMISSIONS [1] 6/12
ONCE [7] 43/9 43/10 47/14 69/21 75/17 85/11 92/21
ONE [21] 7/16 13/25 16/6 20/12 26/20 30/13 32/24 38/15 44/22 44/22 44/24 45/7 49/14 56/3 57/3 60/21 62/4 62/13 65/6 67/11 71/18 ONES [2] 16/18 71/11
ONGOING [1] 24/24
ONLINE [1] 29/16
ONLY [5] 43/18 49/7 68/4 73/23 75/9
OOOOO [2] 95/6 95/14
OPEN [2] 46/24 84/13
OPENED [1] 59/13
OPENING [2] 26/2 48/18
OPENS [1] 48/20
OPERATE [1] 34/20
OPERATING [3] 20/11 43/3 70/25
OPERATION [1] 34/6
OPERATIONS [1] 35/14
OPINION [3] 60/7 60/8 78/14
OPPOSED [1] 39/19
ORDER [21] 35/21 57/1 57/5 60/10 68/16 71/23 72/3 72/5 72/7 72/17 72/19 72/21 72/22 72/23 73/1 73/2 73/6 73/8 73/25 89/2 89/5
ORDERED [1] 30/13
ORDERS [13] 6/24 40/4 40/8 41/7 54/15 58/1 58/5 71/17 71/22 89/16 89/19 90/24 94/11
ORIGINAL [2] 63/7 93/3
OTHER [15] 11/12 12/9 17/16 19/19 19/21 21/11 23/10 28/12 29/10 38/5 43/23 45/7 66/19 67/19 92/3
OTHERWISE [1] 55/21
OUR [3] 5/16 92/15 93/10
OUT [16] 5/14 8/19 23/13 28/22 30/19 33/3 33/13 35/3 38/25 39/21 40/18 51/1 71/24 85/8 85/9 91/19

OUTCOME [1] 9/25
OUTSIDE [2] 23/19 36/18
OVER [10] 6/13 12/17 19/7 20/10 25/14 25/18 26/6 34/12 53/17 93/21
OVERLAPPING [1] 65/10
OVERLY [1] 70/1
OVERRULED [3] 7/15 8/2 31/12
OWN [2] 92/3 94/1

**P**

P.C [1] 2/9
P.J [1] 3/10
P.M [1] 57/17
PAGE [7] 14/18 17/14 46/15 46/16 46/17 48/3 95/9
PARAGRAPH [2] 6/22 46/17 46/21
PARK [1] 24/22
PARSE [2] 10/11 79/17
PART [7] 6/5 10/3 11/3 13/5 19/14 49/15 85/7
PARTICULAR [3] 10/4 41/20 76/6
PARTIES [1] 3/5
PASSWORD [2] 18/9 48/16
PAUSE [2] 80/19 91/24
PECULIARLY [1] 42/1
PENDING [1] 40/4
PEOPLE [26] 23/10 28/23 28/24 29/2 29/3 29/10 29/25 30/5 36/3 41/24 43/23 45/19 45/21 45/24 46/3 50/21 56/17 56/19 57/8 66/10 66/11 71/10 71/15 75/9 91/1 93/25
PERCEIVED [4] 25/10 32/17 59/23 64/23
PERCEPTION [1] 64/11
PERFORM [1] 41/13
PERHAPS [4] 19/24 38/8 38/9 46/18
PERIOD [1] 32/13
PERSHING [1] 24/22
PERSON [10] 12/2 12/3 19/7 36/24 39/10 43/18 45/2 56/20 56/24 79/11
PERSONALLY [1] 60/13
PERSONS [1] 57/9
PERSPECTIVE [1] 88/23
PHILIP [1] 1/16
PHONE [11] 19/7 23/5 27/14 27/17 27/20 36/22 38/1 49/6 52/23 80/14 89/11
PHRASING [2] 37/13 50/8
PICK [1] 4/12
PIPIA [1] 29/5
PLAINTIFF [1] 95/3
PLAINTIFF's [3] 3/9 16/21 46/14
PLAINTIFFS [7] 1/4 1/12 3/6 3/9 4/6 6/13 95/10
PLEASE [5] 3/5 49/23 72/23 80/20 90/8
PLLC [1] 2/13
POINT [38] 21/7 21/24 21/25 22/19 23/2 23/10 27/13 28/13 32/16 33/1 34/13 34/14 34/19 34/24 38/4 40/18 41/11 42/7 42/7 44/9 45/8 45/16 48/21 51/2 55/12 57/5 62/11 66/13 71/13 71/19 75/1 75/13 75/18

# P

POINT... [5] 78/22 87/20 88/23
91/1 92/16
POINTING [2] 20/8 20/18
POLICE [24] 19/10 21/9 29/4
35/8 40/21 41/21 42/1 52/8
53/23 57/1 57/6 57/10 57/14
61/10 66/10 66/11 67/23
71/19 71/21 74/10 79/11
79/11 84/17 86/23
POREH [1] 29/6
PORTION [1] 42/15
POSITION [8] 63/12 64/7 64/9
69/9 69/19 78/9 78/10 78/21
POSITIONS [1] 84/15
POSSIBILITY [2] 19/3 79/10
POSSIBLE [7] 56/17 56/20 57/9
69/3 76/15 76/16 93/24
POSSIBLY [2] 60/23 66/15
POTENTIAL [43] 10/17 11/20
24/4 25/16 26/1 37/12 37/14
37/23 38/4 38/16 38/19
39/14 39/15 39/19 39/20
40/4 41/20 42/23 45/17 46/2
53/3 53/5 53/6 53/21 59/4
59/22 60/18 61/6 61/7 62/20
62/22 62/25 63/14 64/11
65/16 66/14 69/3 69/11 71/3
72/12 81/18 87/23 91/20
POTENTIALLY [6] 9/20 9/21
25/11 28/23 69/3 69/15
POWER [1] 41/9
PRECISE [1] 5/13
PRECISELY [2] 20/24 32/4
PRECISION [1] 22/3
PRESENCE [3] 55/21 60/9 88/3
PRESENT [7] 2/17 17/21 18/1
47/12 47/16 49/2 70/15
PRESENTED [1] 62/12
PRESERVATION [2] 89/2 89/17
PRESERVE [2] 44/23 78/18
PRESERVED [2] 78/19 88/22
PRESS [1] 47/1
PRESSLEY [24] 3/19 21/10
30/18 30/21 32/8 52/1 52/12
52/19 55/18 57/13 57/24
60/23 72/18 73/15 84/7 87/3
87/12 88/7 90/5 90/8 92/22
93/4 93/5 93/8
PRESUMABLY [1] 24/21
PRESUME [1] 58/25
PRESUMED [1] 58/24
PRETTY [4] 20/1 20/2 21/17
23/9
PREVENT [1] 43/4
PREVIOUS [3] 10/23 13/20 52/2
PREVIOUSLY [5] 4/7 14/5 16/9
64/19 71/1
PRIMARILY [1] 60/9
PRIVILEGE [2] 31/11 93/18
PROBABLY [18] 29/12 47/13
47/15 52/24 56/18 57/15
58/22 61/1 70/15 78/24 79/6
82/18 82/19 82/25 83/7
85/21 86/14 86/24
PROBE [1] 37/16
PROBLEM [18] 11/17 11/19
24/4 25/11 25/13 25/20 26/1
37/14 39/19 53/3 53/5 53/6
53/6 53/8 61/5 61/6 71/3
71/7
PROBLEMS [2] 37/20 37/20

