```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3       Rayming Chang, et al,          )
                                        )
 4                    Plaintiffs,       )    File No:  CA 02-2010
                                        )
 5       vs.                            )
                                        )    Date:  January 9, 2013
 6       United States of America,      )         A.M. Session
         et al,                         )
 7                                      )    Time:  9:30 a.m.
                      Defendants.       )
 8
         _____
 9

10                 TRANSCRIPT OF EVIDENTIARY HEARING
                                HELD BEFORE
11                 THE HONORABLE JOHN M. FACCIOLA
                   UNITED STATES MAGISTRATE JUDGE
12
         _____
13

14

15       APPEARANCES:

16

17       For the Plaintiffs:        Mr. Jonathan Turley, Esq.
                                    George Washington Law School
18                                  2000 H Street, NW, Room E305
                                    Washington, DC   20052
19
                                    Mr. Daniel Schwartz, Esq.
20                                  Mr. P. J. Meitl, Esq.
                                    Mr. Nick Sloey, Esq.
21                                  Bryan Cave LLP
                                    1155 F Street, NW, Suite 700
22                                  Washington, DC   20004

23

24

25
```

```
 1    For the Defendants:        Mr. William Causey, AAG
                                 Office of the Attorney General - DC
 2                               441 4th Street, NW, 6th Floor
                                 Washington, DC   20001
 3
                                 Ms. Marina Braswell, Esq.
 4                               Office of the US Attorney - DC
                                 555 4th Street, NW, Room 10-413
 5                               Washington, DC   20530

 6                               Mr. Robert Deso, Esq.
                                 Deso & Buckley, PC
 7                               1828 L Street, NW, Suite 270
                                 Washington, DC   20036
 8
                                 Ms. Lauren Elizabeth Curry, Esq.
 9                               Mr. Mark Tuohey, Esq.
                                 Brown Rudnick, LLP
10                               601 13th Street, NW, Suite 600 South
                                 Washington, DC   20005
11

12    ALSO PRESENT:             Ms. Natalie Olivia Ludaway, Esq.
                                 Leftwich & Ludaway
13                               1400 K Street, NW, Suite 1000
                                 Washington, DC   20005
14

15

16

17
      Court Reporter:            Vicki Eastvold, RMR, CRR
18                               Official Court Reporter
                                 U.S. Courthouse, Room 6722
19                               333 Constitution Avenue, NW
                                 Washington, DC  20001
20                               202-354-3242

21

22

23

24

25
```

1

2                          I N D E X

3

4     MONIQUE PRESSLEY
          Direct Examination by Mr. Meitl (*continuing*)......... 4
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE DEPUTY CLERK:  This is civil case 02-2010

2     Rayming Chang, et al, versus United States of America, et

3     al.  Evidentiary hearing.  Day eight.  Will the parties

4     please identify yourselves for the record?

5          MR. TURLEY:  Morning, Your Honor.  Jonathan Turley

6     for the Chang plaintiffs.  Joining me at counsel table is

7     Mr. Daniel Schwartz, Mr. P.J. Meitl, Mr. Nick Sloey, from

8     the law firm of Bryan Cave.

9          THE COURT:  Okay.

10         MR. CAUSEY:  Morning, Your Honor.  William Causey

11    for the district defendants.

12         THE COURT:  Good morning.

13         MS. LUDAWAY:  Good morning, Your Honor.  Natalie

14    Ludaway on behalf of Monique Pressley.

15         MS. BRASWELL:  Morning, Your Honor.  Marina

16    Braswell on behalf of the federal defendants.

17         MR. TUOHEY:  Morning, Your Honor.  Mark Tuohey and

18    Lauren Currey on behalf of Chief Ramsey.

19         MR. DESO:  Morning, Your Honor.  Robert Deso on

20    behalf of Assistant Chief Newsham.

21         THE COURT:  Thank you.  You may proceed.

22         MR. MEITL:  Thank you, Your Honor.

23              DIRECT EXAMINATION (*continuing*)

24    BY MR. MEITL:

25    Q.  Good morning, Ms. Pressley.

1    A.  Good morning.

2    Q.  Ms. Pressley, I want to start by revisiting a line of

3    questions raised by the Court last time.

4            As you may recall, the Court asked you about

5    district efforts to locate the E-Team data from September

6    27, 2002, prior to Mr. Bynum visiting the district.  And you

7    testified -- and I'll quote it here.  This is from page 29

8    of the transcript of your previous testimony.

9            Quote:  My understanding from prior testimony,

10   specifically of George Crawford, was that he had looked on

11   the server when the server was still functioning and

12   couldn't see anything and thought it was not there.

13           Those are lines 20 to 25.  Do you recall

14   testifying to that in your examination, Ms. Pressley?

15   A.  I believe so.  I don't dispute that I said it.

16   Q.  Okay.  So is it your understanding that the District of

17   Columbia took efforts to locate the E-Team data prior to

18   Mr. Bynum visiting the district in May 2011?

19   A.  Yes.

20   Q.  And those efforts included using Mr. Crawford, who is a

21   district employed IT specialist, in looking for that data.

22   A.  Yes.

23   Q.  But these efforts were unsuccessful, correct?

24   A.  In that the material was not recovered, yes.

25   Q.  He could not find the data.

1    A.   That's my recollection of what he said.   Among others,

2    yes.

3    Q.   Okay.   And as it says here -- as you said -- he tried to

4    find the data when the system was still functioning.   So it

5    wasn't a contractual issue that prevented him from finding

6    it.   He was looking at it when the system was still working,

7    right?

8    A.   I am not certain which system we were discussing for

9    this part of the testimony.   Was there an earlier question

10   that would let me know what we were discussing?

11   Q.   If you look above maybe, to lines 12, we're talking

12   about reinstituting or recontracting.   So does that help

13   you?   You only -- the district only do that with NC4.   They

14   never did that with the Group Systems, correct?

15   A.   With respect to Mr. Bynum, that would relate to E-Team's

16   data, yes.

17   Q.   So my question was, he was trying to find this data even

18   when the system was still functioning.   So it wasn't just a

19   contractual reason why he couldn't find the data.   Correct?

20   A.   Many years earlier, I believe so.   That is my

21   recollection.

22   Q.   And we now know that at least some of that data was

23   still there.   I mean, the district did produce it, correct?

24   The E-Team data.

25   A.   I believe it's correct that all of the E-Team's data was

1     still on the server.

2     Q.  Okay.  But just to be clear, Mr. Crawford, an IT

3     specialist employed by the district, named as the 30(b)(6)

4     witness for the district on certain occasions, he could not

5     find this when he looked for it years before.

6     A.  I don't believe so.  And I do not know that Mr. Crawford

7     ever used that system.  I just recall that when they were

8     looking for information, he went and looked, but said then

9     -- and certainly to the district later during his testimony

10    -- that it was not a system that he used regularly when they

11    were using the E-Team system.  That was not his job.  There

12    were people in the operating offices who utilized the

13    system.  And then there were E-Team's employees on staff who

14    were responsible for utilizing the system.  So I'm not aware

15    of Mr. Crawford ever being one of those people.

16    Q.  Well, the district did employ him to attempt to find

17    that data, didn't they?

18    A.  I don't know that he was employed for that.

19    Q.  Well, the district asked him to locate the data, did

20    they not?

21    A.  I believe at some point he was asked by someone in MPD

22    to look for the data while E-Teams was still being utilized.

23    Q.  And you referenced other individuals who may have

24    greater familiarity with NC4 E-Team.  Those individuals did

25    not find E-Team data at any point between 2002 and when

1    Mr. Bynum found it in 2011, correct?

2    A.  I don't know that anyone else was looking.  I'm -- I'm

3    not certain.

4    Q.  All right.  Well, is it fair to say that the district

5    never located E-Team data between 2002 and 2011 when

6    Mr. Bynum found it?

7    A.  I think it would be fairer to say that at some point,

8    due to the change in personnel and on counsel side and on

9    MPD side, that there was a lack of understanding as to which

10   systems were actually being utilized on the date of the

11   events in 2002.

12          So in preparing witnesses for the new discovery

13   period, some witnesses were saying one thing, some were

14   saying another, and it took some doing and some tracking

15   down to actually figure out who was there and what systems

16   were being used.  So I don't know in terms of MPD personnel

17   how many people who were still on the job when I came into

18   it actually had that information.  So I can't say that

19   someone was actively looking for data or even knew to look

20   for specific data.

21          More to the point, when I came on we were looking

22   for Group Systems and paper.  That was what we were looking

23   for.  So just for my own personal knowledge of what to try

24   to track down in response to requests, it wasn't until the

25   preparation of witnesses that we came to realize that we

1    could be looking for E-data and E-Teams as a system.  So I

2    can't say how many people knew how much.  It seems like not

3    many.

4    Q.  While you were lead counsel, if E-Team data had been

5    located, you certainly would you have produced it, correct?

6    A.  Yes.  And I believe I did while I was lead counsel.

7    Q.  And do you recall in the previous round of special

8    master hearings back in 2010 when you were counsel,

9    Mr. Crawford testified -- we looked at several of his

10   declarations -- where he discussed his search for E-Team

11   data?

12   A.  I recall it generally.  I believe that's what I'm

13   referencing here.  I didn't review any of it for the purpose

14   of my testimony today.

15   Q.  You know, we don't -- or, you don't know who actually

16   selected the delete button that Mr. Bynum found in relation

17   to the E-Team data, do you?

18   A.  I don't know who selected the --

19   Q.  Who pressed the delete button with respect to E-Team

20   data for September 27, 2002?

21   A.  No.

22   Q.  And so we certainly don't know their intention in doing

23   that.

24   A.  I have no idea.

25   Q.  Okay.  But see if you can follow this, Ms. Pressley.  If

1    the objective of whoever selected that delete button was to

2    hide it or to make it appear as it did not exist, would you

3    agree that they were successful in 2002 until 2011?

4    A.  I don't know.  I don't know if they were or not.

5    Q.  Well, I guess I don't understand your answer.  Did the

6    district know about it prior to 2011?

7    A.  I don't know.

8    Q.  When you were lead counsel from 2009 to 2011, did you

9    know about it?

10   A.  I did not.

11   Q.  So at least during that time, if the objective had been

12   to hide this information, they were successful while you

13   were lead counsel in hiding it from you.

14   A.  I don't know that someone was successful in hiding

15   something from me.  I don't know if the intention was to

16   hide.  I would just be wildly speculating as to the mind of

17   an individual whom I do not know.

18   Q.  I understand we don't know their intention.  But for the

19   sake of my question, if their intention was to keep it from

20   being discovered, they were successful, at least while you

21   were lead counsel.  Correct?

22   A.  I did not know.

23   Q.  And, in fact, prior to being discovered in May 2011,

24   discovery had closed, and then was reopened by Judge

25   Sullivan as a result of district discovery, isn't that

1    right?

2    A.  That discovery was reopened, yes.

3    Q.  So but for Judge Sullivan saying, Let's reopen

4    discovery, and the plaintiffs pushing for this for a number

5    of years, the court, the plaintiffs, the parties, they would

6    all be under the impression the E-Team data did not exist,

7    wouldn't they?

8    A.  I don't know that that's the "but for."  Because I don't

9    believe that the plaintiffs were actually producing a

10   discovery request that specifically related to the data that

11   we ultimately produced.  I think, rather, during the

12   discovery period it was the diligence of counsel for the

13   District of Columbia that led to the discovery of the

14   E-Team's data and the ultimate production of such data.

15   Q.  Well, Ms. Pressley, are you aware of Judge Sullivan

16   issuing an order back in 2007 compelling, ordering, the

17   district to produce the JOCC running resume?

18   A.  At that point I believe everyone thought that was paper

19   and Group Systems.  It wasn't until later than 2009 that

20   current counsel for the district at that time realized that

21   the efforts should be pointed in a different direction.  And

22   as soon as that information became available, we sought to

23   get it and we sought to produce it, and we did.

24   Q.  Now, I think you said you attribute the discovery of the

25   E-team data to the diligence of district counsel.  Is that

 1    what you said?

 2    A.  I don't think that it would have been uncovered

 3    otherwise.

 4    Q.  So you don't attribute any of that to the reopening of

 5    discovery or the multiple depositions where we discussed

 6    these topics and this was ultimately uncovered that the

 7    E-Team system was in use?

 8    A.  Well, I think that there are just so many things that

 9    could have happened and probably should have happened for a

10    long number of years; that if I tried to figure out who

11    deserves credit for making a very bad situation a little bit

12    better, that -- you know, it would have to go around to

13    everyone.

14          I'm not trying to self-aggrandize or to allot

15    anyone in the very belated efforts.  I understand things

16    should have been done differently.  All I'm saying is that

17    there was not adequate staff at MPD who had knowledge, and I

18    don't know that that's any one particular person's fault or

19    that that's the district's fault.  Because if an E-Team's

20    person had been on staff all of those years in between, then

21    they could have easily gotten to the information.

22          So it wasn't that it was well hidden by whomever

23    pressed the delete button.  It was that there weren't people

24    with knowledge there.  And I can't intuitive say that

25    whoever pressed the delete button could see three years

1    forward and know that E-Team's contract would be cancelled

2    and no one would be on staff who would know where to look

3    for it or any of those things.  That's just a little wild.

4           What I can say is that any number of things

5    happened because of an issue that took place a decade ago.

6    And then making best efforts after that, I know that the

7    counsel, not just myself, but others who were still

8    associated with the case when we learned information moved

9    on the information we learned.

10   Q.  Okay.  And you just referenced best efforts.  And

11   previously, diligence.  Who are you referred to?  MPD

12   employees or district attorneys?

13   A.  I can only speak for the efforts that were made by my

14   office.  By the District of Columbia Attorney General's

15   Office.

16   Q.  And you were counsel between 2009 and 2011, but we

17   didn't find this until May 2011.  So what took place between

18   May 2009 when new counsel arrived for the district?  Was

19   there the same level of diligence during that time frame?

20   A.  I believe that the discovery and what the conversations

21   with witnesses revealed is what led to further action.  So

22   from 2009, October, through early 2010, I'm not certain how

23   much we knew.  I'm not certain that at that point I even

24   knew that E-Team's data was at one point held

25   electronically.  That that system was being utilized for the

1    2002 event.  I'm not certain at what point -- I mean, there

2    are things that can track it because, you know, as we

3    learned those things, those things were disclosed.  So I

4    haven't revealed my emails to counsel for Chang plaintiffs,

5    but I'm sure that I told you.  And when we knew is when

6    others knew of that information.  And we began to try to

7    track it down.

8    Q.  And would it surprise you that there were numerous

9    declarations filed August 2009 referencing the E-Team

10   system?

11   A.  No.  It wouldn't surprise me.  I mean, I know they

12   weren't mine, but it wouldn't surprise me that there were

13   declarations filed.

14   Q.  Thus, the district knew the E-Team system was at issue

15   in August 2009.

16   A.  I'm not certain what the district knew before I came on

17   board.  I can only say that at the time that I came to look

18   for the JOCC running resume, we were looking for Group

19   Systems and we were looking for paper.  And both of those

20   ultimately ended up being inaccurate, at least from what the

21   witnesses ultimately said.

22   Q.  Now in 2009, right before your arrival on the case,

23   Mr. Koger, Attorney General Nichols, and others filed

24   declarations.  When you came on the case, did you review

25   those declarations?  And this is with respect to discovery

1   efforts and locating information.

2   A.  I'm sure that at some point I did.  I had seven year's

3   worth of material to review.  So I had many meetings.  I

4   wasn't able initially to meet with Mr. Koger.  But when he

5   returned to the office, I was able to meet with him, and

6   there were others who were assisting in the case.  And then

7   there were two huge rooms.  Because at the time that the

8   case -- that I came on the case, the class action was still

9   ongoing.  So there was litigation for Barham and for Chang.

10  And then there were all of the other cases, some of which

11  had not yet settled.  So there were probably at least three

12  war rooms of documents that had to be reviewed.  And when I

13  first came on I started with a binder full of some pleadings

14  and worked from there.

15  Q.  So can you give us a date when you first -- or,

16  approximate date when you first were aware that the E-Team

17  system might have relevant information?

18  A.  I don't know.  I don't recall.

19  Q.  Would it be fair to say that if it was in declarations

20  in the month or two before your arrival, that you would have

21  been aware shortly after your arrival?

22          MS. LUDAWAY:  Your Honor, may I object to this

23  line of testimony?  The minute order that was issued on

24  November the 7th clearly sets forth the scope of

25  Ms. Pressley's testimony.  And I didn't object previously in

1   hopes that this would just be one or two questions.  But

2   this is far beyond what Ms. Pressley is here to testify

3   about.

4            THE COURT:  Ms. Pressley, the question is a narrow

5   one.  When you arrived on scene and became counsel, were you

6   aware at that point that an effort had been made by anybody

7   to search for E-Team data?

8            THE WITNESS:  Not right away.

9            THE COURT:  Did there come a time when you were

10  aware of that?  Counsel's question was are you aware, before

11  your arrival, people were submitting declarations that spoke

12  about the E-Team data.

13           THE WITNESS:  Even now I don't recall what those

14  declarations said.

15           THE COURT:  That's fine.  Move on.

16  BY MR. MEITL:

17  Q.  Now, we did recover the E-Team data, but the district

18  has never been able to recover the Group Systems data, isn't

19  that right?

