# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| RAYMING CHANG, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-2010 (EGS\JMF) |
| | ) | (Submitted to Special Master Facciola) |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DISTRICT OF COLUMBIA'S NOTICE IN RESPONSE TO PLAINTIFFS' FILING REGARDING TESTIMONY OF CHIEF LANIER AND RELEVANT FACTS PERTAINING TO THE SPECIAL MASTER'S FEBRUARY 1, 2013 ORDER

The District of Columbia, by and through counsel, hereby respectfully submits this Notice to address several issues raised by the *Chang* plaintiffs during the recent hearings before the Special Master, to respond to the recent filing by the *Chang* plaintiffs regarding the upcoming testimony of MPD Chief of Police Cathy Lanier (Dkt. No. 935), and to address several pertinent facts in connection with the Special Master's February 1, 2013 Order. (Dkt. No. 936.)

### A.    THE DISCOVERY OF THE E TEAM DATA AND THE DECISION TO REQUEST AN IAD INVESTIGATION

On May 3, 2011, NC4 representative Marc Bynum came to MPD Headquarters and accessed the decommissioned E Team server containing the September 2002 IMF JOCC Running Resume. In the process of accessing the data, Bynum stated to those present that it appeared data had been "deleted" from the September 2002 IMF JOCC file. Bynum made it clear to everyone at the time, however, that the entire Running Resume was found. (Bynum SM,

Nov. 28, 2012, at 88:11-23; Pressley SM, Dec. 18, 2012, at 27:9-11; Frost SM, Jan. 11, 2013, at 46:11-14, 49:24-50:2.)[1]

Although Bynum stated that it appeared that data had been "deleted," he did not explain the meaning of the term "delete."  (Pressley SM, Jan. 9, 2013, at 28:7-21; Frost SM, Jan. 11, 2013, at 46:21-47:7.)  Despite using the term "delete," however, Bynum also made the important statement at the time that he did not think any data had been permanently erased from the system.  (Pressley SM, Jan. 9, 2013, at 34:2-3.)  As everyone knows now, use of the "delete" function in the E Team program did not result in data being erased or destroyed; it meant that someone with administrative rights used the system's "delete" function to move certain data from an open event file to a permanent history file, thus preserving the data and making it unalterable.  (Bynum SM, Nov. 28, 2012, at 83:8-25; 84:8-13.)  After hearing the testimony of NC4 representatives Bynum and Kant, the Special Master also now understands the meaning of the term "delete."  ("I agree that the delete button on the computer doesn't delete anything; it just sends it to another part of the computer's memory."  *See* Comment of Special Master Facciola, Pressley SM, Jan. 9, 2103, at 39:13-15.)

One of the persons present when Bynum accessed the E Team server was Terry Ryan, MPD General Counsel.  Ryan, upon hearing Bynum refer to "deletion," immediately called MPD

---

[1]    The *Chang* plaintiffs still contend – despite overwhelming evidence to the contrary – that the JOCC Running Resume for the September 2002 IMF event was created on the older GroupSystems program.  (*See* Pressley SM, Jan. 9, 2013, at 18:3-4, 15-17.) ("the JOCC running resume data . . . is Group Systems [sic] data.") ("the Chang plaintiffs contend . . . Group Systems [sic] data . . . is the JOCC running resume data.")  The District has explained twice – in a filing with the Court and during the January 9, 2013 Special Master hearing – that the GroupSystems program was used only in the CIC and the IOC on September 27, 2002, but not in the JOCC that day.  (Dkt. No. 927; Pressley SM, Jan 9, 2013, at 29:13-31:7.)  The *Chang* plaintiffs continue to pursue the argument that a JOCC Running Resume was also created on the GroupSystems program because the E Team JOCC Running Resume that was found does not support the merits of their case.

2

Assistant Chief Michael Anzallo, head of MPD's Internal Affairs Division ("IAD"), and requested that IAD determine if a formal IAD investigation should be opened into whether E Team JOCC Running Resume data had been tampered with, including whether any possible criminal conduct was involved.  (Anzallo SM, Jan. 3, 2012, at 218:24-219:17.)  Anzallo had his office dispatch an agent to where the servers were located.  (Anzallo SM, Jan. 3, 2012, at 220:13-25.)  District attorneys who were present at the time knew that Ryan had called IAD and saw that an agent came to where the servers were located.  (Pressley SM, Dec. 18, 2012, at 32:17-25; Frost SM, Jan. 11, 2013, at 52:21-53:10, 77:9-13.)

Shortly thereafter, according to Anzallo, he decided that IAD would not open a formal investigation into the matter because he was personally aware that the Special Master was investigating issues concerning the September 2002 JOCC Running Resume, and he did not want MPD to interfere in any way with the Special Master's investigation.  (Anzallo SM, Jan. 3, 2013, at 225:18-226:4.)  Anzallo did not communicate his decision not to open an IAD investigation to Monique Pressley, the lead trial attorney for the District in the *Chang* case, or any other District attorney working on the case.  (Pressley SM, Dec. 18, 2012, at 55:6-15; Frost SM, Jan. 11, 2013, at 59:11-60:16.)

Thus, District attorneys were under the impression that IAD had begun an investigation on May 3, 2011 – they knew that Ryan had called IAD, they saw an IAD agent come to the location of the servers, the room that housed the servers had been secured, and no one ever told them that an IAD investigation had not been started.  When Pressley was specifically asked whether she thought an IAD investigation was ongoing between May 3 and July 12, 2011, she replied, "Yes."  (Pressley SM, Jan. 9, 2013, at 62:18-63:22.)  The Special Master then asked Pressley:  "[Y]ou had no information that this IAD investigation had been completed, and indeed

had never even commenced?"  Pressley responded, "Exactly."  (Id. at 68:23-69:1.)  Later in her

testimony, Pressley repeated that she thought an IAD investigation was under way through July

12, 2011, when the servers were transferred to the FBI.  (Id. at 111:20-22.)  District attorney

Shana Frost also testified that she thought an IAD investigation had been started on May 3, 2011.

