# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RAYMING CHANG, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-2010 (EGS\JMF) |
| | ) | (Submitted to Special Master Facciola) |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DISTRICT OF COLUMBIA DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING JOCC RUNNING RESUME EVIDENCE FOR <u>REPORT AND RECOMMENDATIONS OF SPECIAL MASTER</u>

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN A. EFROS  Bar No. 250746
Deputy Attorney General
Public Interest Division

WILLIAM F. CAUSEY  Bar No. 260661
Assistant Attorney General
441 Fourth Street, N.W.
Washington, DC 20001
(202) 724-6610
william.causey@dc.gov

Counsel for the District Defendants

Dated:  July 2, 2013

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

I.       INTRODUCTION AND SUMMARY ......................................................... 1

II.      FACTUAL BACKGROUND ........................................................................ 6

III.     SCOPE AND CONDUCT OF SPECIAL MASTER INVESTIGATION ................... 9

IV.      BACKGROUND OF WITNESSES ............................................................ 11

V.       PROPOSED FINDINGS OF FACT ........................................................... 20

         A.   MPD PRACTICE OF PRESERVING EVIDENCE ................................................... 20

         B.   EARLY EFFORTS TO LOCATE EVIDENCE IN THE *CHANG* CASE ................ 22

         C.   JOCC RUNNING RESUME ................................................................................ 29

              1.   Organization of the SOCC in September 2002 .................................... 29

              2.   The E Team Program Replaced the GroupSystems Program in the JOCC
                   for the September 2002 IMF Event ....................................................... 32

              3.   The Kant Photographs Confirm Only E Team was Used in the JOCC ................ 37

              4.   The September 2002 E Team JOCC Running Resume was Not Printed ............. 38

              5.   Efforts to Recover an Electronic Version of the E Team JOCC Running
                   Resume Before 2011 ............................................................................ 42

              6.   The Events of May 3, 2011 ................................................................... 52

              7.   The Imaging of the E Team Hard Drive, the Production of the JOCC Running
                   Resume to the *Chang* Plaintiffs, and the July 12, 2011  Status Hearing ............... 63

              8.   District's Discovery Responses of August 16, 2011 and May 18, 2012 ............... 70

              9.   Inability to Permanently Erase or Delete E Team Data ......................... 75

              10.  E Team Employee Charles O'Connell "Deleted" the E Team Data in February
                   2003 ...................................................................................................... 79

         D.   FBI EFFORTS TO RECOVER GROUPSYSTEMS DATA AND
              RESOLUTION OF E TEAM SERVER "DELETION" ISSUE ................................. 88

         E.   THE E TEAM JOCC RUNNING RESUME DOES NOT SUPPORT THE
              PLAINTIFFS' CASE ........................................................................................... 92

         F.   THE SPORKIN INVESTIGATION AND REPORT .............................................. 95

         G.   THE BLUE BINDER FOUND BY MPD OFFICER JOHN STRADER .................. 98

              1.   Officer Strader Finds the Blue Binder ................................................ 102

              2.   Captain Herold Takes the Binder to the MPD General Counsel's Office ............ 105

3.   Officer Strader Sees the Binder in the General Counsel's Office
Several Weeks After He Finds the Binder ........................................... 110

4.   Events Leading to the August 2 and September 6 Meetings with Strader ........... 112

VI.        PROPOSED CONCLUSIONS OF LAW ................................................. 118

A.   THE COURT'S AUTHORITY TO IMPOSE SANCTIONS ................................... 118

B.   THE DISTRICT'S DUTY TO PRESERVE EVIDENCE ...................................... 124

C.   THE *CHANG* PLAINTIFFS BURDEN OF PROOF REGARDING
SPOLIATION OF EVIDENCE ............................................................... 126

D.   DISCOVERY OBLIGATIONS UNDER THE FEDERAL RULES ....................... 129

1.   Obligation of  Counsel to Conduct Reasonable Inquiry into Discovery
Responses ...................................................................................... 129

2.   Obligation of Counsel to Amend and Supplement Discovery Responses ........... 130

CONCLUSION .................................................................................................. 131

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page**

*Ali v. Tolbert*, 636 F.3d 622 (D.C. Cir. 2011) .......................................................................118

*Arch Ins. Co. v. Broan-Nutone, LLC*, 2012 WL 6634323 (6th Cir. Dec 21, 2012) ..............121

*Arista Records, Inc. v. Sakfield Holding Co.*, 314 F. Supp. 2d 27 (D.D.C. 2004) ................124

*Ashford v. East Coast Express Eviction*, 2008 WL 4517177 (D.D.C. Oct. 8, 2008) .............120

*Atkins v. Fischer*, 232 F.R.D. 116, 127 (D.D.C. 2005) .........................................................118

*Barham v. Ramsey*, 217 F.R.D. 262 (D.D.C. 2003) ...................................................................8

*Barham v. Ramsey*, 338 F. Supp. 2d 48 (D.D.C. 2004) .............................................................6

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) ...........................................6, 7, 13, 14, 28

*Beck v. Test Masters Educational Services., Inc*,
  2013 WL 772879 (D.D.C. March 1, 2013) ......................................................... 120, 121, 123

*Bell v. Rotwein*, 535 F. Supp. 2d 137 (D.D.C. 2008) ...........................................................126

*Bolger v. District of Columbia*, 608 F. Supp. 2d 10 (D.D.C. 2009) ......................................109

*Bonds v. District of Columbia*, 93 F.3d 801 (D.C. Cir. 1996) ...............................................122

*Clarke v. Washington Metropolitan Area Transit Authority*,
  2012 WL 5505242 (D.D.C. Nov. 12, 2012) ...............................................118, 119, 120, 127

*Davis v. Grant Park Nursing Home, LP*, 2010 WL 4642531 (D.D.C. Nov. 9, 2010) ...........128

*Disability Rights Council v. Washington Metro. Transit Auth.*, 242 F.R.D. 139
  (D.D.C. 2007) ...........................................................................................................20, 22, 124

*Delta Sigma Theta Sorority, Inc. v. LaMith Designs, Inc.*,
  275 F.R.D. 20 (D.D.C. 2011) .............................................................................................120

*D'Onofrio v. SFX Sports Group, Inc.*, 2010 WL 3324964
  (D.D.C. Aug. 24 2010) ................................................................................................124, 126

*Equal Rights Center v. Post Properties, Inc.,* 246 F.R.D. 29 (D.D.C. 2007) .........................130

*Fonville v. District of Columbia*, 230 F.R.D. 38 (D.D.C. 2005) ............................................130

*Gerlich v. U.S. Department of Justice*, 2013 WL 1265522
   (D.C. Cir. Mar. 29, 2013) .........................................................................................121, 127

*Grosdidier v. Broadcasting Board of Governors*, 2013 WL 845289
(D.C. Cir. March 8, 2013) ...........................................................................................121

*Guantanamera Cigar Co. v. Corporacion Habanos*, 263 F.R.D. 1 (D.D.C. 2009) .......129, 130

*Holmes v. Amerex Rent-A-Car*, 710 A.2d 846 (D.C. 1998) ...................................................126

*Holmes v. Amerex Rent-A-Car*, 180 F.3d 294 (D.C. Cir. 1999) .............................................126

*Hubbard v. Potter*, 247 F.R.D. 27 (D.D.C. 2008) ..................................................................128

*In re Sealed Case*, 737 F.2d 94 (D.C. Cir. 1984) ....................................................................75

*Jeanblanc v. Oliver Carr Co.*, 1992 WL 189434 (D.D.C. July 24, 1992) .............................124

*Jones v. Hawley*, 255 F.R.D. 51 (D.D.C. 2009) ....................................................................120

*Knights Armament Co. v. Optical Sys. Tech., Inc.*, 254 F.R.D. 463 (M.D. Fla. 2008) ..........130

*Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998) ......................................................127

*Mahaffey v. Marriott International, Inc.,* 898 F. Supp. 2d 54 (D.D.C. 2012) ................. *passim*

*Mazloum v. D.C. Metropolitan Police Department*, 530 F. Supp. 2d 282
   (D.D.C. 2008) ..............................................................................................................127

*McBride v. Halliburton Co.*, 272 F.R.D. 235 (D.D.C. 2011) .................................................125

*McDowell v. Government of the District of Columbia*, 233 F.R.D. 192
   (D.D.C.2006) ................................................................................................................122

*McPeek v. Ashcroft*, 202 F.R.D. 31 (D.D.C. 2001) ................................................................124

*Miller v. Holzmann,* 2007 WL 172327 (D.D.C. Jan. 17, 2007) ............................ 22, 124, 125

*More v Snow*, 480 F. Supp. 2d 257 (D.D.C. 2007) ...............................................................120

*Myrdal v. District of Columbia*, 2007 WL 1655875 (D.D.C. June 7, 2007) .........................130

*Nucor Corp. v Bell*, 251 F.R.D. 191 (D.S.C. 2008) ...............................................................128

*Parsi v. Daioleslam*, 286 F.R.D. 73 (D.D.C. 2012) .....................................................122, 127

*Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*, 685 F. Supp. 2d 456 (S.D.N.Y. 2010) .........................................................................128

*Peskoff v. Faber*, 244 F.R.D. 54 (D.D.C. 2007) ....................................................................124

*Rice v. United States*, 917 F. Supp. 17 (D.D.C. 1996) .........................................................120

*Rude v. Dancing Crab at Washington Harbour,* 245 F.R.D. 18 (D.D.C. 2007) ...................128

*Shepherd v. American Broadcasting Companies, Inc.*,
   62 F.3d 1469 (D.C. Cir. 1995) .......................................................................................118, 122

*Silvestri v. General Motors Corp.*, 271 F.3d 583 (4th Cir. 2001) ........................................128

*Smith v. Café Asia*, 246 F.R.D. 19 (D.D.C. 2007) ...............................................................124

*Smith v. Napolitano*, 626 F. Supp. 2d 81 (D.D.C. 2009) ....................................................124

*Talavera v. Shah*, 638 F.3d 303 (D.C. Cir. 2011) ........................................................121, 127

*Tax Analysts v. I.R.S.*, 117 F.3d 607 (D.C. Cir. 1997) ...........................................................75

*Turner v. Public Service Corp.*, 563 F.3d 1136 (10th Cir. 2009) .........................................128

*United States v. Philip Morris USA, Inc.,* 449 F. Supp. 2d 1 (D.D.C. 2006) ..................22, 125

*U.S. Aviation Underwriters, Inc. v. Pilatus Business Aircraft, Ltd.*,
   582 F.3d 1131, 1145 (10th Cir. 2009)................................................................................130

*Villareal v. El Chile, Inc.*, 266 F.R.D. 207 (N.D. Ill. 2010) ................................................130

*Webb v. District of Columbia*, 146 F.2d 964 (D.C. Cir. 1998) .....................................119, 121

*Westmoreland v. CBS, Inc.*, 770 F.2d 1168 (D.C. Cir. 1985) ...............................................123

*Young v. Office of the U.S. Sergeant at Arms*, 217 F.R.D. 61 (D.D.C. 2003) .......................118

*Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011)........................ *passim*

*Zubulake v. UBS Warburg LLC* (*Zubulake IV*), 220 F.R.D. 212 (S.D.N.Y. 2003)................126

**FEDERAL RULES**

Fed. R. Civ. P. 26(e)(1)(A) ............................................................................................74, 130

Fed. R. Civ. P. 26(g)(1)(A) ..................................................................................................129

Fed. R. Civ. P. 37 ...............................................................................................................122

Fed. R. Civ. P. 37(f) ...................................................................................................20, 22, 125

**MISCELLANEOUS**

D.C. City Council Report on Investigation of the Metropolitan Police Department's
  Policy and Practice in Handling Demonstrations in the District of Columbia
  (March 24, 2004) ...............................................................................................................7

Gorelick, Marzen & Solem, DESTRUCTION OF EVIDENCE (2012 Ed.) .........................128

*Sedona Conference Glossary: E-Discovery & Digital Information Management
  (Third Edition)* (Sept. 2010) ...............................................................................................124

## I.      INTRODUCTION AND SUMMARY

Defendants District of Columbia ("the District"), Metropolitan Police Department ("MPD"), former MPD Chief of Police Charles Ramsey (in his official capacity only), Executive Assistant Chief Michael J. Fitzgerald, Assistant Chiefs Peter J. Newsham (in their official capacities only) and Brian K. Jordan, former MPD officer Bryan DiGirolamo, and MPD Officers Andre Harrison and Michael Smith (collectively "the District"), respectfully submit their Proposed Findings of Fact and Conclusions of Law regarding the investigation conducted by Special Master John M. Facciola concerning the Joint Operations Command Center ("JOCC") Running Resume for the September 2002 IMF event.[1]

Prior to the recovery of the September 27, 2002 JOCC Running Resume in May 2011, the *Chang* plaintiffs repeatedly alleged that the District was responsible for the destruction or loss of the Running Resume, and that the District's "willful and malicious action" was to prevent the plaintiffs from showing what happened at Pershing Park on September 27, 2002.  (*See*, *e.g.*, Dkt. No. 777-1, at ¶ 32.)[2]  The facts developed during this investigation, however, have shown

---

[1]      These Findings of Fact and Conclusions of Law are filed pursuant to a Minute Order issued by the Special Master on May 8, 2013.  For the District's Proposed Findings of Fact and Conclusions of Law regarding Audio and Video Evidence, *see* Dkt. No. 944.

[2]      The citations in this filing use the following system:

Testimony from the Special Master's evidentiary hearings held on October 12-15, 2010, October 18, 2010, November 9-10, 2010, December 14, 2010, November 8-9, 2012, November 28-29, 2012, December 18, 2012, and January 3, 4, 9 and 11, 2013, March 19, 2013, and May 8, 2013, will be cited as "([Witness Last Name] SM, [Date] [a.m. or p.m.], at [page and line number].)"  For example, a citation to Eric Kant's testimony for November 28, 2012, will be cited as "(Kant SM, Nov. 28, 2012, at __:____.)"

Transcript of Hearings held before Judge Sullivan, which are not otherwise designated as an Exhibit, will be cited as "Tr. of [date] Hearing at [page and line number].)"

these allegations to be untrue in every respect.  Not only do the facts show that the District did

not destroy the JOCC Running Resume, or that the District deleted any data from the Running

Resume, but the facts also show that the *Chang* plaintiffs cannot demonstrate any prejudice to

their case now that the Running Resume has been produced.  Without meeting their burden to

prove spoliation and prejudice, the plaintiffs are not entitled to sanctions.

The key facts can be summarized as follows:

- Within weeks after the *Chang* plaintiffs filed their lawsuit, the District began a comprehensive search for relevant evidence that included a litigation hold request before one was required or expected by the Federal Rules of Civil Procedure or prevailing case law.  All original material (except the September 2002 IMF JOCC E Team Running Resume) was copied for production to the D.C. City Council in 2003, and by early 2004 for discovery production to the various Pershing Park plaintiffs – including the *Chang* plaintiffs.  The parties agreed to a suspension of formal discovery between October 2004 and January 2006, and once discovery resumed, the District continued to look for the JOCC Running Resume.  (PF 51-64, 67-73.)[3]

- Prior to the September 2002 IMF event, MPD created a running resume in the Joint Operations Command Center ("JOCC") using a software program known as GroupSystems.  Starting with the September 2002 IMF event, MPD replaced the GroupSystems program in the JOCC with a system known as E Team.  MPD continued to use GroupSystems in the Intelligence Operations Center ("IOC") and the Synchronized Operations Command Center ("SOCC") (now known as the Command Information Center ("CIC")) on September 27, 2002, and a separate GroupSystems IOC running resume and CIC daily report were generated and printed for use by MPD senior officials.  Both the IOC and CIC reports for

---

Exhibits offered by the parties in the Special Master hearings during the October 2010 set of hearings will be cited as ("District Oct. 2010 SM Ex. [number]") or ("Chang Oct. 2010 SM Ex. [number]").  Exhibits offered by the parties during the November 2012, January 2013, and March 2013 set of hearings will be cites as ("District Nov. 2012 SM Ex. [number]") or (Chang Nov. 2012 SM Ex. [number]").  Exhibits otherwise presented to the Special Master will be designated as "(SM Ex. [number].)"

Pleadings and Orders entered on the Court's docket will be cited as "(Dkt. No. [ ].)" Citations to docket entries in other cases will be cited, for example, as "(Barham Dkt. No. [ ].)"

[3]   References are to the District's Proposed Findings ("PF") as set forth in this filing.

September 27, 2002, were produced to the *Chang* plaintiffs early in discovery. At the time of the event, no printed report was made of the E Team JOCC Running Resume because the new E Team system was Web-based and could be accessed by anyone with a proper User ID from any location. Photographs taken in the JOCC during the September 2002 IMF event show that only the E Team system was used in the JOCC. (PF 80-109);

- On October 30, 2007, Judge Sullivan issued an Order in the *Barham* case (which also applied in the *Chang* case) to produce the JOCC Running Resume for September 2002 or describe what efforts had been made to find it. Even before Judge Sullivan's Order, the District was continuing to search for the JOCC Running Resume. As part of this effort, MPD contacted NC4 (the company that acquired E Team assets in 2005 and thus became responsible for maintenance and support of E Team software), to ascertain if the September 2002 Running Resume was stored on NC4 back-up tapes in Philadelphia. NC4 informed MPD that the data could not be located on NC4 back-up tapes. (PF 110-119);

- In May 2008, NC4 representative Marc Bynum ascertained that data was still on E Team server. Unfortunately, this information was not conveyed to MPD's Office of General Counsel ("OGC") because Bynum's visit was not related to litigation. In August 2009, following the entry of a Minute Order by Judge Sullivan that required the District to certify its efforts to locate the JOCC Running Resume, OGC commenced another search for the Running Resume. This time, MPD OGC was aware that NC4 had been contacted again for assistance, but MPD and NC4 were unable to agree on a price to extract the Running Resume data from the E Team server. It was not until October 29, 2010, when Judge Sullivan issued a Minute Order that required MPD to incur whatever cost it would take to retrieve the Running Resume that negotiations resumed between MPD and NC4, which resulted in Bynum returning to MPD Headquarters in May 2011. (PF 120-132);

- On May 3, 2011, NC4 employee Bynum located the JOCC Running Resume and found it in the same condition as when it was created in September 2002, without any permanent loss of data. In the course of locating the data, however, Bynum said it appeared that certain JOCC event files had been moved – or in E Team parlance had been "deleted" – to permanent JOCC history files in February 2003 by an E Team employee. (It was later confirmed that E Team employee Charles O'Connell "deleted" the files in February 2003.) MPD General Counsel Terry Ryan, who was present and heard Bynum mention "deleted" data, immediately requested that MPD's Internal Affairs Division ("IAD") investigate whether this meant that any data had been deleted or destroyed. MPD Chief of Police Cathy Lanier immediately ordered that the room containing the E Team servers be locked. Later that day, MPD decided to not start an investigation, but this decision was not clearly conveyed to Ryan or communicated to District trial counsel. (PF 133-158, 196-218);

3

- In a conference call with the Special Master on May 4, 2011, the Court was advised that Bynum had found all of the JOCC Running Resume data and that no data was missing from the server.  However, in light of Bynum's statement the previous day that data had been "deleted" from the JOCC Running Resume, but knowing that all data had been found, and believing that IAD was investigating the matter, the District decided that it would be best for Bynum – and not District counsel – to explain to the Special Master and the plaintiffs the technical aspects of what "deleted" meant.  The District had every reason to believe that Bynum's deposition would be taken within a matter of weeks.  As it turned out, Mr. Bynum's deposition was delayed for several weeks for reasons beyond the District's control.  After receiving instructions from the Special Master during the May 4 conference call, the E Team server's hard drive was imaged by the United States Secret Service, and the E Team backup server was secured.  Several days later, NC4 extracted the entire JOCC Running Resume from the E Team server and it was produced electronically to all parties, including the *Chang* plaintiffs.  (PF 134-167);

- Before Bynum's deposition could be taken, the Special Master informed the parties at a July 12, 2011 status conference that he might issue part of his Report and Recommendations to Judge Sullivan earlier than expected.  As a result, the District decided to reveal to the Special Master at the July 12 hearing the Bynum information.  Also, it was revealed at the July 12 hearing that – as the District understood the situation – MPD was still conducting an investigation of the servers.  During the hearing, *Chang* counsel objected to MPD conducting any investigation of the servers.  In any event, the Special Master agreed that Bynum's testimony should be taken as soon as possible, and Bynum was deposed on August 23, 2011.  (PF 168-174);

- On July 28, 2011, with the knowledge and approval of the Special Master, the District delivered the two E Team servers and the GroupSystems server to the FBI for forensic examination to determine if data had been deleted from the E Team servers and to attempt to extract any September 2002 data from the GroupSystems server.  In a report dated April 23, 2012, the FBI stated that it had decided it was not necessary to forensically examine the two E Team servers once the FBI learned that NC4 had already accessed all server data in January, 2012, and that the NC4 analysis showed that no E Team JOCC Running Resume data was erased, lost or destroyed.  Regarding the GroupSystems server, the FBI was only able to access data on the GroupSystems server in raw format, that it was not possible to determine the content of that data, and that it was not possible to determine whether anyone had caused data to be erased from the GroupSystems server. Pursuant to a Protective Order approved by the Special Master, the three servers were returned to MPD in October 2012.  (PF 219-233);

- The E Team JOCC Running Resume for the September 2002 IMF event contains only 37 pages that deal with the events in Pershing Park on September 27, 2002, and of these, the *Chang* plaintiffs acknowledge that only eleven entries involve

4

the arrests at Pershing Park.  There are no references in these eleven entries to the individual *Chang* plaintiffs, Chief Ramsey, Assistant Chief Newsham, or the other District defendants, nor is there any information that would dispute Assistant Chief Newsham's testimony that he ordered the arrests.  (PF 234-239);

- In 2009, before the E Team JOCC Running Resume was recovered, the District requested former United States District Judge Stanley Sporkin to conduct an independent investigation into the existence and location of printed and electronic versions of the September 2002 JOCC Running Resume.  Everyone interviewed by Judge Sporkin stated that he or she never saw or did not recall seeing a printed copy of the September 2002 JOCC Running Resume.  This was because a GroupSystems Running Resume was not created in the JOCC for the September 2002 IMF event (so no hard copy existed), and it was unnecessary to print a hard copy of the  E Team JOCC Running Resume because it was stored electronically on the server.  (PF 240-247);

- The *Chang* plaintiffs allege that MPD's Office of General Counsel mishandled a binder found by MPD Officer John Strader in October 2009 that – contrary  to testimony from Officer Strader and everyone else associated with the finding of the binder – contained the non-existent September 2002 IMF GroupSystems JOCC Running Resume.  In fact, four lawyers who examined the binder within minutes of it being delivered to the MPD General Counsel's Office (and later by a fifth lawyer familiar with the *Chang* case) determined that the binder found by Officer Strader contained data pertaining to the April 2002 IMF event, and not the September 2002 IMF event.  Moreover, when Officer Strader was in MPD OGC several weeks later, he saw on a table in Ryan's office the binder he found, which was the same binder that the District later said was the one found by Officer Strader.  (PF 248-302).

The following conclusions can be drawn from these facts:

- The *Chang* plaintiffs have failed to meet their burden of proving that the JOCC Running Resume for the September 2002 IMF event was erased, lost or destroyed, or that anyone attempted to erase or destroy it.  This investigation shows that all data from the E Team JOCC Running Resume was found and produced to the *Chang* plaintiffs in June 2011, and that there was no other running resume created in the JOCC during the September 2002 IMF event.  Without question, the Chang plaintiffs have had in their possession the complete JOCC Running Resume for the last two years and also have known for two years that  *there has been no spoliation of the JOCC Running Resume*; and

- A reasonable fact finder would conclude that the *Chang* plaintiffs have not suffered any prejudice because the JOCC Running Resume was located and it was determined that no data was deleted from the document.  Thus, the *Chang* plaintiffs have failed to meet their burden of proving that they are entitled to any sanctions.

## II.      FACTUAL BACKGROUND

1.       In September 2002, approximately 3,000 to 5,000 people demonstrated in the District of Columbia against the policies of the International Monetary Fund ("IMF") and the World Bank ("WB").  On Friday, September 27, 2002, approximately 400 people were arrested during the demonstrations at General John Pershing Park, located on Pennsylvania Avenue between 14th and 15th Streets, N.W. (the "September 2002 IMF event").  The seven original plaintiffs in this case were among the people arrested in Pershing Park.  *See Barham v. Ramsey*, 338 F. Supp. 2d 48, 51 (D.D.C. 2004).

2.       The Pershing Park arrests were the fourth set of mass arrests made on September 27, 2002.  The earlier arrests occurred at 14th Street and Independence Avenue, N.W., Vermont Avenue and K Street, N.W., and Connecticut Avenue and L Street, N.W.  (Koger SM, Oct. 18, 2010 (p.m.), at 86:05-17.)

3.       The arrests at Pershing Park on September 27, 2002, began at approximately 9:48 a.m.  (E Team JOCC Running Resume, Entry by DCMPDUser073, page 301 of 4700 pages, produced to *Chang* plaintiffs on June 13, 2011 (Chang Nov. 2012 SM Ex. 1).)  The arrest process at Pershing Park concluded at approximately 12:24 p.m.  (*Id.* at page 304, Entry by DCMPDUser010.)

4.       The decision to arrest the *Chang* plaintiffs was made on the scene by MPD Assistant Chief Peter Newsham.  (District's Responses to Requests for Admissions, Nos. 1, 30, 32 (Chang Oct. 2010 SM Ex. 17); Dep. of Peter Newsham, March 12, 2010, at 228:10-229:14 (Chang Oct. 2010 SM Ex. 45).)  *See also Barham v. Ramsey*, 434 F.3d 565, 569-70 (D.C. Cir. 2006).)

5**.**      The chief decisionmaker in the District of Columbia on September 27, 2002, to make and implement law enforcement policy, including making official arrests, was MPD Chief of Police Charles Ramsey.  (Dep. of Newsham, at 335:15-19.)

6.      Chief Ramsey testified that he arrived at Pershing Park at approximately 10:00 a.m. on September 27, 2002.  (Dep. of Charles Ramsey, March 26, 2010, at 96:10-13 (Chang Oct. 2010 SM Ex. 49).)   According to the E Team JOCC Running Resume, this was approximately 12 minutes after the arrests began.  (*See* E Team Running Resume, September 27, 2002, page 301 of 4700 pages (showing that arrests commenced at 9:48 a.m.).)

7.      Chief Ramsey did not make the decision to arrest the *Chang* plaintiffs.  (*See* D.C. City Council Report on Investigation of the Metropolitan Police Department's Policy and Practice in Handling Demonstrations in the District of Columbia, at 97 (referring to February 25, 2003 testimony of Chief Ramsey, *Barham* Dkt. No. 567, Ex. 4).  *See also Barham*, 434 F.3d at 570.

8.      The original Complaint in the *Chang* case was filed on October 15, 2002.  The original Complaint named as defendants the United States, the District of Columbia, the National Park Service, and the Metropolitan Police Department.  (Dkt. No. 1.)  It was served on the District the same day it was filed.  An Amended Complaint was filed on December 6, 2002. (Dkt. No. 9.)

9**.**      On September 25, 2003 – almost one year after the arrests and eleven months after the original Complaint was filed – the *Chang* plaintiffs filed a Second Amended Complaint, adding MPD Chief of Police Charles Ramsey and Assistant Chief Peter Newsham in their official capacities only, and Major Richard Murphy of the National Park Police in his official capacity only.  (Dkt. No. 44.)

7

10**.**     The *Chang* plaintiffs filed a Third Amended Complaint on July 19, 2005, in which they also sued Chief Ramsey, Assistant Chief Newsham, and Major Murphy (in their individual capacities), and added as new defendants District of Columbia Mayor Anthony Williams, MPD Assistant Chiefs Michael J. Fitzgerald, Brian K. Jordan, and Bryan DiGiralamo (in their official and individual capacities), MPD Officers Andre Harrison and Michael Smith (in their official capacities only), and the Fairfax County Sheriff's Department.  (Dkt. No. 153.)

11**.**     The original seven *Chang* plaintiffs elected to opt-out of the class certification in the *Barham* case.  *See Barham v. Ramsey*, 217 F.R.D. 262, 274-75 (D.D.C. 2003).  The *Barham* plaintiffs, comprising a class of almost 400 members, settled with the District Defendants on February 18, 2010.  (Barham Dkt. No. 640.)

12.     In October 2005, three of the *Chang* plaintiffs – Meaghan Enright, Amy Chastain, and Elizabeth Young – accepted Offers of Judgment made by the District pursuant to Rule 68 of the Federal Rules of Civil Procedure.  Judgment *nunc pro tunc* was entered against the District on April 4, 2006 as to these three plaintiffs.  (Dkt. Nos. 144, 190.)  In the words of Judge Sullivan, the "plaintiffs' numbers have dwindled to four."  (Dkt. No. 698, at 6.)  The four remaining plaintiffs – RayMing Chang, Young Choi, Leanne Lee, and Chris Zarconi – did not accept the Offers of Judgment made in 2005.  Offers of Judgment were again made to the four remaining plaintiffs on September 18, 2009, which they again did not accept.  Thus, almost eleven years after the Pershing Park arrests on September 27, 2002, the four current plaintiffs are the only individuals continuing to pursue claims against the District.[4]

---

[4]     According to supplemental discovery responses filed in April 2012, RayMing Chang is employed as a GPS III Advanced Capabilities Program Manager for the U.S. Air Force in Los Angeles, California, and is a First Lieutenant in the U.S. Army Reserve.  *See* Chang's Supplemental Answers to Interrogatories, April 30, 2012, at 6.  Young Choi is a physician resident for the Department of Anesthesiology at the Medical University of South Carolina.  *See*

13.     On September 19, 2010, Judge Sullivan issued a Memorandum Opinion in which he granted the District's motion for partial summary judgment and ruled that the four remaining *Chang* plaintiffs are not entitled to permanent injunctive and declaratory relief.  (Dkt. No. 698.)[5]

## III.     SCOPE AND CONDUCT OF SPECIAL MASTER INVESTIGATION

14.     On May 5, 2010, U.S. District Judge Emmet G. Sullivan appointed U.S. Magistrate Judge John M. Facciola to serve as a Special Master in this case.  (Dkt. No. 645.)

15.     Judge Sullivan directed Special Master Facciola to "prepare and file a Report and Recommendation containing findings of fact and conclusions of law regarding alleged destruction of certain evidence in these cases."  (*Id*. at 2.)[6]  Judge Sullivan specifically directed Special Master Facciola to "investigate, examine, and report on the potential destruction of evidence regarding:  A. the International Monetary Fund ("IMF") September 27, 2002 JOCC

---

Choi's Supplemental Answers to Interrogatories, April 30, 2012, at 5.  Leanne Lee (now Leroy) is a free-lance translator in Lambersant, France.  *See* Leroy Supplemental Answers to Interrogatories, April 24, 2012, at 3, 5.  Christopher Zarconi is a catering supervisor for Restaurant Associates in Washington, D.C.  *See* Zarconi's Supplemental Answers to Interrogatories, April 24, 2012, at 3, 5.  (*See* Dkt. No. 945, Ex. 1.)

[5]     In his Memorandum Opinion issued on September 19, 2010, Judge Sullivan noted that three other Pershing Park arrest cases assigned to him had settled.  *See* Dkt. No. 698 at 3-4.  Only the *Chang* case, involving claims for only monetary damages by four plaintiffs, has remained unsettled and has continued to be the focus of persistent and costly litigation over allegations of discovery abuses that have been shown to be unfounded at every turn (*e.g*., the JOCC Running Resume was not lost as first claimed by the *Chang* plaintiffs; Officer Strader did not find the September 2002 IMF JOCC Running Resume; MPD did not delete data from the JOCC Running Resume; and District lawyers did not intentionally submit false discovery answers).

[6]     At the time Judge Sullivan entered his May 5, 2010 Order, the *Chang* case was consolidated with *Barham v. Ramsey*, Civil Action No. 02-2283 (filed November 19, 2002).  The *Barham* case was a class action involving approximately 380 individuals who also had been arrested at or near Pershing Park on September 27, 2002.  As noted, the *Chang* plaintiffs opted out of joining the *Barham* class.  *See Barham*, 217 F.R.D. at 274-75.

9

Running Resume; B. the IMF September 27, 2002 Recordings of Radio Runs; and C. the IMF September 27, 2002 Video Recordings." (*Id.* at 2-3.)[7]

16**.**     On June 3, 2010, the Court conducted a telephone conference call with the parties, during which the *Chang* plaintiffs orally moved to stay their motion for leave to file their Fourth Amended Complaint.  As a result of plaintiffs' unopposed motion, and the ongoing discovery and proceedings before the Special Master, Judge Sullivan vacated the trial date of October 10, 2010.  (*See* Minute Order, June 7, 2010.)  A new trial date has not been rescheduled.

