UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RAYMING CHANG *et al.*,

     Plaintiffs,

     v.                                  Civil Action No. 02-2010 (EGS/JMF)

UNITED STATES OF AMERICA *et al.*,

     Defendants.

## SECOND REPORT AND RECOMMENDATION

On May 5, 2010, Judge Sullivan appointed the undersigned to serve as the Special Master in this case. Order Appointing Special Master [#645]. Specifically, Judge Sullivan directed that I file a report and recommendation addressing the alleged destruction of evidence regarding 1) the September 27, 2002 running resume; 2) the September 27, 2002 recordings of radio runs; and 3) the September 27, 2002 video tapes. Id. at 3. On December 16, 2013, I issued my first report and recommendation, which contained my findings of fact. Report and Recommendation [#982]. The current opinion contains my conclusions of law.

## DISCUSSION

I.    Legal Standard

Once a party anticipates litigation, it has an obligation to preserve relevant evidence. Smith v. Café Asia, 246 F.R.D. 19, 21 at n.1 (D.D.C. 2007) (citing United Medical Supply Co., Inc. v. U.S., 77 Fed. Cl. 257, 258 (2007). Failure to do so, although not a violation of any of the Federal Rules of Civil Procedure, may nevertheless result in a charge of spoliation and the imposition of sanctions. D'Onofrio v. SFX Sports Grp., Inc., No. 06-CIV-687, 2010 WL

3324964, at *5 (D.D.C. Aug. 24, 2010).  Those sanctions are therefore based on the court's

inherent authority. <u>Shepherd v. Am. Broad. Cos., Inc.</u>, 62 F.3d 1469, 1474 (1995) ("When rules

alone do not provide courts with sufficient authority to protect their integrity and prevent abuses

of the judicial process, the inherent power fills the gap.") (citing <u>Chambers v. NASCO, Inc.</u>, 501

U.S. 32, 46 (1991)).

The court of appeals has indicated that there are two types of sanctions that a court may

impose in the exercise of its inherent authority:  1) punitive or penal sanctions; and 2) issue-

related sanctions. <u>Shepherd</u>, 62 F.3d at 1478.  Punitive or penal sanctions, which include

"dispositive sanctions (dismissal or default judgment), contempt orders, awards of attorneys'

fees, and the imposition of fines," must be based on clear and convincing evidence of the

predicate misconduct. <u>Id.</u> (internal citations omitted).  Issue-related sanctions, on the other hand,

which include adverse evidentiary determinations and preclusion of evidence, are fundamentally

remedial and therefore need only be based on a preponderance of the evidence of that conduct.

<u>Id.</u> (internal citations omitted).

II.     <u>Analysis</u>

Plaintiffs recommend that the Court impose three distinct sanctions upon the District:  1)

evidentiary sanctions; 2) a default judgment against the District on its <u>Monell</u>[1] liability; and 3)

financial compensatory sanctions.  <u>See Chang Plaintiffs' Proposed Conclusions of Fact and Law

for Report and Recommendation of Special Master</u> [#777-1] at 32-39; <u>Chang Plaintiffs'

Supplemental Proposed Findings of Fact and Conclusions of Law Regarding Evidence for

Special Master's Report and Recommendation</u> [#967] at 32-38.

A.      <u>Evidentiary Sanctions</u>

1.      <u>Admissions</u>

---

[1] <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).

First, plaintiffs recommend that the Court deem the following statements admitted as fact:

1. That the MPD, through its top officials, decided to funnel or direct individuals into Pershing Park from surrounding areas and streets with the purpose of confining individuals within the Park on September 27, 2002.

2. That the MPD, through its top officials, decided to encircle Pershing Park to prevent people from leaving the park prior to giving the order for the mass arrest on September 27, 2002.

3. That Ramsey, the chief law enforcement officer for the District, was present at Pershing Park on September 27, 2002, before and during the time when the individuals within Pershing Park were surrounded via police line by law enforcement officials. Ramsey was consulted regarding the arrests, knew at the time that no order to disperse had been given, and approved of the arrests or failed to take action to countermand an order to make the arrests, effectively authorizing them. Thus, Ramsey made a deliberate decision, among several alternatives, to allow the arrests to proceed, knowing that there was no probable cause for those arrests.

