**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RAYMING CHANG, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-2010 (EGS) |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MOTION FOR QUALFIED IMMUNITY OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT FILED BY DISTRICT DEFENDANTS MICHAEL J.
FITZGERALD, BRIAN K. JORDAN, BRYAN DIGIROLAMO, ANDRE L. HARRISON
AND MICHAEL SMITH, AND FOR DISMISSAL OF THE CONSPIRACY COUNTS
AND THE CLAIM FOR PUNITIVE DAMAGES**

District Defendants Michael J. Fitzgerald, Brian K. Jordan, Bryan Digirolamo, Andre L.

Harrison and Michael Smith, by and through counsel, hereby respectfully move for an order

dismissing all claims against these defendants on the grounds of qualified immunity.  In the

alternative, these defendants move for summary judgment, pursuant to Fed. R. Civ. P. Rule 56,

because there is no dispute as to any material facts and they are entitled to judgment as a matter

of law.  In addition, the Court should dismiss the conspiracy claims and the claims for punitive

damages asserted in the Third Amended Complaint against these defendants.

A Memorandum of Points and Authorities in support of this motion is submitted herewith

pursuant to LcvR 7(a).  In addition, a statement of material facts as to which there is no genuine

issue is submitted herewith pursuant to LcvR 7(h).  Finally, a Proposed Order is submitted

herewith.

Respectfully submitted,

EUGENE  A. ADAMS
Interim Attorney General for the District of
  Columbia

ELLEN A. EFROS
Bar No. 250746
Deputy Attorney General
Public Interest Division

*/s/*  William  F.  Causey_____
WILLIAM F. CAUSEY
Bar No. 260661
Assistant Attorney General
441 Fourth Street, N.W.
Washington, DC 20001
(202) 724-6610
william.causey@dc.gov


Counsel for the District Defendants

Dated:  December 22, 2014

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RAYMING CHANG, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-2010 (EGS) |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANUDM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR  QUALFIED IMMUNITY OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT FILED BY DISTRICT DEFENDANTS MICHAEL J.  FITZGERALD, BRIAN K. JORDAN, BRYAN DIGIROLAMO, ANDRE L. HARRISON AND MICHAEL SMITH, AND FOR DISMISSAL OF THE CONSPIRACY <u>COUNTS AND THE CLAIM FOR PUNITIVE DAMAGES</u>

District Defendants Michael J. Fitzgerald, Brian K. Jordan, Bryan DiGirolamo, Andre L. Harrison and Michael Smith, by and through counsel, hereby submit this Memorandum of Points and Authorities in support of their motion for qualified immunity.  In the alternative, these defendants move for summary judgment, pursuant to Fed. R. Civ. P. 56 and LcvR 7(h), as to all claims against them in the above-captioned case, including the three conspiracy counts and the claims for punitive damages.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................. 1

BACKGROUND OF THE CASE .................................................................................... 2

STATEMENT OF FACTS ............................................................................................... 4

   I.   General Facts Pertaining to the Pershing Park Arrests ........................................ 4

   II.  Undisputed Material Facts Regarding the Involvement of these MPD Defendants
      in the Events at Pershing Park ............................................................................. 8

      A.  Executive Assistant Chief Michael J. Fitzgerald .......................................... 8

      B.  Assistant Chief Brian K. Jordan ................................................................. 11

      C.  Officer Bryan DiGirolamo ........................................................................ 13

      D.  Officer Andre L. Harrison ......................................................................... 15

      E.  Officer Michael Smith ............................................................................... 16

   III.  Relevant Testimony from Ramsey and Newsham About the Events at Pershing
      Park .................................................................................................................... 18

      A.  Chief Ramsey ............................................................................................ 18

      B.  Assistant Chief Newsham .......................................................................... 20

   IV.  Relevant Testimony from the Four *Chang* Plaintiffs Regarding Their Arrests and
      Detentions ......................................................................................................... 23

      A.  Plaintiff RayMing Chang .......................................................................... 23

      B.  Plaintiff Young Choi ................................................................................. 24

      C.  Plaintiff Leanne Lee .................................................................................. 25

      D.  Plaintiff Christopher Zarconi .................................................................... 26

      E.  Plaintiffs' Current Status ........................................................................... 27

STANDARD OF REVIEW ............................................................................................ 28

ARGUMENT ................................................................................................................. 29

   I.   Defendants Are Entitled to Qualified Immunity Because They Reasonably
      Believed There Was Probable Cause to Arrest and Detain the Plaintiffs. ........... 29

   II.  In the Alternative, Defendants Are Entitled to Summary Judgment Because the
      Undisputed Facts Show They Did Not Participate in the Decisions to Arrest or
      Detain the Plaintiffs. .......................................................................................... 33

   III.  The Conspiracy Counts Against These Defendants Should Be Dismissed. .......... 34

      A.  The Conspiracy Claim Under 42 U.S.C. § 1985 ........................................ 35

      B.  The Conspiracy Claim under 42 U.S.C. § 1986 ........................................ 40

      C.  The Civil Conspiracy Claim ...................................................................... 43

IV.  The Putative Damage Claims Against the Defendants Should Be Dismissed...................44

CONCLUSION..........................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Creighton*, 483 U.S. 635 (1987) ............................................................... 31

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 29

*Atherton v. D.C. Office of the Mayor*, 567 F.3d 672 (D.C. Cir. 2009) ................................... 35, 36

*Aulson v. Blanchard*, 83 F.3d 1 (1st Cir. 1996) ........................................................... 36

*Barham v. Ramsey*, 217 F.R.D. 262 (D.D.C. 2003) ......................................................... 3

*Barham v. Ramsey*, 338 F. Supp. 2d 48 (D.D.C. 2004) ..................................................... 4

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) ........................................................ 5, 31

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ......................................... 35

*Bush v. Butler*, 521 F. Supp. 2d 63 (D.D.C. 2007) ........................................................ 40, 43

*Bush v. District of Columbia*, 595 F.3d 384 (D.C. Cir. 2010) ............................................ 28

*Butera v. District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001) ......................................... 44

*Caston v. Butler*, 718 F. Supp. 2d 87 (D.D.C. 2010) ..................................................... 45

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................... 28

*D'Amario v. Russo*, 718 F. Supp. 118 (D.R.I. 1989) ...................................................... 36

*Davis v. Scherer*, 468 U.S. 183 (1984) .................................................................. 29

*Dingle v. District of Columbia*, 571 F. Supp. 2d 87 (D.D.C. 2008) ...................................... 28, 31, 44, 45

*District of Columbia v. Minor*, 740 A.2d 523  (D.C. 1999) .............................................. 30

*Estate of Parsons v. Palestinian Authority*, 651 F.3d 118 (D.C. Cir. 2011) ............................ 29

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) ............................................................ 35

*Groh v. Ramirez*, 540 U.S. 551 (2004) .................................................................. 30

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) .................................................... 43

*Halcomb v. Woods*, 767 F. Supp. 2d 123 (D.D.C. 2011) ................................................... 29

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................. 29

*Herrmann v. Moore*, 576 F.2d 453 (2d Cir. 1978) ........................................................ 37

*Hill v. Medlantic Health Corp.*, 933 A.2d 314 (D.C. 2007) .............................................. 43

*Hunter v. Bryant*, 502 U.S. 224 (1991) ................................................................................ 29, 30

*Jackson v. District of Columbia*, 541 F. Supp. 2d 334 (D.D.C. 2008) ................................... 29, 30

*James Taylor Trash Removal v. District of Columbia*, 1999 U.S. Dist. LEXIS 13845 (D.D.C. Sept. 1, 1999) .................................................................................................................... 37

*Jemison v. National Baptist Convention*, 720 A.2d 275 (D.C. 1998) .......................................... 45

*Jonathan Woodner Co. v. Breeden*, 665 A.2d 929 (D.C. 1995) ................................................... 44

*Jones v. Horne*, 634 F.3d 588 (D.C. Cir. 2011) ...................................................................... 29, 30

*Kelley v. District of Columbia*, 893 F. Supp. 2d 115 (D.D.C. 2012) ............................... 35, 36, 37

*Kivanc v. Ramsey*, 407 F. Supp. 2d 270 (D.D.C. 2006) ............................................................... 37

*L.Q.A. By and Through Arrington v. Eberhart*, 920 F. Supp. 1208 (M.D. Ala. 1996) ................ 36

*Malley v. Briggs*, 475 U.S. 335 (1986) ........................................................................................ 32

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................... 28

*McCreary v. Heath*, 2005 WL 3276257 (D.D.C. Sept. 26, 2005) ................................................ 40

*McManus v. District of Columbia*, 530 F. Supp. 2d 46 (D.D.C. 2007) ......................................... 35

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ..................................................................................... 29

*Nader v. National Democratic Nat'l Committee*, 567 F.3d 692 (D.C. Cir. 2009) ......................... 43

*Pardo-Kronemann v. Donovan*, 601 F.3d 599 (D.C. Cir. 2010) ................................................... 33

*Pearson v. Callahan*, 555 U.S. 223 (2009) ................................................................................... 30

*Pitt v. District of Columbia*, 491 F.3d 494 (D.C. Cir. 2007) .................................................. 29, 44

*Rawlings v. District of Columbia*, 820 F. Supp. 2d 92 (D.D.C. 2011) .......................................... 43

*Richards v. Duke University*, 480 F. Supp. 2d 222 (D.D.C. 2007) ............................................... 40

*Saucier v. Katz*, 533 U.S. 194 (2001) ........................................................................................... 29

*Smith v. Wade*, 461 U.S. 30 (1983) ............................................................................................... 44

*Tabb v. District of Columbia*, 477 F. Supp. 2d 185 (D.D.C. 2007) .............................................. 37

*Thomas v. New World Communications,* 681 F. Supp. 55 (D.D.C. 1988) ..................................... 40

*United Brotherhood of Carpenters, Local 610 v. Scott*, 463 U.S. 825 (1983) ............................. 35

*Waterhouse v. District of Columbia*, 298 F.3d 989 (D.C. Cir. 2002) ........................................... 28

*Wham v. United States*, 81 F. Supp. 126 (D.D.C. 1948) ................................................. 36

*Wilson v. Layne*, 526 U.S. 603 (1999) .................................................................. 29, 31

**Federal Statutes**

42 U.S.C. § 1983 .......................................................................................... 5, 44

42 U.S.C. § 1985 .......................................................................................... passim

42 U.S.C. § 1986 .......................................................................................... passim

**District Statutes**

D.C. Official Code § 1-102 (June 2014 Supp.) .......................................................... 36

D.C. Official Code § 5-101.01 (June 2014 Cum. Supp.) .................................................. 36

**Court Rules**

Fed. R. Civ. P. 56 ...................................................................................... i, 28, 33

## INTRODUCTION

This case—now over 12 years old—concerns the arrest of four individuals in General John Pershing Park on September 27, 2002. Since July 2005, these five Metropolitan Police Department ("MPD") officers—police officers with 101 years of combined distinguished service with MPD—have been wrongfully accused of being partly responsible for the September 27, 2002 arrest and detention of the four *Chang* plaintiffs. (*See* Third Amended Complaint (Dkt. No. 153.))[1] As described more fully below, these five defendants had no involvement in the decision to arrest the *Chang* plaintiffs in Pershing Park. For three of the defendants—DiGirolamo, Harrison and Smith—their only involvement in the events of that day was standing in MPD police lines around the Park, and then riding on buses that transported the plaintiffs to detention facilities and filling out necessary arrest paperwork, all at the order and direction of supervising officers.

Now that this case is scheduled for trial,[2] and the Final Report of the Special Master has been filed (*see* Dkt. No. 1001), it is the appropriate time to evaluate the limited role of these five defendants in the events of September 27, 2002. A review of all the evidence shows that these

---

[1]  The citations in this filing use the following system:

Pleadings and Orders entered on the Court's docket will be cited as "(Dkt. No. [ ].)"

Transcripts of depositions will be cited as "Dep. of [name], [date], at [page number]." All cited deposition pages are appended as Exhibits to this motion. There is an Index of the Exhibits describing which exhibit applies to which witness.

Exhibits offered by the parties in the proceedings before Special Master Facciola will be cited as "(District SM Ex. [number]" or "Chang SM Ex. [number]."

[2]  The Court set a trial date of April 6, 2015. *See* Minute Order dated August 26, 2014. A Pretrial Conference is scheduled for March 3, 2015. *See* Pretrial Order dated October 17, 2014 (Dkt. No. 998.)

five MPD officers are entitled to qualified immunity from this lawsuit.  These officers had no reason to know that there was no probable cause to arrest the plaintiffs, and their respective individual conduct that day was reasonable under all the circumstances.  In the alternative, summary judgment should be granted because there is no dispute over the *material* facts of their limited involvement in the events of September 27, 2002.  Granting this motion will streamline this case so that trial can focus on the critical and necessary issues to finally resolve this long-standing dispute.

In addition to granting this relief, the Court also should dismiss Count Six (Conspiracy 42 U.S.C. § 1985); Count Seven (Neglect to Prevent Conspiracy 42 U.S.C. § 1986); and Count Eight (Common Law Conspiracy).  Finally, the Court should dismiss the claims for punitive damages against these five defendants.

## BACKGROUND OF THE CASE

The original Complaint in this case was filed on October 15, 2002, by seven individuals arrested at Pershing Park on September 27, 2002.  The original Complaint named as defendants the United States, the District of Columbia, the National Park Service, and the Metropolitan Police Department.  (Dkt. No. 1.)  An Amended Complaint was filed on December 6, 2002. (Dkt. No. 9.)  On September 25, 2003, the *Chang* plaintiffs filed a Second Amended Complaint, adding MPD Chief of Police Charles Ramsey and Assistant Chief Peter Newsham in their official capacities only, and Major Richard Murphy of the National Park Police in his official capacity only.  (Dkt. No. 44.)

Twenty-two months later, on July 19, 2005, the *Chang* plaintiffs filed a Third Amended Complaint in which they now also sued Chief Ramsey, Assistant Chief Newsham, and Major Murphy in their personal capacities, and added as new defendants District of Columbia Mayor Anthony Williams, and MPD Assistant Chiefs Michael J. Fitzgerald, Brian K. Jordan, and MPD

officers Bryan DiGirolamo, Andre Harrison, and Michael Smith—the five defendants filing this motion—all in their official *and* personal capacities. The plaintiffs also added as a defendant the Fairfax County Sheriff's Department.  (Dkt. No. 153.)[3]

The original seven *Chang* plaintiffs elected to opt-out of the class certification in the *Barham* case.  *See Barham v. Ramsey*, 217 F.R.D. 262, 274-75 (D.D.C. 2003).  The *Barham* plaintiffs, comprising a class of approximately 390 members, settled with the District Defendants on February 18, 2010—almost five years ago.  (Barham Dkt. No. 640.)  The District also settled with the three other plaintiff groups that filed suit arising out of the Pershing Park arrests.  Thus, the *Chang* case, with only four remaining plaintiffs, is the only lawsuit filed in connection with the events of September 27, 2002, that has not settled, despite two mediations conducted by former judges.

On October 11, 2007, the plaintiffs voluntarily dismissed Court Four of the Third Amended Complaint (Failure to Provide Miranda Warnings) and Count Five (Right to Counsel) as to these five MPD defendants.  (Dkt. No. 331.)  Also, on January 16, 2008, the parties stipulated that there was no probable cause to support the claims in Count Nine of false arrest and the claims in Count Ten of false imprisonment.  (Dkt. Nos. 386 and 387.)[4]  On September

---

[3]    In all, there were five lawsuits filed in connection with the events at Pershing Park on September 27, 2002.  In addition to the *Chang* case, approximately 390 individuals arrested in Pershing Park also filed law suits challenging their arrests.  *See Barham v. Ramsey*, Civil Action No. 02-2253 (filed November 19, 2002).  A third lawsuit was filed by three individuals on November 22, 2002.  *See Jones v. District of Columbia*, Civil Action No. 02-2310.  A fourth lawsuit was filed on March 27, 2003.  *See Abbate v. Ramsey*, Civil Action No. 03-767.  The fifth and final lawsuit arising out of the Pershing Park arrests was filed on September 26, 2003.  *See Diamond v. District of Columbia*, Civil Action No. 03-2005.  It should be noted that only the *Chang* plaintiffs sued MPD officers in their personal capacities.

[4]  Although the parties submitted language to the Court regarding this stipulation, the Court has not entered judgment on those two counts as of the date of this filing.

19, 2010, the Court issued a Memorandum Opinion in which it dismissed all claims for injunctive relief in the *Chang* case. (Dkt. No. 698.)

**STATEMENT OF FACTS**

### I.   GENERAL FACTS PERTAINING TO THE PERSHING PARK ARRESTS

In September 2002, between 3,000 to 5,000 people demonstrated in the District of Columbia against the policies of the International Monetary Fund ("IMF") and the World Bank ("WB"). On Friday, September 27, 2002, approximately 500 people were arrested during demonstrations throughout the city, including about 400 people at Pershing Park, located on Pennsylvania Avenue between 14th and 15th Streets, N.W.[5] The seven original plaintiffs in this case were among the people arrested in Pershing Park. *See Barham v. Ramsey*, 338 F. Supp. 2d 48, 51 (D.D.C. 2004). Only four plaintiffs—RayMing Chang, Young Choi, Leanne Lee, and Chris Zarconi ("the *Chang* plaintiffs")—remain in the case.[6] Thus, more than 12 years after the September 27, 2002 Pershing Park arrests, the *Chang* plaintiffs are the only individuals continuing to pursue claims against the District, these MPD officers, and other governmental and individual defendants. In the words of this Court, "plaintiffs' numbers have dwindled to four." (*See* Dkt. No. 698, at 6.) Amazingly, these four plaintiffs constitute only *one percent* of all people arrested in Pershing Park on September 27, 2002.

---

[5]  The Pershing Park arrests were the fourth set of mass arrests made on September 27, 2002. The earlier arrests that day occurred at 14th Street and Independence Avenue, N.W., Vermont Avenue and K Street, N.W., and Connecticut Avenue and L Street, N.W.

