**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————
RAYMING CHANG, *et al.*,                     )
                                             )
                    Plaintiffs,              )
                                             )
v.                                           )          Civil Action No. 02-2010 (EGS)
                                             )
                                             )
UNITED STATES OF AMERICA, *et al.*           )
                                             )
                    Defendants.              )
———————————————————   )

**DISTRICT DEFENDANTS' MOTION *IN LIMINE* TO**
**EXCLUDE FROM EVIDENCE THE REPORT OF THE COMMITTEE ON THE**
**JUDICIARY OF THE COUNCIL OF THE DISTRICT OF COLUMBIA**
**DATED MARCH 24, 2004**

The District Defendants (the District of Columbia, Charles H. Ramsey, Michael Fitzgerald, Peter Newsham, Bryan DiGirolamo, Michael Smith and Andre Harrison) hereby move this Court, *in limine*, to exclude from evidence the Draft Report of the Committee on the Judiciary, issued March 24, 2004, to the Council of the District of Columbia (the "Committee Report"), attached hereto as Exhibit A, as well as the testimony of Kathy Patterson and all related exhibits.  As explained more fully in the accompanying memorandum of points and authorities, the Committee Report is not sufficiently trustworthy to be admissible under Federal Rule of Evidence 803(8)(C), and the Committee Report, as well as Ms. Patterson's testimony, are irrelevant and prejudicial and thus are inadmissible under Rules 401, 402, 403, and 407.

Pursuant to LCvR 7(m), counsel for Plaintiffs indicate that they oppose this motion.  The Federal Defendants (the United States of America and former Major Richard Murphy of the U.S. Park Police) and the Fairfax County Sheriff's Department join in this Motion for the reasons stated in the accompanying memorandum.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ELLEN A. EFROS  D.C. Bar No. 250746
Deputy Attorney General
Public Interest Division

/s/  William  F.  Causey
WILLIAM F. CAUSEY  D.C. Bar No. 260661
SHANA L. FROST  D.C. Bar. No. 458021
Assistant Attorney General
441 Fourth Street, N.W.
Washington, DC 20001
(202) 724-6610
william.causey@dc.gov

*Counsel for the District Defendants*

/s/  Lauren E. Curry
Lauren E. Curry (D.C. Bar No. 990522)
Brown Rudnick LLP
Seven Times Square
New York, NY  10036
(212) 209-4953
(212) 938-2991 (fax)
lcurry@brownrudnick.com

*Counsel for Defendant Charles H. Ramsey*

/s/ Robert E. Deso
Robert E. Deso   #174185
Deso & Buckley, P.C.
1828 L. St., N.W.,  Suite 270
Washington, D.C.  20036
(202) 822-6333
(202) 822-6665 - Fax
redeso@dtswlaw.com

*Attorney for Defendant Peter J. Newsham*

RONALD C. MACHEN JR., D.C. Bar #447889

United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By: _____/s/_____

      MARINA UTGOFF BRASWELL, D.C. Bar
      #416587
      BRIAN P. HUDAK
      Assistant United States Attorneys
      555 Fourth Street, NW
      Washington, DC 20530
      (202) 252-2549

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RAYMING CHANG, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )      Civil Action No. 02-2010 (EGS) |
| | ) |
| | ) |
| UNITED STATES OF AMERICA, *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DISTRICT DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE FROM EVIDENCE THE REPORT OF THE COMMITTEE ON THE JUDICIARY OF THE COUNCIL OF THE DISTRICT OF COLUMBIA DATED MARCH 24, 2004

The District Defendants (the District of Columbia, Charles H. Ramsey, Michael Fitzgerald, Peter Newsham, Bryan DiGirolamo, Michael Smith and Andre Harrison) hereby move this Court, *in limine*, to exclude from evidence the Draft Report of the Committee on the Judiciary, issued March 24, 2004, to the Council of the District of Columbia (the "Committee Report"), attached hereto as Exhibit A, as well as the testimony of Kathy Patterson and all related exhibits.[1]  The Committee Report is not sufficiently trustworthy to be admissible under Federal Rule of Evidence 803(8)(C), and the Committee Report and Ms. Patterson's testimony are irrelevant to the issues in this case and are prejudicial and thus are inadmissible under Rules 401, 402, 403, and 407.

The Federal Defendants (the United States of America and former Major Richard Murphy of the U.S. Park Police) and the Fairfax County Sheriff's Department join in the District Defendants objections.  The Federal Defendants also object to the Committee Report as it

---

[1] Plaintiffs have listed the Draft Committee Report several times on their proposed Exhibit List.  *See* Ex. B (Nos. 118, 277).  Ms. Patterson is listed as a witness on Plaintiffs' witness list.

contains hearsay within hearsay purporting to relay statements made by Major Murphy to an MPD investigator.  This twice-over hearsay is inadmissible under FRE 802.

## INTRODUCTION

Fed. R. Evid. 803(8)(C) provides that "factual findings resulting from an investigation made pursuant to authority granted by law" may be admitted over hearsay objections, even if the declarant is available as a witness, "unless the sources of information or other circumstances indicate lack of trustworthiness."  Rule 803(8)(C) has been used to permit the evaluative reports of public agencies and bodies to be introduced as evidence in related lawsuits.  As stated in the Rule, however, to be admissible a public report must (a) be a presentation of factual findings, and (b) be sufficiently trustworthy.  The Committee Report fails on both accounts and therefore may not be admitted under Rule 803(8)(C).

Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Put another way, relevancy is the "relation between an item of evidence and a matter properly provable in the case." Advisory Committee Notes, Fed. R. Evid. 401; *United States v. Foster*, 986 F.2d 541, 545 (D.C. Cir. 1993); *United States v. Doe*, 903 F.2d 16, 20-21 (D.C. Cir. 1990).  Rule 402 of the Federal Rules of Evidence states that evidence, to be admissible, must be relevant.  Even evidence which is relevant may be excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice.  Here, the Committee Report contains a wide array of content that has no bearing on the facts of this case, including policy recommendations, political judgments, and the subjective observations and opinions of members of the Committee. Many of these discussions also contain statements that are highly prejudicial to the Defendants,

significantly outweighing whatever limited probative value the Committee Report as a whole may have.