PROCEED [2] 4/4 8/2
PROCEEDING [2] 81/25 81/25
PROCEEDINGS [10] 1/25 87/19
8/21 8/24 9/14 9/15 10/23
80/19 91/24 95/19
PROCESS [2] 21/17 48/18
PRODUCED [6] 1/25 9/19 10/3
11/25 15/6 15/8
PRODUCING [2] 14/20 59/24
PRODUCT [1] 93/18
PRODUCTION [3] 16/8 44/22
44/25
PRODUCTIONS [1] 14/15
PROFESSIONAL [5] 7/2 7/8 8/6
16/7 69/8
PROJECT [1] 28/8
PRONOUN [1] 91/13
PROPOSED [1] 8/17
PROTECTED [1] 94/4
PROTECTING [1] 94/5
PROTECTIONS [1] 94/6
PROTEST [1] 13/19
PROVIDE [1] 6/12
PUBLISHED [1] 46/25
PURSUANT [2] 14/15 89/1
PUT [4] 40/10 45/4 45/4 73/1

# Q

QUALITY [2] 28/25 29/4
QUAN [4] 4/16 61/18 92/21
93/4
QUESTION [15] 12/25 15/19
18/19 30/4 30/9 31/13 32/10
34/1 42/20 43/9 48/10 51/3
60/21 63/18 75/5
QUESTIONS [2] 10/16 54/18
QUICKLY [4] 78/25 79/3 79/7
79/7
QUITE [3] 17/25 18/19 43/1
QUOTE [3] 6/22 18/5 49/20

# R

RAI [1] 29/6
RAISE [5] 10/19 49/22 50/6
66/7 69/4
RAISED [2] 64/15 64/19
RAISING [1] 32/1
RAMIFICATIONS [1] 28/19
RANKING [1] 30/2
RAYMING [2] 1/3 3/3
REACTION [3] 53/19 53/20
53/22
READ [4] 8/16 46/17 50/1
50/7
READING [1] 46/18
REAL [3] 43/5 43/9 69/18
REALIZE [1] 82/5
REALLY [27] 13/5 22/3 28/4
29/13 30/20 32/14 32/23
35/6 35/15 37/10 39/16
40/11 49/13 49/21 51/17
51/22 52/25 54/20 55/19
59/12 60/19 65/22 78/15
86/25 87/9 87/10 89/9
REASON [1] 16/4
REASONABLE [1] 10/10
RECALL [22] 4/18 4/25 12/13
12/15 13/23 17/18 21/6
23/11 25/7 30/21 37/6 37/11
40/3 47/7 53/1 54/19 56/4
57/13 73/24 84/8 84/22 86/1
RECAP [1] 16/6
RECEIVE [2] 10/9 60/10

RECEIVED [1] 86/22
RECESS [2] 80/21 92/10
RECOLLECT [4] 12/21 32/1
54/15 70/22
RECOLLECTION [42] 12/19 12/20
12/22 18/8 24/20 25/3 25/23
26/5 27/24 28/3 32/9 32/18
32/21 32/22 35/3 35/7 37/4
37/17 37/18 38/3 38/10
42/22 47/9 47/15 49/7 49/11
51/10 51/21 51/23 51/24
52/12 54/4 54/6 54/13 56/22
60/17 63/13 81/10 84/5
84/21 86/19 90/19
RECOMMENDATION [2] 92/15
93/11
RECORD [4] 3/6 16/18 20/7
95/19
RECORDED [1] 1/25
RECOVER [3] 39/9 43/21 44/11
RECOVERED [4] 17/3 17/5 17/6
17/15
RECROSS [1] 95/2
REDIRECT [1] 95/2
REFER [1] 23/14
REFERENCE [3] 74/13 89/17
94/3
REFERENCED [1] 49/20
REFERRED [6] 12/14 18/5
31/22 39/2 67/15 76/10
REFERRING [3] 32/7 65/13
69/24
REFERS [2] 6/6 50/3
REFRESH [3] 6/16 14/11 47/7
REGARD [2] 7/8 10/14
REGARDING [2] 14/15 18/17
REGULAR [1] 56/4
RELATED [3] 11/21 17/4 58/24
RELATIVELY [1] 65/10
RELEVANT [2] 16/10 39/17
RELIANCE [3] 8/25 10/20 11/2
RELIED [12] 4/15 7/10 9/16
9/21 9/24 10/7 10/14 12/10
13/1 13/13 16/6 16/9
RELUCTANCE [1] 94/9
RELY [2] 8/8 9/11
RELYING [8] 7/19 9/2 11/17
11/19 12/6 16/2 71/10 77/6
REMAINED [2] 27/6 48/3
REMEMBER [99]
REMEMBERED [1] 62/4
REMOVING [1] 70/8
REPEAT [2] 31/12 45/20
REPEATEDLY [1] 7/9
REPLICATE [1] 90/24
REPORT [4] 33/2 55/10 55/13
64/24
REPORTED [1] 54/23
REPORTER [3] 1/22 34/12
95/16
REPORTING [1] 55/22
REPORTS [2] 39/5 46/25
REPRESENTATION [4] 10/2 10/7
11/18 17/8
REPRESENTATIONS [2] 9/3 44/18
REPRESENTING [2] 3/8 15/4
REQUEST [2] 25/2 50/10
REQUIRED [2] 49/14 81/18
REQUIRING [1] 6/24
RESIDED [1] 17/9
RESPECT [2] 49/25 91/20
RESPECTED [1] 62/12
RESPONDED [1] 54/7