20  A.  No.

21  Q.  It's not right?

22  A.  That the district has never been able to recover it?  I

23  don't believe that that's correct.

24  Q.  Are you aware of the district ever producing Group

25  Systems data September 27, 2002?

1          MS. LUDAWAY:  And, again, Your Honor, I object.

2     The order is clear as to what --

3          THE COURT:  May I see the order?

4          MS. LUDAWAY:  Yes, Your Honor.  And I apologize.

5     It's an email.

6          THE COURT:  All right.  I'll disregard that.

7     Thank you.

8          MR. MEITL:  Your Honor, if I may.  This is all

9     going to the JOCC running resume, what happened on May 3,

10    May 4.  This is just following up on previous testimony.

11         THE COURT:  Just a moment.

12         (Pause.)

13         THE COURT:  I've reviewed the order, and Judge

14    Sullivan references my order which -- from which the

15    district appealed.  And it reads as follows:  Pending before

16    the Court -- this is Judge Sullivan speaking -- the District

17    of Columbia's objections to the special master's September

18    27, 2012, order directing the district's former lead

19    counsel, Monique Pressley, to provide testimony about what

20    she knew about the attempted destruction of the E-Team data

21    and her decision to tell counsel for the codefendants, but

22    not the court nor plaintiff's counsel.

23         And the objection is that any discussion about

24    Group Systems is beyond the scope of the order.  Isn't that

25    a legitimate objection?

1           MR. MEITL:  No, Your Honor.  I believe that to

2     understand what Ms. Pressley knew or what action she took

3     with respect to JOCC running resume data, which the

4     plaintiff contend is Group Systems data, we have to have

5     these questions.  These are directly tied to it.  We're not

6     off topic.  We're not discussing something completely

7     ancillary.  This is directly related to Ms. Pressley's

8     knowledge that informed her decision-making or her actions

9     on May 3 and thereafter.

10          THE COURT:  I'm not sure I'll see that connection.

11    I'll let you pursue it briefly.  Please get to the point.

12    BY MR. MEITL:

13    Q.  So Ms. Pressley, my question was, the district's -- we

14    were discussing Group Systems data and I asked you whether

15    the district had ever produced any Group Systems data which

16    the Chang plaintiffs contend is the JOCC running resume

17    data.

18    A.  I don't know if anything was ever produced.  I know that

19    what is supposed to look like the JOC (sic) running resume,

20    that we're saying it should look like based on prior resumes

21    for other events, that nothing that looked like that on

22    paper was ever produced.

23    Q.  And during your time frame as counsel for the district

24    in this case, are you aware of anyone being able to recover

25    Group Systems data from September 27, 2002?

1          MS. LUDAWAY:  An objection, Your Honor.

2          THE COURT:  Overruled.  Do you have any

3     recollection?

4          THE WITNESS:  I don't know that anyone tried.  I

5     think the discussion consistently was that there was a

6     server.  We don't know what's on it.  We don't know if it

7     was utilized during the event.  And it seems to be corrupt.

8     We would need all of these processes in order to get an

9     expert to look at the server.  And there were entire

10    hearings held on whether that would happen.

11         So it's not a question of whether anyone was able

12    to.  It's the question of whether anyone ever attempted to.

13    And during the time that I was there, nothing happened with

14    that server.

15    BY MR. MEITL:

16    Q.  So just to be clear, during your time as counsel for the

17    district, you're not aware of any efforts to recover data

18    from the Group Systems server.

19         MR. CAUSEY:  Your Honor, I'm going to object at

20    this point, please.  That mischaracterizes the evidence.

21    The plaintiffs have already identified the two Group System

22    reports were September 2002 that were generated.  It was

23    given to them years ago.  It's Plaintiff's Exhibits 80 and

24    81.  It's the CIC report and the IOC report which was using

25    Group Systems in September 2002.  It's already been given to

1    the plaintiffs.

2              MR. MEITL:  Your Honor, that is -- this is what

3    was the subject of the district's filing shortly before the

4    holiday break, and which we responded to.  Which I believe

5    it grossly mischaracterizes the evidence that is before the

6    Court.

7              MR. CAUSEY:  Your Honor, they're the plaintiffs --

8              MR. MEITL:  Excuse me.

9              THE COURT:  Let him finish, please.

10             MR. MEITL:  The plaintiffs have long contended

11   that there is a JOCC running resume data that was produced

12   out of the Group Systems.  We have numerous witnesses who

13   testified.

14             THE COURT:  We're going back to the first one.

15   Let me try this.

16             Ms. Pressley, I don't know if you remember, but I

17   do, that we began this when you were counsel.  The testimony

18   -- I believe the very first police officer who testified who

19   talked about printing stuff up and distributing.  Do you

20   remember that?

21             THE WITNESS:  Yes.

22             THE COURT:  Was it your understanding as counsel

23   that that came from Group Systems?  Or did you -- I don't

24   recollect.  But maybe their recollection is better than

25   mine.  In other words, as I understand the situation, it is

1    plain that Group -- whatever happened with E-Team, Group

2    Systems was capable and was operating.  And, indeed, shortly

3    after the demonstration in September 2002 produced some

4    written resumes and they were distributed.  Then we have

5    testimony from them about boxes that were in someone's

6    office that were removed, and someone else came, and where

7    this one was --

8            So what I suppose counsel is wondering is -- and I

9    am, too -- what did you know about Group Systems' capability

10   to produce anything at all?

11           THE WITNESS:  I believe that was Doug Jones.

12           THE COURT:  There's no question it was Doug Jones.

13   He's our very first witness.  You remember, do you not, as

14   you've heard the contention between these parties is

15   plaintiffs insisted that Group Systems had the capability to

16   produce data, and indeed produced it, because shortly after

17   the demonstration a document called the running resume or

18   not was xeroxed, reproduced and distributed.  And then we

19   got into a lot of testimony about where it was, who got it,

20   whether it was in a box and all this other stuff.  You were

21   counsel.  So do you remember that controversy?

22           THE WITNESS:  Yes.

23           THE COURT:  All right.  Do you remember,

24   therefore, whether you ever formed the belief that Group

25   Systems was capable of producing data?  Because a moment ago

1    you said it was your understanding that no one really knew

2    if it was used and whether it was capable of doing anything

3    at all necessary for use in this case.

4            THE WITNESS:  I recall a number of witnesses

5    testifying that there were two systems being used.  I recall

6    Mr. Jones's testimony.  The difficulty with Mr. Jones's

7    testimony is that none of the other witnesses who testified

8    had a similar recollection as Mr. Jones.  And so I did form

9    an opinion with respect to the whole production of paper

10   copies and passing out of paper copies and the box of

11   copies.  Because witnesses like Mr. Gaffigan testified that

12   the system was not supposed to be used that way and you're

13   supposed to see it on the screen.  And if there was a need

14   for a paper copy, it was viewed immediately after the event

15   and destroyed.  So I just never came across another witness

16   who had Mr. Jones's recollection.

17           THE COURT:  This is helpful, because you're now

18   refreshing my recollection.  So Monique Pressley, qua

19   advocate for the District of Columbia, took the position on

20   behalf of the district that Jones was mistaken.  That this

21   system did not produce these documents that were

22   distributed.  To the contrary, other testimony before me

23   suggested that contrary was true; that Group Systems didn't

24   do that and couldn't do that.  Meaning, I take it, that we

25   had to look for E-Team, because that was our only hope.  At

1   least that's what you concluded as advocate.

2           THE WITNESS:  I believe that it was more

3   meaningful, that it was expeditious, to try to get to the

4   system that we could access, because I knew that that one

5   would have the information.  I wasn't certain, based on any

6   of the testimony, whether there were ever paper copies,

7   because I just had that one witness and couldn't corroborate

8   it.  So that was how we ultimately filed something with the

9   Court saying there's -- that -- difficulty in trying to

10  access this server, we know that we can access this other

11  one, and we're moving forward with the one that we can

12  touch.

13          THE COURT:  Gotcha.

14  BY MR. MEITL:

15  Q.  Ms. Pressley, you never made the argument or held the

16  belief that Group Systems wasn't used on September 27, 2002.

17  What the Court was just asking about was whether documents

18  were printed, which is, I think, distinct from whether there

19  was data in electronic form on the Group Systems server,

20  correct?

21  A.  And I wasn't advocating one position or the other.  I

22  recall the witnesses testifying -- a number of witnesses

23  testifying to the use of two systems.  What was actually on

24  the server for Group Systems, I never knew during my tenure

25  there.  Except for, as was referenced by Mr. Causey, I did

1    know that there was a CIC report and that that had been

2    produced.  And I do recall -- because we'd never seen a

3    paper copy of a JOCC running resume -- I do recall one day

4    being amidst about 300 boxes and finding a random CIC report

5    and running down the hallway thinking that I had found the

6    JOCC running resume, and someone having to disabuse me of my

7    hopes and say, No, that's something that's already been

8    produced.  And maybe it would look like that, maybe it

9    wouldn't, but that's not it.

10   Q.  Okay.  So as you said, there were numerous witnesses who

11   said Group Systems data existed for September 27, 2002.  I

12   think my question before we got a little sidetracked there

13   was, was Group Systems -- did you ever make efforts to

14   locate Group Systems data for September 27, 2002?  Or were

15   you aware of such efforts by the district?

16          MS. LUDAWAY:  And again, Your Honor, I don't mean

17   to keep objecting but --

18          THE COURT:  No, it's okay.  Let him finish up on

19   this topic.

20          Do you understand what he's saying?

21          THE WITNESS:  I do.  I can give my same answer.

22   The server, to my knowledge, was never accessed.  So other

23   than the search for paper copies, which we ultimately

24   learned was probably in vain, the record reflects all of the

25   discussion and the hearings before Judge Sullivan regarding

1    the Group Systems server.  And that is the extent of what

2    was done during my tenure.  There was no decision outside of

3    Judge Sullivan's orders on the subject to do something

4    further than that.

5    BY MR. MEITL:

6    Q.  All right.  Let me pull up Exhibit 11.  This is docket

7    number 718, and it's titled District Defendant's Report

8    Regarding Electronic Data Retrieval Efforts, and it was

9    filed on November 1, 2010.  So when you were counsel,

10   correct?

11   A.  Yes.

12   Q.  All right.  Now, this is in response to the Court's

13   October 25, 2010, minute order.  And we're going to scroll

14   down.  It says:  The court order.  It is ordered that the

15   district, at its own expense, shall cause Group-ware to

16   access the data in its server and cause the creation of a

17   running resume.

18        Do you see that?

19   A.  Yes.  I'm familiar with this order.

20   Q.  All right.  So my question is, did the district ever

21   take that step in complying with that order?

22   A.  I think if you just read the rest of it, it will be

23   clear what we did and what we did next.

24   Q.  All right.  If we can scroll to the second page.

25   A.  No.  You might want to do the whole next sentence.  I

1    mean, I think it's all useful.

2    Q.  All right.  Here you're discussing the differences

3    between various servers.  And then if we get to the next

4    page, talks about communications with NC4.  So the E-Team's

5    people.  And then in the next paragraph they talk about the

6    Group System server.  And it says:  It is believed that the

7    files on the server are corrupted.

8         Do you see that?

9    A.  Yes.

10   Q.  Okay.  So my question was, did the district take any

11   efforts, at any point during your tenure as counsel for the

12   district in this case, to recover Group System's data, that

13   as you said numerous witnesses testified to contained data

14   from September 27, 2002?

15   A.  If you mean did we hire an outside forensic expert as I

16   discuss in the next sentence -- because I do believe that I

17   drafted this -- no.  During the time that I was counsel, we

18   did not do this.  Instead, we moved forward with NC4.  And

19   that's sort of how we got to where we are.  So I don't know

20   another way to answer that question.

21   Q.  All right.

22   A.  This is what ultimately we did during the remaining time

23   that I was with the office.

24   Q.  All right.  And so going back to my hypothetical.

25   Granted, we don't know the intention, we don't know who

1    selected the delete button for the E-Team data.  If that

2    same individual has attempted to delete the Group Systems

3    data, that could have been a successful attempt because we

4    can't recover that data, can we?

5              MR. CAUSEY:  Your Honor, objection on two grounds.

6    One, still talking --

7              THE COURT:  Objection sustained.  It's

8    speculative.  No one can possibly answer that question.

9    BY MR. MEITL:

10   Q.  All right.  Ms. Pressley, I want to move --

11   A.  I do believe the data can be recovered, though, so --

12             THE COURT:  Well, Ms. Pressley, you're a marvelous

13   advocate.  Remember what you used to tell your witnesses?

14   Don't say anything unless there's a question pending?

15   Physician, heal thyself.

16             All right.  You can follow up on that because

17   Ms. Pressley just opened the door.  What did you just say,

18   Ms. Pressley?

19             THE WITNESS:  It can be recovered.  I believe that

20   there's still a server, and I think that -- you know, it's

21   just a question of whether forensics wants to look at what's

22   on the server.  And it's always been an open issue.

23   BY MR. MEITL:

24   Q.  And we'll get to that in a little bit with the FBI.  But

25   in your time, are you aware of the Group Systems data ever

1    being recovered in the eleven years of this case?

2              MR. CAUSEY:  Objection again, Your Honor.

3              THE COURT:  He didn't finish the question.  Please

4    finish your question.  Say it again.

5    BY MR. MEITL:

6    Q.  In your time as counsel, are you -- do you have any

7    understanding or awareness of the district recovering any

8    Group Systems data for the September 27, 2002, event?

9    A.  Yes.

10   Q.  And what data was that?

11   A.  At least the intel reports, the CIC reports.  The things

12   that have already been produced.

13   Q.  I'm looking at Exhibit 11 here.  It says:  With respect

14   to the Group Systems server, it is believed that the files

15   on the server are corrupt.

16              Those files have been recovered?

17              MR. CAUSEY:  Your Honor, again, objection.

18   Arguing with the witness.  And she has given her answer.

19   It's the plaintiffs -- I'm sorry -- it's the plaintiffs who

20   produced these two exhibits.  And they're --

21              MR. MEITL:  This isn't an argument, Your Honor.

22              MR. CAUSEY:  May I --

23              THE COURT:  You misspoke.  You say the district

24   when you say --

25              MR. CAUSEY:  We did produce the documents to the

1    plaintiff, and they used them as exhibits.

2              THE COURT:  As 80 and 81.

3              MR. CAUSEY:  That's correct.

4              THE COURT:  Those are the ones to which you

5    referred Ms. Pressley as the ones that Group Systems

6    produced.

7              THE WITNESS:  I'm not sure.

8              MR. MEITL:  No witness has testified.

9              THE COURT:  Hold on.  Please tell us exactly what

10   you're referring to as --

11             MR. MEITL:  We can put Mr. Causey on the stand,

12   too.

13             THE COURT:  Go ahead.  What do you mean by -- what

14   do you say -- what is the district's position with reference

15   to what Group Systems produced, if anything?

16             MR. CAUSEY:  Thank you, Your Honor.  I'll be happy

17   to respond to that.

18             THE COURT:  Please.

19             MR. CAUSEY:  It's the district's current

20   understanding that in September of 2002 there were two

21   different systems running in the synchronized operations

22   center during the IMF demonstrations.  The synchronized

23   operation center had three units:  The JOCC; the IOC, which

24   was the Intelligence Operations Center; and the CIC, which

25   was the Command Information Center.

 1          In the summer of 2002, MPD decided to try a new

 2   system called E-Team which was being used by the district's

 3   Emergency Management Agency to try to coordinate within all

 4   the district emergency agencies one web-based system that

 5   everyone could use.

 6          And MPD decided to try the E-Team system in the

 7   JOCC for September 2002.  It was still using the Group

 8   Systems server for producing the daily CIC report and the

 9   intelligence report.  So in September 2002 there were two

10   separate systems that were running; E-Team and the JOCC, and

11   Group Systems and the IOC and the CIC.

12          It's the district's position the document Sergeant

13   Jones claims he produced was the CIC daily report which

14   Sergeant Jones produced every day.  That was his job.  We

15   never found a Group Systems printed document because one

16   didn't exist.  When we went and looked at the -- to find

17   paper records, we found the Group Systems IOC report and the

18   CIC report.  We produced that to the plaintiffs years ago,

19   and the plaintiffs used them as exhibits back in October of

20   2010.

21          We looked at the Group System server in 2007 to

22   see if there was anything there just to be sure.  The system

23   had not been used since 2003.  The server had not been used

24   since 2003.  The server was corrupted.  We couldn't get into

25   the server.  Group Systems had gone out of business so we

1    couldn't get their assistance to get into the server like we

2    were able to do with NC4.  And, therefore, we concluded that

3    there was no way to produce a paper document from Group

4    Systems or any electronic information.  But what the Group

5    Systems did create on September 27, 2002, has long been

6    produced.

7           THE COURT:  Thank you.

8           MR. CAUSEY:  We've given everything from all of

9    these servers.  Thank you, Your Honor.

10          THE COURT:  And you disagree.

11          MR. MEITL:  Your Honor, we have to object because

12   this story Mr. Causey just gave you, and is also what they

13   put in the filing, this is cobbled together by the thinnest

14   of threads of testimony.  And I think our filings showed how

15   thin those were.

16          There is significant and substantial testimony

17   from witnesses -- not from Mr. Causey -- from witnesses who

18   say, No, that's not what happened.