(Frost SM, Jan. 11, 2013, at 59:11-60:16, 77:22-25.)

        In addition, the District's Rule 30(b)(6) witness on this topic, George Valentine, testified

almost a year ago (and before the District's submission of the May 18, 2012 amended discovery

responses) that the District believed that an IAD investigation was started on May 3 and was in

progress until July 12, 2011, when it was decided that the servers would be transferred to the

FBI.  (Dep. of District 30(b)(6) (Valentine), at 75:16-76:7.)  In fact, OAG was not involved in

the conduct of this or any IAD investigation (as is always the case), which explains why

Valentine could not answer any of the questions asked of him about how the IAD investigation

had progressed or was being conducted.  (Id. at 87:12-88:9.)  When asked at the deposition why

the District did not disclose to the Court or the *Chang* plaintiffs during May and June, 2011,

about the apparent deletions first mentioned by Bynum on May 3, 2011, Valentine referred to the

impressions held by District counsel that the issue of apparent deletions "was actively under

investigation."  (Id. at 126:8-127:14; 128:4-10.)  Valentine added that the District wanted "this

criminal investigation to just work itself through," and that the District "had to wait until there

was some resolution of the criminal referral."  (Id. at 129:3-4, 131:1-2.)[2]

---

[2]        Both Pressley and Frost confirmed in their testimony that OAG counsel are not kept
informed of the progress of IAD investigations.  *See* Pressley SM, Dec. 18, 2012, at 42:6-9
("Well, I like to know everything that is going on with a case when I'm representing the client;
however, when it involves investigations, I often did not know until it was resolved.  That wasn't
information that we had access to as trial counsel."); Frost SM, Jan. 11, 2013, at 55:19-24 ("I
wasn't sure what [the IAD agent's] role there was, besides being there on behalf of IAD.

Finally, Valentine testified that regarding the decision about disclosure of the alleged deletions, "the discovery obligation [was] to get to [the *Chang* plaintiffs] the information [found in the Running Resume], which is what we did following the privilege review, and we felt that the law enforcement component of the investigation would work its way through." (*Id.* at 139:15-19.)  Thus, it is clear from Valentine's Rule 30(b)(6) testimony (and the testimony of District line attorneys Pressley and Frost before the Special Master) that the District thought there was an active IAD investigation in progress between May 3 and July 12, 2011.

### B.   AN E TEAM EMPLOYEE "DELETED" DATA FROM THE SEPTEMBER 2002 IMF JOCC RUNNING RESUME

During the past set of hearings before the Special Master, the *Chang* plaintiffs repeatedly asked witnesses if they knew who "deleted" the E Team data on February 12, 2003.  (*See, e.g.*, Ryan SM Jan. 3, 2013, at 144:1-6; Pressley SM Jan. 9, 2013, at 9:15-21; Frost SM Jan. 11, 2013, at 48:25-49:1.)   At one point, and without one scintilla of evidence, the *Chang* plaintiffs knavishly suggested that Chief Ramsey or Assistant Chief Newsham may have "deleted" the data.  (*See* Pressley SM, Dec. 18, 2012, at 106:24-25.)   In fact, the E Team JOCC Running Resume data that Bynum examined on May 3, 2011, reflects that NC4 representative Charles O'Connell was the administrative user who "deleted" certain data to history files on February 12, 2003.  (Bynum SM, Nov. 28, 2012, at 24:5-9.)   Indeed, the preponderance of the evidence strongly supports this conclusion.

NC4 representative Eric Kant testified that Charles O'Connell was the E Team representative for the Washington, D.C. area in 2003, and that O'Connell would be at MPD Headquarters frequently.  (Kant SM, Nov. 28, 2012, at 126.)   E Team deletion records –

---

Whatever IAD does is what they do.  I do not ask. . . . We - - I don't tell IAD how to do their job.")

*documents offered by the Chang plaintiffs in these proceedings* – show that "Charles O'Connell" deleted the IMF event file on February 12, 2003. (Chang Nov. 2012 SM Ex. 4.) E Team records also show that "Charles O'Connell" deleted nine other event files on February 12, 2003, most of them dealing with matters other than the September 2002 IMF event. (Chang Nov. 2012 SM Ex. 7, at 1-2; Bynum SM, Nov. 28, 2012, at 103:9-104:1.)

A significant fact explained by Kant during his testimony before the Special Master was that E Team records showed that all MPD users who had delete rights would have a user ID such as "DCMPDSysAdm01," whereas E Team employees used only their name for their user ID, such as "Charlie O'Connell." (Kant SM, Nov. 28, 2012, at 155:2-24; Chang Nov. 2012 SM Ex 6.) The E Team deletion records show that "Charlie O'Connell" was the user ID used who deleted the September 2002 IMF events and other unrelated events on February 12, 2003. (Chang Nov. 2012, SM Ex. 4.) Deletions that were made from the JOCC Running Resume for events other that the September 2002 IMF demonstration event were made after February 12, 2003, by MPD personnel using an MPD user ID. (Chang Nov. 2012, SM Ex. 2.)