17.     On November 10, 2010, Judge Sullivan issued a Minute Order that provided that the Special Master had the authority to also investigate "(1) solicitation, preparation, and submission of false or misleading testimony/affidavits, and (2) misleading statements by District counsel" provided such statements by District counsel "relates or stems from the destruction of or tampering with the Running Resume, the Radio Runs, and the Video Tapes." (*See* Minute Order, November 10, 2010.)

18.     As of the date of this filing, the Special Master has held 18 days of hearings during October, November, and December 2010, November and December 2012, and January, March, and May 2013.  Testimony was taken from 32 witnesses and over 200 exhibits were made available to the Special Master.  (*See* Minute Entries dated October 12, 2010, October 13, 2010, October 14, 2010, October 15, 2010, October 18, 2010, November 9, 2010, November 10, 2010, December 14, 2010, October 31, 2012, November 28 and 29, 2012, December 18, 2012, January 3, 4, 9 and 11, 2013, March 19, 2013, and May 8, 2013.)

---

[7]     The District previously submitted Proposed Findings of Fact and Conclusions of Law showing that no audio or video evidence pertaining to the September 2002 IMF event was lost or destroyed.  (Dkt. No. 905-3.)

## IV.    BACKGROUND OF WITNESSES[8]

19.    **Douglas Jones** was employed by MPD from 1981 to December 2010.  (Jones SM, Oct. 12, 2010 (a.m.), at 10:23-11:08.)  Prior to retirement, Jones served as a Sergeant with MPD in the Homeland Security Bureau, Intelligence Fusion Division.  (*Id.* at 11:09-13.)  Jones served as the "watch officer" in the Command Information Center (CIC) and also served in the Joint Operations Command Center (JOCC) when it was activated.  (*Id.* at 12:25-13:05.)  Jones worked the midnight shift during the September 2002 IMF JOCC activation, meaning he worked from approximately 9:30 p.m. to 6:00 a.m.  (*Id.* at 22:25-23:07.)  Jones was assigned E Team user identification DCMPDUser083 for the JOCC during the September 2002 IMF event.  (DC2011 July-002000-2014.)

20.    **Neil Trugman** was a civilian employed by MPD as a law enforcement coordinator between August 2000 and February 2004.  (Trugman SM, Oct. 12, 2010 (a.m.), at 102:25-103:06; Chang Oct. 2010 SM Ex. 9, ¶ 1.)  Trugman previously served as a detective with MPD.  (Trugman SM, Oct. 12, 2010 (a.m.), at 102:14-18.)  In September 2002, Trugman worked in the Office of Quality Assurance under Stephen Gaffigan, Senior Executive Director of the Office.  (*Id.* 104:02-14; Chang Oct. 2010 SM Ex. 9, ¶ 1.)  Trugman's responsibilities included "managing [] the Synchronized Operations Command Center" and "manag[ing] the command center during those special events and prepar[ing] the outside agencies who would have a seat in the room."  (Trugman SM, Oct. 12, 2010 (a.m.), at 103:07-124.)  Trugman spent most of the time during the September 2002 IMF event in the JOCC.  (Gaffigan SM, Oct. 15, 2010, at 49:07-10.)  Trugman was assigned E Team user identification DCMPDSysAdm01 in connection with the September 2002 IMF event.  (DC2011 July-002000-2014.)

---

[8]    Witnesses are listed in the order they appeared before the Special Master.

21.  **George Crawford** is a civilian employed as a computer specialist for the Office of the Chief Technology Officer of the District of Columbia.  (Crawford SM, Oct. 12, 2010 (p.m.), at 14:06-14; Chang Oct. 2010 SM Ex. 11, ¶ 1.)  Crawford did not have user rights for E Team data entry in the JOCC during the September 2002 IMF event, and therefore an E Team user identification number was not assigned to him.

22.  **James Crane** has been employed by MPD since 1988 and currently holds the rank of Commander with MPD.  (Crane SM, Oct. 12, 2010 (p.m.), at 78:06-10.)  Crane served as Deputy Director of the Communications Division from September 2, 2002, until June 2003, and then as Director until September 2007.  (*Id.* at 108:05-12.)  Crane did not have an E Team user identification number assigned to him in the JOCC during the September 2002 IMF event.

23.  **Alfred John Broadbent, Sr.** is a former Assistant Chief of Police for MPD.  He retired in July 2004.  (Broadbent SM, Oct. 12, 2010 (p.m.), at 141:01-10.)  Broadbent was in the JOCC during the arrests of the plaintiffs on September 27, 2002.  (*Id.* at 141:18-23; 144:09-12.)  He was not assigned an E Team user identification number for the September 2002 IMF event.

24.  **Marian Rai Howell** was an Executive Assistant with the D.C. Department of Transportation, Infrastructure Project, and Management Administration in 2010.  (Howell SM, Oct. 13, 2010 (a.m.), at 5:16-18.)  She was employed as a civilian with MPD from 1998 to 2007.  (*Id.* at 4:16-5:14; 14:16-18.)  In 2002, Howell worked for Stephen Gaffigan, Senior Executive Director of the Office of Quality Assurance, and was the Program Manager for the Field Operations Support Division.  (*Id.* at 6:01-21; 36:21-37:01.)  Howell later assumed Gaffigan's responsibilities after his departure from MPD and held those duties for 14 months.  (*Id.* at 13:25-14:22.)

25. **Giuseppe Crisafulli** was employed as a contractor/computer programmer between February 2001 and March 2005 for SuperTech, a company under contract with MPD. (Crisafulli SM, Oct. 13, 2010 (a.m.), at 58:10-24.)  Crisafulli did not have E Team user rights in the JOCC during the September 2002 IMF event.  (*Id.* at 75:02-11.)  Crisafulli testified as a Rule 30(b)(6) witness for the District on the topics of the operation of the JOCC, the CCTV system, and MPD information technology in general.  (Dep. of Giuseppe Crisafulli, April 28, 2010, at 12, (Chang Oct. 2010 SM Ex. 71).)

26. **Cecilia Tilghman** was an employee of MPD between August 1999 and September 2008.  (Tilghman SM, Oct. 13, 2010 (a.m.), at 136:22-24; 142:07-12.)  During the September 2002 IMF event, Tilghman was a staff assistant to Stephen Gaffigan in the Office of Quality Assurance.  (*Id.* at 136:17-21.)

27. **James Costas** is the owner of Winburne & Costas, Inc., a firm that provides support services to law enforcement and public safety agencies.  (Costas SM, Oct. 13, 2010 (p.m.), at 5:11-21.)  Winburne & Costas helped design the JOCC and the positioning and use of stationary Closed-Circuit television cameras (CCTV) as well as manned rooftop cameras.  (*Id.* at 5:22-6:20; 9:14-17.)  He reported to Stephen Gaffigan in connection with his work for MPD. (*Id.* at 25:19-21.)

28. **Peter Newsham** is an Assistant Chief of Police for MPD and has worked for MPD since 1989.  (Newsham SM, Oct. 13, 2010 (p.m.) at 100:07-09.)  On September 27, 2002, Assistant Chief Newsham was assigned responsibility for the section of the city that included Pershing Park.  (*Id.* at 101:10-15.)  Assistant Chief Newsham was the MPD official who made the decision to arrest the *Chang* plaintiffs on September 27, 2002.  (*See* District's Responses to Request for Admissions, Nos. 1, 30, 32 (Dkt. No. 627-3); *see also Barham*, 434 F.3d at 569-70.)

He is named as an individual defendant in this case in both his personal and official capacities. (*See* Dkt. No. 153.)

29.     **Charles Ramsey** was the Chief of Police for MPD between April 1998 and December 2006.  (Ramsey SM, Oct. 14, 2010 (a.m.), at 36:06-10.)  On September 27, 2002, Chief Ramsey was the highest level decision-maker in MPD.  (*Id.*, at 82:8-15; Chang Oct. 2010 Ex. 49, at 335:15-19.)  Chief Ramsey was present at Pershing Park on September 27, 2002, but he did not make the decision to arrest the *Chang* plaintiffs.  (*See Barham*, 434 F.3d at 569-70.) Chief Ramsey is named as an individual defendant in this case in both his personal and official capacities.  (*See* Dkt. No. 153.)

30.     **Terrence (Terry) Ryan** has served as the General Counsel for MPD since September 1997.  (Ryan SM, Oct. 14, 2010 (p.m.), at 4:15-17; 33:13-14.)  He has served in the General Counsel's Office since May 1981.  (*Id.* at 33:12-18.)  Ryan was on duty on September 27, 2002, but he had no responsibility in the JOCC during the September 2002 IMF event, and he was not assigned an E Team user identification number for the JOCC.  (*Id.* at 5:13-23.)  Ryan was present when NC4 employee Marc Bynum accessed the E Team server on May 3, 2011.

31.     **Ronald Harris** is Deputy General Counsel for MPD and has worked as an attorney for MPD since 1989, with a two year break in service during the 1990s.  (Harris SM, Oct. 14, 2010 (p.m.), at 77:09-15.)  Harris reported to Terry Ryan, General Counsel at MPD.  (*Id.* at 77:16-21.)

32.     **Stephen Gaffigan** was a civilian employee of MPD from 1998 to 2004, serving as the Senior Executive Director of the Office of Quality Assurance.  (Gaffigan SM, Oct. 15, 2010, at 42:20-43:08.)  He reported directly to Chief Ramsey.  (*Id*. at 43:15-17.)  Gaffigan's responsibilities included the management and operation of the command center complex, which

included the JOCC.  (*Id.* at 43:09-22.)  Gaffigan currently serves as Assistant Director of the San

Antonio Police Department.  Gaffigan testified as a Rule 30(b)(6) witness for the District on the

general topics of  deletion or destruction of, or tampering with, the E Team Running Resume for

the September 2002 IMF event.  (Dep. of Stephen Gaffigan, March 30, 2012 (District Nov. 2012

SM Ex. 2).)

33.    **Thomas Koger** is an Assistant Attorney General for the Office of the Attorney

General for the District of Columbia ("OAG") and is currently assigned to the Public Interest

Division.  Koger began working for OAG (then Corporation Counsel) in 1992, and then worked

for the U.S. Department of Justice in the Civil Litigation Division, before returning to OAG in

2003.  Koger entered his appearance in the *Chang* case on September 5, 2003.  (Dkt. No. 40.)

He withdrew his appearance on September 30, 2009.  (Dkt. No. 510; Koger SM, Oct. 18, 2010

(a.m.), at 38:20-23; 114:23-115:02.)

34.    **Donald Yates** is a retired Sergeant with MPD.  (Yates SM, Nov. 9, 2010, at 5:07-

11.)  In September 2002, Yates was assigned to the Electronic Surveillance Unit ("ESU") within

MPD and on September 27, 2002, he was detailed to the Intelligence Division.  (*Id.* at 6:02-10.)

35.    **Denise Alexander** is employed by the District as a dispatcher.  (Alexander SM,

Nov. 9, 2010 at 156:07-11.)  Between 2006 and 2010, Alexander was a training instructor for

MPD's Office of Unified Communications.  (*Id.* at 156:14-157:06.)

36.    **Jorge Acevedo** is a Detective with the Narcotics and Special Investigations

Division ("NSID") of MPD and was assigned to the ESU in September 2002.  (Acevedo SM,

Nov. 10, 2010 (a.m.), at 4:15-5:11.)  He was assigned to videotape the IMF demonstrations on

September 27, 2002.  (*Id.* at 6:04-12.)

37.   **Nathanial Britt** is a Detective in the Financial Crimes Unit of MPD.  (Britt SM, Nov. 10, 2010 (a.m.), at 79:23-80:04.)  On September 27, 2002, he was assigned to record the IMF protests.  (*Id.* at 80:10-25; 91:21-92:02.)

38.   **Margaret Nedelkoff** (formerly Kellems) was the Deputy Mayor for Public Safety and Justice of the District of Columbia between September 2000 and June 2004.  (Nedelkoff SM, Nov. 10, 2010 (p.m.), at 53:01-13.)  In her position, she had administrative responsibility over MPD, reporting directly to the Mayor.  (*Id.* at 53:07-13.)  On June 13, 2002, she testified before the D.C. City Council regarding the decision to not record any video of the September 2002 IMF event by CCTV or helicopter.  Deputy Mayor Nedelkoff's June 13, 2002 testimony before the D.C. City Council is available at http://www.dcwatch.com/issues/privacy10.htm. (last visited June 30, 2013).

39.   **Kimberly Thorpe** is a supervisory information technology ("IT") specialist with the District of Columbia Department of Human Resources.  (Thorpe SM, Dec. 14, 2010, at 5:06-17.)  Between 1994 and 2007, Thorpe served as a supervisory IT specialist for MPD in its Chief Information Office.  (*Id.* at 5:18-23; 34:17-19.)  Part of her supervisory responsibilities included the email systems utilized by MPD and the maintenance of computer software and hardware for MPD.  (*Id.* at 26:11-17.)  Thorpe testified as a Rule 30(b)(6) witness for the District on the topics of the identification, isolation, preservation, and production of electronically stored information. (*Id.* at 27:13-25.)

40.   **John Strader** has been an MPD officer since 1994.  In October 2009, Strader found a blue binder in the CIC while searching for the September 2002 JOCC Running Resume. Strader delivered the binder to MPD Captain Jeffrey Herold, who gave the binder to the MPD General Counsel's Office.  (Strader SM, Nov. 8, 2012, at 25:17-18.)  The binder was kept by the

General Counsel's Office until it was turned over to OAG in August 2011.  Strader was also

deposed on December 15, 2011.  (*Chang* Nov. 2012 SM Ex. 30.)

41.    **Marc Bynum** is a Systems Administrator with NC4, the company that purchased

the assets of E Team, Inc. in 2005.  In May 2008, and again in May 2011, Bynum came to MPD

to determine if the data for the E Team JOCC Running Resume for the September 2002 IMF

event could be accessed on the decommissioned E Team servers.  During the May 2011 review,

all the Running Resume data was located on the server and subsequently was imaged by the

United States Secret Service.  An electronic copy of the complete data was provided to the

*Chang* plaintiffs and the other parties in the case.  (Chang, Nov. 2012, SM Ex. 1.)  Bynum

repeatedly testified before the Special Master that no Running Resume data was lost or

destroyed.  (Bynum SM, Nov. 28, 2012, at 26:11-16, 30:18-23, 83:8-25, 93:19-94:6.)  Prior to

his testimony before the Special Master, Bynum was deposed by the *Chang* plaintiffs on August

23, 2011.  (Dep. of Marc Bynum, August 23, 2011 (Dkt. No. 818).)

42.    **Eric Kant** is an Interoperability Architect and Project Manager with NC4 who

was present in the JOCC during the September 2002 IMF event providing technical assistance to

MPD personnel on the operation of E Team.  (Kant SM, Nov. 28, 2012, at 120-21.)  Kant took

approximately 30 photographs in the JOCC on September 28 and 29, 2002.  (*Id*. at 165-67;

Chang SM Nov. 2012 Ex. 13) (DC2011 – 005392-5421.)  The District first learned about these

photographs in January 2012, and immediately provided them to the *Chang* plaintiffs.  (Dkt. No.

876-2.)  In May 2011, Kant assisted in creating an electronic version of the E Team JOCC

Running Resume data for the September 2002 IMF event.  In January 2012, Kant examined the

E Team JOCC Running Resume data and produced several reports reflecting all activity with the

data since the creation of the Running Resume in September 2002, including "deletion" records.

(Kant SM, Nov. 28, 2012, at 149:19-150:1.)  Kant also testified as a Rule 30(b)(6) witness for the District.  (Dep. of Eric Kant, March 7, 2012 (District Nov. 2102 SM Ex. 1).)

43.  **Teresa Quon** serves as an Assistant General Counsel with the Office of General Counsel for the MPD.  Quon has been an attorney since 1990.  Prior to working in the MPD General Counsel's Office, Quon was in private practice, then a line attorney in the Office of the Attorney General, and then a Section Chief in the General Litigation Section of OAG.  (Quon SM, Nov. 28, 2012, at 241:4-242:21.)  Quon is the person to whom MPD Captain Herold gave the blue binder found by Strader in October 2009.  (*Id*. at 244:10-24.)

44.  **Delroy Burton** is a Sergeant with MPD and has been a member of MPD since 1994.  Burton also serves as Executive Steward of the Fraternal Order of Police (FOP) (Burton SM, Nov. 29, 2012, at 9:13-10:12.)  Burton was the FOP member who represented MPD Officer Strader at the meeting with MPD's Office of General Counsel on September 6, 2011.  (*Id*. at 18:13-21.)

45.  **Monique Pressley** was OAG lead counsel in the *Barham* and *Chang* cases from October 2009 to November 2011.  (Pressley SM, Dec. 18, 2012, at 12:22-13:1, 15:5-24.)  She worked for OAG from 2001 to 2005, and then returned in 2009 until her departure in 2011.  As of December 2012, she worked for The Pressley Firm, PLLC.  (*Id*. at 8:15-10:6.)  She is a member of the District of Columbia Bar.  (*Id*. at 6:3-5.)

46.  **Jeffrey Herold** is a Captain in MPD and has been a member of MPD since 1989.  (Herold SM, Jan. 3, 2013, at 180:24-181:1.)  In October 2009, he took possession of a document found by MPD Officer John Strader and delivered it to MPD's Office of General Counsel.  He also attended several meetings in 2011 concerning the Strader document.  (*Id*. at 185:8-11, 189:15-16.)  Herold's description of the document given to him by Strader differs from the

18

description of the document provided at various times in this investigation by Strader and others. (*Id*. at 184:13-19, 186:19-25.)

47.     **Michael Anzallo** is Assistant Chief of Police for MPD.  He has been a member of MPD since 1989.  In 2009, Anzallo became Director of the MPD Internal Affairs Bureau, which contains the Internal Affairs Division (IAD).  (Anzallo SM, Jan. 3, 2012, at 216:18-217:12.) Anzallo was the MPD official who was called by MPD General Counsel Terry Ryan on May 3, 2011, to request that IAD initiate an inquiry into whether there was evidence of any destruction or deletion of data from the E Team servers.  Anzallo decided that a formal investigation would not be opened because the issue of the JOCC Running Resume was already under investigation by the Special Master.  (*Id*. at 221:15-19, 222:2-223:3.)

48.     **Shana Frost** has served as an Assistant Attorney General with OAG since November 2004.  (Frost SM, Jan. 9, 2013, at 34:12-14.)  Prior to joining OAG in November 2004, Frost was in private practice, worked for a non-profit organization that specialized in scientific education for judges, and then worked in a mediation firm.  (*Id*. at 34:10-22.)  Frost began working on the *Chang* case with District lead counsel Monique Pressley in 2009.  (*Id*. at 36:10-21.)

49.     **Cathy Lanier** has been Chief of the Metropolitan Police Department since January 2007.  She has held numerous positions with MPD, rising from a foot patrolman in 1990, to Sergeant in 1994, Captain in 1999, and then as Commander two years later.  During her career at MPD, Chief Lanier has been in charge of the Department's Major Narcotics Branch/Gang Crime Unit, Commander-in-Chief of the Fourth District, and Commander of the Office of Homeland Security and Counter-Terrorism.

50. **Irvin B. Nathan** is the Attorney General for the District of Columbia. Mr. Nathan assumed his responsibilities as Attorney General in January 2011.

## V. PROPOSED FINDINGS OF FACT

### A. MPD PRACTICE OF PRESERVING EVIDENCE

**Summary**: Although MPD operated under a General Order since 1972 for the preservation of evidence in criminal cases, in September 2002, when the IMF event occurred, MPD's practice for locating, preserving, and collecting evidence in civil cases was for MPD's Office of General Counsel to notify appropriate command officials in the areas affected by litigation to retain and produce relevant evidence. This practice followed the Federal Rules of Civil Procedure and existing case law on the obligation of a party to preserve relevant evidence. In September 2002, like most private and governmental organizations, MPD had not started to use a formal, standardized written litigation hold notice in civil cases for the preservation and collection of evidence. Indeed, the first reference to the concept of a formal "litigation hold notice" for the preservation of electronically stored evidence was announced by The Sedona Conference in 2005. The words "litigation hold" first appeared in the Federal Rules of Civil Procedure in 2006 in the Advisory Committee Notes to Rule 37(f). The first case in the District of Columbia that mentioned the requirement of a formal litigation hold notice was in an August 2006 civil case.

The current protocol used by the District for the issuance of a litigation hold letter is more formalized now than it was prior to 2003. MPD began using formal litigation hold notices in March 2008, following this Court's decision in *Disability Rights Council v. Washington Metro Transit Authority*, 242 F.R.D. 139 (D.D.C. 2007).

51**.**    In May 1972, MPD issued a General Order regarding the preservation of evidence in criminal cases.  *See* General Order, Series 601, Number 2, dated May 26, 1972.  At that time, there was no comparable General Order for the preservation of evidence in civil cases.  The 1972 General Order was amended in 2004.  *See* General Order-SPT-601.02, dated February 3, 2004. (Harris SM, Oct. 18, 2010 (a.m.), at 47:04-48:10.)  This amendment applied only to criminal cases.

52.    In 2002, when the *Chang* case was filed, the operating policy of MPD in civil cases was for any request for evidence to also serve as an instruction to preserve such evidence. (Koger SM, Oct. 18, 2010, (p.m.), at 76:04-21.)  In particular, when it was necessary to obtain information in connection with pending civil litigation, MPD General Counsel Terry Ryan or Deputy General Counsel Ron Harris would contact the MPD command officials who were responsible for the areas involved in the litigation and request certain information.  It was understood that the command officials would not only produce the requested information but also preserve the information as well.  (Harris SM, Oct. 18, 2010 (a.m.), at 15:21-16:09).

53.    In 2002, neither the MPD Office of General Counsel nor the Office of the Attorney General ("OAG") was issuing formal litigation hold letters in civil cases.  Harris, who normally was responsible for contacting MPD command officials for relevant evidence in civil cases, testified that he was not familiar with the term "litigation hold letter" in 2002.  (*Id.* at 12:7-13:4, 13:10-22.)

54**.**    The first significant reference regarding the use of a formal litigation hold notice, at least as it applied to electronically stored evidence, was in 2004 with the publication of The Sedona Conference's *Best Practices Recommendations & Principles for Addressing Electronic Document Production,* at 44 (2004 Annotated Version).  The Sedona Conference reflected the

"*developing* case law in this area."  *Miller v. Holzmann*, 2007 WL 172327, at *6 (D.D.C. Jan. 17, 2007) (Facciola, M.J.) (emphasis added).   The first time the words "litigation hold" were mentioned in the Federal Rules of Civil Procedure was in the Advisory Committee Notes to the 2006 amendments to Rule 37(f).

55.     As best as the District can determine, the first two times this Court mentioned "litigation hold" in published opinions were in *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 830 (D.D.C. 2006) (Kessler, J.) (August 17, 2006), and *Disability Rights Council v. Washington Metro Transit Authority*, 242 F.R.D. 139, 146 (D.D.C. 2007) (Facciola, M.J.) (June 1, 2007).

56.     Current OAG protocol regarding the issuance of litigation hold letters is more formalized now than it was prior to 2003.  (Koger SM, Oct. 18, 2010 (p.m.), at 23:22-24:1.)  The Office of General Counsel of MPD began issuing formal litigation hold notices in civil cases in March 2008.  (District Nov. 2012 SM Ex. 22.)

57.     As a result of the *Chang* litigation, MPD established a litigation hold practice of seizing and labeling any personal computer that might contain relevant evidence.  (Crawford SM, Oct. 12, 2010 (p.m.), at 67:6-9.)

## B.     EARLY EFFORTS TO LOCATE EVIDENCE IN THE *CHANG* CASE

**Summary**:     OAG made its first request to MPD for any "records" regarding the *Chang* plaintiffs on October 30, 2002, one month after the IMF event and within two weeks after the *Chang* lawsuit was filed.  On that same date, MPD's OGC began an internal search for records pertaining to "the Pershing Park arrests."  Another request for MPD-wide documents was made by OGC on July 16, 2003, in response to a subpoena issued by the D.C. City Counsel for documents related to the IMF arrests.  On July 29, 2003, MPD's OGC issued a third general

request for documents that effectively served as the first formal litigation hold notice in the *Chang* case because it specifically asked that relevant documents be retained outside any normal retention schedule.

On January 13, 2004, the *Chang* plaintiffs issued their first formal discovery request in the case. As a result, on March 12, 2004, the District issued another notice for a "prompt" search for documents, which effectively served as a formal "litigation hold" notice. The various notices in 2002 through 2004 collected a large amount of information concerning the September 2002 IMF event and the *Chang* arrests, and copies from the original audio and video tapes were made. However, certain original data (such as the master audio tapes) was not retained after the data was copied due to MPD's document retention policy and not because of any conscious or intentional destruction of the information. The District located printed copies of the GroupSystems IOC report and the CIC daily report, but a printed copy of the E Team JOCC Running Resume could not be found. It was later realized that a printed copy of the E Team JOCC Running Resume was never created because the data was stored only in electronic form for the first time.

With the exception of the JOCC Running Resume and photographs of the JOCC taken during the September 2002 IMF event by NC4 representative Eric Kant (both issues discussed in more detail below), all relevant evidence in the *Chang* case was located, copied and produced by the District by December 2006.

58. The first request by the District for information related to the *Chang* case was issued by OAG (then Office of the Corporation Counsel) attorney Len Becker in an email to MPD General Counsel Terry Ryan on October 30, 2002. At that time, Becker provided Ryan

with the names of the *Chang* plaintiffs and asked if MPD had any "records" pertaining to the plaintiffs.  (Chang Oct. 2010 SM Ex. 68.)

59.     On that same date, Ryan forwarded Becker's email to MPD Assistant Chief of Police Alfred John Broadbent.  Ryan asked Broadbent to assist "with the fact gathering and discovery."  (*Id.*)  Ryan noted in his email that Assistant Chief Peter Newsham, the MPD officer who ordered the arrests of the *Chang* plaintiffs and "who [was] most knowledgeable about the Pershing Park arrests," was on administrative leave.  (*Id.*)

60.     Broadbent assigned an MPD officer to coordinate the gathering of information for District counsel Becker, who was the first OAG attorney assigned to the *Chang* case.  (Harris SM, Oct. 18, 2010 (a.m.), at 19:19-21:1.)

61.     On July 15, 2003, the D.C. City Council issued the first of four subpoenas to MPD requesting documents in connection with the September 2002 IMF event.  (Chang Oct. 2010 SM Ex. 72.)  The other three subpoenas were issued on July 24, August 6, and September 29, 2003.  Significantly, the first subpoena issued by the City Council did not specifically request a copy of the September 2002 IMF JOCC Running Resume, although it did ask for "all . . . intelligence and operational documents" and "any documents created within MPD and shared with federal law enforcement authorities."  (*Id.*)  The second and third subpoenas asked for after-action reports and video tapes.  The fourth subpoena specifically requested for the first time the "SOCC/JOCC printouts for the April 2000 [sic] and the September 2002 IMF/World Bank protests."  (*See* Dkt. No. 505-3.)

62.     On July 28, 2003, MPD General Counsel Terry Ryan sent an email to Executive Assistant Chief Michael Fitzgerald seeking assistance in a "document search" of "department files" that would be responsive to the subpoena issued by the Committee on the Judiciary of the

D.C. City Council.  In his email, Ryan recommended that Fitzgerald search 13 different units within MPD.  (Dkt. No. 418-5.)

63.     On July 29, 2003, MPD Deputy General Counsel Ronald Harris also sent an email to Cheryl Mitchell, Deputy Director of Administration and Operations for Corporate Support at MPD, for the collection of evidence to respond to the City Council's July 15, 2003 subpoena.  In this email, Harris requested Mitchell to provide a "memo . . . indicating that someone made a complete and thorough search of emails, documents, letters, etc., of every unit under your authority. . . .  Your memo should set forth the persons who conducted the search, where they did the search, and what was found or a negative response in relation to every item listed in the [subpoena]."  (*See* Chang Oct. 2010 SM Ex. 68.)[9]

64.     MPD responded to the four City Council subpoenas by sending numerous documents on November 21, 2003.  (Dkt. No. 501.)  Regarding the September 2002 JOCC Running Resume, although the City Council specifically had requested a copy of the JOCC Running Resume in the September 2003 subpoena, Harris did not realize that the document

---

[9]     Throughout this litigation, the *Chang* plaintiffs have questioned the preservation efforts used by the District in connection with the September 2002 IMF event.  Perhaps the most memorable description of the extent to which the District went to locate and preserve relevant evidence was in the testimony of James P. Costas before the Special Master on October 13, 2010.  The following exchange took place between the Special Master and Mr. Costas:

"Q:      [Did] Harris and Ryan ever come to you and say, 'Can you help us find any videos of what happened in the city captured by the system that weekend'?

A:       This is what I remember, your Honor:  I remember there was - - and I can't remember to the specific day, but there was always a sense that nothing - - if anything that was captured from that weekend, and not just video, which I don't even remember if we did or not, but anything, anything was to be safeguarded - - *and I remember they were very anal about it, if that's okay to say. . . .*"

(*See* Costas SM, Oct. 13, 2012, at 20:10-19 (Dkt. No. 749)) (emphasis added).

provided to him by MPD Sergeant Jones was not the September 2002 JOCC Running Resume but instead was a copy of the April 2002 GroupSystems IOC report.  (Harris SM, Oct. 18, 2010 (a.m.), at 24:12-26:5.)

65.     After Harris realized that he had mistakenly provided a copy of the April 2002 IOC report to the City Council, he began another search for the September 2002 JOCC Running Resume.  Harris was looking for a hard copy of a document which, as explained more fully below, did not exist.  (*Id.* at 27:12-25.)

66.     The *Chang* plaintiffs' first formal request for documents was dated January 13, 2004.  (Koger SM, Oct. 18, 2010 (a.m.), at 95:07-20, Dkt. No. 418-19.)  This discovery request was issued jointly by the Pershing Park plaintiff groups in the *Abbate*, *Diamond*, and *Chang* cases.  This request for documents did not specifically ask for the JOCC Running Resume by name, although the JOCC Running Resume was generally included in the request for "all documents constituting diaries or logs or summaries of the events of September 27-29, 2002." (*See* Requests for Documents at 9 (Dkt. No. 418-18).)  Deputy General Counsel Harris could think of only one other lawsuit against the District up to that point in time in which a running resume had been requested in discovery.  (Harris SM, Oct. 18 a.m., at 21:2-22:10.)

67.     On March 12, 2004, in response to this document request, OAG attorneys Len Becker and Lucy Pittman sent a memorandum to Rafael Sa'adah, Chief of Staff for the Office of the Deputy Mayor for Public Safety (ODMPSJ) and Denise Grant, Confidential Assistant at the Executive Office of the Mayor (EOM), with a copy to Margaret N. Kellems (Deputy Mayor), Robert C. Utiger (Deputy OAG), and Thomas Koger (OAG trial counsel in the *Chang* case). The memo asked that each recipient assist in the "prompt" search for documents and to provide responses to Koger.  In this memo, Becker and Pittman stated that the search "should be limited

to hard-copy documents; the Office of the Chief Technology Officer will be asked separately to do an appropriate search of e-mail traffic."  With respect to suspending any retention policies, the memo also stated:  "Please note that the District government is under an obligation to maintain documents responsive to the attached document requests.  Please make every effort, including advising your staff, to avoid destruction or discarding any documents that may be responsive to the request."  (*See* Chang Oct. 2010 SM Ex. 68.)  Because this memo requested that documents not be destroyed under the Department's regular document destruction policies, this memo effectively served as a formal litigation hold notice issued by the District in the *Chang* case, several years before litigation hold letters became standard procedure in civil litigation.