4. That Newsham ordered the park to be closed prior to arriving at Pershing Park.

5. That, on September 27, 2002, Michael Fitzgerald was present at and participated in a meeting when the decision to arrest individuals within Pershing Park was made. Fitzgerald was the second highest ranking police official in the District, second only [to] Ramsey. Fitzgerald failed to object to or countermand the use of police lines around Pershing Park on September 27, 2002, and failed to object to or prevent the arrests of individuals within Pershing Park, despite knowing that no probable cause for those arrests existed.

6. That, on September 27, 2002, Brian Jordan was present at and participated in a meeting when the decision to arrest individuals within Pershing Park was made. Jordan made no effort to prevent the arrests from occurring. Jordan failed to object to or prevent the use of police lines around

3

Pershing Park on September 27, 2002, and failed to object to or prevent the arrests of individuals within Pershing Park, despite knowing that no probable cause for such arrests existed.

7. Key evidence in this case, including video and audio recordings from September 27, 2002, and a detailed timeline and synopsis of activity (known as the JOCC Running Resume) created by the MPD on September 27, 2002, were in the possession of the District for some period of time after September 27, 2002. The District was obligated to preserve these materials, but failed to do so. The original video and audio recordings have been destroyed, and the District has lost or destroyed all copies of the JOCC Running Resume.

8. The District's destruction of, tampering with, and refusal to produce substantial material evidence during the initial phases of discovery in this litigation prejudiced the Chang Plaintiffs by rendering inadequate the Plaintiffs' discovery to that point, making necessary substantial re-discovery efforts, and unfairly forcing Plaintiffs to evaluate the District's Rule 68 demands without full knowledge of the substantial and material evidence destroyed, tampered with, or withheld by the District.

[#777-1] at 35-38.

If the Court deems these facts to be admitted, the effect on the District's defense will be preclusive. First, the District would not be able to contest the legality of the arrests.[2] Second, if the District is precluded from eliciting evidence, as it apparently intends, that Ramsey was not aware that Newsham had ordered the arrests without probable cause and had also issued an order to disperse,[3] then the District might no longer have a defense to the 42 U.S.C. § 1983 case. Of course, this would only be the case if Judge Sullivan were to accept plaintiffs' assertion that because Ramsey, the highest ranking officer in the Metropolitan Police Department, decided that

---

[2] I assume, for the sake of the argument, that the District persists in the contention that it can litigate the validity of the arrests despite Judge Sullivan's determination, now affirmed by the court of appeals, that the arrests were illegal. See Transcript of Sept. 25, 2014 Status Conference [#996] at 21.
[3] Id. at 21-22.

plaintiffs should be arrested, his decision constituted the policy of the District of Columbia. [#996] at 10-12.  In this way, Chief Ramsey's decision would itself be the municipal policy that plaintiffs have to prove to establish liability consistent with the Supreme Court's decision in Monell.  Thus, if plaintiffs prevailed on that issue, plaintiffs' case against the District would be reduced to their entitlement to damages and injunctive relief.

In such a situation, the District of Columbia Circuit's decision in Bonds v. District of Columbia, 93 F.3d 801 (D.C. Cir. 1996), is controlling.  In that case, as a sanction for the District's 1) initial late response to an interrogatory (demanding to know who was familiar with particular matters or topics); and 2) ultimate response in a manner that the lower court believed was further indicative of the District's bad faith, the lower court precluded the District from calling any witnesses. Id. at 804.  Initially, the court of appeals remanded the matter to the lower court to explain why a lesser sanction was not sufficient to alleviate any prejudice to the court's calendar or the plaintiffs, or to prevent any benefit to the defendant from its sanctionable behavior. Id.  After receiving the lower court's response, the court of appeals set aside the precluding sanction. Id.