[6]  In October 2005, three of the *Chang* plaintiffs—Meaghan Enright, Amy Chastain, and Elizabeth Young—accepted Rule 68 Offers of Judgment made by the District. Judgment *nunc pro tunc* was entered against the District on April 4, 2006, as to these three plaintiffs. (Dkt. Nos. 144, 190.) The four remaining plaintiffs did not accept the Offers of Judgment made in 2005. Offers of Judgment were again made to the four remaining plaintiffs on September 18, 2009, which they again did not accept.

4

As part of their claims in this lawsuit, the *Chang* plaintiffs alleged that there was a "policy, custom and/or practice of trap and arrest" by MPD developed months before the IMF protests. *See* Third Amended Complaint, ¶¶ 1, 42-74, 141, 147. In particular, the *Chang* plaintiffs alleged that the defendants "agreed the unconstitutional trap-and-arrest maneuver would be utilized; instructed the law enforcement officers who would attend the protests to use the unconstitutional trap-and-arrest maneuver; or instructed the law enforcement officers who would attend the protests on how to perform the unconstitutional trap-and-arrest maneuver." *Id.* at ¶ 156. As described more fully below, there was no such "policy, custom and/or practice" as alleged by the plaintiffs, nor was there any "instruction" to law enforcement officers before September 27, 2002, to use a "trap-and-arrest maneuver."

The decision to arrest the *Chang* plaintiffs at Pershing Park on September 27, 2002 was made solely by MPD Assistant Chief Peter Newsham, the MPD Field Operation Commander. (*See* Dep. of Peter Newsham, March 12, 2010, at 228:10-229:14.)[7] This fact was adopted by the Court of Appeals. *See Barham v. Ramsey*, 434 F.3d 565, 569-70 (D.C. Cir. 2006). In addition to suing Newham, the plaintiffs also sued the District of Columbia under 42 U.S.C. § 1983, asserting *Monell* liability and alleging that the decision to arrest them actually was made by MPD Chief of Police Charles Ramsey, also named as an individual defendant. (*See* Third Amended Complaint, ¶¶ 131-134.[8]

## II. UNDISPUTED MATERIAL FACTS REGARDING MPD PLANNING FOR THE IMF DEMONSTRATIONS

MPD handles large demonstration and crowd events regularly, ranging from Presidential Inaugurations, rock concerts on the Mall, and planned large-scale political and social protests, to

---

[7]  Newsham is represented by separate counsel and is not seeking relief in this motion.

[8]  Chief Ramsey is also represented by separate counsel and is not seeking relief in this motion.

less dramatic events such as the Smithsonian Book Fair and ethnic food street markets. With respect to political demonstrations generally, MPD used a "Manual for Mass Demonstrations and Responding to Civil Disturbances" revised in January 1996, and in effect for the September 2002 IMF event. (*See* Ex. 1 to Dep. of Bryan DiGirolamo, December 2, 2009.) As written in the Manual, the MPD "policy or custom" regarding "mass demonstrations and major civil disturbances in 2002," was "to preserve peace while protecting the First Amendment right of people to assemble peacefully and exercise free speech." (*See* Manual at DC 04065.) In the section entitled "Crowd Management," there is reference to guidelines and procedures that MPD officers should follow in a crowd demonstration situation, such as the importance to "assess the mood of the crowd and to respond to changes in crowd behavior," the "unit commander alone will determine and order the type of response deemed necessary," MPD officers should "display an attitude of neutrality," and that "expressions of friendliness are a valuable tool in maintaining peace." (*Id*. at DC 04082.) With respect to "crowd dispersal," the Manual states:

> When the intensity level of a crowd rises and unlawful disruption, either through violent or passive means, is occurring to the extent that the Field Commander determines there is a need to make a positive police response, he will instruct the affected unit commanders, *where time and circumstances permit*, to issue warnings to the crowd to disperse.

(*Id*. at DC 04083) (emphasis added). Nowhere in the Manual—which consists of 53 pages and 43 pages of appendices—was there mention of the phrase "trap-and-arrest," or the use of a procedure similar to that description.

Largely as the result of the violent IMF protests in Seattle in 1999 and the large IMF demonstrations in the District in April 2002, MPD prepared a "Command Manual" for the IMF Fall Conference. (*See* Chang SM Ex. 29; Dep. of Charles Ramsey, September 19, 2007, at 328; 331-32.) Chief of Police Charles Ramsey testified that the Command Manual was prepared by

the MPD Special Operations Planning Group a week or so before the September 2002 IMF event, and that he had "no direct role in preparing the document." (*See* Ramsey Dep., September 19, 2007, at 305-308; 335-36.) This document provided specific direction for the coordination of logistics, personnel assignments, observation posts, hotel and site security, planning for prisoner transportation and holding, and the use of technology, such as fixed cameras and helicopter flight cameras. There was no reference to a "trap-and-arrest" policy in the Command Manual.

MPD also prepared an "Outside Agency Operations Manual" for distribution to federal and local law enforcement authorities. (*See* Ex. 13 to Ramsey Dep. of September 19, 2007.) This document contained a memorandum of understanding between the U.S. Marshal Service, the United States Attorney for the District of Columbia, the FBI, and MPD on certain procedures to be used for the IMF protests for September 2002. (*See id*., at 23-29.) As stated by Chief Ramsey, it was "important that [these entities] understand the policy and procedures of the Metropolitan Police Department so that everybody is on the same page and we don't have people that are using a level of force that we would consider to be inappropriate under the circumstances because they – according to their own policies, it would be permitted." (*See* Ramsey Dep., September 19, 2007, at 409.) Thus, the main purpose of this agreement was to make sure that other law enforcement authorities understood that MPD policy would control the practices and procedures of enforcement during the September 2002 IMF event. There was no mention of any "trap-and-arrest maneuver" in this Operations Manual.

Finally, as would be expected, there were multiple meetings between MPD senior officials and representatives of federal and local law enforcement authorities to prepare for the IMF event. Several of the participants to these meetings were deposed in this case, including Chief Ramsey, Executive Assistant Chief Fitzgerald, Assistant Chief Newsham, and Captain

Ralph Murphy of the U.S. Park Police. There is no evidence from this extensive discovery that suggested in any way that there was a pre-demonstration agreement to us a "trap-and-arrest maneuver" during the IMF event. (*See*, *e.g.*, Dep. of Charles Ramsey, September 19, 2007, at 414:4-415:2; 419:14-420:5; Dep. of Michael J. Fitzgerald, September 16, 2004, at 42:5-44:21; Dep. of Richard Murphy, February 2, 2005, at 98:9-18; Dep. of Richard Murphy, February 3, 2005, at 406:4-21; 468:14-469:6; 634:10-635:21.)

## II.   UNDISPUTED MATERIAL FACTS REGARDING THE INVOLVEMENT OF THESE MPD DEFENDANTS IN THE EVENTS AT PERSHING PARK

As noted, MPD Officers Fitzgerald, Jordan, DiGirolamo, Harrison and Smith were first added as defendants in the *Chang* plaintiffs' Third Amended Complaint filed in July 2005—almost three years after the Pershing Park arrests and the detention of the plaintiffs. These defendants were not mentioned at all in the original Complaint or the Second Amended Complaint. Set forth below are the pertinent facts concerning the involvement of these defendants in the Pershing Park events.

### A.   Executive Assistant Chief Michael J. Fitzgerald

Michael J. Fitzgerald joined MPD in 1971, and at the time of the Pershing Park events in 2002, he was Executive Assistant Chief of Police reporting to Chief of Police Charles Ramsey. (Dep. of Michael J. Fitzgerald, September 16, 2004, at 16:21-17:6; 17:20-18:3; 18:12-17.) Prior to the events at Pershing Park, Fitzgerald had been involved in many large demonstrations as an MPD officer. (*Id.* at 19:14-20:3.)

Fitzgerald noted that the City had not issued a permit for people to protest in the Park on Friday, September 27, 2002. (*Id.* at 47:10; March 19, 2010 Dep. at 97:12-16.)[9] Nevertheless, there were no MPD plans to form control lines at the Park or to close off demonstrators before

---

[9]  Protestors had permits to demonstrate on Saturday, September 28, and on Sunday, September 29, 2002, but not on Friday, September 27, 2002.

that day.  (September 16, 2004 Dep. at 44:13-21.)  On the morning of September 27, Fitzgerald was with Chief Ramsey riding in a police cruiser around the City, and they saw protestors marching down Connecticut Avenue and they learned that arrests had been made in different parts of the City for failure to obey police orders.  (*Id*. at 79:7-87:9; 88:8-17.)  Fitzgerald also was aware that in other parts of the City some demonstrators had thrown a brick through a bank window and people where chaining themselves together in a "sleeping dragon" formation, thus preventing police from effectively removing them from the streets.  (March 9, 2011 Dep. at 154:4-155:9.)

Fitzgerald and Ramsey arrived at Pershing Park sometime between 9:30 and 10:30 a.m., and they saw demonstrators blocking traffic.  (September 16, 2004 Dep. at 90:16-91:7.) Fitzgerald noticed that the Park already had been closed off, and he believed that arrests had already begun.  (*Id*. at 179:10-21.)  Fitzgerald was with Ramsey at 14th Street and Pennsylvania Avenue when Assistant Chief Peter Newsham walked over to talk to them.  (*Id*. at 99:7-99:16; 113:1-114:6; March 19, 2010 Dep. at 121:17-122:11.)  Newsham told them that he had followed a group of demonstrators down Pennsylvania Avenue who were blocking the street and knocking over trash cans and newspaper dispensers, and that he had to tell demonstrators several times to get out of the street.  (September 16, 2004 Dep. at 126:12-127:21; 128:17-21; March 9, 2011 Dep. at 156:9-157:15.)  Newsham also told Fitzgerald and Ramsey that "the conduct of the demonstrators was escalating," and that he decided to arrests the people in the Park on the charge of failure to obey a police officer.  (September 16, 2004 Dep. at 132:15-133:8; 135:9-17; 194:7-17.)  Fitzgerald does not believe that there were other MPD officers with them at the moment Newsham mentioned these things.  (March 19, 2010 Dep. at 127:13-20.)  When asked to comment on Newsham's arrest order, Fitzgerald said, "Being a police officer, you have to use

common sense, there are [a] lot of minor violations of the law during a demonstration, that basically occur where we don't make arrests from.  There are a lot of demonstrations [ ] where people will do stuff and we can control it and we don't think it will escalate, then we don't make arrests.  We only make arrests as a last resort." (September 16, 2004 Dep. at 134:22-135:8.)

Fitzgerald assumed that people in the Park had been placed under arrest when Newsham talked to him and Ramsey.  (*Id*. at 167:3-10; March 9, 2011 Dep. at 190:3-191:9.)  Fitzgerald did not know at the time of the arrests that there were purported to be members of the press in the Park who were arrested.  (*Id*. at 214:19-215:4.)  Fitzgerald pointed out that it was not his responsibility to determine the validity of any arrests made by an Assistant Chief.  (September 16, 2004 Dep. at 137:9-15.)  He did not make an inquiry if people were given an opportunity to leave the Park before the arrests, nor did he have any knowledge if people were permitted to leave before the arrests.  (*Id*. at 167:15-22; 179:21-180:3; 181:12-15.)  Given the information he had at the moment, Fitzgerald did not disagree with Newsham's arrest decision. (*Id*. at 164:22-165:8; March 19, 2010 Dep. at 138:6-15.)  Fitzgerald did not hear Ramsey verbally agree with the arrest decision or countermand the decision.  (September 16, 2004 Dep. at 147:4-13, March 19, 2010 Dep. at 138:19-139:5.)

Finally, Fitzgerald testified that, in his opinion, MPD should have ignored some minor violations of the law, such as parading without a permit, marching in the street, and turning over trash cans, so that people in Pershing Park could continue their demonstration.  (March 9, 2011 Dep. at 150:18-151:16; 153:5-8.)  Fitzgerald, however, also testified that he did not countermand Newsham's arrest decision because Newsham conveyed to Fitzgerald that the situation in the Park "was escalating to the point where it was beyond just minor offenses" and that things had

"gotten out of hand," and as a result of Newsham's observations, Fitzgerald had no independent facts or reasons to disagree with Newsham's decision.  (*Id*. at 158:2-159:12.)

### B.    Assistant Chief Brian K. Jordan

On September 27, 2002, Brian K. Jordan was an MPD Assistant Chief of Police in charge of the Regional Operations Command-Central.  This gave him senior MPD authority over events occurring near the middle of the City.  (Dep. of Brian K. Jordan, March 24, 2010, at 9:8-10:7.) Pershing Park was not in his immediate command area.  Jordan reported directly to Executive Assistant Chief of Police Fitzgerald and Chief of Police Ramsey.  (Dep. of Brian K. Jordan, March 30, 2005, at 12:20-13:3.)  He had no policy making responsibilities with MPD in 2002. (*Id*. at 11:11-14.)  What is significant about Jordan's involvement in the events at Pershing Park is that he did not order the arrests of protestors in the Park, and he did not participate in any decisions regarding the manner of detention of people who were arrested in the Park that day. As an Assistant Chief, Jordan did not have the authority to countermand any arrest decision made by Newsham at Pershing Park.  (*Id*. at 18:7-13; 19:7-10.)

Early on the morning of September 27, 2002, Jordan was stationed in the vicinity of Vermont Avenue and K Street, N.W. (in his area of command), when he ordered the arrest of protestors because of the breaking of a bank window and other disorderly actions.  (March 24, 2010 Dep. at 62:16-63:9; March 30, 2005 Dep. at 172:10-190:21; 208:7-215:15.)   After the events at Vermont Avenue and K Street ended, Jordan traveled by patrol cruiser to the corner of 15th Street and Pennsylvania Avenue, N.W., that bordered the west and south ends of Pershing Park.  (March 24, 2010 Dep. at 76:17-76:4; 81:11-12.)  He arrived at Pershing Park sometime around 11:00 a.m.  (March 30, 2005 Dep. at 39:11-40:10; 149:5-21.)

After arriving in the area of the Park, he saw Assistant Chief Peter Newsham on the south side of the Park along Pennsylvania Avenue.  (March 24, 2010 Dep. at 83:5-18.)  They had a

brief conversation, and then Jordan walked to 14th Street before leaving the general vicinity of Pershing Park. (March 30, 2005 Dep. at 47:14-17; March 24, 2010 Dep. at 86:5-16.) Jordan's attention was not directed to the protestors in the Park, and he did not observe whether people were entering or leaving the Park. (March 30, 2005 Dep. at 51:5-54:2, 61:4-17.) Jordan did not recall any conversation with Chief Ramsey at the Park about any arrest decision, but he did recall informing Ramsey that the events at Vermont Avenue and K Street were over. (*Id*. at 66:3-67:16; 155:11-16; March 24, 2010 Dep. at 87:19-88:5; 89:15-90:2.) He did not recall any meeting with Ramsey, Newsham, and Fitzgerald as a group about events taking place in the Park. (*Id*. at 120:18-22; 123:4-7.) Indeed, Jordan did not recall even seeing Fitzgerald at the Park. (*Id*. at 90:3-12.)

Jordan testified that he did not have enough information about what was taking place within the Park to determine if there was any unlawful activity. (March 30, 2005 Dep. at 69:5-69:12; 71:22-72:6.) He did not participate in any discussions regarding what the charges would be for the protestors who were arrested in the Park. (*Id*. at 88:8-90:10.) He was not made aware of whether the people in the Park disobeyed any police order. (*Id*. at 90:12-91:14.) Jordan was not present for any discussion about shutting down the Park. (*Id*. at 91:20-92:6.) Nor was Jordan aware of any decision to arrest people in the Park. (*Id*. at 92:7-10.) Although Jordan knew that there were mounted U.S. Park Police near Pershing Park, he did not interact with them, nor was he aware that officers from Fairfax County were present. (*Id*. at 152:17-153:12.)

As can be seen, Jordan's involvement with the events at Pershing Park were extremely limited. His primary responsibility on September 27, 2002, was supervising the events around the area of Vermont Avenue and K Street, N.W., where there was disruption of traffic and some violence with the breaking of windows. Once Jordan arrived at Pershing Park around 11 a.m.,

the arrests had already begun.   He had a brief conversation with Ramsey, Newsham, and Fitzgerald, but he was not involved in any of the decisions regarding giving a dispersal order, making the arrests, or the manner of detention of the people who had been arrested.

## C.    Officer Bryan DiGirolamo

Bryan DiGirolamo was an MPD officer in the Civil Disturbance Unit ("CDU") on September 27, 2002. (Dep. of Bryan DiGirolamo, December 2, 2009, at 27:12-13; 32:9-12.)[10] Pershing Park was his first mass demonstration event as an MPD officer.  (*Id*. at 47:3-5.)  He was not involved in any MPD decisions made in Pershing Park that day, including any decision to give a dispersal order or to arrest people in the Park. (*Id*. at 103:3-5.)  In fact, he testified that he knew nothing about the circumstances of the plaintiffs' arrests.  (*Id*. at 126:10-21.)  He did not carry flexi cuffs, nor did he have a radio when he was at the Park. (*Id*. at 57:14-15.)  His involvement was limited to being ordered to stand in a line at the Park and riding on the bus with a group of about 40 detainees to the Police Academy.  He was one of two officers who filled out arrest forms for that one bus load of detainees, including plaintiffs Lee and Zarconi. (*Id*. at 137:15-138:1; 147:5-11; 169:18-171:18.)  The fact that DiGirolamo filled out arrests forms for Lee and Zarconi hours after they were arrested seems to be the only reason he was sued in this case, including for his personal liability.