## ISSUES IN THIS CASE

The relevant plaintiffs' evidence in this case is that which tends to support the allegations set forth in the Third Amended Complaint filed on July 19, 2005.  The first claim for relief alleges that the defendants violated the First Amendment rights of the plaintiffs by arresting them in the vicinity of Pershing Park and Freedom Plaza on September 27, 2002.  Third Amended Complaint, ¶¶ 129, 130, 76, 77, 78, 79, 80, 81, 82.  The second claim for relief alleges that the arrests of the plaintiffs violated their Fourth Amendment rights.  *Id.*  ¶ 132.  The third claim for relief alleges that the arrests of the plaintiffs were pursuant to an illegal "trap-and-arrest" practice for demonstrations which violated the plaintiffs' rights under the Fifth and Fourteenth Amendments.  *Id.*  ¶ 134.[2]  The eighth claim for relief alleges that the defendants engaged in a common law conspiracy to violate the constitutional rights of the plaintiffs.  *Id.*  ¶¶ 155-159. The ninth claim for relief  alleges  that  the  plaintiffs  were  falsely arrested  on  September  27, 2002.  *Id.*  ¶ 161.  The tenth claim for relief alleges that the plaintiffs were falsely  imprisoned on  September  27,  2002  and  September  28,  2002. *Id.*  ¶ 165.  Thus, all of the allegations in the Chang Third Amended Complaint pertain to the arrests of the plaintiffs on September 27, 2002 in the area of Pershing Park and Freedom Plaza, and the only relevant plaintiffs' evidence under Rule 401 is that which tends to support the claims of the plaintiffs under controlling substantive law.

## OVERVIEW OF THE JUDICIARY REPORT

The Committee Report is a political document that reflects the D.C. City Council's policy and political disagreements with the Mayor's office and MPD regarding police practices.  As

---

[2] Plaintiffs' fourth through seventh claims for relief have been dismissed against all Defendants.

such, the March 24, 2004 Committee Report addresses policy issues, in a legislative context, which are much broader than, and not necessarily related to, the legal issues arising from the arrests of the plaintiffs at Pershing Park on September 27, 2002.  Ex. A, Executive Summary, pp. i and ii.  The Committee Report is organized in a "case study" format.  Two of the four case studies:  "April 2000 and the Convergence Center" and "The 2001 Inauguration, Pepper Spray, and MPD Self-Policing," do not at all pertain to the September 27, 2002 arrests at Pershing Park. *Id.*, pp. ii-iii, 28-47.

The Committee Report addresses policy issues which have no evidentiary relevance to the jury's determination of liability or damages with respect to the September 27, 2002 Pershing Park arrests.  Such non-relevant policy issues in the Committee Report are: "Emerging Issue: Surveillance and Infiltration of Demonstration Organizations;" "Emerging Issue: Failures in Leadership Accountability;" "Emerging Issue: Departing from Best Practice in Managing Demonstrations."  *Id.* pp. vi-ix, 82-124.[3]  The Committee Report concludes that there is a need for enactment of remedial legislation ("Conclusion: The Need for Statutory Guidelines"), *id.* pp. x-xi, 126-129, which likewise have no bearing on liability or damages for the Pershing Park arrests.  Such remedial legislation was enacted as "The First Amendment Assemblies Act of 2004," codified at D.C. Code §§ 5-331.01 through 5-337.01, and constitutes a subsequent

---

[3] Appendix A to the Report sets forth a Summary of the Public Hearing and lists the various witnesses at the public hearings on December 17-18, 2003, According to Appendix A, Councilmember Patterson began the public hearing by reading from correspondence from attorneys complaining about police actions at the April 2000 demonstration and testimony from witnesses at an October 24, 2002 hearing regarding the September 27, 2002 demonstrations. Appendix A lists as witnesses during the two days of hearings the Legal Director of the American Civil Liberties Union, a representative of the Partnership for Civil Justice and National Lawyers Guild Mass Defense Committee, Chairman of the Demonstration Support Committee of the D.C. Chapter of the National Lawyer's Guild – D.C. Chapter, two representatives of the D.C. Chapter of FreeRepublic.com., two individuals arrested at the September 27, 2002 demonstrations,  a representative of the Americans for Democratic Action, Greater Washington Chapter, the author of "Marching  on Washington; The Forging of an American Tradition," Ralph Temple, former director of the American Civil Liberties Union-NCA, Thea Lee, Chief International Economist, AFL-CIO, Timothy Lynch, Project on Criminal Justice, The Cato Institute, Frederick Cooke, former Corporation Counsel of the District of Columbia, Robert Weiner, former President of the D.C. Bar  Association, and Senior Counsel to the White House Counsel,, along with MPD Chief Ramsey, Assistant Chief Newsham, and other current and former MPD members as well as other officials of the District government.

remedial measure, which in itself is inadmissible in these proceedings.  As demonstrated by the

Table of Contents, Ex. A xiii, the bulk of the Committee Report—pages 1-48, 82-130, and the

Appendices starting on page 132—is irrelevant to the Pershing Park arrests.

Additionally, the Committee Report purports to detail statements made by an MPD

investigator regarding an interview he had with Major Murphy concerning discussions Major

Murphy allegedly had with MPD officials on the day of the arrest.  Committee Report at 100-01,

Ex. A.

## ARGUMENT

### I.   THE COMMITTEE REPORT IS HEARSAY THAT DOES NOT QUALIFY AS A PUBLIC RECORD UNDER FED. R. EVID. 803(8)

#### A.   The Committee Report Is Not, and Was Not Intended to Be, a Set of Factual Findings.

If a report is not a set of factual findings, it is not admissible under Rule 803(8)(C).

*Pearce v. E.F. Hutton Group*, 653 F. Supp. 810, 813 (D.D.C. 1987) (citing *Bright v. Firestone

Tire and Rubber Co.*, 756 F.2d 19, 22 (6th Cir. 1984)).  In ruling that a legislative committee

report was not admissible under Rule 803(8)(C), the court in *Pearce* observed that the case did

"not deal with an adjudicatory proceeding nor even with an investigation whose stated purpose

was the resolution of some factual dispute."  *Id.* at 814.  Rather the goal of the report was

"merely to evaluate the Justice Department's actions."  *Id.*  As such, the report did "not have

factual findings within the meaning of rule 803(8)(C)."  *Id.*

When convening the public hearings that formed one of the primary bases of the

Committee Report, Kathy Patterson, Chair of the Committee on the Judiciary, made clear that

the investigation was "of current policies and practices of the Metropolitan Police Department

related to demonstrations."  Ex. C, Transcript, Hearing on Current Policies & Practices of MPD

to Demonstrations in the District of Columbia, Dec. 17-18, 2002 at 3 (hereinafter "Hearing

Transcript").  Similarly, the introduction to the Committee Report quotes from the Committee's resolution approving the investigation which set out the "issues for examination" by the Committee, including "issues raised by the September 27, 2002, arrests of persons assembled in Pershing Park," and "[w]hether Metropolitan Police Department policies reflect best practices in managing large demonstrations such that public safety and individual rights and civil liberties are protected."