**R**

RESPONSE [3] 14/19 54/5 69/6
RESPONSES [1] 46/13
RESPONSIBILITY [2] 41/20 42/2
RESPONSIBLE [4] 45/20 56/20
56/24 71/16
RESPONSIVE [1] 78/12
RESULT [3] 6/8 6/11 18/22
RESUME [27] 4/20 10/6 10/8
11/16 11/24 12/9 12/9 13/15
13/19 15/5 15/7 15/9 15/11
15/14 15/18 15/23 16/5
16/11 16/11 33/10 35/14
46/23 47/4 50/19 53/11
53/12 53/18
Resumed [1] 4/8
RESUMES [2] 14/22 94/19
RETAIN [1] 93/11
RETAINED [2] 17/7 39/10
RETAINS [1] 94/17
RETRIEVE [2] 17/22 18/2
RETRIEVED [1] 89/13
RETURN [3] 4/13 33/14 45/13
RETURNED [1] 38/6
REVEALS [1] 46/10
REVIEW [3] 9/10 16/2 48/24
REVIEWED [1] 7/21
RIGHT [59] 10/11 10/25 11/6
15/23 16/14 17/25 18/12
20/4 20/13 21/2 32/25 33/5
34/8 35/12 36/19 37/21 39/1
43/17 43/19 43/22 43/25
44/4 44/12 47/24 51/14
51/15 51/24 58/20 58/21
58/22 60/23 64/2 64/9 67/8
67/21 68/22 70/5 70/13
74/17 78/20 79/16 79/20
79/23 80/1 80/11 80/17
84/15 85/23 86/8 86/21 87/8
88/16 88/20 89/2 92/20 93/2
93/9 93/25 94/9
RISK [6] 70/8 70/9 70/10
70/10 70/18 88/23
RISKY [1] 69/15
ROAD [1] 2/14
ROBERT [2] 2/9 3/16
ROLE [3] 5/65 4 82/2
ROLLING [2] 43/12 43/14
RON [1] 13/24
RONALD [1] 15/2
ROOM [68] 1/13 1/23 2/6 19/8
19/9 19/11 19/11 19/13
19/18 19/20 19/22 20/9 21/6
23/4 23/12 23/13 23/20 27/6
28/12 28/13 30/15 33/20
34/4 34/4 34/4 35/4 35/8
35/25 36/2 36/3 36/17 36/18
36/21 36/23 38/25 42/24
42/25 42/25 43/18 44/9 49/3
49/5 49/18 50/11 50/21
51/10 55/22 57/6 59/17
67/23 67/25 68/23 68/24
68/25 69/7 70/19 71/18
71/20 72/1 72/2 72/10 72/14
73/5 73/15 75/9 91/21 91/22
91/25
ROUGHLY [1] 59/25
RPR [1] 1/22
RULES [1] 6/23
RUN [3] 69/7 69/22 70/10
RUNNING [29] 4/20 13/15
13/19 14/21 15/5 15/7 15/9

15/11 15/14 15/17 15/23
16/10 16/11 18/9 34/7 34/8
34/11 34/13 36/6 46/23 47/4 48/7 48/16
50/19 68/10 68/14 68/25
69/12 69/21 71/14 71/16
RYAN [20] 4/6 4/10 12/1
12/10 14/10 16/14 34/18
37/16 38/12 50/8 74/10
77/12 80/5 83/12 89/4 92/2
92/16 92/17 94/15 95/4

**S**

SAID [73] 4/21 4/23 7/6 8/23
11/1 11/2 12/10 13/1 13/5
13/9 13/18 16/10 22/21
22/21 22/24 22/24 24/6
24/12 24/20 24/21 25/20
30/19 31/20 35/18 37/9 39/6
39/7 39/16 40/10 45/4 48/2
51/25 53/7 54/4 56/14 58/6
60/15 60/16 60/21 61/17
61/21 61/23 62/1 62/3 62/4
62/7 62/12 63/17 64/15
64/18 66/13 67/14 70/13
71/13 71/14 73/4 73/14 75/7
75/10 75/15 76/8 79/6 79/16
80/24 81/7 82/13 82/24
83/18 84/3 84/19 88/14 90/6
90/22
SAME [13] 5/23 11/10 11/22
12/2 12/3 12/4 16/4 17/14
36/7 52/15 67/25 78/21
86/16
SAT [3] 39/3 68/20 69/1
SAW [1] 61/22
SAY [53] 6/21 7/22 9/4 9/13
13/7 18/4 18/8 19/15 20/16
21/24 23/19 24/2 25/8 25/23
32/12 33/3 33/4 34/25 34/25
34/25 36/14 37/17 38/9
47/14 47/20 49/2 50/11
51/24 54/10 59/2 60/2 60/4
60/5 64/16 66/17 67/9 68/3
68/19 72/25 73/15 74/7
76/11 76/12 81/15 82/19
83/11 84/3 84/5 84/18 86/18
90/8 91/12 92/2
SAYING [20] 12/16 12/18 12/21
12/24 13/6 13/14 15/22
20/21 30/21 35/9 48/12 60/6
63/6 63/13 63/20 68/25
76/14 84/22 85/16 86/25
SAYS [12] 6/9 11/15 46/21
48/19 48/20 50/2 68/12 73/5
74/11 75/8 79/23 80/9
SCENE [11] 38/13 38/16 38/16
38/20 39/18 41/4 41/8 42/8
42/8 42/23 45/13
SCHEDULE [2] 56/9 93/11
SCHOOL [1] 1/12
Schwartz [2] 1/15 3/9
SCREEN [7] 21/21 46/15 46/19
48/4 68/21 69/2 71/2
SEAL [3] 41/8 57/2 57/6
Sean [1] 29/5
SECOND [12] 11/22 31/24 41/2
46/14 47/19 47/20 48/1 48/7
48/13 54/3 58/3 80/1
SECURE [7] 35/19 35/22 35/24
36/1 36/5 38/16 68/24
SECURED [4] 67/23 68/3 68/23
69/5
SEE [32] 3/25 5/18 5/20 6/9