19          So I understand that this is the district's

20   current position.  First time it's been used.  Ms. Pressley

21   didn't use it.  But this is simply not testified to by

22   witnesses.  This is an argument.

23          THE COURT:  I have your point.  It's an issue I'm

24   going to have to resolve.  But let's get back to the

25   question you want to ask Ms. Pressley.

BY MR. MEITL:

Q.  Well, Ms. Pressley, my question was, Mr. Causey just represented we produced everything on the Group Systems server.  Your filing here says that the server -- the files on the server are corrupted.  Have those files been produced?

A.  No.  Nothing was produced after the time period in which they checked and it was corrupted.  Your original question was whether anything had ever been produced from the Group System server, and I answered "yes."

Q.  I believe later you testified "I don't know."  But are you aware what was produced out of Group Systems versus other systems?

A.  I know that everything that's just been discussed in terms of the intel reports, CIC, et cetera, did not come from E-Team's.  I know that came from the Group Systems server and that it was produced early in the litigation, way before I was a part of the case.

So in terms of what else is on the server and whether there is something like what we were looking for during the -- my early part of the case, I don't know whether that's on there or not.

Q.  Okay.  But as you said, numerous witnesses testified that the JOCC was using Group Systems on September 27, 2002.  Not other units.  The JOCC.  Doug Jones, Giuseppi

1   Crisafulli, and Mr. Crawford, Ms. Howell, Mr. Gaffigan.

2            MR. CAUSEY:  Objection, Your Honor.

3   Mischaracterizes --

4            MR. MEITL:  Excuse me, Mr. Causey.

5            THE COURT:  Let him finish his question.

6   BY MR. MEITL:

7   Q.  And those witnesses testified that Group Systems was

8   used.  Has that information been produced to the plaintiffs

9   at any point or has it ever been recovered by the district?

10           MR. CAUSEY:  Objection, Your Honor.  Completely

11  mischaracterizes the record.  We had provided to the Court

12  in our filing last month what these witnesses have said, and

13  they are consistent.  E-Team was the only system running in

14  the JOCC.

15           THE COURT:  Thank you.  To get back to your

16  knowledge -- which is what this is supposed to be about --

17  did you ever in your period of time when you were advocate

18  for the District of Columbia, reach a conclusion as to

19  whether the Groupware system was being used in the JOCC that

20  day?

21           THE WITNESS:  I never reached a conclusion beyond

22  the witness testimony.  And I don't recall from witness to

23  witness which ones discussed specifically its use in the

24  JOCC as opposed to its use in the neighboring unit, et

25  cetera.  I just was operating under the general impression

1    that there were two systems being used, and I wanted

2    whatever was on those systems.

3              THE COURT:  Thank you very much.

4    BY MR. MEITL:

5    Q.  Okay.  We can move forward.  I want to review some loose

6    ends from the May 3rd timeline, the date when Mr. Bynum

7    visited the district.

8              I believe you testified that on May 3rd Mr. Bynum

9    discovered that he could access the system and that he could

10   observe that someone selected the delete button.  Correct?

11   A.  Yes.

12   Q.  All right.  Now, so just going on the timeline.  First

13   on that morning you were called by Ms. Frost in your office,

14   correct?

15   A.  Yes.

16   Q.  And what precisely did Ms. Frost say to you in that

17   conversation?

18   A.  I don't recall -- I don't recall her precise words.

19   From whatever she said, I just needed to come over.

20   Q.  Do you recall generally what she said?

21   A.  I believe you asked me that the last time I was on the

22   stand.  And I'm -- I don't recall the exact words except:

23   You need to come over.

24   Q.  That's all you remember is:  Come over?

25   A.  Yes.

1    Q.  All right.  And then you testified that Mr. Ryan,

2    Ms. Frost, met you on the main level, brought you down to

3    the first floor, and the servers had been brought for

4    Mr. Bynum's review.

5              MS. LUDAWAY:  Your Honor, I object to this line of

6    testimony.  What counsel is doing is rehashing her

7    testimony.  And there's no purpose for it.  It's asked and

8    answered.  And all that happens to a witness is they're

9    having to recall what they said then, what they're saying

10   now.

11             THE COURT:  All right.  I'm going to instruct

12   that, Ms. Pressley, as Mr. Meitl summarizes the testimony,

13   if your recollection differs, obviously, you know to note

14   where your objection is.  All right?  So if your

15   recollection of what you said previously is different,

16   please tell us.  Thank you.

17             MR. MEITL:  Thank you, Your Honor.

18             THE WITNESS:  Or if the transcript is available

19   and I can just look at what I said so I can know what you're

20   saying what I said.

21             THE COURT:  All right.  Please go on.  Okay?  Ask

22   your question.

23   BY MR. MEITL:

24   Q.  I won't repeat questions, Ms. Pressley.  I'm just asking

25   some loose ends.

1          Once you were brought over, brought into the room,

2     did Mr. Ryan or Mr. (Sic) Frost make any comments to you at

3     that point?

4               MS. LUDAWAY:  Objection.  Asked and answered.

5               MR. MEITL:  This has not been asked and answered.

6               THE COURT:  What was the objection?  Hold on.

7               MS. LUDAWAY:  I'm sure it's asked and answered.

8               THE COURT:  Yeah.  Would you, Madam Reporter,

9     please read it back?

10              (NOTE:  Last question and objection read back by

11    the court reporter.)

12              THE WITNESS:  And I know when I testified the last

13    time I was asked any number of times whether Mr. Ryan said

14    things to me and when and whether Ms. Frost --

15    BY MR. MEITL:

16    Q.  I'm asking specifically --

17    A.  -- and I'm not certain at what specific point any

18    particular thing was said.  I know that there was a good bit

19    of talking out in the ante area, and that I couldn't go into

20    the room.  And in terms of minute by minute what was said, I

21    can't say.

22    Q.  And you don't recall what was specifically said to you

23    when you first arrived; why you're here, what's going on.

24    A.  No.  In terms of the specific words or who said them,

25    I'm sure that Ms. Frost was the person talking to me just

1   because, as I said when I testified previously, Mr. Ryan was

2   busy.  He was talking to Marc Bynum at first, and then he

3   went off and went upstairs somewhere.  And I don't know

4   where.  So whatever information I got about how far things

5   had transpired, I believe it came from Ms. Frost.  But I

6   don't recall the words or when they were said.

7   Q.  All right.  Well, during your previous testimony, you've

8   testified that Mr. Bynum, quote, informed you that the

9   delete button had been pressed.

10          Do you recall that?

11  A.  Mr. Bynum did inform me of that.

12  Q.  Now, did he use the words "delete button" or was he

13  referring to deletions in general?

14  A.  At some point I came to understand from Mr. Bynum that

15  it pops up on the screen.  And so I believe you have to

16  click, maybe, as opposed to press on the keyboard.  Maybe

17  you use your mouse.  I don't know that you can press delete

18  on the keyboard and get it done.  I thought it popped up in

19  a smaller screen and you would have to choose the delete

20  button.

21  Q.  What I'm asking about, what Mr. Bynum communicated to

22  you.

23  A.  That's what I'm saying.  I thought he said to me that it

24  popped up on a screen.  And that the person who was using it

25  would have to click on it, is my understanding.

1    Q.  All right.  And later you testified that, quote,

2    Mr. Bynum didn't view anything as deletions on the system.

3    He was clear with me always that there were no deletions.

4    A.  Right.  That everything was there.

5    Q.  Okay.  So let's look at the first disclosure to the

6    Court about these attempted deletions which took place at

7    the July 12 hearing which is marked as Exhibit 39.  And

8    we're going to look at page 27, line 6 through 10.

9         Now, you stated:  He did see what appeared to be

10   clear evidence that the E-Team's data files had been deleted

11   by a user on February 26, 2010.  And that's something he

12   will also be providing testimony about.

13        So on the one hand, you state that Bynum told you

14   there were no deletions.  But at the July 12 teleconference,

15   you said there was clear evidence that the E-Team's data

16   files had been deleted.  So I'm trying to understand that

17   difference.

18   A.  Is that the only thing that I said?  Because I thought

19   that in that same conference I explained -- it's not a

20   statement in isolation.  So I guess by way of explanation

21   what I would say is that these are my words, not

22   Mr. Bynum's.  I know Mr. Bynum has already testified.  But

23   in my words, in explaining what we knew to be true, the file

24   had been deleted by a user, meaning the delete button or the

25   click for the delete button had been pressed.  But what

1    Mr. Bynum also explained to me is that even though that had

2    been done, the information was still available on multiple

3    backup systems.  So it wasn't, as I testified when I was

4    here last time, it wasn't in the place where it normally

5    would have been held if this hadn't been done, but it was

6    still there.  So both are true.

7    Q.  Would it be fair to say that there was clear attempted

8    deletions of data?

9             MS. LUDAWAY:  Objection, Your Honor.  At the last

10   hearing we went --

11            THE COURT:  Yeah, I think she's -- I think we

12   better be very careful about what the word "deletion" means.

13            Ms. Pressley, you and I agree that the delete

14   button on the computer doesn't delete anything; it just

15   sends it to another part of the computer's memory.  Right?

16            THE WITNESS:  Yes.

17            THE COURT:  Now, you've explained to us that Bynum

18   explained to you that although a button was hit, and that

19   button had "delete" on it, there was nothing deleted.

20            THE WITNESS:  Yes.

21            THE COURT:  Because it's elsewhere.  Or it's still

22   there.

23            THE WITNESS:  It's elsewhere.

24            THE COURT:  What counsel is focusing on is when

25   you chatted with me, you seemed to convey to me your

1    testimony that somebody had in fact obliterated it.  Is that

2    what you meant to say?

3            THE WITNESS:  No.  And I believe that in further

4    discussion --

5            THE COURT:  Why don't you go down a little further

6    and see.  Could you please go down a bit so I can see what I

7    say?  All right.  So Facciola says --

8            MR. MEITL:  We'll go through this later in detail,

9    Your Honor.  But I don't believe there was significant

10   discussion of this.

11   BY MR. MEITL:

12   Q.  Do you recall --

13           THE COURT:  Go on with your next question.

14   BY MR. MEITL:

15   Q.  Do you recall at any point during July 12 referencing

16   the delete button versus deletions?

17   A.  Well -- on July 12?  I don't know.  The transcript says

18   what it says.  I guess what would be important is at the

19   point that we're having this conversation, Your Honor, in

20   court we had already had everything produced and we'd

21   already had multiple status conferences -- or phone

22   conferences where we knew that everything was already on

23   there.  So this wasn't the first the Court was hearing of

24   the recovery of the data or the fact that the data was on

25   backup files.  This was the first that the Court was hearing

1  of the fact that someone had pressed the delete button.

2  That is -- I mean, the reason why I'm here and the question

3  that has already been discussed, why that information was

4  just coming out.  And I understand that.  But at the time

5  that I'm saying this in court, everyone already knows that

6  the data is there.  So it wasn't as if I was saying

7  something new in terms of the evidence itself.

8  Q.  Between May 3rd when you first learned about the

9  attempted deletions -- or the selection of the delete button

10 -- and July 12, the time where you first disclosed it to the

11 Court, were you under the impression that someone had

12 intentionally attempted to delete information, whether they

13 were successful or not?

14 A.  No.

15 Q.  Did you have knowledge one way or the other?

16 A.  As I said last time, I did not know one way or the

17 other.  I just knew that someone had pressed a button.

18 Q.  So it was possible it was intentional, it was possible

19 it wasn't.

20 A.  Anything is possible.

21 Q.  All right.  Now, during your previous testimony you also

22 stated -- this is on page 35:  So this whole notion of

23 someone pressing the delete button and the attempted

24 deletions and all of that, that was already known and being

25 acted upon and it had nothing to do with the decisions that

1    I was making or information that I was asking about.

2              Do you recall that?

3              THE COURT:  Could you show her where?

4              MR. MEITL:  Sure.  Page 35, lines 2 through 6.

5    BY MR. MEITL:

6    Q.  Now, can you explain why it had nothing to do with the

7    decisions you were making?

8    A.  Well, I believe at this point -- though I can't see what

9    came before it -- that we were talking about what happened

10   on that particular day.  And on that particular day what I

11   was concerned with was getting the data extracted,

12   organizing a call with the Court to figure out the best

13   steps, next steps, to take.

14   Q.  So you were making decisions as to what would be

15   disclosed to the Court.

16   A.  I don't know about decisions.  I was concerned with what

17   Mr. Bynum could do and the best use of his time.  So my job

18   -- or what I viewed as my job at that point -- was to get a

19   go ahead of some sort from the Court so that we could move

20   forward and get to the data.

21   Q.  But as you previously testified, the fact that the IAD

22   had been called was a, quote, clue to you, that this was a

23   potential crime.

24              MS. LUDAWAY:  Can we have the page of the

25   transcript?

1       MR. MEITL:  I haven't asked the question yet.

2       MS. LUDAWAY:  You said, "quote, clue," so what

3    page are you referring to?

4       MR. MEITL:  Page 37.  Line --

5       THE COURT:  Please go there so I can see it.

6       MS. LUDAWAY:  What line?  Okay.  I see it.

7    BY MR. MEITL:

8    Q.  You stated:  Well, the fact that Mr. Ryan had

9    immediately called IAD upon being given this information by

10   Mr. Bynum --

11   A.  May I see the question?  I'm sorry.

12      THE COURT:  Let her see the question, please.

13      Got it?

14      THE WITNESS:  Yes.  Okay.

15   BY MR. MEITL:

16   Q.  Okay.  So at the very least MPD general counsel's office

17   viewed this as a potential crime, correct?

18   A.  That was my assumption based on the actions that were

19   being taken.  I don't recall ever having that conversation

20   with Mr. Ryan.

21   Q.  And that conclusion -- your conclusion -- did that --

22   that didn't change your opinion as to what should be

23   disclosed to the Court or what questions you might need to

24   ask that day?

25   A.  No.

1    Q.  Ms. Pressley, if Mr. Bynum had told you that day that

2    someone had deleted certain information, actually

3    obliterated it, couldn't be recovered, would you have felt

4    that that had to be disclosed to the special master that

5    day?

6              MR. CAUSEY:  Objection, Your Honor.

7              THE COURT:  What is your objection?

8              MR. CAUSEY:  We're speculating.  We're asking the

9    "if" questions.  Anything is possible.  It would be better

10   to stay to facts.

11             THE COURT:  Mr. Meitl, could you rephrase your

12   question, please?  It was speculative.

13   BY MR. MEITL:

14   Q.  Well, Ms. Pressley, where were you drawing a line as to

15   what would need to be disclosed to the Court about potential

16   crimes?  My hypothetical, which Mr. Causey objected to, is

17   if someone had actually obliterated the data and you knew it

18   was gone forever, would you have disclosed that to the

19   Court?  If you won't answer that hypothetical, that's fine.

20   But how were you drawing the line in your mind as to what

21   potential crimes needed to be disclosed to the Court?

22   A.  I wasn't drawing any lines in my mind, nor was I making

23   decisions about what would need to be disclosed.  If there

24   -- if a crime had been committed, if we're doing the

25   hypothetical, and Mr. Bynum said on this date at this time

1    this person did this thing, that's what the evidence is

2    showing me from reviewing this, then that would be a matter

3    that would go first to MPD and then MPD would do what they

4    do investigating a crime.

5            And I don't know that that criminal investigation

6    and that pursuit of a probable cause warrant and all of the

7    things that police officers and members of the U.S.

8    Attorney's Office do would be something that I or anyone in

9    the civil division of my office would inform plaintiffs in a

10   civil case or special master.  I don't know who would give

11   that information and when.  But there would have to be

12   discussions with a number of different agencies for that

13   decision to be made.  It wasn't something I could just say.

14   Q.  So your concern was IAD had to investigate it before you

15   could disclose it to the Court.

16   A.  My concern when?

17   Q.  On May 3rd.  You just said that's something, if there

18   was a crime, if Mr. Bynum had found something, that would be

19   something the MPD would have to investigate.

20           MS. LUDAWAY:  Your Honor?  This whole line is an

21   improper hypothetical.

22           MR. MEITL:  No.  This is not a hypothetical at

23   all.

24           MS. LUDAWAY:  Yes, yes.

25           MR. MEITL:  This is precisely what happened this

1    day.

2              THE COURT:  Please don't quarrel with each other.

3              Ms. Pressley, can you answer the question without

4    hypothesizing or speculating?

5              THE WITNESS:  I was hypothesizing, because we

6    weren't told that day that a crime had been committed by a

7    particular person at a particular time.  That didn't happen.

8    All we were told is that someone pressed the delete button

9    and that the data was still there.

10             So in my hypothetical, I was saying I don't know

11   at what point the Court would have been told and by whom

12   because a -- different people would have had to make those

13   decisions.  There would have been discussions and decisions

14   in the processes.

15             THE COURT:  What you're telling us -- the point

16   that's highlighted in front of you -- is as soon as Ryan

17   calls IAD, you have found, and you've concluded, something's

18   up and they're concerned about it.

19             THE WITNESS:  Yes.  I knew that Mr. Ryan had

20   enough concern to call IAD.  And that was my clue that the

21   general counsel believed there was at least enough reason to

22   call IAD.  But that was not a process in which my office was

23   involved.

24             THE COURT:  I understand.  Go ahead.

25   BY MR. MEITL:

1   Q.  All right.  Ms. Pressley, in your previous testimony --

2   and we'll put this up on the screen, page 38, lines 4

3   through 8 -- you stated:  But my focus -- and I have to say

4   again my excitement -- was the fact that we had this

5   information and I believe that this information would lead

6   us to be able to confirm that people were breaking the law

7   at the time the mass arrest took place.