Moreover, in early February 2003, MPD replaced GroupSystems with E Team in the CIC and the IOC, which explains why O'Connell would be at MPD Headquarters working on the E Team system when he made the February 12 deletions. (Kant SM, Nov. 28, 2012, at 149:4-18.)[3] In addition, Kant testified that E Team would "use delete quite often to clean up the systems," and that it appeared to him from looking at the February 2003 E Team records (Chang Nov. 2012 SM Ex. 7) that "they were cleaning up the system for the next, what may be occurring next." (Kant SM, Nov. 28, 2012, at 146:24-25; 147:11-12.) It is clear that O'Connell was "cleaning up the system" because he made multiple deletions on February 12, 2003, of old JOCC records.

---

[3]     The District explained in an earlier filing why the evidence shows that GroupSystems was not used in the JOCC during the September 2002 IMF event. (*See* Dkt. No. 927.)

E Team records also show that the JOCC was activated and a new event file was created on February 16, 2003, for a "Snow Emergency." (Chang Nov. 2102 SM Ex. 4 at 2.)  There was a huge snowstorm in the Washington, D.C. area on February 15-17, 2003.  (*See* http://www.erh.noaa.gov/lwx/winter/DC-Winters.htm.) (last visited on Jan. 25, 2013.)  The JOCC was also activated because of major demonstrations on February 15, 2003, against the Iraq invasion.  (*See*  http://www.cnn.com/2003/US/01/18/sproject.irq.us.protests/index.html.)  (last visited on Jan. 25, 2013.)  Therefore, the combination of the installation of the E Team software in the CIC and the IOC, and the activation of the JOCC for a major snow event and the Iraq demonstrations, explains why Charles O'Connell was at MPD Headquarters in February 2003 deleting various event files.  The evidence shows by a preponderance of the evidence that E Team employee Charles O'Connell, and not an MPD employee, "deleted" data from the JOCC Running Resume in February 2003.[4]

## C.   THE MAY 3, 2011 MEETING INVOLVING MPD CHIEF OF POLICE CATHY LANIER

Late in the day on May 3, 2011, Anzallo met with MPD Chief of Police Cathy Lanier in her office.  (Anzallo SM, Jan. 3, 2013, at 226:12-19.)  MPD General Counsel Ryan was not

---

[4]      The *Chang* plaintiffs will likely argue that even if the evidence overwhelmingly shows that an E Team representative actually entered the system and deleted E Team data to history files on February 12, 2003, he must have been instructed to do this by an MPD employee for an improper purpose.  This argument would not make sense.  Charles O'Connell, as the E Team representative who helped installed the E Team system in the JOCC in 2002 and who trained MPD employees about use of the system, is the person that E Team records show moved event files to history files on February 12, 2003.  O'Connell would know exactly what he was doing and it is highly unlikely that he would become a willing participant in some grand conspiracy allegedly orchestrated by MPD personnel to permanently destroy E Team JOCC Running Resume data because of ongoing litigation.  In short, the testimony of Bynum and Kant and the very documents that the *Chang* plaintiffs have put before the Special Master prove by a preponderance of the evidence that Charles O'Connell deleted this data in February 2003 for legitimate purposes.  The *Chang* plaintiffs don't want to admit this fact because it destroys their case for spoliation of the JOCC Running Resume.

present during the early part of this meeting but joined the meeting later, after Chief Lanier placed a telephone call to Attorney General Irvin. B. Nathan.  (Id. at 228:18-24; 232:12-24.) [5]

According to Anzallo, at the beginning of the meeting he told Chief Lanier that the September 2002 IMF E Team Running Resume had been accessed earlier that day and that Bynum was confident the Running Resume data could be recovered.  Anzallo also testified that he informed Chief Lanier that Bynum had stated that it appeared that there may have been "alleged tampering" of certain data. (Anzallo SM, Jan. 3, 2013, at 229:18.)  Anzallo further testified that he then informed Chief Lanier that Ryan had requested that IAD open an investigation into whether any Running Resume date had been tampered with, and that he had decided to not open an MPD investigation because he was aware that the Special Master was also investigating issues pertaining to the JOCC Running Resume, and Anzallo did not want to interfere with the Court's investigation.  (Anzallo SM, Jan. 3, 2013, at 226:20-227:2.)  According to Anzallo, Chief Lanier agreed with his decision.  (Anzallo SM, Jan 3, 2013, at 228:6-7.)

Also according to Anzallo, he recommended to Chief Lanier that the Special Master should be informed that MPD was not going to be involved in any investigation of possible tampering with the E Team data.  (Anzallo SM, Jan. 3, 2013, at 230:6-13.)   At his deposition taken on May 3, 2012, however, Anzallo testified differently.  At his deposition, Anzallo stated that he did <u>not</u> discuss with Chief Lanier during the May 3 meeting what specifically should be disclosed to the Court or the *Chang* plaintiffs.  (Dep. of Anzallo, May 3, 2012, at 42:4-8, 12-14; 43:2-9) (Dkt. No. 899-5).  Despite this inconsistent testimony regarding what Anzallo said to

---

[5]     To this extent, the Special Master's February 1, 2013 Order is incorrect in stating that "Ryan . . . was in the room when Lanier called Nathan."  Order at 2.  The *Chang* plaintiffs agree that Ryan was not in the meeting during Chief Lanier's phone call to the Attorney General. (Dkt. No. 935, at 4.)