68.     By September 2004, the District had produced to the *Chang* plaintiffs copies of all relevant emails, copies of all original audio tapes, and copies of all original video tapes that were recorded of the Pershing Park arrests.  (*See* District's Supplemental Proposed Findings of Fact and Conclusions of Law (Dkt. No. 944.)[10]

69.     On September 24, 2004, Judge Sullivan issued a Memorandum Opinion and Order in the *Barham* and *Chang* cases that granted in part and denied in part certain dispositive

---

[10]     In its Supplemental Proposed Findings of Fact regarding the audio and video evidence, the District noted that copies of the original audio and video tapes were delivered to the *Abbatte*, *Diamond*, and *Barham* plaintiffs by September 2004, but these plaintiff groups apparently did not share this discovery with the *Chang* plaintiffs.  The District invited the *Chang* plaintiffs to explain this, but the *Chang* plaintiffs conspicuously refused to admit that all audio and video evidence was delivered to the *Abbatte*, *Diamond*, and *Barham* plaintiffs in 2004, or explain why they did not receive their copies of this discovery (or ask for them) from their fellow plaintiffs in 2004.  (*See* Plaintiffs' Response to the District Supplement Findings of Fact (Dkt. No. 948, at ¶¶ 87, 88, and 143).)  The District cannot be faulted for the failure of the plaintiff groups to share discovery as directed by Judge Sullivan early in these cases.  (*See* Dkt. No. 68.)

It is equally noteworthy that the *Chang* plaintiffs chose to ignore in their Response any reference to the fact that the other Pershing Park plaintiffs did not claim that the audio and video tapes were deficient or contained any gaps when this evidence was first received by them.  (*See* Plaintiffs' Response, at ¶¶ 85, 142.)

motions filed by Chief Ramsey and Assistant Chief Newsham.  (C.A. No. 02-02283, Dkt. Nos. 165 and 166.)  Both Ramsey and Newsham filed appeals from that Order with the United States Court of Appeals for the District of Columbia Circuit.  (Dkt. Nos. 172 and 174.)

70.    Because these appeals raised dispositive issues (summary judgment and qualified immunity), formal discovery in the *Barham* and *Chang* cases was indefinitely suspended by the parties until the disposition of the appeals.  The Court of Appeals ruled on the appeals in an opinion issued on January 13, 2006.  *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006). Consequently, from October 2004 to January 2006 (a period of 15 months), there was no formal discovery activity between the parties in the *Chang* case.

71.    On December 29, 2006, the District made yet another effort to locate relevant electronic evidence in the *Barham* and *Chang* cases.  Interim Attorney General Eugene A. Adams asked MPD and the Office of the Chief Technology Officer to "preserve all documents and information relevant to the plaintiffs and these cases," and including the imposition of a litigation hold to "preserve all information in reference to these cases that is on your agency's computer systems, that is on a removable electronic media, or otherwise kept."  (Chang Oct. 2010 SM Ex. 73.)

72.    It was generally known throughout MPD that there was a persistent and concerted effort to find evidence regarding the Pershing Park arrests, and in particular to find the JOCC Running Resume.  (Herold SM, Jan. 3, 2013, at 200:21-201:4.)

73.    As described above, between October 30, 2002, and December 29, 2006, the District and MPD had made six written requests for the identification and collection of relevant evidence in the *Chang* case.  With the exception of the JOCC Running Resume, by December 2006, *all* relevant evidence had been produced to the *Chang* plaintiffs – including copies of the

original audio and video tapes that already had been produced to the Pershing Park plaintiffs in 2004.

## C.    JOCC RUNNING RESUME

### 1.    Organization of the SOCC in September 2002

**Summary**:    In September 2002, MPD's Synchronized Operations Command Center ("SOCC") consisted of the Command Information Center ("CIC"), the Intelligence Operations Center ("IOC"), and the Joint Operations Command Center ("JOCC").  The CIC was a 24 hour/7 day-a-week operations center that monitored activities occurring throughout the city.  A daily CIC report was created by MPD personnel, and copies would be printed each morning reflecting the previous 24-hour activity for use by command officials in making decisions regarding the use of manpower and resources at any given moment.

The IOC and the JOCC were activated only for specific events in the District of Columbia, such as presidential inaugurations, State of the Union addresses, mass demonstrations, and emergency weather events.  The IOC was manned by MPD personnel and a separate running resume usually was created of information gathered in the IOC.   The JOCC was activated in order to provide a center for the coordination of information among numerous state and federal law enforcement agencies.  A separate running resume was created by MPD personnel in the JOCC that could be viewed in real time on wall monitors by representatives of participating agencies in the JOCC.  Live video was fed into the JOCC from various camera sources used by MPD in the field, as well as live local and national broadcast and cable television coverage of the event.

74.    The purpose of the Synchronized Operations Command Center (SOCC) was to have a place within MPD Headquarters that could collect, organize, and use information

provided by MPD personnel and other local and federal agencies during an emergency or critical event in the city.  The SOCC is located on the Fifth Floor of MPD Headquarters in an enclosed and secure facility.  (Jones SM, Oct. 12, 2010 (a.m.), at 29:04-09; Trugman SM, Oct. 12, 2010 (a.m.), at 105:06-11.)

75.     The SOCC was divided into three separate operating units.  One unit, now called the Command Information Center (CIC),[11] operated 24 hours a day, 7 days a week, and collected information about events in the city that were reported into the CIC from MPD personnel on the street.  In September 2002, the CIC generated a 24-hour overnight report that was printed and provided to MPD senior staff for review and analysis.  (Gaffigan SM, Oct. 15, 2010, at 97:01-08; Kant SM, Nov. 28, 2012, at 148:10-13.)

76.     A second unit within the SOCC was called the Intelligence Operations Center (IOC).  This unit, unlike the CIC, was not in operation at all times and would be used only on select occasions.  It collected secure information from various local and federal intelligence sources that were analyzed separately from the daily information collected by the CIC.  Prior to 2003, when the IOC began using the E Team software, information collected by the IOC would be reduced to a hard copy document that could be distributed to authorized MPD senior staff. Copies of the CIC and the IOC reports for the September 2002 IMF event were produced to the *Chang* plaintiffs years ago, and in 2010 the *Chang* plaintiffs identified these reports as exhibits in the Special Master proceedings.  (*See* Chang Oct. 2010 SM Exs. 80 and 81.)

---

[11]     One of the confusing aspects of discussing the operation of the SOCC in this case has been that what is now called the CIC was called the SOCC in September 2002.  (Jones SM, Oct. 12, 2010 (a.m.), at 13:12-14:07.)  References to the SOCC and the CIC were used interchangeably – and incorrectly – by many people at MPD Headquarters.  (*Id.* at 38:05-10.) Currently, the SOCC means the entire secure facility on the Fifth Floor in MPD Headquarters, and the CIC is one of three separate units within the SOCC.  Throughout these Proposed Findings of Fact, the District will refer to the SOCC as the entire facility on the Fifth Floor, and the CIC as the daily report center separately housed in one room within the SOCC facility.

77. The third unit in the SOCC during the September 2002 IMF event was the Joint Operations Command Center (JOCC). The JOCC would be activated only during an emergency or crisis event, or when it was necessary to monitor and coordinate a large movement of people within the city.[12] The primary purpose of the JOCC was to provide a central location within MPD Headquarters where all local and federal law enforcement personnel, such as the FBI, the U.S. Park Police, the U.S. Capitol Police, the United States Secret Service, the Washington Metropolitan Area Transit Authority Police, AMTRAK Police, and the Federal Emergency Management Agency, could work together to share and coordinate data simultaneously. The JOCC was located within the SOCC secure area, in a room larger than the CIC and IOC rooms, which could accommodate more people. There were several rows of seating in the JOCC, and stationed at 34 workstations where JOCC personnel who entered data into a system that was collected and stored for future review. There were video monitors on the walls to show live feed video from the field as well as local and national news broadcasts. (Jones SM, Oct. 12, 2010 (a.m.), 15:21-16:18; Crawford SM, Oct. 12, 2010 (p.m.), at 43:14-16; 49:03-09; Gaffigan SM, Oct. 15, 2010, at 46:25-47:08.)

78. During an activation of the JOCC, the room would hold about 30 people from MPD and several federal agencies. (Gaffigan SM, Oct. 15, 2010, at 78:13-18; Kant SM, Nov. 28, 2012, at 123:1-2 (there were approximately 20 to 30 people in the JOCC during the September 2002 IMF event "entering data into the E Team application").)

79. The people working in the JOCC would enter data into the computers and this information would be stored in a report called the JOCC Running Resume. The JOCC Running

---

[12] In the past, the JOCC was activated for other mass demonstration events, such as the April 2002 IMF event, for Presidential Inaugurations and State of the Union Addresses, and for abnormal weather events, such as snowstorms and hurricanes.

Resume was separate from the daily report created in the CIC.  (Jones SM, Oct. 12, 2010 (a.m.), at 46:09-12.)   As discussed in the next section, different servers would be used to record information in the JOCC and the CIC.

### 2.      The E Team Program Replaced the GroupSystems Program in the JOCC for the September 2002 IMF Event

**Summary**:      Prior to the September 2002 IMF event, the system that had been used by MPD since 1995 for the creation of running resumes in the IOC and the JOCC during special events, and for the creation of daily reports in the CIC, was known as GroupSystems.  In 2002, MPD decided to change software programs for data retention in the SOCC and selected a program known as E Team.  For the September 2002 IMF event, MPD decided to test the E Team program in the JOCC, but MPD continued to use GroupSystems in the IOC and the CIC for the September 2002 IMF event.

Because the new E Team system was web-based, and not terminal-based like the older GroupSystems program, it was no longer necessary to print a hard copy of the JOCC Running Resume because it could be accessed by any authorized MPD user through the web at any time and from any location.   Under the older GroupSystems program, it was necessary to print a daily copy of the running resume in order for MPD officials to see what had been recorded on the system (e.g., the April 2002 IMF event, and the 2001 Presidential Inauguration event).  After the September 2002 IMF event, MPD decided to discontinue using the GroupSystems program altogether in the SOCC, and E Team was expanded for use in the IOC and the CIC.  Consequently, the GroupSystems server was decommissioned and placed in the MPD IT locked storage facility on the first floor of MPD Headquarters.  Although MPD continued to use the E Team system until 2008, in 2005 MPD stopped purchasing an annual maintenance and service

contract for the E Team program because of cost factors.  In 2008, the two E Team servers were decommissioned and stored with the GroupSystems server in the IT storage facility at MPD Headquarters.

The overwhelming evidence shows that a GroupSystems Running Resume was not created in the JOCC during the September 2002 IMF event, which explains why a printed copy of a GroupSystems JOCC Running Resume was never found and why JOCC running resume data for September 2002 could never be found on the GroupSystems server.

80.     Beginning in 1995, MPD used a software system known as GroupSystems for data collection in the all three units of the SOCC (the JOCC, CIC, and IOC).  The GroupSystems program used one server.  There was no backup server for the GroupSystems program.  (Jones SM Oct. 12, 2010 (a.m.), at 8411-18.)

81.     Sometime prior to the September 2002 IMF event, MPD replaced the GroupSystems program in the JOCC with a new software application known as E Team because E Team was a more sophisticated web-based program.  (Trugman SM, Oct. 12, 2010 (a.m.), at 105:24-107:05; Crawford Declaration, Chang Oct. 2010 SM Ex. 11, at ¶ 7; Dep. of George Crawford, Feb. 16, 2010, at 95:06-09 (Chang Oct. 2010 SM Ex. 14).)  The Sporkin Report quoted Trugman as saying that the E Team Running Resume remained in the system electronically, and this was the "whole point of going to the computerized system."  (Sporkin Report, at 8 (Dkt. No. 567-1).)

82.     The September 2002 IMF event was the first time the E Team system was used in the JOCC.  (Kant SM, Nov. 28, 2012, at 123:13-15, 196:7-9.)  MPD decided, however, to continue using the GroupSystems program in the IOC and the CIC during the September 2002 IMF event, as evidenced by the fact that printed GroupSystems reports for the IOC and the CIC

for the September 2002 IMF event were produced to the *Chang* plaintiffs in discovery.  (Chang Oct. 2010 SM Exs. 80 and 81.)

83.     ***As early as October 17, 2007, the Pershing Park plaintiffs (including the Chang plaintiffs) were informed by the District that the GroupSystems program was not used in the JOCC during the September 2002 IMF event.  (See Barham Dkt. No. 344, at 2.)***

84.     The E Team system was not intended to be a records management system or a litigation management system.  It was designed to manage disasters and major events in real time.  (Kant SM, Nov. 28, 2012, at 197:10-21.)

85.     E Team provided training to MPD employees who used the E Team system in the JOCC during the September 2002 IMF demonstrations.  Eric Kant, the technician from NC4 and the person who trained MPD and federal personnel on the E Team system, and who "was implementing the E Team application for use in the JOCC" during the September 2002 IMF event, stated several times during his testimony before the Special Master that the training included instruction on how to use the "delete" function of the system, and that a user could not permanently erase or delete data that had been entered into the Running Resume from the system.  (Kant SM, Nov. 28, 2012, at 125:9-18, 127:4-128:21, 136:18-137:25.)

86.     Kant testified before the Special Master that "as far as I am aware, in the JOCC I only saw the E Team application being used."  (Kant SM, Nov. 28, 2012, at 124:6-7.)  Kant added that the E Team system was the only system he observed on the weekend of September 27-29, 2002, that was creating a JOCC Running Resume.  (*Id.* at 196:1-6.)  In response to a

question from the Special Master, Kant stated that he was not aware of "another system" in the JOCC for September 2002.  (*Id.* at 199:6-8.)[13]

87.    Neil Trugman, who was the "Floor Manager" for the JOCC during the September 2002 IMF event, stated under oath that "[i]n September 2002 the department was transitioning from the use of the GroupSystems application for the management of data streaming into the Joint Operations Command Center daily and during special events to a new application called E-Team."  (Trugman SM, Oct. 12, 2010 (p.m.), 4:21-5:24; Declaration of Trugman, at 1 (Chang Oct. 2010 SM Ex. 9).)

88.    George Crawford, an IT specialist with MPD during the September 2002 IMF event, stated under oath that "[e]arlier [meaning prior to September 2002] vintage JOCC Running Resumes had been generated and maintained utilizing a software and hardware configuration known as GroupSystems."  (Declaration of Crawford, at 2) (Chang Oct. 2010 SM Ex. 11).)

89.    During his deposition taken on February 16, 2010, Crawford testified that "E-Team came in pretty much after 9/11.  Neal Trugman brought it in, and it was the - - the purpose was to replace Group Systems with E-Team."  (Crawford Dep. at 95:06-09 (Chang Oct. 2010 SM Ex. 14).)  The following significant exchange with *Chang* counsel also occurred during Crawford's deposition:

Q:    Which systems were in use in September 2002 for purposes of running resumes?

A:    I believe Group Systems and E-Team were running simultaneously and then there was also just a regular Word document, *and I believe E-Team was running on the*

---

[13]    E Team employees Charles O'Connell and John Hughes also were present in the JOCC during the September 2002 IMF event and provided technical assistance to MPD users regarding the E Team system.  (Dep. of Eric Kant, at 35-36; 39-40 (District Nov. 2012, SM Ex. 1); Kant SM, Nov. 28, 2012, at 125:19-126:2, 232:12-14.)

> *joint operations command [JOCC] side.*  Group Systems were running on the SOCC side and some combination was running in Intel [IOC]."

*        *        *        *

Q:    *In the JOCC, because Group Systems wasn't being used in September 2002, it was just E-Teams [sic]; correct?*

A:    Okay, yes.

Q:    That's your understanding?

A:    *Yes.*

(*Id.* at 103:05-12; 108:14-19.) (emphasis added).

90.     Marian R. Howell, who replaced Stephen Gaffigan as the MPD person in charge of the JOCC, stated under oath that "[t]he system that we used [in the JOCC in September 2002] was E-Team, which is an electronic database and all of the information that was entered into E-Team was maintained into E-Team."  (Chang Oct. 2010 SM Ex. 35, 95:12-15.)

91.     MPD Deputy General Counsel Ron Harris stated under oath that MPD "no longer produced the running resume in the format produced for the April 2002 [IMF] event due to a change to a new data management system called E-Team."  (Declaration of Ronald B. Harris, November 16, 2007, at ¶ 7 (Chang Oct. 2010 SM Ex. 56).)

92.     NC4 representative Marc Bynum confirmed that E Team was being used throughout the entire SOCC on the Fifth Floor when he was at MPD Headquarters in 2005. (Bynum SM, Nov. 28, 2012, at 107:21-108:4.)

93.     As noted, MPD decided to first use the new E Team system in the JOCC during the September 2002 IMF demonstrations.  Once MPD began using the E Team system in the JOCC with the September 2002 IMF event, it was unnecessary to print hard copies of the Running Resume because the E Team system was web-based and could be accessed by any

36

MPD official or user of the system at any time, even if that person was not in the JOCC. (Trugman SM, Oct. 12, 2010 (a.m.), at 106:16-18; 107:02-07.)

94.     The E Team system data was stored on a server maintained on the first floor of MPD Headquarters in the IT department, and there was one E Team backup server at the same location.  Because the E Team system was web-based, unlike the GroupSystems program, there was a second backup server at E Team facilities in Philadelphia, PA.  (Dep. of Marc Bynum, at 105:12-22; 106:01-06 (Chang Nov. 2012 SM Ex. 12).)

**3.     The Kant Photographs Confirm Only E Team was Used in the JOCC**

**Summary:**     Eric Kant, the NC4 representative who was in the JOCC during the September 2002 IMF event, took approximately 30 photographs in the JOCC on September 28 and 29, 2002, while the IMF event was ongoing.  The Kant photographs show that only the E Team system was operating in the JOCC that weekend.  There is no evidence from the Kant photographs that a second GroupSystems program was operating in the JOCC *at the same time*.

95.     In January 2012, the District discovered for the first time that Eric Kant, an NC4 employee who worked for E Team in 2002, was in the JOCC during the September 2002 IMF event providing technical assistance to MPD employees regarding the operation of the E Team system.  On Saturday, September 28, and Sunday, September 29, 2002, Kant took approximately 30 personal photographs in the JOCC.  (Kant SM, Nov. 28, 2012, at 165:1-5, 233:4-8.)  (Chang Nov. 2012 SM Ex. 13 (DC 2011-005392- DC 2011-005421).)  The IMF event was still ongoing and the JOCC was still activated on September 28 and 29, 2002.[14]

---

[14]     As soon as Kant informed the District that he took personal photographs in the JOCC during the September 2002 IMF event, the District immediately brought this to the attention of the Special Master and the parties and provided everyone with copies of the photographs.  (Dkt. No. 876-2.)  It should be noted that Kant was not an MPD or District employee and therefore he

96.     The Kant photographs show various scenes on the video monitors on the walls of the JOCC.   Four of the photographs show the use of the E Team system in the JOCC at the moment the photographs were taken.  (DC 2011-005393, 005394, 005405, 005406.)

97.     During Kant's November 28, 2012 testimony, the Special Master noted that one of the photographs (005394) depicted the E Team data sheet on one of the video screens on the wall of the JOCC.  (Kant SM, Nov. 28, 2012, at 168:1-5).[15]

98.     Only the E Team program is shown in any of the Kant photographs; in none of the photographs is there any indication of a GroupSystems program or any other program operating in the JOCC at the same time.

**4.     The September 2002 E Team JOCC Running Resume was Not Printed**

**Summary:**     Prior to 2002, when the GroupSystems program was used in the SOCC, MPD Sergeant Doug Jones typically would print a copy of a JOCC Running Resume (like he did for the April 2002 IMF event) and provide copies to senior MPD officials.  Jones told Judge Sporkin, however, that he did not specifically recall seeing a printed copy of the Running Resume for September 27, 2002, and Jones does not remember printing out any copy of a GroupSystems Running Resume for the September 2002 IMF event.  (Of course, that is because the GroupSystems program was not used in the JOCC during the September 2002 IMF event.)  In addition, numerous senior MPD officials, including JOCC management officials, who worked in the JOCC during the September 2002 IMF event, have testified or stated to Judge Sporkin that

did not receive any of the preservation or litigation hold notices issued by the District for the period between October 2002 and December 2006 as discussed above.

[15]     The JOCC Operations Command Center Activations Procedures required that the wall video screens in the JOCC should display the running resume in real time.  (*See* Chang Oct. 2010 SM Ex. 4, at 1102.)  This is what is depicted in Kant photograph 005394 that was mentioned by the Special Master during Kant's testimony.

they never saw a printed copy of either the E Team or GroupSystems Running Resume for that weekend.  Thus, it is reasonable to conclude that the September 2002 IMF E Team JOCC Running Resume was never printed, which explains why the District could not produce a hard copy in this litigation.

99.     MPD Sergeant Doug Jones was the "watch officer on midnights in the CIC." Prior to September 2002, when the JOCC was activated, Jones would create a template for the GroupSystems running resume.  (Jones SM, Oct. 12, 2010 (a.m.), 13:02-07.)   According to Jones, because there was no backup server for GroupSystems, he took it upon himself to manually save "resumes to a file on the CIC network."  (*Id*. at 22:06-15, 84:15-18, 96:20-25, 101:03-13.)

100.    It was also Jones's standard practice to print out copies of the GroupSystems Running Resume and distribute them to senior MPD officials.  (*Id.* at 13:08-11; Howell SM, Oct. 13, 2010 (a.m.), at 8:14-19, 37:02-13.)

101.    Prior to September 2002, when the GroupSystems software program was the only program used in the entire SOCC to record and store information, MPD Sergeant Doug Jones typically would save an electronic copy of the JOCC running resume "to an electronic file on the CIC network."  When asked by the Special Master, Jones stated that CIC information was stored on a "separate server."  (Jones SM, Oct. 12, 2010 (a.m.), at 22:08-20.)  Jones had testified three years earlier that "[t]he report that's generated from GroupSystems would be on the SOCC server."  (Dep. of Doug Jones, September 12, 2007, at 41:15-42:1 (Dkt. No. 507-7).)[16]

---

[16]     Significantly, this testimony from Jones – rendered three years apart – confirms that there were two servers operating in the SOCC during the September 2002 IMF event – the GroupSystems server for the IOC and the CIC, and the E Team server for the JOCC.  Because there was only one GroupSystems server being used in September 2002, and the CIC used a

102.    As noted, prior to September 2002, it was the practice to print out a copy of the GroupSystems Running Resume in a chronological timeline. (Harris SM, Oct. 14, 2010 (p.m.), at 81:12-83:25.) The GroupSystems Running Resume for the April 2002 IMF event was found by Jones, who sent an email copy to MPD Deputy General Counsel Ron Harris. (Jones SM, Oct. 12, 2010 (a.m.), at 34:03-10; 58:16-24.)[17]

103.    Jones could not remember with any certainty whether he printed out copies of the September 2002 IMF E Team Running Resume. (Jones SM, Oct. 12, 2010 (a.m.), at 79:19-22; (Sporkin Report at 7) (Chang Nov. 2010 SM Ex. 1) (stating that Jones "*made it clear* [that] he cannot specifically recall ever having seen the September 27, 2002 Running Resume.") (emphasis added).)

104.    Jones stated in his Declaration that "[w]hile in the GroupSystems application I conducted a search for the September 2002 IMF [running resume] and could not locate the file." (Declaration of Doug Jones, Nov. 16, 2007, at 2-3) (Chang Oct. 2010 SM Ex. 2).)

105.    The other federal agencies that were in the JOCC normally would not be provided a copy of the Running Resume. (Jones, Oct. 12, 2010 (a.m.), at 89:20-90:02.)

106.    Jones testified that he also searched for an electronic version of the GroupSystems Running Resume, but he was unable to find it. (Dep. of Doug Jones, September 12, 2007, at 47:9-12 (Dkt. No. 507-7).) George Crawford, an MPD IT Specialist, also was unable to find a Running Resume on the GroupSystems server. (Dep. of George Crawford, Feb. 16, 2010, at

"separate server" from the JOCC, it follows that the JOCC was using its own server – the E Team server.

[17]    As noted earlier, Harris misread the email from Jones, thinking that Jones had sent the September 2002 IMF *E Team* JOCC Running Resume when in fact Jones had sent the April 2002 IMF *GroupSystems* Running Resume. As a result, Harris mistakenly sent the wrong running resume to the D.C. City Council in 2003. (Harris SM, Oct. 14, 2010 (p.m.), at 24:19-25:06.)

124:13-15) (Chang Oct. 2012 SM Ex. 14).)  Despite repeated searches by numerous people for a printed copy of a GroupSystems Running Resume for the September 2002 IMF event, no copy was ever located.

107.  Jones testified that at one point that the CIC server that stored the GroupSystems data was replaced and that the data that was on the older CIC server, which contained earlier GroupSystems Running Resumes, was not transferred to the new CIC server.  (*Id.* at 36:19-23.)[18]

108.  At least 12 senior officials who worked in the JOCC during the September 2002 IMF event or who were familiar with the JOCC and the creation of a JOCC Running Resume testified or stated at some point in this investigation that they never saw or did not recall seeing a printed copy of the September 2002 IMF JOCC E Team or GroupSystems Running Resumes. Those people are:

(1)     Chief Charles Ramsey  (Sporkin Report, at 13) (Dkt. No. 567-1.)

(2)     Assistant Chief Peter Newsham (Sporkin Report, at 11) (Dkt. No. 567-1.)

(3)     Alfred John Broadbent, Sr. (Broadbent SM, Oct. 12, 2010, (p.m.), at 148:02-05); (Sporkin Report, at 7-8)  (Dkt. No. 567-1.)

(4)     Sergeant Doug Jones (Jones SM, Oct. 12, 2010 (a.m.), at 79:19-22)

(5)     Neil Trugman (Trugman SM, Oct. 12, 2010 (a.m.), at 110:2-5; Oct. 12, 2010 (p.m.), at 6); (Sporkin Report, at 9) (Dkt. No. 567-1.)

(6)     George Crawford (Crawford SM, Oct. 12, 2010 (p.m.), at 69); (Sporkin Report, at 11-13) (Dkt. No. 567-1.)

---

[18]     Jones is referring here to the conversion from GroupSystems to E Team that occurred in the CIC in February 2003.  As discussed more fully below, NC4 representative Charles O'Connell came to MPD Headquarters in February 2003 to assist with this conversion.  It was at this time that O'Connell stored – or "deleted" – many of the September 2002 IMF event files to the E Team history files for permanent storage.

(7)     Captain Jeffrey Herold (Herold SM, Jan. 3, 2013, at 201:10-14.)

(8)     Stephen Gaffigan (Gaffigan SM, Oct. 15, 2010, at 54:08-14); (Sporkin Report, at 9) (Dkt. No. 567-1.)

(9)     Rai Howell (Sporkin Report, at 11) (Dkt. No. 567-1), at 11.)

(10)    Sergeant Ronald Murphy (Sporkin Report, at 10 n.2) (Dkt. No. 567-1.)

(11)    Giuseppe ("Junior") Crisafulli (Sporkin Report, at 12) (Dkt. No. 567-1.)

(12)    Commander William Ponton (Sporkin Report, 13 n.3) (Dkt. No. 567-1) (referencing Ponton's testimony in the *Barham* case).[19]

109.    The evidence clearly shows that the E Team JOCC Running Resume was never printed during or after the September 2002 IMF event.  The evidence also clearly shows that GroupSystems was not used in the JOCC during the September 2002 IMF event, which explains why a printed or electronic version of a GroupSystems JOCC Running Resume was never found.

### 5.     Efforts to Recover an Electronic Version of the E Team JOCC Running Resume Before 2011

**Summary**:        By February 2003, E Team had fully replaced GroupSystems in the SOCC.  In 2005, because of budget and cost restraints, MPD ceased paying NC4 (the company that in 2005 purchased the assets of E Team) for an annual maintenance and support contract for the E Team system.  As a result, MPD could not independently access the E Team servers through the website after 2005, and MPD also lost the right to obtain data from the NC4 server in

---

[19]     In order to support their spoliation argument, the *Chang* plaintiffs maintain that MPD destroyed or erased all copies of the September 2002 JOCC Running Resume.  For the Special Master to accept this argument he must conclude that one, some, or all of these twelve MPD officials and contractors either participated in destroying the JOCC Running Resume or were aware that it was destroyed.  Throughout this investigation, the *Chang* plaintiffs have failed to produce even one witness to testify that the September 2002 JOCC Running Resume was destroyed.

Philadelphia that was backing up the MPD servers.

As noted above, the parties in the *Barham* and *Chang* cases agreed to suspend discovery activity from October 2004 to January 2006 because of the Ramsey and Newsham appeals. As a result, efforts to locate the JOCC Running Resume were suspended for approximately 15 months. When discovery resumed, the District had difficulty locating the JOCC Running Resume for the September 2002 IMF event because it no longer had access rights to the E Team servers. In any event, virtually all of the discovery activity in the *Chang* case was completed by December 2006, with the exception of finding a printed or electronic version of the JOCC Running Resume.

On October 30, 2007, Judge Sullivan entered an Order in the *Barham* case instructing the District to produce the JOCC Running Resume for the September 2002 IMF event, or if the District could not locate the JOCC Running Resume, then explain the efforts undertaken to find it. The District submitted several declarations in the *Barham* case explaining its efforts to locate the information. One effort made by MPD in the fall of 2007 to locate the E Team JOCC Running Resume was to ask NC4 whether the September 2002 JOCC Running Resume data was on NC4's backup servers in Philadelphia, even though MPD no longer had the right to any backup data from NC4. NC4 reported back to MPD that it did not have any backup data for the September 2002 JOCC Running Resume.

In April 2008, MPD's Information Technology (IT) section contacted NC4 in an effort to migrate E Team data to the new software program being installed in the SOCC. NC4 demanded that MPD purchase a new maintenance and support agreement for about $40,000. MPD IT refused to pay this amount until NC4 could determine that the E Team data could be found. Thus, MPD agreed to pay $1,930 to NC4 to come to MPD Headquarters to see if the E Team

data was still on the servers.  These negotiations occurred without the knowledge of MPD's Office of General Counsel.

On May 6, 2008, NC4 representative Marc Bynum came to MPD Headquarters to determine if E Team data was on the server.  Because MPD's contract with NC4 had expired, Bynum had to renew MPD's certification with NC4 in order to access the servers.  Bynum was able to see that data was still on the E Team server, but he conveyed that information only to his supervisors at NC4; he did not convey that information to anyone at MPD or the District.  MPD General Counsel Terry Ryan later testified that he was not aware that Bynum had located E Team data on the server in 2008.

On July 29, 2009, Judge Sullivan held a status conference in the *Barham* and *Chang* case and ordered the District to confirm that all relevant evidence, including the JOCC Running Resume, had been produced.  This started an immediate new effort by MPD Office of General Counsel and OAG lawyers to seek the assistance of NC4 in locating and producing the E Team running resume.  On August 12, 2009, Attorney General Peter Nickles submitted a Declaration to the Court stating that the discovery issues raised in Judge Sullivan's July 30, 2009 Order would be "thoroughly investigated."  As part of this effort, Attorney General Nickles asked former United States District Judge Sporkin to "independently review . . . the discovery problems" in the case, "as well as the allegations concerning destruction of evidence."  Judge Sporkin later reported that he could find no evidence to prove that anyone ordered the destruction of the JOCC Running Resume.

As a result of Judge Sullivan's July 29, 2009 Order, Ryan asked numerous people in MPD – including the IT section – to renew the search for the September 2002 JOCC Running Resume.  This time, NC4 agreed to find the data for about $5,200.  Unfortunately, a dispute

arose between MPD IT and NC4 over the final price and the data was not recovered.

On October 25, 2010, more than one year later, Judge Sullivan issued another Order requiring the District to incur the necessary expense to locate and retrieve the JOCC Running Resume.  As a result, MPD again reached out to NC4, and NC4 quoted a price of $19,793 to make the effort to retrieve JOCC Running Resume data.  In order to comply with Judge Sullivan's October 25, 2010 Order, the District had to pay $19,793 to NC4 to look for the information.  On November 1, 2010, the District informed the Special Master that NC4 was "cautiously optimistic" that the data could be found.

On May 3, 2011, Marc Bynum came to MPD Headquarters and located the September 2002 IMF JOCC Running Resume on the decommissioned E Team server.  All the JOCC Running Resume data was recovered.  The next day, the District informed the Special Master and the parties that the JOCC Running Resume was recovered and that Bynum would be made available for a deposition as soon as possible to explain what he found.  A copy of the entire September 2002 IMF JOCC Running Resume was electronically produced to all parties in the case.

110.    As noted, in 2002, MPD decided to replace the GroupSystems program used in the JOCC with a program known as E Team. After the September 2002 IMF event, because MPD was pleased with the use of E Team in the JOCC, MPD decided in February 2003 to replace the GroupSystems program in the IOC and CIC with the E Team system.  (Kant SM, Nov. 28, 2012, at 148:18-149:11.)

111.    NC4 purchased the assets of E Team in 2005, and it assumed responsibility for providing support services for E Team.  (*Id*. at 119:12-20.)