In doing so, the court of appeals focused on the motivation for the sanction, beginning with the propositions that a sanction must be proportionate to the behavior and the harm caused and that a court may not resort to a greater sanction when a lesser one will suffice. Bonds, 93 F.3d at 808-09.  In addition, the court held the following:

> When a discovery sanction denies the defendant the right to a trial on the merits, the district court must either make a finding supported by the record that the more severe sanction is necessary to avoid prejudice to the plaintiffs or to the court's calendar or to prevent a benefit to the defendant, or—if the sanction is based only on deterring future discovery misconduct—the more severe sanction must be supported by a finding of flagrant or egregious misconduct by the defendant.

Id.

Applying this standard, I first conclude that the desire to deter future discovery misconduct cannot serve as the basis for the preclusive sanction plaintiffs seek.  My previous findings make it clear that persons employed by the District, who had an obvious responsibility to preserve physical evidence, were negligent.  That does not mean, however, that I find that any of them intentionally destroyed anything to prevent its use by plaintiffs.  In the absence of such a finding, it is impossible to award a punitive sanction consistently with the discussion in Shepherd.  In that case, the court of appeals explained why the imposition of a punitive sanction had to be based on clear and convincing evidence of purposeful behavior, such as when a court punishes the willful disobedience of its order or where the misconduct at issue involves, for example, "'allegations of fraud or some other quasi-criminal wrongdoing by the defendant.'"  Shepherd, 62 F.3d at 1477 (quoting Addington v. Texas, 441 U.S. 418, 424 (1979)).  I therefore cannot find that the District's negligence was the kind of egregious and flagrant misconduct that could justify precluding the District from, in effect, asserting its defenses to plaintiffs' claim.

If, alternatively, the desire is to prevent prejudice to the plaintiffs, then it is true that, as plaintiffs claim, the District's failure to retain the running resume and the video and audio tapes rendered the discovery plaintiffs received inadequate, necessitating additional and substantial re-discovery efforts. [#777-1] at 37-38.  But, it must be recalled that, while it took time and effort, the proceedings before me, in my capacity as Special Master, finally established that the E-team data existed and that the tapes the District produced were useless.  Those proceedings brought discovery to a final and certain end with plaintiffs secure in the knowledge that they now have all existing contemporaneous physical evidence and that what they do not have is gone or useless.  Given that certainty, I do not find that the delay in reaching that point,

(which did not cause a postponement of a specific trial date) was so prejudicial to plaintiffs that it would justify the one-sided trial that the court in <u>Bonds</u> refused to permit.

Finally, the plaintiffs also complain that they had to consider an offer of judgment made under Rule 68 of the Federal Rules of Civil Procedure without the knowledge of the evidence destroyed by the District. [#777-1] at 38.  But, the plaintiffs have not produced any evidence that they would have accepted that offer.  Again, without such evidence, the severe sanction of preclusion, that would in effect require the defendants to concede the plaintiffs' case on liability, cannot be justified.  Plaintiffs' request for admission of the above statements as fact should therefore be denied.

2.    <u>Preclusion of Evidence</u>

Second, plaintiffs recommend that the District be precluded from using any evidence, to include documentary evidence, deposition testimony, or any other form of evidence produced or elicited after the close of discovery, which occurred on November 13, 2007. [#754-2] at 38.

Unlike my decision above with respect to the admission of certain facts, I reach a different conclusion as to this requested sanction.  As Special Master, I have not been made aware of what specific evidence was elicited or produced (with one exception discussed below) after November 13, 2007, and it is therefore impossible for me to assess the prejudice to plaintiffs or benefit to the District from the use of that evidence.

I am certainly familiar with one piece of evidence—the E-team data.  As I understand the District's position, it intends to use the E-team data to argue 1) that it *is* the running resume; and 2) that it does not mention anything about Chief Ramsey's involvement at Pershing Park on September 27, 2002, much less about his 'role in mass arrests.'" <u>District of Columbia Defendants' Response to the *Chang* Plaintiffs' Supplemental Proposed Findings of Fact and</u>

Conclusions of Law Regarding Evidence for Special Master's Report and Recommendations [#973] at 39.  Therefore, the District cannot be held liable because only an order by Ramsey would bind it under 42 U.S.C. § 1983 as a policy by a legitimate policy maker.  Permitting that use would, in my view, be grossly unfair.