Officer DiGirolamo reported for duty on the morning of September 27, 2002, to the 4th District station, his usual place of work.  (*Id*. at 47:22-48:16; 58:13-63:11.)  He arrived at the southeast corner of Pershing Park in mid-morning and was ordered by a supervisor to join a police line that had formed on the south end of the Park.  (*Id*. at 65:16-20; 68:13-20.)  He did not see Chief Ramsey, Newsham or Fitzgerald at the Park.  (*Id*. at 69:7-22; 89:3-10; 89:11-16;

---

[10]  Officer DiGirolamo has been employed as a Special Agent with ATF in New York since September 2004.  (*Id*. at 23:1-15.)

107:12-14.)  Shortly after arriving at the Park he remembered seeing Jordan near the Park, but not later.  (*Id*. 70:1-72:5.)  DiGirolamo did not see any police officers with video cameras near the Park.  (*Id*. at 74:21-75:4.)  He did not see people "ushered into the Park;" to the contrary, he saw people going in and out of the Park.  (*Id*. at 77:6-16; 82:5-7.)  He did not know who ordered the formation of police lines, nor was he part of the arrest team.  (*Id*. at 90:11-19; 103:3-5.)  As DiGirolamo said in his deposition testimony, "I was just executing what I was told."  (*Id*. at 94:17-19.)

DiGirolamo stated in his deposition that he was ordered by a supervisor around noon time to go to one of the buses that was picking up detainees.  (*Id*. at 116:-117:8; 118:7-11; 119:21-120:1.)  He was not told at that time why people had been arrested.  (*Id*. at 122:13-17; 126:10-21.)  When asked by people on the bus why they had been arrested, DiGirolamo said he did not know the reason, but that he would tell them as soon as he found out.  (*Id*. at 123:21-124:21.)  He further testified that if anyone at the time had shown him press credentials, he would have gone to find a supervisor to find out if the person should be released.  (*Id*. at 130:3-131:2.)  DiGirolamo did not search people when they boarded the bus, and he cut off the flexi cuffs on anyone who complained that they were too tight.  (*Id*. at 134:9-17.)  In DiGirolamo's words, "[w]e tried to make it as pleasant as possible" for people who were on the bus.  (*Id*. at 123:17-18.)

DiGirolamo stated that when the bus arrived at the Police Academy, he was given field arrest forms by a supervisor and told to fill out the forms.  (*Id*. at 135:18-136:22.)  Although DiGirolamo had never before filled out a field arrest form, he did the best he could with the information he had.  Because he had not been told the details regarding the arrests, he left blank some of the blocks on the form, including the section calling for a description of the arrests.  (*Id*.

at 139:21-22: 152:9.)  He filled out field arrest forms for plaintiffs Lee and Zarconi, although he was not the MPD officer that actually arrested them hours earlier in the Park.  (*Id*. at 147:5-11; 149:3-21; 169:18-171:18.)  He explained to the detainees on the bus the options for release once they arrived at the processing center at the Academy, took them off the bus and had their Polaroid photographs taken, and then escorted them to the gym where they would remain until released.  (*Id*. at 179:17-181:19; 181:20-182:6; 182:9-13.)  DiGirolamo stayed at the Academy until all the detainees were in the gym.  (*Id*. at 184:1-4.)

### D.   Officer Andre L. Harrison

Andre Harrison had virtually the identical involvement in the events surrounding Pershing Park as did Bryan DiGirolamo.  Harrison, an MPD officer since 1998, was an MPD officer assigned to the CDU in the 4th District on September 27, 2002.  (Dep. of Andre L. Harrison, December 10, 2009, at 19:13-20; 58:10-60:12.)  He did not participate in the decisions to enclose the Park, to give dispersal orders, or to make any arrests or flex-cuff any people in the Park.  He only processed arrest records for about 10 to 15 people because he was ordered to ride on a bus transporting detainees to the Police Academy after the arrests were made.  (*Id*. at 68:17-19; 113:13-15; 144:9-10.)

After reporting for roll call on the morning of September 27, 2002, Harrison was ordered to Pershing Park and upon arrival at the Park joined a police line that had already formed on the north side of the Park.  (*Id*. at 72:3-10; 74:9-17; 76:21-77:1; 78:7-12.)  He did not remember exactly when he arrived at the Park.  (*Id*. at 60:10-12; 64:6-9; 71:1-3.)  He did not recall seeing Newsham at the Park nor did he hear any dispersal order.  (*Id*. at 87:9-15; 107:1-7; 110:16-17.)  He did not recall becoming aware, while at the Park, why people were being arrested, and he did not see any officers using video cameras to film the events in the Park.  (*Id.* at 113:16-114:6; 116:7-12; 257:18-20.)  He did not recall seeing any law enforcement personnel from other

agencies, and he believed that the people that were on his bus were arrested before noon.  (*Id*. at 116:13-17; 133:9-134:2.)  Harrison succinctly described his role at Pershing Park this way:  "I wasn't thinking of whether [people in the Park] were protestors or not.  I was there to stand in line.  It didn't make a difference if they were protestor or not.  Just stand in line."  (*Id*. at 106:15-18.)  Harrison added:  "It wasn't based on my decision of probable cause to place the people under arrest.  The superior office made that determination."  (*Id*. at 149:17-20.)

Harrison also was ordered by a supervising officer to ride on one of the buses with several other MPD officers that transported detainees to the Police Academy.  (*Id*. at 120:22-121:4; 126:9-12.)  He testified that people were already flexi cuffed when he got on the bus.  (*Id*. at 126:20-127:2.)  The bus initially drove to the Police Academy in Southeast, but then was directed to the MPD processing facility at 409 F Street, N.W.  (*Id*. at 134:6-13: 134:14-135:9.)  He said that detainees were on the bus about 8 hours, but during that time people were allowed to leave the bus to go to the restroom, and some people had the flexi cuffs removed.  (*Id*. at 135:22-136:13; 137:3-20.)  When the bus arrived at the processing facility on F Street, Harrison was told by a supervisor to put on the arrest forms the charge of failure to obey an order.  (*Id*. at 125:18-126:2; 137:19-138:4.)  Harrison described in detail during his deposition the procedures used for the processing of the detainees.  (*Id*. at 141:12-142:10; 143:21-145:6; 161:1-172:2.)  Harrison was the MPD officer who completed the arrest form for plaintiff Chang.  (*Id.* at 159:18-160:1.)

### E.  Officer Michael Smith

MPD Officer Michael Smith's involvement in the arrest of plaintiff Choi also was extremely limited.  Similar to the situation with Officers DiGirolamo and Harrison, Officer Smith did not arrest anyone at Pershing Park, did not flexi cuff anyone after the arrests began, and he did not detain anyone after they arrived at the Police Academy.  (Dep. of Michael Smith, December 11, 2009, at 120:22-121:2.)  Smith's involvement was limited to riding one of the

16

buses from the Park to the Academy, processing the paperwork for plaintiff Choi, and occasionally letting people on the bus take a restroom break. (*Id.* at 121:14-15; 123:11-12.) Like DiGiralamo and Harrison, Smith has been personally sued when all he did was obey a superior's order to ride on a bus with some detainees to the Police Academy.

Smith had been with MPD for two years when he was ordered to report to Pershing Park on September 27, 2002. (*Id.* at 19:4-6.) Prior to becoming an MPD officer, Smith was in the U.S. Air Force for 20 years as a security officer with Military Police, and then as a Special Agent with Special Investigations in the Air Force. (*Id.* at 21:6-22.) On the morning of September 27, 2002, Smith, a motorcycle MPD officer, reported to the 2nd District, his usual assignment, and after roll call and sometime before 10 a.m. he was ordered to go to Pershing Park. (*Id.* at 20:2-11; 71:1-8.) He arrived at the northwest corner of the Park on motorcycle, and after leaving his cycle along Pennsylvania Avenue, he was placed in a police line by a supervisor along the north side of the Park. (*Id.* at 74:11-18; 75:8-22; 76:1-10.) About 20 to 25 minutes later, he was moved to a new line near Pennsylvania Avenue and 15th Street. (*Id.* at 102:14-18.) After another 30 minutes, he had the impression that everyone in the Park was being arrested. (*Id.* at 190:2-11; 120:22-121:2.) During his time at Pershing Park, Smith did not see Ramsey, Fitzgerald, Newsham, or Jordan. (*Id.* at 124:16-125:8.)

Smith did not participate in the decision to make arrests in the Park, nor did he know why people were being arrested. (*Id.* at 125:15-18.) In his deposition testimony, he stated: "Based on the decision by the command staff that arrests needed to be made, I believe they had more information as to what was occurring than I had at the time and wasn't present to see what they saw." (*Id.* at 215:14-17.) After being ordered to board one of the buses that would transport detainees to the holding facility, Smith noted that people already were flex-cuffed. (*Id.* at 122:5-

17

18.)  He did not take any property from anyone boarding the bus.  (*Id*. at 169:5-9.)  He rode on a bus with two other MPD officers and about 25 to 30 detainees.  (*Id*. at 123:13-124:1; 128:4-8.) Upon arrival at the Police Academy, Smith was told by a supervisor to fill out the arrest paperwork, that the charge to put on the form was failure to obey, and that the arrest time was 11:15 a.m.  (*Id*. at 128:15-129: 21; 130:15-131:8; 152:10-153:3.)  He filled out the arrest forms—including the one for plaintiff Choi—with "information that was available at the time." (*Id*. at 136:18-21.)  Thus, he did not put on the form details of the actual arrest of the detainees because he was unaware of the details.  (*Id*. at 158:22-160:8.)  This was the first time that Smith filled out a PD759 arrest form in his two years as an MPD officer.  (*Id*. at 199:11-20.)

Smith testified that emotions on the bus varied; some people were laughing and some were crying.  He said everyone took it differently.  (*Id*. at 141:3-10.)  Once he was told by a superior officer about the charge for the arrests, he reported that information to the people on the bus along with what would take place during processing.  (*Id*. at 141:11-142:4.)  He also stated that most people on the bus were able to remove the flex-cuffs themselves, and that no one complained to him that the cuffs were too tight.  (*Id*. at 140:5-15.)  Smith escorted some detainees to the restrooms in the Academy, and although he took people to the processing area, he did not see the gymnasium holding area.  (*Id*. at 150:3-5.)  He became aware of computer problems at the processing facility when he arrived, and he said that the processing took "several hours."  (*Id*. at 138:13-139:1; 150:6-151:1.)

## III.  RELEVANT TESTIMONY FROM RAMSEY AND NEWSHAM ABOUT THE EVENTS AT PERSHING PARK

### A.   Chief Ramsey

On the morning of September 27, 2002, Chief Ramsey was at five locations in the City before going to Pershing Park.  (Dep. of Charles Ramsey, March 26, 2010, at 70:2-84:7.)  On his

third stop at Vermont Avenue and K Street, N.W., he was present when a brick was thrown through a bank window and dozens of protesters were arrested. (Dep. of Charles Ramsey, September 19, 2007, at 329; 446:21-454:11; 466:22-473:11.)  Ramsey arrived at Pershing Park with Fitzgerald and a Washington Post reporter in his police cruiser "near close to 10:00" a.m. (March 26, 2010 Dep. at 69:15-21; 84:8-11; 96:10-13; September 19, 2007 Dep. at 480:13-485:2; 511:6-11.)

When Ramsey arrived at Pershing Park, he noticed a large crowd in the Park and that police lines had formed around the western end of the Park.  (*Id*. at 485:11-486.)  Ramsey could see that some people were exiting the Park on the east side of the Park along 14th Street.  (*Id*. at 494:3-7; 495:11-13; 496:7-8.)   Upon arrival at the Park, Ramsey and Fitzgerald met with Newsham, who was the MPD Field Operation Commander on the scene, for about ten minutes. (*Id*. at 488:12-22; 489:5-7; 496:20-22; March 26, 2010 Dep. at 98:16-99:4.)  Ramsey did not recall seeing MPD Assistant Chief Jordan when he arrived at the Park.  (*Id*. at 497:17-20.) According to Ramsey, Newsham told Ramsey and Fitzgerald that he and other MPD officials had observed protestors engaging in various unlawful acts, including knocking over trash cans and newspaper vending machines, and generally blocking traffic.  (*Id*. at 490:8-13; 493:1-10; 497:2-8; 510:12-18; March 26, 2010 Dep. at 108:13-22.)  Newsham said that the protestors had not stopped blocking traffic despite orders to clear the streets.  (September 19, 2007 Dep. at 497:21-498:17; March 26, 2010 Dep. at 108:13-22.)  Newsham also told Ramsey that he thought everyone in the Park had committed at least one of the offenses Newsham had observed. (September 19, 2007 Dep., at 493:1-10.)  Newsham then told Ramsey that he believed he had probable cause to arrest the people who were in the Park.  (*Id*. at 498:15-17.)

19

Ramsey testified that he believed that Newsham's "intent was to make arrests" when they were talking on the street next to the Park.  (March 26, 2010 Dep. at 108:22.)  Based on what Newsham told him, and what he observed when he arrived at the Park, Ramsey believed that Newsham had probable cause to order the arrest of some of the protestors in the Park.  (Ramsey Dep., September 18, 2007, at 38:8-14; 55:3-8; September 19, 2007 Dep., at 499:16-500:3; March 26, 2010 Dep. at 115:1-11; 153:7-13.)  Ramsey also believed that the Park had been cleared of uninvolved citizens before the arrest order was made by Newsham. (September 18, 2007 Dep., at 50:20-51:6; 53:10-15.)   Fitzgerald was with Ramsey when Newsham talked with Ramsey. (March 26, 2010 Dep. at 111:5-9.)  Ramsey did not recall being with Jordan at that moment.  (*Id*. at 112:6-11.)

In addition, Ramsey was not aware at the moment that there were people in the Park who may not have engaged in earlier unlawful activity.  (September 18, 2007 Dep., at 50:20-51:6; 63:9-13.)   Ramsey also testified that he assumed Newsham had followed standard MPD procedures to ensure probable cause existed to order the arrest of the people in the Park. However, Ramsey was unaware that Newsham had not given a general dispersal order before ordering the arrests, even though he assumed that such a warning had been given.  (March 26, 2010 Dep. at 115:14-16; 123:5-7; 203:10-20.)  Thus, Ramsey thought the Park had been cleared of non-protestors before the arrests were made.  (March 26, 2010 Dep. at 129:16-22; 130:6-16; 133:2-12; 135:15-136:10.)  Ramsey also testified that he "did not disapprove or give [Newsham] any reason to believe that I thought he did not have probable cause to arrest."  (*Id*. at 121:19-21.)

## B.    Assistant Chief Newsham

In September 2002, Newsham was an Assistant Chief of Police reporting directly to Chief of Police Ramsey.  (Dep. of Peter Newsham, September 6, 2007, at 24:16-18.)  As noted, he was the designated MPD Field Operation Commander for the Pershing Park area.  (*Id*. at

59:16-61:8; 129:15-21.)  Prior to demonstrators gathering in Pershing Park, Newsham observed

protestors in the streets at various locations throughout the city turning over trash cans and

newspaper stalls, and he heard on the police radio about the bank window smashed by a thrown

brick at Vermont Avenue and K Street, N.W.  (*Id*. at 115:13-117:7.)  He described the protestors

conduct as "violent, and also something that could potentially get out of control."  (*Id*. at 117:10-

12.)  He added that he observed numerous small groups of people around the Park in an "excited

state" and "running through the streets, they were disobeying direction to get up on the

sidewalks."  (*Id*. at 120"14-21.)  Newsham said these people were headed to Pershing Park.  (*Id*.

at 121:5-6.)

        Newsham testified that he arrived at Pershing Park about 9:00 a.m. and walked around

the Park.  (*Id*. at 124:4-15.)  He noticed that police lines had already formed around part of the

Park but he did not order the formation of those lines.  (*Id*. at 125:2-126:16.)  He also noticed

that people were allowed to go through those lines to enter or exit the Park.  (*Id*. at 130:20-

132:7.)  Newsham recalls speaking with Assistant Chief Jordan before giving the arrest order

(*Id*. at 134:15-22; 135:22-136:5), but he stated clearly that he did not discuss his impending

decision to order the arrests with Jordan.  (*Id*. at 137:12-17.)

        Newsham also spoke to Chief Ramsey and Assistant Chief Fitzgerald after they arrived at

the Park.  He told Ramsey "all the information that I had regarding the behavior of the

demonstrators prior to entering the park, their behavior while they were in the park, the fact that

the demonstrators did not have a permit, and that it was my intention to make an arrest."  (*Id*. at

174:1-6.)  (*See also* Dep. of Peter Newsham, November 5, 2007, at 44:13-45:6; 46:17-50:2.)

Newsham stated that Jordan and Fitzgerald were also present when he had this conversation with

Ramsey.  (September 6, 2007 Dep. at 176:16-177:3.)  Newsham said he did not give a general

dispersal order, and that he did not inform Ramsey, Fitzgerald or Jordan that a dispersal order had not been given before the arrests were made.  (*Id*. at 181:4-182:2.)  Newsham added that no one at the scene advised him to give a dispersal order.  (*Id*. at 225:16-22.)  He did not talk to Ramsey after the arrests began.  (*Id*. at 229:1-5.)

Newsham also had several conversations with Captain Ralph Murphy of the U.S. Park Police and also a defendant in this case.  In one of the conversations, Murphy told Newsham that although Pershing Park was federal territory, Murphy was not going to have the U.S. Park Police make arrests because the Park Police "didn't have the resources to handle that" and because of the concern of using the Park Police horses on the hills in the Park that might result in injury to the protestors.  (*Id*. at 159:14-161:17; 295:9-14; 300:11-15.)  Murphy confirmed this in his deposition.  (*See* Murphy Dep., February 3, 2005, at 536:3-12.)  Murphy provided the same explanation to Jordan at about the same time.  (See Murphy Dep., February 2, 2005, at 229:13-230:3; 235:5-236:11.)