Councilmember Sharon Ambrose further explained the true policy-making purpose of the investigation and report during her opening statement at the Committee's December 2003 hearings.  She warned against the danger of "repressive tactics" by MPD, and stated that, "I think we have to establish a clear, clear policy on these issues in local government, and then I think the police department has to adjust their training to reflect those policies and those aims."  Ex. C, Hearing Transcript at 15.  Again, Councilmember Ambrose made clear that the purpose of the hearings was not to engage in fact-finding with respect to Pershing Park or any other event, but rather to establish new policy and require new police training procedures.

Chairperson Patterson again affirmed the limited scope of the investigation when she noted that the Committee "decided to conduct this investigation through case studies since in a few months time we could not be exhaustive."  *Id.* at 9.  The September 27, 2002 arrests at Pershing Park thus were merely one of the "case studies" the Committee decided to use to investigate the policies and practices of the MPD.

Thus, the Committee Report's stated goal, as a legislative body with the authority and responsibility to make legislative changes where necessary, was not to determine the facts of what happened in Pershing Park, but instead to evaluate the MPD's actions in Pershing Park. This distinction is critical in determining whether a report is admissible as factual evidence under

803(8)(C):  to be admissible, a report must be a set of factual findings, not an evaluation of

public actors or a set of policy recommendations.  Just as the committee report in *Pearce* was

inadmissible because it was prepared "merely to evaluate the Justice Department's actions," here,

the Committee Report is inadmissible because it was prepared merely to evaluate the MPD's

policies and procedures and the "issues raised" with respect to those procedures by, among

various other events, the Pershing Park arrests.  Thus, the Committee's investigation was not

intended to be, nor should it be considered by this Court, a thorough factual investigation of the

Pershing Park arrests, nor was its "stated purpose . . . the resolution of some factual dispute."

*See Pearce*, 653 F. Supp. at 814.[4]

### B.      The Committee Report Itself is Not Trustworthy

In determining whether a public or agency report, such as the Committee Report, is

admissible over a hearsay objection, the Supreme Court has used the following factors to

evaluate whether a report is sufficiently trustworthy for admissibility:  "(1) the timeliness of the

investigation; (2) the special skill or expertise of the investigating official; (3) whether a hearing

was held and the level at which it was conducted; and (4) possible motivation problems." *Beech*

*Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 (1988) (citing the Advisory Committee notes for

Rule 803(8)(C)).  In *Barry v. Trustees of the Int'l Ass'n Full-Time Salaried Officers*, 467 F. Supp.

2d 91, 97 (D.D.C.  2006), the Court applied these factors in assessing the admissibility of two

Congressional committee reports, noting that such reports, like the Committee Report here, "are

not entitled to an additional presumption of trustworthiness or reliability . . . simply by virtue of

---

[4] There is some question, moreover, whether these conclusions were even the result of the investigation of the Committee or whether the Committee was predisposed to reach the conclusions it did with respect to the propriety of the arrests and where responsibility for the arrests should rest.  The introduction to the Committee Report says, in fact, that the investigation was initiated because the police had engaged in actions that "appeared to violate the U.S. Constitution." Ex. A at 2.  Because the "[t]he Williams Administration ha[d] continually voiced its support for police actions that appeared to others to violation the U.S. Constitution as well as D.C. law and Metropolitan Police Department regulations," the Committee felt compelled to step in with its own investigation.  *Id.*

having been produced by Congress." *Id.* at 98.  There, Judge John D. Bates reviewed the line of cases in which federal courts have examined the admissibility of public reports issued by legislative committees to determine the admissibility of two such reports -- one from a U.S. Senate committee and one from a committee of the U.S. House of Representatives.  While noting there was little guidance on the subject, Judge Bates observed that the courts that have dealt with the issue of such reports' admissibility frequently concerned themselves with the "possibility that partisan political considerations, as well as elected officials' tendency to 'grandstand,' have influenced the factual findings, conclusions, or opinions included in Congressional reports." *Barry*, 467 F. Supp. 2d at 98.  Based on a review of the *Beech* factors, the court admitted the Senate committee report, noting that "both the tone and the content of the report demonstrate a careful, methodical investigation that eschewed hasty conclusions and inflammatory rhetoric," but declined to admit the House report, which contained only "tentative legal conclusions without appreciable analysis." *Id.* at 100.[5]

Here, the Judiciary Committee's investigation and Committee Report stand in stark contrast to the Senate investigation and resulting report in *Barry*.  In this case, the Committee's chairperson and its lead investigative counsel both had clearly made their minds up regarding what happened in Pershing Park long before the first witness appeared before them.  To demonstrate the failure of the Committee and its staff to "eschew hasty conclusions and inflammatory rhetoric," witness the following public statements by Chairperson Patterson, each of which she made <u>before</u> the Committee's December 2003 hearings, many before it had even initiated its investigation:

---

[5] Indeed, the Court noted that members of the minority party praised the Senate Committee for conducting the hearing, "in a very fair and very thorough way." *Barry*, 467 F. Supp. 2d at 101.  The Court further observed that admission of portions of the Senate report would not prejudice the defendant, confuse the issues or mislead the fact finder in the case because, unlike here, the case was being tried to the Court and not to a jury. *Id.*

- "Why was the decision made to apparently make these arrests without first warning the demonstrators to disperse. . .?"  (in letter to Mayor)[6]

- The Metropolitan Police Department "violated the rights of hundreds of District residents and visitors."[7]

- "I had hoped Mayor Williams would take seriously the internal affairs conclusion that his department wrongfully arrested hundreds of people last September. . . . Ninety days after receiving that report, he has not held his subordinates responsible."[8]

- "That neither the mayor nor the chief has even apologized for [the arrests] is regrettable . . . There are some issues where there are not two sides."[9]

- "Nobody in the Williams administration has acknowledged the level of wrongdoing, the violations of basic civil liberties, that seems clear on its face … That's what caused me concern."[10]

Chairperson Patterson also had the following to say to Assistant Chief Newsham during her questioning of him in the Committee's executive session:  "I want you to be aware that it is likely that the Committee on the Judiciary under my leadership is going to say at some point publicly that the responsibility for the events of that day, and events specifically at Pershing Park, were the responsibility of the Chief of Police.  I'm just saying that because that's the perspective that I take on this.  I want you to be aware of that."  Exhibit I at 110, D.C. City Council Judiciary Hearing, Nov. 24, 2003, Interview of Peter Newsham.