6/14 6/15 7/3 7/4 8/4 14/1
14/12 14/12 14/16 14/22
14/25 17/8 17/7 15 20/10
21/23 21/25 26/12 30/5 33/7
34/5 38/24 46/15 46/18
46/20 47/5 50/8 80/18 88/19
SEEMS [2] 33/16 79/23
SEEN [5] 6/1 6/16 6/18 68/21
69/1
SEND [5] 25/14 25/18 25/21
26/6 39/22
SENDING [2] 15/21 28/16
SENDS [1] 50/11
SENSE [4] 4/19 29/24 74/8
90/18
SENSITIVE [1] 70/1
SENT [5] 5/22 26/2 33/13 35/3
40/18
SENTENCE [5] 6/10 40/22 50/1
50/2 79/8
SEPARATE [4] 11/23 12/6
52/18 84/15
SEPARATELY [2] 4/22 62/1
September [11] 4/19 5/12 6/4
10/6 13/15 13/19 17/4 18/12
18/17 47/4 65/13
SEQUENCE [1] 35/5
SERGEANT [1] 29/5
SERIOUS [6] 6/12 10/16 11/20
16/7 49/14 49/15
SERVER [45] 17/10 17/10 18/9
18/10 21/20 24/5 24/14
25/12 29/1 30/16 33/19 34/3
34/5 34/7 34/20 34/20 35/22
37/8 44/21 44/22 44/23
44/23 45/9 46/22 46/23
49/20 50/12 50/14 50/15
50/18 51/12 66/14 67/21
67/22 68/7 68/18 68/21
69/14 70/1 70/8 70/20 87/24
88/3 88/21 90/24
SERVERS [6] 19/15 19/22
19/23 43/6 44/22 88/22
SERVICES [1] 17/7
SET [5] 14/8 19/18 19/22
35/22 46/14
Shana [11] 2/2 3/14 32/8
38/7 40/23 57/24 57/25
72/15 73/16 84/7 86/14
SHE [48] 21/13 21/14 29/7
34/14 53/17 53/24 54/4 54/6
54/8 54/10 54/10 54/18
54/22 56/6 56/9 56/11 56/23
56/25 57/10 67/10 72/1 72/1
76/8 76/8 76/8 76/11 76/12
76/14 79/1 79/2 79/3 79/3
79/6 82/13 82/17 82/18
82/19 82/22 83/11 83/15
83/16 83/17 83/18 83/20
83/22 91/20 91/21 91/22
Sheriff's [1] 4/2
SHOULD [33] 7/22 28/10 31/8
31/21 36/13 36/14 41/13
54/22 55/10 59/21 63/5
63/24 64/5 67/17 68/13
68/19 72/2 74/9 75/6 76/9
79/6 81/20 82/10 82/24 83/7
83/20 85/13 87/4 87/7 87/14
87/14 90/21 91/18
SHOULDN'T [3] 59/25 81/10
82/15
SHOW [4] 5/15 19/25 26/8
46/12

## S

**SHOWED** [2] 7/25 26/24
**SHOWING** [1] 6/2
**SHOWN** [2] 4/24 61/17
**SHOWS** [1] 50/24
**SHUT** [6] 42/24 42/25 43/3 43/4 43/14 70/25
**SIGN** [1] 73/1
**SIGNAL** [1] 11/15
**SIGNED** [4] 13/24 13/25 14/1 15/1
**SIGNIFICANT** [1] 12/5
**SIMILAR** [1] 92/21
**SIMPLY** [1] 35/25
**SINCE** [5] 30/23 41/24 41/24 69/24 71/16
**SIR** [2] 5/21 16/23
**SITTING** [3] 34/16 55/16 84/13
**SIZE** [3] 20/16 20/19 29/22
**SLOEY** [2] 1/15 3/10
**SO** [121]
**SOCC** [3] 14/21 15/5 28/25
**SOCC/JOCC** [3] 14/21 15/5 28/25
**SOLICIT** [2] 31/11 60/7
**SOME** [41] 5/8 9/11 17/22 18/2 19/20 21/22 28/23 28/24 29/11 32/5 32/9 32/15 37/15 40/1 40/2 40/18 41/11 43/5 44/3 44/9 44/20 48/17 48/21 51/3 55/10 55/12 56/18 57/5 57/8 62/11 65/4 66/1 70/16 71/19 72/9 75/1 75/13 76/12 78/22 87/19 93/16
**SOMEBODY** [7] 21/10 25/11 51/13 70/7 80/8 80/14 88/2
**SOMEONE** [22] 7/10 18/14 22/18 24/5 24/19 25/17 26/6 26/9 26/14 26/21 39/11 46/11 53/3 53/9 70/11 71/17 73/1 74/12 88/4 89/24 91/12 91/13
**SOMETHING** [18] 11/1 16/10 19/11 20/9 22/6 24/22 26/18 29/17 31/21 35/18 37/7 40/10 54/11 64/18 68/12 83/6 87/5 87/14
**SOMETIME** [1] 80/12
**SOMETIMES** [2] 59/13 59/13
**SOMEWHERE** [2] 27/20 57/16
**SOON** [3] 76/15 76/16 94/11
**SORRY** [11] 3/21 14/5 17/23 28/9 53/16 56/15 57/22 62/9 63/11 64/8 79/19
**SORT** [1] 39/3
**SOUGHT** [4] 6/13 24/10 31/4 55/9
**SOURCE** [2] 72/22 73/8
**SPAN** [1] 42/12
**SPEAK** [3] 54/22 86/13 90/7
**SPEAKING** [3] 40/1 50/6 59/25
**SPECIAL** [5] 30/24 40/12 40/13 41/14 68/5
**SPECIALIST** [1] 43/20
**SPECIFIC** [15] 24/20 25/2 25/8 32/21 38/2 38/11 41/8 45/3 51/9 51/23 54/5 54/15 57/20 86/20 87/6
**SPECIFICALLY** [12] 6/8 7/6 8/5 11/12 12/20 24/12 25/18 26/17 26/21 37/22 45/25