8          Do you recall that testimony?

9   A.  Yes.

10  Q.  Why did you believe that the E-Team data would confirm

11  that people were breaking the law at the time the mass

12  arrest took place?  What was that based on?

13          MS. LUDAWAY:  Objection.  Outside of the scope of

14  what this proceeding is about.

15          THE COURT:  No, I think it is.  Now, you had -- at

16  this point when you were about to appear before me, right?

17  You tell us your focus was that the running resume might be

18  very good evidence for you in that if there are indications

19  in the running resume of breaking of a law, then there is

20  probable cause and the order to arrest becomes defensible.

21  Is that what you meant?

22          THE WITNESS:  Well, if only it were that easy.

23  No.  Because I think that there were some bells that we

24  couldn't unring in terms of things that had already

25  happened.  But there were other ways -- and I don't want to

1   reveal defense strategy or litigation strategy.  There were

2   other ways that we thought that that information would be

3   very useful.  And then, you know, there were countless

4   witnesses, from former Chief Ramsey to Assistant Chief

5   Newsham who had testified as to things that the people

6   surrounding the area of Pershing Park were doing.  So if

7   anything contemporaneous to that event could verify the

8   things that they said that led them -- we did believe that

9   that would be useful information on a number of different

10  fronts.

11              THE COURT:  Thank you.

12  BY MR. MEITL:

13  Q.  So, Ms. Pressley, my question was why did you believe

14  that the E-Team data, in particular, would confirm that

15  people were breaking the law at the time the mass arrest

16  took place?  Why did you have that belief?  What was the

17  basis for it?

18  A.  There's no magic, really, to the fact that it was E-Team

19  data.  It was just that if it was contemporaneous data that

20  was based on calls that were coming in.  So, you know, for

21  instance, Molotov cocktail thrown on 14 and K, that would be

22  a good entry.  Or, Bank of America window broken.  If that

23  was an entry.  Or, bicyclers riding down the street one way,

24  wrong direction.  Or, people sitting in the middle of the

25  street chained to themselves.

1        These were all things that happened.  But these

2    were not all things which we had evidence.  So if any of

3    that was being called in and would have appeared in the

4    report -- and that was what, from my office, had always been

5    the need for the report.  And I do believe that if the U.S.

6    Attorney's Office had had such information at the time, then

7    a number of the arrests would have been -- would have stuck.

8    I mean, there wouldn't have been a need to dismiss them for

9    inability to show probable cause for arrest if you had the

10   information.

11   Q.  You refer to people in line 7 there.  Are you referring

12   to the Chang plaintiffs?

13   A.  I'm referring to anyone who was arrested.

14   Q.  Okay.  Inside Pershing Park.

15   A.  Right.

16   Q.  Why would it be relevant that other individuals were

17   breaking the law if they were inside Pershing Park, which is

18   the first I'm hearing of it.  Why would it be relevant to

19   the Chang plaintiff's case whether other people were

20   breaking the law?

21        MR. CAUSEY:  Objection, Your Honor.

22        THE COURT:  It does get right into her mental

23   impressions and conclusions.  Sustained.

24        MR. CAUSEY:  Yes.  Thank you.

25   BY MR. MEITL:

1    Q.  Well, Ms. Pressley, we can look at previous response by

2    the district to a request for admission where the district

3    admits that it currently knows of no evidence that the Chang

4    plaintiffs committed any crimes on September 27, 2002.  And

5    so your statement here is this would lead us to be able to

6    confirm that people were breaking the law.

7           Are you referring -- did you think that you could

8    confirm that the Chang plaintiffs had committed criminal

9    acts on September 27, 2002?

10          MS. LUDAWAY:  Objection.

11          THE COURT:  Again that's based on mental

12   impressions and strategies of counsel.  Objection sustained.

13   BY MR. MEITL:

14   Q.  Well, Ms. Pressley, did the E-Team data actually show

15   you that the Chang plaintiffs were breaking the law?

16   A.  I don't know.

17   Q.  You reviewed the E-Team data, did you?

18   A.  I did.  I can't say that I saw any names.

19   Q.  Did the E-Team data show any evidence that anyone inside

20   Pershing Park broke the law?

21   A.  The issue wasn't --

22   Q.  I'm sorry.  Let me finish the question.  Any non-law

23   enforcement personnel broke the law inside Pershing Park?

24   A.  I don't think the issue was inside the park.  The issue

25   was things that happened that led people to be corralled and

1    held in the park.

2              So, no, I don't think there was anything that

3    showed that the people who were held in the park and

4    technically were already about to be under mass arrest, no.

5    It didn't show that.  I think actually you know the history

6    of all the evidence in this case was that people were led

7    into the park and then after a period of time the arrest

8    took place.

9    Q.  Well, maybe I'm confused by your statement on page 38

10   because it says:  People were breaking the law at the time

11   that the mass arrest took place.

12             So perhaps I misunderstood it.  I thought you were

13   referring to people inside Pershing Park.

14             THE COURT:  Wait a minute.  She said:  I believe

15   that this information would lead us to be able to confirm

16   that people were breaking the law at the time that the mass

17   arrest took place.  I don't understand it to be representing

18   to me when she was talking to me that people were breaking

19   the law.  She's saying she would -- that this information

20   would lead us to be able to confirm that people were

21   breaking the law.

22             MR. MEITL:  Fair enough, Your Honor.

23   BY MR. MEITL:

24   Q.  My question is -- I read that to mean that you were

25   discussing Pershing Park.  Is that not what you meant?  The

1    mass arrests took place inside Pershing Park, correct?  For

2    a number of hours.

3    A.  Yes.  Generally -- this relates to the Pershing Park

4    event, yes.

5    Q.  So --

6    A.  But not to necessarily something that happened in a

7    particular part of the park or another one that -- no.

8    Q.  Now, just back to May 3 timeline for just a moment.

9    After you had been in the ante room for about 45 minutes, I

10   believe you testified, you returned to the OAG.  When you

11   got back to the OAG, who did you speak with?

12   A.  I believe that I testified previously that I spoke with

13   my supervisors.  I'm not sure that I spoke with both Ellen

14   Efros and George Valentine at the same time or separately,

15   but I know that I had conversations and got them up to speed

16   on what I knew of what was going on.

17   Q.  Did you talk to Attorney General Nathan on May 3rd?

18   A.  No.

19   Q.  So just to be very clear, you didn't communicate with

20   him in any way on May 3rd?

21   A.  No.

22   Q.  Did you receive any instructions, orders, or directives

23   from him even if it was indirectly?

24              MR. CAUSEY:  Objection, Your Honor.

25              THE COURT:  Answer "yes" or "no," and nothing

1    more.

2            THE WITNESS:  No.

3    BY MR. MEITL:

4    Q.  Did your supervisors convey any information to you that

5    had been relayed to them by Mr. Nathan on May 3?

6            THE COURT:  "Yes" or "no."

7            THE WITNESS:  I don't recall that on May 3rd.

8    BY MR. MEITL:

9    Q.  Following Mr. Bynum's accessing of the data on May 3,

10   when was the next time you spoke or communicated with

11   Attorney General Nathan about this case?

12   A.  I'm not sure.

13   Q.  Do you recall if it was on May 4th, the next day

14   following the conference call with the Court?

15   A.  No.  I recall that it was not.

16   Q.  Do you recall that you did not speak to him on May 4th

17   at all?

18   A.  I recall that.

19   Q.  Are you aware that Assistant Chief Anzallo testified

20   that the chief of police had a conversation with Attorney

21   General Nathan on May 3rd and informed him of Chief Lanier

22   and Chief Anzallo's decision there would be no IAD

23   investigation into the attempted deletions, and that the

24   issue of the attempted deletions would need to be referred

25   to the special master?

1    A.  No, not aware of that.

2    Q.  Did Attorney General Nathan ever provide that

3    information to you at any point in time?

4              MR. CAUSEY:  Objection, Your Honor.

5              THE COURT:  What information?

6              MR. MEITL:  That Chief Lanier had instructed him

7    that the MPD would not be performing an IAD investigation

8    and that the matter should be referred to the special

9    master.

10             THE COURT:  What's the objection?

11             MR. CAUSEY:  Your Honor, all of this is the work

12   product of the district attorneys working on this case.  Who

13   talked to who --

14             THE COURT:  Let me see if I can maybe narrow it.

15             Did you ever learn -- independently of whoever

16   said it to you -- that Lanier had called Nathan?

17             THE WITNESS:  On the 3rd?

18             THE COURT:  Or the 4th.

19             THE WITNESS:  Neither.  No.  No.

20             THE COURT:  Did you ever learn at any time that

21   Lanier and Nathan had specifically spoke to the question of

22   what communication would be made with Facciola about the

23   events of May 3?

24             THE WITNESS:  No.  I don't -- no.  I don't -- I

25   was -- I never learned of any conversation that related

1    directly to that issue.

2         THE COURT:  So then you are learning of what

3    Lanier said to Nathan today.

4         THE WITNESS:  I'm learning today of what Anzallo

5    said Lanier said to Nathan today, I guess, by testimony.

6         THE COURT:  But prior to that, you never knew of

7    the conversation that occurred between Lanier and Nathan in

8    which Lanier told Nathan there would be no IAD investigation

9    and this would be referred to Facciola.

10        THE WITNESS:  And -- no.  And I -- that -- no, and

11   that would not jibe with what I do recall.

12        THE COURT:  Okay.

13   BY MR. MEITL:

14   Q.  Regardless of knowing whether or not Chief Lanier

15   communicated that specifically to Attorney General Nathan,

16   as Mr. Anzallo testified, were you aware at any time that

17   the chief of police informed the OAG in general -- a

18   specific individual or someone within the OAG -- that IAD

19   would not be investigating this issue?

20   A.  No.

21   Q.  I think you said:  It does not jibe with what I recall.

22   Is that what you just said?  When you were --

23   A.  That was referring to the question that Your Honor was

24   asking me.

25   Q.  Is there -- is it you don't recall that?  Or what do you

1    recall?

2    A.   I don't recall anything concerning what you just asked

3    me.  I don't recall that at all.

4    Q.   So you have no knowledge whatsoever of any instruction

5    from the MPD to the OAG's office, or any attorney in the

6    OAG, telling them that this matter should be referred to the

7    special master?

8    A.   No one from MPD told me that, and I don't believe that

9    anyone from MPD told Ms. Frost that.

10   Q.   Did anyone from OAG tell you they had been told that by

11   MPD?

12   A.   No.

13   Q.   And you never saw any document or communication that

14   reflected something related to that?

15   A.   Related to the fact that IAD would not be investigating

16   and that it should be referred to Magistrate Judge Facciola?

17   Q.   Yes.

18   A.   No.

19   Q.   Okay.  Now, you testified in relation to May 3rd and May

20   4th, quote -- and this is on page 47, lines 24, to page 48,

21   line 4:  I know that the primary thing that had been decided

22   about what the parties and the Court needed to be told in

23   that conference call was that the data was assessed --

24   accessible, and give marching orders about what needed to be

25   done from there.

1    A.  I'm not where you are.  Oh.

2    Q.  See that?

3    A.  Yes, now I do.

4    Q.  Can you please tell us who was involved or what steps

5    took place before that decision that you're referencing

6    there was reached?

7    A.  OAG personnel.

8    Q.  And who were those people?

9    A.  Who were involved in the general discussions about next

10   steps?

11   Q.  The decision you're referencing on line 1 of page 48.

12   A.  Ms. Efros, Ms. Frost, and me.  I don't know whether

13   Mr. Valentine was in any of the meetings or not.

14   Q.  What was the process that led to that decision?

15           MR. CAUSEY:  Objection, Your Honor.

16           THE COURT:  Objection sustained.  Mental

17   impressions.

18   BY MR. MEITL:

19   Q.  Maybe my question wasn't clear.  Was -- was it

20   conversations -- oral conversations -- between you,

21   Ms. Frost, Ms. Efros?

22   A.  I believe so.

23   Q.  Was it a trading of emails?

24   A.  Just between that 24-hour period?  I don't think so.  I

25   recall going back to the office and informing people

1    personally of just where things stand, and then starting to

2    make phone calls to try to organize a conference with the

3    Court.

4    Q.  Did you consult with anyone outside of Ms. -- OAG

5    personnel?

6              MR. CAUSEY:  Your Honor, I'm going to again object

7    to this entire line.  This is just trying to get into the

8    offices of OAG to find out what we were doing, what we were

9    deciding, and who we were talking to.  It's completely

10   improper.

11             MR. MEITL:  I believe she can answer.  I'm asking

12   outside of OAG.

13             THE COURT:  Going back to your testimony on page

14   48, decision is going to be made what you're going to say to

15   Facciola, right?  And people are involved in that decision.

16   And people are Efros, Frost and Pressley, right?

17             THE WITNESS:  At least, yes.

18             THE COURT:  Is Valentine?

19             THE WITNESS:  I can't remember whether he was

20   actually in the meeting.

21             THE COURT:  Is Nathan involved?

22             THE WITNESS:  No, I don't believe so.

23   BY MR. MEITL:

24   Q.  Anyone --

25             THE COURT:  When you say "other persons," other

1    persons not with the Attorney General's Office?

2              THE WITNESS:  No.

3              THE COURT:  But there might have been other

4    persons within the OAG who get involved in the decision as

5    to what's going to be told to Facciola?  Do you remember?

6              THE WITNESS:  Not that way.  And I -- the best

7    that I can say is, there was not a good deal of discussion

8    about it.  We were dealing with what needed to be done in

9    terms of Mr. Bynum.  And that was just where everything was

10   headed.  And I can't say that it was not discussed in terms

11   of what the goal of the conference call would be and what

12   Mr. Bynum would actually testify to as opposed to what we

13   would say, but it was -- it was a small part of a greater

14   conversation about what was going to be done with this data.

15             THE COURT:  Thank you.

16   BY MR. MEITL:

17   Q.  Now, your last appearance the Court asked you about your

18   decision to disclose during the May 4th teleconference what

19   the district considered to be good news about the E-Team

20   data and not disclose the bad news.  This is on page 49,

21   lines 1 through 3.

22             In response you stated:  I think in reviewing the

23   transcript from that day, I think I was discussing good news

24   and bad news at the same time.

25             Do you see that?

1   A.  Yes.

2   Q.  All right.  You also stated, and this is on page 49,

3   lines 5 through 7:  Mr. Bynum would need to testify.  That

4   it would likely be necessary for him to testify in both

5   proceedings, and that should be done.

6        Okay.  So let's look at the May 4th teleconference

7   which is marked as Exhibit 67.  We're going to look at page

8   17, lines 9 through 16.  And I'll read that part.  I believe

9   this is where you discuss the next steps:  And then by way

10  of next step, after we've produced information to the Court

11  and the parties, the district certainly would expect that

12  Mr. Bynum would be available to testify about what he

13  uncovered and how it was uncovered and to explain any

14  questions that the Court may have and to make the server

15  itself available so that you can see what can be seen from

16  the server, the first server.

17        Now, we can -- you can look through the rest of

18  the transcript, as well.  But did you ever disclose the bad

19  news, as you said last time to the Court?

20  A.  Well, when I said I was discussing good news and bad

21  news --

22        THE COURT:  Well, to be fair to Ms. Pressley, that

23  was my bad joke.  So you don't have to live with my bad

24  jokes.  So don't put it in those terms, if that's not how

25  you thought about it.

1          THE WITNESS:  What I meant was, basically, just

2     everything that you just read.  That we were giving

3     information that in the office's view was necessary in order

4     to get to a decision about what could be done with the

5     server.  And then I was saying quite plainly that Mr. Bynum

6     would be available to testify.  And not just that he would

7     tell you what was uncovered, but how, and to answer the

8     questions about what was uncovered and how it was uncovered.

9     So from my office's viewpoint, that was -- that was a

10    definite.  That was what was going to happen.  There was no

11    discussion in my office of trying to hide that fact.

12    BY MR. MEITL:

13    Q.  You tell the Court here that Mr. Bynum, quote, needs to

14    testify?  As you testified to last time?

15    A.  I don't -- I used the words that are right in front of

16    you.

17    Q.  So last time you said:  We told the Court his deposition

18    was necessary.

19          I don't see that.  Am I -- is it implied?

20    A.  I'm not even sure what you're asking me.

21          THE COURT:  I don't get it, either.

22    BY MR. MEITL:

23    Q.  Well, last time you were here you said:  We told the

24    Court that Mr. Bynum, quote, needs to testify.  And his

25    testimony was necessary.

1          And I'm wondering from this transcript excerpt, is

2     that implied?  Are you telling the Court that in any way?

3     A.  I don't know what "would expect" would mean, but I think

4     the fact that I'm mentioning Mr. Bynum's testimony as the

5     next logical step, and him being available to do any

6     explaining that needs to be done, is, yes, saying that that

7     would happen.  But, I mean, there's no -- it was very clear

8     from even the end of this call that Chang plaintiffs fully

9     intended for him to testify.  There was never any doubt that

10    he was going to be testifying.  The only issue was in what

11    proceeding.