Chief Lanier about any disclosures to the Court, a decision was made on May 3, 2011, to have a federal agency, such as the FBI or the United States Secret Service, and not MPD, image the hard drive containing the data that Bynum found earlier that day.  (Id. at 32:10-33:13.)  This is consistent with the Rule 30(b)(6) testimony of George Valentine that Chief Lanier told Ryan "that she wanted to reach out to the FBI, the Secret Service," to image the hard drives.  (District Rule 30(b)(6) Dep. (Valentine), March 30, 2012, at 66:4-8.)  This also is consistent with the testimony of District counsel Frost, who stated several times before the Special Master that she understood from Ryan on May 3 that Chief Lanier wanted a forensic image made of the E Team servers.  (Frost SM, Jan. 11, 2013, at 57:2-25.)[6]

Chief Lanier then called District of Columbia Attorney General Irvin B. Nathan and, according to Anzallo, she stated to the Attorney General "what we decided" and "explained to him what we were going to do."  (Anzallo SM, Jan. 3, 2013, at 228:12; 229:24-25.)  Anzallo also described the call as "a matter-of-fact conversation, just here is my decision."  (Id., at 228:25-229:1.)  When asked if the issue about the IAD investigation was the "primary subject of that conversation [with Attorney General Nathan]," Anzallo responded, "Yes."  (Id., at 229:3-5.)  Later in his testimony, Anzallo again stated that Chief Lanier told Attorney General Nathan that there would be no IAD investigation.  (Id., at 238:2-3.)  As noted, Ryan had not yet joined the meeting when Chief Lanier called Attorney General Nathan.  (Id., at 232:12-24.)  As set forth in the Praecipe filed on behalf of Attorney General Nathan on February 12, 2013, that call did not

---

[6]     Although both the FBI and the Secret Service came to MPD Headquarters on May 3, 2011, only the Secret Service had the appropriate equipment to image the hard drives on the E Team servers.  The Secret Service imaged the hard drives the next day after the Special Master told the parties in the May 4 conference call how he wanted the data preserved and produced to the parties.

involve any directive from Chief Lanier, and she did not make any request for action by the Attorney General.  (Dkt. No. 939.)

 After the telephone call between Chief Lanier and Attorney General Nathan, Chief Lanier requested that Ryan come to her office and join the meeting between herself and Anzallo. (*Id.* at 233:6-17; 234:11-12.)  According to Anzallo, Chief Lanier told Ryan that IAD was not going to investigate any possible deletions and that the matter should be referred back to the Special Master.  (*Id.* at 234:15-19.)  Ryan testified before the Special Master that he did not recall being told by either Chief Lanier or Anzallo that there would not be an IAD investigation of the alleged tampering of E Team JOCC Running Resume data; Ryan said he "was left with the impression that MPD *should not* be doing the investigation."  (Ryan SM, Jan. 3, 2013, at 84:15-17) (emphasis added).  Later in this testimony, Ryan reaffirmed his recollection on this point:  "My recollection is, at the end of the meeting, I got the distinct impression that we *should not* be conducting an investigation.  I remember that clearly."  (Id. at 86: 106) (emphasis added). This follow-up with *Chang* counsel then occurred:

> Q:     So you do recall that, by the end of the meeting, you clearly understood that IAD should not do the investigation?
>
> A:     We should not be doing it.  Not that it was not going to happen; we just should not be doing it.

(Id. at 87:1-4.)  Ryan concluded by stating:  "Again, I don't know that there was a direction.  I don't recall a direction that there would be no investigation."  (*Id*. at 15-16.)

 Ryan also stated that he did not recall any such discussion at the May 3, 2011 meeting about whether the Special Master should be informed of the "deletions" mentioned by Bynum earlier that day, (*Id*. at 84:19-25; 86:2-5.)  As can be seen, the Praecipe filed on behalf of the Attorney General is consistent with Ryan's testimony that Ryan does not recall being told by

Chief Lanier at the meeting that District lawyers should be told to inform the Court about any deletions.

### D.      THE MAY 4, 2011 CONFERENCE CALL WITH THE SPECIAL MASTER

On May 4, 2011, the District filed a Notice informing the Special Master and the parties that the E Team JOCC Running Resume data had been found on the E Team server.  (Dkt. No. 779.)  The Notice stated that a conference call with the Court had been scheduled for later that day.

During the conference call that took place shortly thereafter, the District again informed the Special Master that the E Team JOCC Running Resume had been found on the server. (District Nov. 2012 SM Ex. 3, at 4) (Transcript of May 4, 2011 conference call).   District Counsel Monique Pressley informed the Special Master and the parties that Bynum was confident that all of the data could be recovered, and she described how the data could be extracted from the server.  (*Id*. at 4-6.)  The Special Master indicated his desire to have a forensic image made of the hard drives, and to make sure that all metadata would be preserved.  (*Id*. at 6-7.)  The Special Master then instructed the District to preserve the data on the second E Team server, and to have the Running Resume downloaded to a DVD or another hard drive so that it could be produced to the parties.  (*Id*. at 14-15.)  Pressley then stated that "the District certainly would expect that *Mr. Bynum would be available to testify about what he uncovered and how it was uncovered, and to explain any questions the Court may have . . . .*"  (Id. at 17) (emphasis added).[7]

---

[7]      District attorney Pressley testified at the Special Master hearing that she knew Bynum "was going to testify, I was going to make him an available witness, he was known to the parties, he was known to the Court.  I thought it would be necessary for him to testify in the civil litigation.  I thought it would be necessary for him to testify before the Special Master; I knew that he would testify in detail as to what he knew, what he found, what it meant."  (Pressley SM,

As can be seen from the transcript of the conference call, the District wanted to have Bynum's deposition taken as soon as possible so that he could testify "about what he uncovered." (*Id*. at 17.)  District counsel made the decision that it was better for Bynum to explain directly to the *Chang* plaintiffs and the Court what he had found regarding any possible "deletions" of data rather than have District lawyers try to explain the technical aspects of the E Team system.  (Pressley SM, Dec. 18, 2012, at 48:13-16; 49:1-23.)  At the time, the District expected that Bynum's deposition would be taken within a matter of weeks.  (*Id*. at 51:14-21.)