112.    MPD continued to use the E Team system for operations in the SOCC until 2008. In 2005, due to cost factors, MPD did not renew the maintenance and support contract with NC4 for the two existing E Team servers.   As a result, E Team was no longer the host system for MPD, and NC4 no longer retained MPD information on its backup server in Philadelphia, PA. (Bynum SM, Nov. 28, 2012, at 74:16-75:17; Dep. of Marc Bynum, August 23, 2011, at 106 (Chang Nov. 2012 Ex. 12).)   Consequently, the District was not able to obtain the September 2002 IMF JOCC Running Resume from NC4's (formerly E Team's) backup server after 2005 without spending a significant amount of money for a new maintenance and support contract.

113.    On October 1, 2007, the *Barham* plaintiffs filed a motion to compel the production of the JOCC Running Resume for the September 2002 IMF event.   (Barham Dkt. No. 338.)   The District did not oppose the motion, but provided a detailed explanation as to why the JOCC Running Resume could not be found.   As noted above, MPD was using a new program known as E Team in the JOCC to capture and compile information during the September 2002 IMF event.   ***Thus, as noted above, as early as October 2007, when the District filed its response to the Barham motion to compel, the District informed the Pershing Park plaintiffs (including the Chang plaintiffs) that the GroupSystems program was not used in the JOCC on September 27, 2002.***   (Barham Dkt. No. 344, at 2.)

114.    On October 30, 2007, Judge Sullivan entered an Order in the *Barham* case granting the motion to compel and directing the District to "produce the [JOCC] running resume for September 27, 2002," or "if the District of Columbia is unable to produce the J.O.C.C. running resume by the close of discovery on November 16, 2007, defendants shall submit a

sworn declaration by counsel of record describing in detail the efforts undertaken to locate the document." (*Barham* Dkt. No. 351, at 1.)[20]

115.    By November 12, 2007, numerous people connected with MPD or the District had been searching since 2003, in one form or another, for the E Team JOCC Running Resume. These people included Doug Jones and George Crawford, two of the most knowledgeable people about the operation of the SOCC.  (*See, e.g.*, Jones SM, Oct. 12, 2010 (a.m.), at 32:01-12, 60:18-61:14, 61:21-24; Jones Declaration, Chang Oct. 2010 SM Ex. 2, at ¶ 6; Crawford SM, Oct. 12 (p.m.), at 23:04-20, 24:14-16; Declaration of George Crawford, October 17, 2007, at ¶¶ 4-10 (Chang Oct. 2010 SM Ex. 11.)

116.    In response to Judge Sullivan's October 30, 2007 Order, the District submitted five declarations on November 16, 2007, describing the on-going efforts made by the District and MPD to locate the JOCC Running Resume.  Three of the declarations were submitted by former MPD JOCC official Neil Trugman, MPD computer specialist George Crawford, and MPD Deputy General Counsel Ron Harris.  (Chang Oct. 2010 SM Exs. 9, 11, and 56, respectively.)

117.    As noted, MPD IT was still using E Team in the SOCC in 2008, even though it had discontinued paying for the NC4 annual maintenance and support contract since 2005 for financial reasons.  (Bynum SM, Nov. 28, 2012, at 110:14-18.)

118.    In April 2008, MPD's Information Technology (IT) section wanted to migrate the NC4 "MPD incident data" to a new software program being installed in the SOCC.  (Chang Nov. 2012 SM Ex. 87, DC2011 July-001206.)  In order to do this work, MPD IT contacted NC4,

---

[20]     It does not appear from the record that the *Chang* plaintiffs joined in the *Barham* motion, and Judge Sullivan's October 30, 2007 Order does not appear on the Court's docket in the *Chang* case.  In any event, the District interpreted Judge Sullivan's Order to apply in the *Chang* case because of the dual applicability of discovery matters in both cases.

which demanded that MPD renew the maintenance and support contract for about $40,000.  (*Id.* at DC2011 July-001210.)  MPD IT rejected this proposal on April 9, 2008, because of the cost of a maintenance contract for a system it would no longer be using, and MPD IT did not want to pay this amount of money unless it could be determined that the E Team data could still be retrieved.  (*Id.* at DC2011 July-001208.)   *What is important to note from the email exchanges offered by the Chang plaintiffs is that no lawyer involved in defending the Chang case, either from the MPD Office of General Counsel or OAG, was included in these discussions and therefore they were not aware that these negotiations were taking place.*

119.   Eventually, MPD IT and NC4 reached an agreement that NC4 would determine if the E Team data was still available.  It was agreed that NC4 would send an agent to MPD Headquarters to look at the E Team servers and determine only if the data was on the server for $1,930.  (Chang Nov. 2012 SM Ex. 87, DC2011 July-001206.)  This cost did not include any expense for retrieving the data off the server.  (As discussed below, this would later cost the District almost $20,000.)

120.   Consequently, on May 6, 2008, NC4 representative Marc Bynum came to MPD Headquarters and determined that the E Team data was on the server and that the data could be extracted from the server.  (Bynum SM, Nov. 28, 2012, at 68:20-69:11, 70:4-9.)  However, in order to access the E Team server in May 2008, Bynum had to renew the NC4 certification for the E Team servers, because that certification had expired in 2005.  (*Id.* at 100:17-20.)  The fact that the certification had expired in 2005 explains why MPD could not access the servers on its own since 2005.  (*Id.*)  Thus, between 2005 and 2008, MPD was not able to access the E Team servers to determine if any JOCC Running Resume information from September 2002 was on the servers without paying a high price to NC4 to get the data.

48

121.    Bynum conveyed to Norbert Butler at NC4 that the servers could be accessed and the data could be extracted, but Bynum did not inform MPD of this information at the time he found the data.  (*Id*. at 70:4-71:10, 110:19-22.)  Bynum also stated that he was not aware if anyone at MPD or the District was made aware that the E Team data had been found.  (*Id*. at 111:2-4.)

122.    Ryan repeatedly testified before the Special Master that he was not aware in 2008 of Bynum's visit to access of the E Team servers.  (Ryan SM, Jan. 3, 2013, at 16:21-23; 18:8-10; 18:22-19:3; 32:14-16.)  As Ryan stated, "I have no knowledge about how [IT] handled this particular transaction.  I don't know anything about it."  (*Id*. at 43:3-4.)  Ryan also testified that "if [the MPD General Counsel's Office] had learned about [Bynum's efforts] in 2008, we would have alerted the office of the attorney general who would have been the entity within the District Government that would have communicated with Judge Facciola or Judge Sullivan."  (*Id*. at 27:22-25.)  District counsel Frost testified that she was "surprised" to learn in 2011 that Bynum had been to MPD Headquarters in 2008 looking for E Team data.  (Frost SM, Jan. 11, 2013, at 43:22-23.)

123.    On July 29, 2009, Judge Sullivan held a status conference in the *Barham* and *Chang* cases.  On July 30, 2009, Judge Sullivan issued an Order requiring District of Columbia Attorney General Peter Nickles to address the problems that the District was having in finding the September 2002 IMF JOCC Running Resume.  (Dkt. No. 486.)

124.    As a result of Judge Sullivan's Order, MPD General Counsel Terry Ryan held a meeting on August 4, 2009, to discuss what efforts had been undertaken to obtain all relevant discovery in the *Barham* and *Chang* cases, including the JOCC Running Resume.  Attending this meeting were Ryan, Deputy General Counsel Ronald Harris, Mark Viehmeyer, Acting Director

of the Labor and Employees Relations Unit (a lawyer and part of the General Counsel's Office), and Travis Hudnall, MPD Chief Technology Officer.  (Ryan SM, Jan. 3, 2013, at 32:6-11, 46:13-20.)  Ryan informed the Court on August 4, 2009, that efforts were again being made by his office to locate the Running Resume.  (Ryan SM, Jan. 3, 2013, at 32:4-11.)

125.    On August 5, 2009, as a follow-up to the meeting the day before, Ryan sent an email and memorandum to numerous MPD personnel asking that they confirm that a search for all relevant September 2002 IMF JOCC Running Resume information had been conducted. Ryan also asked the people receiving the memo to let him know if there were former MPD personnel no longer with the Department who might be aware of relevant information.  (Ryan SM, Oct. 14, 2010 (p.m.), at 27:13-21.) (*See also* Ryan Declaration, August 12, 2009, at 2-4 (Chang Nov. 2012 SM Ex. 88).)

126.    On August 12, 2009, Attorney General Nickles submitted his Declaration in compliance with Judge Sullivan's July 30, 2009 Order.  (Declaration of Attorney General Peter Nickles, August 12, 2009, at ¶ 3) (Chang Oct. 2010 SM Ex. 65) (Dkt. No. 490-2.)  Attorney General Nickles assured the Court that the discovery issue discussed in the Court's Order would be "thoroughly investigated."  (*Id*. at ¶ 3.)  In fact, as part of this investigation, Attorney General Nickles asked former United States District Judge Stanley Sporkin to "independently review . . . the discovery problems at issue here, as well as the allegations concerning destruction of evidence."  (*Id*. at ¶ 8.)  In addition, more senior OAG lawyers were assigned to manage the *Chang* case, and the Attorney General advised the Court regarding the efforts to locate the JOCC Running Resume.  (*Id*. at ¶¶ 19, 20.)  Finally, Attorney General Nickles described the "remedial steps [that] have and are being implemented to avoid a recurrence of the problems" in future discovery.  (*Id*. at ¶ 25.)

127.     Also on August 12, 2009, District lead counsel Thomas Koger submitted a Declaration in compliance with Judge Sullivan's July 30, 2009 Order.  (Declaration of Thomas L. Koger, August 12, 2009 (Chang Oct. 2010 SM Ex. 70)) (Dkt. No. 490-3.)  In this Declaration, Koger recounted in some detail the efforts made by the District to locate the September 2002 IMF JOCC Running Resume.  (*Id.* at ¶¶ 5-8.)  As was the case with the Declaration submitted by Attorney General Nickles, Koger made no mention of the efforts by NC4 in 2008 to locate E Team data because, like MPD General Counsel Ryan, he was not aware of those efforts at the time he drafted and submitted the Declaration.

128.     As a result of the direction of Ryan to renew the search for the E Team Running Resume, MPD IT again reached out to NC4 for assistance in finding the E Team data.  (Chang Nov. 2012 SM Ex. 89, DC2011 July-000971.)  Another series of negotiations commenced – this time with the knowledge of MPD Office of General Counsel – and NC4 agreed to reduce the cost to extract the data to about $5,200.  (Chang Nov. 2012 SM Ex. 92.)  An agreement was never reached to have NC4 find the JOCC Running Resume because of a dispute between MPD and NC4 over the final price.  (Chang Nov. 2012 SM Ex. 89, DC2011 July-000739-42.)  As a result, the JOCC Running Resume was not recovered in 2009.

129.     On October 25, 2010, Judge Sullivan issued a Minute Order in the *Chang* case regarding a Preliminary Report of the Special Master (Dkt. No. 712) with respect to the September 2002 IMF JOCC Running Resume.  Judge Sullivan's Minute Order required the District to access the "Groupware" and create a running resume at its own expense.[21]  The Court's Order also required the District to submit a report on these efforts by November 1, 2010.

---

[21]     By October 2010, it was clear that despite repeated efforts, a September 2002 IMF Running Resume could not be found on the GroupSystems server.  This is because a

130.     On November 1, 2010, the District informed the Court that NC4 had told District counsel that it was "cautiously optimistic that E Team data was capable of being extracted."  The District also informed the Court at the same time that the estimated cost quoted by NC4 to extract the data would be about $20,000 and that it would take NC4 several weeks to complete the extraction.  (Dkt. No. 718.)

131.     It was necessary for MPD to process a new contract in order to have NC4 conduct a new search for the E Team data.  (Dkt. No. 718, at 2; Pressley SM, Dec. 18, 2012, at 29:9-19.) After an "extremely arduous purchase order process," the funds eventually were released to pay for the work.  (Frost SM, Jan. 11, 2013, at 42:13.)    A check for $19,793 was sent to NC4 on April 20, 2011.

132.     NC4 representative Marc Bynum came to MPD Headquarters on May 3, 2011 to perform the work.  (Bynum SM, Nov. 28, 2012, at 19:2-4.)

### 6.     The Events of May 3, 2011

**Summary:**        On May 3, 2011, NC4 representative Marc Bynum was able to access the E Team JOCC Running Resume on the decommissioned E Team server at MPD Headquarters. In accessing the system, Bynum examined a "History File" that was created in February 2003 when a user (later determined to be E Team employee Charles O'Connell) manually engaged an operating function (what the *Chang* plaintiffs call "the delete button") that permanently stored existing data in the system.  This function of storing data was known in E Team terminology as a "delete function," and Bynum mentioned to the people who were present when he first saw this information that it appeared that an E Team user had "deleted" data in the system.  The people

---

GroupSystems JOCC Running Resume was never created.  Nevertheless, the District read Judge Sullivan's Minute Order as a direction to continue to look for the E Team Running Resume.

who heard Bynum say this immediately thought he meant that data had been removed or erased permanently from the server; they misunderstood him because they did not know at the time that "delete" did not mean permanently destroying or erasing data.

MPD General Counsel Terry Ryan, who was present when Bynum stated that it appeared that Running Resume data had been "deleted," understood that intentional destruction of evidence could involve a crime, and therefore he immediately contacted MPD Assistant Chief Michael Anzallo, who was head of the MPD's Internal Affairs Division ("IAD"). Ryan wanted IAD to be aware of the situation and commence an investigation of the matter. Anzallo, after sending an IAD agent to the scene, briefly conferred with MPD Chief of Police Cathy Lanier, who ordered that the servers be secured and also decided that it would be improper for MPD to attempt to image the hard drive because the process might damage the server or cause data to be lost. As a result, Chief Lanier contacted the FBI and requested assistance in imaging the hard drive. In the meantime, someone also contacted the United States Secret Service, and both FBI and Secret Service agents arrived at MPD Headquarters.

In the early evening of May 3, 2011, Anzallo met again with Chief Lanier. Anzallo informed her that, despite Ryan's request, IAD would not be "investigating" the matter. Chief Lanier repeated to Anzallo that it would be best for the FBI or a third party to image the server's hard drive. According to Chief Lanier, because her view on the role of MPD in the matter conflicted with Ryan's view, she called Attorney General Irvin B. Nathan, who, according to Chief Lanier, was the "boss in terms of legal decisions." In a brief conversation lasting about five minutes, Chief Lanier repeated to Attorney General Nathan that it would be better for the FBI or a third party to image the hard drive of the server. The Attorney General agreed, and he asked Chief Lanier to keep the Court advised of what she was doing. According to Attorney

General Nathan, he did not recall Chief Lanier saying during this call that MPD would not be investigating the matter, and he testified that he was left with the impression that MPD would be conducting some form of inquiry into the matter.

Following the conversation between Chief Lanier and Attorney General Nathan, Chief Lanier asked Ryan to join the meeting with Anzallo. Chief Lanier informed Ryan that she wanted either the FBI or the Secret Service to image the hard drive. (Secret Service agents eventually imaged the hard drive because the FBI agents did not have the proper equipment with them at that time.) According to Anzallo, Chief Lanier told Ryan that MPD would not be investigating the matter. However, Ryan testified that he did not recall being told by either Chief Lanier or Anzallo that MPD would not be investigating the matter. Thus, both lawyers who were involved in the discussions that evening with Chief Lanier – Attorney General Nathan and MPD General Counsel Ryan – were left with the impression that MPD would not be imaging the hard drive on the E Team server, but that MPD would be conducting some sort of inquiry into the matter.

Early on May 4, 2011, a decision was made by District counsel to inform the Special Master immediately that the entire JOCC Running Resume had been found and to seek the Court's guidance on how to preserve the information for production to the parties. Later that morning in a telephone conference call, the District informed the Special Master and the parties that the JOCC Running Resume had been fully recovered and that Bynum would be made available for a deposition as soon as possible.

133.    On May 3, 2011, the one GroupSystems server and the two E Team servers were located in the IT storage facility in Room 1104 of MPD Headquarters. The GroupSystems server

had been there since it was decommissioned in 2003.  The two E Team servers had been there since they were decommissioned in 2008.

134.    On May 3, 2011, NC4 Assistant Administrator Marc Bynum came to MPD Headquarters for the purpose of accessing and imaging the September 2002 IMF JOCC E Team Running Resume.  Bynum's assignment was "to restore the [E Team] data, make sure it was valid and usable and provide it to our report writers so they could extract the information in a format that was readable."  (Bynum SM, Nov. 28. 2012, at 93:18-21.)

135.    Bynum examined the main E Team server that was stored at MPD Headquarters. He was able to successfully access the server and locate the *entire* Running Resume.  (*Id*. at 18:17-19:4, 112:5-11; Dep. of Marc Bynum, Aug. 23, 2011, at 13, 108 (Chang SM, Nov. 2012 Ex. 12.)

136.    When he accessed the data containing the Running Resume, Bynum examined a file on the system called a "History File."  As explained by Bynum in his deposition taken in August 2011:  "E Team records data in any situation or event chronologically and there's a running history file that's maintained.  If items are deleted, whatever organization is using the application can go back and manage those items.  Once an item has been deleted, it can't be modified.  It does show up in the history file as a deleted item."  (*Id*, at 15:2-8.)

137.    When Bynum accessed the decommissioned E Team server on May 3, 2011, he could readily tell that none of the E Team data had been "permanently destroyed."  Bynum also told the people present on May 3, 2011, that all the JOCC Running Resume data was on the system and that it could be extracted from the system.  (Bynum SM, Nov. 28, 2012, at 94:11-17.) Bynum explained to the Special Master that using the delete function does not obliterate data but simply moves the data to another part of the computer's memory.  (*Id*. at 25:22-27:2.)

138.    When Bynum reviewed the History File for the September 2002 IMF JOCC

Running Resume, he noticed that Charles O'Connell, an NC4 employee, was one of the users

who made "deletions" in 2003.  Bynum mentioned this to the group who was with him when he

accessed the E Team server on May 3, 2011.  (*Id*. at 24:5-9, 37:2-38:15; Chang Nov. 2012 SM

Ex. 12, at 38-40, 97.) [22]

139.    Bynum could tell that the people who heard him make the "deletion" comment

thought he meant data had been destroyed, when in fact he actually meant that data was being

stored permanently in the system by a particular identifiable user.  (Bynum SM, Nov. 28, 2012,

at 83:1-84:13.)  Indeed, Bynum later stated that his use of words on May 3, 2011, may have been

misleading and there "was some misunderstanding when I first brought it up and didn't explain

it." (*Id*. at 113:15-114:5.)

140.    In his testimony before the Special Master, Bynum again explained that the

purpose of the "delete" function on the E Team system was so that a user could store information

in the E Team system.  (*Id*. at 17:7-11.)[23]

141.    MPD General Counsel Terry Ryan and OAG Counsel Shana Frost were

physically present at MPD Headquarters when Bynum first accessed the E Team server.  Also

present but in and out of the room at various times when Bynum first accessed the E Team data

---

[22]    Bynum confirmed in his testimony before the Special Master that the first time he was aware that the delete function had been used in connection with the E Team JOCC Running Resume was when he accessed the server in May 2011.  Although Bynum accessed the E Team server in May 2008, he did not examine any data at that time and therefore did not learn that the delete function had been used in connection with the Running Resume.  Consequently, Bynum also confirmed in his testimony that he did not tell the District in May 2008 that the delete function had been used.  (Bynum SM, Nov. 28, 2012, at 35:20-36:4.)

[23]    During his August 23, 2011 deposition, when the *Chang* plaintiffs tried to get Bynum to admit that it appeared that data had been destroyed from the September 2002 JOCC Running Resume, Bynum corrected them by stating that data had been "deleted" and not destroyed, as the term "deleted" was then used and understood by E Team users.  (Chang Nov 2012, SM Ex. 12, at 28-29.)

were District counsel Monique Pressley, MPD Commander James Crane, MPD Officer Stephen

Bias, and George Crawford, a civilian computer specialist for MPD.  (Anzallo Dep. at 15-16;

Ryan SM, Jan. 3, 2013, at 43:13-21; Frost SM, Jan. 11, 2013, at 44:12-46:3.)

142.  Bynum's comment to the group on May 3, 2011, led MPD General Counsel Terry

Ryan, who was present when Bynum accessed the E Team server and made the "deletion"

comment, to believe that E Team Running Resume information had been permanently removed

from the system, and thus raising the possibility of a criminal matter.  (Ryan SM, Jan. 3, 2013, at

40:6-13.)  Ryan did not understand at the time that "delete" had a technical E Team meaning.

However, as a result of hearing Bynum refer to "deleted" information, Ryan immediately called

Assistant Chief Michael Anzallo, head of the MPD Internal Affairs Bureau, to request that the

Internal Affairs Division ("IAD") investigate whether data had been wrongfully erased from the

E Team server.  Ryan did not speak with any other MPD personnel before contacting Anzallo.

(Anzallo SM, Jan. 3, 2013, at 218:13-219:17-19.)

143.  In response to Ryan's telephone call, Anzallo contacted Commander Christopher

LoJacono, an MPD official in IAD, and requested that Commander LoJacono send a detective

immediately to assess the situation.  LoJacono sent IAD Detective Sylvan Altieri.  (Anzallo SM,

Jan. 3, 2013, at 220:17-25.)  Ryan and the District lawyers saw that an IAD detective had been

sent to the scene after Ryan had requested an IAD investigation.  (Ryan SM, Jan. 3, 2013, at

220:24-221:9; Pressley SM, Dec. 18, 2012, at 40:11-41:18; Frost SM, Jan. 11, 2013, at 52:24-

53:10, 77:12-18, 78:1-7.)

144.  Anzallo then informed Chief Lanier that Ryan had called IAD requesting that it

investigate the circumstances surrounding Bynum's "deletion" comment.  According to Chief

Lanier, she told Anzallo at this time "to make sure somebody guarded the door in the locked

room where the servers were, and that's his only role until we had somebody - - I recommended the FBI come and take the servers. I think the first issue was to image the servers so we have an exact replica of the servers so - - something that you could, you know, maintain if there was damage during the analysis. So I then recommended that we have the FBI come in." (Lanier SM, March 19, 2013, at 10.) In the meantime, someone else had called the Secret Service to come and image the hard drive, because both the FBI and the Secret Service agents arrived at MPD Headquarters on the afternoon of May 3, 2011. (Lanier SM, March 19, 2013, at 13:20-14:3.)

145. In the early evening of May 3, 2011, before either the FBI or the Secret Service had done anything with the E Team servers, Anzallo again met with Chief Lanier. Anzallo informed Chief Lanier that he had decided that "IAD was not going to do an investigation." (Anzallo SM, Jan. 3, 2013, at 223:20-224:1.)[24]

146. In the meeting with Anzallo in the early evening of May 3, 2011, Chief Lanier agreed that MPD should not be imaging the servers or handling the servers in an attempt to extract data from the servers. Chief Lanier testified before the Special Master that she had this view because (a) MPD no longer had the forensic capability to do this analysis, and (b) it would be better for a third party and not MPD to be involved with the issue of any lost data from the servers. (Lanier SM, March 19, 2013, at 11:22-12:24.)

---

[24]     The *Chang* plaintiffs later agreed that the IAD should not have investigated the JOCC Running Resume, stating that any IAD investigation would have raised a "towering conflict of interest." (Dkt. No. 803, at 2-3, 8-10, n.4.)

147.    During the May 3, 2011 meeting with Anzallo, Chief Lanier did *not* say anything to Anzallo about what should be told to the Special Master.  (*Id*. at 11:2-5.)[25]

148.    At this point in the meeting, Chief Lanier decided to call District of Columbia Attorney General Irvin B. Nathan.  According to Chief Lanier, "the reason I did that is - - as I said, it's not often that Terry Ryan and I disagree, but . . . typically, in those circumstances, I would contact the AG and say, this is my feelings, this is why I feel this way and, you know, ultimately he is the arbiter of the decision; he is the boss in terms of the legal decisions, so I wanted to kind of get my - - you know, my feelings on the record with the AG to see how he felt."  (*Id*. at 12:4-12.)[26]

149.    Chief Lanier testified that she told the Attorney General that MPD lacked the expertise to image the servers, that she thought the FBI should image the servers, and that she "thought it would be inappropriate for MPD to have any additional involvement in this, you know, analysis of what has already been alleged as missing or lost or whatever data."  (*Id*. at

---

[25]    This is consistent with Anzallo's later deposition testimony when he said that Chief Lanier did not say anything to him at the second May 3, 2011 meeting about whether anything needed to be disclosed to the Court.  (Dep. of Anzallo, May 3, 2012, at 42) (Chang Nov. 2102 SM Ex. 23).)

[26]    Because of these reasons stated by Chief Lanier as the purpose for her May 3, 2011 call to the Attorney General, the District objected to the substance of the conversation between Chief Lanier and Attorney General Nathan on the grounds of attorney-client privilege.  (Lanier SM, March 19, 2013, at 12:15-16 [the transcript incorrectly states that this objection was made by Mr. Turley instead of by Mr. Causey, who made the objection]; Nathan SM, May 8, 2013, at 4:9-20.) The Special Master overruled the District's objections.

Also, during his testimony, Attorney General Nathan was asked if Chief Lanier mentioned to him during their conversation anything about her disagreement with Ryan, and the Attorney General responded that Chief Lanier did not mention Ryan in their May 3 telephone conversation.  ( *Id*. at 64:15-22.)  As can be seen from Chief Lanier's testimony, quoted above, she did not say that she said this to the Attorney General; only that this was the reason she made the call.  The Attorney General stated that if Chief Lanier has said this to him during their May 3 phone call, he would have wanted to talk to Ryan before making any judgments or decisions about the matter.  (*Id*. at 64:24-65:6.)

12:19-24.)  According to Chief Lanier, the Attorney General told her that he agreed that the FBI should image the servers and that she should contact the FBI to handle the matter.  (*Id*. at 12:25-13:4.)  Chief Lanier described her call with the Attorney General as being a "brief conversation." (*Id*. at 14:4-10.)

150.    Attorney General Nathan testified that, to the best of his recollection, he first heard about the recovery of the E Team JOCC Running Resume from George Valentine, a member of the Attorney General's senior staff, around the time when Chief Lanier called him on May 3.  (Nathan SM, May 8, 2013, at 6:10-7:14.)  Attorney General Nathan thought the news about finding the JOCC Running Resume was "good news," because he knew since first assuming the duties of the Office of the Attorney General that the District had been unable to locate the JOCC Running Resume for the September 2002 IMF event.  (*Id*. at 7:6-8.)  The Attorney General also recalled Valentine telling him that there was a "concern" about possible "attempted deletions from the hard drive" of the E Team server. (*Id*. at 7:9-14.)

151.    Regarding the May 3, 2011 telephone conversation between Chief Lanier and Attorney General Nathan, the Attorney General testified that Chief Lanier told him that MPD should not be imaging the hard drive of the E Team server because the hard drive possibly could be damaged or altered, and that she stated that she would prefer for the FBI or some third party to image the server's hard drive.  (*Id*. at 7:23-8:7.)  Attorney General Nathan told Chief Lanier that he agreed with her, and that she should advise the Court of what she was doing.  (*Id*. at 8:7-10.)

152.    During his testimony before the Special Master, the Attorney General stated several times that he understood from the May 3 telephone conversation with Chief Lanier that MPD "would investigate this matter about the missing document and now the attempted

deletions," but that MPD would have the analysis of the hard drive to be done by a private contractor or the FBI. (*Id.* at 9:20-10:4, 12:5-11, 24:5-11.) When the Special Master specifically asked if the Attorney General had any recollection of Chief Lanier "ever saying that she had no intention that the Metropolitan Police Department would be involved in any investigation," Attorney General Nathan responded that he had "absolutely no recollection of that." (*Id.* at 10:5-14.) The Attorney General also stated that the *Chang* case would come up periodically during senior staff meetings in his office, and that he was told by people familiar with the *Chang* case that MPD was conducting an investigation into the JOCC Running Resume "deletions" issue. (*Id.* at 10:13-23.)[27]

153.    Attorney General Nathan did not discuss his May 3 telephone conversation with Chief Lanier with anyone within OAG after the call, including MPD General Counsel Terry Ryan, District lead counsel Monique Pressley, or District counsel Shana Frost. (*Id.* at 9:2-11, 13:9-17.)

154.    Assistant Chief Anzallo did not recall Chief Lanier saying anything to the Attorney General during their phone conversation about whether the Special Master should be told about any alleged deletions. (Anzallo SM, Jan. 3, 2013, at 231:18-22, 238:4-7.) Chief Lanier confirmed this in her testimony before the Special Master. (Lanier SM, March 19, 2013, at 13:8-11.) In addition, District counsel Pressley testified that no one told her that disclosures

---

[27]    This would be consistent with the fact that Ryan, Pressley, and Frost all had the impression after May 3, 2011, that MPD was conducting some form of investigation into the "deletion" issue until at least July 12, 2011, when Chief Lanier learned that the servers were still at MPD Headquarters and it was decided to send the servers to the FBI for forensic examination. (Ryan SM, Jan. 3, 2013, at 84:15-17); (Pressley SM, Jan. 9, 2013, at 62:18-63:22, 111:20-22); (Frost SM, Jan. 11, 2013, at 59:11-60:16, 77:22-25.) As Chief Lanier aptly stated in her testimony: "[T]here are two different things going on here. *It became a little confusing over the course of a couple of weeks.* One was the imaging of the servers, which was preserving, you know, original content. And then there is the analysis of the servers." (Lanier SM, March 19, 2013, at 14) (emphasis added).

should be made to the Special Master.  (Pressley SM, Jan. 9, 2013, at 56:4-18.)  Nor did Chief

Lanier expect that the Attorney General would do anything after their call.  (*Id*. at 40:21-25.)  As

noted, Attorney General Nathan testified that he did not have any discussion with Ryan or

District counsel about his May 3, 2011 phone conversation with Chief Lanier.

155.    After the telephone conversation with the Attorney General, Chief Lanier

requested that MPD General Counsel Terry Ryan join her and Assistant Chief Anzallo in her

office.  In her testimony before the Special Master, Chief Lanier stated the following regarding

Ryan's involvement in the meeting:  "So I had a brief conversation with Terry.  I told Terry that I

had spoken with [the Attorney General] and that the FBI would do the analysis or, if the Secret

Service was there and they had the equipment and they were going to imaging, they could do the

imaging, that's fine.  So it was a brief conversation.  It was very late.  There was nobody else in

the suite and it was pretty late in the afternoon."  (Lanier SM, March 19, 2013, at 14:4-10.)

According to Anzallo, Chief Lanier informed Ryan that "IAD is not going to be involved," and

that "this has to be referred back to the Court." The meeting then ended without any further

discussion between Chief Lanier, Anzallo, and Ryan.  (Anzallo SM, Jan 3, 2013, at 234:15-

235:9.)

156.    Ryan testified before the Special Master that he did not recall being told by either

Chief Lanier or Anzallo that MPD would not be involved in looking into possible deletions of

data from the E Team JOCC Running Resume data.  (Ryan SM, Jan. 3, 2013, at 87:15-15 ("I

don't recall a direction [from Chief Lanier or Anzallo] that there would be no investigation.").)[28]

---

[28]    As noted by Chief Lanier, the testimony of Anzallo and Ryan reflect the "confusion" that
existed about what role MPD would (or should) have in the matter.  It should seem clear that
Chief Lanier and Anzallo were saying to Ryan that MPD would not be involved in imaging the
hard drive for fear of damaging the server – exactly what Chief Lanier told the Attorney General
a few minutes before her conversation with Ryan.  Ryan – like Attorney General Nathan – heard

157.   Ryan also testified that he did not recall any discussion at the May 3, 2011 meeting about whether the Special Master should be informed of the "deletions" mentioned by Bynum earlier that day.  (*Id*. at 84:19-25, 86:2-5.)   This is consistent with what Chief Lanier and Anzallo told the Special Master.

158.   Before the Secret Service was asked to start imaging in the E Team server's hard drive, District counsel wanted to first report to the Special Master and the parties that the E Team JOCC Running Resume had been found, and to seek the advice of the Special Master on how to proceed going forward with respect to the imaging of the hard drive and the production of the data to the parties. (Frost SM, Jan. 11, 2013, at 67:6-14, 68:11-15, 69:2-5.)

### 7.   The Imaging of the E Team Hard Drive, the Production of the JOCC Running Resume to the *Chang* Plaintiffs, and the July 12, 2011 Status Hearing

**Summary:**   On May 4, 2011, the District reported to the Special Master and the parties that Bynum had found all the JOCC Running Resume data.  In a conference call with the parties later that morning, the Special Master ordered that a forensic image of the hard drive of the main server be made (the Secret Service was at MPD Headquarters ready to begin that process), and that the backup server should be secured (which already was done the day before pursuant to Chief Lanier's order).   The District also said during the conference call that it would make Bynum promptly available for a deposition so that he could explain under oath with all parties present what he found.  Later that day, the Secret Service made a forensic image of the main E Team server hard drive.