First, we now know that the E-team data has been on the server since its creation on September 27, 2002, the day of the arrests.  As a contemporaneous recording of the events on that day, it therefore qualifies under Rule 26 as a document "the disclosing party has in its possession, custody or control and may use to support its claims or defenses"—the defense that Ramsey did not give the order to arrest.  See Fed. R. Civ. P. 26(a)(1)(A)(ii).  Under Rule 37(c)(1), the failure to disclose the existence of the E-team data, of which the District should have been aware, necessarily precludes the District from now using the data unless its failure to produce was substantially justified or harmless.

But, the District's failure to produce the E-team data until the proceedings before the Special Master is impossible to justify.  The E-team data was on a server and accessible to the District from the date of its creation in 2002 until its retrieval, by the most ordinary means, years later.  Norbert Butler, an employee of the District, was made aware in 2008 by an NC4 employee, Marc Bynum, that there was a near certainty that the E-team data could be retrieved.  See [#982] at 46.  The District ultimately declined to contract with NC4 to retrieve the data because the price exceeded by $200 a $5000 contractual limitation.  Id. at 48.  By August 12, 2009, Terrence Ryan, General Counsel for the Metropolitan Police Department, knew that the E-Team data could be retrieved.  Id. at 47.  But, he apparently never told counsel for the District what he had learned—that the E-Team data could be retrieved—even though counsel were searching for that very data.  The District's being "penny wise and pound foolish" and Ryan's

failing to bring this to the immediate attention of the Deputy Attorneys General, who were responsible for this case, cannot possibly be described as substantial justification for the needless delay in the District's finally retrieving the data and making it available to plaintiffs.

Finally, had there been a timely disclosure of the existence of the E-team data, the plaintiffs would have been spared a decade of delay at least as to that issue.  That unconscionable and unjustified delay, in my view, in itself, justifies the preclusion of the District's use of the E-team data.  Plaintiffs' request that the District be precluded from using any evidence of the E-team data should therefore be granted.

It must be noted that I am premising this remedy on a provision of the Federal Rules of Civil Procedure.  I appreciate that the parties have advised me that they did not make the disclosures to each other that are required by Rule 26(a)(1).  See Praecipe Regarding Initial Disclosures [#997].  Be that as it may, I know of no authority that excuses either or both of them from the mandatory obligation imposed by that rule.

In any event, I would reach the same conclusion were I exercising my inherent authority. Shepherd makes it clear that an issue-related sanction must be tried before a more drastic and punitive sanction is imposed. Shepherd, 62 F.3d at 1479-80.  One obvious purpose of such a remedial sanction is to restore the balance between the parties, which was upset by one party's failure to comply with an obligation it had. D'Onofrio, 2010 WL 3324964, at *7 (precluding use of evidence can ensure that a party will not be able to profit from its own failure to comply with discovery rules or rules set forth by the court).  In my view, it is simply unfair to permit the District to make any use of the E-team data when it took so long to ultimately find it and when the District could unquestionably have found it earlier had it been diligent in investigating and then following up once Bynum told Butler, a District and MPD employee, that there was an

excellent chance of finding it on the District's server.  Fairness requires that the District not now

be permitted to exploit evidence that it should have found and produced several years ago.

      B.    <u>Default Judgment Against the District on its Monell Liability</u>

Plaintiffs contend that there is clear and convincing evidence "that the District engaged in

systematic document destruction that would have been relevant to the District's *Monell* liability"

and that the entry of a default judgment is therefore appropriate. [#967] at 126.  Plaintiffs also

argue that "[t]here is clear and convincing evidence that the District destroyed, altered or failed

to produce audio recordings, video recordings, and the Group Systems JOCC Running Resume,

all of which were the most relevant, contemporaneous records relevant to the Plaintiffs' claims"

and that "[t]he absence of that evidence has substantially prejudiced the Plaintiffs." <u>Id.</u> at 127.