During his first deposition, Newsham was asked only about MPD Officer Smith. Newsham testified that he did not know Smith or recognize his MPD badge number.  (*Id*. at 216:22-217:4.)  Newsham also stated that any MPD officer, and not necessarily the arresting officer, could complete the information on an MPD Form 759 arrest ticket.  (*Id*. at 217:21-218:2.)  Newsham also confirmed that the officer filling out an arrest ticket does not have to witness the crime charged in the ticket.  (*Id*. at 219:3-12.)  Newsham was not asked about MPD Officers DiGirolamo or Harrison in his two depositions.  Finally, Newsham did not recall speaking to any other federal official at Pershing Park on September 27, 2002, nor did he remember seeing any other MPD official speak with a federal official that day.  (*Id*. at 300:4-9; 301:3-9.)

## IV.   RELEVANT TESTIMONY FROM THE FOUR *CHANG* PLAINTIFFS REGARDING THEIR ARRESTS AND DETENTIONS

### A.   Plaintiff RayMing Chang

Plaintiff Chang alleges in the Third Amended Complaint that after his arrest he was transported by a Metro bus to the MPD Police Academy and then to Judiciary Square, where he was detained for about 16 hours.  He was flexi cuffed for about 13 hours.  Police advised Chang that he had three options: (1) remain in custody until an arraignment within the next 24 hours or so; (2) pay $100 and "forfeit;" or (3) pay $100 and schedule a hearing in Superior Court.  MPD records show that Chang selected the second option.  He was released at approximately 3:00 am on Saturday, September 28, 2002.  (Dkt. No. 153, ¶ 93.)

Additional facts offered by plaintiff Chang in discovery pertinent to this motion are few but undisputed.  Chang testified that he was involved in the Pershing Park event as a legal observer for the National Lawyers Guild though George Washington University Law School (Dep. of RayMing Chang, October 22, 2007, at 172:16-173:3.)  Chang said that he received about 17 hours of pro bono credit from the Law School for the time of his detention, and that he received some formal recognition for the event from the Law School at a later date.  (*Id*. at 171:7-172:9; 200:18-201:18.)  He did not specify what that recognition was.

Chang did not recall if he knew that the protestors did not have a permit to demonstrate on September 27, 2002, but "[i]f they were arrested for not having a permit, so be it."  (Dep of RayMing Chang, May 10, 2004, at 115:19-117:10; 117:20-21.)  He claims that he arrived at Pershing Park at 9:20 a.m., about 30 minutes before the arrest order was made by Newsham.  (*Id*. at 122:7-11.)  He did not recall seeing Newsham or any other defendant at the Park.  (May 10, 2004 Dep. at 113:7-115:6; 123:10-22.)  Chang did not recall who actually arrested him in the Park, and he was not even sure that it was an MPD officer that arrested him.  (*Id*. at 184:1-20.)

Chang affirmatively said that he first met MPD Officer Harrison on the bus when Chang was being transported to the Police Academy, and that Harrison did not hand-cuff Chang in the Park. (*Id*. at 189:2-5; 190:2-4.)  Chang said that all Harrison did was "wrote out the paper—the ticket." (*Id*. at 187:9-22.)  Chang admitted that his record was expunged within several months after he was arrested.  (May 10, 2004 Dep. at 126:12-127:1.)  Finally, Chang offered no evidence that supported a conspiracy claim.  (October 22, 2007 Dep. at 183:7-22.)

### B.      Plaintiff Young Choi

Plaintiff Choi alleges in the Third Amended Complaint that he was detained for about 16 hours.  After his arrest, he was handcuffed and transported by bus to the Police Academy and later cuffed (wrist to opposite ankle) again for approximately 8 hours. MPD records show that Choi agreed to pay the "forfeit" and he was released at about 2:00 am on September 28, 2002. (Dkt. No. 153, ¶ 95.)

Choi was present at Pershing Park taking photographs for The Hatchet, a student newspaper for George Washington University.  (Dep. of Young Choi, August 20, 2004, at 17:12-20.)  He said he obtained a press credential from the GW Hatchet newspaper and not from MPD; he was not aware that only press credentials issued by MPD were to be recognized as official by the police during the demonstration.  (*Id*. at 129:18-132:3.)  Choi was able to retrieve all of the photographs he took on September 27, 2002, and he provided them to the Hatchet.  (*Id*. at 19:10-20:4.)

Choi could not identify the MPD officer who arrested him or flexi cuffed him.  (*Id*. at 126:11-22.)  Choi could not even remember if the officer that processed his arrest paperwork was an MPD officer.  (*Id*. at 38:21-39:15.)  When asked if MPD Officer Fitzgerald took any specific action that warranted Choi naming Fitzgerald as a defendant, Choi said, "I honestly don't remember." (*Id*. at 58:1-20.)  Choi said the same thing about MPD Officer Jordan.  (*Id*. at 58:21-

59:8.)  He had no personal knowledge of what Newsham did at Pershing Park.  (*Id*. at 129:10-13.)  Regarding MPD Officer Smith, who processed the arrest paperwork for Choi, Choi testified that Smith "was the one that was escorting us on the bus and escorted us while we were awaiting the admission into the Academy."  (*Id*. at 61:15-62:17.)  Choi confirmed that he had been arrested before he first came into contact with Smith.  (*Id*. at 62:18-20; 63:17-64:6.)

In his 2004 deposition, Choi stated that he believed there was a conspiracy regarding his arrest because he was arrested as a reporter even though other reporters were not arrested at Pershing Park.  (*Id*. at 100:5-101:101.)  However, three years later, Choi testified that he was not aware of any facts that would support any of the conspiracy charges.  (Dep. of Young Choi, November 7, 2007, at 33:3-11.)  Moreover, Choi is the only one of the four *Chang* plaintiffs who rejected an offer from the District to expunge his arrest record from September 27, 2002.  (*Id*. at 67:2-6.)  Finally, Choi said he could not offer any facts that would support an award of punitive damages against any of the five defendants filing this motion.  (*Id*. at 34:2-5; 73:18-74:15.)

## C.    Plaintiff Leanne Lee

Plaintiff Lee (now Leroy) alleges in the Third Amended Complaint that she was detained for approximately 27 hours.  After her arrest, she was kept on a Metro bus for several hours and then transported to the Police Academy.  While handcuffed, she was placed on a mat with several other arrestees.  MPD records show she was released at approximately 1:00 p.m. on Saturday, September 28, 2002, after paying the requisite $50 fine. (Dkt. No. 153, ¶ 97.)

In her deposition testimony, Lee added that she was a staff photographer for The Hatchet on September 27, 2002.  (Dep. of Leanne Lee, December 22, 2004, at 12:10-13.)  Lee said that she arrived at Pershing Park about 8:45 or 9:00 a.m. (*Id*. at 53:13-54:1; 157:17-21; 164:22-165:1; 174:10-12.)  She was arrested and put on a bus by 11:00 a.m.  (*Id*. at 55:15-19.)  Although Lee asked to leave the Park before she was arrested, she admitted that she did not show the police her

identification with The Hatchet despite the fact that she saw other journalist given permission by the police to leave the Park. (*Id*. at 59:20-22; 63:6-8.) Lee testified that at no time did any police officer use any physical force toward her. (*Id*. at 85:15-21.)

At her second deposition on October 19, 2007, Lee testified that she was arrested shortly after she made her second request to leave the Park at "around 9:45." (Dep. of Leanne Lee, October 19, 2007, at 28:21-29:20.) Lee cannot remember who arrested her in the Park. (*Id*. at 29:19-30:4.) Nor could she recall who handcuffed her or rode with her on the bus to the Police Academy. (*Id*. at 38:10-14.) Finally, Lee could not recognize the names of the other four defendants, and she could remember DiGirolamo's name only with the help of her lawyer. (*Id*. at 46:19-47:12.)

### D.       Plaintiff Christopher Zarconi

Finally, plaintiff Zarconi alleges in the Third Amended Complaint that he was transported by bus to the Police Academy, where he was detained for a total of approximately 26 hours. At the Academy, he was allowed to use the bank teller machine to withdraw cash to pay the $50 forfeit. He was released at about 1:00 pm on Saturday, September 28, 2002. (Dkt. No. 153, ¶ 99.)

Zarconi added these facts in his deposition testimony. On September 27, 2002, Zarconi was also a photographer for The Hatchet, and the Pershing Park event was about the fifth protest he had photographed. (Dep. of Christopher Zarconi August 24, 2004, at 21:2-4.) He referred to himself as a "photojournalist." (*Id*. at 32:16-21.) After viewing demonstrations in the early morning near Vermont and K Streets, N.W., Zarconi walked with protestors to Pershing Park sometime between 9:00 and 9:30 a.m. (*Id*. at 36:11-38:1.) Like his fellow George Washington University press photographers, Zarconi did not have press credentials issued by MPD. (*Id*. at

61:6-22.)  After Zarconi was released from custody, he got his camera back undamaged.  (*Id*. at 76:16-77-7.)

After he was arrested, Zarconi was placed on a Metro bus and driven to the Police Academy.  (*Id*. at 77:11-17.)  During the time Zarconi was in custody, he did not see any MPD officer use any physical force.  (*Id*. at 85:4-12.)  He does not recall any interaction with DiGirolamo on the bus or at the Academy or during the processing.  (*Id*. at 86:8-18; 87:22-88:2.) While at the Academy, Zarconi did not observe MPD using any physical force, and he was permitted to use the restroom and he was given food and beverage.  (*Id*. at 80:11-21; 81:12-14; 89:5-17.)  He never asked the police to loosen his flexi cuffs.  (*Id*. at 94:6-9.)  Zarconi voluntarily paid the $50 forfeiture and was released.  (*Id*. at 92:18-93:2.)

At his deposition taken on November 9, 2007, Zarconi testified that he could not describe MPD Officer DiGirolamo.  (Dep. of Christopher Zarconi, November 9, 2007, at 7:10-12.) Zarconi did not even know that DiGirolamo was employed by MPD.  (*Id*. at 32:21-33:1.)

### E.  Plaintiffs' Current Status

According to supplemental discovery responses filed in April 2012, RayMing Chang was employed at that time as a GPS III Advanced Capabilities Program Manager for the U.S. Air Force in Los Angeles, California, and is a First Lieutenant in the U.S. Army Reserve.  *See* Chang's Supplemental Answers to Interrogatories, April 30, 2012, at 6.  Young Choi stated he was a physician resident for the Department of Anesthesiology at the Medical University of South Carolina.  *See* Choi's Supplemental Answers to Interrogatories, April 30, 2012, at 5. Leanne Lee (now Leroy) is a free-lance translator in Lambersant, France.  *See* Leroy Supplemental Answers to Interrogatories, April 24, 2012, at 3, 5.  Christopher Zarconi is a

catering supervisor for Restaurant Associates in Washington, D.C.  *See* Zarconi's Supplemental

Answers to Interrogatories, April 24, 2012, at 3, 5.  (*See* Dkt. No. 945, Ex. 1.)[11]

## STANDARD OF REVIEW

Summary judgment should be granted when the moving party has shown that there are no

genuine issues of material fact and that the moving party is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v.*

*District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  The party seeking summary judgment

bears the initial burden of demonstrating the absence of a genuine dispute of material fact.

*Celotex*, 477 U.S. at 323.  The Court must view all facts in the light most favorable to the non-

moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment must be entered "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  *Celotex*, 477 U.S. at 317.  "In such a situation, there can be no

'genuine issues of any material facts,' since a complete failure of proof concerning an essential

element of the non-moving party's case necessarily renders all other facts immaterial."  *Id*. at

322-23.  *See also Dingle v. District of Columbia*, 571 F. Supp. 2d 87, 94 (D.D.C. 2008).

The non-moving party's opposition must consists of more than mere unsupported

allegations or denials, and must be supported by affidavits or other competent and admissible

evidence based on personal knowledge setting forth the specific facts showing that there is a

genuine dispute for resolution at trial.  Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *Bush v.*

*District of Columbia*, 595 F.3d 384, 386 (D.C. Cir. 2010).  "The mere existence of a scintilla of

---

[11]  Of course, if this information is not currently correct, plaintiffs can amend or supplement the
facts by submitting current information in their opposition to this motion.  Plaintiffs have a
continuing obligation to do that in any event if the information is incomplete or incorrect.  *See*
Fed. R. Civ. P. 26 (e)(1)(A).

evidence in support of the [non-moving party's] position will be insufficient" to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Estate of Parsons v. Palestinian Authority*, 651 F.3d 118, 123 (D.C. Cir. 2011). Summary judgment may still be granted even if the evidence favoring the non-moving party is "merely colorable, or is not significantly probative." *Id.* at 249-50; *Jackson v. District of Columbia*, 541 F. Supp. 2d 334, 340 (D.D.C. 2008).

## ARGUMENT

I. **DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE THEY REASONABLY BELIEVED THERE WAS PROBABLE CAUSE TO ARREST AND DETAIN THE PLAINTIFFS.**

The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Jones v. Horne*, 634 F.3d 588, 597 (D.C. Cir. 2011). Therefore, the issue of qualified immunity should be resolved before trial. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam); *Davis v. Scherer*, 468 U.S. 183, 195 (1984). Qualified immunity is an issue of law for the Court to decide. *Pitt v. District of Columbia*, 491 F.3d 494, 509 (D.C. Cir. 2007).

Qualified immunity turns upon the "objective legal reasonableness of the officers' action, assessed in light of the legal rules that were clearly established at the time the action was taken." *Wilson v. Layne*, 526 U.S. 603, 614 (1999); *Halcomb v. Woods*, 767 F. Supp. 2d 123, 141 (D.D.C. 2011). The "dispositive inquiry" for purposes of qualified immunity is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *Pitt,* 491 F.3d at 509.

The D.C. Circuit has held numerous times that a police officer is entitled to qualified immunity if his actions emanate from the collective knowledge of other officers more directly involved or familiar with the facts of an arrest, and it was reasonable for the officer to rely on that collective information. *Wesby v. District of Columbia*, 765 F.3d 13, 29 (D.C. Cir. 2014) (affirming 841 F. Supp. 2d 20, 38 (D.D.C. 2012)); *United States v. Hawkins*, 595 F.2d 751, 752 n.2 (D.C. Cir. 1978); *Smith v. United States*, 358 F.2d 833, 835 (D.C. Cir. 1966). The doctrine of collective knowledge is "firmly established in this jurisdiction." *Parsons v. United States*, 15 A.3d 276, 279 (D.C. 2011). In the recent case of *Reiver v. District of Columbia*, 925 F. Supp. 2d 1, 11-12 (D.D.C. 2013), the court granted qualified immunity to a police officer preparing the arrest paperwork who reasonably based his information on the representation that the arresting officer had probable cause to make the arrest. *See also Rice v. District of Columbia*, 774 F. Supp. 2d 18, 23 (D.D.C. 2011) (court should apply collective knowledge doctrine where there are fast moving events involving a number of police officers in different locations).

The Supreme Court also has held that law enforcement officers who "'reasonably *but mistakenly* conclude that probable cause is present' are entitled to immunity." *Hunter*, 502 U.S. at 227 (emphasis added). "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id*. at 205. *See also District of Columbia v. Minor*, 740 A.2d 523, 530 (D.C. 1999). This includes whether the "error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)); *Jones*, 634 F.3d at 598. The facts concerning the issue at hand "must be evaluated from the perspective of a reasonable officer at the scene." *Jackson v. District of Columbia*, 541 F. Supp. 2d 334, 342 (D.D.C. 2008). Any infringement of the constitutional rights of a plaintiff

"must be apparent" to the police officer.  *Layne*, 526 U.S. at 615.  Thus, the ultimate question in the *Chang* case is whether the defendants' conduct at Pershing Park was reasonable and whether they knew that plaintiffs' rights were being violated.  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Dingle v. District of Columbia*, 571 F. Supp. 2d 87, 97 (D.D.C. 2008).

Based on these principles of law, and a review of all the pertinent facts regarding the events at Pershing Park on September 27, 2002, it should be clear that MPD officers Fitzgerald, Jordan, DiGirolamo, Harrison and Smith did not "knowingly" violate plaintiffs' rights.  This is true regarding the decision to arrest the plaintiffs.  Given their respective limited roles in what took place at Pershing Park on September 27, 2002, each had a reasonable basis to believe that there was probable cause to arrest the plaintiffs.  It has always been known in this litigation that Assistant Chief Peter Newsham gave the arrest order at Pershing Park.  *See Barham v. Ramsey*, 434 F.3d 565, 569-70 (D.C. Cir. 2006).  The facts also are clear that none of these five defendants participated in—or was even consulted about—the decision to arrest the plaintiffs.  Moreover, all the defendants were unaware that a dispersal order had not been given to the people in the Park before the arrest decision was made.  Nor did they know at the time the arrest order was made what charge supported the arrest decision.  All five defendants, from their respective vantage points, before and after their arrival at the Park, knew that hundreds of demonstrators were blocking traffic and throwing items into the streets, and Jordan personally saw the violence that occurred earlier in the morning at Vermont Avenue and K Streets, N.W. with the breaking of a bank window by demonstrators.  When Fitzgerald arrived at the Park, Newsham told him the situation in the Park had been "escalating" throughout the morning. Jordan, DiGirolamo, Harrison and Smith also saw general disorder and uneasiness in the Park when they arrived at the scene separately.  Thus, there was no reasonable ground for any of these

31

defendants to later dispute or question the decision to arrest the people in the Park, including the *Chang* plaintiffs.

The same is true regarding the detention of the *Chang* plaintiffs. As noted, three of the defendants—DiGirolamo, Harrison and Smith—were ordered by supervising officers to board buses and ride with the detainees to the Police Academy.  In fact, it was not until the buses arrived at the Academy that these three defendants knew what the charge would be for the arrest. They were ordered to complete the necessary arrest paperwork randomly for certain detainees, and the only reason that DiGirolamo, Harrison and Smith are defendants in this case is because they completed the arrest paperwork for the four *Chang* plaintiffs.  It was not unreasonable for DiGirolamo, Harrison and Smith to be unaware of the specific circumstances surrounding the arrest of the four *Chang* plaintiffs when they were ordered by supervisors to get on the buses, ride with the plaintiffs to the Police Academy, and complete the arrest paperwork for the four *Chang* plaintiffs.  As Fitzgerald stated in his *third* deposition, DiGirolamo, Harrison and Smith "were following directives from their supervisors," and they "were [acting] reasonabl[y] under the circumstances."  (*See* Fizgerald Dep., March 9, 2011, at 115:13-20.)