Ms. Patterson was not the only Committee member or investigator to exhibit such predetermined viewpoints.  The Committee's chief investigative counsel (and now councilmember) Mary Cheh, told the press within the first few days of the Pershing Park arrests that it was her belief that "[i]f the same tactics had been used against the Million Man March, or

---

[6] Ex. D, "Did D.C. Police Go Too Far," The Washington Post. Oct. 1, 2002 at B1.

[7] Ex. E, David A. Fahrenholdt and David Nakamura, "Doubt Cast on Arrests of IMF Protestors," The Washington Post, Feb. 27, 2003 at B1.

[8] Ex. F. Arthur Santana. "D.C. Council Probing Police Conduct in Protests," The Washington Post, April 29, 2003 at B3.

[9] Ex. G, David Nakamura, "Patterson, Williams Wage Battle Over Police Personnel," The Washington Post, July 20, 2003 at Cl.

[10] Ex. H, Carol D. Leonnig, "D.C. Told to Release Report on Protests," The Washington Post, Sept. 12, 2003 at BI.

the Million Mom March . . . people would have been quite irate."[11]  Councilmember  Ambrose

appeared similarly to have made up her mind regarding the propriety of the Pershing Park

arrests, as noted by her introductory statement at the public hearings:

> Madam Chair, I have lived in this city since 1969, and all through the Viet Nam
> era, I participated in demonstrations in this city and the surrounding area
> countless times.  And I did not see then some of the repressive tactics that I see
> our own Metropolitan Police Department taking in local demonstrations in recent
> months.  So I think this is very important.  I think we have to establish a clear,
> clear policy on these issues in local government, and then I think the police
> department has to adjust their training to reflect those policies and those aims
> rather than those that some administration, some people who live in the White
> House might want to impose on us.  So I look forward to hearing the testimony
> this morning.

Ex. C, Hearing Transcript at 15.  Again, this statement from Councilmember Ambrose was made

before the first witness had been introduced at the public hearings.  In *Barry*, the court's decision

to exclude the House report cited the fact that at the committee's hearing, "representatives turned

up the rhetoric and engaged in the kind of soliloquies that have prompted courts' concerns about

political 'grandstanding.'"  *See Barry*, 467 F. Supp. 2d at 101. Councilmember Ambrose's

introductory statement prompts similar concerns.

The rhetoric and grandstanding continued the next day when Councilmember Patterson

took exception to Chief Ramsey's opening statement before the Committee by saying that "we

are not going to start this hearing out today with each of you putting information into the record

that is false and I am going to correct the record."  Ex. C, Dec. 18 Hearing Transcript at 30-31.

She went on to say that "on October 24, 2002, in this chamber in a hearing, the three witnesses

brought to us by the ACLU, I heard horrific testimony about their arrest for no reason and their

detention for 24, 26, 30 hours.  I went to Mayor Williams and I said 'this is outrageous.  Will you

please direct your Department to do an investigation?'"  *Id.*  Councilmember Patterson clearly

---

[11] Ex. D, "Did D.C. Police Go Too Far," The Washington Post, Oct 1. 2002 at B I.

did not need to hear Chief Ramsey's testimony to conclude that these arrests were "outrageous" and "horrific" and had occurred "for no reason."

After reviewing these statements, it would be nearly impossible to conclude to that the Committee members were intending to embark on a "careful, methodical investigation that eschewed hasty conclusions and inflammatory rhetoric" or that the resulting report was "the product of serious investigation rather than political grandstanding." *Barry*, 467 F. Supp. 2d at 100-01.  Rather, the Committee Report "represents the political position of the representatives who voted for it" and is therefore "untrustworthy and inadmissible." *Richmond Med. Ctr. v. Hicks*, 301 F. Supp. 2d 499, 512 (E.D. Va. 2004).

### C.    Reports of Political Bodies are Inherently Untrustworthy

Recognizing that problems such as those exhibited by the Committee Report are to be expected whenever such reports are prepared by partisan, political bodies, many courts have noted that legislative reports have inherent motivation problems that will in most, if not all cases, render such reports untrustworthy and therefore inadmissible.   This Court has made the important observation that Rule 803(8)(C) "only permits the introduction into evidence of 'the factual findings of an <u>objective</u> governmental investigation.'"  *Pearce*, 653 F. Supp. at 814 (quoting *Baker v. Firestone Tire & Rubber Co.*, 793 F.2d 1196, 1199 (11th Cir. 1986) (emphasis in *Pearce*); *see also Anderson v. City of New York*, 657 F. Supp. 1571, 1579 (S.D.N.Y. 1987) (Court noted that while it "respects efforts at legislative fact-finding, nevertheless it cannot be denied that hearings and subsequent reports are frequently marred by political expediency and grandstanding.").[12]

---

[12] Indeed, the *Pearce* Court questioned whether reports, produced by "a politically motivated, partisan body" could ever be admissible:  "Given the obvious political nature of Congress, it is questionable whether <u>any report</u> by a committee or subcommittee of that body could be admitted under rule 803(8)(C) against a private party.  There would appear to be too great a danger that political considerations might affect the findings of such a report."