## S (continued)

81/13
**SPECIFY** [1] 16/12
**SPELL** [1] 27/2
**SPELLED** [1] 24/8
**SPELLING** [1] 27/3
**SPENT** [1] 68/17
**SPOKE** [2] 86/14 88/6
**STAFF** [2] 41/7 61/10
**STAND** [1] 71/17
**STANDARDS** [2] 7/8 8/6
**STANDING** [3] 28/6 30/16 74/10
**START** [7] 6/9 17/13 69/16 69/17 70/9 70/11 71/4
**STARTED** [6] 23/23 43/8 43/10 43/10 44/16 50/14
**STATE** [1] 6/21
**STATED** [11] 9/19 16/1 18/1 30/10 39/13 41/13 45/24 51/19 56/16 63/23 70/4
**STATEMENT** [2] 11/2 69/23
**STATEMENTS** [1] 60/14
**STATES** [5] 1/1 1/6 1/10 3/3 14/20
**STATING** [2] 11/4 22/7
**STAY** [2] 36/21 36/24
**STENOGRAPHY** [1] 1/25
**STEP** [1] 61/15
**STEPHEN** [2] 29/3 29/8
**STEPS** [6] 57/2 61/9 76/24 77/1 77/2 77/4
**STEVEN** [5] 21/11 29/3 43/24 48/16 70/16
**STICK** [1] 8/7
**STILL** [17] 8/7 9/5 9/7 9/7 9/10 9/16 11/11 12/5 17/9 18/23 36/5 42/8 45/14 68/9 68/10 68/14 81/4
**STOP** [10] 22/12 22/21 22/23 22/24 22/25 33/8 35/9 35/10 35/14 69/16
**STOPPED** [2] 65/19 79/14
**STRADER** [16] 4/17 4/23 5/4 7/11 10/4 10/14 11/25 12/14 12/16 16/2 61/11 61/12 61/17 61/21 62/1 63/12
**STRADER'S** [1] 13/14
**STREET** [6] 1/13 1/17 2/3 2/6 2/10 2/18
**STRESS** [1] 48/7
**STRIKE** [1] 34/15
**STRIKING** [1] 34/14
**STRONG** [3] 82/18 82/22 85/7
**STRONGLY** [3] 82/17 82/20 83/18
**STUFF** [1] 48/19
**SUBJECT** [8] 7/19 10/15 11/9 11/20 11/22 12/3 16/6 31/3
**SUBORDINATES** [6] 26/12 26/17 26/20 37/7 66/2 69/9
**SUBPOENA** [3] 14/15 14/19 16/10
**SUBSEQUENTLY** [3] 41/18 71/25 82/6
**SUBSTITUTING** [1] 62/19
**SUCCESSFULLY** [1] 19/1
**SUCH** [3] 29/23 30/8 31/17
**SUDDENLY** [1] 71/1
**SUFFICIENTLY** [1] 78/12
**SUGGEST** [2] 11/14 29/11
**SUGGESTING** [2] 48/3 63/19
**SUGGESTION** [2] 31/11 92/14
**SUITE** [4] 1/17 2/10 2/14 2/18
**SULLIVAN** [7] 47/3 54/23 55/23

## S (continued)

74/3 79/9 79/17 87/8
**SUMMONED** [1] 41/19
**SUPPLEMENTAL** [3] 46/13 93/21 94/11
**SUPPOSED** [1] 91/7
**SURE** [19] 5/2 5/16 8/2 2 18/19 22/24 23/24 31/25 44/21 45/1 49/24 57/2 62/21 63/18 69/3 69/10 75/5 76/23 83/20 94/4
**SUSPECTED** [1] 64/12
**SUSPEND** [1] 92/18
**SWITCHED** [2] 61/11 61/13
**SWORN** [1] 4/7
**SYLVAN** [2] 26/25 90/19
**SYSTEM** [28] 17/4 17/22 18/2 20/11 24/18 24/19 29/16 29/19 30/3 30/6 43/3 46/7 46/8 47/10 47/18 47/20 47/21 47/24 48/2 48/3 48/9 48/13 48/15 48/17 48/22 49/20 50/3 51/6
**SYSTEMS** [1] 17/15

## T

**TABLE** [2] 3/9 19/22
**TABLES** [1] 19/19
**TACK** [1] 60/21
**TAKE** [27] 4/13 8/17 14/24 25/7 25/19 26/11 33/3 38/19 41/8 57/2 57/20 61/9 61/15 64/7 64/9 76/24 77/1 77/2 77/4 83/10 83/11 83/12 83/16 84/16 89/6 92/5 92/7
**TAKEN** [4] 6/11 58/2 80/21 92/10
**TAKING** [2] 34/13 67/19
**TALK** [2] 28/12 40/9
**TALKED** [3] 10/23 37/9 40/8
**TALKING** [7] 8/1 27/14 32/13 42/7 65/15 66/24 83/14
**TAMPERED** [6] 26/18 26/21 37/8 57/3 57/4 64/13
**TAMPERING** [4] 26/23 28/19 69/20 79/19
**TANDEM** [1] 11/10
**TEAM** [10] 17/4 17/8 17/15 46/22 50/14 50/15 50/18 79/22 88/3 89/13
**TECHNICAL** [1] 43/19
**TECHNICIAN** [2] 48/11 48/22
**TELEPHONE** [5] 77/19 77/24 80/24 84/8 84/11
**TELL** [22] 22/3 22/20 28/15 30/16 39/8 39/18 46/9 48/22 53/5 66/21 67/1 79/8 79/25 80/3 80/15 84/4 85/6 85/14 88/2 90/8 91/12 91/14
**TELLING** [3] 36/13 70/20 84/9
**TELLS** [2] 22/18 50/21
**TERMINOLOGY** [1] 37/18
**TERMS** [9] 7/10 8/5 8/25 10/13 12/6 16/2 32/3 37/8 61/12
**TERRANCE** [2] 4/6 95/4
**TESTIFIED** [4] 10/15 12/23 36/11 88/18
**TESTIFY** [1] 8/11
**TESTIFYING** [1] 4/18
**TESTIMONY** [12] 4/22 4/25 5/8 8/7 13/3 13/20 14/4 16/12 52/2 61/11 61/21 94/19
**THAN** [9] 20/5 20/14 22/2 22/17 34/17 38/5 74/3 77/24