12    Q.  Let's move on.  At the end of your testimony last time

13    we discussed reasons that the district chose not to tell the

14    Court and the plaintiffs about the attempted deletions.  And

15    we went through those rather quickly.  We didn't get to all

16    of them, so let me go through some of them and wrap up some

17    loose ends.

18          The first reason I believe you said was there was

19    an IAD investigation ongoing.  That you believed was

20    ongoing.  Correct?

21    A.  Yes.

22    Q.  Now, do you know any other individual within the

23    district who was under the impression that there was an

24    ongoing IAD investigation between May 3, 2012, and July 12,

25    2012, other than you?

1    A.  Do I know who was under that impression?

2    Q.  Do you know of anyone who believed that?

3          MR. CAUSEY:  Your Honor, again, we're very close

4    to work product.

5          THE COURT:  I don't think so.  Let me see if I

6    understand something.

7          At the time you get it, and represent to me in

8    May, you don't tell me about this attempted deletion, right?

9    And then last time you were here you were explaining many of

10   the reasons.  One of them was an existing IAD investigation.

11         Are you -- you, of course, were thinking that

12   there was an IAD investigation.  But you just heard a moment

13   ago how Anzallo represented, testified to me, and said:

14   Lanier says to Nathan there's going to be no IAD

15   investigation.  This is a matter for Facciola.  Right?

16         Now the problem that counsel is pointing to is it

17   seems that, therefore, on May 4th Anzallo has said indeed

18   Lanier himself has picked up the phone and said to Nathan:

19   No IAD.  It's Facciola's baby.

20         Yet you tell us that one of the reasons was the

21   IAD investigation.

22         THE WITNESS:  Yes.

23         THE COURT:  Help us here.  How do we understand

24   this?

25         THE WITNESS:  To the extent that that call took

1    place I can say --

2            THE COURT:  Which call?

3            THE WITNESS:  The call from --

4            THE COURT:  Lanier to me.

5            THE WITNESS:  Yes.  And that what was said was

6    that; no one on the sixth floor, which is where you would

7    find Mr. Valentine, Ms. Efros, Ms. Frost, myself -- all the

8    people who were responsible for day-to-day action in the

9    case -- I would feel safe in saying that no one had that

10   information.

11           THE COURT:  Key information that Lanier called

12   Nathan.

13           THE WITNESS:  To the extent that that happened,

14   and that what was said was that it would be left to the

15   special master's proceeding?  No one -- no one with whom I

16   worked on a day-to-day basis had that information.

17           THE COURT:  Ms. Pressley, do you feel a little

18   blind sided now?

19           THE WITNESS:  No.  That's not -- that's not it.

20           THE COURT:  Okay.  Counsel?  Ma'am clerk, can I

21   see you?

22   BY MR. MEITL:

23   Q.  Did you, Ms. Pressley -- well, are you aware,

24   affirmatively aware, of anyone else believing or being under

25   the impression that there was an IAD investigation?

1    A.  Yes, the same -- the same thing.  I don't feel

2    comfortable discussing the discussion that I was having with

3    Ms. Efros, and I think it would be necessary for me to do so

4    in order to answer that question because you're asking me

5    what impression others were under and that was a part of our

6    discussion.  But I can say in the negative that no one with

7    whom I worked daily had any information regarding the IAD

8    investigation being over and regarding the chief's desire

9    for it to only be investigated through the special master

10   proceeding.  I can say that that is a negative.

11   Q.  Do you have any reason to believe that what Mr. Anzallo

12   testified to is incorrect?  There's a couple times there

13   where you hesitated when asked questions.  Do you think that

14   that didn't occur?  That Chief Lanier did not instruct

15   Attorney General Nathan?

16   A.  It's odd.

17   Q.  Why is that?

18   A.  It's just odd.

19            THE COURT:  I'm sorry, "it's odd"?

20            THE WITNESS:  Odd.

21   BY MR. MEITL:

22   Q.  Why do you find it odd?

23   A.  Well, I think I testified last time that if there was an

24   issue and there was a potential crime, if there was a

25   concern, and the reason why the general counsel's office had

 1    -- you know, perhaps a crime had been committed, then the

 2    manner in which that would be investigated would not be for

 3    it to be referred to a civil proceeding.  So I do find that

 4    odd.  It just didn't -- and what I know of the way things

 5    are done, that would be odd.

 6    Q.  Would you find it odd if Attorney General Nathan

 7    received that instruction and didn't pass it on down to you

 8    and your supervisors?

 9    A.  I don't believe that.

10    Q.  You don't believe what?

11    A.  That attorney general would receive an instruction and

12    not pass it down through the ranks.  The only thing that I

13    could believe is that if there was any conversation at all

14    between the attorney general and his client, and that

15    anything was discussed between the two of them, that they

16    reached a resolution from that, and that the people who were

17    down the chain received the information that was necessary

18    in order to proceed as we should based on whatever the

19    resolution was between the attorney general and the client.

20    So I don't know what that conversation was.

21              THE COURT:  Give our court reporter a break.  Ten

22    minutes.  11:15.  Do not discuss your testimony with anyone.

23              (Break in the proceedings at 11:02 a.m.)

24

25              (Upon resuming at 11:15 a.m.)

1          THE COURT:  Proceed.

2          MR. MEITL:  Thank you, Your Honor.

3   BY MR. MEITL:

4   Q.  Ms. Pressley, when we left off we were discussing Chief

5   Lanier's conversation with Attorney General Nathan.  You

6   indicated that you thought it was odd if Attorney General

7   Nathan had received that order, didn't pass it down.

8          So would it be fair to say either Chief Lanier is

9   incorrect, or in your experience Attorney General Nathan

10  acted odd in not providing this information?

11         MS. LUDAWAY:  Objection, Your Honor.

12         THE COURT:  First of all, it's a compound

13  question.  What do you want her to -- first of all, why is

14  she in a position to make any judgment about Lanier?

15         MR. MEITL:  I can move on, Your Honor.

16         THE COURT:  All right.

17  BY MR. MEITL:

18  Q.  Ms. Pressley, last time you testified in relation to the

19  IAD investigation -- and this is page 81, line 25 to 82, 02.

20  You said:  What I saw and what I was told on May 3rd were

21  the sum of my knowledge with respect to the existence of the

22  investigation.

23         Do you see that?

24  A.  Yes.

25  Q.  So to be clear, you never had another conversation

1    during your entire tenure following this with the OAG

2    regarding the IAD investigation?

3    A.   Conversations within OAG?  Or conversations with MPD?

4    Q.   Conversations with anyone discussing the existence of

5    the IAD investigation.

6            MR. CAUSEY:  Your Honor, again, objection.  I

7    think it can be just a "yes" or "no."

8            THE COURT:  I think that's fair.  Maybe better way

9    to put it is:  As of May 4 were you under the impression

10   that the IAD investigation is going forward?  That's one of

11   the reasons you don't tell me.  And there are other comments

12   on when you had a conversation with anyone -- AO, Attorney

13   General, Metropolitan Police -- that dispelled that

14   impression you had?

15           THE WITNESS:  No.

16           THE COURT:  So as we discussed a moment ago, you

17   learned it today.

18           THE WITNESS:  Well, no.  I, through my attorney,

19   learned of some of the -- a bit of the prior testimony.  So

20   from the last time that I was here.  And then today I'm

21   learning of what Assistant Chief Anzallo testified.

22           THE COURT:  But to answer counsel's question,

23   between May 4th and July 11th no one ever -- you had no

24   information that this IAD investigation had been completed,

25   and indeed had never even commenced?

1          THE WITNESS:  Exactly.

2          THE COURT:  Thank you.

3    BY MR. MEITL:

4    Q.  Did you take any actions after May 3rd at any point time

5    until you resigned from OAG to determine whether an IAD

6    investigation existed?

7          MR. CAUSEY:  Objection, Your Honor.

8          THE COURT:  No, I think she's already answered it,

9    haven't you?  Did you take any efforts?  Did you call IAD?

10   Did you call Anzallo?  Did you ask Ryan what was going on

11   with the IAD investigation?

12         THE WITNESS:  Yes.

13         THE COURT:  Who -- did you ever talk to Anzallo?

14         THE WITNESS:  I don't think so.

15         THE COURT:  Did you talk to Ryan?

16         THE WITNESS:  I think that what I testified last

17   time was that I certainly would have had interest in how the

18   investigation was going and whether it was still ongoing.

19   So I do believe that at some point I was inquiring, but I

20   don't recall getting any additional information.  And I

21   don't know if that --

22         THE COURT:  Did you make that inquiry of Ryan?

23         THE WITNESS:  I believe so.

24         THE COURT:  In writing or in -- oral?  Do you

25   remember?

1          THE WITNESS:  No.

2          THE COURT:  But you did make inquiry of Ryan?

3          THE WITNESS:  I'm sure at some point I asked.

4    Because we were -- that was an ongoing impression, that the

5    IAD investigation was ongoing.

6          THE COURT:  All right.  When you asked Ryan, do

7    you recall what he said?

8          THE WITNESS:  No.

9    BY MR. MEITL:

10   Q.  And you're referring to the days and weeks after May

11   3rd, May 4th, correct?

12   A.  Yes.

13   Q.  Maybe we can try to nail down this.  There's several

14   pleadings where you asserted that there was an IAD

15   investigation.  So let's look at the first one, which is

16   Exhibit 80.  I'm sorry.  This is actually an email that was

17   sent by you to Chang counsel on July 21, 2012.  So this is

18   nine days after the July 12 hearing.  We're going to look at

19   the third bullet.

20          And you state:  The district does not agree to the

21   deposition of the MPD Internal Affairs Department

22   investigator assigned to investigate the E-Team's data

23   attempted deletion issue.  The matter is the subject of an

24   open investigation and, therefore, privileged.

25          So prior to sending this email, and based upon the

 1    Chang plaintiff's request to take this deposition, is that

 2    when you had a conversation inquiring about the status of

 3    the IAD investigation?

 4    A.   No.  And the open investigation that I was referencing

 5    was not, at that point, IAD.

 6    Q.   What were you referring to there?

 7    A.   The Justice Department.

 8    Q.   The Justice Department investigation of the attempted

 9    deletions?

10    A.   Yes.

11    Q.   Okay.  Let's look at Exhibit 24 which are discovery

12    responses submitted by the district.  And we're going to

13    look at pages 10 to 11.  And you helped draft these

14    responses, didn't you?

15    A.   I don't know.

16    Q.   We can go to the last page.

17         So this is after your time.  Correct?

18    A.   It is.

19    Q.   Okay.  But I still want to look at pages 10 to 11.  It

20    says:  At this meeting, which was on May 3, Assistant Chief

21    Anzallo also informed Chief Lanier --

22    A.   At what meeting?  Can you -- just one second.  I've

23    never seen this.

24    Q.   The purpose of this, Ms. Pressley, is to make sure we

25    understand the district has represented that there was no

1    IAD investigation.  Okay?  So this -- these were discovery

2    responses submitted by the district.  I just want to make

3    sure you're aware of that.

4              MR. CAUSEY:  Which she had no involvement in

5    whatsoever.

6              THE COURT:  Yes.  It's just for your information.

7    Take a look at that.

8              THE WITNESS:  Okay.

9    BY MR. MEITL:

10   Q.  Says:  At this meeting --

11             THE COURT:  Ms. Efros and Ms. Frost, in response,

12   are now talking about this -- what we now know to be a

13   conversation about Anzallo.  And then that leads to a

14   conversation between Lanier and Nathan.  Take a moment and

15   read that paragraph.

16   BY MR. MEITL:

17   Q.  And I'll read the relevant part into the record:  At

18   this meeting, Assistant Chief Anzallo also informed Chief

19   Lanier that a formal IAD investigation of the E-Team servers

20   was not appropriate given the fact that the issue of the

21   JOCC running resume already was being investigated by the

22   Court.

23             Do you see that?

24   A.  I do.

25   Q.  Okay.  So let's look at another document.  This was

1   filed in October 2011.  You were still counsel in the case

2   in October 2011, correct?

3   A.   Pardon?

4   Q.   You were still counsel in the case October 2011?

5   A.   Yes.  For a few more weeks.

6   Q.   So this is Exhibit 38, docket number 846.  We're going

7   to look at page 9.  And it says:  The District of Columbia

8   initiated an internal investigation.

9   A.   Where?

10   Q.   Just one second.  We'll find it for you.  It's right

11   there at the top.  It says:  Thereafter, the District of

12   Columbia initiated an internal investigation.

13         Do you see that?

14   A.   Yes.  And ultimately referred the matter to the office

15   of the United States Attorney and the Federal Bureau of

16   Investigation.  That's correct.

17   Q.   Okay.  So in October 2011 it was still your belief that

18   there had been an IAD investigation.  Correct?

19   A.   Well, I still believe today one was initiated.  I don't

20   know -- I mean, I'm understanding now witnesses have

21   testified it lasted all of a day and someone decided it was

22   not appropriate.

23         But to your question, yes, at the time that this

24   was drafted up until the time I last testified when I heard

25   what the other witnesses had said in brief, I believed that

1    the investigation lasted until the time that the matter was

2    referred to the OUSA and the FBI.  I believe that those two

3    things happened at the same time.  That one ended and the

4    other began.  That was my impression up until right before I

5    came to testify.

6    Q.  But it's your understanding at least today that

7    Assistant Chief Anzallo has testified there never was an IAD

8    investigation at all.

9    A.  I don't know what his exact words were.

10              THE COURT:  I can show you, Ms. Pressley.

11              THE WITNESS:  Right.

12   BY MR. MEITL:

13   Q.  I can bring it up.  It's Exhibit 23 at page 80.  We

14   don't have a transcript from his testimony, but this is his

15   deposition transcript.  Looking at lines 4 through 8.  Said:

16   We did not open a case.

17              THE COURT:  You got the wrong page.

18              MR. MEITL:  Page 80.  I'm sorry.

19   BY MR. MEITL:

20   Q.  Doesn't look like it's pulling up for him.  Might have

21   to scroll to it.  But I'll represent to you the quote.  He

22   says:  We did not open a case.  He was then asked:  Did

23   Detective Altieri do any investigation?  He answered:  No.

24   And then on page 29 he was asked -- he stated:  There was no

25   investigation, therefore there was no suspension.

1          So you're now aware that --

2     A.  Suspension of what?

3     Q.  He was being asked whether the IAD investigation had

4     been suspended.  Said there was no suspension because there

5     was no investigation.

6     A.  Okay.

7     Q.  So you're now at least aware that that's what -- Chief

8     Anzallo's testimony.

9     A.  Yes.

10    Q.  Now at the July 12 hearing after you disclosed the

11    attempted deletions to the plaintiffs, you also told the

12    plaintiffs that IAD was investigating the issue, didn't you?

13    A.  I don't recall what I said on this to the plaintiffs.

14    I'm referring to a point in the courtroom because I know we

15    were right over there in that area when the conversation

16    took place.  I'm not sure how much information was shared at

17    that point.  I don't recall that exactly.

18          THE COURT:  What part --

19          THE WITNESS:  Well, no, Your Honor.  It was -- the

20    conversation that took place, I was at -- we took a break.

21          THE COURT:  I understand.

22          THE WITNESS:  We took a break and then I walked

23    over and talked to counsel for Chang plaintiffs.  And I'm

24    not certain of all of the different words that were said.  I

25    don't have a recollection about that.  I just know what

1   ultimately was said in court and that's what's reflected in

2   the transcript.

3          THE COURT:  So we took a break.  Then I returned,

4   and at that point you recounted to me what you had told them

5   during the break.

6          THE WITNESS:  Well, no.  First, Mr. Turley.

7          THE COURT:  Mr. Turley spoke first.

8          THE WITNESS:  And then I came up at the Court's

9   urging.

10          THE COURT:  I remember that, as well.

11   BY MR. MEITL:

12   Q.  And in that exchange with the Court it was revealed by

13   Mr. Turley that you had informed us that there was an IAD

14   investigation, correct?

15   A.  I don't know.  Is there a page?

16   Q.  We can pull it up.  It's the July 12 hearing, which is

17   Exhibit 39, page 30.  And Mr. Turley discloses:  We were

18   also informed there was a current investigation being done

19   by Internal Affairs at the MPD into this attempt to destroy

20   evidence.

21          See that?

22   A.  Yes.

23   Q.  So you disclosed it to the plaintiffs.  That's fair,

24   correct?

25   A.  That's -- that's what Mr. Turley says I said.  And I

1   think that was discussed later on, as well, within the

2   discussion before the Court.

3   Q.  And then following this hearing, that's when Chief

4   Lanier decided to refer the matter to the FBI?  That's your

5   testimony?

6   A.  That's not my testimony.

7   Q.  What happened?

8   A.  What do you mean?

9   Q.  Well, at some point there was a referral to the United

10  States Attorney's Office and the FBI.  I believe you

11  testified to that earlier, correct?

12  A.  Right.  And that that came out of a -- to my

13  understanding -- a discussion between the attorney general

14  and his client, being Chief Lanier.

15  Q.  And that occurred on July 12, the same day as this

16  hearing, correct?

17  A.  I believe that that conversation occurred that evening.

18  Q.  So after this hearing, after Mr. Turley's criticizing

19  MPD?

20  A.  After what?

21  Q.  Mr. Turley is criticizing MPD for investigating itself,

22  as he put it.

23  A.  Well, I don't know how much Attorney General Nathan or

24  Chief Lanier knew about anything that Mr. Turley said during

25  that hearing that day.  I certainly didn't go back to my

1    office and report that Mr. Turley was criticizing MPD for

2    investigating itself.  That's not something I shared.