The Secret Service imaged the E Team hard drives immediately after the completion of the conference call with the Special Master.  On May 11, 2011, NC4 was able to provide to the District an electronic version of the E Team JOCC Running Resume.  There were over 4700 pages of data, much of it consisting of duplicate entries on the E Team system caused by the way data was entered into the system in September 2002.  (Chang Nov. 2012 SM Ex. 1.)  District lawyers took about a week, working with MPD, to review the data for privilege.  The data was then provided to the Federal Defendants to conduct their privilege review.

The Federal Defendants sought and received permission from the Special Master to have approximately four weeks to conduct their review.  (Dkt. No. 786.)  The Special Master ordered that during this month-long review, the Running Resume data would be provided to the *Chang* plaintiffs as it was reviewed by the Federal Defendants.  Thus, the Running Resume data was rolled-out to the *Chang* plaintiffs during the month of June 2011 on a weekly basis.  Of course, it was not possible to have Bynum deposed while this was taking place because the *Chang*

---

Dec. 18, 2012, at 39:21-40:1.)  To be sure, there was no intention by the District – at any time – to prevent the Special Master and the *Chang* plaintiffs from questioning Bynum about the "deletions."

plaintiffs needed time to analyze the data before Bynum's deposition could be taken.  Bynum was eventually deposed on August 23, 2011.

### E.    THE DISTRICT'S DECISION TO REVEAL THE "DELETIONS" THROUGH BYNUM'S DEPOSITION TESTIMONY DID NOT VIOLATE ANY ETHICAL RULES

As noted, although District counsel was not sure what Bynum meant by "deletions" on May 3, 2011, they decided that the best way to inform the *Chang* plaintiffs and the Special Master about any "deletion" issue would be for Bynum himself to provide sworn testimony as soon as possible on this topic.  District counsel wanted Bynum – and not District lawyers – to explain the technical issues regarding the term "deletion" and to describe exactly what he did to locate the JOCC Running Resume data on May 3, 2011.  (Pressley SM, Dec. 18, 2012, at 39:21-40:1, 67:13-73:5; Frost SM, Jan. 11, 2013, at 67:8-14, 68:6-69:5, 86:16-87:2, 89:5-7.)  This clearly was the better way to proceed given the persistent accusations from the *Chang* plaintiffs at every turn of this case that the District was engaged in destruction of evidence and discovery abuse coverup.

Although the *Chang* plaintiffs have suggested that the decision to have this information come from Bynum in sworn testimony rather than from the unsworn statements of District counsel was improper, the District's litigation strategy decision regarding how to disclose what Bynum found on May 3, 2011, did not violate any ethical rules, and particularly Rule 3.3 of the D.C. Rules of Professional Conduct.  Rule 3.3(a)(1) prohibits a lawyer from knowingly making a false statement to the Court or failing to correct a previous false statement of material fact or law made to the Court by the lawyer.  "False" means contrary to fact, and "misleading" refers to something that is literally correct but likely to direct the listener away from the truth.  An attorney may make an affirmative representation to the Court only when she knows the assertion

is true or believes it to be true on the basis of a reasonably diligent inquiry.  ABA Model Rule 3.3, Comment [3].     Comment [2] to D.C. Rule 3.3(a)(1) provides that "[t]here may be circumstances when the failure to make a disclosure is the equivalent of an affirmative misrepresentation."  A misrepresentation occurs when the attorney makes a partially true but still misleading statement or omission that is the equivalent of an affirmative false statement. D.C. Rule 4.1, Comment [1].

Here, it is clear that the District's attorneys did not know what Bynum meant by his statement on May 3, 2011, about apparent "deletions" of JOCC Running Resume data.  Both Ryan and Anzallo thought there might be criminal activity in connection with any possible "deletions." (Ryan SM, Nov. 9, 2102, at 37:22-24; Anzallo SM, Jan. 3, 2013, at 223:4-7.) Indeed, as described above, on May 3, 2011, District counsel was under the impression that an investigation had been started, and that any possible criminal involvement regarding "deletions" of the Running Resume would be investigated by IAD.  Regarding the handling of the matter in the *Chang* case pending before the Special Master, however, District counsel wanted Bynum himself to describe the meaning of "deletion" in the context of the issues in the civil litigation.

Indeed, it was not until Bynum was deposed on August 23, 2011, and thereafter when additional E Team records were produced showing the "delete" activity in connection with the E Team JOCC Running Resume, that District attorneys (and the *Chang* plaintiffs) finally learned what "deletion" meant.  Had the District's lawyers reported to the Special Master on or about May 4, 2011, that E Team records had been "deleted," that would have been a misrepresentation to the Special Master because, as it later turned out, that statement – as it was commonly understood – would  have been false because no data had been actually removed from the system.   The District lawyers wanted to perform their due diligence on the facts before

expressing them to the Court and the *Chang* plaintiffs.  Only Bynum knew what the term

"deletion" meant in this particular context, which is why the District lawyers decided it was best

for him to explain that term to everyone, at the same time and under oath, subject to questioning

by the *Chang* plaintiffs.[8]  The *Chang* plaintiffs may disagree with this litigation decision, but it

does not make the decision unethical or improper.

As this review makes clear, there was never any intention of District lawyers to keep

from the Special Master and the *Chang* plaintiffs the fact that Bynum saw "deletions" of E Team

JOCC Running Resume data.  From the very beginning, the attorneys representing the District

identified Bynum as the person who could speak to these issues and sought his early deposition

so that he could explain under oath for everyone at the same time what he found on May 3, 2011.