The District completed its privilege review of the E Team JOCC Running Resume

----

this to mean that *MPD should not image the servers*, rather than *MPD would not be conducting some form of inquiry* into who may have been responsible for possible "deletion" of data.

within a week of the data being extracted from the system, and the information was first presented to the Federal Defendants to conduct their privilege review of the Running Resume. The Federal Defendants unexpectedly requested four weeks to conduct their review, thereby extending the time to take Bynum's deposition.   The Special Master granted the Federal Defendants' request for four weeks to complete their privilege review, and approved a plan that permitted the District to roll-out the Running Resume data to the *Chang* plaintiffs as blocks of data were reviewed and approved by the Federal Defendants.  The Federal Defendants completed their review of the data by the end of June, and all data was provided to the *Chang* plaintiffs by July 1, 2011.

At a status conference conducted on July 12, 2011, the Special Master began the hearing by stating that he might release part of his factual findings in the investigation to Judge Sullivan within a few weeks.  This statement concerned District counsel, because they did not want the Special Master to be submitting any findings to Judge Sullivan before Bynum could be deposed. Accordingly, District counsel Monique Pressley decided to inform the Special Master and the plaintiffs at that moment of Bynum's comment about any "delete" activity with the E Team JOCC Running Resume. The District again noted its desire that Bynum be deposed shortly so that all the information about the apparent "deletions" could be on the record.  Because of additional delays due to summer scheduling and travel issues with Bynum coming to the District of Columbia, Bynum was not deposed until August 23, 2011.

159.   Following the telephone conversation between Chief Lanier and Attorney General Nathan on the evening of May 3, 2011, when it was confirmed that MPD would not image the E Team server hard drive but that the FBI would be asked to do that work, it was learned that the FBI agents who were then present at MPD Headquarters did not have the proper equipment with

them to do the work.  Because the Secret Service agents had the proper equipment with them, it was decided that the Secret Service would image the E Team server hard drive.  (Anzallo SM, Jan. 3, 2013, at 240:21-241:6; Lanier SM, March 19, 2013, at 13:20-14:3, 18-15:6.)

160.    The District wanted to inform the Special Master immediately that the entire JOCC Running Resume had been found, and to confer with the Special Master and the parties before the Secret Service began to image the E Team server hard drive.  (Dep. of George Valentine, March 30, 2012, at 139:04-141:02; 153:08-154:10) (Chang Nov. 2012 SM Ex. 42); (Frost SM, Jan. 11, 2013, at 67:6-14, 68:11-15, 69:2-5.)

161.    Therefore, on the morning of May 4, 2011, the District filed a Notice with the Court advising that the E Team JOCC Running Resume data had been found and that Bynum was "reasonably confident that all data entered during the weekend [of the IMF event] has been located and is now accessible on the server."  (Dkt. No. 779.)  Shortly thereafter, at the request of the District, a conference call was held between the Special Master and the parties.  (Dkt. No. 816.)   ***Thus, on May 4, 2011, the Chang plaintiffs learned that the entire E Team JOCC Running Resume had been found.***

162.    During the May 4, 2011 conference call, the Special Master requested that the District (a) make a forensic image of the data and preserve all metadata in the process; (b) secure the second E Team server; and (c) copy the data to a CD or hard drive in a format that was readable.  (Dkt. No. 816.)   The Court issued a Minute Order later that day summarizing the conference call.  (Minute Order, May 4, 2011.)

163.    During the May 4, 2011 conference call with the Special Master, it was discussed that the parties expected to be taking the deposition of Bynum regarding what he found on May 3, 2011.  (Dkt. No. 816, at 17.)  The District expected that Bynum's deposition could be taken

within a matter of weeks.   However, as discussed below, Bynum's deposition was delayed because of the extended period of time it took for the Federal Defendants to review the Running Resume data for privilege, and the with the onset of summer vacations schedules.

164.   Because the District knew that the *Chang* plaintiffs would eventually take Bynum's deposition, the District decided that it would be best for Bynum to explain what he found, rather than have District counsel attempt to explain technical facts to the Special Master and the attorneys for the *Chang* plaintiffs.   Moreover, the District was aware that all the data concerning the September 2002 IMF JOCC Running Resume had been recovered and that no data was lost.   In addition, District counsel was under the impression that MPD was conducting an investigation into possible "deletion" issues, and it was hoped that any results of an investigation would be available within a short period of time.   As a result, it was decided that a copy of the Running Resume should be provided to the *Chang* plaintiffs and that Bynum would be made promptly available at a deposition to explain what he found and so that all parties could question him about the data.   (Pressley SM, Dec. 18, 2012, 49:1-50:3; Pressley SM, Jan. 9, 2013, 61:1-11); (Dep. of George Valentine, March 30, 2012, at 139:04-141:02; 143:6-144:14; 153:08-154:10; 158:4-11.) (Chang Nov. 2012 SM Ex. 42).)[29]

165.   Following the conference call with the Special Master in which he informed the District as to what he wanted done to preserve the data on the server, the Secret Service began the process of imaging the E Team server hard drive.   (Anzallo SM, Jan. 3, 2013, at 241:2-5.)

---

[29]      Indeed, if the Special Master and the *Chang* plaintiffs had been told on May 4 that there were "deletions" from the Running Resume, this information would have been false and misleading, and the District lawyers would have had to report back later in order to correct their mistake.   As Attorney General Nathan aptly described during his testimony before the Special Master, the decision to wait until Bynum could testify about the meaning of the word "deletion" was "a delay in reporting a false alarm."   (Nathan SM, May 8, 2013, at 18:4-6.)

The Secret Service completed the imaging of the E Team server hard drive in the early hours of May 5, 2011.

166.    On or about May 11, 2011, Eric Kant, an NC4 Interoperability Architect, created a printout of the September 2002 IMF E Team JOCC Running Resume that Marc Bynum accessed on May 3, 2011.   The system revealed that the JOCC Running Resume for the September 2002 IMF event was created on September 26, 2002, at 16:41 EST.   The printout of the entire Running Resume consisted of approximately 4700 pages.   (*See* E Team Incident Report) (Chang Nov. 2012 SM Ex. 1.)

167.    The JOCC Running Resume that Kant extracted from the E Team system was first provided to the Federal Defendants for a privilege review.   The Federal Defendants unexpectedly requested about 30 days to review the material.   Because of this unexpected dealy, and pursuant to an Order issued by the Special Master, the District provided the *Chang* plaintiffs with a roll out of portions of the Running Resume once the sections were reviewed and approved by the Federal Defendants.   (Dkt. No. 786.)   An electronic copy of the entire JOCC Running Resume was provided to the *Chang* plaintiffs by July 5, 2011.   (Dkt. No. 801; Dkt. No. 802, at 3; Frost SM, Jan. 11, 2013, at 178:10-12.)   Unfortunately, Bynum's deposition could not be taken before all parties had the opportunity to review the JOCC Running Resume data, and by the time those reviews were completed by the parties, the Special Master scheduled a status conference for July 12, 2011.

168.    Once the *Chang* plaintiffs had the entire JOCC Running Resume, the Special Master conducted a status conference on July 12, 2011.   (Dkt. No. 804) (Chang Nov. 2012 SM Ex. 39.)   At the beginning of the status conference, the Special Master stated:   "I am very anxious to get the findings of facts done, and have already begun to work on them to the point

where I'm moving along." (*Id*. at 5.)  Shortly thereafter, the Special Master stated: "[T]hat's the

way I'm going right now, and that's the way I think it's got to be.  And then what I will do, and

probably will do this certainly before the week ends, I will get a statement to Judge Sullivan,

bringing him up to date at least on what I've learned, that the [E Team Running Resume]

document is now available, and asking for his guidance." (*Id*. at 7.)

169.    When District counsel Monique Pressley heard that the Special Master was

thinking about issuing part of his report of the investigation to Judge Sullivan, she decided to

inform the Special Master that Bynum had stated on May 3, 2011, that there were possible

"deletions" of E Team JOCC Running Resume data, but that the District wanted Bynum to

explain the technical aspects of what was meant by his reference to possible "deletions" at a

deposition where the *Chang* plaintiffs could question Bynum about the matter.  (Pressley SM,

Dec. 18, 2012, at 47:24-51:22, 66:17-25, 70:1-71:1.)  (*See also* Valentine 30(b)(6) Dep., March

30, 2012, at 154:16-155:15.)

170.    Therefore, during the status conference, District counsel Pressley disclosed first to

counsel for the *Chang* plaintiffs about Bynum's statement concerning possible "deletions" of E

Team JOCC Running Resume data.  However, before Pressley could inform the Special Master

of this same information when court resumed after a short break, *Chang* counsel went to the

podium and informed the Special Master about what Pressley had told him during the break.

(*See* Transcript of July 12, 2011 Status Conference, (Chang Nov. 2012 SM Ex. 39), at 26-28.)

The Special Master did not at that moment order the District to provide the Court and the *Chang*

plaintiffs with any immediate report about the possible "deletions" noted by Bynum on May 3,

2011 – nor did the *Chang* plaintiffs ask for any such report.  Rather, the Special Master

confirmed that the parties should take Bynum's deposition as soon as possible, which was what the District had been planning to do all along.  (*Id*. at 32.)

171.    District Counsel Pressley also informed the *Chang* plaintiffs during the July 12, 2011 Status Conference that – as far as she understood the situation – MPD had initiated an IAD investigation into whether there was any improper attempted "deletions" of data from the E Team servers.  (*Id*. at 30-31.)  Counsel for the *Chang* plaintiffs then expressed disapproval of MPD conducting any investigation of the servers.  (*Id*. at 30-31; Ryan SM, Jan. 3, 2013, at 159:12-15.)[30]  As noted below, the District decided to send the servers to the FBI after the status conference on July 12, 2011.

172.    After the July 12, 2011 status conference, the District again made efforts to schedule Bynum's deposition as soon as possible.  Because of summer vacation scheduling issues, Bynum was not deposed until August 23, 2011 (*See* Dep. of Marc Bynum, August 23, 2011 (Chang Nov. 2012 SM Ex. 12).)

173.    The *Chang* plaintiffs were told by Bynum as early as August 23, 2011 – *almost two years ago* – that "deletion" did not mean that data was permanently erased from the system. Bynum described the "deletion" as a term used by E Team that indicated a user was moving data from an event file to a history file, and he explained why the printout of the E Team JOCC Running Resume was 4700 pages by stating:  "Every time a report is edited or deleted, it goes into history.  That's why this is such a large document with so many duplications."  Bynum also stated in his deposition that "deleted" information would always be in the E Team system in the History File.  (Dep. of Marc Bynum, August 23, 2011, at 118, 137-38 (Chang Nov. 2012, SM Ex. 12).)

---

[30]    Several days later, *Chang* plaintiffs again expressed this disapproval in writing.  (Dkt. No. 803, at 2.)

174.    Of the 4700 pages of the E Team JOCC Running Resume printout out by Kant in May 2011, only 37 pages related directly to the September 2002 arrests at Pershing Park.  Many of the entries on these pages contained duplicate entries.  (E Team Incident Summary, pages 289 to 326) (Dep. of Kant, March 7, 2012, Ex. 9.)[31]

### 8.    District's Discovery Responses of August 16, 2011 and May 18, 2012

**Summary:**    District counsel Monique Pressley and Shana Frost testified that they believed an MPD investigation had been started on May 3, 2011, due to what they heard and observed that day when MPD General Counsel Terry Ryan requested IAD open an investigation, and they saw that an IAD agent was sent to the room where the E Team servers were located and the room was locked.  District counsel was not informed about the decision made later on May 3, 2011, that MPD was not formally opening an IAD investigation as initially requested by Ryan. In the course of defending civil litigation, it was the normal practice for District counsel to be unaware of the progress of any IAD investigation that may be related to a particular civil case – District counsel defending civil cases like the *Chang* case would let a potential MPD criminal investigation proceed on its own terms and at its own pace.

Pressley and Frost also testified that they believed an IAD investigation was ongoing until a decision was made on July 12, 2011, to send the two E Team servers and the one GroupSystems server to the FBI.  They had no reason to be untruthful about this because all of the E Team JOCC Running Resume data had been recovered and produced to the *Chang* plaintiffs and everyone – including the *Chang* plaintiffs – knew what was contained in the document.

---

[31]    As discussed in more detail below, the *Chang* plaintiffs acknowledge that only 11 entries on these 37 pages pertain to the arrests at Pershing Park on September 27, 2002.

After the three servers were sent to the FBI, the District submitted discovery responses to the *Chang* plaintiffs on August 16, 2011.  The responses – which were reviewed, approved, and signed by two MPD officials before they were submitted to the *Chang* plaintiffs – stated that there was an ongoing IAD investigation that had been started on May 3, 2011, which was suspended when the servers were sent to the FBI on July 28, 2011.  It was reasonable for Pressley and Frost to rely on the accuracy and completeness of the MPD review of the discovery responses before they signed the responses as District counsel and submitted them to the *Chang* plaintiffs.

After Anzallo's deposition testimony on May 3, 2012, when District counsel first learned that an IAD investigation of the E Team servers had not been formally started on May 3, 2011, District counsel submitted supplemental discovery responses on May 18, 2012, which corrected the earlier August 16, 2011 discovery responses that implied that an IAD investigation had been started on May 3, 2011.  The supplemental responses explained in detail why District counsel was under the impression that an investigation had been ongoing until the servers were transferred to the FBI.

175.    MPD Assistant Chief Anzallo's decision on May 3, 2011, that IAD would not conduct an investigation of the "deletion" issue regarding the E Team servers was not conveyed to District counsel Monique Pressley or Shana Frost.  As noted, they were under the impression that an IAD investigation was started on May 3, 2011.  (Pressley SM, Dec. 18, 2012, at 55:6-15; Frost SM, Jan. 11, 2013, at 59:11-60:1.)    When Pressley was expressly asked during her testimony before the Special Master whether she thought an investigation was ongoing between May 3 and July 12, 2011, she replied, "Yes."  (Pressley SM, Jan. 9, 2013, at 62:18-63:22, 111:20-22.)  Frost also testified that she was under the impression that an IAD investigation was

occurring between May 3 and July 12, 2011. (Frost SM, Jan. 11, 2013, at 59:11-60:16, 77:22-25.)

176.   In addition, the District's Rule 30(b)(6) witness on this topic, George Valentine, testified that the District believed that an IAD investigation was started on May 3 and was in progress until July 12, 2011, when the two E Team servers and the GroupSystems server were sent to the FBI.   (Dep. of District 30(b)(6) (Valentine), at 75:16-76:7, 143:6-144:14) (Chang Nov. 2012 SM Ex. 42.)   In fact, it is usually the situation, particularly in civil cases like the *Chang* case, that District lawyers are not kept informed about the progress or status of MPD IAD investigations.   (*Id*. at 144:7-14, 182:12-20; Pressley SM, Dec. 18, 2012, at 42:6-9; Frost SM, Jan. 11, 2013, at 55:19-24.)[32]

177.   When asked at the Rule 30(b)(6) deposition why the District did not disclose to the Special Master or the *Chang* plaintiffs during May and June, 2011, the apparent "deletions" first mentioned by Bynum on May 3, 2011, Valentine stated that one reason was the impressions held by District counsel that the issue of apparent deletions "was actively under investigation." (*Id*. at 126:8-127:14, 128:4-10.)   Valentine added that the District wanted "this criminal investigation to just work itself through," that the District "had to wait until there was some resolution of the criminal referral," and "that the law enforcement component of the [IAD] investigation would work its way through." (*Id*. at 129:3-4, 131:1-2, 139:15-19.)

---

[32]   This explains why Valentine could not answer all the questions about how IAD investigations are conducted during his Rule 30(b)(6) deposition. (*Id*. at 87:12-88:9.) Moreover, another reason why Valentine was not prepared to respond to questions about any IAD investigation was that the plaintiffs' Rule 30(b)(6) Notice of Deposition served on the District on July 22, 2011, did not list any reference to an IAD investigation as a topic to be covered during the deposition, even though the *Chang* plaintiffs were told on July 12, 2011, that an IAD investigation had been started on May 3, 2011. (Dkt. No. 817-2.)

178.    Both Pressley and Frost confirmed in their testimony before the Special Master that District counsel are normally not kept informed of the progress or status of IAD investigations.  (Pressley SM, Dec. 18, 2012, at 42:6-9; Frost SM, Jan. 11, 2013, at 55:19-24.)

179.    Apart from the fact that District counsel were under the impression that an IAD investigation was ongoing, OAG decided that the best way to inform the Special Master and the *Chang* plaintiffs about any "deletion" issue would be for Bynum himself to provide sworn testimony as soon as possible.  District counsel wanted Bynum – and not District counsel – to explain the technical issues regarding the term "deletion" and to describe exactly what Bynum did to locate the JOCC Running Resume data on May 3, 2011.  (Pressley SM, Dec. 18, 2012, at 39:21-40:1, 67:13-73:5; Frost SM, Jan. 11, 2013, at 67:8-14, 68:6-69:5, 86:16-87:2, 89:5-7.)

180.    Following the July 12, 2011 decision to transfer the three servers to the FBI, and while the parties were about to take the deposition of Bynum,[33] the District submitted discovery responses to plaintiffs' Second Set of Interrogatories.  (Chang Nov. 2012, SM Ex. 22.)

181.    In responses to Interrogatories 6, 7, 8, 9, 10 and 11, the District noted an objection that stated:  "The District further objects to this Interrogatory to the extent it seeks information pertaining to *the initial IAD inquiry* and the ongoing and potentially criminal investigation currently being conducted by the FBI; thus the information sought is protected by the law enforcement privilege."  (*Id*.) (emphasis added).

182.    In the response to Interrogatory 10, the District stated the following:  "Subject to and without waiving these objections, the District responds that on May 4, 2011 [sic—the correct date is May 3, 2011], when counsel for the District first learned of an attempted destruction of

---

[33]    As noted, Bynum's deposition was taken on August 23, 2011.  The District wanted to make sure that the *Chang* plaintiffs had this discovery response before they took Bynum's deposition.

data from the MPD E Team system, MPD General Counsel Terrence Ryan contacted Assistant

Chief of Police Michael Anzallo and Commander Christopher LoJacono of the Internal Affairs

Division to report the appearance of destruction, and to request that an Internal Affairs Division

("IAD") initiate an investigation into the incident.   That same day, Commander LoJacono

assigned IAD Agent Detective Sylvan Altieri to begin a preliminary inquiry.   *The IAD inquiry*

*was suspended* pending proceedings before the Court."   (*Id*.) (emphasis added).[34]

183.   Significantly, before District counsel submitted these interrogatory objections and

responses to the *Chang* plaintiffs, the draft answers were reviewed (and eventually signed) by

two MPD officials – Commander James Crane of the Tactical Information Division, and Barry

Gersten, MPD Chief Information Officer.   Thus, two MPD officials confirmed for the District

lawyers signing the interrogatory responses that the information contained in the responses was

true and correct.   (*Id*.)

184.   On May 3, 2012, Anzallo, testifying in deposition as a Rule 30(b)(6) witness for

the District, stated that an IAD investigation was not started on May 3, 2011.   (Chang Nov. 2012

SM Ex. 23.)   This was the first time that anyone associated with the *Chang* case stated that an

IAD investigation of the E Team servers had not been started on May 3, 2011 – *and it was*

*contrary to what two MPD officials confirmed in writing to District lawyers almost nine months*

*earlier*.   (Chang Nov. 2012 SM Ex. 22.)

185.   As a result of Anzallo's May 3, 2012 testimony, and pursuant to its obligation

under Rule 26(e)(1)(A) of the Fed. R. Civ. P., the District filed amended and supplemental

discovery responses on May 18, 2012, regarding the statements about an IAD investigation

---

[34]   The words "proceedings before the Court" referred to the July 12, 2011 hearing before
the Special Master and the Bynum deposition that was scheduled to take place in one week, on
August 23, 2011.

contained in the August 16, 2011 discovery responses.   In these amended and supplemental responses, the District provided a detailed explanation of the events of May 3, 2011, including the events of the meeting later that day between Anzallo and Chief Lanier, which was later joined by MPD General Counsel Ryan.  The supplemental responses also explained why District counsel defending the *Chang* case was unaware that an IAD investigation had not been started on May 3, 2011.[35]

186.    The District's May 18, 2012 draft supplemental discovery responses were reviewed and approved by MPD officials before the responses were served on the *Chang* plaintiffs.  (Chang Nov. 2012 SM Ex. 24.)

### 9.    Inability to Permanently Erase or Delete E Team Data

**Summary**:    The E Team program used by MPD in the JOCC on September 27, 2002, was designed so that authorized MPD users of the system could not permanently erase or delete data from the Running Resume.  Users could use a "delete" function key to save data to a permanent Running Resume history file.  Authorized personnel who were assigned an E Team User ID could access the E Team server at any time, as could any E Team employee.  For example, in February 2003 alone, E Team records show that over 59 MPD, NC4, and District employees accessed the E Team program in the JOCC.  (In February 2003, the JOCC was activated because of mass demonstrations against the Iraq invasion and a major snowstorm.)

---

[35]    The May 18, 2012 supplemental discovery responses did not refer to the May 3, 2011 telephone call between Chief Lanier and Attorney General Nathan because the District believed that that communication was protected by the attorney-client privilege.  *See Tax Analysts v. I.R.S.*, 117 F.3d 607, 618 (D.C. Cir. 1997) ("The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services" as well as "communications from attorneys to their clients if the communication rests on confidential information obtained from the client").  *See also In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984).

Despite frequent access to the E Team Running Resume by multiple authorized users after the September 2002 IMF event, there is no evidence that any MPD or District employee intentionally or deliberately erased, deleted, or attempted to permanently erase or delete, any data from the E Team JOCC Running Resume.  As noted, the complete E Team JOCC Running Resume for the September 2002 IMF event was recovered and produced to the *Chang* plaintiffs.

187.    Eric Kant, an Interoperability Architect for NC4, repeatedly testified before the Special Master that no E Team JOCC Running Resume data for the September 2002 IMF event data was permanently erased, lost, or destroyed.  (Kant SM, Nov. 28, 2012, at 136:18-138:4, 139:9-141:16, 145:19-146:16, 189:10-12.)

188.    Kant also testified before the Special Master that he was not aware of another system being used in the JOCC during the September 2002 IMF event.  (*Id*. at 124:3-7, 196:1-6.)

189.    Kant explained during his testimony before the Special Master that only MPD employees with administrative rights had access to the delete function.  Kant said that only one or two high-level people at MPD (other than E Team representatives) had access to the delete function.  (Kant SM, Nov. 28, 2012, at 128:22-130:11, 135:19-136:6.)  Kant also stated the following during his testimony before the Special Master:

Q:      Let's say a running resume is created in September 2002.  And there's a lot of data that has been put into the system.  And several months later, I want to destroy that information, erase it, get rid of it, it will never be seen again.  What do I have to do to have that happen?

A:      You can't.

(*Id*. at 140:25-141:6.)

190.    After the *Chang* plaintiffs took Marc Bynum's deposition on August 23, 2011, they requested the District have NC4 locate and produce, at the District's expense, the additional

reports referred to by Bynum in his deposition that would describe in more detail the "delete" activity concerning the E Team JOCC Running Resume for the September 2002 IMF event.  The District agreed to the *Chang* plaintiffs' request and entered into a contract with NC4 dated January 9, 2012, to obtain the information – at the District's expense.  (*Id*. at 65:17-66:04.) Clearly, if the District was trying to hide from the plaintiffs – and from the Court – information that would show that an MPD or District employee intentionally erased or tried to erase data from the September 2002 IMF JOCC Running Resume, the District would not have agreed to expend the money and voluntarily obtain this additional information from NC4.

191.    Eric Kant was the person at NC4 who prepared the five additional reports from the E Team system and printed hard copies of the reports.  The five reports generated by Kant in January 2012 were:  (1) E Team Summary Report of Deleted Events Records; (2) E Team Action Plan; (3) E Team Summary Report of Deleted Incidents Records; (4) E Team Summary Report of Profile Detail; and (5) Profile Summary.  All five reports generated by Kant were immediately distributed to all parties in January 2012, including the *Chang* plaintiffs.  (Kant SM, Nov. 28, 2012, at 143:3-18.)  ***These reports simply confirmed what the Chang plaintiffs and the Court had known since the Running Resume had been produced in June 2011 and Bynum's deposition had been taken in August 2011 – that no JOCC Running Resume data had been destroyed or lost.  Despite this knowledge, the Chang plaintiffs have persisted in litigating the JOCC Running Resume "deletion" issue without ever producing any evidence to show otherwise.***

192.    In his testimony before the Special Master, Kant described the "delete" function by stating that "for the E Team application, delete actually adds data to the record and then renders it no longer editable."  (Kant SM, Nov. 28, 2012, at 136:18-19.)  Kant added that in

making the data uneditable, "[*I*]*t doesn't destroy any data*. There's no untoward effects to deleting." (*Id*. at 187:11-13) (emphasis added).

193.    In his testimony before the Special Master, Marc Bynum similarly described the delete function as storing or saving data in a history file.  When the delete function is used, the data is not destroyed or erased and the data becomes unalterable.  (Bynum SM, Nov. 28, 2012, at 83:12-84:7.)

194.    One of the five documents found by Kant on the E Team server was called a "Deleted Events Record."  The summary report for the Deleted Events Record shows the "deletion" of twenty (20) separate events stored on the E Team server.  (Chang Nov. 2012 SM Ex. 2.)  Two of the deleted entries relate to the September 2002 IMF demonstrations.  The computer recorded one IMF deletion event on February 12, 2003, at 08:07, and a second deletion event on February 12, 2003 at 08:08.  *The computer recorded both deletions as being made by Charles O'Connell, an E Team employee*.  Other deletions on this summary report, to cite a few examples, included the Mobilization for Global Justice concert (created on September 28, 2002 at 07:38 and deleted on February 12, 2003 at 08:07 by Charles O'Connell); the IMF/WB Dinner reception (created on September 29, 2002 at 10:05 and deleted on February 12, 2003 at 08:06 by Charles O'Connell); Motorcade Movement to U.S. Capital (created on October 8, 2002 at 11:25 and deleted on February 12, 2003 by Charles O'Connell); Snow Emergency (created on February 16, 2003 at 14:17 and deleted on February 16, 2003 at 14:19 by DCMPDSysAdm01); and the 2004 Fourth of July Ceremony on the Mall (created on July 4, 2004 at 08:11 and deleted on September 30, 2004 at 17:17 by DCMPDSysAdm01).  (*Id*.)  This information shows that the last iteration of various E Team Running Resumes was stored in the history files of the E Team system for numerous events, and some were stored months after the events in question, including

the JOCC Running Resume for the September 2002 IMF event.[36]  (*See generally* Kant SM, Nov. 28, 2012, at 144:12-147:21, 211:23-212:9.)

195.    Another E Team record found by Kant on the E Team server was a summary report for "Deleted Incidents Records."  (Chang Nov. 2012 SM Ex. 7.)  The fifth item on page one of this report refers to an "incident name" as "FREEDOM PLAZA ARREST BEING MADE."  The report shows this particular incident being created on September 27, 2002, at 09:52 EST.  The report also shows that it was "deleted" by DCMPDUser010 on September 27, 2002, at 10:43.  Thus, DCMPDUser010 decided to move this entry to the history records of the JOCC Running Resume 51 minutes after the notation was created in the Running Resume, clearly while the incident at Pershing Park was still taking place.  This shows that a particular user of the E Team JOCC Running Resume decided to store the last iteration of the incident concerning arrests at Freedom Plaza in the History File of the Running Resume within one hour of the information for this incident being first recorded into the system.  By undertaking this function, as testified to by both Kant and Bynum, the person using this identification did not intend to remove permanently the data from the Running Resume, but intended to store permanently this data for this particular incident.  (*Id.* at 136:18-138:4, 139:9-141:16, 145:19-146:16, 189:10-12; Bynum SM, Nov. 28, 2012, at 83:12-84:7.)

**10.    E Team Employee Charles O'Connell "Deleted" the E Team Data in February 2003**

**Summary:**    E Team records for the September 2002 IMF event indicate that E Team employee Charles O'Connell was the person who "deleted" the September 2002 IMF event file

---

[36]    As discussed in more detail in the next section, E Team records support the conclusion that E Team employee Charles O'Connell "deleted" the E Team JOCC Running Resume data on February 12, 2002.

on February 12, 2003.  It is readily apparent from these records that an E Team employee used an E Team User ID for access to the system in February 2003 to "delete" this information.  An MPD employee could not have accomplished this "deletion" because MPD employees did not have access to an E Team user ID to access the system.

O'Connell was the principal E Team representative for the MPD E Team system in 2003. O'Connell was present at MPD Headquarters in February 2003 when the E Team system was being installed in the CIC and the IOC at that time and it was apparent that he was storing older event records from the E Team system in connection with this installation.  Moreover, the JOCC was activated in mid-February 2003 because of a huge snowstorm that resulted in between 16 and 21 inches of snow in the Washington, D.C. area on February 15-17, 2003.  This also explains why nine other event records were "deleted" by Charles O'Connell at the same time.

196.    As noted, in September 2002, when the JOCC Running Resume was created for the IMF event, the E Team system permitted various users to share login information. A user of the system who would be logging in for the first time would have to enter his or her name, position, and User ID on a profile screen.  Later, when the user would again enter the system, the last profile screen would appear, and the user could either select or change that user profile information.  Consequently, anyone had the capability to log into the E Team system using anyone's user name.  As explained by NC4 employee Eric Kant, the E Team system was designed to permit an operator to share user names.  (Kant SM, Nov. 28, 2012, at 153:13-154:16, 175:13-15, 176:16-17.)

197.    Because the E Team system used in the JOCC during the September 2002 IMF event was a web-based system, it was possible that an outside, non-standard user could access the E Team server through a Lotus Domino server.  In his deposition in August 2011, Bynum

explained that it was very difficult for someone to access the Running Resume from Lotus Notes and erase or destroy data:  "They would actually have to go into the Domino back end.  They would have to know what to look for.  They might be able to do a search, but they would have to know the document ID, and they would have to delete it from the back end."  (Chang Nov. 2012 SM Ex. 12, at 124.)

198.    Bynum again explained during his testimony before the Special Master that person would have to be a sophisticated user of computer systems and would have to have administrative authority to access the Lotus Domino server through a program called Lotus Notes.  (Bynum SM, Nov. 28, 2012, at 99:16-100:6.)

199.    Bynum also told the Special Master that anyone trying to access the E Team server through Lotus Domino would need a "unique administrative password."  (Bynum SM, Nov. 28, 2102, at 99:19-25.)

200.    In his testimony before the Special Master, Kant stated that it was "unlikely" that any E Team data was deleted by accessing the system through Lotus Domino.  (Kant SM, Nov. 28, 2012, at 209:17-19.)  Later in his testimony, Kant echoed what Bynum said about the fact that it would take a sophisticated person who was very good at data base management to access through Lotus Domino.  (*Id*. at 238:22-239:6.)

201.    There is no evidence that anyone accessed the September 2002 E Team JOCC Running Resume from Lotus Notes.

202.    As explained by Kant during his testimony before the Special Master, during the period September 2002 to February 2003, Charles O'Connell was the NC4 employee assigned to assist customers located in the Northeast section of the country (including Washington, D.C.) who used the E Team program.  As a result of his E Team responsibilities for MPD, O'Connell

would be at MPD Headquarters on numerous occasions.  Indeed, O'Connell was present at MPD Headquarters during the September 2002 IMF event.  (*Id*. at 125:19-126:2.)

203.    As noted, in January 2012, NC4 representative Eric Kant created several reports from the MPD decommissioned E Team server that reflect various activities in the MPD E Team system for 2002 and 2003.  Three reports prepared by Kant and which were promptly produced to the *Chang* plaintiffs were the (a) Deleted Events Record; (b) Deleted Events Detail; and (c) Profile Summary for February 2003.  (Chang Nov. 2012, SM Exs. 2, 4, and 6, respectively.)  (*Id*. at 143:3-5, 213:4-16.)  (*See also* Bynum SM, Nov. 28, 2012, at 46:12-20, 54:21-55:8; 56:7-59:17.)