As noted above, however, under <u>Bonds,</u> the sanction of a default judgment, like that of deeming

the above eight statements admitted as fact, is not proportionate to the District's negligent

behavior, as detailed above.  Plaintiffs' request for a default judgment as to its <u>Monell</u> claim

against the District should therefore be denied.

      C.    <u>Financial Compensatory Sanctions</u>

Third, plaintiffs recommend that the Court order the District to reimburse them "for the

cost of all prior discovery, which has been made useless or incomplete because of the District's

discovery abuses and destruction of evidence." [#967] at 130.  For its part, the District blames

plaintiffs and their counsel for the delay they have encountered and denies any liability for

counsels' attorney's fees. [#973] at 113-14.

    But, "[i]n the United States, the prevailing litigant is ordinarily not entitled to collect a

reasonable attorneys' fee from the loser." <u>Alyeska Pipeline Serv. Co. v. The Wilderness Soc'y</u>,

421 U.S. 240, 247 (1975).  The "American Rule," that each party bears its own fees and costs,

yields only when a court exercises its inherent authority to rescue a party from its opponent's bad

faith: "To be sure, the [Supreme] Court has recognized the 'inherent power' of the federal courts

to assess attorneys' fees when the losing party has 'acted in bad faith, vexatiously, wantonly, or

for oppressive reasons.'" Fairfax-Brewster Sch., Inc. v. Gonzales, 427 U.S. 160, 183 (1976)

(internal citations omitted).  Moreover, "the substantive standard for a finding of bad faith is

'stringent' and 'attorneys' fees will be awarded only when extraordinary circumstances or

dominating reasons of fairness so demand.'" Assoc. of Amer. Physicians and Surgeons, Inc. v.

Clinton, 187 F.3d 655, 659 (D.C. Cir. 1999) (quoting Nepera Chem., Inc. v. Sea-Land Serv.,

Inc., 794 F.2d 688, 702 (D.C. Cir. 1986)).

That bad faith may take either of two forms.  The court of appeals has explained the

standards as follows:

> Bad faith can support an award of attorneys' fees in
> circumstances where the bad faith (1) occurred in connection with
> the litigation, or (2) was an aspect of the conduct giving rise to the
> lawsuit. *Nepera Chem., Inc. v. Sea–Land Serv., Inc.*, 794 F.2d 688,
> 701 (D.C. Cir.1986).  Examples of the first include the filing of a
> frivolous complaint or meritless motion, *see Lipsig*, 663 F.2d at
> 182, or discovery-related misconduct, *Fritz v. Honda Motor Co.*,
> 818 F.2d 924 (D.C. Cir.1987).
>
> Bad faith in conduct giving rise to the lawsuit may be
> found where "a party, confronted with a clear statutory or
> judicially-imposed duty towards another, is so recalcitrant in
> performing that duty that the injured party is forced to undertake
> otherwise unnecessary litigation to vindicate plain legal rights."
> *Fitzgerald v. Hampton*, 545 F. Supp. 53, 57 (D.D.C. 1982).  *See
> also American Employers Ins. Co. v. American Sec. Bank*, 747
> F.2d 1493, 1502 (D.C. Cir.1984) ("[E]xception to the American
> rule . . . allows an award of attorneys' fees when the party has been
> the victim of unwarranted, oppressive, or vexatious conduct on the
> part of his opponent and has been forced to sue to enforce a plain
> legal right.").

Am. Hosp. Ass'n v. Sullivan, 938 F.2d 216, 219-20 (D.C. Cir. 1991).