In conclusion, the Supreme Court has said that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986).  The evidence in this record is unmistakably clear that the actions of MPD Officers Fitzgerald, Jordan, DiGirolamo, Harrison and Smith on September 27, 2002, were reasonable under all the circumstances, and they did not knowingly violate the rights of the *Chang* plaintiffs that day.  They are entitled to qualified immunity.

## II. IN THE ALTERNATIVE, DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE UNDISPUTED FACTS SHOW THEY DID NOT PARTICIPATE IN THE DECISIONS TO ARREST OR DETAIN THE PLAINTIFFS.

Summary judgment should be granted if there is no dispute over material facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010).  There are no disputes over the *material* facts concerning the defendants' involvement in the arrest or detention of the four *Chang* plaintiffs.  Because these defendants did not violate any rights of the plaintiffs in connection with plaintiffs' arrest or detention, the defendants are entitled to judgment as a matter of law.

The five undisputed *material* facts that relate to the conduct of these five defendants as alleged in the Third Amended Complaint shows the following:

1.  *None of these defendants made the decision to arrest the plaintiffs, and they were not consulted by Newsham about whether arrests should be made*.  (Fitzgerald Dep., September 16, 2004, at 132:15-133:8; 135:9-17); (Jordan Dep., March 24, 2010, at 18:7-13; 19:7-10); (DiGirolamo Dep., December 2, 2009, at 103:3-5); (Harrison Dep., December 10, 2009, at 68:17-19; 113:13-15; 144:9-10); (Smith Dep., December 11, 2009, at 234:19-235:3.)

2.  *Fitzgerald and Jordan, the two MPD commanding officers at Pershing Park, did not participate in and were unaware that a dispersal order was not given by Newsham before arrests were ordered by Newsham*.  (Fitzgerald Dep., September 16, 2004, at 167:3-22; 179:21-180:3; 181:12-15; March 9, 2011 Dep., at 190:3-191:9);  (Jordan Dep., March 30, 2005, at 90:12-91:14; Jordan Dep., March 24, 2010, at 120:18-22; 123:4-7.)

3.  *DiGirolamo, Harrison and Smith, had no knowledge of the reason or circumstances for the arrest of the people in Pershing Park*.  (DiGirolamo Dep., December 2,

2009, at 90:11-19; 103:3-5); (Harrison Dep., December 10, 2009, at 113:16-114:6; 116:7-12;

257:18-20); (Smith Dep., December 11, 2009, at 125:15-18.)

4.    ***DiGirolamo, Harrison and Smith did not flexi cuff the plaintiffs at Pershing***

***Park.***  (DiGirolamo Dep., December 2, 2009, at 134:9-17); (Harrison Dep., December 10, 2009,

at 126:20-127:2); (Smith Dep., December 11, 2009, at 122:5-18.)

5.    ***DiGirolamo, Harrison and Smith, the three MPD officers who were on buses***

***with the plaintiffs and signed the arrest paperwork for the plaintiffs, were ordered to perform***

***those tasks by superior officers***.  (DiGirolamo Dep., December 2, 2009, at 116:-117:8; 118:7-11;

119:21-120:1; 135:18-136:22) (Harrison Dep., December 10, 2009, at 68:17-19; 113:13-15;

125:18-126:2; 137:19-138:41; 44:9-10); (Smith Dep., December 11, 2009, at 128:15-129: 21;

130:15-131:8; 152:10-153:3.)

In short, because there is no genuine dispute over these material facts, and it is clear that

these defendants were not responsible for the decision to arrest and detain the plaintiffs, the

defendants are entitled to summary judgment.

## III.   THE CONSPIRACY COUNTS AGAINST THESE DEFENDANTS SHOULD BE DISMISSED.

The *Chang* plaintiffs allege that these five defendants, acting with other unidentified

police officers, conspired in several ways to violate their constitutional rights on September 27,

2002.  First, plaintiffs allege under 42 U.S.C. § 1985 that the defendants, acting with other

unidentified police officers, conspired before the September 27, 2002 Pershing Park event to

develop and execute a "trap and arrest" scheme to bring about a mass arrest of demonstrators

during the IMF protests that weekend, and that defendants "targeted the Plaintiffs because of

their perception of the Plaintiffs' political beliefs and associations, which Defendants presumed

because of their youth and student status."   (*See* Third Amended Complaint, ¶¶ 139-147.)

Second, plaintiffs allege negligence to prevent a conspiracy under 42 U.S.C. § 1986.  (*Id.* at ¶¶ 148-153.)  Third, plaintiffs allege a common law conspiracy.  (*Id.* at 154-159.)  For the following reasons, all three counts must be dismissed.

      **A.**     **The Conspiracy Claim Under 42 U.S.C. § 1985**

The conspiracy claim brought under 42 U.S.C. § 1985 fails for several reasons.  First, in a § 1985 conspiracy claim, the plaintiffs must allege a conspiracy motivated by "some racial, or perhaps otherwise class-based, invidious discriminatory animus."  *United Brotherhood of Carpenters, Local 610 v. Scott,* 463 U.S. 825, 828-29 (1983) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971)). Requiring the plaintiffs to allege some act that is motivated by class-based invidiously discriminatory animus is required to "avoid converting Section 1985 into a general federal tort law claim."  *Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 120 (D.D.C. 2012) (quoting *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 75 (D.D.C. 2007). *See also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993); *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009).

In the *Chang* complaint, the plaintiffs allege that the defendants were motivated to arrest and detain them because of a "perception" that the plaintiffs had "political beliefs and associations," and that "similarly situated journalists"  who "appeared to be older than the average college student" were permitted to leave Pershing Park before Newsham gave the arrest order. *See* Third Amended Complaint, at ¶¶ 144, 145.  This is not the kind of class-based, "invidious discriminatory animus" that the statute or case law requires.  Even if true and plaintiffs could prove these claims (which, as discussed below, they cannot), students with political beliefs acting as journalists do not belong to a protected class such as race, national origin, or gender that applies in § 1985 conspiracy claims. *United Brotherhood of Carpenters*, 463 U.S. at 837 (section 1985 cannot be construed "to reach conspiracies aimed at any class or

organization on account of its political views or activities . . .")  In short, without pleading a proper protected class, there is no valid § 1985 conspiracy claim.  *Atherton*, 567 F.3d at 688-89 (failure to allege protected class defeats § 1985 conspiracy claim).  This is true whether the defendants are public officials or private individuals.  *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996).  *See also Kelley*, 893 F. Supp. 2d at 121.

Two cases virtually on point support dismissal of plaintiffs' § 1985 conspiracy claim on grounds that they are not part of a protected class.  In *L.Q.A. By and Through Arrington v. Eberhart*, 920 F. Supp. 1208, 1229 (M.D. Ala. 1996), a § 1985 claim brought by a student alleging a conspiracy by school officials to suppress his First Amendment rights was dismissed because the student was not a member of a recognized protected class.  In *D'Amario v. Russo*, 718 F. Supp. 118, 123 (D.R.I. 1989), a § 1985 conspiracy claim was brought by a freelance "rock" photojournalist alleging he was wrongfully denied access to a concert hall to take photographs and denied freedom of speech and freedom of press.  The court dismissed his § 1985 claim because the plaintiff was not part of a protected class permitted to assert a § 1985 conspiracy claim.  The *Chang* case can be added to these two cases and should be dismissed as well.

Another reason plaintiffs' § 1985 conspiracy claim fails is because of the intracorporate conspiracy doctrine, which precludes any conspiracy claim alleging interaction among and between the District, MPD, and these five defendants.  The District of Columbia is a municipal corporation.  D.C. Official Code § 1-102 (June 2014 Supp.).  MPD is a component of the District Government, and these five defendants were employees of MPD at the time of the alleged conspiracies.  *Id*. at § 5-101.01 (June 2014 Cum. Supp.).  *See also Wham v. United States*, 81 F. Supp. 126 (D.D.C. 1948).  As a general rule, "a corporation cannot conspire with itself any more

than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Kivanc v. Ramsey*, 407 F. Supp. 2d 270, 275 (D.D.C. 2006). In other words, "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, offices, and employees." *Kelley*, 893 F. Supp. 2d at 119-20 (quoting *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978). There is no question that all MPD defendants in the *Chang* case were acting within the scope of their employment on September 27, 2002. *See James Taylor Trash Removal v. District of Columbia*, 1999 U.S. Dist. LEXIS 13845, at *8 (D.D.C. Sept. 1, 1999) ("D.C. government officials, acting within the scope of their employment, are considered members of a single entity for the purposes of § 1985.") Thus, there can be no conspiracy concerning the events at Pershing Park because the District and the defendants comprise a single entity, and thus are not subject to suit under 42 U.S.C. § 1985. *Kelley*, 893 F. Supp. 2d at 120; *Tabb v. District of Columbia*, 477 F. Supp. 2d 185, 190 (D.D.C. 2007) (both holding that intracorporate conspiracy doctrine involving the District of Columbia and its agents defeats a conspiracy claim under § 1985).

Finally, with respect to the § 1985 conspiracy claim, and irrespective of the two reasons to dismiss the claim just mentioned, there are no relevant facts that support the claim on the merits. In over 12 years, and in dozens of endless depositions, plaintiffs have not produced one piece of evidence that would support any of the three conspiracy claims in this case. All four plaintiffs testified they knew of no evidence that would support any of the conspiracy claims. *See* Chang Dep., October 22, 2007, at 183:7-22; Choi Dep., November 7, 2007, at 33:3-11; Lee Dep., October 19, 2007, at 33:16-34:5; Zarconi Dep., November 9, 2007, at 36:21-39:1).[12]  Nor

---

[12]  As noted, plaintiff Choi stated in his 2004 deposition that he believed there was a conspiracy regarding his arrest because he was arrested as a reporter even though other reporters were not arrested at Pershing Park. (Dep. of Young Choi, August 20, 2004, at 100:5-101:101.) This

did any of the many depositions taken by the *Chang* lawyers produce any evidence of a meeting of the minds among these defendants to "trap and arrest" protestors in Pershing Park before September 27, 2002, or to arrest and detain the four *Chang* plaintiffs that day.  As discussed above, there is nothing in the MPD planning documents for the September 2002 IMF event that suggest any concerted plan to "trap and arrest" anyone during that event.  With respect to the particular arrests of the *Chang* plaintiffs, the evidence is clear that it was Newsham alone who made a decision to arrest the plaintiffs for which he thought there was probable cause at the moment to support the arrests.  No one conspired with him to make that decision, including the Chief of Police, and Newsham did not make that decision based on a pre-planned orchestrated strategy of mass arrests.

In fact, there is abundant evidence in this record that specifically refutes the basis for any conspiracy claim.  For example, the five defendants did not see each other or talk to each other on September 27, 2002 about any concerted decision to arrest or detain people in the Park, nor did they participate in any decision to arrest or detain the plaintiffs.  (*See, e.g.*, Jordan Dep. March 24, 2010, at 66:3-67:16; 155:11-16; 87:19-88:5; 89:15-90:2; 91:20-92:6; 92:7-10; 152:17-153:12; DiGirolamo Dep., December 2, 2009, at 152:17-153:12; 90:11-19; 103:3-5; Harrison Dep., December 10, 2009, at 87:9-15; 107:1-7; 110:16-17; 113:16-114:6; 116:7-12; 257:18-20; Smith Dep., December 10, 2009, at 125:15-18.)  Jordan did not meet with Ramsey, Newsham, or Fitzgerald to discuss the decision to arrest people in the Park.  (Jordan Dep., March 24, 2010, at

---

hardly constitutes evidence of a conspiracy among nine or more law enforcement officers to arrest the plaintiffs.  Besides, as noted, being a student journalist is not a properly protected class for purposes of suit under § 1985.  In a later deposition in 2007, Choi said he was unaware of any evidence to support a conspiracy claim.  (Dep. of Young Choi, November 7, 2007, at 33:3-11.)  Also, as noted, the other three *Chang* plaintiffs knew of no evidence to support any of the conspiracy claims.

120:18-22; 123:4-7.)  In fact, Jordan did not recall even seeing Fitzgerald at the Park that day. (*Id*. at 90:3-12.)

Furthermore, Newsham did not consult Fitzgerald or Jordan about the arrest decision, and Fitzgerald and Jordan did not participate in any way in making that decision. (Fitzgerald Dep, September 16, 2004 Dep., at 132:15-133:8; 135:9-17.)   Nor did Fitzgerald consult with Newsham or anyone else about whether a dispersal order should be given before the arrests were ordered. (*Id*. at 146:22-147:3; 179:21-180:3; 181:12-15; 194:21-195:10.)  Jordan does not recall any meeting at Pershing Park when he talked with Ramsey, Newsham, and Fitzgerald together about events taking place in the Park.  (Jordan Dep., March 24, 2010, at 120:18-22; 123:4-7.) Indeed, Jordan did not recall even seeing Fitzgerald at the Park.  (*Id*. at 90:3-12.)  Moreover, Ramsey did not recall seeing MPD Assistant Chief Jordan at the Park.   (Ramsey Dep., September 19, 2007, at 497:17-20.)  Also, on the day of the Pershing Park arrests, Fitzgerald did not know DiGirolamo, Harrison, or Smith.  (Fitzgerald Dep., March 19, 2010, at 70:20-71:14.) Newsham testified that he did not know Smith on September 27, 2002, nor did he recognize Smith's MPD badge number.  (Newsham Dep., September 6, 2007, at 216:22-217:4.)

Moreover, there were no MPD plans before September 27, 2002, to form control lines at Pershing Park or to close off demonstrators once they were in the Park.  (Fitzgerald Dep., September 16, 2004, at 44:13-21.)  There were no MPD plans to force journalists into the Park or to prevent them from leaving the Park.  (Fitzgerald Dep., September 16, 2004, at 214:19-215:4.) Finally, although Newsham had several conversations with Captain Ralph Murphy of the U.S. Park Police during the event, the Park Police did not actively participate with MPD in the arrests of the people in the Park.  (Newsham Dep., September 6, 2007, at 159:14-161:17; 295:9-14; 300:11-15; Murphy Dep., February 2, 2005, at 235:8-16.)   And Jordan did not have any

interaction with either the U.S. Park Police or officers from Fairfax County at Pershing Park during the event.  (Jordan Dep., March 30, 2005 at 152:17-153:12.)

For these three reasons, the § 1985 conspiracy claim should be dismissed.

### B.      The Conspiracy Claim under 42 U.S.C. § 1986

The law is well-settled that a complaint that fails to state a valid conspiracy claim under § 1985 also fails under § 1986, the second conspiracy claim in the *Chang* plaintiffs' Third Amended Complaint.  *Bush v. Butler*, 521 F. Supp. 2d 63, 70 (D.D.C. 2007) (plaintiff cannot state claim under 42 U.S.C. § 1986 unless he can state valid claim under 42 U.S.C. § 1985); *Richards v. Duke University*, 480 F. Supp. 2d 222, 240-41 (D.D.C. 2007) (same).  As discussed above, the § 1985 conspiracy claim fails because the *Chang* plaintiffs, suing as students journalists, are not within a protected class to obtain relief under a § 1985 claim.  Also, because the § 1985 claim must be dismissed because of the intracorporate conspiracy doctrine, the same applies to the § 1986 claim for negligence to prevent a conspiracy.

Moreover, a claim under § 1986 presumes that the person or persons sued had knowledge of the alleged wrongs and had the power to prevent those wrongs from occurring.  *See McCreary v. Heath*, 2005 WL 3276257, at *6, n.9 (D.D.C. Sept. 26, 2005); *Thomas v. New World Communications,* 681 F. Supp. 55, 72 (D.D.C. 1988).  This is certainly not the case with respect to the § 1986 claims against DiGirolamo, Harrison or Smith.  DiGirolamo testified that he knew nothing about the circumstances of the plaintiffs' arrests.  (Dep. of Bryan DiGirolamo, December 2, 2009, at 126:10-21.)  He was not involved in any MPD decisions made in Pershing Park that day, including any decision to give a dispersal order or to arrest people in the Park. (*Id.* at 103:3-5.)  He did not know who ordered the formation of police lines, nor was he part of the arrest team.  (*Id.* at 90:11-19; 103:3-5.)  His only involvement was being ordered to stand in a police line around the Park and to prepare the paperwork for the arrest of plaintiffs Lee and Zarconi.

As DiGirolamo said in his deposition testimony, "I was just executing what I was told." (*Id*. at 94:17-19.)

The same is true for Harrison and Smith. Harrison did not participate in the decisions to enclose the Park, to give dispersal orders, or to make any arrests or flex-cuff any people in the Park. He only processed arrest records for about 10 to 15 people because he was ordered to ride on a bus transporting detainees to the Police Academy after the arrests were made. (Dep. of Andre Harrison, December 10, 2009. at 68:17-19; 113:13-15; 144:9-10.) He did not recall seeing Newsham at the Park nor did he hear any dispersal order. (*Id*. at 87:9-15; 107:1-7; 110:16-17.) Nor did he recall becoming aware while at the Park why people were being arrested, and he did not see any officers using video cameras to film the events in the Park. (*Id*. at 113:16-114:6; 116:7-12; 257:18-20.) With respect to Smith, he did not participate in the decision to make arrests in the Park, nor did he know why people were being arrested. (Dep. of Michael Smith, December 11, 2009, at 125:15-18.) During his time at Pershing Park, Smith did not see Ramsey, Fitzgerald, Newsham, or Jordan. (*Id*. at 124:16-125:8.) Like DiGirolamo and Harrison, Smith's involvement with the events at Pershing Park on September 27, 2002, was largely limited to following orders to ride on a bus and prepare arrest paperwork. Clearly these three defendants were not in any position to prevent the arrests and detentions of the four *Chang* plaintiffs.