The Court in *Anderson* expressed additional skepticism regarding whether a legislative committee has the investigative skill or expertise, as identified in *Beech*, to issue a report that is sufficiently trustworthy to be admitted under Rule 803(8)(C). *Anderson*, 657 F. Supp. at 1579. The court specifically questioned whether the expertise in a policy area that comes from participating in hearings "provides committee members with any special expertise in evaluating witnesses, especially regarding their credibility or accuracy of recall." *Id.* Rather, the Committee Report's findings and conclusions were based in some significant part on the fact that the Committee members simply did not believe the testimony of MPD officials. For example, in the section entitled "Failures of Leadership Accountability," the Committee Report notes the Chief Ramsey and "senior members of his support staff" have over the past three years made statements or gave testimony that the included "evasions," "misrepresentations," "exaggerate[ions]," or were otherwise "implausible on their face." Ex. A, Committee Report at 96, 99, 102. Thus, the Committee's assessment of witness credibility appears to have played a key role in the conclusions it reached and, indeed, admission of the Committee Report would threaten the role of the jury as arbiter of witness credibility in these proceedings.[13]

Given the significant record of bias and political motivation, and the inherent lack of trustworthiness in both the Committee proceedings and the resulting Committee Report, the

---

*Pearce*, 653 F. Supp. at 814 (emphasis added).; *see also Richmond Med. Ctr.*, 301 F. Supp. 2d at 512 ("Courts have consistently excluded congressional reports, finding that they did not satisfy the requirements of Rule 803(8)(C) because of the inherently political nature of the reports.") (emphasis added).

[13] Additionally, the Committee was not "operating under stringent procedural guidelines" as most witnesses testifying at the public hearing - including all witnesses testifying against the MPD - were not put under oath. In fact, the transcript of the public hearing demonstrates the first witness the Committee put under oath was Deputy Chief James Short. Ex. C (Hearing Transcript at 157:11-16). This swearing-in occurred after Deputy Chief Short had begun giving testimony, with Councilmember Patterson noting that she "forgot to swear [him] in." *Id.* at 157:14. Furthermore, notwithstanding Ms. Patterson's statement that "the Judiciary Committee does swear all witnesses," all ten of the witnesses who had given prior testimony that day -- most against the MPD - did so without being sworn. Deputy Chief Short and Assistant Chief Albert Broadbent, the only two witnesses who appeared that day on behalf of the MPD, were the only two witnesses sworn in by the Committee during the first day of testimony.

Court should exclude the Committee Report pursuant to Rule 803(8)(C), as well as the testimony of Ms. Patterson pursuant to Rule 403.

**II.     The Report Is Not Admissible Evidence Under Federal Rule of Evidence 407**

Federal Rule of Evidence 407 prohibits the admissibility of a defendant's subsequent remedial measure to prove liability for prior wrongdoing.  Specifically, the Rule provides that, "[w]hen, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would  have made the  injury or harm less likely to occur, evidence of the subsequent measures  is not admissible to prove negligence, culpable conduct, . . . or a need for a warning or instruction . . ." Fed. R. Evid. 407.  Here, the Judiciary Committee investigation and Committee Report and the resulting enactment of  "The First Amendment Assemblies Act of 2004" are subsequent remedial measures properly excluded from evidence pursuant to Rule 407.

As noted by the Rule Advisory Committee, the basis for the exclusion of remedial measures "rests on a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety.  The Courts have applied this principle to exclude evidence of subsequent repairs, installation of safety devices, changes in company rules, and discharge of employees, and the  language of the present rule is broad enough to encompass all of them. . . . Exclusion is called for only when the evidence of subsequent remedial measures is offered as proof of negligence or culpable conduct.  In effect it rejects the suggested inference that fault is admitted. . . . Evidence of subsequent measures that is not barred by Rule 407 may still be subject to exclusion on Rule 403 grounds when the dangers of prejudice or confusion substantially outweigh the probative value of the evidence." Advisory Committee Notes, Fed. R. Evid. 407.

The exclusionary provisions of Rule 407 have been broadly applied by the courts to encompass changes in company rules or a change in policy.  Moreover, the application of Rule

407 is not limited to remedial actions taken by a responsible party against whom the evidence is offered; any remedial actions are excludable under Rule 407.  Advisory Committee Notes, Fed. R. Evid. 407; *In re Air Crash Disaster*, 86 F.3d 498, 529 (6th Cir. 1996); *accord McFarland v. Caterpillar, Inc.*, 974 F.2d 176,181 (D.C. Cir. 1992).

Evidence of changes suggested by the Council and/or made in MPD policies after the September 27, 2002 incident which gave rise to the litigation are excluded under Rule 407 if offered to prove culpable conduct in connection with the event.  *Cox v. District of Columbia*, 1992 U.S. Dist. LEXIS 9246, * 5 (D.D.C. June 26, 1992); *Specht v. Jensen*, 863 F.2d 700, 701 (10th Cir.  1988), *cert. denied* 488 U.S. 1008 (1989) (press release summarizing the results of the City's investigation about alleged illegal search of plaintiffs' home and office  excluded under Rule 407 as, "the press release here summarizes the results of the City's investigation of  the incidents giving rise to the lawsuit.  The release states that the officers involved exercised poor judgment in failing to read the writ of assistance thoroughly, and that appropriate disciplinary action would be taken.  The release thus sets out remedial measures taken by the City to prevent the recurrence of the poor judgment the investigation revealed, and is therefore within the ambit of the Rule."); *Complaint of Consolidation Coal Co.*, 123 F.3d 126, 136 (3d Cir. 1997); *Gilanean v. City of Boston*, 431 F. Supp. 2d 172, 177 (D. Mass. 2006).

The hearing conducted by the Judiciary Committee, and the Committee Report prepared as a result thereof, are clearly self-initiated remedial measures which subsequently resulted in remedial legislation.  Thus, the Committee Report is not admissible to prove culpable conduct on the part of the District or its employees for the arrests which were made on September 27, 2002.

### III. <u>The Report Contains Many Sections That Are Irrelevant and Highly Prejudicial</u>

In addition to the clear problems delineated above with respect to Rule 803(8)(C), a large proportion of the Committee Report should be excluded simply because it is irrelevant and

prejudicial against the Defendants.  For example, pages 108 to 124 of the Committee Report critique the MPD's general handling of demonstrations, with examples dating as far back as 1971, including several statements that are highly critical of the MPD.  This section of the Committee Report also offers policy recommendations on how the MPD could improve its handling of demonstrations.  These critical observations and recommendations, while they may perhaps be valid and appropriate in another context, are not relevant to an examination of the facts of September 27, 2002.