**T**

THXR... [1] 92/3

THANK [20]  3/7 3/12 3/15 4/5
16/23 21/4 35/16 42/4 45/10
45/11 53/24 54/4 55/25 56/1
63/21 67/4 88/9 91/17 94/14
94/22

THAT [765]

THAT's [37]  7/9 12/24 14/3
14/3 14/11 15/22 17/12 18/7
19/14 24/7 30/18 33/14
33/20 34/14 36/13 38/22
39/23 45/1 45/23 49/1 49/7
50/12 56/11 57/22 62/4
62/22 64/16 64/24 66/20
67/11 67/17 71/3 74/18 80/5
85/3 88/13 93/14

THE CONTEXT [1]  69/10

THEIR [10]  55/21 63/12 67/16
67/16 81/18 82/4 93/7 94/1
94/4 94/6

THEM [24]  4/24 19/15 19/22
23/3 28/15 29/12 30/16 32/5
32/7 41/19 43/8 43/9 43/10
43/12 43/13 43/14 44/1
77/11 78/16 79/9 84/2 86/18
86/22 86/24

THEN [34]  4/12 8/20 16/8
17/13 21/20 25/22 26/11
27/12 34/24 39/21 40/19
40/20 44/17 45/8 45/13
48/17 50/11 51/9 52/12 54/1
61/25 65/17 68/16 69/18
69/19 69/20 71/4 73/5 73/19
82/9 83/10 84/15 85/12 86/8

THERE [118]

THERE's [5]  20/5 37/20 39/20
46/21 80/13

THEREABOUTS [1]  73/21

THEREFORE [1]  41/23

THESE [17]  7/19 8/13 9/14
10/16 11/9 12/3 20/2 29/10
29/22 33/3 43/6 56/12 62/15
62/18 85/7 93/25 94/16

THEY [42]  4/24 16/17 17/9
18/9 18/21 18/22 19/21 20/4
20/5 22/12 23/2 26/2 28/16
39/22 40/1 40/2 41/20 43/8
43/9 43/10 43/11 43/11
45/22 48/16 57/3 58/21
59/21 60/6 60/7 60/8 62/13
68/22 74/3 75/15 75/21 76/4
82/3 82/5 83/24 85/9 88/22
93/6

THEY'LL [1]  66/12

THEY'RE [2]  19/24 20/1

THEY'VE [1]  53/25

THICK [1]  19/25

THING [6]  32/24 45/7 56/3
59/20 66/19 78/3

THINGS [7]  38/15 59/18 60/15
73/23 79/20 83/21 89/12

THINK [90]  8/17 10/7 11/14
12/23 12/25 13/25 14/3 14/3
22/5 22/21 23/6 23/6 23/21
23/22 24/3 24/13 25/1 27/14
27/18 27/22 27/23 28/8 29/7
29/12 29/18 29/25 30/18
30/22 31/20 33/12 35/2
35/10 37/3 37/24 38/2 38/8
39/4 39/17 40/8 43/5 43/20
44/14 44/15 45/23 49/5

49/25 52/8 52/14 54/8 54/10
55/19 57/9 57/23 61/3 62/23
63/2 63/7 63/23 64/11 65/19
66/10 67/13 68/9 68/10
68/15 71/19 72/15 73/2
73/10 73/16 73/18 74/2 74/7
77/17 77/25 78/3 78/15
78/20 78/24 79/6 79/13
82/18 82/19 82/24 87/1
87/15 90/22 92/8 93/14 94/2

THINKING [4]  52/4 71/9 74/3
93/20

THINKS [1]  50/18

THIRD [1]  64/2

THIS [165]

THOMAS [2]  5/19 6/4

THOSE [17]  10/23 11/22 16/15
18/12 29/2 29/14 45/21
45/24 49/3 49/12 64/18
83/21 83/21 84/15 85/16
86/12 89/19

THOUGH [2]  66/13 68/10

THOUGHT [12]  13/9 45/19
59/21 68/23 81/4 82/25
87/25 88/6 88/18 89/10 91/5
93/16

THREE [1]  59/9

THROUGH [2]  13/2 76/23

THROUGHOUT [1]  19/16

TIME [58]  5/8 7/21 8/9 8/12
9/12 9/18 10/5 11/10 12/14
12/17 18/16 18/25 23/22
26/24 27/5 27/6 27/24 28/5
29/21 30/23 31/4 31/16
31/25 32/12 33/13 34/3 36/7
36/15 36/21 36/24 42/12
43/6 44/4 46/4 47/19 47/20
47/23 48/1 48/4 48/7 48/14
48/17 51/22 52/13 53/2
54/16 63/9 63/11 65/6 65/24
68/13 76/12 78/17 80/24
85/24 86/8 86/16 88/21

TIMELINE [2]  5/3 31/25

TIMES [1]  86/16

TIMING [1]  50/12

TO DIRECT [1]  16/14

TODAY [7]  22/3 32/21 35/6
51/8 54/17 60/16 86/4

TOGETHER [1]  11/10

TOLD [32]  4/15 22/11 23/3
24/9 26/9 30/18 32/18 33/8
39/3 39/7 53/21 58/16 58/17
60/17 63/5 63/9 70/13 79/18
83/2 86/24 87/4 87/7 87/14
87/14 88/7 88/11 89/5 89/12
89/23 90/1 90/9 91/6