3    Q.  So it's a complete coincidence that first time the

4    plaintiffs learn about this, raised concerns about IAD

5    investigating itself, that very same day, hours later, MPD

6    decides to refer the whole matter to another law enforcement

7    agency?

8            THE COURT:  Wait a minute, Mr. Meitl.  Hold on

9    just a second.  Doesn't Facciola do something on July 11

10   that bears on this?

11           MR. MEITL:  Your Honor, I don't believe that --

12           THE COURT:  Well, what happens on -- would someone

13   please look at the docket?  What does --

14           Ms. Pressley, to the best of your recollection,

15   don't I do something after you report this to me?  Because I

16   remember an order I think I issued on July 12.  Is that

17   right?

18           MR. MEITL:  I don't believe you --

19           THE COURT:  Madam Clerk, can you pop up the

20   docket, please?  Go to July 11.

21           MR. MEITL:  2011.

22           THE COURT:  2011.

23           THE DEPUTY CLERK:  I see July 12 an order.

24           THE COURT:  Madam clerk, can you please read that?

25           THE DEPUTY CLERK:  Okay.  Pursuant to the status

1    conference held this date the following is hereby ordered:

2    1, defendant shall file their proposed findings of fact and

3    conclusions of law as to the audio recordings and video

4    footage within 30 days.  2, the parties are to meet and

5    confer immediately to discuss the need for additional

6    discovery related to the E-Team document recently produced

7    by the District of Columbia.  Number 3, the parties are to

8    submit a joint proposal for such discovery within ten days.

9    Number 4, the parties are to immediately schedule the

10   deposition of Marc Bynum, and the Court is to be provided on

11   a daily basis a copy of a transcript.  Number 5, the parties

12   are to jointly coordinate with chambers recording the

13   schedule -- I'm sorry -- regarding the schedule for the

14   evidentiary hearing to take place in August and/or September

15   2011.  So ordered.  Signed by Magistrate Judge John Facciola

16   on July 12, the year 2011.

17           THE COURT:  All right.  Now -- okay.  And that's

18   the last entry on the 12th?  Ma'am clerk?

19           THE DEPUTY CLERK:  Minute entry preceding that

20   entry setting the trial on July 12.

21           THE COURT:  Thank you.  So that's what occurs.

22   Facciola's order.  Now, I don't recollect -- perhaps you

23   could help me -- a specific discussion involving me on the

24   day in court about who would be doing the investigation.

25   Please correct me if I'm wrong.

1          THE WITNESS:  We did have a discussion,

2     Your Honor.  Before the big reveal, if you will.  And after

3     -- and there was a great deal of discussion before this part

4     of the transcript.  Because my recollection, in terms of

5     back drop of this hearing, is that the parties were coming

6     thinking that this was just a status where we were going to

7     update the Court as to the fact that the data had all been

8     reviewed and produced and what the next steps would be in

9     terms of scheduling Mr. Bynum's testimony and other

10    testimony.  And I think that counsel for Chang plaintiffs

11    had submitted some sort of list with a number of things they

12    wanted done.

13          But when Your Honor came into the courtroom that

14    day, you had your own list and had decided:  Well, I think

15    I'm ready for a portion of this to go over to Judge

16    Sullivan.  So we want to immediately get our conclusions of

17    law submitted, et cetera.

18          And so at that point I was standing up and saying

19    to the Court:  I think that we need to hear from Mr. Bynum

20    first.  I think that that's going to bear directly on the

21    answers for question number one.  So before we submit those,

22    it would be important to get that testimony.  And you said:

23    Well, why can't we do both?

24          So we had some back and forth and some discussion

25    about it.  And, ultimately, you and I had an exchange in

 1     which the district's position was that there was no need for

 2     a further order from Judge Sullivan expanding the scope of

 3     your authority in order to do this investigation.  That you,

 4     based on the orders that Judge Sullivan already issued,

 5     could investigate the uncovering of the data, why it wasn't

 6     found earlier, and all of those things.

 7            So our position at that point was that you were,

 8     for the purposes of the civil litigation, able to just

 9     continue on and do that and question Mr. Bynum without any

10     need of expansion.

11            THE COURT:  But I have a very specific

12     recollection, both in a pleading and in court, of Mr. Turley

13     objecting to, quotes, the MPD investigating itself.  Did

14     that lead us to a discussion of referral to the FBI whether

15     through Ms. Braswell or otherwise?

16            THE WITNESS:  No.

17            THE COURT:  Thank you.

18     BY MR. MEITL:

19     Q.  Why don't I read that objection.  It's on that same

20     page.  Professor Turley starts by saying:  And we would like

21     to put on the record that we believe it is entirely

22     inappropriate for the MPD to be investigating an attempt to

23     destroy evidence that could incriminate MPD officers or the

24     MPD generally.

25            And then it goes on.

1           Just so I'm clear, the decision on July 12 was not

2     related in any way to what took place in this hearing?  Or

3     the Court's order following this hearing?

4     A.   No.  What I said to you is that it had nothing to do

5     with Mr. Turley's comments.  First, because that's what IAD

6     does.  It investigates itself and it investigates literally

7     -- actions that incriminate MPD officers or agents of MPD.

8     That's the purpose of the Internal Affairs Division.  That's

9     their whole function.

10          So the fact that Mr. Turley objected to IAD doing

11    its job was not of any moment to me such that I would relay

12    it to anyone.  But I did relay all of the actions of the day

13    and things that had been decided, and then the Court's order

14    came out.  And so that information, I'm certain, was

15    reported to my supervisors.

16          But I don't -- I know that I did not go and say

17    counsel for Chang plaintiffs raised this issue among other

18    issues.  Even though Mr. Turley said this is not a criticism

19    of Ms. Pressley -- which would have had to have been a first

20    -- I still didn't go and report it.

21    Q.   Well, are you aware why the MPD did not refer this prior

22    to July 12 if it wasn't related to this hearing?

23    A.   Am I aware of why they didn't refer it?  Not

24    necessarily.  There were ongoing discussions on that issue

25    with respect to this case.  Not just the one issue of a

1    delete button, but dating back to Judge Sullivan's initial

2    inquiry and the reason why we have special master

3    proceedings.

4            I mean, one of the whole issues that was being --

5    that Judge Sullivan said any number of times in any number

6    of different orders and in court was he wanted a

7    determination as to whether there would be a need to refer

8    the matter to the Department of Justice for investigation.

9            And he said, you know, referring it without

10   something from the special master that would either

11   strengthen such a referral or would let him know that such a

12   referral would not be necessary was important to him.  And I

13   thought that was one of the reasons that had he expressed

14   why we were having this very proceeding.

15           So, yes, there was an ongoing conversation in my

16   office about the need for referral, whether referral was

17   appropriate.  And that dates back to when it was Attorney

18   General Nichols in the office.

19   Q.  All right.  Well, so last time you testified that the

20   IAD investigation, quote, played a part in my decision-

21   making about what I could open my mouth and say.  But you

22   also testified that there would be no reason, due to the

23   investigation, that the fact that the delete button was

24   pushed couldn't be shared.  Was the investigation itself or

25   the existence of the investigation that couldn't be

1    disclosed?  Do you recall that?

2    A.   In terms of what I would share.  But Mr. Bynum wouldn't

3    have any knowledge of what was being investigated or whom or

4    any of those things.  So I didn't see any reason why he

5    would not be able to testify as to his knowledge.

6    Q.   Just so I understand.  You felt comfortable being able

7    to disclose that Mr. -- what Mr. Bynum had found; just not

8    the existence of an IAD investigation into that.

9    A.   I don't know what my comfort levels were beyond just

10   everything I've already testified in terms of the reasons

11   that it was done the way it was done and the decisions that

12   were made.  And I would prefer not to have to rehash all of

13   them.  I mean, they're in the transcript.

14   Q.   I understand.  One of the reasons that you said it

15   wasn't disclosed was this IAD investigation.  So I'm just

16   trying to make sure I specifically understand that concern.

17   The fact that there was an IAD investigation was not the

18   barrier to disclosing this to the Court and the plaintiffs.

19   It was that you didn't feel comfortable disclosing the

20   existence of the IAD investigation.  Is that correct?

21   A.   It was a factor.  And I'm not sure which part of it was

22   more of a factor or less.  There were all -- there were any

23   number of different reasons, all of which I outlined when I

24   was last in this seat.  And all of those reasons combined

25   led to ultimately the information that I provided, the

1    information I didn't provide.  And those were all reasons --

2    I can't say, other than two of them, I think, were -- two of

3    the Valentine reasons, I believe I said when I was last

4    here, were important reasons.  And then there were other

5    reasons that came from the discussions in the office.  But

6    they were all factors that just led to a -- what we viewed

7    as litigation-related decision.

8    Q.  But you were concerned -- or, you felt that there was

9    some barrier to you disclosing the existence of an open IAD

10   investigation to the Court and the plaintiffs.  Correct?

11             MS. LUDAWAY:  Objection.  Asked and answered.

12             THE COURT:  Sustained.

13             MR. MEITL:  I don't believe I got an answer,

14   Your Honor.

15             THE COURT:  Sustained.

16   BY MR. MEITL:

17   Q.  Well, Ms. Pressley, you did, in fact, disclose the

18   existence of an IAD investigation to other joint defense

19   counsel on May 12, didn't you?

20   A.  I'm not certain that I did.  I know we went through this

21   the last time, and you said that the discovery responses of

22   one of the codefendants reflected that.  But I don't recall

23   that in the conversation.  I don't remember saying that.  So

24   that's still where we are today.  My testimony is the same

25   as it was the last time I was on the stand.

1    Q.  Okay.  And that was Exhibit 76 which was filed by Chief

2    Ramsey.  At the July 12 hearing, you disclosed the existence

3    of an IAD to the plaintiffs.  We just looked at that, right?

4    A.  The fact that it was being -- that the matter was being

5    investigated, yes.

6    Q.  So the existence of the IAD investigation really was not

7    a barrier to disclosing this.  You disclosed it to the

8    defense counsel, you disclosed it to the plaintiffs.

9              MS. LUDAWAY:  Objection, Your Honor.

10   BY MR. MEITL:

11   Q.  It was disclosed, correct?

12             MS. LUDAWAY:  Your Honor --

13             THE COURT:  It's argumentative.  Unless you wish

14   to speak to this.  If your integrity is at issue.

15             THE WITNESS:  No.

16             THE COURT:  "No" what?

17             THE WITNESS:  I don't wish to speak to it any

18   further than I already have.

19             THE COURT:  Then it's sustained.

20   BY MR. MEITL:

21   Q.  All right.  Ms. Pressley, you also said that the law

22   enforcement privilege was one of the reasons you did not

23   disclose the information to the Court.  And the Court,

24   during your testimony last time, rightfully pointed out

25   there may need to be a request for that information.

1      A.   No.  That's not correct.

2      Q.   It's not correct?

3      A.   It's not me that said that.  You're talking about the

4      Valentine reasons.  That -- we were going through that

5      checklist, and you were asking me whether I agreed that the

6      reasons Mr. Valentine gave for why it wasn't disclosed -- I

7      think I did my own kind of separate checklist and looked at

8      his and said:  Yes, that could be a factor.  Yes, that

9      couldn't be a factor.  But I don't believe that law

10     enforcement privilege was at the front of my thinking at the

11     time.

12     Q.   Was it one of the factors that led to you not to

13     disclose this?

14     A.   I can't say that it was.  I don't know.

15     Q.   All right.  Well, let's look at the request, which is

16     Exhibit 96.  These are the Chang plaintiff's second set of

17     interrogatories, which are dated February 24, 2010.  We can

18     show you that on the last page.  So these are the Chang

19     plaintiff's requests.  We're going to turn to page 7.

20     There's only one interrogatory.  And that asked, in relevant

21     part, for the district to identify any allegations made from

22     January 1, 2002, to the present, that the district, the

23     Metropolitan Police Department, or any subdivision thereof,

24     improperly edited, tampered with, deleted or destroyed

25     Documents -- and "documents" is capitalized -- audio

1    recordings or video recordings.  And documents defined on

2    page 2 very broadly as typically in these kinds of requests.

3          Now, Ms. Pressley, would you agree that what

4    Mr. Bynum had found with regard to the attempted deletions

5    or the delete button was responsive to this request?

6    A.  I don't know that it's responsive with respect to

7    improperly edited or deleted or destroyed documents.  I

8    mean, I don't think -- to answer your question, obviously,

9    we were producing Mr. Bynum as a witness because we believed

10   that he had responsive information, had important

11   information generally.  I don't know that it was because of

12   this one interrogatory.  I mean, we knew he was a witness

13   that you needed to talk to, and that's why we were saying:

14   Talk to him.  But I don't know that he could have

15   information -- I don't know that his testimony did show that

16   something was done improperly.  I guess my understanding of

17   his testimony, and of the other person from NC4, is that

18   that's something that was done that could have been done

19   just as a matter of routine.

20   Q.  Well, Mr. Bynum didn't know why it was done, correct?

21   A.  On the day that I talked to him, no.

22   Q.  Or ever, correct?

23         MS. LUDAWAY:  Wait.  Objection.  She can't --

24   BY MR. MEITL:

25   Q.  Well, are you aware of Mr. Bynum's --

1          THE COURT:  He withdrew the question.  Go ahead.

2    BY MR. MEITL:

3    Q.  Are you aware of Mr. Bynum ever having knowledge why the

4    delete button was selected?

5    A.  I haven't spoken to Mr. Bynum since leaving the office,

6    and a good bit before leaving the office, so I don't know.

7    Q.  Okay.  And Mr. Bynum raised this concern with you.

8    Didn't know exactly what it meant.  But he said:  It looks

9    like someone selected the delete button.

10          So just to be clear, did you view that -- these

11   interrogatories pre-date Mr. Bynum's discovery.  Did you

12   view what Mr. Bynum had told you as responsive to this

13   discovery request?

14   A.  Everything that Mr. Bynum found out I viewed as

15   responsive to some request or another for information, and

16   that's why from the May 3rd conference call with the Court

17   onward I was saying that the testimony of Mr. Bynum, what

18   was recovered, how it was recovered, was important.  And I

19   know that on July 12th I said that in court prior to

20   revealing that someone had pushed the delete button.  And my

21   time at the podium I said, again, that Mr. Bynum's testimony

22   was important for that -- for those reasons.

23          So I don't dispute that it's responsive to this or

24   probably any number of other requests.

25   Q.  Well, was the July 12 disclosure the district's response

1    to this request when it decided to just supplement its --

2            MR. CAUSEY:  Your Honor, she just answered that

3    question.

4            THE COURT:  No, I think he's getting to the point

5    that I tried to figure out.

6            Are you suggesting that it is within the province

7    of the investigation that the response to this interrogatory

8    was false?  Because the response is not here.

9            MR. MEITL:  We can also show the response,

10   Your Honor, but I don't think there was ever a response by

11   the district at any point in time in a -- a formal response

12   that discussed Mr. Bynum's discovery.  And I'm asking

13   Ms. Pressley if that supplementation --

14           THE COURT:  Wait.  Let me let me parse this.  You

15   propound this interrogatory in 2010, right?  Before Bynum

16   makes his discovery.  What is the response?  Where's the

17   response?

18           MR. MEITL:  I don't know we have electronic copy

19   with us, Your Honor, but I did look at it just the other

20   day.

21           THE COURT:  But the response couldn't possibly

22   talk to what Bynum discovered.  So now your inquiry is why?

23   Why is this interrogatory significant?  Because it was not

24   supplemented after she speaks to Bynum?

25           MR. MEITL:  Two issues.  That's the first.

```
 1              THE COURT:  And that's a violation of the federal

 2       rules?

 3              MR. MEITL:  That the district never -- even once

 4       they found out what Mr. Bynum had found, waited the full 70

 5       days until July 12th to provide this information to Chang

 6       plaintiffs.  And even then, it was at the July 12th

 7       teleconference.  It wasn't in a formal filing with the Court

 8       or any other form.  So I'm just asking Ms. Pressley:  When

 9       did the district supplement its response as to this

10       interrogatory?

11              THE COURT:  Well, and you haven't asked when she

12       stopped beating her wife.  But I guess what you're trying to

13       make, the point here, is that it was improper not to

14       supplement this as soon as Bynum's discovery is made.  Is

15       that your point?

16              MR. MEITL:  That is one of them.  Yes, Your Honor.

17              THE COURT:  And, Ms. Pressley, do you have any

18       recollection when you were the district's counsel of

19       supplementing this interrogatory?  Did you say:  Oh, there

20       was that --

21              THE WITNESS:  No.  And I don't know that based on

22       this interrogatory that there would have been a supplement.

23              THE COURT:  But putting that to one side.  You

24       never said in your own mind:  I wonder if we have to

25       supplement our response by virtue of what Bynum said.
```

1          THE WITNESS:  Right.  Not to -- not to this

2     particular interrogatory, no.  We discussed --

3          THE COURT:  When you learned what Bynum -- when

4     you learned what Bynum had found, did you remember this

5     interrogatory?

6          THE WITNESS:  Not in particular.  I can't say that

7     I was thinking this particular interrogatory at that time.

8     But there were no allegations made from January 1, 2002, to

9     the time that I was still counsel in the case of any

10    improperly edited or destroyed documents.  So to say -- to

11    have to say for each allegation identified, state the date

12    that the allegation was received, the date of the alleged

13    conduct, I wouldn't have had that information.  It was just

14    testimony about something that was done, whether properly or

15    improperly.  We just knew that an action had taken place.