## F.    THE JULY 12, 2011 STATUS CONFERENCE BEFORE THE SPECIAL MASTER

Once all the JOCC Running Resume data had been produced to the *Chang* plaintiffs, the

Special Master held a status conference on July 12, 2011.  At the beginning of the hearing, the

Special Master informed the parties that he intended "to report to Judge Sullivan on what has

occurred."  (Chang Nov. 2012 SM Ex. 39, at 7.)  In response to this comment by the Special

Master, District lead counsel Monique Pressley stated, ". . . since one of the main issues is the

very existence of the data, *and whether or not it was purposely destroyed*, we do believe that

information that we have about that will aid in the decision that Judge Sullivan makes. . . ."  (*Id.*,

at 10.)  (emphasis added).

---

[8]    As District counsel Frost stated during her testimony before the Special Master, "we weren't sure what this whole deleting thing meant and we believed that, when Mr. Bynum came in, he could talk about how the software worked and what the results of pressing the delete key was."  (Frost SM, Jan. 11, 2013, at 100:24-101:3.)

During a break in the hearing, Pressley informed that *Chang* plaintiffs about the discovery by Bynum of "deletions" to E Team JOCC Running Resume data, because she planned to inform the Special Master about this when the hearing resumed.  When the hearing resumed, and before Pressley could inform the Special Master about the deletions, *Chang* counsel told the Court what Pressley had stated during the break.  (*Id*. at 26.)  Upon receiving this information, the Special Master indicated that he expected the parties would want to take Bynum's deposition, which is what the District first had suggested to the Court during the May 4 conference call.  (Id. at 27.)  Pressley also advised the *Chang* plaintiffs during the break that it was her understanding that IAD was investigating the deletion issue.  The *Chang* plaintiffs told the Special Master that they objected to any MPD investigation of alleged tampering of data.  (*Id.* at 30-31.)  The hearing ended with the expectation that Bynum's deposition would be set in the near future.  As noted, Bynum was eventually deposed on August 23, 2011.

### G.     THE TRANSFER OF THE THREE SERVERS TO THE FBI

On July 12, 2011, following the status conference before the Special Master, Chief Lanier and the Attorney General Nathan decided that because of the objections of the *Chang* plaintiffs, it would be best to ask the FBI to take custody of the MPD servers.  In addition to looking at the E Team servers to see if there was any evidence of an attempt to permanently delete data, the FBI was also requested to see if it could find any data on the GroupSystems server that might be relevant to the *Chang* case, and if any such data could be found, whether it could be imaged and recovered.  The three servers were physically transferred to the FBI on July 28, 2011, with the

knowledge and approval of the Special Master.  (Dkt. No. 917.)  The FBI had possession of the

servers from July 28, 2011, until October 26, 2012, when they were returned to MPD.  (*Id*.)[9]

 As the record in this case now reflects, in early January 2012, while the FBI had

possession of the servers, the District again contracted with NC4 to examine and copy all data

pertaining to the September 2002 JOCC Running Resume.  NC4 representative Eric Kant was

able to located several files that reflected all activity regarding the JOCC Running Resume,

including files pertaining to the delete history of JOCC Running Resume data.  That data was

immediately provided to the *Chang* plaintiffs, and Kant provide a detailed explanation of the

delete function of the E Team system and explained to the *Chang* plaintiffs at his deposition on

March 7, 2012, that the records showed that no data was destroy or erased from the JOCC

Running Resume.[10]

Once Kant explained to everyone in the case that no JOCC Running Resume data was

lost at any time, there was no legitimate reason for the FBI to examine the E Team servers to see

if anyone had tampered with them – it was now confirmed that all the data had been recovered

and that no data had been erased or destroyed.  The FBI would not have been able to do anything

more than what Kant did in January 2012 to produce all information concerning "deletions" of

JOCC Running Resume E Team data.  In short, there was no reason for the FBI to try to figure

out how to access that information and what it meant.  To do that, the FBI would have to go to

---

[9]     The *Chang* plaintiffs have repeatedly accused the District of making a "limited referral" to the FBI.  (Dkt. No. 879, at 3.)  In fact, the Special Master's July 28, 2011 Order specifically mentioned the purpose of the referral:  The FBI examination would be "regarding the attempted deletion of data on the E-Teams [sic] server and the data missing from the Group Systems [sic] server."

[10]     Despite Kant's full and complete explanation to the *Chang* plaintiffs – now a year ago – that no data was erased or destroyed from the JOCC Running Resume, the *Chang* plaintiffs continue to waste time the Court's time and the taxpayers' money by arguing that data was "deleted" from the system.

someone at NC4 to interpret the data found on the system, and that already had been done by Kant in January and explained to all parties in March.  Thus, by April, the FBI decided that it was not necessary to examine the E Team servers further because "MPD was able to resolve the issues" about the servers.  (Dkt. No. 894.)

The FBI, however, continued to examine the GroupSystem server, but it was only able to view data on the GroupSystems server in a raw format.  In a report dated April 23, 2012, the FBI stated that it did not have the "technical expertise" to analyze the data to determine if entries were altered or deleted, that "other examination techniques" could not "achieve the level of detail necessary to make these determinations."  Because it felt that there was not a high likelihood of success in making that determination, the FBI informed the District that it was closing its investigation.  (Dkt. No. 894-1.)  Of course, there was no September 2002 JOCC Running Resume data on the GroupSystems server for the FBI to examine in the first place.

### H.    THE DISTRICT'S AUGUST 16, 2011 INTERROGATORY RESPONSES

Following the July 12, 2011 decision by Chief Lanier and Attorney General Nathan to transfer the three servers to the FBI, the District submitted discovery responses to plaintiffs' Second Set of Interrogatories.  (Chang Nov. 2012 SM Ex. 22.)   As can be seen from the above discussion, at the time these responses were submitted, District counsel working on the *Chang* case believed that an IAD investigation had been started on May 3, 2011, and that an MPD investigation was still ongoing at the time it was decided to transfer the three servers to the FBI on July 12, 2011.  (*See e.g.*, Pressley SM, Dec. 18, 2012, at 83:4-7.)