204.    The Deleted Events Detail record (Chang Ex. 4) reflects that the E Team file for the September 2002 IMF event was created on September 26, 2002, at 16:41 EST by a person using the User ID "DCMPDDSysAdm01."  This record also shows that the file entry was modified by a person using User ID "DCMPDUser070" on September 28, 2002, at 22:01 EST.  This particular record also shows that the event file was "deleted" on February 12, 2003, at 8:07 a.m. by "Charles O'Connell."  The User ID for this last entry was simply the name "Charles O'Connell."  This was the personal E Team account for O'Connell because the user entry does not include a "DCMPD" prefix.  All user accounts for E Team employees used their names only.  (Chang Nov. 2012 SM Ex. 4; Bynum SM, Nov. 28, 2012, at 55:16-28.)

205.    The information on the Profile Summary for February 2003 (Chang Ex. 6) reflects the same "deletion" made on February 12, 2003, at 8:07 a.m. by Charles O'Connell.  This Profile Summary, consisting of 15 pages, shows the chronological list by date and time of various "deletions" that were made during the month of February 2003.  The first column on Exhibit 6 reflects the date and time of any "deletion" made during February 2003 to E Team records

created by MPD. The second column of data reflects the User ID of the person as recorded on the Profile Summary who accessed that data on the date and time indicated. The third column of this exhibit reflects the name as shown on the Profile Summary. The fourth and final column of data reflects the name of the organization or agency of the person who is the User ID in column two. (Bynum SM, Nov. 28, 2012, at 58:23-59:7 (referring to Chang Nov. 2012 SM Ex. 5, the Profile Summary for September 2002, which contains the same general information as does Chang SM Ex. 6).)

206.   As noted, Exhibit 4 confirms that a "deletion" was made of the September 2002 event file on February 12, 2003, at 8:07 a.m. Exhibit 4 also shows that this "deletion" was recorded by the Profile Summary as being made by a user called "Charles O'Connell." Exhibit 6 shows the profiles for individuals accessing the E Team system at MPD during February 2003. This exhibit shows the User IDs for all these individuals. As can be seen, all users who accessed the E Team during this month used a particular User ID identification. For most of these, the User ID used an MPD User ID number, such as "DCMPDSysAdm02" or "DCMPDUser079." These were user identifications that MPD provided to MPD personnel having a need for access to the E Team JOCC Running Resume. (Kant SM, Nov. 28, 2012, at 153:9-155:1.)

207.   Kant explained that if any MPD personnel had deleted E Team records at any time, the delete records would have to show that the user was accessing the system using a DCMPDSysAdm profile. (*Id.* at 156:25-157:5.)

208.   Exhibit 4 also shows that on February 12, 2003, Charles O'Connell "deleted" the event files for nine other events from the MPD E Team system, and all were "deleted" within a few minutes of each other. (Bynum SM, Nov. 28, 2012, at 102:1-104:1, 115:6-9.)

209.   Significantly, it should be noted on Exhibit 6 that there are several notations under the User ID column that do not reflect an MPD User ID number, but rather only names of people, such as Charles O'Connell, Troy Armstrong, John Bowles, and David Trang.   All of these individuals are shown in the right hand column as being with "E Team/Agency Representative" or "E Team/Support."   This means that E Team personnel used their own E Team User IDs to access the system in February 2003, which consisted of their names only, and they did not have to enter an MPD user identification to access the system.   In other words, an MPD employee could not have accessed the system in February 2003 using Charles O'Connell's E Team User ID name.

210.   Normally, an E Team employee would not "delete" data from the MPD E Team system without authorization or direction from MPD.   (Bynum SM, Nov. 28, 2012, at 53:6-9, 61:24-62:4.)   There is no evidence that any MPD or District employee directed O'Connell – or anyone else at E Team – to "delete" any information in the E Team system for the purpose of erasing or destroying JOCC Running Resume information.

211.   Bynum also testified before the Special Master that from his review of E Team records, nobody entered the E Team September 2002 IMF event file between September 2002 and February 2003.   (Bynum SM, Nov. 28, 2012, at 105.)   This fact is significant because if anyone at MPD wanted to destroy the September 2002 IMF E Team JOCC Running Resume, one would expect that they would attempt to destroy that data shortly after the *Chang* case was filed in October 2002, and they would not wait four months after the complaint was filed to destroy evidence.

212.   Bynum testified that he came to MPD Headquarters sometime in 2006 to "clear out all that data" that had been stored on the E Team server on a daily basis in the CIC since

2003.  This visit was not connected to the *Chang* litigation.  (Bynum SM, Nov. 28, 2012, at 106:4-8.)

213.    When Kant reviewed the delete history records, he determined that someone was "cleaning up the system for . . . what may be occurring next."  (Kant SM, Nov. 28, 2012, at 147:11-12.)   Kant also stated that it was not unusual for O'Connell to come to MPD Headquarters to work on the E Team system.  (*Id.* at 126:21-23.)

214.    Chang Exhibit 4 shows that a new event file was created on February 16, 2003, for a "Snow Emergency."  (Chang Exhibit 4 at 2.)  Kant also recalled that there was a snow storm in the District of Columbia area around this time.  (Kant SM, Nov. 28, 2012, at 147:16-17, 149:15-16.)

215.    The logical and rational explanation for this "deletion" on February 12, 2003, was that it was O'Connell who "deleted" past event records to the history files in the E Team system because MPD was about to activate the JOCC in preparation for a huge snowstorm that left between 16 and 26 inches of snow in the Washington, D.C. area on February 15-17, 2003.  (http://www.erh.noaa.gov/lwx/winter/DC-Winters.htm)   (last accessed on June 18, 2013.) (*See also* Kant SM, Nov. 28, 2012, at 149:12-16.)[37]

216.    Between February 12, 2003, and February 26, 2003, E Team records indicate that approximately eighteen (18) authorized MPD employees accessed the E Team system.  According to MPD E Team user records, the following is a list of the identity of each user, their user identification number, and the date(s) they accessed the E Team system:

| | | |
|---|---|---|
| Lamont Coleman | DCMPDUser122 | 2/12/03 |
| Scott Dignan | DCMPDSysAdm02 | 2/12/03 |

---

[37]    The Special Master can take judicial notice of this event pursuant to Rule 201 of the Federal Rules of Evidence.

| | | |
|---|---|---|
| Neil Trugman | DCMPDSysAdm01 | 2/12/03, 2/13/03, 2/17/03, 2/18/03, 2/19/03 |
| Todd Mattingly | DCMPDSysAdm123 | 2/13/03 |
| | DC MPDSysAdm020 | 2/23/03 |
| Gregory Countee | DCMPDUser071 | 2/13/03, 2/19/03 |
| Erich Miller | DCMPDUser097 | 2/13/03, 2/19/03 |
| Ronald Young | DCMPD045 | 2/13/03 |
| Monicamarie Hawkins | DCMPDUser032 | 2/13/03, 2/25/03 |
| John Strader | DCMPDUser021 | 2/13/03 |
| Anna Moss | DCMPDUser080 | 2/15/03 |
| Doral Scott | DCMPDUser014 | 2/16/03 |
| | DCMPDUser042 | 2/23/03 |
| Douglas Jones | DCMPDUser 083 | 2/18/03 |
| Donna Jones | DCMPDUser011 | 2/18/03 |
| Grisel Reid | DCMPDUser082 | 2/21/03, 2/26/03 |
| Grady Holmes | DCMPDUser028 | 2/25/03 |
| Stephen Bias | DCMPDUser030 | 2/26/03 |
| Somalli Fuller | DCMPDUser029 | 2/26/03 |
| Damion Johnson | DCMPDUser027 | 2/26/03 |

(*See* E Team Profile Summary, Operational Period for February 2003) (Chang Nov. 2012 SM Ex. 6)  Bynum confirmed that there were more than 20 MPD personnel who had user rights (as

opposed to administrative rights, which were necessary to use the delete function) during this time period.  (Bynum SM, Nov. 28, 2012, at 85:22-86:1.)

217.    It is important to note that from the above list, only three MPD personnel had administrative right – Scott Dignan, Neil Trugman, and Todd Mattingly.  These were the only MPD personnel who could delete data from the E Team system in February 2003.  However, as noted, the E Team delete history shows unmistakably that it was Charles O'Connell, using an E Team User ID, who "deleted" the JOCC data on February 12, 2003.

218.    It is also important to note that numerous MPD users were in the E Team JOCC system in February 2003 -- because, as noted, the JOCC was operating for the February 15-17 snowstorm.  In fact, during February 2003, E Team records (Chang SM Ex. 6) show there were 55 MPD and 4 E Team personnel with user rights who were in the E Team system.[38]  It is noteworthy that no MPD defendant in this case is recorded as having entered the E Team system between October 2002 and February 2003.[39]

---

[38]    These people were Charles O'Connell (E Team), Troy Armstrong (E Team), Damian Wilk, Darric Milligan, William Vucci, Reginald Henderson, Sean Patton, Robert Moss, Nathanial Cooley, Althea Smith, Wilbur Niepling, Robert Robeson, Bennie Williams, Katerina Davitaia, George Wilson, John Bowles (E Team), Bruce Moyer, Marc Williams, Steven McArthur, Edward Williams, Yvette Bryant, Crystal Beslow, James, McBride, Ernest Clinkscales, Darren Fusaro, Gary Gieseke, Liam LaRue, Herbert Howell, Renee Dyson, Kevin Brittingham, Shawn Turonis, Dwight Van Tassell, Wendy Berg, Shan Thompson, Tracie Cannon, Phil Earp, Shawn Doody, Mark Wilkins, John Dreibelbis III, David Trang (E Team), James McCauley, David Clark, Ronald Thomas, Jean Cotter, Isabella Jones, Malcolm Forbes, McCoy Perry, Rob Torchon, Michael Milochik, Casandra Gudger, Harold Cribbs, Dennis Maroney, Oliva Wilcox, KeAsha Rogers, Donna Jones, Wayne True, Mike Richie, David Fletcher, and Dennis Pashos.  (*See* E Team Profile Summary, Operational Period for February 2003 (Chang Nov. 2012 SM Ex. 14 (DC2011 July-002000-2014).)

[39]    As late as the testimony of Attorney General Nathan on May 8, 2011, counsel for the *Chang* plaintiffs, in response to a direct question from the Special Master, told the Court that the *Chang* plaintiffs still intended to submit proposed findings to show that the facts are "unequivocal" that there was a specific effort to delete information "so that it could not thereafter be retrieved."  Nathan SM, May 8, 2013, at 33.  The only facts that have been "unequivocal" in this lengthy investigation have been that there was no destruction or loss of JOCC Running

### D.    FBI EFFORTS TO RECOVER GROUPSYSTEMS DATA AND RESOLUTION OF E TEAM SERVER "DELETION" ISSUE

**Summary**:          After the July 12, 2011 hearing before the Special Master, MPD Chief of Police Cathy L. Lanier first learned that the E Team servers were still at MPD Headquarters. She thought the servers had been taken from MPD Headquarters in early May when the Secret Service imaged the E Team hard drive.    After Chief Lanier conferred with Attorney General Irvin B. Nathan about the matter later that day (the Attorney General does not recall that conversation), she had MPD ask the FBI to take possession of the servers and determine if there was any evidence of erasure or destruction of data from the two E Team servers, and to examine the GroupSystems server to ascertain if it possibly contained any data regarding the September 2002 IMF event.  Consequently, the District sought and received the permission of the Special Master to transfer all three servers to the FBI.  The three servers were sent to the FBI on July 28, 2011.

The FBI issued a report dated April 23, 2012, that stated the FBI decided it was unnecessary to examine the E Team servers because it learned that NC4, which understood all functions of the program and had access to all data on the servers, had studied the "delete" history of all JOCC Running Resume data on the servers and found that no data had been erased or destroyed and that all data had been saved. Thus, the FBI stated that "MPD was able to resolve" the issues regarding the E Team servers, which was true.  (As noted, the NC4 reports showing that no data was erased or destroyed were produced to the *Chang* plaintiffs four months earlier, in January 2012.)

Resume data – facts known by everyone for the last two years – and that the *Chang* plaintiffs have suffered no prejudice from any delay in producing the data – data that is the same today as it was two, five, or ten years ago.  Given the statement made by their counsel on May 8, 2013, the *Chang* plaintiffs remain untethered to the facts.

The FBI Report also noted that an FBI Computer Analysis Response Team examined the GroupSystems server.  The FBI reported that it was only able to access data on the GroupSystems server in a raw format, that it was not possible to determine what the data was, and that it was not possible to determine if anyone erased or attempted to destroy any data found on the server.  The FBI also concluded that there would not be a "high level of success" in using other examination techniques to obtain any GroupSystems information.  Of course, the FBI was unable to locate a September 2002 Running Resume on the GroupSystems server because GroupSystems was not used in the JOCC during the September 2002 IMF event.

Pursuant to a Protective Order agreed to by all parties and approved by the Special Master, the FBI returned the three servers to MPD on October 26, 2012.

219.    As noted, in the Fall of 2007, at the request of the MPD's Office of General Counsel, MPD computer specialist George Crawford searched the decommissioned GroupSystems server to see if he could find any data from the September 2002 IMF event. Crawford determined that there was an application on the server, but he could not access it in a readable format.  Nor did he find a September 2002 IMF Running Resume on the server. (Crawford SM, Oct. 12, 2010 (p.m.), at 53:4-15, 54:8-55:10.)[40]

220.    As noted, the parties in the *Chang* case appeared before the Special Master for a status conference on July 12, 2011.  (Dkt. No. 804.)  After the July 12, 2011 status conference, District counsel and MPD General Counsel Ryan briefed MPD Chief of Police Cathy Lanier

---

[40]    The unreadable data that Crawford saw on the decommissioned GroupSystems server in 2007 was most likely the data created in the CIC and IOC during the September 2002 IMF event and earlier data placed on the GroupSystems server, such as the April 2002 IMF event and the 2001 Presidential Inauguration.  All of this data was produced to the *Chang* plaintiffs in hard copy early in the case.  (*See* Chang Oct. 2010 SM Exs. 60, 61, 80 and 81.)  (*See also* Pressley SM, Jan. 9, 2013, at 28:25-31:9.)

about what took place at the status conference.  (Ryan SM, Jan. 3, 2013, at 159:16-160:12.)  As noted, Pressley and Frost believed that IAD was still investigating whether any data had been unlawfully erased or destroyed, and Chief Lanier thought the FBI or the Secret Service had taken possession of the servers in May and that the imaging and the forensic analysis "was all done at once."  (Lanier SM, March 19, 2013, at 14:15-15:6, 20:13-21:1.)  As Chief Lanier aptly stated during her testimony before the Special Master, there was "so much confusion amongst us" in July about what was happening with the servers.  (*Id*. at 36:24-37:7-13.)

221.    Chief Lanier testified before the Special Master that she had the understanding that the imaging of the hard drive and the analysis of the server would be conducted at the same time.  (*Id*. at 14:15-15:6.)  She stated that there was a "misunderstanding" about whether the Secret Service would conduct an analysis of the servers at the same time they imaged the E Team hard drive in May 2011.  (*Id*. at 29:16-23.)

222.    Once Chief Lanier realized on July 12, 2011, that the E Team servers were still at MPD Headquarters, she decided that it would be appropriate for the FBI should take possession of the two E Team servers and the one GroupSystems server to determine if any data was erased or destroyed from the E Team servers and to see if there was a September 2002 JOCC Running Resume on the GroupSystems server.  If a September 2002 running resume for the September 2002 IMF event could be found on the GroupSystems server, MPD would further request that the FBI make a forensic image of that data, and ask if the FBI could see whether anyone tried to erase data with the GroupSystems server.  (Ryan SM, Jan. 3, 2013, at 160:1-12, 161:15-17.)

223.    Later on July 12, 2011, Chief Lanier asked Assistant Chief Anzallo to contact the FBI regarding the matter.  (Lanier SM, March 19, 2013, at 20:1-21:1; Anzallo SM, Jan. 3, 2013, at 240:2-241:14.)  Anzallo was on vacation when he received the call from Chief Lanier.  (*Id.* at

240:13-14.)   In her testimony before the Special Master, Chief Lanier recalled her call to Anzallo, but she did not recall the details of that call.  (Lanier SM, March 19, 2013, at 20:1-6.)[41]

224.     Anzallo testified that he telephoned Ron Hosko, head of the Criminal Division of the Washington D.C. Field Office of the FBI.  (Anzallo SM, Jan. 3, 2013, at 242:4-16.) Hosko told Anzallo that the FBI would look into the matter and decide whether to conduct a full investigation.  (Anzallo SM, Jan. 3, 2013, at 242:18-25.)

225.     On July 26, 2011, the District submitted to the Special Master a proposed Order that would permit the District to transfer possession of the three servers to the FBI.  That same day, the Special Master approved the proposed Order transferring the three servers to the FBI.  (Dkt. No. 870.)

226.     The GroupSystems server and the two E Team servers were delivered to the FBI on or about July 28, 2011.  The FBI immediately opened an investigation.  (FBI Report, April 23, 2012 (Dkt. No. 894-1).)

227.     Over the course of the next several months, MPD General Counsel Ryan had several conversations with different FBI agents working on the investigation.  (Ryan SM, Jan. 3, 2013, at 168:14-25, 171:22-172:18.)  Usually, the FBI would call Ryan to report that a different Special Agent was now in charge of the investigation.  (*Id*. at 168:17-25.)  At one point near the end of the FBI investigation, Ryan received a call from Special Agent Michael Lasut informing Ryan that the FBI had "essentially exhausted their investigation on the servers," and "had not been able to determine that anybody had made any deletions."  (*Id*. at 172:11-18.)

---

[41]     The decision to contact the FBI was taken five days **before** the *Chang* plaintiffs suggested this action to the Special Master.  (*See* Dkt. No. 803, at 13 ("[T]he District . . . should refer this matter for investigation by the federal law enforcement authorities . . .").)

228.    On April 11, 2012, the District informed the Special Master and the parties that the FBI had completed its investigation of the GroupSystems server.  (Dkt. No. 885).

229.    The FBI issued a final report regarding its investigation into the servers dated April 23, 2012.  Although the FBI report is dated April 23, 2012, it was not sent to MPD until May 14, 2012.  (*See* Dkt. No. 894-1.)

230.    In its final report, the FBI stated that "MPD was able to resolve the issues surrounding two of the servers, but did not have the technical expertise to examine the third, which is referred to as the 'group' server [sic]."  (*Id*.)

231.    The FBI report also stated that "after exerting all reasonable resources, [the CART] was only able to view the data from the group server [sic] in a raw format.  This level of analysis did not make it possible to determine if and when entries were altered or deleted."  Finally, the FBI report concluded that "[t]here are other examination techniques which could be attempted to achieve the level of detail necessary to make these determinations; however, they do not have a high likelihood of success."  (*Id.*)

232.    On October 23, the Special Master approved a Protective Order for the return of the three servers to MPD.  (Minute Order, October 23, 2012.)

233.    On October 26, 2012, the FBI returned the three servers to the District.  (Dkt. No. 917.)

### E.    THE E TEAM JOCC RUNNING RESUME DOES NOT SUPPORT THE PLAINTIFFS' CASE

**Summary**:     The printout of the September 27, 2002 E Team JOCC Running Resume consists of 4700 pages, which includes numerous duplications because of the way data was stored in the system.  Of these 4700 pages, only 133 entries on 37 pages (again containing some duplication) reflect information involving the arrests or events at Pershing Park that day.  The

*Chang* plaintiffs acknowledge that only 11 entries on the JOCC Running Resume pertain to events that took place at Pershing Park on September 27, 2002.  Other than notations that arrests were being made at Pershing Park, the times of the arrests, and that buses would be needed to transport detainees, there is no reference in either the JOCC Running Resume (or the IOC Running Resume) to the individual *Chang* plaintiffs, Chief Ramsey, Assistant Chief Newsham, or any other District defendants.  There are no references to who gave the order to arrest the plaintiffs.  In short, the September 2002 IMF E Team JOCC Running Resume (and the GroupSystems IOC Running Resume and the CIC daily report) do not contain any information that supports any of the plaintiffs' claims in this lawsuit.

234.   The *Chang* plaintiffs acknowledge that the E Team JOCC Running Resume "contains only limited information" from the day of the arrests in Pershing Park – September 27, 2002.  According to the Plaintiffs' review of the information, "there are only 133 entries from September 27, 2002. . . .  In the end, the Plaintiffs can identify only 11 unique entries that relate to the activities at Pershing Park. . . ."  (Dkt. No. 802, at 4; *see also* Dkt. No. 803, at 12 (where the *Chang* plaintiffs again admit that there are only 11 entries "that relate to the events at Pershing Park").)

235.   On July 8, 2011, the *Chang* plaintiffs submitted the following chart to the Special Master.  (Dkt. No. 802, at 5-6.)  The chart reflects the 11 unique entries referred to in the next preceding paragraph:

| Incident **Protest March/Rally Freedom Plaza 14th & Pa. Ave., NW** was created on 09/27/2002 at 09:18 EST | | |
|---|---|---|
| **09/27/2002 at 09:18 EST** | Protestors gathering in the park. Expected to begin marching shortly. ***DCMPDUser010*** */History Version Yes* | 290 of 4700 |
| 09/27/2002 at 09:21 | DCMPDUser073 MPD 75 PROTETES GOT OFF OF METRO WALKING TOWARD FREEDOM PLAZA WITH ONE BIG BANNERS SAYING "CAPITALIST WAR". | 290 of 4700 |

| 09/27/2002 at 09:21 | DCMPDUser010 MPD Scene cleared. | 290 of 4700 |

| Incident **ARREST BEING MADE FREEDOM PLAZA** was created on **09/27/2002 at 09:52 EST** | | |
|---|---|---|
| 09/27/2002 at 09:48 | DCMPDUser073 MPD 100-150 PROTESTERS ARE BEING ARRESTED AT THE PARK AREA OF FREEDOM PLAZA. | 301 of 4700 |
| 09/27/2002 at 09:52 | DCMPDUser073 MPD INTEL 61 ON THE SCENE APPROXIMATELY 60 PROTESTERS ARE TRYING TO CROSS OVER TO THE PLATOONS FROM FREEDOM PLAZA. THEY ARE GETTING SOMETHING OUT OF THE WATER AND PUTTING IT IN CONTAINERS. THEY ARE NOW PUTTING ON MASK. | 301 of 4700 |
| 09/27/2002 at 09:56 | DCMPDUser073 MPD BICYCLIST ARE BEING FORCED TO STOP BY MPD AT FREEDOM PLAZA. | 301 of 4700 |
| 09/27/2002 at 10:14 | DCMPDUser010 MPD ARRESTS ARE STILL BEING MADE AT THIS LOCATION. | 302 of 4700 |
| 09/27/2002 at 10:40 | DCMPDUser010 MPD MULTIPLE ARRESTS ARE CONTINUING. PRISONERS ARE BEING LOADED UP ON METROBUSSES FOR TRANSPORT TO PROCESSING. | 301 of 4700 |
| 09/27/2002 at 12:24 | DCMPDUser010 MPD ARRESTS HAVE CONCLUDED. VARIOUS UNITS REMAIN ON THE SCENE WHICH IS CURRENTLY SECURE. | 301 of 4700 |
| 09/27/2002 at 13:04 | DCMPDUser010 MPD ALL CLEAR. | 301 of 4700 |

| Incident **DETENTION JOURNAL Freedom Plaza** was created on **09/27/2002 at 16:34 EST** | | |
|---|---|---|
| **09/27/2002 at 16:34 EST** | The following reporters were caught up in the mass arrests. Once they were properly identified by their press credentials they were released in accordance with detention journal procedures at 1300 hours: Stephanie Moore - UPI Mike Bruno - Washington Post Christina Marinapino - Washington Post *DCMPDUser010 / History Version Yes* | 357 of 4700 |

236.    As can be seen by plaintiffs' own chart, there is no reference in the E Team JOCC

Running Resume to any activity at Pershing Park on September 27, 2002 attributable to any of

the defendants.   The *Chang* plaintiffs admitted this much when they stated:   "There is no

discussion in the E Team document of . . . [Chief] "Ramsey," [Assistant Chief] "Newsham," or

[Assistant Chief] "Fitzgerald."  (*Id.* at 6.)

94

237.    As can be seen from plaintiffs' chart, there is no reference in the E Team JOCC Running Resume as to who ordered the arrests at Pershing Park on September 27, 2002.  The *Chang* plaintiffs admitted this much when they stated:  "There is no discussion in the E Team document of who made the arrests in Pershing Park or which command officials were on the scene at the time that the arrests were ordered."  (*Id.*)

238.    There is no dispute between the parties that the September 27, 2002 IOC Running Resume also does not indicate who ordered the arrests at Pershing Park.  (*Id.*; Chang Nov. 2010 SM, Ex. 81.)

239.    ***In short, there is no information on the JOCC Running Resume (or the IOC Running Resume or the CIC daily report) regarding the September 2002 IMF event that support any of the claims made by the Chang plaintiffs in this case.***

### F.    THE SPORKIN INVESTIGATION AND REPORT

**Summary:**    In 2009, at the request of then-D.C. Attorney General Peter Nickles, former United States District Judge Stanley Sporkin conducted an independent investigation regarding the existence and location of printed and electronic copies of any JOCC Running Resumes for the September 2002 IMF event, and the existence and reason for certain alleged "gaps" in the MPD audio recordings that were produced to all the Pershing Park plaintiffs in discovery.  Judge Sporkin interviewed fourteen witnesses.  No witness stated with any certainty that printed copies of the September 2002 JOCC Running Resume ever existed; in fact, all people interviewed stated that they never saw or did not recall seeing any hard copy of the September 2002 JOCC Running Resume.

240.    Shortly after Judge Sullivan issued his July 30, 2009 Order, former Attorney General for the District of Columbia Peter J. Nickles obtained the services of former United

States District Judge Stanley Sporkin to investigate and report on discovery issues in the *Chang* case. (Dkt. No. 567-1)

241.   Judge Sporkin issued a report on December 4, 2009. (Dkt. No. 567-1.) The report addressed two specific discovery issues. The first issue was the JOCC Running Resume, which had not been located as of December 2009. The second issue was so-called "gaps" in the audio recordings for September 27, 2002, which the District previously addressed in its Proposed Findings of Fact and Conclusions of Law Regarding Audio and Video Evidence. (Dkt. No. 944.)

242.   With respect to the JOCC Running Resume, the Sporkin Report concluded that there was no evidence to find that anyone ordered the destruction of the JOCC Running Resume. (*Id.* at 1-2.) Of course, this turned out to be true because the entire JOCC Running Resume was found intact without any deletions.

243.   Again with respect to the JOCC Running Resume, the Sporkin Report recommended that the District determine if there was a backup copy of the JOCC Running Resume. (*Id.* at 2.) However, as noted, the District already learned in October 2007 that NC4 did not have any backup tapes for the September 2002 IMF JOCC Running Resume.

244.   Fourteen District witnesses were interviewed in the Sporkin investigation, including Chief Ramsey, Assistant Chief Newsham, MPD General Counsel Terry Ryan, MPD Deputy General Counsel Ron Harris, Stephen Gaffigan, and Commander James Crane. The report noted that OAG and MPD fully cooperated in the investigation, that all District witnesses were cooperative, and that there was no attempt by any District witnesses to deceive or mislead. (*Id.* at 2-4.)

245.   The investigation found that there was no conclusive evidence that a printed hard copy of the September 2002 IMF JOCC Running Resume was ever made. (*Id.* at 6.) Indeed, the

Sporkin Report identified ten people as saying that they never saw or did not recall seeing a printed copy of the September 2002 IMF JOCC Running Resume (Broadbent, Trugman, Gaffigan, Murphy (as quoted by Ryan), Howell, Newsham, Crawford, Crisifulli [sic],[42] Ramsey, and Ponton).  (*Id.* at 6-13.)

246.    With respect to the one person who has stated at times that he saw a printed copy of the Running Resume – MPD Sergeant Douglas Jones – the Sporkin Report noted that Jones "*made it clear* [that] he cannot specifically recall ever having seen the September 27, 2002 Running Resume."  (*Id.* at 7) (emphasis added).  Thus, of the fourteen people interviewed by Judge Sporkin, eleven stated that they did not see nor did not recall seeing a JOCC Running Resume for the September 2002 IMF event.  The point is this – ***no person interviewed by Judge Sporkin stated that they definitively saw a printed copy of any JOCC Running Resume for the September 2002 IMF event.***

247.    Despite the overwhelming evidence he collected in his own investigation, Judge Sporkin "believe[d] there was a Running Resume for [September 27, 2002] in both electronic and hard copy form."  (*Id.* at 15.)  As can be seen in these Findings and Conclusions set forth herein, Judge Sporkin's conclusion regarding a hard copy of the Running Resume is not supported by the evidence in this investigation.[43]

---

[42]     Crisafulli's name is misspelled in the Sporkin Report.  *See, e.g.*, Report at 12.

[43]     With respect to an electronic version of the E Team Running Resume for September 27, 2002, the Sporkin Report concluded, "[w]e are particularly troubled by the fact that the group electronic recordation system was purged."  (*Id.* at 16.)  Although it is not clear what Judge Sporkin meant by "group electronic recordation system," this conclusion is incorrect regarding the E Team system because that information was not "purged" but was fully recovered in May 2011.  Of course, Judge Sporkin did not know this in 2009.  Moreover, as noted, a GroupSystems JOCC Running Resume was not created during the September 2002 IMF event.  Thus, any conclusion in the Sporkin Report that data was "purged" from the GroupSystems server is also incorrect.

### G.    THE BLUE BINDER FOUND BY MPD OFFICER JOHN STRADER

**Summary**:    In October 2009, while cleaning the CIC, MPD Officer John Strader found a binder that he claimed was the size of legal paper (8 ½ by 14 inches) with blue covers and a metal two-pronged clip fixed in the top of the back cover for holding papers in the binder. Strader also said the binder he found had bold black magic marker writing on the front cover, and that it was about two to three inches thick.  Strader said he quickly flipped through the pages after finding the binder, that it appeared to contain radio runs, and that he saw the words "September 2002" on a page near the end of the binder.

Within minutes of finding the binder, Strader gave it to MPD Captain Jeffrey Herold, who immediately delivered the binder to MPD Assistant General Counsel Teresa Quon in MPD's Office of General Counsel (OGC).  Strader did not tell Herold – or anyone else that day – that he found the September 2002 IMF Running Resume.  When Herold gave the binder to Quon, or within minutes thereafter, District OAG attorney Thomas Koger arrived at the General Counsel's Office on other business.  Koger examined the binder and stated that it contained running resumes and other information from the April 2002 IMF event.  Koger was familiar with this information because he had just settled the case concerning the April 2002 IMF event. Besides Koger and Quon, MPD General Counsel Terry Ryan and Deputy General Counsel Ron Harris also examined the binder within several minutes and saw that it did not contain the September 2002 JOCC Running Resume.  Consequently, because four lawyers familiar with the mass demonstrations cases saw that the binder did not involve the *Chang* case but rather a case that had just settled, it was not reported to District counsel handling the *Chang* case.  OGC, however, kept possession of the binder until it became an issue in August 2011.

Significantly, within weeks after finding the binding in 2009, Strader saw it sitting in

Ryan's office, and at that time Strader, Ryan, and Harris took a tour of the CIC so that Strader could show Ryan and Harris exactly where he found the binder.  Knowing that the binder contained documents about the April 2002 IMF event, Ryan and Harris thought it would be prudent to conduct another search of that location for other documents that might pertain to the September 2002 IMF event that had not yet been found and produced by the fall of 2009.  Ryan carried the binder with him on the tour, but Strader did not say it was not the binder he found several weeks earlier.

Almost two years later, on August 1, 2011, (and after the September 2002 JOCC Running Resume had been found), District counsel Shana Frost was in the CIC when Strader (whose normal work assignment was in the CIC) mentioned to Frost that he had found a hard copy of the September 2002 JOCC Running Resume almost two years earlier and that it had been delivered to OGC by Captain Jeffrey Herold.  This was the first time in 22 months since first finding the binder that Strader told anyone that he thought he found the September 2002 IMF JOCC Running Resume.  Frost immediately contacted Ryan to ask if OGC had such a document.  Ryan said that his office had a binder found by Strader and delivered to OGC by Herold in the fall of 2009, but that it was not the September 2002 IMF JOCC Running Resume. After examining the binder in Ryan's office, Frost could readily see that the binder did not relate to the *Chang* case.  However, because Strader had said specifically that he found the September 2002 IMF Running Resume, Frost wanted to ask Strader some questions about the binder.