First, as is obvious, plaintiffs were not forced, in the proceedings before me as Special Master, to bring litigation to enforce a pre-existing, clearly established right, as in the American Hospital case.  See Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Service, 590 F.2d 1171, 1174 (D.C. Cir. 1978) (that litigant lost does not entitle opponent to fees; that it did not prevail does not mean that its conduct was vexatious or wanton when its position had a foundation).  Accord Lipsig v. Nat'l Student Mktg. Corp., 663 F.3d 178, 181 (D.C. Cir. 1980).

Second, the exception for vexatious litigation is stringently applied. Lipsig, 663 F.3d at 181.  It certainly does not mean that a litigant who loses must pay the other side's fees.  It is reserved, instead, for "advocacy for the sake of burdening an opponent with unnecessary expenditures of time and effort." Id.  It must also be recalled that, as explained above, in Shepherd, the court of appeals characterized an award of attorney's fees as a punitive sanction, available only upon a showing, by clear and convincing evidence, of egregious behavior. Shepherd, 62 F.3d at 1472.  I view this demanding standard to be met only by behavior which purposefully imposes upon the opposing party costs and fees that are unnecessary.  I find no such behavior here.

The lawyers who represented the District did not engage in any such behavior.  To the contrary, they made principled arguments and certainly did not engage in any litigation tactics that were designed to burden plaintiffs.  In hindsight, I can say, however, that Ms. Presley should have advised me and plaintiffs' counsel of the attempted deletion of the E-Team data as soon as she learned of it.  See [#982] at 65.  Additionally, the failure of a District employee to advise counsel for the District that a contractor was nearly certain that the contractor could retrieve the E-team data resulted in a delay during which the District looked for something that was, in

essence, not lost.  But, I cannot say that those errors in judgment can possibly be described as intentionally vexatious and oppressive behavior.

By the same token, I must say that I find the lack of care displayed by the Metropolitan Police Department, with respect to the videotapes, surprising.  I can still remember learning, as a 23-year-old prosecutor, how a police officer carves his initial into the stock of a gun he seizes so that he can authenticate it when it is offered into evidence.  It has been my experience, as both a prosecutor and a judge, that the officers of the MPD handle physical evidence carefully, and are well aware of the necessity to do so to preserve the evidence for trial.  In this regard, the behavior of the police as to the videotapes is an inexplicable deviation from that standard.  The tapes were not logged, they were not labeled, and they were not protected from being overwritten, and unfortunately are now useless.

In addition, the originals of the audio tapes are gone and the copies that we do have are just as useless as the videotapes.  There was an unseemly disagreement between Harris and his employee over whether Harris told her what to say in her declaration so that he could represent that there were no unexplained lacunas in the tapes.  See [#982] at 114.  All of this could have been avoided had the original tapes been kept or had Harris only listened to the tapes that were available in the first instance.

Finally, when a police officer finds what may be the long lost running resume and gives it to one of the attorneys in Ryan's office, it never occurs to anyone to mark or label it, leading to a hearing devoted to which book is which.  Instead, the appearance of the book becomes, to two of the District attorneys, an excuse to play a bad practical joke on Harris.

In summary, while this negligent conduct regrettably occurred I cannot say, as I must prior to recommending an award of attorney's fees, that the District's behavior could possibly be

described as intentional and willful or vexatious and oppressive.  I therefore find no warrant in the existing precedents for awarding fees and I do not recommend that Judge Sullivan make such an award.[5]

### CONCLUSION

In accordance with the above conclusions of law, I therefore recommend the following: 1) that plaintiffs' request for admission of certain statements as fact be denied; 2) that plaintiffs' request that the District be precluded from using any evidence of the E-team data be granted; 3) that plaintiffs' request for a default judgment as to its <u>Monell</u> claim against the District be denied; and 4) that plaintiffs not be awarded attorney's fees.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

---

[5] I appreciate that the plaintiffs also note that at on various occasions, Judge Sullivan indicated (on the record) that the District would be required to pay plaintiffs additional discovery costs. [#967] at 130.  However, Judge Sullivan was speaking about the discovery yet to take place while I am addressing the entirely different question of what sanction should be imposed, if any, for the District's behavior in the discovery that has already taken place and in the proceedings before me.