Even though Fitzgerald and Jordan were in MPD command positions on September 27, 2009, the same conclusion applies to them regarding the § 1986 failure to prevent conspiracy claim. After Fitzgerald arrived at Pershing Park with Chief Ramsey, he noticed that the Park already had been closed off, and he believed that arrests had already begun. (Dep. of Michael Fitzgerald, September 16, 2004, at 179:10-21.) Fitzgerald was with Ramsey at 14th Street and

41

Pennsylvania Avenue when Assistant Chief Peter Newsham walked over to talk to them and told that he had followed a group of demonstrators down Pennsylvania Avenue who were blocking the street and knocking over trash cans and newspaper dispensers, and that he had to tell demonstrators several times to get out of the street.  (*Id.* at 126:12-127:21; 128:17-21; March 9, 2011 Dep. at 156:9-157:15.)  Newsham also told Fitzgerald and Ramsey that "the conduct of the demonstrators was escalating," and that he decided to arrests the people in the Park on the charge of failure to obey a police officer.  (September 16, 2004 Dep. at 132:15-133:8; 135:9-17; 194:7-17.)   Fitzgerald had no reason to question or challenge Newsham's decision to arrest the protestors in the Park.

As for Jordan, he did not recall any conversation with Chief Ramsey at the Park about any arrest decision, but he did recall informing Ramsey that the events at Vermont Avenue and K Streets were over.  (*Id.* at 66:3-67:16; 155:11-16; March 24, 2010 Dep. at 87:19-88:5; 89:15-90:2.)  Jordan did not recall any meeting with Ramsey, Newsham, and Fitzgerald as a group about events taking place in the Park.  (*Id.* at 120:18-22; 123:4-7.)  Indeed, Jordan did not recall even seeing Fitzgerald at the Park.  (*Id.* at 90:3-12.)  Jordan also testified that he did not have enough information about what was taking place within the Park to determine if there was any unlawful activity.  (March 30, 2005 Dep. at 69:5-69:12; 71:22-72:6.)  He did not participate in any discussions regarding what the charges would be for the protestors who were arrested in the Park.  (*Id.* at 88:8-90:10.)  He was not made aware of whether the people in the Park disobeyed any police order.  (*Id.* at 90:12-91:14.)  Jordan was not present for any discussion about shutting down the Park.  (*Id.* at 91:20-92:6.)  Nor was Jordan aware of any decision to arrest people in the Park.  (*Id.* at 92:7-10.)  Finally, as an Assistant Chief, Jordan did not have the authority to

countermand any arrest decision made by Newsham at Pershing Park. (Dep. of Brian Jordan, March 30, 2005, at 18:7-13; 19:7-10.)

Plaintiffs have failed to produce any evidence in this long record that these five defendants were aware of any conspiracy to arrest the plaintiffs, or were aware of any such conspiracy and were negligent in preventing the arrest of the plaintiffs. In short, the conspiracy claim under § 1986 should be dismissed.

### C.     The Civil Conspiracy Claim

In the District of Columbia, civil conspiracy "is not an independent tort but only a means for establishing vicarious liability for an underlying tort." *Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 103 (D.D.C. 2011) (quoting *Nader v. National Democratic Nat'l Committee*, 567 F.3d 692, 697 (D.C. Cir. 2009). *See also Hill v. Medlantic Health Corp.*, 933 A.2d 314, 334 (D.C. 2007). The elements of a civil conspiracy are (1) an agreement between two or more persons; (2) to commit an unlawful action, or to commit an lawful act by unlawful means; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) the overt act was done pursuant to some common scheme. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *Bush*, 521 F. Supp. 2d at 68.

In short, all three of the conspiracy claims should be dismissed as a matter of law. Apart from that, a reasonable jury could not find that any of these five defendants acted with the purpose of intentionally and wilfully depriving the plaintiffs of any constitutional rights. And the defendants cannot be negligent in failing to stop a conspiracy that did not exist and for which they knew nothing about. Therefore, summary judgment should be granted to the defendants on the three conspiracy counts.

## IV.   THE PUTATIVE DAMAGE CLAIMS AGAINST THE DEFENDANTS SHOULD BE DISMISSED.

As part of their claim for relief, the four remaining *Chang* plaintiffs seek punitive damages against all of the individual MPD officers in this case, including these five defendants. *See* Third Amended Complaint (Dkt. No. 153), at 37.  There is no basis for an award of punitive damages against these five defendants, and the Court should dismiss the claim for punitive damages at this time.[13]

It is well-settled in the District of Columbia that "punitive damages are warranted only when the defendant commits a tortious act accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, wilful disregard of the plaintiff's right, or other circumstances tending to aggravate the injury." *Pitt v. District of Columbia*, 491 F.3d 494, 507-08 (D.C. Cir. 2007) (quoting *Butera v. District of Columbia*, 235 F.3d 637, 657 (D.C. Cir. 2001)).  *See also Dingle*, 571 F. Supp. 2d at 100.  This is also true for any claim for punitive damages for violation of any federal constitutional right of the plaintiffs under 42 U.S.C. § 1983.  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  The jury must find by clear and convincing evidence that the tortious act "was accompanied by conduct and a state of mind evincing malice or its equivalent." *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995).  *See also Butera*, 235 F.3d at 657.  The

---

[13]  Given the absence of any evidence to support a claim for punitive damages against these five defendants, the *Chang* lawyers nevertheless spent considerable time and money deposing each defendant on their personal financial situation, and about privileged communications between them and District counsel on whether the District of Columbia had agreed to indemnify them for punitive damages.  *See* Fitzgerald Dep., March 19, 2010, at 205:10-212:14;  223:7-236:7; Fitzgerald Dep., March 9, 2011, at 26:9-29:8;  36:6-57:6;  59:12;  66:10-71:12;  108:11-110:8; Jordan Dep., March 16, 2011, at 21:9-26:18;  27:21-33:1;  39:9-42:7;  173:5-181:22; DiGirolamo Dep., December 2, 2009, at 210:5-214:14;  Harrison Dep., December 10, 2009, at 261:12-268:14; 271:3-280:16;  Smith Dep., December 11, 2009, at 249:1-256:15.  The extent to which the *Chang* lawyers explored personal financial matters with the defendants and conversations with their lawyers was in large part an effort by the *Chang* lawyers to embarrass, intimidate, and harass these defendants.

jury may evaluate the surrounding circumstances to make this determination. *Jemison v. National Baptist Convention*, 720 A.2d 275, 285-86 (D.C. 1998).

Given the facts set forth above regarding the involvement of these defendants in the events at Pershing Park on September 27, 2002, it is clear that punitive damages are unwarranted in this case. No reasonable jury could conclude that the conduct of any of these defendants was so outrageous, reckless, or oppressive as to support punitive damages. Conclusory allegations without any supporting evidence are insufficient to support an award of punitive damages. *Caston v. Butler*, 718 F. Supp. 2d 87, 89 (D.D.C. 2010); *Dingle*, 571 F. Supp. 2d at 100. The *Chang* plaintiffs have made allegations but have presented no facts to support those allegations. The Court should dismiss the punitive damage claims as to these five defendants.

## <u>CONCLUSION</u>

For the above-stated reasons, the Court should conclude that defendants Michael J. Fitzgerald, Brian K. Jordan, Bryan DiGirolamo, Andre L. Harrison, and Michael Smith are entitled to qualified immunity. In the alternative, these defendants are entitled to summary judgment on all claims against them, including the claim for punitive damages. The Court should also dismiss the conspiracy counts in the Third Amended Complaint.

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN A. EFROS  Bar No. 250746
Deputy Attorney General
Public Interest Division

*/s/*  William  F.  Causey
WILLIAM F. CAUSEY  Bar No. 260661
Assistant Attorney General
441 Fourth Street, N.W.
Washington, DC 20001
(202) 724-6610

45

william.causey@dc.gov


Counsel for the District Defendants

Dated:  December 22, 2014

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RAYMING CHANG, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-2010 (EGS) |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE FILED BY DISTRICT DEFENDANTS MICHAEL J.  FITZGERALD, BRIAN K. JORDAN, BRYAN DIGIROLAMO, ANDRE L. HARRISON AND MICHAEL SMITH**

District Defendants Michael J. Fitzgerald, Brian K. Jordan, Bryan DiGirolamo, Andre L. Harrison and Michael Smith, by and through counsel, pursuant to LcvR 7(h), hereby submit this statement of material facts not in dispute that support their motion for summary judgment.

## V.    GENERAL FACTS PERTAINING TO THE PERSHING PARK ARRESTS

1.      In September 2002, between 3,000 to 5,000 people demonstrated in the District of Columbia against the policies of the International Monetary Fund ("IMF") and the World Bank ("WB").

2.      On Friday, September 27, 2002, approximately 500 people were arrested during demonstrations throughout the city, including about 400 people at Pershing Park, located on Pennsylvania Avenue between 14th and 15th Streets, N.W.

3.      The Pershing Park arrests were the fourth set of mass arrests made on September 27, 2002.  The earlier arrests occurred at 14th Street and Independence Avenue, N.W., Vermont Avenue and K Street, N.W., and Connecticut Avenue and L Street, N.W.

4.      The seven original plaintiffs in this case were among the people arrested in Pershing Park.  *See Barham v. Ramsey*, 338 F. Supp. 2d 48, 51 (D.D.C. 2004).

5.      Only four plaintiffs—RayMing Chang, Young Choi, Leanne Lee, and Chris Zarconi ("the *Chang* plaintiffs")—remain in the case.

6.      In October 2005, three of the *Chang* plaintiffs – Meaghan Enright, Amy Chastain, and Elizabeth Young – accepted Rule 68 Offers of Judgment made by the District.  Judgment *nunc pro tunc* was entered against the District on April 4, 2006, as to these three plaintiffs.  (Dkt. Nos. 144, 190.)  The four remaining plaintiffs did not accept the Offers of Judgment made in 2005.  Offers of Judgment were again made to the four remaining plaintiffs on September 18, 2009, which they again did not accept.

7.      The *Chang* plaintiffs are the only individuals continuing to pursue claims against the District, these MPD officers, and other governmental and individual defendants.

8.      The four *Chang* plaintiffs constitute only *one percent* of all people arrested in Pershing Park on September 27, 2002.

9.      The decision to arrest the *Chang* plaintiffs at Pershing Park on September 27, 2002 was made by MPD Assistant Chief Peter Newsham, the MPD Field Operation Commander. (*See* Dep. of Peter Newsham, March 12, 2010, at 228:10-229:14.) (Exhibit 1.)[14]  This fact was adopted by the Court of Appeals.  *See Barham v. Ramsey*, 434 F.3d 565, 569-70 (D.C. Cir. 2006).

## VI.   CROWD UNDISPUTED MATERIAL FACTS REGARDING MPD PLANNING FOR THE IMF DEMONSTRATIONS

10.     With respect to political demonstrations generally, MPD used a "Manual for Mass Demonstrations and Responding to Civil Disturbances" revised in January 1996, and in effect for

---

[14]  Exhibits for this motion are appended hereto.  Cited pages from deposition transcripts are contained as one exhibit for each deposition taken.  Thus, for example, all cited pages throughout the motion for the March 12, 2010 deposition of Peter Newsham are contained in Exhibit 1.

the September 2002 IMF event.  (*See* Ex. 1 to Dep. of Bryan DiGirolamo, December 2, 2009.)

(Exhibit 2.)  This was the Manual in effect for the September 2002 IMF event.

11.     In the section entitled "Crowd Management," there is reference to guidelines and

procedures that MPD officers should follow in a crowd demonstration situation, such as the

importance to "assess the mood of the crowd and to respond to changes in crowd behavior," the

"unit commander alone will determine and order the type of response deemed necessary," MPD

officers should "display an attitude of neutrality," and that "expressions of friendliness are a

valuable tool in maintaining peace."  (*Id*. at DC 04082.)  With respect to "crowd dispersal," the

Manual states:

> When the intensity level of a crowd rises and unlawful disruption, either through
> violent or passive means, is occurring to the extent that the Field Commander
> determines there is a need to make a positive police response, he will instruct the
> affected unit commanders, *where time and circumstances permit*, to issue
> warnings to the crowd to disperse.

(*Id*. at DC 04083) (emphasis added).

12.     Nowhere in the Mass Demonstration Manual—which consists of 53 pages and 43

pages of appendices—is there mention of the phrase "trap-and-arrest," or the use of a procedure

similar to that description.

13.     Largely as the result of the violent IMF protests in Seattle in 1999 and the large

IMF demonstrations in the District in April 2002, MPD prepared a "Command Manual" for the

IMF Fall Conference.  (*See* Chang SM Ex. 29.)  (Exhibit 3.)  *See also* Dep. of Charles Ramsey,

September 19, 2007, at 328; 331-32.)  (Exhibit 4.)

14.     The Command Manual was designed to provide specific direction to MPD

officers on logistics, personnel assignments, observation posts, hotel and site security, planning

for prisoner transportation and holding, and the use of technology, such as fixed cameras and

3

helicopter flight cameras.  Chief of Police Charles Ramsey testified that the Command Manual was prepared by the MPD Special Operations Planning Group a week or so before the September 2002 IMF event, and that he had "no direct role in preparing the document."  (*See* Ramsey Dep., September 19, 2007, at 305-308; 335-36.)  There is no reference to a "trap-and-arrest" policy in the Command Manual.

15.    MPD also prepared an "Outside Agency Operations Manual" for distribution to federal and local law enforcement authorities. (*See* Ex. 13 to Ramsey Dep. of September 19, 2007.) (Exhibit 5.)  This document contained a memorandum of understanding between the U.S. Marshal Service, the United States Attorney for the District of Columbia, the FBI, and MPD on certain procedures to be used for the IMF protests for September 2002.  (*See id*., at 23-29.)   As stated by Chief Ramsey,  it was "important that [the FBI] understand the policy and procedures of the Metropolitan Police Department so that everybody is on the same page and we don't have people that are using a level of force that we would consider to be inappropriate under the circumstances because they – according to their own policies, it would be permitted."  (Ramsey September 19, 2007 Dep. at 409.)

16.    Thus, the main purpose of this agreement was to make sure that other law enforcement authorities understood that MPD policy would control the practices and procedures of enforcement during the September 2002 IMF event.  There was no mention of any "trap-and-arrest maneuver" in this Operations Manual.

17.    Finally, as would be expected, there were multiple meetings between MPD senior officials and representatives of federal and local law enforcement authorities to prepare for the IMF event.  Several of the participants to these meetings were deposed in this case, including Chief Ramsey, Executive Assistant Chief Fitzgerald, Assistant Chief Newsham, and Captain

Ralph Murphy of the U.S. Park Police.  There is no evidence from this extensive discovery that suggested in any way that there was a pre-demonstration agreement to us a "trap-and-arrest maneuver" during the IMF event.  (*See*, *e.g*., Dep. of Charles Ramsey, September 19, 2007, at 414:4-415:2; 419:14-420:5; Dep. of Michael J. Fitzgerald, September 16, 2004, at 42:5-44:21.) Exhibit 6.)  *See also* Dep. of Richard Murphy, February 2, 2005, at 98:9-18.) (Exhibit 7.)  *See also* Dep. of Richard Murphy, February 3, 2005, at 406:4-21; 468:14-469:6; 634:10-635:21.) (Exhibit 8.)

## VII.   UNDISPUTED MATERIAL FACTS REGARDING THE INVOLVEMENT OF THESE MPD OFFICERS IN THE EVENTS AT PERSHING PARK

### D.        A.      Executive Assistant Chief Michael J. Fitzgerald

18.     Michael J. Fitzgerald joined MPD in 1971, and at the time of the Pershing Park events in 2002, he was Executive Assistant Chief of Police reporting to Chief of Police Charles Ramsey.  (Dep. of Michael J. Fitzgerald, September 16, 2004, at 16:21-17:6; 17:20-18:3; 18:12-17.)

19.     Prior to the events at Pershing Park, Fitzgerald had been involved in many large demonstrations as an MPD officer.  (*Id.* at 19:14-20:3.)  Protestors had permits to demonstrate on Saturday, September 28, and on Sunday, September 29, 2002, but not on Friday, September 27, 2002.

20.     The District of Columbia had not issued a permit for people to protest in the Park on Friday, September 27, 2002.  Protestors had permits to demonstrate on Saturday, September 28, and on Sunday, September 29, 2002, but not on Friday, September 27, 2002.  (*Id*. at 47:10; Dep. of Michael J. Fitzgerald, March 19, 2010 Dep. at 97:12-16.) (Exhibit 9.)

21.     There were no MPD plans to form control lines at the Park or to close off demonstrators before that day.  (Fitzgerald Dep., September 16, 2004, at 44:13-21.)

22.     On the morning of September 27, Fitzgerald was with Chief Ramsey riding in a police cruiser around the City, and they saw protestors marching down Connecticut Avenue and they learned that arrests had been made in different parts of the City for failure to obey police orders.  (*Id*. at 79:7-87:9; 88:8-17.)

23.     Fitzgerald also was aware that in other parts of the City some demonstrators had thrown a brick through a bank window and people where chaining themselves together in a "sleeping dragon" formation, thus preventing police from effectively removing them from the streets.  (Dep. of Michael J. Fitzgerald, March 9, 2011, at 154:4-155:9.) (Exhibit 10.)

24.     Fitzgerald and Ramsey arrived at Pershing Park sometime between 9:30 and 10:30, and they saw demonstrators blocking traffic.  (September 16, 2004 Dep. at 90:16-91:7.) Fitzgerald noticed that the Park already had been closed off, and he believed that arrests had already begun.  (March 9, 2011 Dep. at 179:10-21.)

25.     Fitzgerald was with Ramsey at 14th Street and Pennsylvania Avenue when Assistant Chief Peter Newsham walked over to talk to them.  (September 16, 2004 Dep. at 99:7-99:16; 113:1-114:6; Fitzgerald Dep., March 19, 2010, at 121:17-122:11.)  Newsham told them that he had followed a group of demonstrators down Pennsylvania Avenue who were blocking the street and knocking over trash cans and newspaper dispensers, and that he had to tell demonstrators several times to get out of the street.  (Fitzgerald Dep., September 16, 2004, at 126:12-127:21; 128:17-21; Fitzgerald Dep., March 9, 2011,. at 156:9-157:15.)