The Committee Report also includes among its "case studies" specific examinations of MPD actions during several other demonstrations, including:

- MPD's closure of the headquarters or "convergence center" of several anti-globalization organizations on multiple code violations the day before a scheduled demonstration in April, 2000.  Ex. A at 28-36.  Included among the Committee Report's "findings" was that the MPD's actions "raised serious questions as to whether the action was a pretextual criminal enforcement search in violation of the Fourth Amendment."  *Id.* at 36.

- An MPD officer's alleged use of pepper spray during a demonstration coinciding with the Presidential Inaugural Activities of January 2001.  *Id.* at 38-47.  Included among the "findings" resulting from this case study were statements that MPD "ignored [certain] conflicting evidence" in its investigation of the incident and that the incident "gives rise to the perception that misconduct is investigated only when it becomes a political liability."  *Id.* at 47.

The Committee Report also includes as an "emerging issue" an examination of MPD's alleged practice of "surveillance and infiltration" of protest groups, dating as far back as 1975.  *Id.* at 82-94.  This section, however, makes no mention of the Pershing Park arrests, nor does it discuss in any way how such alleged "surveillance and infiltration"" practices relate to the Pershing Park arrests.

These sections are not only irrelevant to the Pershing Park protests and the arrests that resulted, but contain highly prejudicial statements, rendering them inadmissible under both Rules 402 and 403.  At least as important, however, they further demonstrate the Committee's failure to

undertake a detached fact-finding approach to investigating these incidents and preparing their report.  Statements about whether "serious questions" are raised or whether "perceptions" are created are not factual findings, they are statements of opinion and individual judgment.  The Committee Report is rife with such statements, which permeate these sections as well as those that more directly concern the Pershing Park arrests.  The prejudicial effect of these statements and the fact that they are not relevant to any examination of the facts of this case, necessitates that the entire Committee Report be excluded from evidence under Rules 401, 402 and 403.

A.    The Pershing Park Arrests

Although pages 48-81 of the Committee Report do pertain to the Pershing Park arrests, that portion of the Committee Report does not contain any factual evidentiary material that is relevant to the allegations in the Third Amended Complaint.  As the introductory paragraph states, "the Committee's investigation has focused on the arrest of nearly 400 persons in Pershing Park that day as a case study of MPD practices in order to assess whether the Department adheres to its own policy, to legal requirements, and to best practices in assuring civil rights while protecting public safety."  Ex. A at 48.  Although the focus of the Committee is appropriate within the context of adopting prospective remedial legislation, the legislative investigation conducted by the Judiciary Committee was a legislative political activity and the Committee Report issued by the Judiciary Committee is not factual evidence which is relevant to the judicial determination of the allegations of the plaintiffs.

Page 48 of the Committee Report is a brief, selective, incomplete historical summary of MPD planning for the demonstrations which occurred on September 27-29, 2002.  That brief, incomplete selective historical summary has no relevant evidentiary value in and of itself.

Similarly, pages 49-54 are a brief, selective summary of the events which occurred on September 27, 2002, to include selective quoted snippets from Assistant Chief Newsham's

deposition testimony before the Judiciary Committee sitting in Executive Session.  That testimony, in its entirety, as well as Assistant Chief Newsham's testimony before the Council sitting in Public Session, has been produced or was available to plaintiffs' counsel and thus is available for cross-examination of Assistant Chief Newsham at trial.  However, the brief excerpts in the Committee Report, and the Committee's selective, subjective summary of events, has no relevant evidentiary value in and of itself.

Pages 54-56 of the Committee Report set forth the Committee's subjective conclusion that Chief Ramsey set a "preemptive tone" for the events of September 27, 2002; that MPD released "inaccurate information" to the public, in "violation of the public trust;" and that "MPD created an expectation of violence."  These are political conclusions of the Committee, not relevant evidentiary facts.  Not only are these political conclusions irrelevant and unreliable, they are inflammatory and unfairly prejudicial and thus excludable under Rule 403.

Pages 56-58 of the Committee Report state a legal conclusion that the arrests at Pershing Park were unlawful, and that there was no probable cause to arrest all of the people in Pershing Park because Assistant Chief Newsham could not be sure that the people inside Pershing Park were responsible for the earlier unlawful activity outside the Park. Ex. A at 56-57.  The Committee thus states a legal conclusion regarding the arrests, which is not relevant, admissible evidence.  In reaching its legal conclusion, the Committee refers to the  testimony of retired MPD Deputy Chief Robert Klotz and other witnesses at the Committee hearings.  Ex. A at 57.  That testimony is inadmissible hearsay.  The Committee also states the legal conclusion that even if the demonstrators were marching without a permit, the arrests were still unlawful because the demonstrators were not given a warning.  Ex. A at 57-58.  The Committee also concludes that, "Chief Ramsey is responsible for the arrests at Pershing Park, though he initially testified

before the Judiciary Committee that he was not part of that decision."  Ex. A at 59.  These political/legal opinions/conclusions of the Committee are not relevant factual evidence which can be considered by a jury, nor is hearsay testimony of witnesses before the Committee admissible.

The Committee also concludes, based upon selective snippets of testimony before the Judiciary Committee, that because Chief Ramsey was on the scene at Pershing Park, he was the "official in charge," and therefore he was "a full participant in the decision to conduct a mass arrest at Pershing Park."  Ex. A at 59.  The Judiciary Committee's interpretation of the term "field commander" as used in the MPD General Orders is not relevant to any decisional issues of the case.  Nor is the Committee's political legal conclusion that Chief Ramsey was legally responsible for making the arrests at Pershing Park merely because he was on the scene.  If the issue of Chief Ramsey's involvement in the arrest decision goes to a jury, the jury's determination of Chief Ramsey's involvement in the arrests at Pershing Park is subject to instructions of the Court, not conclusions of the Committee.