TOM [1]  10/21

TOO [1]  21/10

TOOK [4]  27/25 49/17 78/21
80/23

TOP [1]  20/5

TOPIC [4]  59/1 59/2 59/3 59/4

TOUCH [5]  33/17 34/25 35/9
38/24 94/10

TOUCHED [1]  33/22

TOUCHES [1]  34/19

TOUR [3]  12/15 12/22 61/23

TOURS [1]  12/13

TRANSCRIPT [3]  1/9 1/25 95/19

TRANSMISSION [1]  13/24

TRANSMITTED [1]  13/17

TREAT [1]  38/19

TRIED [3]  24/19 66/13 89/24

TROUBLE [2]  73/6 73/14

TRUE [6]  15/3 15/4 18/25 31/2
41/16 61/7

TRUGMAN [1]  29/5

TRY [3]  17/14 21/20 29/17

TRYING [16]  9/13 11/4 11/23
13/7 20/8 22/18 28/22 32/12
48/6 48/12 48/19 51/1 62/5
65/18 68/18 79/16

TURLEY [8]  1/12 3/8 4/11 50/1
51/1 86/22 92/1 95/5

TURN [5]  22/20 22/21 69/15
69/17 70/20

TURNED [5]  12/17 34/10 35/22
68/15 70/11

TURNING [1]  70/8

TURNS [1]  39/21

TWO [18]  4/22 6/14 42/13
44/7 44/21 49/3 49/12 62/11
63/6 75/9 79/20 83/21 83/21
84/15 85/7 86/12 88/22
89/12

TYPE [1]  72/11

TYPES [1]  7/20

TYPICAL [2]  19/23 56/11

TYPICALLY [1]  39/20

**U**

U.S [5]  1/22 2/6 6/23 47/1
47/2

UH [3]  56/13 60/24 68/2

UH-HUH [3]  56/13 60/24 68/2

ULTIMATELY [1]  4/23

UNAFFECTED [1]  11/11

UNDER [10]  16/9 79/4 81/12
81/19 81/23 82/15 83/8
83/23 84/12 87/19

UNDERSTAND [20]  8/22 9/13
10/12 18/19 18/21 31/25
37/17 38/13 38/15 45/3 48/6
65/18 69/10 75/5 79/21
81/13 82/5 89/7 93/19 94/7

UNDERSTANDING [10]  26/13
29/15 29/21 46/7 48/8 57/19
82/4 85/1 94/15 94/19

UNDERSTOOD [6]  31/2 56/6
60/5 60/5 75/7 82/7

UNEQUIVOCAL [1]  93/25

UNIT [1]  39/22

UNITED [4]  1/1 1/6 1/10 3/3

UNQUESTIONABLY [1]  93/13

UNTIL [8]  8/18 33/9 51/12
68/16 68/17 83/8 84/14
94/18

UP [36]  4/12 10/11 14/10
19/22 22/16 23/2 23/4 23/12
26/8 26/24 29/4 29/10 29/13
29/22 35/11 35/18 44/21
44/22 44/23 46/19 48/16
48/18 48/20 50/24 54/1
54/25 57/16 58/16 58/19
59/6 68/14 68/17 68/21
69/21 71/5 82/10

UPON [3]  4/15 16/2 74/23

UPSTAIRS [3]  58/11 58/22 82/3

US [22]  4/13 18/20 25/5 25/6
25/22 26/12 36/8 36/13
39/11 44/20 44/23 44/25
45/7 45/19 46/9 48/23 50/9
59/9 68/16 71/25 72/9 90/21

USE [2]  33/17 93/15

USED [7]  19/13 23/6 26/23
37/13 38/3 48/16 69/25

## U

UTGOFF [1] 2/5
UTTERING [1] 80/12

## V

VA [1] 2/14
VARIOUS [1] 31/3
VERSUS [1] 3/3
VERY [9] 14/25 21/15 21/16
26/4 47/9 53/24 54/4 56/10
92/8
VIEW [10] 9/16 39/24 60/9
66/18 69/6 69/12 74/12
78/11 82/22 88/14
VIEWS [3] 9/11 55/9 85/7
VIOLATE [1] 44/24
VIOLATION [1] 94/17
VIOLATIONS [1] 6/6

## W

WAIT [3] 27/4 27/22 46/18
WAITED [5] 8/18 8/23 9/14
9/15 27/8
WAITING [9] 26/8 26/13 27/23
28/11 38/21 40/19 42/17
42/18 84/14
WALK [1] 23/13
WALKER [3] 1/22 95/18 95/25
WANT [17] 5/2 6/3 6/5 12/13
19/15 25/9 31/24 35/18
37/16 46/16 61/15 63/17
76/14 82/7 82/13 92/2 92/11
WANTED [11] 8/24 25/10 35/4
37/13 43/11 48/6 48/15
60/21 79/3 83/18 85/15
WANTS [1] 84/18
WARN [1] 56/19
WAS [395]
WASHINGTON [9] 1/7 1/12 1/13
1/18 1/23 2/4 2/7 2/10 2/18
WASN'T [15] 9/24 13/14 16/11
26/4 28/9 40/19 47/24 50/13
58/12 72/6 74/15 74/19
76/14 88/11 88/17
WATCHING [1] 42/16
WAY [13] 13/8 15/22 19/6
45/5 61/16 69/6 69/7 76/17
78/20 89/6 90/6 90/11 94/17
WE [100]
WE'LL [2] 17/13 55/4
WE'RE [13] 5/16 6/2 14/10
14/18 17/14 22/25 24/21
31/24 51/2 53/25 65/13
83/14 90/23
WE'VE [5] 16/3 22/24 43/7
63/6 80/25
WEEKEND [1] 93/21
WELCOME [1] 16/24
WELL [32] 5/15 9/1 10/1
17/13 25/15 28/22 34/18
34/24 36/11 36/13 38/12
39/20 43/2 43/25 47/20 48/6
53/8 53/24 57/21 69/9 71/8
73/14 74/10 75/7 75/10
76/23 80/4 82/1 88/16 21 90/7
93/4 94/8
WENT [8] 27/5 44/8 51/16
52/24 53/21 58/21 58/22
85/21
WERE [101]
WEREN'T [5] 8/11 18/16 48/12
63/5 72/5