16          THE COURT:  Go ahead.

17    BY MR. MEITL:

18    Q.  Regardless of this interrogatory -- you said there were

19    many discovery requests -- did you ever consider the need to

20    provide the information that Mr. Bynum had told you on May 3

21    to the plaintiffs because of your discovery obligations?

22    A.  I believe that was why we supplemented the witness list

23    with his name, because he was a witness who had information

24    that was relevant to the case.

25    Q.  You said "witness list."  What are you referring to?

1   A.  I think we sent an additional list of people who Chang

2   plaintiffs may want to interview, and that his name was on

3   it.  I don't remember when that was.  But I thought that

4   there was an additional list along that time period.

5   Q.  Okay.  Now, one of the other reasons that Mr. Valentine

6   testified to -- but we didn't get to last time -- was that

7   the attempted deletions were not disclosed to the Court

8   because the Chang plaintiffs had a history of disclosing

9   certain facts in public filings, which then made their way

10  into news media.  And the district was concerned that they

11  would do this if the attempted deletions were disclosed.

12          Did you share that concern?

13          MS. LUDAWAY:  Objection, Your Honor.  We got to

14  this issue.

15          MR. MEITL:  No, we didn't.

16          THE COURT:  Yes, we did.  This is where I thought

17  --

18          MR. MEITL:  Two separate things, Your Honor.

19          THE COURT:  -- poor Ms. Pressley had to defend my

20  honor, such as it is.  And Valentine's suggestion was that

21  if we told Facciola, it would go into the media.  When we --

22  Mr. Tuohey objected, said that's not what Mr. Valentine

23  said, and we looked at his deposition.

24          And then we had a discussion that what

25  Mr. Valentine seemed to be referring to -- what I certainly

 1    was referring to -- is that if a disclosure was made to me

 2    of an attempt to delete data, I considered that public

 3    information.  That I'm not the American Arbitration

 4    Association and we would make a record of that.

 5          So counsel is quite right.  My recollection is

 6    that was the last thing we did before we broke.  Isn't that

 7    right?

 8          MR. MEITL:  That is correct, Your Honor.

 9    Mr. Valentine in his testimony was listing several reasons.

10    One of the reasons he testified to was his concern about the

11    Court, which you just discussed.  Then separately he

12    discussed press coverage.  So I just want to go into that

13    briefly.  Maybe they're related, but I do think that they're

14    relevant.

15          THE COURT:  I don't know.  We're all agreed this

16    case, rightly or wrongly, has drew press attention, right?

17    That was a given when you took this responsibility, right?

18          THE WITNESS:  That is a given.

19          THE COURT:  You were about to become a media star.

20    But in any event -- pursue your question.  Please let's not

21    -- I'm not worried about what shows up in the Washington

22    Post.  Let's go.

23    BY MR. MEITL:

24    Q.  That part of the transcript, which is Exhibit 42, at

25    page 152, lines 9 to 11.  Mr. Valentine stated:  By going in

1    and standing up in court and saying to the universe someone

2    at MPD tried to delete data, that's explosive.

3            And later, on page 130 --

4    A.  Well, can you tell me -- can I see the question he was

5    answering?

6    Q.  Sure.

7    A.  Okay.

8    Q.  Then on page 130, lines 5 through 8, he said:  We

9    determined it was too risky to put that out there -- hold

10   on.  I'll let it get pulled up.  We determined that it was

11   too risky to put that out there, have it on the front page

12   of the Post, while we were still investigating.

13           I believe Mr. Valentine was testifying to two

14   separate things.  One in relation to the judge, and one just

15   walking into court and telling everyone this.

16           My question to you is, was potential news coverage

17   one of the reasons you chose not to disclose this to the

18   Court and the plaintiffs?

19           MS. LUDAWAY:  And, again, Your Honor, objection.

20   At the last hearing, Ms. Pressley went in detail --

21           THE COURT:  I think -- let's just finish it up.

22   Between when you made the decision that you made on May 4th

23   that you would tell us all about Bynum, but you would not

24   talk about the deletion of the data, at that time did you

25   share the concern that Mr. Valentine did that if you were to

1    say that publicly it would show up in the Post the next day

2    and that would be, quote, too risky to run that risk.

3            THE WITNESS:  I don't know that I -- that in the

4    discussions we had that concern about this specific -- this

5    specific issue.  I know generally -- as I said when I

6    testified last time, Your Honor may recall you issued sort

7    of a gag order of sorts in this case and that we were not

8    supposed to be having conversations with members of the

9    press and we weren't supposed to be providing matters that

10   went back and forth in discovery to the press.  And I can't

11   remember how long ago that order was.  But it did seem that

12   the way around that was to put it in a filing.  And so I

13   know generally there was frustration in my office that

14   matters that are normally a part of discovery in a case were

15   instead part of the public record of the case even when the

16   matters had not yet been vetted and when witness had not yet

17   -- witnesses hadn't testified.  So I understand what

18   Mr. Valentine is saying here, but I don't know that that was

19   specifically discussed with me present as a reason regarding

20   this particular disclosure.

21           THE COURT:  Was it part of your motivation?  Did

22   you ever consider it or care about it?

23           THE WITNESS:  No, I pretty much knew this was

24   coming out.

25           THE COURT:  There you go.  Thank you.  Proceed,

1    counsel.

2    BY MR. MEITL:

3    Q.  Well, whether you knew it was coming out, was it one of

4    the reasons you delayed in telling the Court and the

5    plaintiffs about it?

6    A.  No, I don't know that there was any fruit in the number

7    of weeks of delay.  There was no plan to it.  It wasn't

8    utilized for anything in particular.  It was just a period

9    of time that passed while the material was being reviewed

10   and produced, and waiting for the witness to take the stand.

11   And I certainly didn't think on May 3 and May 4 that it was

12   going to take that number of weeks for Mr. Bynum to actually

13   testify.  And I don't think it would have taken that long

14   for him to testify if it hadn't taken a period of time for

15   the information to get to the parties.  And if the parties

16   hadn't made the decision that it would be better to have the

17   data before having his testimony.

18          So there wasn't any scurrying about on the part of

19   our office to get something or another done or to keep

20   something from being done regarding Mr. Bynum and what was

21   -- what his testimony was going to ultimately be.

22   Q.  Okay.  Ms. Pressley, I want to briefly go through the

23   transcript from the July 12 hearing.  This was the hearing

24   where you ultimately disclosed it to the Court and the

25   plaintiffs.  This is Exhibit 39.  We're going to start on

1    page 5.  It starts with the Court stating:  I'm very anxious

2    to get the finding of facts done.  And I've already begun

3    working on it to the point where I'm moving along.

4              You see that?

5    A.  Yes.  I just -- yes.

6    Q.  We're going to flip ahead to page 7.  And the Court

7    asked you, Ms. Pressley, for your thoughts and comments as

8    to where you are on this.  I'd like your thoughts since you

9    didn't file a written submission.

10             You see that?

11   A.  But it was my thoughts on what he had said previously,

12   was the way that he was thinking that he -- he'd like to

13   proceed.  So --

14   Q.  Fair enough.

15   A.  Right.  It was thoughts on --

16   Q.  On process going forward.

17   A.  Right.

18   Q.  And you didn't disclose at that point the attempted

19   deletions, did you?

20   A.  No.  I said a whole lot, though.

21   Q.  Okay.  Now, let's turn to page 9.  And down the page a

22   bit.  You state:  Well, since there -- the investigation was

23   not closed at the time that it was, that the data was

24   produced, the district's position is that we would like to

25   formally introduce it within the special master's

1    proceeding.  And then if there's no need for further

2    testimony regarding the data, then we don't necessarily have

3    an objection to that.  Since there have been no proposed

4    findings or conclusions, and since one of the main issues is

5    the very existence of the data and whether or not it was

6    purposely destroyed, we do believe that information that we

7    have about that will aid in any decision that Judge Sullivan

8    makes.

9            I could go on.  So just scrolling up to page 9

10   there.  Ms. Pressley, don't you at least consider here that

11   there's going to be no additional testimony?

12   A.  I think that was in response to the questions and the

13   discussion above.  I mean, I believe that when you read all

14   of these pages of all of the different statements I was

15   making, I pretty much was trying to go as far as I possibly

16   could in saying:  Wait a minute.  And that was my message to

17   the Court.  I at that point was still hopeful that Mr. Bynum

18   would be able to be the one to provide the information.  But

19   I did not want for the Court to move forward and turn the

20   matter over -- back over to Judge Sullivan without this

21   being heard.

22           So everything that I was saying there, though I

23   was definitely trying to get His Honor to read through tea

24   leaves at that point to a certain extent, but I was trying

25   to send a signal that there was more that needed to be said.

1    And when I thought that his mind was still made up to move

2    forward, I told counsel.

3    Q.  Well, it says here:  If there's no need for further

4    testimony.

5            There absolutely was a need for Mr. Bynum's

6    testimony, wasn't there?

7            MR. CAUSEY:  Your Honor, objection.

8            THE COURT:  Same objection.  State of mind of

9    counsel.  Go ahead.  Proceed.

10   BY MR. MEITL:

11   Q.  Let's turn to page 17 near the bottom of the page.  It's

12   Judge Facciola, in fact, who raises the examination of Marc

13   Bynum.  He says:  So then what we could do, I suppose, would

14   be you could have some interviews and then that testimony

15   would be taken before me of this technician, this NC4

16   person.  He can explain what his job is.

17           So he's the one who raises the examination or

18   deposition of Mr. Bynum.  It's not you.

19   A.  I don't know.  What came before that?

20   Q.  Well, Ms. Pressley, you reviewed this.

21   A.  What page?

22           MR. CAUSEY:  Objection, objection.  Your Honor,

23   what came before is what Mr. Meitl did not read on page 10.

24   He only read part of Ms. Pressley's answer.  The end of her

25   answer is clear.

1      THE COURT:  Go back to that, please.

2      MR. MEITL:  Your Honor, I'm sure Mr. Causey can do

3   this in his cross.  I don't know --

4      THE COURT:  That's all right.  Let's --

5      MR. CAUSEY:  I think, Your Honor, in fairness to

6   the witness --

7      THE COURT:  That's right.  Read it.

8      MR. MEITL:  I'm not -- I don't know what he's

9   referring to.

10     MR. CAUSEY:  Page 10.  Scroll down to where it

11  says:  "THE COURT:  No.  I mean" --

12     The rest of that the answer was not read.  The

13  answer between lines -- approximately 6 and 11 Mr. Meitl did

14  not read.

15     THE COURT:  I'm looking at that.  You looking at

16  that, Ms. Pressley?

17     THE WITNESS:  Yes.

18     THE COURT:  And I say:  Why couldn't we simply, on

19  the basis of my report, expand my responsibilities as

20  special master to investigate the circumstances of the

21  disclosure of this document.

22     What do you say?

23     MR. CAUSEY:  No.  Above that, Your Honor.  I'm

24  sorry.

25     THE COURT:  I read that.  We've all read that.

1    Okay?  So you now have --

2            THE WITNESS:  The district's position is that no

3    expansion is necessary.  That we believe that the data and

4    the circumstances of it are a part of the very first issue

5    that we gave you.

6            THE COURT:  So you're saying:  Facciola, there's

7    no reason for you to expand your duties because we -- as you

8    testified before -- we think this is already within your

9    province as defined by Judge Sullivan's order.

10            THE WITNESS:  Yes.

11            THE COURT:  Does that meet your objection,

12   Mr. Causey?

13            MR. CAUSEY:  Not really, Your Honor.  I think what

14   I'm referring to we haven't talked about yet.  Which is the

15   difference between line 6 and 11 when Ms. Pressley refers to

16   the special master proceedings --

17            THE COURT:  Yeah.  I read that.

18            MR. CAUSEY:  And then this material would be

19   hashed out for the first time.

20            THE COURT:  You can address that on redirect.  I

21   just want to make sure Ms. Pressley had saw her answer in

22   context.

23            Are you comfortable now?

24            THE WITNESS:  Yes.  At least with respect to this

25   page.  I think that there was later discussion -- I'm not

1    certain why Your Honor at that point refers to NC4

2    technician.  But I do recall that we again -- because the

3    suggestion then was:  Well, we can still have the technician

4    to testify, but we can move forward.  And I know I responded

5    again saying:  Now I think he has to testify.  And it would

6    be part of this proceeding.

7            THE COURT:  I understand.  Thank you.

8    BY MR. MEITL:

9    Q.  So let's turn to page 20.  And I believe this is where

10   you state:  Your Honor, the district's position is that all

11   of this information that should be provided to the Court

12   through testimony, not through counsel.  And the Court

13   responds:  Well, I just wanted to get my hands on one aspect

14   of this so I can understand it and, if necessary, report it

15   to Judge Sullivan.

16           Do you see that?

17   A.  Yes.

18   Q.  So here the Court is at least saying:  Just give me the

19   basics, Ms. Pressley.  I just want to know what we're

20   dealing with so we can figure out the process.

21           But even here you don't disclose the attempted

22   deletions.

23   A.  No.  He asked a question and I answered it.

24   Q.  Well, you don't disclose the attempted deletions, do

25   you?

1   A.  At this point in the hearing -- I mean, no.  We all know

2   when it was disclosed.

3   Q.  All right.  Well, you then -- in your response to his

4   questions, you go through what Mr. Bynum did.  You summarize

5   it.  You discuss it.  You discuss what his testimony is

6   going to be.  Is that fair?

7   A.  I give information in response to the question, yes.

8   Q.  In relation to what Mr. Bynum did and what he will

9   testify to?

10  A.  What he was specifically retained to do.  The question

11  from the Court was did he inadvertently realize he could

12  call up the data?  Or was he specifically retained to call

13  up the data?  And I answered that question.  He was

14  specifically retained to reboot their server and ascertain

15  whether the data was there -- on there or not.  He did not

16  do the forensic imaging.

17         And then I go through not really what he found,

18  but I go through what happened next.  That once we knew the

19  data was there we stopped, we called the parties, called the

20  Court.  Then at that point, at the Court's suggestion, a

21  forensic imaging -- before going any further, the server --

22  a forensic image was taken of the server.  We have a disk in

23  the intelligence department of MPD.

24         So, no, I would say the answer is "no."  I don't

25  go through and discuss or give a preview of his testimony,

1    at least in this answer.  I just say what he was called to

2    do and then I say what we did next.

3    Q.  So you don't think that's what Mr. Bynum would have

4    testified to?

5    A.  He wouldn't have known anything about anything past

6    number 18.  Past line 18.  Because it's about what the

7    office did, lines 19 through 25.

8    Q.  Now, let's turn to page 24.  This is where the Court

9    takes a break.  Says:  Why don't the parties confer.

10           It was at this point that you first told the

11   plaintiffs of the attempted deletions, correct?

12   A.  Of -- yes.  Of the -- yes.

13   Q.  And I think we already went over this.  This is when you

14   informed them of the IAD investigation as reflected in the

15   testimony later -- or, the transcript later.

16   A.  Right.  And my point in going -- whatever way it was

17   left when we took the break, and whatever, I didn't see that

18   part of the transcript.  I'm not sure.  But I know there was

19   something about it that made me concerned that we would be

20   moving forward.  And that we would move forward without this

21   testimony being a part of the record.

22           So in a way that I would not have, but for feeling

23   like it needed to be done right away -- and I didn't call

24   and check with a supervisor or anyone -- I just came and

25   provided you the information because I thought it was

1     important that we be on the same page in terms of not

2     wanting to move forward until the information came out in

3     court.

4              Ultimately, when His Honor came back in and the

5     Court decided to wait on that issue, so we got the relief we

6     were requesting without providing the additional

7     information.  But, of course, I had already provided it to

8     counsel for Chang plaintiffs so it then became a part of the

9     record before the Court.

10    Q.  Ms. Pressley, isn't it true that once Judge Facciola

11    told you "let's take the testimony of this technician,"

12    which we just looked at on page 17, that's when you decided:

13    Look.  I've got to tell them, because we're going to do this

14    testimony.

15    A.  No.  Because the suggestion -- if you look at what he

16    was suggesting, he was suggesting at that point that we do

17    the testimony but still send in the conclusions.  And that

18    did not jive.  Because the testimony would potentially

19    affect that question, that first question of whether there

20    had been deletion or attempted deletion or destruction, or

21    whatever it was.

22              So it was obvious that Marc Bynum was going to

23    testify.  My issue at that point was that the office had

24    always thought, and I certainly had always thought, that

25    Bynum's testimony would be a part of the record before the

1    special master before that issue was sent back to Judge

2    Sullivan.  And I did not want that kind of error.

3    Q.  Ms. Pressley, wasn't it possible that at this July 12

4    hearing, Judge Facciola -- or, Judge Sullivan, through an

5    amended order -- said:  We've done enough of the special

6    master investigation.  We're done.  Plaintiffs have already

7    submitted proposed findings of fact, conclusions of law.

8    You have the E-Team data, move forward.  Wasn't that at

9    least possible?

10            MS. LUDAWAY:  Objection.  Speculation.

11            THE COURT:  Go overruled.  Go ahead.

12            THE WITNESS:  That, in essence, was sort of where

13   it felt like it was procedurally, and I had a problem with

14   that.  I had -- I had an issue with it going forward in that

15   way.  And that was why ultimately I made the disclosure.