The understanding by District counsel that an IAD investigation had been started on May 3, 2011, and was still in progress on July 12, 2011, is evident from the District's responses to Interrogatories 6, 7, 8, 9, 10 and 11.  The language in each of these responses that set forth part

of an objection to the interrogatories stated the following:  "The District further objects to this Interrogatory to the extent it seeks information *pertaining to the initial IAD inquiry and the ongoing and potentially criminal investigation currently being conducted by the FBI*; thus the information sought is protected by the law enforcement privilege."  (emphasis added).  This language was used by the District lawyers because they believed on August 16, 2011, that an IAD investigation had been started on May 3, 2011, that the FBI had taken over that investigation, and that a legitimate law enforcement privilege attached to both the IAD and the FBI investigations.

Moreover, in its substantive responses to Interrogatory 10, the District stated:

"Subject to and without waiving these objections, the District responds that on May 4, 2011 [sic – the correct date is May 3, 2011], when counsel for the District first learned of an attempted destruction of data from the MPD E Team system, MPD General Counsel Terrence Ryan contacted Assistant Chief of Police Michael Anzallo and Commander Christopher LoJacono of the Internal Affairs Division to report the appearance of destruction, and to request that the Internal Affairs Division ("IAD") initiate an investigation into the incident.  *That same day, Commander LoJacono assigned IAD Agent Detective Sylvan Altieri to begin a preliminary inquiry.  The IAD inquiry was suspended pending proceedings before the Court."* (emphasis added).[11]  The response goes on to state Chief Lanier and Attorney General Nathan decided on July 12, 2011 to "refer the matter of the attempted destruction" to the FBI for further investigation.  Again, this language was used because District lawyers were under the impression on August 16, 2011, that an IAD investigation had been started and was ongoing as of July 12, 2011.

---

[11]     The words "proceedings before the Court" referred to the July 12, 2011 hearing and the Bynum deposition that was scheduled to take place in one week.

All of this was covered in the testimony of Monique Pressley before the Special Master.

The following exchange took place at that time:

Q:      ". . . [w]ere you aware at any point in time on May 3rd or May 4th, 2011, that the
        chief of police and the head of IAD, Assistant Chief Michael Anzallo, had
        determined there would be no IAD investigation?

A:      I was not aware of any decision like that.

        .               .               .               .               .

Q:      It's your understanding that there was an ongong IAD investigation for weeks and
        months?

A:      I believe at the point that the matter was referred to the Justice Department, which
        I think happened July 12th or somewhere around there, I believed then that what
        was in-house was now being investigated elsewhere.

Q:      So it's your testimony today that you thought there was an IAD investigation
        ongoing from May 3rd, 2011, to July 12th, 2011?

A:      Yes.

(Pressley SM, Dec. 18, 2012, at 82:17-21; 83:2-11.)  (*See also id.* at 92:8-13.)

District counsel Frost also believed on August 16, 2011, that there had been an ongoing

IAD investigation from May 3, 2011, to the time that a decision was made on July 12, 2011, to

transfer the servers  to the FBI.  (Frost SM, Jan. 11, 2013, at 59:11-60:16, 77:22-25.)

Rule 26(g)(1)(A) provided at the time these discovery responses were submitted that the

attorney signing discovery disclosures was representing to the Court and the parties that she

"certifies to the best of the person's knowledge, information, and belief formed after a reasonable

inquiry . . . [that] with respect to the disclosure, it is complete and correct *as of the time it is*

*made*. . ." (emphasis added).  By signing the discovery responses submitted on August 16, 2011,

District counsel was not in violation of the rule.  It is clear from the testimony provided by

District counsel to the Special Master that the lawyers representing the District and signing the

discovery responses believed there was an IAD investigation taking place for the period May 3 to July 12, 2011.  Thus, the statements contained in the August 16, 2011 interrogatory responses were not false when made, and District counsel were not in violation of Rule 26(g).[12]

## I.     THE DISTRICT'S MAY 18, 2012  AMENDED INTERROGATORY RESPONSES

Assistant Chief Anzallo was deposed by the *Chang* plaintiffs on May 3, 2012.  During his deposition, Anzallo testified that he decided on May 3, 2011, that IAD would not open a formal investigation into the E Team deletion issue because the Special Master already was investigation issues pertaining to the September 2002 IMF JOCC Running Resume.  (Dep. of Michael Anzallo, May 3, 2012, at 25:2-14) (Dkt. No. 899-5). This was the first time that anyone testified on the record that a decision was made on May 3, 2011, to *not open* an IAD investigation.

Rule 26 (e)(1)(A) of the Federal Rules of Civil Procedure requires a party to submit "in a timely manner" amended discovery responses "if the party learns that in some material respect [an earlier] disclosure or response is incomplete or incorrect. . . ."  As a result of Anzallo's deposition testimony on May 3, 2012, and pursuant to its obligation under Rule 26(e)(1)(A), the District on May 18, 2012 submitted amended interrogatory answers to the *Chang* plaintiffs.

---

[12]     It also should be noted that these interrogatory responses were reviewed and signed by two MPD officials – Commander James Crane of the Tactical Information Division, and Barry Gersten, MPD Chief Information Officer.  It is unlikely that these two MPD officials would have signed the responses if they knew for a fact that IAD was not investigating possible destruction of E Team Running Resume data.  To the contrary, the fact that these two MPD officials signed the responses indicated that they also were under the impression that an IAD investigation had been started and was ongoing when the decision was made on July 12, 2011, to transfer the servers to the FBI.  Moreover, the fact that two MPD officials signed the responses provided substantial justification to District counsel that the responses were true when made and was sufficient to meet the reasonable inquiry requirement imposed on District counsel by Rule 26(g). *See also Guantanamera Cigar Co. v Corporacion Habanos*, 263 F.R.D. 1, 5 (D.D.C. 2009) (party has obligation under Rule 26(g) to investigate case in connection with discovery responses).