Consequently, a meeting was held on August 2, 2011, in Ryan's office, attended by Strader, Frost, Ryan, and Quon.  Strader was shown the blue binder (which was marked at Strader's December 15, 2011 deposition as Ex. 3 and which the *Chang* plaintiffs have marked as Exhibit 31 for the Special Master hearings), and he claimed that it was not the same binder he

found in 2009. Frost, who was surprised by this statement, decided to request another meeting, this time with Herold present. This meeting, conducted on September 6, 2011, was attended by Frost, Strader, Herold, Ryan, and Quon. Strader was accompanied by Sergeant Delroy Burton, an Executive Steward with the Fraternal Order of Police (FOP). Strader and Herold were shown Exhibit 31, and Herold at that time stated that he did not think the binder was the same that he brought to Quon in October 2009. Herold later testified that Exhibit 31 "may very well have been" the binder he gave to Quon in 2009. Strader left the September 6, 2011 meeting with Burton before Strader could comment again on the binder.

On or about September 16, 2001, the FOP filed a letter in the *Chang* case, to which was attached a statement drafted by Strader indicating that the binder shown to him at the August 2 meeting was not the binder he found in October 2009. Although the letter is dated August 31, 2011, the FOP letter was not filed with the Court until September 16, 2011, when the District first saw the letter. Consequently, the District was not aware of the FOP letter until after the August and September meetings with Strader.

At his deposition in December 2011, Strader was shown Exhibit 31, and this time Strader stated that Exhibit 31 was the not the same document shown to him at the meetings in August and September 2011. As a result, Strader was claiming that there were three different blue binders involved in the matter. Herold was shown Exhibit 31 at his deposition in January, 2012, and he stated that it appeared to be the same binder shown to him at the September 2011 meeting.

There are numerous reasons why the blue binder that Herold delivered to OGC in October 2009 is Exhibit 31. *First,* four attorneys familiar with IMF mass demonstration cases looked at the binder ***at the time Herold delivered the binder to OGC*** in October 2009 and

concluded that it contained documents relating to the April 2002 IMF event.  (This was later confirmed by a fifth lawyer (Frost) familiar with the JOCC Running Resume.)  *Second*, Strader claimed that the document he found had blue covers, with black magic marker writing in bold letters on the cover, and partly contained copies of radio runs near the first few pages.  This description matches Exhibit 31.  *Third*, Strader did not tell Herold – or anyone else that day – that he (Strader) found the September 2002 JOCC Running Resume when he gave the binder to Herold.  *Fourth*, Strader saw Exhibit 31 in Ryan's office several weeks after finding the binder and did not say that it was not the binder he found.  *Fifth*, even Strader and Herold, who handled the binder within minutes of each other, cannot agree on a description of the binder.  *Finally*, the blue binder never left the custody of OGC between October 2009, when Herold delivered the binder to OGC, and August 2011, when Frost took possession of the binder for OAG.  The binder that OGC had in its possession the entire time was Exhibit 31.

Most important is the fact that by August and September 2011, the District had already found the E Team JOCC Running Resume (recovered by Bynum in May 2011).  To be sure, the District had been looking for a printed copy of the September 2002 JOCC Running Resume for years, and if Strader had found the Running Resume in 2009 (or any document related to the *Chang* case that had not been previously produced in discovery), the District would have disclosed that fact immediately.  There would be no logical reason for MPD to lose, destroy or hide the binder found by Strader in 2009, and then bring attention to the matter in 2011 by having Strader and Herold attempt to identify the binder.

Strader was in possession of the binder for about five minutes in October 2009, and Herold had possession of the binder for about ten minutes when he delivered it to OGC.  The evidence shows that both officers have poor recollections of what they handled for several

minutes almost four years ago, and even they disagree among themselves as to what they saw when the binder was initially found.  The evidence overwhelmingly shows that Exhibit 31 does not contain the September 2002 IMF JOCC Running Resume, and it is the blue binder that Strader found in October 2009.

### 1.   Officer Strader Finds the Blue Binder

248.   MPD Officer John T. Strader, has been a member of the MPD force for almost 19 years and has worked in the CIC since 2002.  (Strader SM, Nov. 8, 2012, at 6:24-25.)  Strader recalled that he might have been at Pershing Park on September 27, 2002, but does not have any specific recollection of where he was on that day.  (Dep. of John Strader, December 15, 2011, at 12, 14, 19 (Chang Nov. 2012 SM Ex. 30).)

249.   On October 7, 2009, MPD Sergeant Doug Jones sent an email to MPD Officers Strader and Stephen Bias.  The email requested they look for any documents that might relate to the September 2002 JOCC Running Resume.  (Chang Nov. 2012 SM Ex. 28.)[44]  Strader replied to the email by reminding Jones that he (Strader) did not start working in the CIC until November of 2002, but that he would help.  (Strader SM, Nov. 8, 2012, at 14:18-21; Dep. of Strader, at 23.)

250.   Strader testified that while he and others were cleaning the CIC, he opened a drawer in a white filing cabinet where CIC personnel kept luncheon menus and spare packets of

---

[44]     Sgt. Jones testified before the Special Master in 2010 that he already made an extensive search for the September 2002 IMF JOCC Running Resume:  "I looked through files . . . numerous file cabinets, numerous boxes, and I went in all the cubbies in both the JOCC and the SOCC [CIC]."  Jones said that he searched "high and low" for "hours and hours . . . looking for this and asking people. . . .  I asked everybody that I ran into to help."  However, despite his diligent and persistent searches, Jones never found a hard copy of any September 2002 JOCC Running Resume – and that is because a hard copy of the JOCC Running Resume was never printed.  (Jones SM, Oct. 12, a.m., at 32:13-21.)

condiments, and found three books – including a blue binder – lying on top of everything in the

drawer.  (Strader Nov. 8, 2012, at 18:14-19:17.)   Strader had been in the same cabinet drawer

the day before to get menus and did not see the blue binder at that time.  (*Id*. at 19:10-11.)[45]

251.   Strader described the binder as being "a bluish marbleized color" with JOCC

Activation Running Resume written on the cover in black magic marker.  He also described the

binder as containing legal sized paper in an expandable folder with metal prongs in the back

cover at the top that folded over to hold the enclosed documents in place.  Strader further

described the binder as being "like an accordion, like something that would expand."  (*Id*. at

19:20-21.)  Strader said that the book was "between two and three inches thick."  (*Id*. at 20:17-

18.)[46]

252.   Strader testified that when he found the book, he "first opened the cover, [and] it

appeared to be to me a transcript of radio runs. . . .  When I got about three quarters of the way

---

[45]      During his December 15, 2011 deposition, Strader expressed considerable confusion over
when he found the blue binder.  Strader first claimed that he found it in March 2010 when Jeff
Wobbleton sent an email on March 2, 2010, asking Strader and others to help clean up the CIC in
preparation for a Congressional visit.  (Dep of Strader, at 29) (Chang Nov. 2012 SM Ex. 30.)
Later in his deposition, Strader changed his testimony and stated that he actually found the blue
binder several months earlier—sometime between October 2009 and December 2009—when he
recalled that he went to give the binder to Sergeant Jones in the SOCC.  (*Id*. at 138.)  Strader
then stated that the email from Wobbleton in March 2010 actually was in connection with a
second office clean up of the CIC.  (*Id*. at 139-43.)  Strader admitted in his testimony before the
Special Master that he was mistaken in his deposition about when he found the binder.  He
finally agreed that he found the binder in the fall of 2009.  (Strader SM, Nov. 8, 2012, at 98:9-
99:1.)  Strader's confusion over when he found the binder makes it reasonable to conclude he
was also mistaken about what he found.

[46]      In his deposition, Strader said the book had "two metal things that pull up and you can
slide the papers out and then you bend those over [referring to the prongs for the clasp].  But the
metal parts did not come out on the outside.  In other words, when the cover was closed you
wouldn't see the metal, and the back portion of the book, it's kind of like an accordion thing.  In
other words, it could grow as it got bigger."  (Dep. of Strader, at 41.)  Strader provided the same
general description of the binder in his testimony before the Special Master.  (Strader SM, Nov.
8, 2012, at 19:17-24.)

through the book, down towards the bottom right side of the page I was looking at, I saw September 27th, 2002, Pershing Park. So I closed the book." (*Id.* at 20:21-21:3.) (*See also* 91:18-25.) Significantly, however, Strader testified that he did not notice if the binder contained a running resume for the September 2002 IMF event. (*Id.* at 93:21-94:3; 94:6-17; 95:12-16.)[47]

253.    Strader did not make a copy of the contents of the blue binder. (Dep. of Strader, at 44.)

254.    Strader took the binder to MPD Lieutenant Jesse Porter, who suggested he take the blue binder to MPD Chief Patrick Burke's office in the SOCC and give it to Sergeant Jones. (Strader SM, Nov. 8, 2012, at 21:3-9; 23:22-24.) When Strader went to give the blue binder to Jones, who normally was in Chief Burke's office, Strader learned that Jones had left for the day. (*Id.* at 24:6-9.)

255.    Strader recalled that present in Chief Burke's office at that moment were Thomas Wilkins, Sergeant Christopher Yezzi, and Captain Jeffrey Herold. Strader first offered the binder to Wilkins who, being a civilian employee of MPD, thought it best not to take custody of the binder. Instead, Herold, an MPD officer, took the binder from Strader and agreed to take it to Terry Ryan, the General Counsel of MPD. (*Id.* at 24:24- 25:25.)[48]

---

[47]     The following exchange occurred during Strader's testimony before the Special Master: "Q: So when you scanned through the book [when you found it], you didn't notice whether there was a reference to a JOCC running resume? A: No, sir." (Strader SM, Nov. 8, 2012, at 94:1-3.) Despite Strader's admission that he did not think he found a JOCC Running Resume in October 2009, the *Chang* plaintiffs have ignored Strader's testimony and have repeatedly asserted that Strader had "found" or "discovered" the September 2002 IMF JOCC Running Resume. (*See* Plaintiffs' Response to the District's Supplemental Findings of Fact Regarding Audio and Video Evidence, Dkt. No. 948, at 3 n.1, 19, 20, 27, 70, and 90.) One of the *Chang* lawyers also misrepresented this fact when questioning MPD Chief of Police Lanier. (*See* Lanier SM, March 19, 2013, at 37:22-23.)

[48]     The District maintains that the blue binder that Strader found in October 2009 was later shown to him during his deposition and was identified as Deposition Exhibit 3, which the *Chang* plaintiffs marked for the Special Master hearings as Chang Nov. 2012 SM Ex. 31 (DC2011-

## 2. Captain Herold Takes the Binder to the MPD General Counsel's Office

256.    MPD Captain Jeffrey Herold testified before the Special Master that he was in a conference room in the SOCC at MPD Headquarters when Strader gave him a binder.  (Herold SM, Jan. 3, 2013, at 182:14-183:3.)  Present were Thomas Wilkins and Sergeant Christopher Yezzi.  (Dep. of Herold, at 13-14; 19-20) (Chang Nov. 2012 SM Ex. 35).)  In his deposition taken in January 2012, Herold could not recall whether Strader gave him the binder in 2009 or 2010.  (*Id.* at 13.)

257.    At the time he gave the binder to Herold, Strader said to Herold that he found the binder in a cabinet in the CIC and that he thought the binder was important.  *Herold testified twice that when Strader gave him the binder, Strader did not mention the September 2002 IMF JOCC Running Resume, or say anything about a running resume in general*.  (*Id.* at 15-16; Herold SM, Jan. 3, 2013, at 183:3-184:6, 205:6-16.)

258.    Herold described the book as looking like other MPD in-house production manuals with a black band running down the spine binding it together, cardboard covers, and regular 8 1/2 by 11 typing or copy paper.  Herold repeatedly stated that he did not recall the color of the covers.  (Dep. of Herold, at 24-25; Herold SM, Jan. 3, 2013, at 184:12-19, 186:24-25, 201:15-22, 212:14.)  In his testimony before the Special Master in January 2013, Herold was asked about Strader's description of the color of the binder as "blue marbleized color."  When the Special Master asked Herold what he thought "blue marbleized color" meant, Herold pointed to Exhibit 31 and said "very similar to what this is."  (*Id.* at 212:13-17.)

000018-89.)  Throughout this filing, the District will refer to Chang Exhibit 31 as the binder that Strader found and the one that Herold gave to the MPD General Counsel's Office in October 2009.

259.     In his January 2012 deposition, Herold could not recall whether the binder was an inch thick or three inches thick, and he could not recall if there was any writing on the cover of the binder.  (Dep. of Herold, at 25-26.)  In his testimony before the Special Master one year later, Herold said the binder was "not quite a half an inch," and that there was writing on the cover but he could not recall what the writing said.  (Herold SM, Jan. 3, 2013, at 184:19, 186:19-23.)

260.     Significantly, however, Herold testified in 2013 before the Special Master that he thought the binder given to him by Strader was about the same thickness as Exhibit 31 and that Exhibit 31 contained the same size of paper that was in the binder given to him by Strader.  (*Id*. at 202:3-13.)

261.     Although Strader testified before the Special Master that the binder he gave to Herold had two metal pronged clips fastened to the back of the binder to hold legal-sized paper, Herold stated that the binder Strader gave him did not have two metal prongs and that the binder contained letter-sized paper.  (*Id*. at 203:22-204:24, 212:21-24.)

262.     In his deposition, Herold testified that the binder given to him by Strader "looked like an internal document that our department creates, our plan manuals look very similar to that," with "a black band down the side binding it."  (Dep. of Herold, at 23-24.)  In his testimony before the Special Master one year later, Herold stated that the binder given to him by Strader "appeared to be something produced by our reproduction office."  (Herold SM, Jan. 3, 2013, at 192:2-8.)

263.     Herold would have been familiar with MPD publications that were bound with black or blue binding on the spine because he had worked in the MPD Special Operations Division that was responsible for publication of these MPD bound manuals, and that Herold actually wrote several of the manuals published by the Division.  (Frost SM, Jan. 11, 2013, at

197:14-198:7.)  Several bound manuals with black or blue binding on the spine were produced

for IMF events back in 2002 and 2003 when Herold worked in Special Operations Division.[49]

264.     After receiving the binder from Strader, Herold briefly reviewed the binder and

saw that it was a running resume, although he did not determine whether it involved the

September 2002 IMF event.  (Herold SM, Jan. 3, 2013, at 187:1-3.)  In his deposition, Herold

could not recall any of the information that was written in the book, including any dates.  (Dep.

of Herold, at 26.)  Herold stated that he had seen a JOCC Running Resume previously, but that

he never saw the September 2002 IMF JOCC Running Resume.  (*Id*. at 28; Herold SM, Jan. 3,

2013, at 201:10-14.)  This is additional proof that Strader did not find the September 2002 IMF

JOCC Running Resume in 2009.

265.     Herold took the binder to the MPD Office of General Counsel because he

"thought it was an important document."  (*Id*. at 184:10.)  Herold estimated that the binder was

in his possession for "less than five minutes," and that it was in Strader's possession for "less

than" 2 minutes.  (*Id*. at 215:2-3.)[50]

---

[49]     Three such bound volumes were shown to Frost during her testimony before the Special
Master, and she identified them as MPD in-house manuals that would have been produced by
MPD when Herold worked in the MPD Special Operations Division that produced these bound
volumes.   One of these manuals was entitled "First District International Monetary Fund
Operational Plan" for the September 2002 IMF event, with a blue binding on the spine and
"JOCC" written in black magic marker on the cover.   Another manual was entitled "Outside
Agency Operations Manual" for the September 2002 IMF event, with a black band on the spine.
A third manual was entitled "Command Manual" for the April 2003 IMF event.  It also had
"JOCC" written on the cover in black magic marker.  (Frost SM, Jan. 11, 2013, at 196:7-198:12.)
The *Chang* plaintiffs have had these documents for over 5 years.  (*See, e.g.*, Chang Oct. 2012
SM Ex. 29.)   It is reasonable to conclude that Herold thought one of these in-house MPD
manuals that he had helped produce in 2002 and 2003 was what Strader handed to him in
October 2009.

[50]     Thus, another explanation for all the inconsistencies and discrepancies concerning the
testimony of Strader and Herold is that both of them had possession of the binder for less than
ten minutes almost four years ago.

266.    Herold gave the binder to Teresa Quon, an attorney in the MPD's Office of General Counsel.  (*Id*. at 185:7-11; Quon SM, Nov. 28, 2012, at 243:14-244:1.)

267.    Quon testified before the Special Master that Herold gave her a three-ring binder, light blue in color, about one-half to two inches thick, with black writing on the cover.  (*Id*. at 243:21-244:1.)  She remembered the binder "very distinctly," and she identified Exhibit 31 as the binder that Herold gave to her.  (*Id*. at 244:13-24.)  Later in her testimony, Quon said she was "absolutely" certain that Exhibit 31 was the same binder given to her by Herold.  (*Id.* at 254:5.)  At the conclusion of her testimony before the Special Master, Quon stated that she was "100 percent certain without a doubt" that Exhibit 31 was the binder given to her by Herold in 2009.  (Quon SM, Nov. 29, 2012, at 73:1.)

268.    Herold stated that OAG attorney Thomas Koger was either in Quon's office when Herold gave the binder to Quon, or arrived shortly after Herold came to the OGC office.  Koger reviewed the document and said it was from a lawsuit that was just recently "settled."[51]  Herold told the Special Master that after Koger looked at the binder he (Koger) was "pretty sure of what it was."  (Herold SM, Jan. 3, 2013, at 207:12.)  Herold lost interest in the binder after Koger said it was related to settled litigation.  (Dep. of Herold, at 32-33, 36; Herold SM, Jan. 3, 2013, at 207:11-208:2.)  Quon confirmed that Koger looked at the binder and concluded that it did not pertain to the *Chang* case.  Like Herold, Quon quoted Koger as stating that the binder involved a case that had "settled."  (Quon SM, Nov. 28, 2012, at 246:12-20, 249:7-9.)

---

[51]    Koger was referring to the settlement in *Bolger v. District of Columbia*, Civil Action No. 03-0906 (JDB), which involved arrests made during the April 2002 IMF event.  The *Bolger* case settled in October 2009.  (*See Bolger* Dkt. No. 206.)  Koger was the lead District counsel in the *Bolger* case.

269.     Quon then showed the binder to Ryan.   Ryan testified that the binder that Quon handed to him was a binder with two or three-rings on the inside, with mottled blue covers, with magic marker writing on the cover, and the binder was less than three-quarters of an inch thick. (Ryan SM, Nov. 28, 2012, at 128:16-22; 129:2-8; 146:24-25.)

270.     Ryan briefly examined the contents of the binder and could readily see that it did not pertain to the *Chang* case.   (*Id.* at 128:5-12; 266:16-19.)   Ryan stated that the binder contained several separate running resumes toward the end of the material in the binder that appeared to be from the spring of 2002.   Ryan did not see any reference in the material to September 2002.   (*Id*. at 134:22-135:7; 138:13-16; 145:20-22.)[52]

271.     Ryan handed the binder to Harris, who also examined the contents.   Harris stated that it contained a running resume from the spring of 2002.   (*Id*. at 139:10-13.)

272.     Thus, within a matter of minutes from the binder being delivered to MPD's Office of General Counsel, four attorneys familiar with the *Bolger* and *Chang* cases (Quon, Koger, Ryan, and Harris) looked at the contents of the binder and could see that it did not pertain to the September 2002 IMF event.   (*Id*. at 155:22-24; 258:18-24.)

273.     The attorneys in MPD's Office of General Counsel did not give the binder to any of the attorneys representing the District in the *Chang* case because "it was not evidence in the Pershing Park case."   (Quon SM, Nov. 28, 2102, at 255:23.)    As Ryan repeatedly stated during his testimony before the Special Master, it was clear that the binder found by Strader was not relevant to the *Chang* case and therefore it was not responsive to any outstanding discovery

---

[52]     Ryan's description of the appearance and the contents of the binder handed to him by Quon in the fall of 2009 precisely matched the appearance and contents of Exhibit 31.   Exhibit 31 contains four different JOCC running resumes for the April 2002 IMF event in the back section of the binder:  one for April 22, 2002 (DC 2011-000035 to 000048; a second for April 21-22, 2002 (DC 2011-000049-000059; a third for April 20-21, 2002 (DC 2011-000060-000076; and a fourth for April 19-20, 2002 (DC 2011-000077-000087).

request in the case.  (Ryan SM, Nov. 8, 2012, at 262:8-9; 15-22; 266:16-19; 270:24-271:3.) Ryan added that if the binder found by Strader had been the September 2002 JOCC Running Resume, "we would have alerted the attorney general's office immediately." (*Id*. at 269:6-7.)

274.    Quon and Ryan testified that the binder was maintained in MPD's Office of General Counsel between October 2009 and August 2011.  (Quon SM, Nov. 28, 2012, at 257:10-20; Ryan SM, Nov. 8, 2012, at 140:19-24.)   In August 2011, when there was first discussion about Strader finding a JOCC Running Resume, the binder was provided to the District lawyers handling the *Chang* case.  Quon said that binder that was produced to OAG was Exhibit 31, the same blue binder given to her by Herold in October 2009.  (Quon SM, Nov. 28, 2012, at 257:21-22.)

### 3.      Officer Strader Sees the Binder in the General Counsel's Office Several Weeks After He Finds the Binder

275.    Strader stated that "a few weeks" after finding the blue binder in 2009, he had a conversation with several officers in the CIC, and MPD Sergeant Ricky Murray suggested to Strader that he should give Chief of Police Cathy Lanier "a head's up" about the discovery of the binder.  Strader called MPD Captain Ralph Ennis, an assistant to Chief Lanier, to discuss the binder, and Ennis suggested that Strader talk to MPD General Counsel Terry Ryan.  (Strader SM, Nov. 8, 2012, at 26:8-28:10.)

276.    Later that same day, Strader went to the MPD's Office of General Counsel and was greeted by Ron Harris, Deputy General Counsel.  Strader was shown into Terry Ryan's inner office.  Teresa Quon was present in Ryan's office at the time.  Ryan then showed a blue binder to Strader and asked him if he had ever seen it before.  Strader looked at the binder that Ryan handed to him and said that it was the blue binder he found in the CIC and gave to Herold.

(*Id*. at 28:22-29:24; 98:14-16; 102:7-14; 106:5-6.)  The binder that Ryan handed to Strader was Exhibit 31.  (Quon SM, Nov. 29, 2012, at 60:16-63:7.)

277.    Strader did not say to Ryan or Quon at that time that the blue binder in Ryan's office was a different binder from the one Strader found a few weeks earlier.  (Ryan SM, Nov. 8, 2012, at 170:9-13; 171:4-6.)  Thus, the only conclusion that can be reached is that the binder that Strader saw in Ryan's office in late October or early November of 2009 was Exhibit 31, the same binder that Quon said was given to her by Herold, and the same binder that Quon, Koger, Ryan, and Harris examined and saw that it pertained to the April 2002 IMF event.

278.    Strader then took Ryan and Harris to the spot in the CIC where Strader claimed he found the binder.  The filing cabinet had since been removed.  Ryan carried with him the binder that Strader saw in Ryan's office at all times during that tour.  (Strader SM, Nov. 8, 2012, at 30:12-31:4.)  When Ryan was expressly asked by the Special Master, Ryan testified that at no time during that tour of the CIC did Strader say that the blue binder in Ryan's possession (Exhibit 31) was not the binder Strader found a few weeks earlier.  (Ryan SM, Nov. 8, 2012, at 170:9-13.)  (*See also* Quon SM, Nov. 29, 2012, at 72:11-16.)

279.    Ryan and Harris asked Strader to take them to all other places in the SOCC complex where things could be stored.  There were two brown cabinets in a closet.  Ryan opened a drawer dated January to December 2002 and removed the September file that contained the daily printout of the CIC (then called the SOCC) report from September 27.  The report for September 27 stated: "For JOCC activation see running resume."  (Strader SM, Nov. 8, 2012, at 31:3-33:15.)[53]

---

[53]    It is likely that this printout was one of the copies of the September 27, 2002 CIC daily report that Jones claimed he copied regarding the September 2002 IMF event.

280.     Strader pointed out the filing cabinets where he had placed two boxes of videos several years earlier, and Harris then mentioned to Ryan that this is location where Harris found videotapes in 2004.  (*Id.* at 34:15-36:1.)[54]

### 4.     Events Leading to the August 2 and September 6 Meetings with Strader

281.     In July 2011, MPD Officer Stephen Bias informed Strader that Commander James Crane wanted MPD personnel to conduct another search for anything related to E Team and any financial statements in reference to the September 2002 IMF event.  Bias asked for Strader's assistance in conducting this search, and Strader, Bias, and Officer Antonio Perry worked together on this project.  (*Id.* at 42:19-43:18; 44:24-45:2; Dep. of Strader, at 98-99, 101.)

282.     Strader and District counsel Shana Frost first met in the CIC in March 2010.  At that time, Strader did <u>not</u> tell Frost that he had found the September 2002 JOCC Running Resume in the previous fall.  In fact, Strader did not mention any running resume at that time. (Strader SM, Nov. 8, 2012, at 52:4-25; Frost SM, Jan. 11, 2013, at 175:17-177:5.)

283.     On August 1, 2011 – about 17 months later – as Strader and Bias were conducting the search for documents in the CIC as requested by Commander Crane, Strader again saw Frost and for the first time told her that he had found a binder almost two years earlier what Strader claimed had "JOCC Activation Running Resume" handwritten on the cover.  Strader told Frost that the binder he found had blue covers, about 2-3 inches thick, with black magic marker writing on the cover.  (Strader SM, Nov. 8, 2012. at 52:3-53:12; Frost SM, Jan. 11, 2013, at

---

[54]     These videotapes were first provided to the Pershing Park plaintiffs in March 2004.  *See* the District's Proposed Findings of Fact and Conclusions of Law Regarding Audio and Video Evidence, at ¶ 141.  (Dkt. No. 944.)  As described in that filing, and as noted above, it appears that *Chang* counsel did not avail themselves of the opportunity to obtain the tapes produced by the District from counsel in the other Pershing Park cases as contemplated by Judge Sullivan's Order issued early in the Pershing Park cases.  (*See* Dkt. No. 68.)

177:9-24, 179:8-11.)  When Frost testified before the Special Master, she said that what Strader

described to her generally met the description of Exhibit 31.  (*Id.* at 180:1- 23.)

284.     After reporting to her supervisors what Strader had told her, Frost immediately

called Ryan and asked if Strader had produced to OGC in the fall of 2009 a binder that contained

the September 2002 JOCC Running Resume.  Ryan told Frost that a binder found by Strader had

been delivered to OGC in 2009, but that it did not contain the September 2002 JOCC Running

Resume.  (*Id*. at 180:24-181:19.)

285.     Frost went to OGC to examine the binder that Ryan said was delivered by Herold

to OGC in October 2009.   Ryan readily produced the binder, and he told Frost that the binder

had been in the possession of OGC ever since it was delivered by Herold in 2009.   Frost

examined the contents of binder and could immediately see that it did not contain the September

2002 IMF JOCC Running Resume, but that it was the JOCC Running Resume for the April 2002

IMF event.  (Frost SM, Jan. 11, 2013, at 183:18-20.)

286.     ***As a result, <u>five</u> attorneys familiar with both the April 2002 and the September
2002 IMF events and the Chang case in particular looked at the binder found by Strader and
concluded – and have testified under oath – that it did <u>not</u> contain the September 2002 IMF
JOCC Running Resume but rather the JOCC Running Resume for April 2002.  (Id. at 184:8-
185:10.)   Indeed, no witnesses examined before the Special Master – including Strader,
Herold or Burton – have testified under oath that the binder Strader found in 2009 contained
the September 2002 IMF JOCC Running Resume.***

287.     As a result of Frost's independent examination of the binder, she decided to ask

Strader to come to OGC to examine Exhibit 31 to confirm that it was the binder he found in the

CIC in October 2009.  Thus, on August 2, 2011, Frost called Strader and left a voicemail

message.[55]   Strader called Frost back and Strader agreed to meet her in OGC that afternoon to look at the binder.  (*Id*. at 186:16-187:17.)

288.    Strader, Ryan, Frost, and Quon were at the meeting in OGC on the afternoon of August 2, 2011.  (Ryan SM, Nov. 8, 2012, at 205:21-24.)  Quon showed Strader the binder that the *Chang* plaintiffs later marked as Exhibit 31.  Strader did not examine the contents of the binder, but he nevertheless stated just by looking at the binder that it was not the binder he found in October 2009 – almost two years earlier.  (Quon SM, Nov. 28, 2012, at 59:10-65:15.)

289.    When Strader was asked by Quon at the August 2, 2011 meeting to draw a picture of the outside of the binder he claimed he found in October 2009, so that the attorneys could have a better idea of Strader's description of the binder, Strader refused to draw any picture.  Strader then abruptly left the meeting.  (*Id*. at 67:7-19.)  The August 2, 2011 meeting lasted about 10 minutes.  (Frost SM, Jan. 11, 2013, at 189:24-190:1.)[56]

290.    After the meeting on August 2, 2011, Frost thought it would be best to have another meeting so that Herold could also be present to describe the binder and relate the events of October 2009.  (*Id*. at 191:13-23.)[57]  As a result, Ryan contacted Strader and asked Strader if

---

[55]    The content of the voicemail message is reported in Ryan's testimony before the Special Master.  (*See* Ryan SM, Nov. 8, 2012, at 204:14-25.)  The message simply requested a meeting.

[56]    When Strader was shown the same Exhibit 31 at his December 15, 2011 deposition, he denied that the binder was the one he found in October 2009, but he also denied that Exhibit 31 was shown to him at the August 2, 2011 meeting.  Therefore, according to Strader, there were *three* mysterious binders all of which have the same general appearance—blue in color with black magic marker handwriting on the cover that are no more than one inch or two inches thick and contain what appear to be radio runs and running resumes.  Incredible as it seems, Strader confirmed during his testimony before the Special Master that he believes he has seen *three* different blue binders in this case.  (Strader SM, Nov. 8, 2010, at 67:20-68:9; 108:7-11.)  In fact, throughout this entire matter, there has been only one binder – Exhibit 31.

[57]    Herold testified in his deposition and before the Special Master that he believed there was a meeting concerning the binder with Ryan and Frost after the August 2 meeting and before the September 6 meeting, but he doesn't recall when that meeting occurred or what was discussed.

he would again come to MPD's Office of General Counsel sometime after Labor Day in September 2011.  (Ryan SM, Nov. 8, at 70:23-72:13.)  A meeting was scheduled for September 6, 2011.

291.    On or about August 15, 2011, before the September 6 meeting, Strader contacted Kristopher K. Baumann, Chairman of the Metropolitan Police Department Labor Committee of the Fraternal Order of Police (FOP), the union for MPD officers, in order to have union representation at the September 6 meeting.  Baumann assigned Delroy Burton, an MPD Sergeant and Executive Steward of the FOP, to represent Strader at the meeting.  ((Dep. of  Strader, at 163-64; Burton SM, Nov. 29, 2012, at 17:14-17.)

292.    Present at the September 6, 2011 meeting in the OGC was Herold, Strader, Burton, Ryan, Quon, and Frost.  (Strader SM, Nov. 8, 2012, at 73:10-15; Herold SM, Jan. 3, 2013, at 194:10-14; Burton SM, Nov. 29, 2012, at 19:1-2.)

293.    During this meeting, Strader and Herold were shown Exhibit 31.  (Dep. of John Strader, at 165.)

294.    At no time did Herold tell Frost that Strader had told him that he (Strader) had found the September 2002 IMF JOCC Running Resume.  (Frost SM, Jan. 11, 2013, at 198:13-16.)

295.    Before there could be any discussion of Exhibit 31, Frost raised the concern that Burton's presence at the meeting could result in a waiver of the privileges that might be involved.  Accordingly, there was a discussion between Frost, Ryan, Strader, and Burton on how to proceed, including whether Strader could be provided a letter from a senior MPD official

_____

(Dep. of Herold, at 46-48; Herold SM, Jan. 3, 2013 at 189:15-190:8.)  Frost does not recall a separate meeting with Herold before the September 6 meeting.  (Frost SM, Jan. 11, 2013, at 3:25-4:22.)

stating that Strader would not be subject to discipline in connection with his involvement with the binder.  Burton would not agree that what Frost might say in front of him would be privileged.  Before that issue could be resolved, however, Strader and Burton decided between themselves to leave the meeting.  (Burton SM, Nov. 29, 2012, at 19:3-22:1; 34:4-6.)

296.    Burton, who was present at the August 2, 2011 meeting for a short time, testified that the binder shown to Strader at that meeting was light blue in color, in a worn condition, with writing on the front cover and about an inch thick, and was "very similar in appearance" to Exhibit 31.  (Burton SM, Nov. 29, 2012, at 36:6-19, 43:13-44:17.)  In fact, Burton – Strader's FOP representative – confirmed that he has no knowledge of the destruction of any evidence in this case, including the blue binder.  (*Id.* at 46:1-9.)

297.    At no time has MPD taken any adverse employment action against Officer Strader as a result of his involvement in these proceedings.  (Dep. of Strader, at 181-83.)