26.     Newsham also told Fitzgerald and Ramsey that "the conduct of the demonstrators was escalating," and that he decided to arrests the people in the Park on the charge of failure to obey a police officer.  (Fitzgerald Dep., September 16, 2004, at 132:15-133:8; 135:9-17; 194:7-

17.)  Fitzgerald does not believe that there were other MPD officers with them at the moment Newsham mentioned these things.  (Fitzgerald Dep., March 19, 2010, at 127:13-20.)

27.    Fitzgerald assumed that people in the Park had been placed under arrest when Newsham talked to him and Ramsey.  (*Id*. at 167:3-10; Fitzgerald Dep., March 9, 2011, at 190:3-191:9.)

28.    Fitzgerald did not know at the time of the arrests that there were purported to be members of the press in the Park who were arrested.  (*Id*. at 214:19-215:4.)

29.    It was not Fitzgerald's responsibility to determine the validity of any arrests made by an Assistant Chief.  (Fitzgerald Dep., September 16, 2004, at 137:9-15.)

30.    Fitzgerald did not make an inquiry if people were given an opportunity to leave the Park before the arrests, nor did he have any knowledge if people were permitted to leave before the arrests.  (*Id*. at 167:15-22; 179:21-180:3; 181:12-15.)

31.    Fitzgerald did not disagree with Newsham's arrest decision given the information Fitzgerald had at the moment. (*Id*. at 164:22-165:8; Fitzgerald Dep., March 19, 2010, at 138:6-15.)

32.    Fitzgerald did not hear Ramsey verbally agree with the arrest decision or countermand the decision.  (September 16, 2004 Dep. at 147:4-13, March 19, 2010 Dep. at 138:19-139:5.)

33.    Fitzgerald did not countermand Newsham's arrest decision because Newsham conveyed to Fitzgerald that the situation in the Park "was escalating to the point where it was beyond just minor offenses" and that things had "gotten out of hand," and as a result of Newsham's observations, Fitzgerald had no independent facts or reasons to disagree with Newsham's decision.  (*Id*. at 158:2-159:12.)

7

34.     Fitzgerald did not make the decision to arrest the people in the Park, he did not know whether people in the Park were given a dispersal order or chance to leave the Park before the arrests were made, and he assumed that when the arrest decision was made there was probable cause to make the arrests.  (*Id.* at 146:22-147:3; 179:21-180:3; 181:12-15; 194:21-195:10.)

## B.     Assistant Chief Brian K. Jordan

35.     On September 27, 2002, Brian K. Jordan was an MPD Assistant Chief of Police in charge of the Regional Operations Command-Central.  This gave him senior MPD authority over events occurring near the middle of the City.  Pershing Park was not in his immediate command area on September 27, 2002.  (Dep. of Brian K. Jordan, March 24, 2010, at 9:8-10:7.) (Exhibit 11.)

36.     Jordan reported directly to Executive Assistant Chief of Police Fitzgerald and Chief of Police Ramsey.  (Dep. of Brian K. Jordan, March 30, 2005, at 12:20-13:3.) (Exhibit 12.) He had no policy making responsibilities with MPD in 2002.  (*Id.* at 11:11-14.)

37.     Jordan did not order the arrests of protestors in the Park, and he did not participate in any decisions regarding the manner of detention of people who were arrested in the Park that day.  As an Assistant Chief, Jordan did not have the authority to countermand any arrest decision made by Newsham at Pershing Park.  (*Id.* at 18:7-13; 19:7-10.)

38.     Early on the morning of September 27, 2002, Jordan was stationed in the vicinity of Vermont Avenue and K Street, N.W. (in his area of command), when he ordered the arrest of protestors because of the breaking of a bank window and other disorderly actions.  (Jordan Dep., March 24, 2010, at 62:16-63:9; Jordan Dep., March 30, 2005, at 172:10-190:21; 208:7-215:15.)

39.     After the events at Vermont Avenue and K Street ended, Jordan traveled by patrol cruiser to the corner of 15th Street and Pennsylvania Avenue, N.W., that bordered the west and south ends of Pershing Park.  (Jordan Dep., March 24, 2010, at 76:17-76:4; 81:11-12.)

40.     Jordan arrived at Pershing Park sometime around 11:00 a.m.  (Jordan Dep., March 30, 2005, at 39:11-40:10; 149:5-21.)

41.     After arriving in the area of the Park, Jordan saw Assistant Chief Peter Newsham on the south side of the Park along Pennsylvania Avenue.  (Jordan Dep., March 24, 2010, at 83:5-18.)  They had a brief conversation, and then Jordan walked to 14th Street before leaving the general vicinity of Pershing Park.  (Jordan Dep., March 30, 2005, at 47:14-17; Jordan Dep., March 24, 2010, at 86:5-16.)

42.     Jordan's attention was not directed to the protestors in the Park, and he did not observe whether people were entering or leaving the Park.  (Jordan Dep., March 30, 2005, at 51:5-54:2, 61:4-17.)

43.     Jordan did not recall any conversation with Chief Ramsey at the Park about any arrest decision, but he did recall informing Ramsey that the events at Vermont Avenue and K Streets were over.  (*Id*. at 66:3-67:16; 155:11-16; Jordan Dep., March 24, 2010,  at 87:19-88:5; 89:15-90:2.)

44.     Jordan did not recall any meeting with Ramsey, Newsham, and Fitzgerald as a group about events taking place in the Park.  (*Id*. at 120:18-22; 123:4-7.)  Indeed, Jordan did not recall even seeing Fitzgerald at the Park.  (*Id*. at 90:3-12.)

45.     Jordan did not believe he had enough information about what was taking place within the Park to determine if there was any unlawful activity.  (Jordan Dep., March 30, 2005, at 69:5-69:12; 71:22-72:6.)

46.     Jordan did not participate in any discussions regarding what the charges would be for the protestors who were arrested in the Park.  (*Id*. at 88:8-90:10.)

47.     Jordan was not made aware of whether the people in the Park disobeyed any police order.  (*Id*. at 90:12-91:14.)

48.     Jordan was not present for any discussion about shutting down the Park.  (*Id*. at 91:20-92:6.)  Nor was Jordan aware of any decision to arrest people in the Park.  (*Id*. at 92:7-10.)

49.     Although Jordan knew that there were mounted U.S. Park Police near Pershing Park, he did not interact with them, nor did was he aware that officers from Fairfax County were present.  (*Id*. at 152:17-153:12.)

### C.     Officer Bryan DiGirolamo

50.     Bryan DiGirolamo was an MPD officer in the Civil Disturbance Unit ("CDU") on September 27, 2002. (Dep. of Bryan DiGirolamo, December 2, 2009, at 27:12-13; 32:9-12.) (Exhibit 13.)  DiGirolamo has been employed as a Special Agent with ATF in New York since September 2004.  (*Id*. at 23:1-15.)

51.     Pershing Park was DiGirolamo's first mass demonstration event as an MPD officer.  (*Id*. at 47:3-5.)

52.     DiGirolamo was not involved in any MPD decisions made in Pershing Park that day, including any decision to give a dispersal order or to arrest people in the Park. (*Id*. at 103:3-5.)  In fact, he testified that he knew nothing about the circumstances of the plaintiffs' arrests. (*Id*. at 126:10-21.)  He did not carry flexi cuffs, nor did he have a radio when he was at the Park. (*Id*. at 57:14-15.)

53.     DiGirolamo reported for duty on the morning of September 27, 2002, to the 4th District station, his usual place of work.  (*Id*. at 47:22-48:16; 58:13-63:11.)  He arrived at the

southeast corner of Pershing Park in mid-morning and was ordered by a supervisor to join a police line that had formed on the south end of the Park.  (*Id*. at 65:16-20; 68:13-20.)

54.     DiGirolamo did not see Chief Ramsey, Newsham or Fitzgerald at the Park.  (*Id*. at 69:7-22; 89:3-10; 89:11-16; 107:12-14.)   Shortly after arriving at the Park he remembered seeing Jordan near the Park, but not later.  (*Id*. 70:1-72:5.)

55.     DiGirolamo did not see any police officers with video cameras near the Park.  (*Id*. at 74:21-75:4.)

56.     DiGirolamo was one of two officers who filled out arrest forms for that one bus load of detainees, including plaintiffs Lee and Zarconi. (*Id*. at 137:15-138:1; 147:5-11; 169:18-171:18.)

57.     DiGirolamo did not see people "ushered into the Park;" to the contrary, he saw people going in and out of the Park.  (*Id*. at 77:6-16; 82:5-7.)

58.     DiGirolamo did not know who ordered the formation of police lines, nor was he part of the arrest team.  (*Id*. at 90:11-19; 103:3-5.)

59.     DiGirolamo was ordered by a supervisor around noon time on September 27, 2002, to go to one of the buses that was picking up detainees.  (*Id*. at 116:-117:8; 118:7-11; 119:21-120:1.)  He was not told at that time why people had been arrested.  (*Id*. at 122:13-17; 126:10-21.)  When asked by people on the bus why they had been arrested, DiGirolamo said he did not know the reason, but that he would tell them as soon as he found out.  (*Id*. at 123:21-124:21.)

60.     If anyone had shown DiGirolamo any press credentials, he would have gone to find a supervisor to find out if the person should be released.  (*Id*. at 130:3-131:2.)

61.     DiGirolamo did not search people when they boarded the bus, and he cut off the flexi cuffs on anyone who complained that they were too tight.  (*Id*. at 134:9-17.)

62.     When the bus arrived at the Police Academy, DiGirolamo was given field arrest forms by a supervisor and told to fill out the forms.   (*Id*. at 135:18-136:22.)   Although DiGirolamo had never before filled out a field arrest form, he did the best he could with the information he had.

63.     Because DiGirolamo had not been told the details regarding the arrests, he left blank some of the blocks on the form, including the section calling for a description of the arrests.  (*Id*. at 139:21-22: 152:9.)

64.     DiGirolamo filled out field arrest forms for plaintiffs Lee and Zarconi, although he was not the MPD officer that actually arrested them hours earlier in the Park.  (*Id*. at 147:5-11; 149:3-21; 169:18-171:18.)

65.     DiGirolamo explained to the detainees on the bus the options for release once they arrived at the processing center at the Academy, took them off the bus and had their Polaroid photographs taken, and then escorted them to the gym where they would remain until released.  (*Id*. at 179:17-181:19; 181:20-182:6; 182:9-13.)   DiGirolamo stayed at the Academy until all the detainees were in the gym.  (*Id*. at 184:1-4.)

### D.     Officer Andre L. Harrison

66.     Officer Andre Harrison, an MPD officer since 1998, was an MPD office assigned to the CDU in the 4th District on September 27, 2002.  (Dep. of Andre L. Harrison, December 10, 2009, at 19:13-20; 58:10-60:12.) (Exhibit 14.)

67.     Harrison did not participate in the decisions to enclose the Park, to give dispersal orders, or to make any arrests or flex-cuff any people in the Park.   He only processed arrest

records for about 10 to 15 people because he was ordered to ride on a bus transporting detainees to the Police Academy after the arrests were made.   (*Id.* at 68:17-19; 113:13-15; 144:9-10.)

68.     After reporting for roll call on the morning of September 27, 2002, Harrison was ordered to Pershing Park and upon arrival at the Park joined a police line that had already formed on the north side of the Park.   (*Id.* at 72:3-10; 74:9-17; 76:21-77:1; 78:7-12.)   He did not remember exactly when he arrived at the Park.   (*Id.* at 60:10-12; 64:6-9; 71:1-3.)

69.     Harrison did not recall seeing Newsham at the Park nor did he hear any dispersal order.   (*Id.* at 87:9-15; 107:1-7; 110:16-17.)

70.     Harrison did not become aware while at the Park why people were being arrested, and he did not see any officers using video cameras to film the events in the Park.   (*Id.* at 113:16-114:6; 116:7-12; 257:18-20.)

71.     Harrison did not recall seeing any law enforcement personnel from other agencies, and he believed that the people that were on his bus were arrested before noon.   (*Id.* at 116:13-17; 133:9-134:2.)

72.     Harrison was ordered by a supervising officer to ride on one of the buses with several other MPD officers that transported detainees to the Police Academy.   (*Id.* at 120:22-121:4; 126:9-12.)   He testified that people were already flexi cuffed when he got on the bus.   (*Id.* at 126:20-127:2.)

73.     The bus initially drove to the Police Academy in Southeast, but then was directed to the MPD processing facility at 409 F Street, N.W.   (*Id.* at 134:6-13: 134:14-135:9.)   Harrison said that detainees were on the bus about 8 hours, but during that time people were allowed to leave the bus to go to the restroom, and some people had the flexi cuffs removed.   (*Id.* at 135:22-136:13; 137:3-20.)

74. When the bus arrived at the processing facility on F Street, Harrison was told by a supervisor to put on the arrest forms the charge of failure to obey an order. (*Id.* at 125:18-126:2; 137:19-138:4.)   Harrison was the MPD officer who completed the arrest form for plaintiff Chang. (*Id.* at 159:18-160:1.)

### E.  Officer Michael Smith

75. Similar to the situation with Officers DiGirolamo and Harrison, Officer Smith did not arrest anyone at Pershing Park, did not flexi cuff anyone after the arrests began, and he did not detain anyone after they arrived at the Police Academy.  (Dep. of Michael Smith, December 11, 2009, at 120:22-121:2.) (Exhibit 15.)

76. Smith's involvement was limited to riding one of the buses from the Park to the Academy, processing the paperwork for plaintiff Choi, and occasionally letting people on the bus take a restroom break. (*Id.* at 121:14-15; 123:11-12.)

77. Smith had been with MPD for two years when he was ordered to report to Pershing Park on September 27, 2002. (*Id.* at 19:4-6.)

78. Prior to becoming an MPD officer, Smith was in the U.S. Air Force for 20 years as a security officer with Military Police, and then as a special agent with Special Investigations in the Air Force. (*Id.* at 21:6-22.)

79. On the morning of September 27, 2002, Smith, a motorcycle MPD officer, reported to the 2nd District, his usual assignment, and after roll call and sometime before 10 a.m. he was ordered to go to Pershing Park. (*Id.* at 20:2-11; 71:1-8.)  He arrived at the northwest corner of the Park on motorcycle, and after leaving his cycle along Pennsylvania Avenue, he was placed in a police line by a supervisor along the north side of the Park. (*Id.* at 74:11-18; 75:8-22; 76:1-10.)

80.     About 20 to 25 minutes later, Smith was moved to a new line near Pennsylvania Avenue and 15th Street.  (*Id*. at 102:14-18.)  After another 30 minutes, he had the impression that everyone in the Park was being arrested.  (*Id*. at 190:2-11; 120:22-121:2.)

81.     During his time at Pershing Park, Smith did not see Ramsey, Fitzgerald, Newsham, or Jordan.  (*Id*. at 124:16-125:8.)

82.     Smith did not participate in the decision to make arrests in the Park, nor did he know why people were being arrested.  (*Id*. at 125:15-18.)

83.     After being ordered to board one of the buses that would transport detainees to the holding facility, Smith noted that people already were flex-cuffed.  (*Id*. at 122:5-18.)  He did not take any property from anyone boarding the bus.  (*Id*. at 169:5-9.)  He rode on a bus with two other MPD officers and about 25 to 30 detainees.  (*Id*. at 123:13-124:1; 128:4-8.)

84.     Upon arrival at the Police Academy, Smith was told by a supervisor to fill out the arrest paperwork, that the charge to put on the form was failure to obey, and that the arrest time was 11:15 a.m.  (*Id*. at 128:15-129: 21; 130:15-131:8; 152:10-153:3.)

85.     Smith filled out the arrest forms—including the one for plaintiff Choi—with information that was available at the time.  (*Id*. at 136:18-21.)  Thus, he did not put on the form details of the actual arrest of the detainees because he was unaware of the details.  (*Id*. at 158:22-160:8.)  This was the first time that Smith filled out a PD759 arrest form in his two years as an MPD officer.  (*Id*. at 199:11-20.)

86.     Smith testified that emotions on the bus varied; some people were laughing and some were crying.  He said everyone took it differently.  (*Id*. at 141:3-10.)

87.     Once Smith was told by a superior officer about the charge for the arrests, he reported that information to the people on the bus along with what would take place during

15

processing.  (*Id*. at 141:11-142:4.)  He also stated that most people on the bus were able to remove the flex-cuffs themselves, and that no one complained to him that the cuffs were too tight.  (*Id*. at 140:5-15.)

88.     Smith escorted some detainees to the restrooms in the Academy, and although he took people to the processing area, he did not see the gymnasium holding area.  (*Id*. at 150:3-5.)

89.     Smith became aware of computer problems at the processing facility when he arrived, and he said that the processing took "several hours."  (*Id*. at 138:13-139:1; 150:6-151:1.)

## VIII.   UNDISPUTED MATERIAL FACTS REGARDING THE INVOLVEMENT OF RAMSEY AND NEWSHAM AT PERSHING PARK

### E.     Chief Ramsey

90.     On the morning of September 27, 2002, Chief Ramsey was at four locations in the City before going to Pershing Park.  (Dep. of Charles Ramsey, March 26, 2010, at 70:2-84:7.) (Exhibit 16.)  On his third stop at Vermont Avenue and K Street, N.W., he was present when a brick was thrown through a bank window and dozens of protesters were arrested. (Ramsey Dep., September 19, 2007, at 446:21-454:11; 466:22-473:11.)

91.     Ramsey arrived at Pershing Park with Fitzgerald and a Washington Post reporter in his police cruiser "near close to 10:00" a.m.  (Ramsey Dep., March 26, 2010,. at 69:15-21; 84:8-11; 96:10-13; Ramsey Dep., September 19, 2007,. at 480:13-485:2; 511:6-11.)