The Committee also concludes that the "official version" from MPD of what went wrong at Pershing Park "fails to acknowledge the fundamental flaws of MPD's execution of its interpretation of its mass arrest policies."  The overall conclusion of the Judiciary Committee is that "the Executive Branch has repeatedly tried to minimize the nature and extent of the mistakes that were made . . ."  Ex. A at 59-60.  The Judiciary Committee concludes, in essence, that Assistant Chief Newsham was, in the vernacular, the "fall guy" for the arrests and that the Executive Branch witnesses "created the false impression of  an action that was only technically incorrect, not fundamentally flawed."  Ex. A at 59-60.  The political conclusions of the Judiciary Committee regarding the perceived duplicity of Executive Branch witnesses is not factual

evidence relevant to the decisional issues in the litigation, or of Assistant Chief Newsham's decisions or actions.   It is a function of the jurors to assess witness credibility; the jury's responsibility cannot be fulfilled by substituting the political conclusions of the Judiciary Committee.   Moreover, those conclusions of the Committee are inflammatory and unfairly prejudicial and thus excludable under Rule 403.

Pages 62-80 of the Report set forth a "Case Study:  The Pershing Park Investigation." This section of the Report sets forth selective "facts" based upon excerpts from videotapes of a press conference (Ex. A at 62); exchanges of correspondence between the Executive Branch and the Judiciary Committee (Ex. A at 63); excerpts from statements of police officials (Ex. A at 63); excerpts from the MPD after-action report (Ex. A at 63-64); activities of the Judiciary Committee (Ex. A at 64-65); a summarized chronology of MPD actions taken to investigate the Pershing Park arrests (Ex. A at 65-66); the Committee's view that having Executive Assistant Chief Fitzgerald interview Assistant Chief Newsham was, "an action inconsistent with typical investigative practice"[14] (Ex. A at 66-68); and the Judiciary Committee's views regarding the "highly unusual" manner in which the final MPD Investigation Report was prepared (Ex. A at 69-75).   The Judiciary Committee concluded that MPD "violated its own General Orders" by "failing to properly initiate a formal investigation of the wrongful arrests" and that Chief Ramsey ordered changes made in the MPD investigative report to "serve to weaken criticism of the Department of the nature of the arrests."  Ex. A at 76.   The Judiciary Committee also concluded that having Executive Assistant Chief Fitzgerald interview Assistant Chief Newsham, "was a clear conflict of interest," and that the interview conducted by Executive Assistant Chief Fitzgerald was "incomplete."  Ex. A at 77-78.   The Judiciary Committee further concluded that

---

[14] The Report does not state what is "typical investigative practice" for investigation a mass arrest ordered by an Assistant Chief of Police.

the MPD final Report of Investigation was "marred by evasions and misstatements by senior officials, including Chief Ramsey, giving rise to the appearance of an attempt to cover up Chief Ramsey's role in ordering the Pershing Park arrests." *Id.* at 78. The Judiciary Committee further concluded that MPD, "created a conflict of interest by assigning Assistant Chief Newsham, Director of the Office of Professional Responsibility, to an operational role during the September 2002 demonstrations, a conflict that continues to exist." *Id.* at 79.  The Judiciary Committee then made a recommendation as to how MPD should investigate such incidents in the future. *Id.* at 79-80.  Thus, this portion of the Judiciary Committee Report addresses the post-event internal investigation of the Pershing Park arrests.  It is clearly a political statement criticizing MPD policy and procedures, and Chief Ramsey, rather than an objective statement of facts, such as those found in NTSB investigative reports or some scientific reports.  The Committee Report is a political policy editorial, not an objective factual report.

The political conclusions and editorial views of the Judiciary Committee are not factual evidence relevant to the legal issues which must be decided in the litigation.  Thus, they are not relevant evidence under Rule 401 and are not admissible under Rule 402 and are excludable under Rule 403 because they are inflammatory and unfairly prejudicial.  The subjective views and conclusions of the Judiciary Committee are not a proper basis for a jury to decide the legal and factual issues in the litigation.

B.     The Surveillance and Infiltration Issues

Pages 82-94 of the Report discuss the Committee's findings and views regarding MPD "surveillance and in filtration" of demonstrations going as far back as 1975.  This part of the Committee report contains no reference to, and is not relevant to, the arrests conducted at Pershing Park on September 27, 2002.  Thus, it is not relevant evidence under Rule 401.

C.     Emerging Issue:  Failures of Leadership Accountability

Pages 96-107 of the Report address instances in which the Committee states that various senior officials of MPD gave testimony before the Committee which testimony the Committee opines was evasive, not credible or contrary to "the record." The issues addressed by the Committee in this section of the Report are as follows:

In February 2003 before the Council, Chief Ramsey denied that he had a role in the decision to arrest individuals in Pershing Park in September 2002.

There has been a persistent effort by MPD leadership to exaggerate the number of and threat posted by anti-globalization demonstrators.

Both Chief Ramsey and Assistant Alfred Broadbent, Jr. expressly denied that the Department directed protestors into Pershing Park, yet the record shows that the opposite is the case.

Chief Ramsey testified that following the Office of Professional Responsibility investigation into the Pershing Park arrests, he implemented certain requirements in MPD policy and procedures, but some of those requirements have existed in MPD policy since 1978.

Assistant Chief Brian Jordan testified that he did not participate in discussions among command staff members prior to the arrests at Pershing Park, information contradicted by four witnesses, including three MPD officials in their sworn testimony.

Chief Ramsey and Assistant Chief Broadbent in Council testimony denied or sought to diminish the seriousness of alleged violations of the rights of political activists.

Senior officials in the Department displayed a pattern of evasion in their depositions by claiming not to recall certain events—claims that are implausible on their face.

With respect to each of these "emerging issues," the Judiciary Committee selected and credited the testimony of some witnesses, discredited the testimony of other witnesses (senior MPD officials) and expressed the Committee's subjective views regarding the credibility of the witnesses who testified in Executive Session depositions before the Committee and in open testimony before the Committee. These credibility opinions expressed by the Committee are political statements regarding post-event testimony, not factual evidence relevant to the litigation. Moreover, the Committee's political views are based upon selected evidence which

the Committee gleaned from depositions and testimony before the Committee as part of the legislative process. The testimony of witnesses in Executive Session deposition and at the Public Hearing has been recorded and thus is available for impeachment at trial, if appropriate. However, the selected, excerpted portions of testimony utilized by the Judiciary Committee to form its opinions of the witnesses is not relevant evidence in the litigation, nor are the credibility conclusions of the Committee. To the extent that any of the issues addressed by the Committee in that section of its Report dealing with alleged failures in leadership accountability by MPD officials is relevant to the decisional issues in the litigation, it is the responsibility of the jury to hear and weigh the testimonial evidence at trial, and to reach conclusions based upon that testimony and the instructions of the Court. It would be improper to allow the jury to reach its conclusions regarding the decisional issues in the case based upon the political opinions of the Committee. Moreover, the Committee's subjective credibility opinions are inflammatory and unfairly prejudicial and thus excludable under Rule 403.