WHAT [123]
WHAT'S [5] 15/19 19/13 62/5
67/21 67/22
WHATEVER [5] 18/21 40/16
45/5 51/5 93/3
WHEN [78] 9/4 9/13 10/13
12/15 13/17 17/21 18/1
18/20 19/3 19/6 21/14 22/11
23/3 24/9 27/14 29/16 29/21
30/15 32/4 32/6 32/12 32/24
33/9 34/3 35/5 35/10 36/18
37/9 38/9 39/7 39/17 39/20
40/2 42/8 44/10 45/13 47/18
47/20 48/2 48/19 49/18
49/19 50/13 51/9 51/14 50/10
55/14 57/7 58/8 59/2 60/4
62/11 63/17 64/22 65/7
65/15 65/15 68/3 68/23
69/25 71/4 71/25 72/7 72/16
72/19 72/21 72/25 73/14
74/10 76/4 78/6 80/8 81/19
82/9 82/19 83/24 85/19
87/11 88/17
WHENEVER [1] 58/21
WHERE [16] 4/12 4/14 6/8
18/11 19/14 19/20 21/25
28/9 30/15 46/18 59/18
67/17 69/19 83/15 86/9 87/7
WHEREUPON [1] 94/23
WHEREVER [1] 44/5
WHETHER [26] 4/16 7/11 7/18
15/19 17/9 19/1 25/7 26/18
26/21 31/8 33/1 33/18 35/8
36/12 43/9 48/22 51/13
54/22 55/5 55/10 63/18
70/17 71/21 77/22 87/4
90/21
WHICH [12] 10/9 11/16 16/18
19/9 20/9 20/10 20/12 25/5
31/20 40/6 59/23 86/1
WHILE [6] 18/13 27/8 27/17
28/11 38/25 85/22
WHITE [2] 20/18 20/19
WHO [47] 7/19 11/19 12/3
15/1 16/6 16/9 21/6 21/6
23/14 23/16 24/7 25/4 25/21
26/19 27/10 27/11 28/22
28/24 29/2 29/7 29/16 32/7
34/19 39/10 40/22 41/24
43/18 43/22 43/24 44/2
45/25 46/3 47/18 58/10
58/14 59/6 68/24 70/13
70/15 70/16 72/22 72/14
72/22 72/23 81/23 82/10
91/2
WHO'S [1] 29/4
WHOEVER [2] 18/21 66/13
WHOLE [3] 36/24 42/14 59/20
WHOM [3] 31/15 31/17 86/12
WHOSE [1] 60/25
WHY [15] 4/12 24/14 24/16
24/18 58/25 59/21 61/3 61/5
64/7 64/9 66/9 75/22 77/5
88/19 90/8
WIDE [1] 19/24
WILL [14] 7/1 14/5 16/17
84/10 91/22 92/21 92/23
93/7 93/20 93/23 94/10
94/10 94/16 94/17
WILLIAM [2] 2/2 3/13
WISH [1] 93/15
WITHDRAWAL [4] 5/15 5/18
5/19 5/22

WITHDRAWN [1] 5/11
WITHIN [4] 25/5 32/13 42/1
64/23
WITHOUT [1] 45/2
WITNESS [3] 4/6 91/21 95/2
WOMAN [1] 56/10
WOMEN [1] 66/11
WON'T [1] 51/16
WONDERED [1] 90/20
WORD [2] 79/17 93/15
WORDS [9] 24/3 24/23 38/3
60/1 76/13 80/13 85/16
85/17 87/18
WORK [10] 17/13 19/20 23/5
28/7 35/4 44/10 45/4 51/5
51/8 93/17
WORKED [1] 5/7
WORKING [4] 24/21 28/24
56/12 75/20
WORLD [4] 18/11 28/25 48/20
64/22
WOULD [89] 3/5 8/15 8/18
8/20 8/23 8/24 9/1 9/5 9/5
9/9 9/16 9/21 9/22 9/24
10/7 10/10 11/7 18/23
19/23 20/16 21/24 25/3
25/21 25/21 25/21 26/6
26/11 29/1 29/16 32/8 34/18
34/19 39/17 40/23 43/18
45/3 47/21 47/25 50/5 57/20
59/23 60/16 62/17 62/18
62/20 64/12 64/13 67/7 69/6
69/8 69/20 70/9 75/4 75/6
75/7 75/10 75/12 75/15
75/17 75/17 75/21 75/21
76/2 76/4 76/25 77/3 77/13
77/14 77/25 79/10 80/5 81/8
81/15 82/23 85/1 85/9 87/1
88/1 88/2 88/7 88/24 89/4
92/8 92/18 93/5 93/6 93/6
93/10 93/16
WOULDN'T [3] 24/17 64/9
66/18
WRONG [5] 15/17 51/25 65/3
80/24 83/15

## Y

YEAH [7] 23/9 23/15 28/7 36/2
52/7 56/9 64/2
YEARS [5] 6/14 10/21 40/5
53/18 65/21
YES [120]
YESTERDAY [13] 3/19 4/14 4/22
5/7 7/10 7/14 7/18 7/23
8/11 12/12 12/23 13/2 13/9
YET [5] 16/1 34/10 36/1 66/4
66/7
YOU [616]
YOU AGREED [1] 60/4
YOU'LL [5] 5/18 6/3 6/9 14/11
46/20
YOU'RE [13] 10/12 16/24 20/21
22/22 22/23 34/4 45/14
61/25 62/5 70/12 70/13
76/19 76/20
YOU'VE [5] 7/21 17/23 33/8
45/16 69/21
YOUR [119]
YOURSELF [2] 35/19 51/10
YOURSELVES [1] 3/5