16   BY MR. MEITL:

17   Q.  So your testimony is you made the disclosure because you

18   didn't want this all to end before Bynum testified.

19   A.  Yes.  And everything that I'm saying is exactly that.

20   Q.  When you approached Chang counsel at this break, wasn't

21   it Mr. Turley who said to you:  You need to tell the Court

22   about this?

23   A.  He may have.  I mean, the issue -- my issue wasn't me

24   telling the Court, as I've said consistently.  I thought it

25   should come from the witness.  I thought that the testimony,

1   what was uncovered, how it was uncovered, what the delete

2   button meant, what he knew about who pressed it, all of that

3   should come from the witness.  So what I was trying to make

4   sure didn't happen was that the process ended before the

5   witness testified.

6          So even when the Court came back and made the

7   decision to not send that part over to Judge Sullivan -- to

8   not have the proposed findings of fact and conclusions of

9   law -- I still was of the impression that it should come

10  from the witness.  So I'm sure that Mr. Turley wanted

11  something different from that, and that's just the way that

12  this case always ran.  And then Mr. Turley did stand up and

13  say that there were things that should be brought to the

14  attention of the Court.  And I think I then again said:

15  Well, I believe -- the district's position is that it should

16  come from the witness.  And Magistrate Judge Facciola said:

17  Oh, tell me now.

18  Q.  So without that prompting, is it correct that you were

19  not intending to tell the Court of the attempted deletions

20  on July 12?

21  A.  I don't think that I had made a decision to change

22  course.  I certainly knew that in telling counsel for Chang

23  plaintiffs, that it would get to the Court through some

24  other means than a witness.  But I don't know that I had

25  decided to do something different in just those minutes that

1    unfolded.  And I think -- you know, I mean, it's there.

2    Q.  When you say --

3    A.  The transcript is there.

4    Q.  -- "change course" or "do something different," you mean

5    proceed as you had been proceeding, wait for the testimony.

6    A.  That the -- that what was found and how it was found

7    should come from the person who actually had the

8    information.  Not -- not my hearsay, not my witness prep

9    conversations; but the witness.

10   Q.  Ms. Pressley, if the Chang plaintiffs had never demanded

11   the deposition of Mr. Bynum, or if the special master Judge

12   Sullivan didn't demand his examination, would this have ever

13   been disclosed to the Court and the plaintiffs?

14   A.  I don't know that you demanded his deposition.  And I

15   believe in the transcript what I say is the district intends

16   to introduce this evidence.  So ultimately, absolutely.  We

17   would have had to request to do a deposition because the

18   only people who could conduct discovery at that point were

19   -- was plaintiffs.  Judge Sullivan's order stated

20   specifically that it was Chang plaintiff's renewed

21   discovery.  And there had been a number of times in court

22   where we had said we may need discovery of our own, and

23   Judge Sullivan said, You would have to make a specific

24   request and justify it.  So we would have had to make a

25   request to do the deposition ourselves and to introduce the

1    testimony.

2            But, yes, this was going to come out.  There's no

3    way that, if you hadn't requested the deposition or if the

4    magistrate hadn't ordered the deposition, that it just would

5    have been somehow secret.  That's not the case at all.

6    Mr. Bynum's testimony was necessary for the introduction of

7    the evidence coming into the record.  And it was, from my

8    office's point of view, going to happen for sure.  So, no,

9    nothing could be further from the truth.

10   Q.  Well, between May 3, 2011, and July 12 -- this hearing

11   -- did you feel increasing pressure to disclose this to the

12   Court and the plaintiffs?  Was a pressure building on you?

13   Did you feel:  I've got to get this out at some point?

14   A.  I certainly didn't want it to languish.  I didn't want

15   that.  It wasn't a purposeful delay.  But I can't describe

16   it as pressure.  The case was eight years old.  And so for a

17   few weeks to go by in the discovery process was certainly

18   not unheard of at this point.  And things were not moving

19   rapidly, necessarily, on the special master track either.

20   So, no, there wasn't an exigency where this information was

21   concerned.  It was another part of a very difficult and

22   painstakingly long litigation.

23   Q.  Mr. Valentine testified that -- this is Exhibit 42 on

24   page 141 at lines 3 through 8:  I think the longer this went

25   the more concerned we got -- well, you know, we need to get

1    this information to the Chang plaintiffs.

2            Did you become more concerned as time passed?

3    A.  As I said, it wasn't something that I wanted to

4    languish.  And, absolutely, on May 3rd, May 4th, our view of

5    the case and the way that it was going to unfold over the

6    next few weeks, months, was not that it was going to take

7    that long for Mr. Bynum to testify.  And certainly we know

8    that any time there's any manner of delay that all sorts of,

9    you know, nefarious purposes and mal-intent are imputed to

10   the members of the Office of the Attorney General.

11           So, certainly, there was an expectation that there

12   would be an accusation.  Because there always was.  But I

13   wasn't in a pressure cooker where I felt, you know, I've

14   just got to get this out.  It was not that.

15   Q.  All right.  Let's go back to the transcript from the

16   July 12 hearing.  Exhibit 39, I think.  Page 30.  And we

17   briefly discussed this earlier.  Mr. Turley says:  We were

18   also informed there is a current investigation being done by

19   Internal Affairs.

20           Now, you didn't dispute that, right?  Because you

21   believed there was an IAD investigation.

22   A.  I did.

23   Q.  And on page 31, line 19, the Court specifically asked

24   you:  Is there an investigation?

25           I don't think your answer directly responds to

1   that.  Not criticizing, I'm just stating it.  And you're

2   free to read it.  Later in the response you say -- you do

3   refer to an investigation.  So you're not disputing it.

4   Just to be clear.  You thought there was an IAD

5   investigation.

6   A.  I thought that there was.  Information that I provided

7   was, basically, the same as what I've testified today.  That

8   was the extent of my knowledge of it.  That someone was

9   called in.  I didn't have anything additional to report

10  about the status of it.

11  Q.  Ms. Pressley, at any point in time before July 12, was

12  there a review within the OAG regarding whether or not any

13  professional rules mandated disclosure of the attempted

14  deletions --

15           MR. CAUSEY:  Objection, Your Honor.

16           MR. MEITL:  I'm not done yet.

17           THE COURT:  Let me ask you another question.  Some

18  law firms, as you know, a specific person, a lawyer, who's

19  the ethics counselor to the rest of the firm.  I don't

20  remember if the U.S. Attorney's Office had such a person.

21  But in the OAG is there someone you can go to and discuss

22  responsibilities under the Rules of Professional

23  Responsibility, DC Court of Appeals?

24           THE WITNESS:  Yes.

25           THE COURT:  Answer "yes" or "no."  Did anyone ever

1    discuss with that person the legitimacy of the position?

2           THE WITNESS:  I'm not certain whether that person

3    -- whether this particular disclosure was discussed with

4    that person.  I am certain that that was discussed.

5           THE COURT:  What was discussed?

6           THE WITNESS:  Whether there was an ethical

7    obligation.

8           THE COURT:  So there was discussion.

9           THE WITNESS:  To disclose a number of things

10   regarding Justice Department, IAD, et cetera.

11          THE COURT:  Thank you.

12   BY MR. MEITL:

13   Q.  Well, when you said there was that discussion about

14   ethical concerns; and the conclusion was there was no

15   ethical issue that required you to disclose this to the

16   Court?

17          MR. CAUSEY:  Objection, Your Honor.

18          THE COURT:  Sustained.  Attorney/client privilege.

19          MR. MEITL:  Well, Your Honor, Exhibit 42 is

20   Mr. Valentine's deposition.  And we asked him at page 184:

21   Was the district concerned at all that it had an obligation

22   under the Professional Rules of Responsibility or the

23   court's rules to disclose this evidence or this information

24   to the Court prior to July 12?

25          He said:  I believe that that review took place,

1    and a conclusion was under these circumstances with the law

2    enforcement privilege at that time there was no duty to

3    disclose.

4            So I think the district has testified to this.

5    Mr. Valentine was --

6            THE COURT:  Proceed.  There's no question.  You

7    want to pose a question on --

8    BY MR. MEITL:

9    Q.  Well, my question is, was the conclusion that there was

10   no ethical obligation to disclose this to the Court and the

11   plaintiffs?

12           MR. CAUSEY:  Objection, Your Honor.  Same reason.

13           THE COURT:  Say your question again.  The answer

14   speaks for itself.  All right?  So Valentine is telling the

15   world the review took place, apparently by an ethics

16   counsellor, and a decision was made.  That was your

17   understanding, as well?

18           THE WITNESS:  No.  Not from the conversations that

19   I had.  What I was going to say is that when Mr. Valentine

20   is giving this testimony on behalf of the district, that

21   that part of the information did not come from me.  And what

22   I would also say is that the function that Mr. Valentine

23   played for the civil litigation division at its helm was to

24   constantly have those types of conversations when there was

25   even a hint of an issue that would for any reason need to

1    either be disclosed to the Court or to the U.S. Attorney's

2    Office.  So the way in which he normally informed

3    discussions in the office was by saying:  I've already run

4    this by so-and-so, and this is the case.  Or by raising a

5    flag if there was a flag.  Or by directing that something be

6    done.  So that is information that would be particularly in

7    his knowledge.

8    BY MR. MEITL:

9    Q.  Ms. Pressley, who was the ethics review person in 2011?

10   A.  I'm not certain.  Their title is -- I'm not certain.

11   There's a particular title.  It's not ethics review person.

12   But I can't remember right now.  I have to ask someone still

13   in the office.

14   Q.  So on July 12, did you feel that it was -- at that point

15   it was necessary to disclose this to the Court and the

16   plaintiffs?  Was that the point in time where you felt:  I

17   have to do it now?

18   A.  Yes.

19   Q.  To the Court and the plaintiffs?

20   A.  No.

21   Q.  Just to the plaintiffs?

22   A.  I felt it was necessary to disclose it to whom I

23   disclosed it.  And that was Chang plaintiff's counsel.

24   Because my point at that point I believe was -- I think if

25   you look earlier in the transcript, I was advocating for a

1    particular position.  And the Court asked all of the

2    different attorneys:  Do you take a position on this?  Some

3    said that they took no position.  Some said, you know, that

4    they would agree to it or they had no problem with it.  And

5    I thought it was important, if it was even possible, for

6    counsel for Chang plaintiffs and counsel for the district to

7    agree that Mr. Bynum's testimony and the introduction of the

8    E-Team's resume would be a part of the proceeding before the

9    findings of fact and conclusions of law were submitted or

10   resubmitted, because I know that Chang plaintiffs already

11   had submitted them.  So I was seeking to get agreement to

12   confer for the purpose of an agreement on a recommendation

13   to the Court to go forward.

14   Q.  Well, Ms. Pressley, Mr. Valentine, page number 42,

15   deposition 1-8-6, and I believe this was in relation to his

16   discussions with you, lines 14 through 20 that you indicated

17   that:  Even though I knew that I could probably sit on it

18   some more because Judge Facciola was bringing -- about to

19   make some decision, I wanted to advise the Chang plaintiffs

20   and the Court at that time of what had happened.

21        So was it that point in time or was it that you

22   thought you could continue to sit on it for some period of

23   time?

24   A.  I don't know that those are my words.  But certainly

25   it's the case that even once it was disclosed to you it did

1    not necessarily in my mind have to be disclosed in open

2    court.  I thought it was still more appropriate to come

3    through the witnesses.  And I think that based on what the

4    Court ultimately came back in and did at that point, which

5    was to hold up that part of the investigation so that the

6    information could come in, it could have gone that way.  And

7    it was not.  And the record reflects it was not me that came

8    up when the Court came back in and said:  Wait, wait, wait,

9    Your Honor.  You really need to know this particular piece.

10               I guess what I would also say is even after it was

11   all disclosed, we didn't move forward in a different way.

12   There was no new order issued that reflected that some other

13   thing should be done.  We weren't directed, for instance, to

14   go to the Justice Department with the information

15   immediately or anything like that.  The actions that were

16   taken after that were the actions that were considered by my

17   office and by the Metropolitan Police Department.

18   Q.  Okay.  Ms. Pressley, in your previous testimony when we

19   were discussing what Mr. Bynum had told you when he had

20   accessed the data, you stated -- and this is page 37, line 7

21   to 8:  I was focused and elated about the prospect of having

22   the information.

23               And then later on page 37 again, line 17 to 18,

24   you said:  I felt like it was a very good day at the office

25   in that I knew that we would now be able to access certain

1    E-Team data.

2           You also described this discovery of this

3    information later as exciting.  Do you recall that?

4    A.  I do.

5    Q.  Now, you also stated it was absolutely advantageous

6    regarding the current special master investigation and the

7    spoliation accusations.  Do you remember that?

8    A.  Absolutely.

9    Q.  Ms. Pressley, your colleagues described what happened on

10   May 3 far differently, I'll represent to you.  And we can

11   look at some of the quotes.

12          Mr. Valentine testified that on May 3rd -- this is

13   Exhibit 42, page 67, at lines 5 through 6.  He said in

14   relation to the attempted deletions:  I think everyone was

15   kind of floored at what they learned and were concerned.

16   A.  I don't know who the 'everyone' is.  I'm sure on the MPD

17   side of things that they had concerns.  That's why the

18   referral -- well, in the earlier paragraph, the initial

19   referral was to IAD, but I think the chief wanted to get the

20   assistance of the United States.  I think everyone was kind

21   of floored at what they learned and was concerned.  So maybe

22   his everyone who's floored is MPD.

23          We were not floored.  The -- Monique Pressley or

24   Shanna Frost or Ellen Efros were not floored -- I wouldn't

25   describe it as floored -- at the recovery of the data.  We

1    were very happy that the data was recovered.  Very, very

2    happy.

3    Q.  Were you floored in relation to what you learned about

4    the attempted deletions?

5    A.  No.

6    Q.  All right.  Now, Mr. Ryan's testimony on this issue --

7    this was on November 9, page 25, lines 10 to 13.  He said

8    that:  The discovery of the attempted deletions was, quote,

9    potentially big problem.  If, in fact, somebody had

10   attempted to delete the information on that server that

11   could be a huge problem.

12          Now Mr. Ryan's not making a distinction between

13   actual deletions versus attempted deletions.  Did you think

14   it was a huge problem like Mr. Ryan did?

15   A.  No.  And I think that's why Mr. Ryan took the action he

16   was taking.  Because that was his concern.

17   Q.  Just to be clear, you thought what you learned on May

18   3rd was exciting, advantageous, great.  Your colleagues are

19   concerned, floored, it's a huge problem.

20   A.  What colleagues?

21   Q.  Mr. Ryan, Mr. Valentine.

22   A.  Look, the attorney general's office -- Mr. Valentine

23   didn't feel that way.  I don't know whose -- on whose behalf

24   he was saying "floored."  I don't know if anyone used the

25   term "floored" or if that's just a term he used colloquially

1   in the deposition.

2          However, on that day no one at the Office of the

3   Attorney General was floored in a bad way; if there's a good

4   way or a bad way to be floored.  We were happy that the

5   information had been recovered.  And from a defense counsel

6   perspective, it was a good day at the office.

7          From an MPD, Internal Affairs, agency director

8   perspective, I'm sure it was different than that.  But those

9   were client concerns that had something to do with things

10  other than the defense of the litigation.

11         THE COURT:  All right.  It's 12:30.  How much more

12  do you have?

13         MR. MEITL:  Quite a bit, Your Honor.

14         THE COURT:  Quite a bit?  What do you mean "quite

15  a bit"?

16         MR. MEITL:  Well, there's still some areas we

17  haven't gone into.

18         THE COURT:  Like what?

19         MR. MEITL:  The FBI investigation.

20         THE COURT:  Why would she know anything about the

21  FBI investigation?

22         MS. BRASWELL:  We would object, Your Honor, to

23  that.

24         THE COURT:  Hold on, Ms. Braswell.

25         MR. MEITL:  She was lead counsel at the time of

 1     the referral.  And there was numerous filings related --

 2             THE COURT:  So you have at least another hour in

 3     interrogation?

 4             MR. MEITL:  Yes, Your Honor.

 5             THE COURT:  All right.  I'll give you this.  I'll

 6     give you one more hour.  Over the luncheon recess, you

 7     better carve it down.  And please eliminate asking her what

 8     she thinks about what Valentine thinks and what Ryan thinks.

 9     I couldn't care less.  I want this interrogation to hone in

10     on what Ms. -- specified in the order.  Why she made the

11     statement she did on May 4, why she did what she did on July

12     11.  We explored that at great length.  I've given you

13     enormous latitude.  Don't abuse it.

14             (Break in the proceedings at 12:30 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2                    <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

3

4

5

6              I, VICKI EASTVOLD, do hereby certify that the

7    above and foregoing, consisting of the preceding 121 pages,

8    constitutes a true and accurate transcript of my

9    stenographic notes and is a full, true and complete

10   transcript of the proceedings to the best of my ability.

11       Dated this 22nd day of January, 2013.

12

13                                 _____s/Vicki Eastvold_____

14                                 Official Court Reporter
                                   United States Courthouse
15                                 Room 6722
                                   333 Constitution Avenue, NW
16                                 Washington, DC   20001

17

18

19

20

21

22

23

24

25

───── 1/9/13 ─────