(Chang Nov. 2012 SM Ex. 24.)[13]   In particular, the District corrected its earlier response to Interrogatory No. 10 by clearly stating that an IAD investigation had not been started by Anzallo on May 3, 2011.  (*Id*. at 10.)   The District's amended response went on to provide a detailed explanation of the events of May 3, 2011, including the events of the meeting later that day between Anzallo and Chief Lanier, which was joined by Terry Ryan, and why District counsel defending the *Chang* case were not made aware that no IAD investigation was commenced on May 3.  (Id. at 9-16.)

The amended response to Interrogatory 10 was carefully drafted by the District.  It was reviewed and approved by two MDP officials – the same two officials who signed and approved the August 16, 2011 responses.  Its primary purpose was to correct the information provided on August 16, 2011, about the representation that an IAD investigation had been started on May 3, 2011.  In this regard, the amended response to Interrogatory 10 described that while Anzallo had made the decision on May 3, 2011, to not open an IAD investigation, and that – according to Anzallo –  Ryan was made aware of this fact at the meeting with Chief Lanier late in the day on May 3, 2011, Ryan had no recollection of that fact being brought to his attention at the May 3 meeting, and therefore he never communicated to District trial counsel, on May 3, 2011, or any time thereafter, that no IAD investigation had been commenced.  The District wanted to provide a clear and expansive explanation to the *Chang* plaintiffs why District counsel had been under the impression since May 3, 2011, that an IAD investigation was underway.

---

[13]     Rule 26(e)(1)(A) also provides that a party has to supplement earlier responses only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process on in writing."  It could be argued that the District did not have to submit its May 18, 2012 amended discovery responses on the IAD investigation question because this information had been already disclosed to the *Chang* plaintiffs in the deposition of Anzallo on May 3, 2012.  *See U.S. Aviation Underwriters, Inc. v. Pilatus Business Aircraft, Ltd.*, 582 F.3d 1131, 1145 (10th Cir. 2009) (no requirement to submit corrected response if information already known to other parties).

In this regard, the key sentence in this amended response was the following: "However, Mr. Ryan has no present recollection of being told by Assistant Chief Anzallo and/or Chief Lanier that a decision had been made to not open a formal IAD investigation and, as a result, *OAG attorneys defending the Chang case* did not know about the decision to not open a formal IAD investigation." (emphasis added). This point was noted by the Special Master during Ryan's testimony on January 3, 2013:

> Q:   So insofar as the OAG attorneys defending this case did not know about that decision [that an IAD investigation was not opened on May 3, 2011], that was because you had no recollection of that decision and you never told them?
>
> A:   Correct.

(Ryan SM, Jan. 3, 2013, at 91.) District counsel Pressley and Frost both confirmed in their testimony before the Special Master that neither Ryan nor anyone else at MPD told them that an IAD investigation had not been started on May 3, 2011. (Pressley SM, Dec. 18, 2012, at 83:8-11; Frost SM, Jan. 11, 2013, at 121:24-122:2.)

In addition, the *Chang* plaintiffs have tried to make it appear as if the Attorney General was somehow responsible for the content of the May 18, 2012 Amended Responses by having his name on the signatory page. The Attorney General's name is on every signatory page on any pleading or document filed in court by the District of Columbia, just like the United States Attorney's name is one every filing made by the United States. (*See, e.g*., Dkt. Nos. 302, 435, 789, 798.) But this does not mean, as the *Chang* plaintiffs incorrectly suggest, that the May 18, 2012 discovery responses were "signed" by Attorney General Nathan – clearly they were not. As stated in the February 12, 2013 Praecipe filed on behalf of the Attorney General, he did not review the Amended Responses before they were submitted, nor was he aware that the Amended Responses had been prepared or what they stated. The Attorney General for the District of

Columbia – just like the United States Attorney – does not read and sign every pleading and filing made in the hundreds of cases pending every day before the various state and federal courts where the District of Columbia (or the United States) is a party or has an interest.

Therefore, the statement in Response 10 that "OAG attorneys defending the *Chang* case did not know about the [IAD] decision" was not a false or misleading statement because, as noted above, that information had not been communicated by Ryan to the District trial attorneys in the *Chang* case.  As Pressley's and Frost's testimony make clear, the District attorneys defending the *Chang* case were not told by *anyone* that there was no pending IAD investigation. In fact, they did not learn that no IAD investigation ever was commenced of until months later, which is why the Amended Responses were filed on May 18, 2012, two weeks after it was first learned that there was no IAD investigation.

In short, the District complied with its obligation under the civil discovery rules to amend its interrogatory responses in a timely manner.  The District provided detailed and relevant information to the *Chang* attorneys in a timely manner to correct what turned out to be an earlier incorrect discovery response.  The District and its lawyers did not made any false or misleading statements in the amended responses.  Indeed, the District made no false or misleading statements at any time regarding its understanding that an IAD investigation had been commenced on May 3, 2011.

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN A. EFROS [250746]
Deputy Attorney General
Public Interest Division

/s/  William F. Causey
WILLIAM F. CAUSEY [260661]
Assistant Attorney General
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001
(202) 724-6610
william.causey@dc.gov


Counsel for the District Defendant


Dated:  March 5, 2013

## CERTIFICATE OF SERVICE

I certify that on March 5, 2013, I filed the foregoing with the Court's electronic filing system, which will serve notice upon all counsel of record.


/s/ William F. Causey
Counsel for the District Defendants