298.    After Strader left the meeting, Herold was shown Exhibit 31 and he was asked if it was the binder that he delivered to OGC in October 2009.  Herold did not believe it was the same binder.  However, Herold said he understood the purpose of identifying the binder was to help the District properly produce responsive materials to the plaintiffs and not that the District wanted him to misidentify the book.  (Dep. of Herold, at 48:12-50:21.)

299.    During his deposition taken on January 27, 2012 (more than four months after the September 6, 2011 meeting), Herold was shown Exhibit 31.  Significantly, Herold stated in his deposition the following:  "To be accurate, portions of this document [Exhibit 31] very well may have been in that document that I gave to Ms. Quon."  (Dep. of Herold, at 53.)  Herold confirmed the accuracy of this testimony when he appeared before the Special Master in January 2013.  (Herold SM, Jan. 3, 2013, at 211:3-18.)  Thus, Herold has suggested by his testimony on several

occasions that Exhibit 31 might very well be the blue binder that he delivered to OAG in October 2009.

300.    Strader never gave Herold the impression that the District lawyers were attempting to intimidate him, influence him, or suggest how he should respond about the binder. (*Id*. at 51:2-7.)

301.    Because Exhibit 31 contained information concerning a case that had settled by October 2009 and was a closed case and no longer active, it was appropriate for MPD's Office of General Counsel to store the binder with other similar records in MPD's Office of General Counsel.  It was given to District Counsel Frost only when Frost requested to see the binder two years later.[58]

302.    It is reasonable to conclude that the blue binder found by Strader in October 2009 was the same blue binder that was shown to him at the August 2, 2011 meeting in the MPD General Counsel's office and the same binder that was shown to him at his deposition on December 15, 2011.  The binder shown to Strader at both meetings was Exhibit 31.[59]

---

[58]    During Strader's deposition on December 15, 2011, and during his testimony before the Special Master on November 8, 2012, Strader was factually wrong numerous times about key information or was confused about when significant events occurred.  As noted, through most of his deposition testimony, Strader insisted that he found the blue binder in March 2010, and only after he was corrected did he finally concede that he actually found the binder in October 2009.  In addition, although he has worked in the CIC since November 2002, and helped generate the daily E Team CIC report, Strader did not know when MPD stopped using E Team in the CIC.  (Strader SM, Nov. 2012, at 11:8-16.)  Strader kept referring to the "Groupware" system until *Chang* counsel corrected him.  (*Id*. at 15:17-16:2.)  Finally, Strader was confused about when he met with Ryan and Harris and they went to the CIC to see where Strader found the binder.  (*Id*. at 105:19-106:6.)  In short, Strader has shown a poor recollection of many important facts in connection with this document.

[59]    Because the JOCC E Team Running Resume was found in May 2011, and it offers no support to the *Chang* plaintiffs' case, the only argument plaintiffs can make to suggest that the District had a motive to lose or switch the Strader binder hangs on there being a second running resume.  This requires the plaintiffs to argue that what Strader found in October 2009 was really a GroupSystems JOCC Running Resume for the September 2002 IMF event.  There are four

## VI.    PROPOSED CONCLUSIONS OF LAW

### A.    THE COURT'S AUTHORITY TO IMPOSE SANCTIONS

303.    Courts have the inherent power "to protect their institutional integrity and to guard against abuses of the judicial process." *Ali v. Tolbert*, 636 F.3d 622, 627 (D.C. Cir. 2011), (quoting *Shepherd v. American Broadcasting Companies, Inc.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995)).  *See also Chen v. District of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011); *Young v. Office of the U.S. Sergeant at Arms*, 217 F.R.D. 61, 65 (D.D.C. 2003); *Atkins v. Fischer*, 232 F.R.D. 116, 127 (D.D.C. 2005).

304.    Sanctions are divided into two general categories:  (1) punitive or penal sanctions; and (2) issue-related sanctions.  *Shepherd*, 62. F.3d at 1478; *Clarke v. Washington Metropolitan Area Transit Authority*, 2012 WL 5505242 at *7 (D.D.C. Nov. 12, 2012).

### 1.    Court's Authority to Impose Punitive or Penal Sanctions

305.    Punitive or penal sanctions include dismissals, default judgments, contempt orders, and the imposition of fines.  *Shepherd*, 62 F.3d at 1478; *Clarke*, 2012 WL 5505242 at *7.

306.    A punitive or penal sanction may be imposed  against the District when:  (1) the *Chang* plaintiffs have been so prejudiced by misconduct of the District that it would be unfair to require the *Chang* plaintiffs to proceed further in the case; (2) the District's misconduct has put an intolerable burden on the Court by requiring the Court to modify its own docket and

---

obvious problems with this stretch of an argument.  First, as explained above, there was no September 2002 IMF GroupSystems JOCC Running Resume because the GroupSystems program was not used *in the JOCC* for the September 2002 IMF event.  Second, even though Strader claimed that he looked through the binder when he found it, he never told Herold or anyone else that same day that he found a running resume, much less the September 2002 IMF running resume.  Third, plaintiffs' argument would not explain why *five attorneys* have testified under oath that the binder Strader found contained the April 2002 Running Resume.  Finally, as noted, no witness has testified before the Special Master that Strader found the September 2002 IMF JOCC Running Resume – including Strader himself, his FOP representative, or the person to whom he gave the binder in 2009.

operations in order to accommodate any delay; or (3) the Court finds it necessary to sanction conduct that is disrespectful to the Court and to deter similar misconduct in the future. *Webb v. District of Columbia*, 146 F.2d 964, 971 (D.C. Cir. 1998); *Clarke*, 2012 WL 5505242, at *7.

307.   The *Chang* plaintiffs have failed to meet their burden to prove by clear and convincing evidence that they are entitled to any punitive or penal sanction. *Shepherd*, 62 F.3d at 1477-78; *Beck*, 2013 WL 772879, at *2; *Mahaffey v. Marriott International, Inc.*, 898 F. Supp. 2d 54, 59 n.3 (D.D.C. 2012); *Clarke*, 2012 WL 5505242 at *7. This investigation has revealed that all of the JOCC Running Resume data was recovered and no data was lost or destroyed. That data clearly shows that there is no "smoking gun" in the Running Resume that supports any of plaintiffs' claims asserted in this case. As a result, the *Chang* plaintiffs have not suffered any prejudice as a result of the amount of time it took for the District to locate and produce the JOCC Running Resume. The document contains the same information today as it did in 2002, 2008, or 2011, and none of it is helpful to the *Chang* plaintiffs.

308.   Moreover, any delay in these proceedings has been the result of the *Chang* plaintiffs constantly raising new issues and requesting the testimony of new witnesses which, when examined carefully, have turned out to be baseless (e.g., continuing to suggest that there were "deletions" of the JOCC Running Resume when the *Chang* plaintiffs knew in May 2011 that all data was recovered; claiming there was a second GroupSystems Running Resume in the JOCC in September 2002 when they have known since 2007 that only one Running Resume was created in the JOCC; persisting in the suggestion that MPD Officer John Strader found the September 2002 IMF JOCC Running Resume, when even Officer Strader did not make such a claim and it was clear that the document he found pertained to the April 2002 IMF event; and spending days questioning five District lawyers (including the Attorney General) over alleged

discovery violations that never occurred).[60]   In short, the *Chang* plaintiffs have failed to prove that punitive or penal sanctions are warranted in this case.

### 2.   Court's Authority to Impose Issue-Related Sanctions

309.   Issue-related sanctions may be imposed to remedy a precise evidentiary issue; such as a party who fails to retain evidence may be precluded from introducing types of evidence, or the jury may draw an adverse inference from any missing evidence.  *Shepherd*, 62 F.3d at 1478; *Clarke*, 2012 WL 5505242, at *7.

310.   In this case, an adverse inference instruction is warranted against the District only when there is "a failure to preserve evidence," even if deliberate or reckless conduct is not present.  *Delta Sigma Theta Sorority, Inc. v. LaMith Designs, Inc*., 275 F.R.D. 20, 28 (D.D.C. 2011); *Jones v. Hawley*, 255 F.R.D. 51, 53 (D.D.C. 2009); *More v Snow*, 480 F. Supp. 2d 257, 274-75 (D.D.C. 2007); *Rice v. United States*, 917 F. Supp. 17, 19-20 (D.D.C. 1996).

311.   The negligent *destruction* of evidence may also warrant issue-related sanctions.  *Mahaffey*, 898 F. Supp. 2d at 58; *Chen*, 839 F. Supp. 2d at 12; *Beck v. Test Masters Educational Services, Inc.*, 2013 WL 772879, at *2 (D.D.C. Mar. 1, 2013); *More*, 480 F. Supp. 2d at 274-75; *Rice*, 917 F. Supp. at 19-20.

312.   If the party seeking sanctions can show that the other party destroyed potential evidence in bad faith or through gross negligence, the jury may be permitted to infer that the missing evidence is favorable to the moving party.  *Mahaffey*, 898 F. Supp. 2d at 62; *Chen*, 839 F. Supp.2d at 15.  *See also Ashford v. East Coast Express Eviction*, 2008 WL 4517177, at *2 (D.D.C. Oct. 8, 2008).

---

[60]   Of course, this same analysis applies to audio and video tapes that the District timely produced in this case.  There is nothing contained in the audio and video tapes that support the plaintiffs' case.  *See* Dkt. No. 944.

313.     Moreover, an adverse inference instruction is warranted only if the defendant "has *destroyed* potentially relevant evidence."  *Gerlich v. United States Department of Justice*, 2013 WL 1265522, at *8 (D.C. Cir. Mar. 29, 2013) (emphasis added).  *See also Talavera v. Shah*, 638 F.3d 303, 311 (D.C. Cir. 2011); *Webb*, 146 F.3d at 972-73.

314.     If the party seeking sanctions can show that the other party was only negligent in the handling of evidence, as opposed to grossly negligent or reckless behavior, that mere negligence is insufficient to infer relevance as to the third requirement for an issue-related sanction.  *Mahaffey*, 898 F. Supp. 2d at 63.

315.     The Court may impose the sanction of a permissive adverse inference instruction (which allows, rather than directs, a fact finder to presume that lost or destroyed evidence contained information favorable to the plaintiffs), but only if the Court finds that the conduct of the defendant was negligent in *losing* or *destroying* the evidence.  Conversely, the sanction of a mandatory adverse inference instruction (which instructs the jury to find that the missing evidence would be favorable to the plaintiffs), is appropriate only if the Court finds that the defendant intentionally *lost* or *destroyed* the evidence.  *Arch Ins. Co. v. Broan-Nutone, LLC*, 2012 WL 6634323, at *4 (6th Cir. Dec 21, 2012); *Beck*, 2013 WL 772879, at *4.  *See also Grosdidier v. Broadcasting Board of Governors*, 2013 WL 845289, at *7 (D.C. Cir. Mar. 8, 2013) (adverse inference instruction warranted only where "evidence is relevant to a material issue").

316.     In this case, the *Chang* plaintiffs are not entitled to any adverse inference instruction or any other issue-related sanctions because they have failed to meet their burden of proof in showing that the District ultimately failed to produce evidence it was required to produce, or that the District destroyed any evidence.  The results of this investigation clearly

show that the JOCC Running Resume was not destroyed and audio and video tapes were not erased.  There is no missing evidence that would permit a jury to infer that any missing evidence would be favorable to the plaintiffs.  In short, there has been no spoliation of evidence in this case.

### 3.     Court's Authority to Impose Sanctions Under Rule 37 for Discovery Violations

317.    This Court also has the authority to impose sanctions for discovery violations under Rule 37 of the Federal Rules of Civil Procedure.  *Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996); *Shepherd v. American Broadcasting Cos.*, *Inc.,* 62 F.3d at 1474; *Parsi v. Daioleslam*, 286 F.R.D. 73, 77 (D.D.C. 2012); *Chen*, 839 F. Supp. 2d at 12.  The factors for the Court to consider in deciding on an appropriate sanction include:  (a) the resulting prejudice to the other party; (b) the resulting prejudice to the judicial system; and (c) the need to deter bad discovery behavior in the future.  *McDowell v. District of Columbia*, 233 F.R.D. 192, 201 (D.D.C. 2006).

318.    Normally, sanctions cannot be imposed under Rule 37 unless and until the Court issues a discovery order that has been violated by the offending party.  *Shepherd*, 62 F.3d at 1470 ("A production order is generally needed to trigger Rule 37(b)."); *Parsi*, 286 F.R.D. at 76, 81-82.

319.    During the course of this litigation, the Court issued three orders pertaining to discovery of the September 2002 IMF JOCC Running Resume:  (a) Judge Sullivan's October 30, 2007 Order that the District produce JOCC Running Resume by the close of discovery on November 16, 2007, <u>or</u> explain why it cannot produce the data; (b) Judge Sullivan's July 30, 2009 Order requiring the District to certify its efforts to locate the JOCC Running Resume; and (c) Judge Sullivan's October 25, 2010 Minute Order requiring the District to access the "Groupware" system and create a running resume at the District's expense.

320.     Sanctions under Rule 37 are not warranted against the District because the District did not violate any of these discovery orders in the *Chang* case.  The facts show that regarding the Order of October 30, 2007, despite repeated attempts to locate both a printed copy and an electronic copy of the JOCC Running Resume, the information could not be located as of late October 2007.  As a result, on November 16, 2007, the District timely submitted to the Court five declarations describing the efforts to locate the JOCC Running Resume.  The District complied with this Order.  Regarding the Order of July 30, 2009, on August 12, 2009, the District provided the Court with a declaration signed by then District lead counsel Thomas Koger timely describing the efforts he and the MPD Office of General Counsel made to locate the JOCC Running Resume.  The District complied with this Order.  Regarding the Minute Order of October 25, 2010, the District made repeated efforts to locate printed and electronic versions of the GroupSystems running resume.  However, as explained above, the GroupSystems program was not used in the JOCC during the September 2002 IMF event.  The District cannot produce what does not exist.  Moreover, the District continued to search for the E Team JOCC Running Resume, and despite having to pay over $20,000 to get this information, and appeal a decision by Office of the City Financial Officer denying the requisition request to pay for the recovery, the E Team JOCC Running Resume was finally found and produced to the Court and the parties.  The District complied with this Order.

321.     Moreover, the *Chang* plaintiffs may not receive expenses under Rule 37(a) for their motion seeking sanctions because a motion for sanctions is not an order compelling disclosure or discovery.  *See Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1173 (D.C. Cir. 1985); *Beck*, 2013 WL 772879, at *5.

322.    Finally, the *Chang* plaintiffs may not receive attorney fees as a sanction under Rule 37(b) because the District did not disobey any order of the Court to provide or permit discovery.  *Beck*, 2013 WL 772879, at *6.

### B.    THE DISTRICT'S DUTY TO PRESERVE EVIDENCE

323.    The District of Columbia had a duty to preserve potentially relevant evidence once it anticipated litigation in this case.  *Mahaffey,* 898 F. Supp. 2d at 58; *Chen*, 839 F. Supp. 2d at 12; *D'Onofrio v. SFX Sports Group, Inc*., 2010 WL 3324964, at *5 (D.D.C. Aug. 24, 2010); *Smith v. Napolitano*, 626 F. Supp. 2d 81, 101 (D.D.C. 2009); *Smith v. Café Asia*, 246 F.R.D. 19, 21 n.2 (D.D.C. 2007).  This duty included locating relevant information that was known to the District or was reasonably calculated to lead to the discovery of admissible evidence, and/or was the subject of a pending discovery request.  *Mahaffey*, 898 F. Supp. 2d at 60.  *See also Arista Records, Inc. v. Sakfield Holding Co*., 314 F. Supp. 2d 27, 33 n.3 (D.D.C. 2004);  *Jeanblanc v. Oliver Carr Co.*, 1992 WL 189434, at *2 (D.D.C. July 24, 1992).

324.    The District's duty to *preserve* evidence includes electronically stored information that could be relevant to the dispute.  *Peskoff v. Faber*, 251 F.R.D. 59, 62 (D.D.C. 2008); *Miller v. Holzmann*, 2007 WL 172327, at *5-8 (D.D.C. Jan. 17, 2007); *McPeek v. Ashcroft*, 202 F.R.D. 31, 32 (D.D.C. 2001).  This duty may include the need for the District to search any available backup tapes to locate discoverable evidence.  *Disability Rights Council of Greater Washington v. Washington Metro Transit Authority*, 242 F.R.D. 139, 146 (D.D.C. 2007).

325.    "Preservation" means "[t]he process of retaining documents and ESI [electronically stored information], including document metadata, for legal purposes and should include suspension of normal document destruction policies and procedure."  *Sedona Conference Glossary:  E-Discovery & Digital Information Management (Third Edition)* at 41 (Sept. 2010).

The District's obligation to suspend its normal document retention practices included the requirement of issuing a "litigation hold" to ensure that relevant documents were not lost or destroyed.   The Sedona Conference, *Best Practices Recommendations & Principles for Addressing Electronic Document Production*, at 44 (2004 Annotated Version). Of course, the Sedona Conference's commentary on preservation and litigation hold obligations reflect the "*developing* case law in this area."   *Miller v. Holzmann*, 2007 WL 172327, at *6 (emphasis added).

326.    The first time the words "litigation hold" were mentioned in the Federal Rules of Civil Procedure was in the Advisory Committee Notes to the 2006 amendments to Rule 37(f). The requirement was first mentioned by this Court in a judicial opinion in *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 830 (D.D.C 2006) (August 17, 2006).   Thus, the District's obligation to issue a formal litigation hold notice in the *Chang* case did not arise until August 2006.  *See Miller v. Holzmann*, 2007 WL 172327, at *6.  Despite the fact that the District did not have a formal obligation to issue litigation hold notices in the Pershing Park cases, including the *Chang* case, until August 2006, the District began issuing litigation hold notices as early as March 2004, and the District issued numerous notices over the next several years in an effort to locate relevant information.

327.    Without some showing by the *Chang* plaintiffs that any allegedly non-produced document or recording contains a "smoking gun," the District was not required to incur unusual costs to locate and produce a particular document or recording.  *McBride v. Haliburton Co.*, 272 F.R.D. 235, 241 (D.D.C. 2011).   Nor was the District required to produce multiple identical copies of relevant documents to every Pershing Park plaintiff group, including the *Chang* plaintiffs.  *See* Judge Sullivan's Order of November 25, 2003 (Dkt. No. 68).  *See also Zubulake*

*v. UBS Warburg LLC* (*Zubulake IV*), 220 F.R.D. 212, 218 (S.D.N.Y. 2003).  The District fully complied with the Court's November 25, 2003 Order.

328.   The District complied with its duty to preserve evidence in this case.  The *Chang* plaintiffs have failed me meet their burden of proof to show that any improper or inadequate preservation efforts by the District resulted in the loss or destruction of any relevant evidence that would have been favorable to the plaintiffs.

### C.   THE *CHANG* PLAINTIFFS BURDEN OF PROOF REGARDING SPOLIATION OF EVIDENCE

329.   District of Columbia law recognizes the tort of spoliation as requiring the *destruction* of relevant evidence.  *Holmes v. Amerex Rent-A-Car*, 710 A.2d 846, 854 (D.C. 1998).  *See also Holmes v. Amerex Rent-A-Car*, 180 F.3d 294, 297 (D.C. Cir. 1999).  "Spoliation requires a showing that the *loss or destruction* of the document significantly impairs the plaintiff's ability to prove his claim."  *Bell v. Rotwein*, 535 F. Supp. 2d 137, 145 (D.D.C. 2008) (emphasis added).

330.   A party that fails to preserve evidence may be accused of spoliation, which is the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.  *Mahaffey*, 898 F. Supp. 2d at 58; *Chen*, 839 F. Supp. 2d at 12; *D'Onofrio*, 2010 WL 3324964, at *5 and n.5.

331.   Any sanction against the District for spoliation of the JOCC Running Resume is warranted only if:  (1) the District (the party having control over the evidence) had an obligation to preserve the evidence when it was alleged to have been lost, destroyed, or altered; (2) any alleged destruction or loss of the JOCC Running Resume was accompanied by a culpable state of mind on the part of the District; and (3) the JOCC Running Resume that was allegedly lost, destroyed or altered was relevant to the claims or defenses of the *Chang* plaintiffs to the extent

126

that a reasonable fact finder could conclude that the alleged lost or destroyed evidence would have supported the claims or defenses of the *Chang* plaintiffs. *Mahaffey*, 898 F. Supp. 2d at 58; *Chen*, 839 F. Supp. 2d at 12-13; *Mazloum v. D.C. Metropolitan Police Department*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008); *Clarke,* 2012 WL 5505242, at *7.

332.    With respect to the third requirement, the concept of "relevance" encompasses not only the ordinary meaning of the term, but also that the alleged destroyed or lost evidence would have been favorable to the *Chang* plaintiffs. *Mahaffey*, 898 F. Supp. 2d at 62; *Chen*, 839 F. Supp. 2d at 14.   In other words, the *Chang* plaintiffs have the burden of proving by a preponderance of the evidence that a sanction against the District is warranted, and only when "the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue." *Talavera*, 638 F.3d at 311; *Shepherd*, 62 F.3d at 1478-79; *Beck,* 2013 WL 772879, at *2; *Parsi*, 286 F.R.D. at 77; *Clarke,* 2012 WL 5505242, at *7; *Chen*, 839 F. Supp.2d at 13.[61]

333.    The *Chang* plaintiffs must make "some showing that the [alleged] destroyed evidence would have been relevant to the contested issue." *Gerlich*, 2013 WL 1265522, at *9 (quoting *Kronisch v. United States*, 150 F.3d 112, 127-28 (2d Cir. 1998)).   Virtually all courts, including this Court, require more than simply a showing that relevant information was lost or

---

[61]    The *Chang* plaintiffs likely will argue that they have been prejudiced by the failure of the District to locate the E Team JOCC Running Resume earlier and that they have expended unnecessary legal fees while the District was searching for the Running Resume.  The flaw with this argument is that the plaintiffs find themselves no worse off now than if the Running Resume had never been found – in fact, eventually finding the Running Resume, no matter how long it took District to find it, has made the plaintiffs' case even weaker because the Running Resume challenges a critical argument they have pursued throughout this case – that Chief Ramsey ordered the arrests.  The JOCC Running Resume does not prove that Chief Ramsey ordered the arrests.  In other words, finding the Running Resume has turned out to be more prejudicial to the plaintiffs' case than if the Running Resume had never been found at all.  Therefore, the *Chang* plaintiffs cannot successfully argue that they have been prejudiced by the delay in finding the document.

destroyed to impose sanctions for spoliation.[62]   Spoliation has not occurred if alleged lost or destroyed evidence is not pertinent to the plaintiffs' claims.   As this Court explained in *Davis v. Grant Park Nursing Home, LP*, 2010 WL 4642531, at *1 (D.D.C. Nov. 9, 2010), "[a]ssessing whether sanctions are warranted for the loss of otherwise discoverable information is a function of whether a party has been prejudiced by that loss."   Thus, the *Chang* plaintiffs must show that any alleged lost, destroyed, or altered evidence would have been favorable to them.   *Chen*, 839 F. Supp. 2d at 14.   The *Chang* plaintiffs have failed to prove that any evidence that they allege is relevant in this case was lost or destroyed by the District.   Also, the *Chang* plaintiffs have failed to prove that any information contained in the JOCC Running Resume (and the audio and video tapes) supports the merits of their case.   The District has produced all available evidence sought by the *Chang* plaintiffs in this case.

334.   Moreover, the argument by the *Chang* plaintiffs that the District's production of the JOCC Running Resume is somehow insufficient or incomplete must be based on more than mere speculation.   "[T]he Court must have more to go by than a hunch on plaintiffs' part." *Hubbard v. Potter*, 247 F.R.D. 27, 29 (D.D.C. 2008).   The *Chang* plaintiffs have failed to offer any credible evidence that the JOCC Running Resume produced by the District is insufficient or incomplete.

335.   The District cannot be sanctioned for failure to preserve evidence if that evidence was never created.   *Mahaffey*, 898 F. Supp. 2d at 61; *Rude v. Dancing Crab at Washington Harbour,* 245 F.R.D. 18, 23 (D.D.C. 2007).   The *Chang* plaintiffs have the burden to offer more than mere speculation and conjecture that a particular document existed.   Gorelick, Marzen &

---

[62]      *See, e.g.*, *Turner v. Public Service Corp.*, 563 F.3d 1136, 1149 (10th Cir. 2009); *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010); *Nucor Corp. v Bell*, 251 F.R.D. 191, 194 (D.S.C. 2008).

Solum, DESTRUCTION OF EVIDENCE § 2.6 (2012 Ed.).  The *Chang* plaintiffs have failed to meet their burden of proof regarding the existence of any document, including a GroupSystems JOCC Running Resume, which they claim the District has not produced.

336.    The *Chang* plaintiffs have failed to meet their burden of showing that the JOCC Running Resume produced by the District is insufficient or incomplete.

337.    The District has not lost, destroyed, or tampered with any evidence in this case, including the September 2002 IMF JOCC Running Resume.  Accordingly, the *Chang* plaintiffs have failed to meet their burden of proving spoliation of the JOCC Running Resume.  Therefore, there are no grounds for sanctions against the District for spoliation of the JOCC Running Resume.

### D.      DISCOVERY OBLIGATIONS UNDER THE FEDERAL RULES

#### 1.      Obligation of Counsel to Conduct Reasonable Inquiry into Discovery Responses

338.    Rule 26(g)(1) of the Fed. R. Civ. P. provided, at the time the District submitted its August 16, 2011 discovery responses to the *Chang* plaintiffs, that the attorney signing the discovery disclosures was representing to the Court that she "certifies to the best of the person's knowledge, information, and belief *formed after a reasonable inquiry* . . . [that] with respect to the disclosure, it is complete and correct *as of the time it is made*. . ." (emphasis added).

339.    A party has an obligation to make a reasonable inquiry to make sure that a discovery response is "complete and accurate as of the time it is made."  Rule 26(g)(1)(A) of the Fed. R. Civ. P.  *See also Guantanamera Cigar Co. v. Corporacion Habanos*, 263 F.R.D. 1, 5 (D.D.C. 2009).

340.    "Interrogatories are served on parties, and defendant's answers must be signed by the party upon whom they were served, i.e., a representative of the District of Columbia who

attests to their truth on behalf of the District of Columbia." *Myrdal v. District of Columbia*, 2007 WL 1655875, at *2 (D.D.C. June 7, 2007) (citing *Fonville v. District of Columbia*, 230 F.R.D. 38, 45 (D.D.C. 2005)). *See also Villareal v. El Chile, Inc.*, 266 F.R.D. 207, 211 (N.D. Ill. 2010); *Knights Armament Co. v. Optical Systems Technology, Inc.*, 254 F.R.D. 463, 467 (M.D. Fla. 2008).

341.    When District counsel filed supplemental discovery responses on August 16, 2011, reasonable inquiry was made by counsel regarding the correctness of the responses because the responses were reviewed and signed by MPD officials.

### 2.    Obligation of Counsel to Amend and Supplement Discovery Responses

342.    Rule 26(e)(1)(A) of the Fed. R. Civ. P. requires a party to submit "in a timely manner" amended or supplemental discovery responses "if the party learns that in some material respect [an earlier] disclosure or response is incomplete or incorrect. . . ."

343.    Counsel is not under a duty to submit amended or supplemental discovery responses in writing if the information had been already disclosed to the opposing party in some other fashion, such as a deposition. *See U.S. Aviation Underwriters, Inc. v. Pilatus Business Aircraft, Ltd.*, 582 F.3d 1131, 1145 (10th Cir. 2009) (no requirement to submit corrected response if information already known to other parties).

344.    The burden is on the *Chang* plaintiffs to show that any discovery responses by the District were incomplete or not candid based on the knowledge that District counsel had at the time the responses were filed. *Guantanamera Cigar Co.,* 263 F.R.D. at 7; *Equal Rights Center v. Post Properties, Inc.*, 246 F.R.D. 29, 32 (D.D.C. 2007). District counsel did not make any misrepresentation to the Court or to the parties when they submitted supplemental discovery

responses on August 16, 2011.  The *Chang* plaintiffs have failed show that any facts stated by

District counsel in those responses were known by District counsel to be untrue or incorrect.


**CONCLUSION**

The recovery of the September 2002 IMF JOCC Running Resume in May 2011, and the

detailed analysis of that data by the people who created the E Team program, who trained MPD

personnel on the use of the program, and who were present and assisted MPD officials and

employees during the IMF event, leads to the unmistakable conclusion that no E Team JOCC

Running Resume data was altered, erased, lost or destroyed.  The entire E Team JOCC Running

Resume was recovered and produced to the *Chang* plaintiffs two years ago.  In short, there has

been no spoliation of JOCC Running Resume data in this case.

Largely as a result of the fact that the *Chang* plaintiffs have known for two years that the

E Team JOCC Running Resume does not assist them in any way in this case, they have created

one false issue after another to obscure the true facts about the JOCC Running Resume, and to

prolong the inevitable conclusion that there has been no spoliation of evidence.  For instance, the

*Chang* plaintiffs have suggested there was a second Running Resume created in the JOCC during

the September 2002 IMF event, when in fact they knew as early as 2007 that the E Team

program was the only one used in the JOCC during the IMF event, and photographs taken in the

JOCC during the event prove this to be the case.  The *Chang* plaintiffs have suggested that a hard

copy of the JOCC Running Resume was made and later destroyed, when in fact the person who

they claim made the hard copy later testified that he did not recall seeing a hard copy of the

September 2002 JOCC Running Resume, and everyone else who has testified on the issue in this

investigation has stated that they either never saw a hard copy of the document or do not recall

seeing one.  The *Chang* plaintiffs have suggested that MPD officials destroyed the JOCC

Running Resume, when in fact E Team documents show that an E Team employee permanently stored the September 2002 Running Resume on the system in February 2003.   The *Chang* plaintiffs have suggested that a binder containing the JOCC Running Resume for the September 2002 IMF event was mysteriously found in October 2009 in a file cabinet, when in fact the binder was a copy of the running resume for the April 2002 IMF event.   At every turn, the allegations made by the *Chang* plaintiffs about the JOCC Running Resume were thoroughly explored in this investigation and proven to be false.

Once it became apparent to the *Chang* plaintiffs that they were unsuccessful in proving spoliation regarding the JOCC Running Resume, they turned their attention to attacking District counsel.   First, they argued that District counsel was not being candid with the court about disclosures to the Special Master of the information found by NC4 employee Marc Bynum on May 3, 2011.   However, the next day, District counsel informed the Court that the entire JOCC Running Resume was recovered and that District counsel wanted Bynum himself to explain to the court the technical aspects of what he found.   It was unfortunate that Bynum could not be deposed until August 23, 2011.   District counsel has provided in this investigation a rational explanation of why the details of the Bynum information were not revealed until the July 12, 2011 status conference.   Second, the *Chang* plaintiffs argued that District counsel violated the discovery rules by providing misleading information in supplemental discovery responses. However, when this issue was explored, it became apparent that District counsel did not make any intentional misrepresentations about the facts of the case, but instead they submitted information that revealed their misunderstanding about whether MPD was conducting an internal investigation about the handling of the E Team servers.

At the end of the day, and after being given repeated opportunities to make their case, the *Chang* plaintiffs have failed to meet their burden of proving that the JOCC Running Resume was erased, lost or destroyed.   Nor is there any evidence that District counsel engaged in any misconduct in the case.   The *Chang* plaintiffs also have failed to prove that any delay in finding and producing the JOCC Running Resume has prejudiced their case against the defendants.   In fact, that the JOCC Running Resume does nothing to bolster or prove the speculation of the Chang plaintiffs about who gave the arrest order on September 27, 2002.   Furthermore, because there has been no spoliation of evidence, because the District did not violate any discovery rules, and because the plaintiffs have not suffered any prejudice in connection with any issue involving the JOCC Running Resume, sanctions should not be imposed against the District.

Respectfully submitted,


IRVIN B. NATHAN
Attorney General for the District of Columbia

Ellen A. Efros
ELLEN A. EFROS [250746]
Deputy Attorney General
Public Interest Division

/s/  William F. Causey
WILLIAM F. CAUSEY [260661]
Assistant Attorney General
441 Fourth Street, N.W.
Washington, DC 20001
(202) 724-6610
william.causey@dc.gov


Counsel for the District Defendants


Dated:  July 2, 2013

133

## CERTIFICATE OF SERVICE

I certify that on July 2, 2013, I filed the foregoing with the Court's electronic filing system, which will serve notice upon all counsel of record.

/s/ William F. Causey
Counsel for the District Defendants