92.     Ramsey noticed a large crowd in the Park and that police lines had formed around the western end of the Park.  (*Id*. at 485:11-486.)  Ramsey could see that some people were exiting the Park on the east side of the Park along 14th Street.  (*Id*. at 494:3-7; 495:11-13; 496:7-8.)

93.     Upon arrival at the Park, Ramsey and Fitzgerald met with Newsham, who was the MPD Field Operation Commander on the scene, for about ten minutes.  (*Id*. at 488:12-22; 489:5-7; 496:20-22; Ramsey Dep., March 26, 2010, at 98:16-99:4.)

94.     Ramsey did not recall seeing MPD Assistant Chief Jordan when he arrived at the Park.  (*Id*. at 497:17-20.)

95.     According to Ramsey, Newsham told Ramsey and Fitzgerald that he and other MPD officials had observed protestors engaging in various unlawful acts, including knocking over trash cans and newspaper vending machines, and generally blocking traffic.  (*Id*. at 490:8-13; 493:1-10; 497:2-8; 510:12-18; Ramsey Dep., March 26, 2010, at 108:13-22.)

96.     Newsham said that the protestors had not stopped blocking traffic despite orders to clear the streets.  (Ramsey Dep., September 19, 2007, at 497:21-498:17; Ramsey Dep., March 26, 2010, at 108:13-22.)

97.     Newsham also told Ramsey that he thought everyone in the Park had committed at least one of the offenses Newsham had observed.  (Ramsey Dep., September 19, 2007, at 493:1-10.)

98.     Newsham then told Ramsey that he believed he had probable cause to arrest the people who were in the Park.  (*Id*. at 498:15-17.)

99.     Ramsey believed that Newsham's "intent was to make arrests" when they were talking on the street next to the Park.  (Ramsey Dep., March 26, 2010, at 108:22.)

100.    Based on what Newsham told him, and what he observed when he arrived at the Park, Ramsey believed that Newsham had probable cause to order the arrest of some of the protestors in the Park.  (Dep. of Charles Ramsey, September 18, 2007, at 38:8-14; 55:3-8

17

(Exhibit 17); Ramsey Dep., September 19, 2007, at 499:16-500:3; Ramsey Dep., March 26, 2010, at 115:1-11; 153:7-13.)

101.    Ramsey also believed that the Park had been cleared of uninvolved citizens before the arrest order was made by Newsham. (Ramsey Dep., September 18, 2007, at 50:20-51:6; 53:10-15.)

102.    Fitzgerald was with Ramsey when Newsham talked with Ramsey.  (Ramsey Dep., March 26, 2010, at 111:5-9.)  Ramsey did not recall being with Jordan at that moment.  (*Id*. at 112:6-11.)

103.    Ramsey was not aware when he talked with Newsham that there were people in the Park who may not have engaged in earlier unlawful activity.  (Ramsey Dep., September 18, 2007, at 50:20-51:6; 63:9-13.)

104.    Ramsey assumed Newsham had followed standard MPD procedures to ensure probable cause existed to order the arrest of the people in the Park.

105.    Ramsey was unaware that Newsham had not given a general dispersal order before ordering the arrests, even though he assumed that such a warning had been given. (Ramsey Dep., March 26, 2010, at 115:14-16; 123:5-7; 203:10-20.)

106.    Ramsey thought the Park had been cleared of non-protestors before the arrests were made. (Ramsey Dep., March 26, 2010, at 129:16-22; 130:6-16; 133:2-12; 135:15-136:10.)

107.    Ramsey did not disapprove or give [Newsham] any reason to believe that Ramsey thought Newsham did not have probable cause to arrest."  (*Id*. at 121:19-21.)

## F.    Assistant Chief Newsham

108.    In September 2002, Newsham was an Assistant Chief of Police reporting directly to Chief of Police Ramsey.  (Dep. of Peter Newsham, September 6, 2007, at 24:16-18.) (Exhibit 18.)

109.     Newsham was the designated MPD Field Operation Commander for the Pershing Park area.  (*Id*. at 59:16-61:8; 129:15-21.)

110.     Prior to demonstrators gathering in Pershing Park, Newsham observed protestors in the streets at various locations throughout the city turning over trash cans and newspaper stalls, and he heard on the police radio about the bank window smashed by a thrown brick at Vermont Avenue and K Street, N.W.  (*Id*. at 115:13-117:7.)  He described the protestors conduct as "violent, and also something that could potentially get out of control."  (*Id*. at 117:10-12.)

111.     Newsham observed numerous small groups of people around the Park in an "excited state" and "running through the streets, they were disobeying direction to get up on the sidewalks."  (*Id*. at 120"14-21.)  Newsham could see that these people were headed to Pershing Park.  (*Id*. at 121:5-6.)

112.     Newsham arrived at Pershing Park about 9:00 a.m. and walked around the Park.  (*Id*. at 124:4-15.)  He noticed that police lines had already formed around part of the Park but he did not order the formation of those lines.  (*Id*. at 125:2-126:16.)  He also noticed that people were allowed to go through those lines to enter or exit the Park.  (*Id*. at 130:20-132:7.)

113.     Newsham recalled speaking with Assistant Chief Jordan before giving the arrest order, but he did not discuss his impending decision to order the arrests with Jordan.  (*Id*. at 134:15-22; 135:22-136:5; 137:12-17.)

114.     Newsham had several conversations with Captain Ralph Murphy of the U.S. Park Police.  In one of the conversations, Murphy told Newsham that although Pershing Park was federal territory, Murphy was not going to have the U.S. Park Police make arrests because the Park Police "didn't have the resources to handle that" and because of the concern of using the Park Police horses on the hills in the Park that might result in injury to the protestors.  (*Id*. at

19

159:14-161:17; 295:9-14; 300:11-15.)  Murphy confirmed this in his deposition.  (*See* Murphy Dep., February 3, 2005, at 536:3-12.)  Murphy provided the same explanation to Jordan at about the same time.  (See Murphy Dep., February 2, 2005, at 229:13-230:3; 235:5-236:11.)

115.    Newsham also spoke to Chief Ramsey and Assistant Chief Fitzgerald after they arrived at the Park.  He told Ramsey "all the information that I had regarding the behavior of the demonstrators prior to entering the park, their behavior while they were in the park, the fact that the demonstrators did not have a permit, and that it was my intention to make an arrest."  (*Id*. at 174:1-6.)  *(See also* Dep. of Peter Newsham, November 5, 2007, at 44:13-45:6; 46:17-50:2.) (Exhibit 19.)  Newsham stated that Jordan and Fitzgerald were also present when he had this conversation with Ramsey.  (Newsham Dep., September 6, 2007, at 176:16-177:3.)

116.    Newsham did not give a general dispersal order, and that he did not inform Ramsey, Fitzgerald or Jordan that a dispersal order had not been given before the arrests were made.  (*Id*. at 181:4-182:2.)

117.    No one at the scene advised Newsham to give a dispersal order.  (*Id*. at 225:16-22.)

118.    Newsham did not talk to Ramsey after the arrests began.  (*Id*. at 229:1-5.)

119.    Newsham did not recall speaking to any other federal official at Pershing Park on September 27, 2002, nor did he remember seeing any other MPD official speak with a federal official that day.  (*Id*. at 300:4-9; 301:3-9.)

## IV.    GENERAL UNDISPUTED MATERIAL FACTS

120.    None of these defendants made the decision to arrest the plaintiffs, and they were not consulted by Newsham about whether arrests should be made.  (Fitzgerald Dep., September 16, 2004, at 132:15-133:8; 135:9-17); (Jordan Dep., March 24, 2010, at 18:7-13; 19:7-10);

(DiGirolamo Dep., December 2, 2009, at 103:3-5); (Harrison Dep., December 10, 2009, at 68:17-19; 113:13-15; 144:9-10); (Smith Dep., December 11, 2009, at 234:19-235:3.)

121.    Fitzgerald and Jordan, the two MPD commanding officers at Pershing Park, did not participate in and were unaware that a dispersal order was not given by Newsham before arrests were ordered by Newsham.  (Fitzgerald Dep., September 16, 2004, at 167:3-22; 179:21-180:3; 181:12-15; March 9, 2011 Dep., at 190:3-191:9);   (Jordan Dep., March 30, 2005, at 90:12-91:14; Jordan Dep., March 24, 2010, at 120:18-22; 123:4-7.)

122.    DiGirolamo, Harrison and Smith, had no knowledge of the reason or circumstances for the arrest of the people in Pershing Park.  (DiGirolamo Dep., December 2, 2009, at 90:11-19; 103:3-5); (Harrison Dep., December 10, 2009, at 113:16-114:6; 116:7-12; 257:18-20); (Smith Dep., December 11, 2009, at 125:15-18.)

123.    DiGirolamo, Harrison and Smith did not hand-cuff the plaintiffs at Pershing Park. (DiGirolamo Dep., December 2, 2009, at 134:9-17); (Harrison Dep., December 10, 2009, at 126:20-127:2); (Smith Dep., December 11, 2009, at 122:5-18.)

124.    DiGirolamo, Harrison and Smith, the three MPD officers who were on buses with the plaintiffs and signed the arrest paperwork for the plaintiffs, were ordered to perform those tasks by superior officers.  (DiGirolamo Dep., December 2, 2009, at 116:-117:8; 118:7-11; 119:21-120:1; 135:18-136:22) (Harrison Dep., December 10, 2009, at 68:17-19; 113:13-15; 125:18-126:2; 137:19-138:41; 44:9-10); (Smith Dep., December 11, 2009, at 128:15-129: 21; 130:15-131:8; 152:10-153:3.)

## V.  UNDISPUTED MATERIAL FACTS REGARDING THE ARRESTS AND DETENTONS OF THE FOUR CHANG PLAINTIFFS

### G.    A.    Plaintiff RayMing Chang

125.    Plaintiff RayMing Chang was involved in the Pershing Park event as a legal observer for the National Lawyers Guild though George Washington University Law School (Dep. of RayMing Chang, October 22, 2007, at 172:16-173:3.) (Exhibit 20.)  Chang said that he received about 17 hours of pro bono credit from the Law School for the time of his detention, and that he received some formal recognition for the event from the Law School at a later date. (*Id*. at 171:7-172:9; 200:18-201:18.)

126.    Chang did not recall if he knew that the protestors did not have a permit to demonstrate on September 27, 2002, but "[i]f they were arrested for not having a permit, so be it."  (Dep of RayMing Chang, May 10, 2004, at 115:19-117:10; 117:20-21.) (Exhibit 21.)

127.    Chang claims that he arrived at Pershing Park at 9:20 a.m., about 30 minutes before the arrest order was made by Newsham.  (*Id*. at 122:7-11.)  He did not recall seeing Newsham or any other defendant at the Park.  (Chang Dep., May 10, 2004, at 113:7-115:6; 123:10-22.)    128.    Chang did not recall who actually arrested him in the Park, and he was not even sure that it was an MPD officer that arrested him.  (*Id*. at 184:1-20.)

129.    Chang first met MPD Officer Harrison on the bus when Chang was being transported to the Police Academy, and that Harrison did not hand-cuff Chang in the Park.  (*Id*. at 189:2-5; 190:2-4.)  Chang said that all Harrison did was "wrote out the paper—the ticket."  (*Id*. at 187:9-22.)

130.    Chang admitted that his record was expunged within several months after he was arrested.  (Chang Dep., May 10, 2004, at 126:12-127:1.)  Finally, Chang offered no evidence that supported a conspiracy claim.  (Chang Dep., October 22, 2007, at 183:7-22.)

H.        B.        **Plaintiff Young Choi**

131.      Plaintiff Young Choi was at Pershing Park taking photographs for The Hatchet, a student newspaper for George Washington University.  (Dep. of Young Choi, August 20, 2004, at 17:12-20.) (Exhibit 22.)

132.      Choi obtained a press credential from the GW Hatchet newspaper and not from MPD; he was not aware that only press credentials issued by MPD were to be recognized as official by the police during the demonstration.  (*Id*. at 129:18-132:3.)  Choi was able to retrieve all of the photographs he took on September 27, 2002, and he provided them to the Hatchet.  (*Id*. at 19:10-20:4.)

133.      Choi could not identify the MPD officer who arrested him or flexi cuffed him.  (*Id*. at 126:11-22.)  Choi could not even remember if the officer that processed his arrest paperwork was an MPD officer.  (*Id*. at 38:21-39:15.)

134.      Choi had no personal knowledge of what Newsham did at Pershing Park.  (*Id*. at 129:10-13.)

135.      MPD Officer Smith was the person who rode on the bus with Choi.  (*Id*. at 61:15-62:17.)  Choi confirmed that he had been arrested before he first came into contact with Smith.  (*Id*. at 62:18-20; 63:17-64:6.)

136.      In his 2004 deposition, Choi stated that he believed there was a conspiracy regarding his arrest because he was arrested as a reporter even though other reporters were not arrested at Pershing Park.  (*Id*. at 100:5-101:101.)  However, three years later, Choi testified that he was not aware of any facts that would support any of the conspiracy charges.  (Dep. of Young Choi, November 7, 2007, at 33:3-11.) (Exhibit 23.)

137.      Choi is the only one of the four *Chang* plaintiffs who rejected an offer from the District to expunge his arrest record from September 27, 2002.  (*Id*. at 67:2-6.)

138.    Choi has no facts that would support an award of punitive damages against any of the five defendants filing this motion.  (*Id*. at 34:2-5; 73:18-74:15.)

**I.    Plaintiff Leanne Lee**

139.    Lee was a staff photographer for The Hatchet on September 27, 2002.  (Dep. of Leanne Lee, December 22, 2004, at 12:10-13.) (Exhibit 24.)

140.    Lee arrived at Pershing Park about 8:45 or 9:00 a.m.  (*Id*. at 53:13-54:1; 157:17-21; 164:22-165:1; 174:10-12.)

141.    Lee was arrested and put on a bus by 11:00 a.m.  (*Id*. at 55:15-19.)

142.    Lee did not show the police her identification with The Hatchet before her arrest despite the fact that she saw other journalist given permission by the police to leave the Park. (*Id*. at 59:20-22; 63:6-8.)

143.    Lee testified that at no time did any police officer use any physical force toward her.  (*Id*. at 85:15-21.)

144.    At her second deposition on October 19, 2007, Lee testified that she was arrested shortly after she made her second request to leave the Park at "around 9:45."  (Dep. of Leanne Lee, October 19, 2007, at 28:21-29:20.) (Exhibit 25.)  Lee cannot remember who arrested her in the Park.  (*Id*. at 29:19-30:4.)

145.    Lee did not who flexi-cuffed her or rode with her on the bus to the Police Academy.  (*Id*. at 38:10-14.)

**J.    Plaintiff Christopher Zarconi**

146.    Zarconi was a photographer for The Hatchet on September 27, 2002, and the Pershing Park event was about the fifth protest he had photographed.  (Dep. of Christopher Zarconi August 24, 2004, at 21:2-4.) (Exhibit 26.) He referred to himself as a "photojournalist." (*Id*. at 32:16-21.)

24

147.    After viewing demonstrations in the early morning near Vermont and K Streets, N.W., Zarconi walked with protestors to Pershing Park sometime between 9:00 and 9:30 a.m. (*Id*. at 36:11-38:1.)

148.    Zarconi did not have press credentials issued by MPD.  (*Id*. at 61:6-22.)

149.    After Zarconi was released from custody, he got his camera back undamaged.  (*Id*. at 76:16-77-7.)

150.    After he was arrested, Zarconi was placed on a Metro bus and driven to the Police Academy.  (*Id*. at 77:11-17.)

151.    During the time Zarconi was in custody, he did not see any MPD officer use any physical force.  (*Id*. at 85:4-12.)

152.    Zarconi does not recall any interaction with DiGirolamo on the bus on at the Academy or during the processing.  (*Id*. at 86:8-18; 87:22-88:2.)

153.    While at the Academy, Zarconi did not observe MPD using any physical force, and he was permitted to use the restroom and he was given food and beverage.  (*Id*. at 80:11-21; 81:12-14; 89:5-17.)  He never asked the police to loosen his flexi cuffs.  (*Id*. at 94:6-9.)

154.    Zarconi voluntarily paid the $50 forfeiture and was released.  (*Id*. at 92:18-93:2.)

Respectfully submitted,

EUGENE  A. ADAMS
Interim Attorney General for the District of
 Columbia

ELLEN A. EFROS
Bar No. 250746
Deputy Attorney General
Public Interest Division

*/s/*  William  F.  Causey
WILLIAM F. CAUSEY
Bar No. 260661

25

Assistant Attorney General
441 Fourth Street, N.W.
Washington, DC 20001
(202) 724-6610
william.causey@dc.gov


Counsel for the District Defendants

Dated:  December 22, 2014

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| RAYMING CHANG, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-2010 (EGS) |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
|  | ) | |

**PROPOSED ORDER**

Upon consideration of the Motion for Qualified Immunity or, in the Alternative, for Summary Judgment filed by District Defendants Michael J. Fitzgerald, Brian K. Jordan, Bryan DiGirolamo, Andre L. Harrison, and Michael Smith, and for Dismissal of the Conspiracy Counts and the Claim for Punitive Damages, the opposition filed thereto by the Chang plaintiffs, and the entire record, it is this _____ day of _____, 2015,

**ORDERED**, that the Defendants' Motion for Qualified Immunity be, and the same hereby is, **GRANTED;** and it is further

**ORDERED**, that Counts Six, Seven and Eight are hereby **DISMISSED WITH PREJUDICE**, and it is further

**ORDERED**, that all punitive damage claims against these five defendants are hereby **DISMISSED WITH PREJUDICE**, and it is further

**ORDERED**, that all claims against Defendants Michael J. Fitzgerald, Brian K. Jordan, Bryan DiGirolamo, Andre L. Harrison, and Michael Smith, are hereby **DISMISSED WITH PREJUDICE**.

_____
EMMET G. SULLIVAN
United States District Judge