     D.    <u>Emerging Issues: Departing From Best Practices in Managing Demonstrations</u>

Pages 108-124 of the Report address policy issues regarding MPD handling of demonstrations in general, which the Judiciary Committee believes that MPD could and should improve. This wide-ranging political critique of MPD references demonstrations going as far back as the May Day demonstrations in 1971 and traces various events and various MPD policy documents and practices over the years. In this section of the Report the Committee makes numerous political/policy findings and recommendations on various issues pertaining to mass arrest procedures that have no bearing on the issues in this case. *See* Ex. A at 117-124.

These recommendations, while appropriate to the legislative investigatory process and for the drafting of prospective remedial legislation, are clearly political/policy conclusions which

have no relevant factual evidentiary value to the decisional issues in the litigation. Thus, this section of the Report is not relevant evidence under Rule 401.

Moreover, these suggestions collectively infer that MPD is incompetent in dealing with demonstrations and is insensitive to the rights of demonstrators.[15]   This inference is unfairly prejudicial and thus the Report's "suggestions" are excludable under Rule 403, as well as Rule 401.

E.      Committee Action

Pages 130-131 of the Report summarize the actions taken by the Committee during its investigation.  These actions are not relevant evidence under Rule 401.

F.      Appendix A: Summary of Public Hearings

Pages 132-141 of the Report consist of summarized excerpts from the testimony of twenty-four different witnesses who testified at the Committee hearing.  These short hearsay summaries of testimony are not relevant, admissible evidence and they do not become so just because they are included in the Committee Report.

Pages 142-147 of the Report is a legal memorandum dated November 25, 2003 from Alena Morris to Cathy Patterson regarding "MPD Investigation: Prior Restraint and First Amendment Issues."   This internal Committee legal memorandum is not relevant factual evidence under Rule 401.

Pages 148-154 of the Report is a memorandum from Josh Harris to Amy Mauro dated August 7, 2003 regarding "Excessive Force: Overview."  This internal Committee memorandum is not relevant factual evidence under Rule 401.

---

[15] The Report does not credit MPD for the dozens of demonstrations it deals with each year which do not result in arrests or complaints.

Pages 155-160 of the Report is a memorandum from Josh Harris to Investigations Staff dated July 15, 2003 regarding "Domestic Spying Case Law."   This internal Committee legal memorandum is not relevant factual evidence under Rule 401.

## IV.   The Report's Statements Regarding Statements Made by an MPD Investigator Concerning His Interview with Major Murphy Are Inadmissible Hearsay.

The Committee's Report's statements concerning statements made by an MPD investigator purporting to summarize an interview with Major Murphy are hearsay within hearsay to which no exception applies.   FRE 802 provides that "[h]earsay is not admissible" unless an exception applies."   Fed. R. Evid. 802.   FRE 801 defines hearsay to mean an out of court statement offered for the truth of the matter asserted.   Fed. R. Evid. 801(a)-(c).   FRE 805 provides that hearsay within hearsay -- *i.e.*, an out of court statement purporting to convey another out of court statement -- is admissible only if "each part of the combined statements conforms with an exception to the [hearsay] rule."   Fed. R. Evid. 805.

Here the Committee Report, an out of court statement, purports to summarize out of court statements made by an MPD investigator.   The MPD's investigator's statements, which are out of court statements being offered for the truth of what Major Murphy and others told him, are hearsay.   The Committee Report's summary of such out of court statements are also hearsay. None of these hearsay statements falls into an exception set forth in the FRE.   *See generally* Fed. R. Evid. 803.   Consequently, these statements are inadmissible at trial and that portion of the Committee Report should be excluded on this basis.

## CONCLUSION

Wherefore, for the foregoing reasons, this Court should enter an order excluding the Committee Report from evidence in this matter.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ELLEN A. EFROS  D.C. Bar No. 250746
Deputy Attorney General
Public Interest Division

/s/  William  F.  Causey
WILLIAM F. CAUSEY  D.C. Bar No. 260661
SHANA L. FROST  D.C. Bar. No. 458021
Assistant Attorney General
441 Fourth Street, N.W.
Washington, DC 20001
(202) 724-6610
william.causey@dc.gov

*Counsel for the District Defendants*


/s/  Lauren E. Curry
Lauren E. Curry (D.C. Bar No. 990522)
Brown Rudnick LLP
Seven Times Square
New York, NY  10036
(212) 209-4953
(212) 938-2991 (fax)
lcurry@brownrudnick.com

*Counsel for Defendant Charles H. Ramsey*


/s/ Robert E. Deso
Robert E. Deso   #174185
Deso & Buckley, P.C.
1828 L. St., N.W.,  Suite 270
Washington, D.C.  20036
(202) 822-6333
(202) 822-6665 - Fax
redeso@dtswlaw.com

*Attorney for Defendant Peter J. Newsham*


RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By: _____/s/_____

    MARINA UTGOFF BRASWELL, D.C. Bar
    #416587
    BRIAN P. HUDAK
    Assistant United States Attorneys
    555 Fourth Street, NW
    Washington, DC 20530
    (202) 252-2549

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

RAYMING CHANG, *et al.*,                  )
                                          )
                     Plaintiffs,          )
                                          )
v.                                        )          Civil Action No. 02-2010 (EGS)
                                          )
                                          )
UNITED STATES OF AMERICA, *et al.*        )
                                          )
                     Defendants.          )
_____  )

**ORDER**

Before the Court is the Defendants' motion to exclude the Report of the D.C. City

Council's Judiciary Committee from evidence in this matter.  Upon consideration of the

Defendants' motion, and any opposition or reply thereto, it is this ___ day of _____,

2015:

**ORDERED** that the Defendants' motion to exclude the Report of the D.C. City

Council's Judiciary Committee from evidence in this matter be and hereby is **granted**; and it is

**FURTHER ORDERED** that the Committee Report, as well as any attachments thereto,

be and hereby are excluded from evidence in this matter.



                                          _____
                                          Hon. Emmet G. Sullivan
                                          United States District Judge

Copies served on counsel of record via ECF